1  RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
2  JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
3  10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
4  Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
5  Email: RB@LNBYB.com, MYK@LNBYB.COM; JYO@LNBYB.com

6  Proposed Attorneys for Chapter 11 Debtor
7  and Debtor in Possession

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10             **SANTA ANA DIVISION**

11

12

13  In re                                    )  Case No. 8:21-BK-10958-ES
                                             )
14  PLAMEX INVESTMENT, LLC,                  )  Chapter 11
                                             )
15         Debtor and                        )  **DEBTOR'S EMERGENCY MOTION**
           Debtor in Possession.             )  **FOR ENTRY OF AN INTERIM**
16                                           )  **ORDER, PENDING A FINAL**
                                             )  **HEARING, AUTHORIZING THE**
17                                           )  **DEBTOR TO USE CASH**
                                             )  **COLLATERAL**
18                                           )
                                             )  [Declaration of Donald Chae and Declaration
19                                           )  of Luis C. Valenzuela Filed Concurrently
20                                           )  Herewith]
                                             )
21                                           )  Date:     April 16, 2021
22                                           )  Time:     10:00 a.m.
                                             )  Place:    Courtroom 5A
23                                           )            Via Zoom.Gov
                                             )
24                                           )
25                                           )
                                             )
26  ─────────────────────────────────────   )

27

28

1

**SUMMARY**

Pursuant to Local Bankruptcy Rules 2081-1 and 4001-2, 11 U.S.C. § 363, and Rule 4001 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), Plamex Investment, LLC, a Delaware limited liability company, and the chapter 11 debtor and debtor-in-possession herein ("Plamex"), hereby moves, on an emergency basis ("Motion"), for the entry of an interim order, pending a final hearing, authorizing Plamex to use cash collateral in accordance with its proposed operating budget for the approximately 13-week period through and including July 16, 2021 ("Budget"), a copy of which Budget is attached as **Exhibit 12** to the Declaration of Donald Chae filed concurrently herewith ("Chae Declaration").[1]  The specific grounds for the Motion are set forth in detail in the attached Memorandum of Points and Authorities.

Plamex filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 *et seq.* ("Bankruptcy Code") on April 14, 2021 (the "Petition Date"). Plamex continues to manage its financial affairs and operate its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

Plamex is the fee simple owner of Plaza Mexico, a 403,242 square-foot community shopping center offering specialty retail and dining located in Lynwood, California just north of the 105 freeway (approximately 20 minutes from LAX). For over 20 years, Plaza Mexico has been a community landmark in Southern California. The premise behind Plaza Mexico is to represent the rich Latino heritage of the community and create an authentic Mexican cultural landscape through the incorporation of Mexican architecture, authentic building materials, notable monuments, and a forum to celebrate all Mexican fiestas. Currently, Plaza Mexico is occupied by tenants that include Food 4 Less, Rite Aid, Curacao, Chuck E. Cheese, and a wide variety of restaurants and retailers of clothing, electronics, shoes, toys, jewelry, and furniture. The property also boasts a revenue-creating LED tower overlooking the I-105 Freeway.

---

[1] As also noted in the Memorandum of Points and Authorities, the Budget does not currently include almost $4.5 million in reserves being held by the secured creditors which Plamex will seek to recover during its case. Once recovered, Plamex will prepare and file an updated budget.

Plamex is wholly owned by its sole member, 3100 E. Imperial Investment, LLC ("3100" and with Plamex, collectively, the "Debtors"), which also filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on the Petition Date concurrently with Plamex's petition. The Debtors' bankruptcies are the results of two primary factors: (i) substantial loss of rent revenue from Plamex's tenants due to the COVID-19 pandemic which caused the Debtors to default on their obligations to their secured lenders, and (ii) efforts by the secured lenders to foreclose on their collateral, including a foreclosure sale scheduled by the holders of the "Mezzanine Loan" (as defined in the Memorandum of Points and Authorities annexed hereto) for April 15, 2021 at 10:00 a.m. (EST) on the membership interests held by 3100 in Plamex.  As a result, the Debtors had no choice but to file their petitions to preserve their assets for the benefit of all constituencies.

The Debtors strongly believe that they are well positioned to emerge from Chapter 11 successfully because the primary source of their financial difficulties over the past year – the financial effects caused by the pandemic – are improving through the rollout of vaccines, and easing of restrictions on businesses, congregation and travel. The Debtors' principals have been and continue to be in active discussions with many very interested replacement lenders, investors, partners and buyers, and intends to move expeditiously towards proposing reorganizations and/or sale of assets pursuant to Section 363 of the Bankruptcy Code which are in the best interests of all constituents of the Debtors' cases.

In order to continue its business operations and preserve the going-concern value of its assets including the valuable Plaza Mexico property, Plamex requires authority to use cash collateral.  Plamex is a borrower under a "*Loan Agreement*" dated June 16, 2016 pursuant to which it received a loan for the principal amount of $106,000,000. This $106,000,000 loan is evidenced further by a promissory note which was contemporaneously severed and split into six replacement promissory notes: Replacement Promissory Note A-1 for $28,000,000, Replacement Promissory Note A-2 for $20,000,000, Replacement Promissory Note A-3 for $20,000,000, Replacement Promissory Note A-4 for $20,000,000, Replacement Promissory Note A-5 for $10,000,000, and Replacement Promissory Note A-6 for $8,000,000 (collectively, the "Notes"). CWCapital Asset

Management, LLC is the servicer ("<u>Servicer</u>") of all of the Notes, including the A-2 and A-3 Notes which are held by Wells Fargo Bank, National Association, as Trustee for Morgan Stanley Capital I Trust 2016-UBS11, Commercial Mortgage-Pass Through Certificates, Series 2016-UBS11 (the "<u>Trust</u>"). The Notes are secured by a "*Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing*" ("<u>Deed of Trust</u>") upon the Plaza Mexico real property, and liens upon substantially all other assets of Plamex purportedly perfected by, among other things, the recording of UCC-1 financing statements in the States of Delaware and California. Attached to the Chae Declaration are true and correct copies of the "*Loan Agreement*" (**Exhibit 1**), Deed of Trust (**Exhibit 2**), and recorded financing statements in Delaware (**Exhibit 3)** and California (**Exhibit 4).**

Based on the foregoing, Plamex believes that the holders of the Notes, including the Trust, all of which are being administered by the Servicer, are the only parties that have an interest in Plamex's cash. As of the Petition Date, Plamex understands that the outstanding balance under the Notes is approximately $108,000,000, consisting of unpaid principal of $106,000,000, and unpaid interest and other fees of approximately $2,000,000 (which Plamex may dispute).

Pursuant to this Motion, Plamex seeks an order of the Court authorizing it to use its cash collateral, through and including July 16, 2021, to pay the operating expenses set forth in the Budget (which is attached as Exhibit 12 to the Chae Declaration filed concurrently herewith) as well as all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court. Plamex also seeks authority to deviate from the line items contained in the Budget by not more than 20%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s).

The primary asset of this estate is the Plaza Mexico property. In connection with the Notes which were made in June 2016, the property was appraised by CBRE, Inc. ("<u>CBRE</u>") with an "as-is" value as of March 16, 2016 of $184,000,000, and a "prospective as stabilized" value as of April 1, 2017 of $187,000,000. A copy of this 2016 appraisal is attached as Exhibit A to the Declaration of Luis C. Valenzuela ("<u>Valenzuela Declaration</u>") filed herewith. As set forth in the Valenzuela Declaration, Plamex is informed that the Servicer engaged CBRE sometime in October 2020 to provide a further appraisal as to the value of the property. Despite requests to

the Servicer and CBRE for a copy of the report of the appraisal conducted in 2020, Plamex was not given a copy of the report. However, based on Mr. Valenzuela's direct communication with Sean Crosby of CBRE in approximately January 2021, Plamex learned that the property was appraised as having a value of approximately $170,000,000. While Plamex believes that the property has a value that is much higher in value than $170,000,000, Plamex submits that holders of the Notes, which claim are collectively owed approximately $108,000,000, are adequately protected by a substantial equity cushion in the property.

As protection for Plamex's use of cash collateral, Plamex proposes that holders of the Notes be granted replacement liens on Plamex's assets, to the extent of any diminution in value of their interests in the Plamex's pre-petition collateral, and to the same extent, validity, scope and priority of their respective pre-petition liens.

Plamex also submits that the holders of the Notes are further adequately protected by the continued operation of the Plaza Mexico property which is Plamex's primary business. As reflected in the Budget, the payment of the expenses set forth in the Budget and the continued operation of the plaza will adequately protect the holders of the Notes, as the estate will continue to generate revenue and preserve the going-concern value of the plaza.  If Plamex is not permitted to use its cash collateral to operate its business and preserve the going-concern value of its assets, it will be forced to immediately shut down the plaza, which in turn will eliminate the estate's ability to generate any revenue.  In short, there can be no question that Plamex needs to spend its cash collateral to continue to generate cash revenue.

**ADDITIONAL INFORMATION**

In compliance with Bankruptcy Rule 4001(b)(1)(B) and Local Bankruptcy Rule 4001-2, Plamex has filed concurrently herewith the mandatory Court-approved Form F4001-2 (Statement Regarding Cash Collateral Or Debtor In Possession Financing) which discloses whether the proposed order authorizing Plamex to use cash collateral on an interim basis, pending a final hearing, contains certain provisions of findings of fact.

5

1    Pursuant to Bankruptcy Rule 4001, while the Court cannot conduct a final hearing on the

2    Motion earlier than 14 days after service of this Motion, the Court may conduct a preliminary

3    hearing before such 14-day period expires to enable Plamex to use cash collateral as is necessary

4    to avoid immediate and irreparable harm to its estate pending a final hearing.  For the reasons

5    noted above, Plamex respectfully submits that it must be authorized to use its cash collateral to

6    pay the expenses set forth in the Budget pending a final hearing in order to avoid immediate and

7    irreparable harm to its business and bankruptcy estate.

8    This Motion is based upon Local Bankruptcy Rules 2081-1 and 4001-2, 11 U.S.C. § 363,

9    and Rule 4001 of the Federal Rules of Bankruptcy Procedure, this Motion, the supporting

10   Memorandum of Points and Authorities, the Chae Declaration, the Valenzuela Declaration, and

11   all other declarations and evidence filed concurrently herewith, the entire record in the Debtors'

12   cases, the statements, arguments and representations of counsel to be made at the hearing on the

13   Motion, and any other evidence properly presented to the Court at or prior to the hearing on the

14   Motion.

15   In order to provide maximum notice of this Motion, concurrently with the filing of this

16   Motion with the Court, Plamex has served the Motion upon the Office of the United States

17   Trustee, all secured creditors and their counsel (if known), the 20 largest unsecured creditors of

18   Plamex, and parties requesting special notice via overnight mail.  Hard copies of this Motion are

19   available upon request to the Debtors' proposed counsel whose contact information is located on

20   the upper-left hand corner of this Motion.  Upon obtaining a hearing date/time from the Court,

21   Plamex will serve notice of the hearing on this Motion via overnight mail.

22   **WHEREFORE,** Plamex respectfully requests that this Court hold an emergency hearing

23   on this Motion, and enter an interim order in substantially the form attached as **Exhibit 13** to the

24   Chae Declaration filed concurrently herewith:

25       (1)    affirming the adequacy of the notice given;

26       (2)    granting the relief requested in the Motion on an interim basis;

27

28

(3)    authorizing Plamex to use cash collateral, on an interim basis pending a final hearing, to pay (i) all of the expenses set forth in the Budget, with authority to deviate from the line items contained in the Budget by up to 20%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s); and (ii) all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court;

(4)    finding that the relief requested in the Motion is necessary to avoid immediate and irreparable harm;

(5)    setting a final hearing to consider the entry of a final order granting the relief requested in the Motion; and

(6)    granting such other and further relief as the Court deems just and proper under the circumstances.

Dated: April 14, 2021

PLAMEX INVESTMENT, LLC

By:  */s/ Monica Y. Kim*
    RON BENDER
    MONICA Y. KIM
    JULIET Y. OH
    LEVENE, NEALE, BENDER, YOO
      & BRILL L.L.P.
    Proposed Attorneys for Chapter 11 Debtor
    and Debtor-in-Possession

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## STATEMENT OF FACTS

### A.    *Background*.

On April 14, 2021 ("Petition Date"), voluntary petitions under Chapter 11 of the Bankruptcy Code were filed by related entities, Plamex Investment, LLC ("Plamex") and 3100 E. Imperial Investment, LLC ("3100" and with Plamex, collectively, the "Debtors").[2] Since the Petition Date, the Debtors have been operating their businesses and managing their affairs as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The two individuals behind the Debtors are Min Chae and Donald Chae, brothers who each have more than 30 years of experience in real estate investment, development, and management. The Chae brothers' specialty and expertise rest in creating vibrant and thriving cultural retail centers at previously under-performing locations, particularly in ethnically diverse areas. The "Plaza Mexico" is one such project and the crown jewel of the Chae brothers' real estate portfolio.

The Debtor, Plamex, is the fee simple owner of Plaza Mexico, a 403,242 square-foot community shopping center offering specialty retail and dining located in Lynwood, California just north of the 105 freeway (approximately 20 minutes from LAX). For over 20 years, Plaza Mexico has been a community landmark in Southern California. The premise behind Plaza Mexico is to represent the rich Latino heritage of the community and create an authentic Mexican cultural landscape through the incorporation of Mexican architecture, authentic building materials, notable monuments, and a forum to celebrate all Mexican fiestas. Currently, Plaza Mexico is occupied by tenants that include Food 4 Less, Rite Aid, Curacao, Chuck E. Cheese, and a wide variety of restaurants and retailers of clothing, electronics, shoes, toys, jewelry, and furniture. The property also boasts a revenue-creating LED tower overlooking the I-105 Freeway.

Plamex is wholly owned by its sole member, 3100, one of the Debtors herein.  3100 is wholly owned by an entity called Placo Investment, LLC ("Placo") and Placo is wholly owned

---

[2] The Debtors will be requesting joint administration of their bankruptcy cases.

by ISLT Investment, LLC ("ISLT").  Neither Placo nor ISLT has filed its own bankruptcy case.

As described further below, the multi-layered organizational structure of the Debtors and their parent companies, as well as the terms of the Debtors' limited liability agreements, as amended and restated ("LLC Agreements"), are the direct result of pre-petition structured finance and securitization transactions. As part of these transactions, the secured lenders and the preferred equity holder forced an elaborate corporate structure in part to create bankruptcy-remote entities, which are otherwise known as "special purpose" entities or vehicles, to isolate and deter bankruptcy filings by these entities. The Debtors contend that such terms are unenforceable "*ipso facto*" clauses which are void as a matter of law and public policy.

In the Debtors' cases, the LLC Agreements for each of Plamex and 3100 were amended and restated contemporaneously with the secured financings by the secured lenders to restrict filings of bankruptcy cases by their sole members. To file bankruptcy petitions, the LLC Agreements of these entities require these entities to obtain the written consents of two "Independent Managers." Although the language of the LLC Agreements purport to give the sole member the authority to appoint the Independent Managers, in reality and in practice, they were selected unilaterally by the secured lenders without any input from or consultation with the sole members.

The LLC Agreements of Plamex and 3100 show that the Independent Managers for Plamex are Ricardo Beausoleil and Jennifer Schwartz, and that the Independent Managers for 3100 are Alan Stachura (replaced by Sean Emerick) and Steven Zimmer. Fortunately, the Debtors were able to obtain the written consents from all of these Independent Managers to file their respective Chapter 11 petitions.

The Debtors' bankruptcies are the results of two primary factors: (i) substantial loss of rent revenue from Plamex's tenants due to the COVID-19 pandemic which caused the Debtors to default on their obligations to their secured lenders, and (ii) efforts by the secured lenders to foreclose on their collateral, including a foreclosure sale scheduled by the holders of the "Mezzanine Loan" (as defined below) for April 15, 2021 at 10:00 a.m. (EST) on the membership

interests held by 3100 in Plamex.

More specifically, Plaza Mexico has not been immune to the financial effects of the COVID-19 pandemic. Due to government-imposed stay-at-home orders and related restrictions which started in March of 2020, Plaza Mexico's tenants were required to close and/or experienced a drastic loss of business, sales and income. Many of the tenants have not paid full or any rents to Plamex, which, in turn, resulted in a default by the Debtors to their secured lenders and the PE Member (defined below). The Debtors were in the process of re-financing at the time the pandemic hit, which halted the process. Recently, as California has started to ease restrictions, rent collections at Plaza Mexico have been brought almost back to pre-pandemic levels. There is an increase in foot traffic, and tenants are starting to pay rents timely. However, despite these positive movements, the holder of the Mezzanine Loan was unwilling to stop its April 15, 2021 foreclosure sale. As a result, 3100 and Plamex had no choice but to file their petitions to preserve their assets for the benefit of all constituencies.

**B.    _Secured Debts_**.

**1.    _Plamex - Senior Loans._**

On June 16, 2016, Plamex, as borrower, obtained $106,000,000 in loans from Natixis, New York Branch ("Senior Loans"), secured by a "*Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing*" ("Deed of Trust") upon the Plaza Mexico real property, and liens upon substantially all other assets of Plamex purportedly perfected by, among other things, the recording of UCC-1 financing statements in the States of Delaware and California. Attached to the Declaration of Donald Chae filed in support of this Motion ("Chae Declaration") are true and correct copies of the "*Loan Agreement*" on the Senior Loans (**Exhibit 1**), Deed of Trust (**Exhibit 2**), and recorded financing statements in Delaware (**Exhibit 3**) and California (**Exhibit 4).**

The promissory note evidencing the Senior Loans was contemporaneously severed and split into six replacement promissory notes: Replacement Promissory Note A-1 for $28,000,000, Replacement Promissory Note A-2 for $20,000,000, Replacement Promissory Note A-3 for

$20,000,000, Replacement Promissory Note A-4 for $20,000,000, Replacement Promissory Note A-5 for $10,000,000, and Replacement Promissory Note A-6 for $8,000,000 (collectively, the "Notes"). CWCapital Asset Management, LLC is the servicer ("Servicer") of all of the Notes, including the A-2 and A-3 Notes which are held by Wells Fargo Bank, National Association, as Trustee for Morgan Stanley Capital I Trust 2016-UBS11, Commercial Mortgage-Pass Through Certificates, Series 2016-UBS11 (the "Trust").

The Senior Loans mature on or about July 5, 2021. The Senior Loans accrue non-default interest at a fixed rate of 4.598%, and default interest rate that is the lesser of (i) maximum rate permitted by applicable law, or (ii) 5% above the regular rate. Plamex went into default on the Senior Loans in May 2020; thus, since May 2020, the Senior Loans have been accruing interest at the default rate in addition to late fees, and other charges. Given the pandemic and the financial effects of the pandemic including Plamex's efforts to re-finance the Senior Loans which was in process during the Spring of 2020 when the pandemic suddenly hit, Plamex has requested, but the holders of the Notes have refused, to extend the maturity date of the Senior Loans. As of the Petition Date, Plamex understand that the outstanding balance under the Notes is approximately $108,000,000, consisting of unpaid principal of $106,000,000, and unpaid interest and other fees of approximately $2,000,000 (which Plamex may dispute).

As described more fully below, in June 2016, at the time of the Senior Loans, the Plaza Mexico property was appraised at approximately $184-187 million. Plamex is informed that, in October 2020, the Servicer of the Notes secured an appraisal of the Plaza Mexico property for $170 million. Plamex believes that the fair market value of Plaza Mexico is much higher.

Due to the overwhelming support of local government and the demand for additional housing in the area, Plamex has taken substantial steps to increase the retail space and add residential components. Plamex has spent over four years to secure the entitlements to construct an additional 200,000 square-foot of retail space, 1,836 apartment units, and a hotel concept. The entitlement value for the residential alone is in the range of $25,000 to $70,000 per unit, or $45.9 million to $91.8 million. This expansion project will transform Plaza Mexico into a one-stop

destination for modern living, shopping, entertainment, and business and further increase the value of the Plaza Mexico property. Based on all of the foregoing, there is no question that there is substantial equity in Plaza Mexico for the Plamex estate.

   2.   ***3100 - Mezzanine Loans.***

   Concurrently with the Senior Loans, on June 16, 2016, 3100 obtained $14,000,000 in mezzanine loans also from Natixis, New York Branch ("Mezzanine Loans"). These Mezzanine Loans were also contemporaneously or subsequently sold, conveyed and assigned to Waterfall Olympic Fund Grantor Trust, Series III ("Waterfall") and Quarry Head 2017-1 Grantor Trust ("Quarry"). The Mezzanine Loans were primarily secured by a pledge of all of 3100's membership interest in and to Plamex pursuant to a "*Pledge and Security Agreement*." Attached to the Chae Declaration are true and correct copies of the "*Mezzanine Loan Agreement*" (**Exhibit 5**), and the "*Pledge and Security Agreement*" (**Exhibit 6**). The holders of the Mezzanine Loans also purportedly perfected their liens on substantially all assets of 3100 by the recording of UCC-1 financing statements in the States of Delaware and California. True and correct copies of these Delaware and California recorded financing statements are also attached to the Chae Declaration as **Exhibit 7** and **Exhibit 8**, respectively.

   Because 3100's ability to service its debt payments on the Mezzanine Loans also hinges on the performance of Plaza Mexico, which it was unable to do as a result of the pandemic and its financial effects, 3100 also went into default as to the Mezzanine Loans. Waterfall and Quarry sought to foreclose upon the pledge and lien upon 3100's membership interests in Plamex, with a UCC foreclosure sale scheduled for April 15, 2021 at 10:00 a.m. (EST). Plamex and 3100 commenced their bankruptcy cases to avoid foreclosure upon such membership interests and to preserve these interests and the Plaza Mexico property for all constituents.

   Pursuant to an "*Intercreditor Agreement*" between Natixix, New York Branch with itself on behalf of the Senior Loans and the Mezzanine Loans, the Mezzanine Loans are, among other things, subordinated to the Senior Loans, including as to payment. This "*Intercreditor Agreement*" is attached to the Chae Declaration as **Exhibit 9**.

### 3. *Preferred Equity Contribution at Placo Investment LLC Level.*

As aforementioned, Plamex is the fee simple owner of Plaza Mexico and borrower of the Senior Loans, and at Level 1 of the elaborate corporate structure imposed by the secured lenders in connection with the June 2016 financing transactions. 3100 is the sole member of Plamex and the borrower of the Mezzanine Loans, and at Level 2 of the corporate structure. Placo is the sole member of 3100 (Level 3 of the corporate structure) which received a "contribution" from an entity known as WF 1105, LLC ("WF 1105"), an affiliate of Waterfall, the co-holder of the Mezzanine Loans.

Pursuant to the terms of an "*Amended and Restated LLC Agreement of Placo Investment, LLC*", dated December 14, 2018, between ISLT and WF 1105, WF 1105 made a "contribution" of $18,000,000 into Placo, thereby becoming a preferred equity member ("PE Member") of Placo. Although structured as a "contribution," the Placo LLC Agreement imposes mandatory monthly distributions designed for full repayment of the preferred equity contribution plus interest at a rate of $18% per annum, among other distribution requirements under the LLC Agreement. The repayment of the "contribution" and other financial obligations of Placo are protected by a large variety of guaranties and indemnities from each of the Chae brothers, their family trusts, other related non-debtor businesses, and security interests in other businesses.

Placo is in default under its mandatory repayment obligations to its PE Member. Under Placo's LLC Agreement, WF 1105, as the PE Member, is given substantial rights and powers to control, manage and operate Placo, 3100, and their respective properties, in the event of default. Placo contends that the "contribution" and the terms of the LLC Agreement could be determined to be disguised financing arrangement, in which case, WF 1105, as the PE Member, could carry substantial lender liability issues given that the true substance of the transaction does not appear to be an equity contribution, but rather, a loan.

Besides the Secured Loans, Plamex has minimal unsecured creditors which collectively are owed less than $200,000.

The Debtors strongly believe that they are well positioned to emerge from Chapter 11 successfully because the primary source of its financial difficulties over the past year – the financial effects caused by the pandemic – are improving through the rollout of vaccines, and easing of restrictions on businesses, congregation and travel. The Debtors' principals have been and continue to be in active discussions with many very interested replacement lenders, investors, partners and buyers, and intends to move expeditiously towards proposing reorganizations and/or sale of assets pursuant to Section 363 of the Bankruptcy Code which are in the best interests of all constituents of these cases.

## C.    *Debtors' Operational Matters*.

Pursuant to a "*Management Agreement*" dated September 22, 2011 between Plamex and Greenland Property Management, LLC ("Greenland"), Plamex employed Greenland to rent, lease, operate and manage the Plaza Mexico property.[3] Greenland is an entity that is also ultimately owned by the Chae brothers. Greenland, in conjunction with other property management companies owned by the Chae brothers, including M&D Properties (collectively, "Manager"), manage the day-to-day operations and affairs of the Plaza Mexico shopping center.

Plamex, Manager and the holders of the Senior Loans are also parties to a "*Deposit Account Agreement*" pursuant to which Plamex and Manager agreed that all rents from the property would be deposited and paid into a lockbox held at Wells Fargo Bank ("WFB"). This "*Deposit Account Agreement*" is attached as **Exhibit 10** to the Chae Declaration. A "*Deposit Account Control Agreement*" (*i.e.,* a "DACA") was executed between Plamex, Natixis, New York Branch, and WFB setting forth the rights of the parties with respect to the lockbox account. The DACA is attached as **Exhibit 11** to the Chae Declaration.

As of the Petition Date, the balances in the lockbox and many other reserve accounts maintained by the Servicer on behalf of the holders of the Notes are approximately $4.5 million (collectively, the "Reserves"), as follows:

---

[3] Pursuant to an "*Assignment of Management Agreement*," Manager purported to subordinate its interest under the Management Agreement in lien and payment to the rights and interests of the holders of the Senior Loans.

| | |
|---|---|
| Property tax reserve | $131,888.84 |
| Insurance reserve | $39,390.87 |
| TI & Leasing Commission reserve | $1,515,593.06 |
| Misc. Repair reserve | $32,674.68 |
| Misc. reserve – Food 4 Less | $88,259.34 |
| Misc. reserve – La Curacaos | $50,066.25 |
| Reserves – operating expenses | $1,883,865.06 |
| Capital expense reserve | $69,583.90 |
| Free rent reserve | $14,809.79 |
| Outstanding litigation reserve | $31,120.49 |
| OPA reserve | $70,627.13 |
| Suspense reserve | $28,627.13 |
| **Total** | **$4,453,036.16** |

Plamex will seek to recover the Reserves from the Servicer during its case.

As mandated by the Office of the United States Trustee, immediately following the filing of their bankruptcy petitions, the Debtors have each opened their respective general, payroll and tax debtor in possession bank account ("DIP Accounts"). Plamex does not intend to seek Court approval to continue with the pre-petition cash management system (*i.e.,* use of the lockbox account held at WFB), and all funds of the estate will be deposited and disbursed through its DIP Accounts with timely reporting as required by the Office of the United States Trustee and other applicable Bankruptcy Code provisions and Bankruptcy Rules.

**D.    *The Need For Use Of Cash Collateral***

By this Motion, Plamex seeks an order of the Court authorizing Plamex to use its cash collateral, for the next 13 weeks through and including July 16, 2021, to pay the operating expenses set forth in the proposed budget (the "Budget") attached as **Exhibit 12** to the Chae Declaration filed concurrently herewith, as well as all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court. The starting cash balance in the Budget only reflects the approximately $140,000 that Plamex had, as of its filing, in its general operating account (which will be transferred into a DIP Account), and does not currently include the significant Reserves which need to be recovered from the Servicer and holders of the Notes in order for Plamex to maintain its property and reach its restructuring goals.

1    In addition, Plamex seeks authority to deviate from the line items contained in the Budget, without

2    the need for any further Court order, by up to 20%, on both a line item and aggregate basis, with

3    any unused portions to be carried over into the following week(s). Plamex will not deviate from the

4    Budget beyond the foregoing parameters without further order of the Court.

5        Plamex must be able to use its revenue (*i.e.,* rents from the plaza), in accordance with the

6    Budget, to pay all of its normal and ordinary operating expenses (such as management fees to its

7    Manager which funds payroll, utilities, taxes, insurance, maintenance and security) as they come

8    due in the ordinary course of its business, which in turn will facilitate the continued operation of its

9    business and the preservation and maximization of the going-concern value of its business and

10   assets.  If Plamex does not obtain authority to use its cash collateral, its estate will suffer immediate

11   and irreparable harm, including, without limitation, a cessation of its business operations and a

12   corresponding (and likely substantial) decline in the value of its business and assets.

13       In connection with the Notes which were made in June 2016, the property was appraised

14   by CBRE, Inc. ("CBRE") with an "as-is" value as of March 16, 2016 of $184,000,000, and a

15   "prospective as stabilized" value as of April 1, 2017 of $187,000,000. A copy of this 2016

16   appraisal is attached as Exhibit A to the Declaration of Luis C. Valenzuela ("Valenzuela

17   Declaration") filed herewith. As set forth in the Valenzuela Declaration, Plamex is informed that

18   the Servicer engaged CBRE sometime in October 2020 to provide a further appraisal as to the

19   value of the property. Despite requests to the Servicer and CBRE for a copy of the report of the

20   appraisal conducted in 2020, Plamex was not given a copy of the report. However, based on Mr.

21   Valenzuela's direct communication with Sean Crosby of CBRE in approximately January 2021,

22   Plamex learned that the property was appraised as having a value of approximately

23   $170,000,000. While Plamex believes that the property has a value that is much higher in value

24   than $170,000,000, Plamex submits that holders of the Notes, which claim are collectively owed

25   approximately $108,000,000, are adequately protected by a substantial equity cushion in the

26   property.

27

28

16

**II.**

**DISCUSSION**

**A.    Plamex Must Be Authorized To Use Cash Collateral To Operate Its Business And To Maintain And Preserve The Value Of Its Assets.**

Plamex's use of property of its bankruptcy estate is governed by Section 363 of the Bankruptcy Code.  Section 363(c)(l) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section. . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(l).

A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363.  *See* 11 U.S.C. §1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest. . . ."  11 U.S.C. §363(a).  Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(l) if:

> (A) each entity that has an interest in such cash collateral consents; or
> (B)     the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

*See* 11 U. S.C. §363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its property.  11 U.S.C. § 363(c)(2)(B); *In re Oak Glen R-Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); *In re Tucson Industrial Partners*, 129 B.R. 614 (9th Cir. BAP 1991).  In addition, where the debtor is operating a business, it is extremely

17

important that the access to cash collateral be allowed in order to facilitate the goal of reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business." *In re Dynaco Corporation*, 162 B.R. 389 (Bankr. D.N.H. 1993), *quoting In re Stein*, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).

The critical operating expenses that Plamex must be able to pay to continue operating its business during the first few months of this bankruptcy case are set forth in the Budget attached as Exhibit 12 to the Chae Declaration. Plamex has no ability to continue to maintain its business operations or to preserve and maximize the value of its assets unless it is authorized to use its cash collateral to pay its projected expenses in accordance with the Budget. There can be no dispute that Plamex's inability to pay such expenses would cause immediate and irreparable harm to its bankruptcy estate. Indeed, Plamex's inability to pay critical operating expenses, including management fees to its Manager which funds payroll, taxes, utilities, insurance, maintenance and security would result in the immediate shutdown of the entire plaza with a large number of tenants and the decimation of the value (going-concern or otherwise) of Plamex's business and assets. The maintenance of the Plamex's business and preservation and maximization of its assets are of the utmost significance and importance to a successful reorganization of Plamex and its sole member, 3100, through their Chapter 11 cases. In addition to its normal operating expenses, Plamex seeks authority to use cash collateral to pay all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court. To provide Plamex with reasonable flexibility in the event that sales (and correspondingly, operating expenses) are higher than projected or delayed, Plamex also seeks authority to deviate from the line items contained in the Budget by not more than 20%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s).

**B.** **The Holders Of The Notes Are Adequately Protected By A Substantial Equity Cushion, Plamex's Continued Operation And Maintenance Of The Property, And Replacement Lien.**

Pursuant to Section 363(c)(2), the Court may authorize a debtor in possession to use a secured creditor's cash collateral if the secured creditor consents to the use of cash collateral or is adequately protected. *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984). *See also In re O'Connor*, 808 F.2d 1393, 1398 (10th Cir. 1987); *In re McCombs Properties VI, Ltd.*, 88 B.R. 261, 265 (Bankr. C.D. Cal. l988) ("*McCombs*").

Plamex does not know whether the holders of the Notes will consent to its use of cash collateral to pay the expenses set forth in the Budget in accordance with the terms and conditions set forth in this Motion. Accordingly, Plamex submits that it should be authorized to use cash collateral pursuant to section 363(c)(2)(A) of the Bankruptcy Code.

Even if the holders of the Notes do not consent to Plamex's use of cash collateral, as proposed herein, Plamex submits that the value of these holders' interests in the cash collateral will be adequately protected by a substantial equity cushion. As discussed above, these holders are the only parties who may have security interests in Plamex's cash.

Pursuant to the Supreme Court case of *United Savings Association v. Timbers of Inwood Forest Associates*, 108 S.Ct. 626, 629 (1988) ("*Timbers*") and subsequent case law, the property interest that a debtor must adequately protect pursuant to Sections 361(1) and (2) of the Bankruptcy Code is only the value of the lien that secures the creditor's claim. *Timbers*, 108 S.Ct. at 630. *See also McCombs, supra*, at 266. Section 506(a) "limit[s] the secured status of a creditor (*i.e.*, the secured creditor's claim) to the lesser of the [allowed amount of the] claim or the value of the collateral." *McCombs* at 266.

The Ninth Circuit made clear in *Mellor, Id.* at 1401, that an equity cushion of 20% is considered clear adequate protection of a secured creditor's interest in cash collateral. *See also In re McGowan,* 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) (holding a 10% cushion is sufficient to be adequate protection); *In re Rogers Development Corp.*, 2 B.R. 679, 685 (Bankr. E.D. Vir.

1   1980) (court decided that an equity cushion of approximately 15% to 20% was sufficient

2   adequate protection to the creditor, even though the debtors had no equity in the property).

3   Furthermore, in determining whether a secured creditor has equity in property, the Court

4   should consider the "entire security package" not just a portion thereof.  *In re Opelika*

5   *Manufacturing Corporation*, 66 B.R. 444, 447-48 (Bankr. N.D. Ill. 1986).

6   Just a few months prior to the Petition Date, and based on an appraisal undertaken by the

7   Servicer for the holders of the Notes by CBRE, the Plaza Mexico property was determined to

8   have a value of approximately $170,000,000 to secure these holders' collective claim of

9   approximately $108,000,000. Plamex also believes that the value of the property is much higher

10  than $170,000,000 and may undertake its own independent appraisal as part of its reorganization

11  process.  Given the value of the property (*i.e.*, not less than $170,000,000) and the amount

12  currently owed to East West (*i.e.*, approximately $108,000,000), the holders of the Notes are

13  adequately protected by an equity cushion of 35%, well above the 20% range that the Ninth

14  Circuit has indicated constitutes clear adequate protection of a secured creditor's interest in cash

15  collateral.

16  Furthermore, Plamex submits that the value of the Notes holders' interests in the cash

17  collateral will be adequately protected by, among other things, the maintenance and continued

18  operation of its business and property.

19  The law is clear that the preservation of the value of a secured creditor's lien is sufficient

20  to provide adequate protection to a secured creditor when a debtor seeks to use cash collateral.

21  *In re Triplett*, 87 B.R. 25 (Bankr. W.D.Tex. 1988).  *See also In re Stein*, 19 B.R. 458 (Bankr.

22  E.D.Pa. 1982).  In *Stein*, the Court found that, as a general rule, a debtor may use cash collateral

23  where such use would enhance or preserve the value of the collateral, and allowed the debtor

24  therein to use cash collateral even though the secured party had no equity cushion for protection.

25  The *Stein* Court determined that the use of cash collateral was necessary to the continued

26  operations of the debtor, and that the creditor's secured position could only be enhanced by the

27  continued operation of the debtor's business.  *See also In re McCombs, supra*, where the court

28

determined that the debtor's use of cash collateral for needed repairs, renovations and operating expenses eliminated the risk of diminution in the creditor's interest in the cash collateral and such use would more likely increase cash collateral.

As reflected in the Budget, the payment of the expenses necessary for Plamex to maintain and continue operating its business will adequately protect the holders of the Notes because, by doing so, Plamex will be able to, among other things, preserve and maintain the value of the Plaza Mexico property with continued, maximum rents and related revenue. Other courts have determined that a debtor's continued business operations can constitute the adequate protection of a secured creditor. *See Matter of Pursuit Athletic Footwear, Inc.,* 193 B.R. 713 (Bankr. D. Del. 1996); *In re Newark Airport/Hotel Ltd. Partnership*, 156 B.R. 444, 450 (Bankr. D.N.J. 1993); *In re Dynaco*, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993); *In re Immenhausen Corp.*, 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).

Additionally, in determining adequate protection, courts have stressed the importance of promoting a debtor's reorganization. In *In re O'Connor*, *supra*, the Tenth Circuit stated:

> "In this case, Debtors, in the midst of a Chapter 11 proceeding, have proposed to deal with cash collateral for the purpose of enhancing the prospects of reorganization. This quest is the ultimate goal of Chapter 11. Hence, the Debtor's efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest. Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end. Thus, while interests of the secured creditor whose property rights are of concern to the court, the interests of all other creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration."

808 F.2d at 1937.

The use of cash collateral is critical to both of the Debtors' ability to implement effective reorganization strategies for the benefit of all of their creditors. If Plamex is not permitted to use cash collateral in accordance with the Budget to enable it to pay all of its normal operating expenses as they come due in the ordinary course of its business, which in turn will facilitate the continued operation of its business and the preservation and maximization of the going-concern value of its business and assets, it will be forced to immediately halt all business operations,

1   which will significantly and negatively impact the value of its business and assets, as well as the

2   membership interests held by 3100 in Plamex. Clearly, the use of cash collateral will only

3   enhance the prospect of the Debtors' reorganizations.

4          In addition to all of the forms of adequate protection discussed above, Plamex also

5   proposes to provide the holders of the Notes with a replacement lien and security interest against

6   its post-petition assets, to the extent of any diminution in value of the holders' interests in the

7   pre-petition collateral, with such replacement lien to have the same extent, validity, and priority

8   as the pre-petition lien held by these holders. Such replacement lien will provide these holders

9   with further adequate protection.

10         Given the foregoing forms of adequate protection being provided to the holders of the

11  Notes for Plamex's use of cash collateral, Plamex submits that the requirements of Bankruptcy

12  Code Section 363(c)(2) have been satisfied and that it should be authorized to use cash collateral

13  in accordance with the terms set forth in this Motion.

14  **B.    Procedural Requirements Regarding Approval Of The Motion Have Been Satisfied.**

15         Rules 4001(b) and 4001(c) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy

16  Rules") set forth procedural requirements for obtaining use of cash collateral and post-petition

17  financing. There are three general procedural requirements. Plamex submits that it has complied

18  with these procedural requirements. First, the Motion must contain a copy of the proposed form

19  of order granting the Motion, which has been done by attaching the proposed order as **Exhibit 13**

20  to the Chae Declaration filed concurrently herewith. Second, the Motion must provide a concise

21  statement of the relief requested, which was done above. Third, the Motion is required to be

22  served on any entity with an interest in Plamex's cash collateral, any committee appointed or the

23  twenty largest unsecured creditors if there is no committee, and on such other parties as the

24  Court directs. Here, Plamex has served a copy of the Motion and all supportive papers upon the

25  Office of the United States Trustee, all known secured creditors and their counsel (if known), the

26  twenty largest unsecured creditors of the Debtors, and parties requesting special notice.

27  Accordingly, the Motion complies with the requirements of Bankruptcy Rules 4001(b) and

28

4001(c).

In addition, in compliance with Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Bankruptcy Rule 4001-2, Plamex has filed concurrently herewith the mandatory Court-approved Form F4001-2 (Statement Regarding Cash Collateral Or Debtor In Possession Financing), which discloses whether the proposed order granting the motion and authorizing Plamex to use cash collateral contains certain provisions of findings of fact.  Accordingly, the Motion complies with the procedural requirements of Local Bankruptcy Rule 4001-2.

### III.

### CONCLUSION

Based upon all of the foregoing, Plamex respectfully requests that this Court hold an emergency hearing on this Motion, and enter an interim order in substantially the form attached as **Exhibit 13** to the Chae Declaration filed concurrently herewith:

(1)    affirming the adequacy of the notice given;

(2)    granting the relief requested in the Motion on an interim basis;

(3)    authorizing Plamex to use cash collateral, on an interim basis pending a final hearing, to pay (i) all of the expenses set forth in the Budget, with authority to deviate from the line items contained in the Budget by up to 20%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s); and (ii) all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court;

(4)    finding that the relief requested in the Motion is necessary to avoid immediate and irreparable harm;

(5)    setting a final hearing to consider the entry of a final order granting the relief requested in the Motion; and

1    (6)    granting such other and further relief as the Court deems just and proper under the

2  circumstances.

3  Dated:  April 14, 2021                    PLAMEX INVESTMENT, LLC

4                                    By:    /s/ Monica Y. Kim

5                                          RON BENDER
                                           MONICA Y. KIM
6                                          JULIET Y. OH
                                           LEVENE, NEALE, BENDER, YOO
7                                             & BRILL L.L.P.
                                           Proposed Attorneys for Chapter 11 Debtor
8                                          and Debtor-in-Possession

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28