RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: RB@LNBYB.com, MYK@LNBYB.COM; JYO@LNBYB.com

Proposed Attorneys for Chapter 11 Debtor
and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No. 8:21-bk-10958-ES |
| | |
| PLAMEX INVESTMENT, LLC, | Chapter 11 |
| | |
|     Debtor and | **DECLARATION OF DONALD CHAE IN SUPPORT OF DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN INTERIM ORDER, PENDING A FINAL HEARING, AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL** |
|     Debtor in Possession. | |
| | |
| | Date:      April 16, 2021 |
| | Time:     10:00 a.m. |
| | Place:    Courtroom 5A |
| |             Via Zoom.Gov |

1

I, DONALD CHAE, hereby declare as follows:

1.      I am the Manager of Placo Investment, LLC ("Placo"), which is the sole member of 3100 E. Imperial Investment, LLC ("3100"), which is the sole member of Plamex Investment, LLC, a Delaware limited liability company and the debtor and debtor-in-possession herein ("Plamex"), and I am therefore familiar with the business operations and financial records of the Debtor.  I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.      I make this declaration in support of that certain *Debtor's Emergency Motion For Entry Of An Interim Order, Pending A Final Hearing, Authorizing The Debtor To Use Cash Collateral* (the "Motion"), to which this declaration is attached.  All capitalized terms not specifically defined herein shall have the meanings ascribed to them in the Motion.

3.      On April 14, 2021 ("Petition Date"), voluntary petitions under Chapter 11 of the Bankruptcy Code were filed by related entities, Plamex and 3100 E. Imperial Investment, LLC ("3100" and with Plamex, collectively, the "Debtors"). Since the Petition Date, the Debtors have been operating their businesses and managing their affairs as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

4.      The two individuals behind the Debtors are me and Min Chae, brothers who each have more than 30 years of experience in real estate investment, development, and management. The Chae brothers' specialty and expertise rest in creating vibrant and thriving cultural retail centers at previously under-performing locations, particularly in ethnically diverse areas. The "Plaza Mexico" is one such project and the crown jewel of the Chae brothers' real estate portfolio.

5.      The Debtor, Plamex, is the fee simple owner of Plaza Mexico, a 403,242 square-foot community shopping center offering specialty retail and dining located in Lynwood, California just north of the 105 freeway (approximately 20 minutes from LAX). For over 20 years, Plaza Mexico has been a community landmark in Southern California. The premise behind Plaza Mexico is to represent the rich Latino heritage of the community and create an authentic Mexican cultural landscape through the incorporation of Mexican architecture, authentic building materials,

notable monuments, and a forum to celebrate all Mexican fiestas. Currently, Plaza Mexico is occupied by tenants that include Food 4 Less, Rite Aid, Curacao, Chuck E. Cheese, and a wide variety of restaurants and retailers of clothing, electronics, shoes, toys, jewelry, and furniture. The property also boasts a revenue-creating LED tower overlooking the I-105 Freeway.

6.      Plamex is wholly owned by its sole member, 3100, one of the Debtors herein.  3100 is wholly owned by Placo and Placo is wholly owned by ISLT Investment, LLC ("ISLT").  Neither Placo nor ISLT has filed its own bankruptcy case.

7.      As described further below, the multi-layered organizational structure of the Debtors and their parent companies, as well as the terms of the Debtors' limited liability agreements, as amended and restated ("LLC Agreements"), are the direct result of pre-petition structured finance and securitization transactions. As part of these transactions, the secured lenders and the preferred equity holder forced an elaborate corporate structure in part to create bankruptcy-remote entities, which are otherwise known as "special purpose" entities or vehicles, to isolate and deter bankruptcy filings by these entities. I am informed and contend that such terms are unenforceable "*ipso facto*" clauses which are void as a matter of law and public policy.

8.      In the Debtors' cases, the LLC Agreements for each of Plamex and 3100 were amended and restated contemporaneously with the secured financings by the secured lenders to restrict filings of bankruptcy cases by their sole members. To file bankruptcy petitions, the LLC Agreements of these entities require these entities to obtain the written consents of two "Independent Managers." Although the language of the LLC Agreements purport to give the sole member the authority to appoint the Independent Managers, in reality and in practice, they were selected unilaterally by the secured lenders without any input from or consultation with the sole members.

9.      The LLC Agreements of Plamex and 3100 show that the Independent Managers for Plamex are Ricardo Beausoleil and Jennifer Schwartz, and that the Independent Managers for 3100 are Alan Stachura (replaced by Sean Emerick) and Steven Zimmer. Fortunately, the Debtors were able to obtain the written consents from all of these Independent Managers to file their respective

Chapter 11 petitions.

10.    The Debtors' bankruptcies are the results of two primary factors: (i) substantial loss of rent revenue from Plamex's tenants due to the COVID-19 pandemic which caused the Debtors to default on their obligations to their secured lenders, and (ii) efforts by the secured lenders to foreclose on their collateral, including a foreclosure sale scheduled by the holders of the "Mezzanine Loan" (as defined below) for April 15, 2021 at 10:00 a.m. (EST) on the membership interests held by 3100 in Plamex.

11.    More specifically, Plaza Mexico has not been immune to the financial effects of the COVID-19 pandemic. Due to government-imposed stay-at-home orders and related restrictions which started in March of 2020, Plaza Mexico's tenants were required to close and/or experienced a drastic loss of business, sales and income. Many of the tenants have not paid full or any rents to Plamex, which, in turn, resulted in a default by the Debtors to their secured lenders and the PE Member (defined below). The Debtors were in the process of re-financing at the time the pandemic hit, which halted the process. Recently, as California has started to ease restrictions, rent collections at Plaza Mexico have been brought almost back to pre-pandemic levels. There is an increase in foot traffic, and tenants are starting to pay rents timely. However, despite these positive movements, the holder of the Mezzanine Loan was unwilling to stop its April 15, 2021 foreclosure sale. As a result, 3100 and Plamex had no choice but to file their petitions to preserve their assets for the benefit of all constituencies.

12.    On June 16, 2016, Plamex, as borrower, obtained $106,000,000 in loans from Natixis, New York Branch ("Senior Loans"), secured by a "*Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing*" ("Deed of Trust") upon the Plaza Mexico real property, and liens upon substantially all other assets of Plamex purportedly perfected by, among other things, the recording of UCC-1 financing statements in the States of Delaware and California. Attached hereto are true and correct copies of the "*Loan Agreement*" on the Senior Loans (**Exhibit 1**), Deed of Trust (**Exhibit 2**), and recorded financing statements in Delaware (**Exhibit 3**) and California (**Exhibit 4).**

13.    The promissory note evidencing the Senior Loans was contemporaneously severed and split into six replacement promissory notes: Replacement Promissory Note A-1 for $28,000,000, Replacement Promissory Note A-2 for $20,000,000, Replacement Promissory Note A-3 for $20,000,000, Replacement Promissory Note A-4 for $20,000,000, Replacement Promissory Note A-5 for $10,000,000, and Replacement Promissory Note A-6 for $8,000,000 (collectively, the "Notes"). CWCapital Asset Management, LLC is the servicer ("Servicer") of all of the Notes, including the A-2 and A-3 Notes which are held by Wells Fargo Bank, National Association, as Trustee for Morgan Stanley Capital I Trust 2016-UBS11, Commercial Mortgage-Pass Through Certificates, Series 2016-UBS11 (the "Trust").

14.    The Senior Loans mature on or about July 5, 2021. The Senior Loans accrue non-default interest at a fixed rate of 4.598%, and default interest rate that is the lesser of (i) maximum rate permitted by applicable law, or (ii) 5% above the regular rate. Plamex went into default on the Senior Loans in May 2020; thus, since May 2020, the Senior Loans have been accruing interest at the default rate in addition to late fees, and other charges. Given the pandemic and the financial effects of the pandemic including Plamex's efforts to re-finance the Senior Loans which was in process during the Spring of 2020 when the pandemic suddenly hit, Plamex has requested, but the holders of the Notes have refused, to extend the maturity date of the Senior Loans. As of the Petition Date, Plamex understands that the outstanding balance under the Notes is approximately $108,000,000, consisting of unpaid principal of $106,000,000, and unpaid interest and other fees of approximately $2,000,000 (which Plamex may dispute).

15.    As described more fully below, in June 2016, at the time of the Senior Loans, the Plaza Mexico property was appraised at approximately $184-187 million. Plamex is informed that, in October 2020, the Servicer of the Notes secured an appraisal of the Plaza Mexico property for $170 million.  Plamex believes that the fair market value of Plaza Mexico is much higher.

16.    Due to the overwhelming support of local government and the demand for additional housing in the area, Plamex has taken substantial steps to increase the retail space and add residential components. Plamex has spent over four years to secure the entitlements to

construct an additional 200,000 square-foot of retail space, 1,836 apartment units, and a hotel concept.  The entitlement value for the residential alone is in the range of $25,000 to $70,000 per unit, or $45.9 million to $91.8 million. This expansion project will transform Plaza Mexico into a one-stop destination for modern living, shopping, entertainment, and business and further increase the value of the Plaza Mexico property. Based on all of the foregoing, there is no question that there is substantial equity in Plaza Mexico for the Plamex estate.

17.    Concurrently with the Senior Loans, on June 16, 2016, 3100 obtained $14,000,000 in mezzanine loans also from Natixis, New York Branch ("Mezzanine Loans"). These Mezzanine Loans were also contemporaneously or subsequently sold, conveyed and assigned to Waterfall Olympic Fund Grantor Trust, Series III ("Waterfall") and Quarry Head 2017-1 Grantor Trust ("Quarry"). The Mezzanine Loans were primarily secured by a pledge of all of 3100's membership interest in and to Plamex pursuant to a "*Pledge and Security Agreement.*" Attached hereto are true and correct copies of the "*Mezzanine Loan Agreement*" (**Exhibit 5**), and the "*Pledge and Security Agreement*" (**Exhibit 6**). The holders of the Mezzanine Loans also purportedly perfected their liens on substantially all assets of 3100 by the recording of UCC-1 financing statements in the States of Delaware and California. True and correct copies of these Delaware and California recorded financing statements are also attached hereto as **Exhibit 7** and **Exhibit 8**, respectively.

18.    Because 3100's ability to service its debt payments on the Mezzanine Loans also hinges on the performance of Plaza Mexico, which it was unable to do as a result of the pandemic and its financial effects, 3100 also went into default as to the Mezzanine Loans. Waterfall and Quarry sought to foreclose upon the pledge and lien upon 3100's membership interests in Plamex, with a UCC foreclosure sale scheduled for April 15, 2021 at 10:00 a.m. (EST). Plamex and 3100 commenced their bankruptcy cases to avoid foreclosure upon such membership interests and to preserve these interests and the Plaza Mexico property for all constituents.

19.    Pursuant to an "*Intercreditor Agreement*" between Natixix, New York Branch with itself on behalf of the Senior Loans and the Mezzanine Loans, the Mezzanine Loans are, among other things, subordinated to the Senior Loans, including as to payment.  This "*Intercreditor*

*Agreement*" is attached hereto as **Exhibit 9**.

20.    As aforementioned, Plamex is the fee simple owner of Plaza Mexico and borrower of the Senior Loans, and at Level 1 of the elaborate corporate structure imposed by the secured lenders in connection with the June 2016 financing transactions. 3100 is the sole member of Plamex and the borrower of the Mezzanine Loans, and at Level 2 of the corporate structure. Placo is the sole member of 3100 (Level 3 of the corporate structure) which received a "contribution" from an entity known as WF 1105, LLC ("WF 1105"), an affiliate of Waterfall, the co-holder of the Mezzanine Loans.

21.    Pursuant to the terms of an "*Amended and Restated LLC Agreement of Placo Investment, LLC*", dated December 14, 2018, between ISLT and WF 1105, WF 1105 made a "contribution" of $18,000,000 into Placo, thereby becoming a preferred equity member ("PE Member") of Placo. Although structured as a "contribution," the Placo LLC Agreement imposes mandatory monthly distributions designed for full repayment of the preferred equity contribution plus interest at a rate of $18% per annum, among other distribution requirements under the LLC Agreement. The repayment of the "contribution" and other financial obligations of Placo are protected by a large variety of guaranties and indemnities from each of the Chae brothers, their family trusts, other related non-debtor businesses, and security interests in other businesses.

22.    Placo is in default under its mandatory repayment obligations to its PE Member. Under Placo's LLC Agreement, WF 1105, as the PE Member, is given substantial rights and powers to control, manage and operate Placo, 3100, and their respective properties, in the event of default. Placo contends that the "contribution" and the terms of the LLC Agreement could be determined to be disguised financing arrangement, in which case, WF 1105, as the PE Member, could carry substantial lender liability issues given that the true substance of the transaction does not appear to be an equity contribution, but rather, a loan.

23.    Besides the Secured Loans, Plamex has minimal unsecured creditors which collectively are owed less than $200,000.

24.     The Debtors strongly believe that they are well positioned to emerge from Chapter 11 successfully because the primary source of its financial difficulties over the past year – the financial effects caused by the pandemic – are improving through the rollout of vaccines, and easing of restrictions on businesses, congregation and travel. The Debtors' principals have been and continue to be in active discussions with many very interested replacement lenders, investors, partners and buyers, and intends to move expeditiously towards proposing reorganizations and/or sale of assets pursuant to Section 363 of the Bankruptcy Code which are in the best interests of all constituents of these cases.

25.     Pursuant to a "*Management Agreement*" dated September 22, 2011 between Plamex and Greenland Property Management, LLC ("Greenland"), Plamex employed Greenland to rent, lease, operate and manage the Plaza Mexico property. Greenland is an entity that is also ultimately owned by the Chae brothers. Greenland, in conjunction with other property management companies owned by the Chae brothers, including M&D Properties (collectively, "Manager"), manage the day-to-day operations and affairs of the Plaza Mexico shopping center.

26.     Plamex, Manager and the holders of the Senior Loans are also parties to a "*Deposit Account Agreement*" pursuant to which Plamex and Manager agreed that all rents from the property would be deposited and paid into a lockbox held at Wells Fargo Bank ("WFB"). This "*Deposit Account Agreement*" is attached hereto as **Exhibit 10**. A "*Deposit Account Control Agreement*" (*i.e.,* a "DACA") was executed between Plamex, Natixis, New York Branch, and WFB setting forth the rights of the parties with respect to the lockbox account. The DACA is attached hereto as **Exhibit 11**.

27.     As of the Petition Date, I am informed that the balances in the lockbox and many other reserve accounts maintained by the Servicer on behalf of the holders of the Notes are approximately $4.5 million (collectively, the "Reserves"), as follows:

| Property tax reserve | $131,888.84 |
|---|---|
| Insurance reserve | $39,390.87 |
| TI & Leasing Commission reserve | $1,515,593.06 |
| Misc. Repair reserve | $32,674.68 |
| Misc. reserve – Food 4 Less | $88,259.34 |
| Misc. reserve – La Curacaos | $50,066.25 |

| | |
|---|---|
| Reserves – operating expenses | $1,883,865.06 |
| Capital expense reserve | $69,583.90 |
| Free rent reserve | $14,809.79 |
| Outstanding litigation reserve | $31,120.49 |
| OPA reserve | $70,627.13 |
| Suspense reserve | $28,627.13 |
| **Total** | **$4,453,036.16** |

Plamex will seek to recover the Reserves from the Servicer during its case.

28.　As mandated by the Office of the United States Trustee, immediately following the filing of their bankruptcy petitions, the Debtors have each opened their respective general, payroll and tax debtor in possession bank account ("DIP Accounts"). Plamex does not intend to seek Court approval to continue with the pre-petition cash management system (*i.e.,* use of the lockbox account held at WFB), and all funds of the estate will be deposited and disbursed through its DIP Accounts with timely reporting as required by the Office of the United States Trustee and other applicable Bankruptcy Code provisions and Bankruptcy Rules.

29.　By this Motion, Plamex seeks an order of the Court authorizing Plamex to use its cash collateral, for the next 13 weeks through and including July 16, 2021, to pay the operating expenses set forth in the proposed budget (the "Budget") attached hereto as **Exhibit 12**, as well as all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court. The starting cash balance in the Budget only reflects the approximately $140,000 that Plamex had, as of its filing, in its general operating account (which will be transferred into a DIP Account), and does not currently include the significant Reserves which need to be recovered from the Servicer and holders of the Notes in order for Plamex to maintain its property and reach its restructuring goals. In addition, Plamex seeks authority to deviate from the line items contained in the Budget, without the need for any further Court order, by up to 20%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s). Plamex will not deviate from the Budget beyond the foregoing parameters without further order of the Court.

30.　Plamex must be able to use its revenue (*i.e.,* rents from the plaza), in accordance with the Budget, to pay all of its normal and ordinary operating expenses (such as management

1   fees to its Manager which funds payroll, utilities, taxes, insurance, maintenance and security) as

2   they come due in the ordinary course of its business, which in turn will facilitate the continued

3   operation of its business and the preservation and maximization of the going-concern value of its

4   business and assets.  If Plamex does not obtain authority to use its cash collateral, its estate will

5   suffer immediate and irreparable harm, including, without limitation, a cessation of its business

6   operations and a corresponding (and likely substantial) decline in the value of its business and

7   assets.

8        31.    In connection with the Notes which were made in June 2016, the property was

9   appraised by CBRE, Inc. ("CBRE") with an "as-is" value as of March 16, 2016 of $184,000,000,

10  and a "prospective as stabilized" value as of April 1, 2017 of $187,000,000. A copy of this 2016

11  appraisal is attached as Exhibit A to the Declaration of Luis C. Valenzuela ("Valenzuela

12  Declaration") filed herewith. As set forth in the Valenzuela Declaration, Plamex is informed that

13  the Servicer engaged CBRE sometime in October 2020 to provide a further appraisal as to the

14  value of the property. Despite requests to the Servicer and CBRE for a copy of the report of the

15  appraisal conducted in 2020, Plamex was not given a copy of the report. However, based on Mr.

16  Valenzuela's direct communication with Sean Crosby of CBRE in approximately January 2021,

17  Plamex learned that the property was appraised as having a value of approximately $170,000,000.

18  While Plamex believes that the property has a value that is much higher in value than

19  $170,000,000, Plamex submits that holders of the Notes, which claim are collectively owed

20  approximately $108,000,000, are adequately protected by a substantial equity cushion in the

21  property.

22        32.    Attached hereto as **Exhibit 13** is the proposed order granting the Motion.

23        I declare under penalty of perjury under the laws of the United States of America that the

24  foregoing is true and correct.

25        Executed this 14th day of April, 2021, at Buena Park, California.

26

27                                                DONALD CHAE

28

**Exhibit 1**

**LOAN AGREEMENT**


Dated as of June 16, 2016


Between


PLAMEX INVESTMENT, LLC,
as Borrower


and


NATIXIS, NEW YORK BRANCH,
as Lender


_____

# TABLE OF CONTENTS

**Page**

1.  DEFINITIONS; PRINCIPLES OF CONSTRUCTION ................................................. 1
    1.1  Terms and Definitions ............................................................................ 1
    1.2  Index of Other Definitions .................................................................... 19
    1.3  Principles of Construction .................................................................... 19

2.  GENERAL LOAN TERMS ...................................................................................... 19
    2.1  The Loan ................................................................................................ 19
    2.2  Interest; Monthly Payments ................................................................. 19
    2.3  Loan Repayment and Defeasance ........................................................ 22
    2.4  Release of Property ............................................................................... 25
    2.5  Payments and Computations ................................................................ 28

3.  CASH MANAGEMENT AND RESERVES ............................................................... 29
    3.1   Cash Management Arrangements ......................................................... 29
    3.2   Required Repairs .................................................................................. 29
    3.3   Taxes and Insurance ............................................................................. 30
    3.4   Capital Expense Reserves .................................................................... 30
    3.5   Rollover Reserves ................................................................................. 31
    3.6   Operating Expense Subaccount ........................................................... 32
    3.7   Casualty/Condemnation Subaccount ................................................... 32
    3.8   Security Deposits .................................................................................. 32
    3.9   Grant of Security Interest; Application of Funds ................................ 33
    3.10  Property Cash Flow Allocation ............................................................ 33
    3.11  Cash Collateral Reserve ....................................................................... 35
    3.12  Food 4 Less Cash Trap Reserve Subaccount ....................................... 35
    3.13  Notice from Mezzanine Lender ........................................................... 36
    3.14  Payments made to Mezzanine Lender on behalf of Borrower ............. 36
    3.15  Mezzanine Loan .................................................................................... 37
    3.16  Free Rent Reserve ................................................................................ 37
    3.17  Planet Fitness TI/LC Reserve ............................................................... 38
    3.18  Food 4 Less CAM Reserve .................................................................... 38
    3.19  La Curacao CAM Reserve ..................................................................... 38
    3.20  Litigation Reserve ................................................................................ 39
    3.21  Proposed Construction Reserve ........................................................... 39
    3.22  Earthquake Insurance Reserve ............................................................ 40

4.  REPRESENTATIONS AND WARRANTIES ............................................................ 41
    4.1  Organization; Special Purpose ............................................................. 41
    4.2  Proceedings; Enforceability ................................................................. 41
    4.3  No Conflicts ........................................................................................... 41
    4.4  Litigation ............................................................................................... 41
    4.5  Agreements ............................................................................................ 42
    4.6  Title ........................................................................................................ 42
    4.7  No Bankruptcy Filing ............................................................................ 42

i

| | | |
|---|---|---|
| 4.8 | Full and Accurate Disclosure | 43 |
| 4.9 | No Plan Assets | 43 |
| 4.10 | Compliance | 43 |
| 4.11 | Contracts | 44 |
| 4.12 | Federal Reserve Regulations; Investment Company Act | 44 |
| 4.13 | Utilities and Public Access | 44 |
| 4.14 | Physical Condition | 44 |
| 4.15 | Leases | 44 |
| 4.16 | Fraudulent Transfer | 45 |
| 4.17 | Ownership of Borrower | 45 |
| 4.18 | Management Agreement | 45 |
| 4.19 | Hazardous Substances | 45 |
| 4.20 | Principal Place of Business | 46 |
| 4.21 | Other Debt | 46 |
| 4.22 | Embargoed Person | 46 |
| 4.23 | Anti–Money Laundering | 46 |
| 4.24 | OPA | 47 |
| 4.25 | ISLT Pledges | 47 |
| 4.26 | Environmental Documents | 47 |
| 4.27 | Parking Agreement | 47 |
| 4.28 | La Curacao CAM | 48 |
| 4.29 | One Green ISLT Pledges | 48 |
| 4.30 | Kiosk Leases | 48 |

| | | |
|---|---|---|
| 5. | COVENANTS | 48 |
| 5.1 | Existence | 48 |
| 5.2 | Taxes | 49 |
| 5.3 | Repairs; Maintenance and Compliance; Alterations | 49 |
| 5.4 | Performance of Other Agreements | 50 |
| 5.5 | Cooperate in Legal Proceedings | 50 |
| 5.6 | Further Assurances | 50 |
| 5.7 | Environmental Matters | 50 |
| 5.8 | Title to the Property; Liens | 52 |
| 5.9 | Leases | 52 |
| 5.10 | Estoppel Statement | 54 |
| 5.11 | Property Management | 55 |
| 5.12 | Special Purpose Entity | 55 |
| 5.13 | Assumption in Non–Consolidation Opinion | 55 |
| 5.14 | Change In Business or Operation of Property | 56 |
| 5.15 | Certain Prohibited Actions | 56 |
| 5.16 | Prohibited Transfers | 56 |
| 5.17 | Expenses | 58 |
| 5.18 | Indemnity | 59 |
| 5.19 | Embargoed Person | 60 |
| 5.20 | Anti–Money Laundering | 61 |
| 5.21 | ERISA | 61 |
| 5.22 | Mezzanine Loan | 62 |

5.24    OPA.................................................................................................. 62
5.25    Parking Agreements........................................................................ 64
5.26    ISLT Pledges.................................................................................... 66
5.27    Borrower Affiliated Leases.............................................................. 67
5.28    Environmental Documents............................................................... 69
5.29    Tenant Insurance.............................................................................. 69
5.30    Master Lease..................................................................................... 69
5.31    Gap Zoning Policy............................................................................ 71

6.    NOTICES AND REPORTING........................................................................ 71
6.1    Notices.............................................................................................. 71
6.2    Borrower Notices and Deliveries..................................................... 72
6.3    Financial Reporting.......................................................................... 72

7.    INSURANCE; CASUALTY; AND CONDEMNATION..................................... 74
7.1    Insurance........................................................................................... 74
7.2    Casualty............................................................................................. 77
7.3    Condemnation................................................................................... 78
7.4    Application of Proceeds or Award.................................................... 78

8.    DEFAULTS.................................................................................................. 80
8.1    Events of Default.............................................................................. 80
8.2    Remedies........................................................................................... 82

9.    SECONDARY MARKET PROVISIONS........................................................... 84
9.1    Transfer of Loan............................................................................... 84
9.2    Use of Information............................................................................ 88
9.3    Borrower Indemnity.......................................................................... 88
9.4    Restructuring of Loan....................................................................... 90

10.    MISCELLANEOUS...................................................................................... 92
10.1    Exculpation....................................................................................... 92
10.2    Brokers and Financial Advisors....................................................... 95
10.3    Retention of Servicer....................................................................... 96
10.4    Survival............................................................................................. 96
10.5    Lender's Discretion.......................................................................... 96
10.6    Governing Law.................................................................................. 96
10.7    Modification, Waiver in Writing...................................................... 97
10.8    Trial by Jury..................................................................................... 98
10.9    Headings/Exhibits............................................................................ 98
10.10    Severability....................................................................................... 98
10.11    Preferences....................................................................................... 98
10.12    Waiver of Notice............................................................................... 98
10.13    Remedies of Borrower...................................................................... 99
10.14    Prior Agreements............................................................................. 99
10.15    Offsets, Counterclaims and Defenses.............................................. 99
10.16    Publicity............................................................................................ 99

NY:1797184.16

10.17  No Usury ........................................................................................................ 99
10.18  Conflict; Construction of Documents ............................................................ 100
10.19  No Third Party Beneficiaries ........................................................................ 100
10.20  Yield Maintenance Premium ........................................................................ 100
10.21  Assignment .................................................................................................... 101
10.22  Counterparts .................................................................................................. 101

iv

Schedule 1  –  Index of Other Definitions
Schedule 2  –  Required Repairs
Schedule 3  –  Organization of Borrower
Schedule 4  –  Definition of Special Purpose Entity
Schedule 5  –  Tenant Direction Letter
Schedule 6  –  Release Parcel
Schedule 7  –  Free Rent Abatement Schedule
Schedule 8  –  Intentionally Omitted
Schedule 9  –  Environmental Documents
Schedule 10 –  Pending Litigation
Schedule 11 –  Proposed Construction
Schedule 12-- Form of Payment Guaranty
Schedule 13 – Preapproved Replacement Parking Area

NY:1797184.16

# LOAN AGREEMENT

This LOAN AGREEMENT (as the same may be modified, supplemented, amended or otherwise changed, this "***Agreement***"), is made as of June 16, 2016, by and between PLAMEX INVESTMENT, LLC, a Delaware limited liability company (together with its permitted successors and assigns, "***Borrower***"), and NATIXIS, NEW YORK BRANCH, a direct branch of Natixis S.A., a société anonyme à conseil d'administration (public limited company) organized and existing under the laws of France (together with its successors and assigns, "***Lender***").

## 1.    DEFINITIONS; PRINCIPLES OF CONSTRUCTION

### 1.1    Terms and Definitions.  The following terms have the meanings set forth below:

#### 1.1.1    Key Terms and Definitions.

***Borrower Representative:***   3100 E. IMPERIAL INVESTMENT, LLC, a Delaware limited liability company.

***Deposit Bank***:   PNC Bank, National Association, or such other bank or depository selected by Lender in its discretion.

***Guarantor***:   individually and collectively, as the context may require, MIN CHAE, a natural person, and DONALD CHAE, a natural person.

***Interest Rate***:  a rate of interest equal to 4.598110% per annum.

***Key Principals***:   individually and collectively, as the context may require, MIN CHAE, a natural person, and DONALD CHAE, a natural person.

***Manager***:   GREENLAND PROPERTY MANAGEMENT, LLC, a California limited liability company, or any successor, assignee or replacement manager appointed by Borrower in accordance with Section 5.11 hereof.

***Monthly Debt Service Payment Amount***:shall mean interest on the unpaid Principal accrued and accruing through the last day of the Interest Period.

***Principal***:  maximum original principal amount of $106,000,000.00.

***Property***:  the parcel of real property and Improvements thereon owned by Borrower and encumbered by the Security Instrument; together with all rights pertaining to such real property and Improvements, and all other collateral for the Loan as more particularly described in the Granting Clauses of the Security Instrument.  The Property is located in Lynwood, Los Angeles County, California.

***Start–up Date***:  the earlier of: (a) the third (3rd) anniversary of the date hereof; and (b) the date that is two (2) years from the "start–up day" (within the meaning of Section 860G(a)(9) of the Code) of the REMIC Trust holding the Note, or if more than one Note exists evidencing the Debt the REMIC Trust holding the final portion of the Note to be

NY:1797184.16

securitized.

*Stated Maturity Date*: July 5, 2021.

**1.1.2   <u>Additional Terms and Definitions.</u>**

*3000 Imperial*: 3000 E. IMPERIAL, LLC, a California limited liability company.

*Acceptable Tenant Estoppel Certificate*: an estoppel certificate executed by a Tenant under a Lease which shall be in form and substance satisfactory to Lender and shall provide, among other things, (i) that such Lease is in full force and effect and no default has occurred and is continuing under such Lease, (ii) that all of Borrower's work to be performed in connection with the construction of the premises demised under such Lease has been completed (or will be completed pursuant to the express provisions of the Lease, provided any such amounts required to complete such work have been escrowed with Lender in accordance with the terms of this Agreement), (iii) that all tenant improvement allowances payable by Borrower to the Tenant under such Lease have been paid in full by Borrower, (iv) that such Tenant has taken possession of and is occupying all of the space demised to such Tenant under such Lease, is in occupancy, open for business and is paying unabated base rent in accordance with such Lease (after the expiration of any free rent or rent concession periods) and (v) that there are no offsets due such Tenant under such Lease.

*Affiliate*: as to any Person, any other Person that, directly or indirectly, is in Control of, is Controlled by or is under common Control with such Person or is a director or officer of such Person or of an Affiliate of such Person.

*Approved Capital Expenses*: Capital Expenses incurred by Borrower, provided that such Capital Expenses shall either be (i) included in the approved Capital Budget for the current calendar month or (ii) approved by Lender.

*Approved Leasing Expenses*: actual out–of–pocket expenses incurred by Borrower and payable to third parties that are not Affiliates of Borrower or Guarantor in leasing space at the Property pursuant to Leases entered into in accordance with the Loan Documents, including brokerage commissions and Tenant improvements, which expenses (i) are (A) specifically approved by Lender in connection with approving the applicable Lease, (B) incurred in the ordinary course of business and on market terms and conditions in connection with Leases which do not require Lender's approval under the Loan Documents, or (C) otherwise approved by Lender, which approval shall not be unreasonably withheld or delayed, and (ii) are substantiated by executed Lease documents and brokerage agreements.

*Approved Operating Expenses*: operating expenses incurred by Borrower which (i) are included in the approved Operating Budget for the current calendar month, (ii) are for real estate taxes, insurance premiums, electric, gas, oil, water, sewer or other utility service to the Property or (iii) have been approved by Lender.

*Bail-In Action:* means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

2

NY:1797184.16

***Bail-In Legislation:***   means, (a) with respect to any EEA Member Country implementing Article 55 of the Bank Recovery and Resolution Directive, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) the then applicable Commission Delegated Regulation (if any) supplementing the Bank Recovery and Resolution Directive in relation to Article 55 thereof.

***Bank Recovery and Resolution Directive:***   means Directive 2014/59/EU of the European Parliament and of the Council of the European Union.

***Borrower Affiliated Lease***: any Lease, now or hereafter, in which the Tenant is a Borrower Affiliated Tenant.

***Borrower Affiliated Lease Default Event***: the occurrence of any (x) monetary default or (y) material non-monetary default by a Borrower Affiliated Tenant under its respective Borrower Affiliated Lease.

***Borrower Affiliated Tenant***: any Tenant under a Lease who is an Affiliate of Borrower or Guarantor.

***Business Day:***   any day other than a Saturday or a Sunday or  any day on which commercial banks in New York, New York are authorized or required to close.

***Capital Expenses***:  expenses that are capital in nature or required under GAAP to be capitalized.

(1)    ***Cash Trap Period***:  (a) shall commence upon Lender giving notice to Borrower and Clearing Bank of the occurrence of any of the following: (i) a Default or an Event of Default,  (ii) the failure by Borrower, after the end of a calendar quarter, to maintain the Debt Service Coverage Ratio of at least 1.25:1 (a "***DSCR Cash Trap Trigger***"), (iii) the commencement of a Food 4 Less Cash Trap Period, (iv) at Lender's election, any default in payment by ISLT under the Beach Orangethorpe Guaranty or the Beach Orangethorpe II Guaranty;  or (v) for any reason the Parking Agreement is terminated, unless  Borrower complies with clauses (a) through (e) of Section 5.25.3 hereof prior to or concurrently with such termination of the Parking Agreement, and (b) shall end upon Lender giving notice to Borrower and the Clearing Bank that the Cash Trap Period has ended, which notice Lender shall only be required to give if (1) the Loan and all other obligations under the Loan Documents have been repaid in full, (2) there has been a Full Defeasance of the Loan, (3) in the case of a DSCR Cash Trap Trigger, for six (6) consecutive months since the commencement of the existing Cash Trap Period, (A) no Default or Event of Default has occurred, (B) no event that would trigger another Cash Trap Period has occurred, and (C) the Debt Service Coverage Ratio is at least equal to 1.30:1, (4) in the case of a Food 4 Less Cash Trap Period, such Food 4 Less Cash Trap Period has terminated (and no Cash Trap Period is continuing), or (5) solely with respect to a Cash Trap Period commenced in connection with clause (v) above Borrower within ten (10) Business Days of the termination of such Parking Agreement complies with clauses (a) through (e) of Section 5.25.3 hereof (and no other Cash Trap Period is continuing).

***Children's Place***: shall mean THE CHILDREN'S PLACE RETAIL STORES, INC., a Delaware corporation, and its successors and/or assigns.

***Children's Place Lease***: that certain Shopping Center Lease, dated as of May 31, 2011, by and between Borrower, as landlord, and Children's Place, as tenant, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms of the Loan Documents.

***Clearing Account***:  the account established by Borrower for the benefit of Lender at the Clearing Bank for the direct deposit by Tenants of all Rents.

***Clearing Account Agreement***:  that certain agreement by and among Lender, Borrower and Clearing Bank setting forth Borrower's and Clearing Bank's obligations relating to the establishment of the Clearing Account.

***Clearing Bank***:  the bank selected by Borrower and approved by Lender in its sole discretion at which the Clearing Account is established.

***Code***:  the Internal Revenue Code of 1986, as amended and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

***Control***:  with respect to any Person, either (i) ownership, directly or indirectly, of forty–nine percent (49%) or more of all equity interests in such Person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, through the ownership of voting securities, by contract or otherwise.

***Current Mezzanine Loan***: shall mean that certain mezzanine loan in the principal amount of $14,000,000.00 made on the date hereof by Current Mezzanine Lender to Current Mezzanine Borrower, and evidenced and secured by the Current Mezzanine Loan Documents.

***Current Mezzanine Borrower***: shall mean, individually and collectively, Mezzanine Borrower.

***Current Mezzanine Loan Default***: shall mean an "Event of Default" under the Current Mezzanine Loan and as defined in the Current Mezzanine Loan Documents and Lender may conclusively rely on any notice from Current Mezzanine Lender of such Current Mezzanine Loan Default without any inquiry into the validity thereof.

***Current Mezzanine Loan Documents***: shall mean (i) the Mezzanine Loan Agreement (the "***Current Mezzanine Loan Agreement***") between Current Mezzanine Lender and Current Mezzanine Borrower, (ii) the Promissory Note (the "***Current Mezzanine Note***") in the original principal amount of the Current Mezzanine Loan made by Current Mezzanine Borrower and payable to Current Mezzanine Lender, (iii) the Pledge and Security Agreement made by Current Mezzanine Borrower in favor of Current Mezzanine Lender, (iv) each UCC Financing Statement executed by Current Mezzanine Borrower in favor of Current Mezzanine Lender in connection with the foregoing and (v) any other "Loan Document", as defined in the Current Mezzanine Loan Agreement, as each of the foregoing may be modified, amended and restated from time to time in accordance with the terms and provisions of the Intercreditor Agreement.

NY:1797184.16

***Current Mezzanine Lender***: shall mean Natixis Real Estate Capital LLC, in its capacity as the holder of the Current Mezzanine Loan and any subsequent holder of the Current Mezzanine Loan to whom the Current Mezzanine Loan has been assigned or transferred pursuant to the terms of the Intercreditor Agreement.

***Debt***:  the unpaid Principal, all interest accrued and unpaid thereon, any Yield Maintenance Premium and all other sums due to Lender in respect of the Loan or under any Loan Document.

***Debt Service***:  with respect to any particular period, the scheduled Principal and interest payments due under the Note, the Current Mezzanine Note, and, if applicable, the New Mezzanine Loan Note in such period.

***Debt Service Coverage Ratio***:  as of any date, the ratio calculated by Lender of (i) the Net Operating Income for the twelve (12) month period ending with the most recently completed calendar month to (ii) the Debt Service with respect to such period.

***Default***:  the occurrence of any event under any Loan Document which, with the giving of notice or passage of time, or both, would be an Event of Default.

***Default Rate***:  a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law, or (ii) five percent (5%) above the Interest Rate, compounded monthly.

***Defeasance Percentage***:  the percentage derived by dividing, (i) in the case of an initial Partial Defeasance, the original principal amount of the Defeased Note by the original principal amount of the Note or (ii) in the case of a subsequent Defeasance, the amount of the subsequent Defeased Note by the original principal amount of its corresponding Undefeased Note.

***Deposit Account***:  the Eligible Account at the Deposit Bank established and controlled by Lender to receive Rents from the Clearing Bank.

***Deposit Account Agreement***:  that certain agreement by and among Lender, Borrower and Deposit Bank establishing the Deposit Account and setting forth the parties' obligations relating to the funds transferred from the Clearing Account pursuant to the provisions of this Agreement.

***Earthquake Insurance Policies***: Earthquake insurance, in form and substance reasonably acceptable to Lender, in an amount of no less than the total insurable value of the Property and including business income coverage with not less than an eighteen (18) month period of restoration and a six (6) month extended period of indemnity, with a deductible no greater than five (5%) percent of the total insurable value of the Property.

***EEA Financial Institution***: means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established

5

in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

*EEA Member Country*:  means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

*EEA Resolution Authority*:  means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

*Eligibility Requirements*:  means, with respect to any Person, that such Person (i) has total assets (in name or under management or advisement) in excess of $500,000,000 and (except with respect to a pension advisory firm, asset manager, registered investment advisor or manager or similar fiduciary) either (x) capital/statutory surplus or shareholder's equity of at least $200,000,000 or (y) market capitalization of at least $350,000,000, and (ii) is regularly engaged in the business of making or owning (or, in the case of a pension advisory firm, asset manager, registered investment advisor or manager or similar fiduciary, regularly engaged in managing investments in) commercial real estate loans (including participation interests in commercial real estate loans and mezzanine loans to direct or indirect owners of commercial properties, which loans are secured by pledges of direct or indirect ownership interests in the owners of such commercial properties), originating preferred equity investments, owning or operating commercial properties or making investments in commercial real estate.

*Eligible Account*:  shall mean either (i) an account maintained with the Deposit Bank or another depository institution or trust company; provided the short term unsecured debt obligations or commercial paper of such other depository institution or trust company are rated at least A-1 (or equivalent) by each Rating Agency in the case of accounts in which funds are held for thirty (30) days or less (or, in the case of accounts in which funds are held for more than thirty (30) days and the long term unsecured debt obligations of which are rated at least A+ (or equivalent) by each Rating Agency) or (ii) a segregated trust account maintained with the trust department of a federal or state chartered depository institution or trust company acting in its fiduciary capacity which institution or trust company is subject to regulations similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and is subject to federal and state authority.

*Environmental Documents*:  individually and collectively, as the context may require, the Environmental CCR and the Environmental Easement.

*Environmental Report*:  shall mean that certain Phase I Environmental Site Assessment Report, dated as of March 18, 2016, prepared by Partner Assessment Corporation as Partner Project No. 16-155867.1.

*ERISA*:  the Employment Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

*ERISA Affiliate*:  all members of a controlled group of corporations and all trades and business (whether or not incorporated) under common Control and all other entities which, together with Borrower, are treated as a single employer under any or all of Section 414(b), (c),

(m) or (o) of the Code.

      ***Escrows***:  amounts paid by Borrower into Subaccounts established for the purpose of paying Taxes, the premiums for Policies, ground rents, franchise and license fees.

      ***EU Bail-In Legislation Schedule***:  means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

      ***Fiscal Year***: shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the term of the Loan.

      ***Food 4 Less***: shall mean ALPHA BETA COMPANY, a California corporation, and any replacement Tenant for all or any portion of the Food 4 Less Space.

      ***Food 4 Less Cash Trap Cure Event***: shall occur at such time as Borrower has satisfied any of the following conditions, and provided that no other Food 4 Less Cash Trap Trigger Event has occurred and is continuing:

      (a)    with respect to any Food 4 Less Cash Trap Trigger Event that has occurred solely due to a Food 4 Less Non-Renewal Trigger, (A) Food 4 Less has renewed or extended the Food 4 Less Lease for all of the Food 4 Less Space pursuant to a lease renewal or extension agreement with a net effective rental rate of not less than the net effective rental rate under the Food 4 Less Lease as of the date hereof, for a term of not less than five (5) years, and otherwise in form and substance and upon terms reasonably acceptable to Lender (a "***Food 4 Less Lease Renewal***"), (B) Borrower shall have delivered to Lender (1) a copy of the Food 4 Less Lease Renewal and (2) an Acceptable Tenant Estoppel Certificate from Food 4 Less with respect to the Food 4 Less Lease (as renewed or extended pursuant to the Food 4 Less Lease Renewal) and (C) Borrower shall have paid all tenant improvement allowances and leasing brokerage commissions payable by Borrower in connection with such Food 4 Less Lease Renewal and delivered to Lender evidence in form and substance reasonably satisfactory to Lender of the payment of same;

      (b)    with respect to any Food 4 Less Cash Trap Trigger Event that has occurred solely due to a Food 4 Less Bankruptcy Trigger, either (x) Food 4 Less has ceased to be a debtor in such voluntary bankruptcy or insolvency proceeding (and the Food 4 Less Lease has been affirmed, assumed or assigned in a manner satisfactory to Lender), or (y) a Food 4 Less Replacement Tenant has taken an assignment of the Food 4 Less Lease and assumed all of the obligations of the tenant thereunder, and Borrower has delivered to Lender (1) a copy of the assignment of the Food 4 Less Lease to the Food 4 Less Replacement Tenant (together with evidence reasonably satisfactory to Lender that the Food 4 Less Replacement Tenant is open for business in the space demised to the Food 4 Less Replacement Tenant and paying full unabated rent in accordance with the Food 4 Less Replacement Lease), and (2) an Acceptable Tenant Estoppel Certificate from the Food 4 Less Replacement Tenant;

      (c)    with respect to any Food 4 Less Cash Trap Trigger Event that has occurred solely due to a Food 4 Less Go Dark Trigger, (A) Food 4 Less has resumed operations and been open for business to the public at the Property in the entire Food 4 Less Space for

ninety (90) consecutive calendar days (and no Event of Default has occurred or is then in effect during such ninety (90) consecutive calendar day period), (B) the Food 4 Less Lease is in full force and effect and no default has occurred and is continuing under the Food 4 Less Lease, and (C) Borrower shall have delivered to Lender an Acceptable Tenant Estoppel Certificate from Food 4 Less with respect to the Food 4 Less Lease;

(d)      with respect to any Food 4 Less Cash Trap Trigger Event, Borrower has (A) entered into a Lease with a replacement tenant reasonably satisfactory to Lender (a "***Food 4 Less Replacement Tenant***") demising all of the Food 4 Less Space, with a net effective rental rate of not less than the net effective rental rate under the Food 4 Less Lease as of the date hereof, for a term of not less than five (5) years, and otherwise in form and substance and upon terms reasonably acceptable to Lender (a "***Food 4 Less Replacement Lease***"), (B) delivered to Lender (1) a copy of the Food 4 Less Replacement Lease (together with evidence reasonably satisfactory to Lender that the Food 4 Less Replacement Tenant is open for business in the space demised to the Food 4 Less Replacement Tenant and paying full unabated rent in accordance with the Food 4 Less Replacement Lease), (2) an Acceptable Tenant Estoppel Certificate from the Food 4 Less Replacement Tenant and (3) if requested by Lender, a subordination, non-disturbance and attornment agreement from the Food 4 Less Replacement Tenant in form and substance satisfactory to Lender and (C) paid all tenant improvement allowances and leasing brokerage commissions payable by Borrower in connection with the Food 4 Less Replacement Lease and delivered to Lender evidence in form and substance reasonably satisfactory to Lender of the payment of same;

***Food 4 Less Cash Trap Period***: shall (i) commence upon the occurrence of a Food 4 Less Cash Trap Trigger Event, and (ii) end at such time, if ever, upon the occurrence of a Food 4 Less Cash Trap Cure Event.

***Food 4 Less Cash Trap Trigger Event***: the earliest to occur of:

(a)      the earlier of (x) the date that is six (6) months prior to the then current expiration date of the Food 4 Less Lease, (y) the date upon which Food 4 Less delivers to Borrower a written notice or otherwise indicates its intention not to renew the Food 4 Less Lease, or (z) the date by which Food 4 Less must exercise its next occurring renewal option under the applicable terms of the Food 4 Less Lease (any of the foregoing, a "***Food 4 Less Non-Renewal Trigger***");

(b)      the date upon which Food 4 Less becomes a debtor in any bankruptcy or insolvency proceeding (a "***Food 4 Less Bankruptcy Trigger***");

(c)      the date upon which Food 4 Less vacates, surrenders or ceases to conduct its normal business operations at substantially all of the Food 4 Less Space, or otherwise "goes dark" (or gives notice to Borrower of its intention to vacate, surrender or cease to conduct its normal business operations at substantially all of the Food 4 Less Space, or otherwise "go dark") (a "***Food 4 Less Go Dark Trigger***");

(d)      the date upon which a monetary or material non-monetary default occurs (beyond any applicable notice,  grace and cure periods expressly provided for under the Food 4

Less Lease) under the Food 4 Less Lease (a "*Food 4 Less Default Trigger*"); or

(e) the date upon which the Food 4 Less Lease expires or is surrendered, cancelled or otherwise terminated (or Borrower receives a notice from Food 4 Less of its intention to surrender, cancel or otherwise terminate the Food 4 Less Lease).

*Food 4 Less Lease*: that certain Shopping Center Lease, dated as of September 16, 1987, by and between Borrower, as landlord, and Food 4 Less (as successor-in-interest to FOOD MARKETS, INC., a California corporation), as tenant, as amended by that certain First Amendment to Lease, dated as of July 3, 2003, as the same may be further amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms of the Loan Documents.  References in this Agreement to the Food 4 Less Lease shall be deemed to mean the Food 4 Less Replacement Lease(s), upon the replacement of the Food 4 Less Lease pursuant to one or more Food 4 Less Replacement Leases.

*Food 4 Less Space***:**  all of the space demised to Food 4 Less pursuant to the Food 4 Less Lease as of the date hereof.

*GAAP***:**  generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

*"Gap Zoning Policy"*  that certain Zoning Restriction Protector Policy on the Lender's Non-conforming Use Form issued by Lexington Insurance Company with Lender as named insured dated as of the date hereof.

*Governmental Authority***:**  any court, board, agency, commission, office or authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) now or hereafter in existence.

*Intercreditor Agreement*: shall mean the intercreditor agreement between Lender, as senior lender, and Mezzanine Lender, as mezzanine lender, as the same may be amended, restated, supplemented or otherwise modified from time to time.

*Interest Period***:**  (i) the period from the date hereof through the next day of a calendar month that is the fourth (4th) day of such calendar month, and (ii) each period thereafter from the fifth (5th) day of each calendar month through the fourth (4th) day of the next calendar month; except that the Interest Period, if any, that would otherwise commence before and end after the Maturity Date shall end on the Maturity Date.  Notwithstanding the foregoing, in the event Lender shall have elected to change the date on which scheduled payments under the Loan are due, as described in the definition of "Payment Date", from and after the effective date of such election, each Interest Period shall commence on the day of each month in which occurs such changed Payment Date and end on the day immediately preceding the following Payment Date, as so changed.

*ISLT*: ISLT INVESTMENTS LLC, a Delaware limited liability company.

*ISLT Pledge(s)*: shall mean, individually and collectively as the context may require, (a) that certain Assignment of Distributions and Security Agreement, dated as of

February 1, 2011, by and between ISLT, as grantor, in favor of Beach Orangethorpe, LLC, a California limited liability company ("***Beach Orangethorpe***"), as lender, as amended by that certain First Amendment to Assignment of Distributions and Security Agreement, dated as of September 22, 2011, by and between ISLT and Beach Orangethorpe, securing that certain Guaranty, dated as of February 1, 2011, made by ISLT, MIN SEOK CHAE, an individual, and DONALD CHAE, an individual, for the benefit of Beach Orangethorpe (the "***Beach Orangethorpe Guaranty***") in connection with that certain loan from Beach Orangethorpe to The Source At Beach, LLC, a California limited liability company; and (b) that certain Assignment of Distributions and Security Agreement, dated as of February 1, 2011, by and between ISLT, as grantor, in favor of Beach Orangethorpe II, LLC, a California limited liability company ("***Beach Orangethorpe II***"), as lender, as amended by that certain First Amendment to Assignment of Distributions and Security Agreement, dated as of September 22, 2011, by and between ISLT and Beach Orangethorpe II, securing that certain Guaranty, dated as of February 1, 2011, made by ISLT, MIN SEOK CHAE, an individual, and DONALD CHAE, an individual, for the benefit of Beach Orangethorpe II (the "***Beach Orangethorpe II Guaranty***") in connection with that certain loan from Beach Orangethorpe II to The Source At Beach, LLC, a California limited liability company; each as may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms and conditions of this Agreement.

***Kickin' Crab Lease***: that certain Lease, dated as of December 18, 2013, by and between Borrower, as landlord, and COMEX KC, LLC, a California limited liability company, as tenant, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms of the Loan Documents

***La Curacao***: ADIR INTERNATIONAL EXPORT, LTD.

***La Curacao Lease***: that certain Shopping Center Lease, dated as of July 29, 2004, by and between Borrower, as landlord, and La Curacao, as tenant, as amended by that certain First Amendment to Plaza Mexico – Lynwood Town Centre Shopping Center Lease Dated July 29, 2004, dated as of January 7, 2005, as further amended by that certain Second Amendment to Plaza Mexico – Lynwood Town Centre Shopping Center Lease Dated July 29, 2004, dated as of April 1, 2005, as the same may be further amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms of the Loan Documents.

***Leases***:  all leases and other agreements or arrangements heretofore or hereafter entered into affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the Property or the Improvements, including any guarantees, extensions, renewals, modifications or amendments thereof and all additional remainders, reversions and other rights and estates appurtenant thereunder.

***Legal Requirements***: statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting Borrower, any Loan Document or all or part of the Property or the construction, ownership, use, alteration or operation thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instrument, either of record or known to Borrower, at any time in force affecting all or part of the Property.

10

***Lien***: any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest, PACE Loan or any other encumbrance, charge or transfer of, or any agreement to enter into or create any of the foregoing, on or affecting all or any part of the Property or any interest therein, or any direct or indirect interest in Borrower or Borrower Representative, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

***Loan Documents***: this Agreement and all other documents, agreements and instruments now or hereafter evidencing, securing or delivered to Lender in connection with the Loan, including the following, each of which is dated as of the date hereof: (i) Promissory Note made by Borrower to Lender in the principal amount equal to the Loan (as the same may be amended, modified, restated, severed, split, consolidated, renewed, replaced, or supplemented from time to time, the "***Note***"), (ii) the Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing made by Borrower in favor of Lender which covers the Property (the "***Security Instrument***"), (iii) the Assignment of Leases and Rents from Borrower to Lender, (iv) the Assignment of Agreements, Licenses, Permits and Contracts from Borrower to Lender, (v) the Clearing Account Agreement, (vi) the Deposit Account Agreement and (vii) the Guaranty of Recourse Obligations (the "***Recourse Guaranty***") made by Guarantor; as each of the foregoing may be (and each of the foregoing defined terms shall refer to such documents as they may be) amended, restated, replaced, supplemented or otherwise modified from time to time.

***Loan–to–Value (LTV)***: a fraction expressed as a percentage, the numerator of which is equal to the sum of the outstanding principal balance of the Loan, the outstanding principal balance of any New Mezzanine Loan and the outstanding principal balance of the Current Mezzanine Loan, and the denominator of which is the appraised value of the Property as reasonably determined by Lender based upon a current "as–is" MAI appraisal for the Property obtained by and acceptable to Lender at Borrower's sole cost and expense.

***Lynwood Authority***: LYNWOOD HOUSING AUTHORITY.

***Lynwood City***: CITY OF LYNWOOD, a municipal corporation.

***Management Agreement***: the management agreement between Borrower and Manager, pursuant to which Manager is to manage the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with Section 5.11.

***Master Lease***: that certain Lease, dated as of as of the date hereof, by and between Borrower, as landlord, and Master Tenant, as tenant, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms of the Loan Documents.

***Master Tenant***: PLACO FITNESS, LLC, a California limited liability company.

***Material Alteration***: any (i) individual alteration affecting (A) structural elements of the Property, (B) a roof of the Property or (C) any building system of the Property, or (ii) non-

structural alteration the cost of which exceeds $300,000; provided, however, that in no event shall any of the following constitute a Material Alteration: (a) any Required Repairs, (b) any tenant improvement work performed pursuant to any Lease (except for any tenant improvement work to be completed by Borrower or the Tenant under the Planet Fitness Lease pursuant to the Planet Fitness Lease) existing on the date hereof or entered into hereafter in accordance with the provisions of this Agreement, (c) alterations performed as part of a Restoration, or (d) any repairs or maintenance to existing structural or non-structural elements performed in the ordinary course of business that do not in the aggregate exceed $300,000.  Notwithstanding the foregoing or anything to the contrary contained herein, (i) any work to be performed by or on behalf of Borrower  and/or Planet Fitness in connection with the construction of the premises demised under the Planet Fitness Lease, and/or (ii) any alterations, improvements and/or construction in, on, or to, the "No-Build Zone" (as defined in the Planet Fitness Lease) shall be deemed to constitute a Material Alteration.

*Material Lease***:**  (x) any Borrower Affiliated Lease, (y) the Master Lease, or (z) any Leases which individually or in the aggregate with respect to the same Tenant and its Affiliates (i) constitute five percent (5%) or more of the Property's gross leaseable area, (ii) have a gross annual rent of five percent (5%) or more of the total annual Rents, (iii) demise at least one full floor of the Improvements, or (iv) for multifamily residential property, any Lease which is not for the residential use of the lessee thereunder.

*Maturity Date***:**  the date on which the final payment of principal of the Note (or the Defeased Note, if applicable) becomes due and payable as therein provided, whether at the Stated Maturity Date, by declaration of acceleration, or otherwise.

*Mezzanine Loan*: shall mean, individually or collectively, as the context may require, the Current Mezzanine Loan and the New Mezzanine Loan.

*Mezzanine Borrower*: shall mean 3100 E. IMPERIAL INVESTMENT, LLC, a Delaware limited liability company.

*Mezzanine Loan Default*: shall mean a Current Mezzanine Loan Default and/or a New Mezzanine Loan Default.

*Mezzanine Loan Documents*: shall mean, individually or collectively, as the context may require, the Current Mezzanine Loan Documents and the New Mezzanine Loan Documents.

*Mezzanine Loan Liens*: shall mean the Liens in favor of the holder of (i) the Current Mezzanine Loan created pursuant to the Current Mezzanine Loan Documents or (ii) the New Mezzanine Loan created pursuant to the New Mezzanine Loan Documents.

*Mezzanine Loan Realization*: shall mean any Transfer of the membership interests in Borrower in connection with the exercise by Mezzanine Lender of its rights and remedies under the Mezzanine Loan Documents, including without limitation, by assignment in lieu of foreclosure.

12

***Mezzanine Lender***: shall mean, individually or collectively, as the context may require, Current Mezzanine Lender or New Mezzanine Lender.

***Mezzanine Note***: shall mean, individually or collectively, as the context may require, the Current Mezzanine Note and any New Mezzanine Note.

***Monthly Current Mezzanine Debt Service Payment***: shall mean, as to each Payment Date, an amount equal to the scheduled payment of principal and/or interest payable by Current Mezzanine Borrower on such Payment Date pursuant to the terms of the Current Mezzanine Loan Documents.

***Monthly New Mezzanine Debt Service Payment***: shall mean, as to each Payment Date, an amount equal to the scheduled payment of principal and/or interest payable by New Mezzanine Borrower pursuant to the terms of the New Mezzanine Loan Documents.

***Minor Lease***: any Lease that is not a Material Lease.

***Natixis***: means Natixis, New York Branch, a société anonyme à conseil d'administration (public limited company) organized and existing under the laws of France, its successors and assigns.

***Net Operating Income***:  for any period, the actual net operating income of the Property after deducting therefrom deposits to (but not withdrawals from) any reserves required under this Agreement (provided however, there shall be no deduction for deposits to the Tax and Insurance Subaccount on account of the Earthquake Insurance Policies).

***New Mezzanine Loan Default***: shall mean an "Event of Default" under the New Mezzanine Loan and as defined in the New Mezzanine Loan Documents and Lender may conclusively rely on any notice from New Mezzanine Lender of such New Mezzanine Loan Default without any inquiry into the validity thereof.

***New Mezzanine Loan Documents***: shall mean all documents evidencing or securing any New Mezzanine Loan.

***New Mezzanine Lender***: shall mean the holder of the New Mezzanine Loan Note.

***New Mezzanine Loan Note***: shall mean the promissory note(s) evidencing the New Mezzanine Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

***NRSRO***: shall mean any credit rating agency that has elected to be treated as a nationally-recognized statistical rating agency for purposes of the Exchange Act irrespective of whether or not such credit rating agency has been engaged by Lender or another Indemnified Party to rate any of the Securities issued in connection with a Secondary Market Transaction involving the Loan or any portion thereof.

***Officer's Certificate***:  a certificate delivered to Lender by Borrower which is signed by a senior executive officer of Borrower Representative.

13

**OPA:** that certain Owner Participation Agreement, dated as of February 2, 2016, by and between Lynwood City, Lynwood Authority, 3000 Imperial, and Borrower, as the same may be further amended, restated, consolidated, pledged and/or assigned from time to time.

**Open Prepayment Date:** the Payment Date which is closest to the ninetieth (90th) day prior to the Stated Maturity Date for the Loan.

**PACE Loan:** (x) any "Property-Assessed Clean Energy loan" or (y) any other indebtedness, without regard to the name given to such indebtedness, which is (i) incurred for improvements to the Property for the purpose of increasing energy efficiency, increasing use of renewable energy sources, resource conservation, or a combination of the foregoing, and (ii) repaid through multi-year assessments against the Property.

**Parking Agreement:** that certain Lease Agreement, dated as of the date hereof, by and between Borrower and 3000 Imperial.  References in this Agreement to the Parking Agreement shall be deemed to mean the Replacement Parking Agreement, upon the replacement of the Parking Agreement pursuant to one or more Replacement Parking Agreements.

**Payment Date:** the fifth (5th) day of each calendar month or, if such day is not a Business Day, the immediately preceding Business Day; provided, however, that Lender may elect once during the Term, in its sole discretion, to change the date on which scheduled payments are due under the Loan upon written notice thereof to Borrower setting forth such changed date, in which event, upon the effective date of such notice, the Payment Date shall be the date set forth therein.

**Permitted Encumbrances:** (i) the Liens created by the Loan Documents, (ii) all Liens and other matters disclosed in the title insurance policy insuring the Lien of the Security Instrument, (iii) Liens, if any, for Taxes or other charges not yet due and payable and not delinquent, (iv) any workers', mechanics' or other similar Liens on the Property provided that any such Lien is bonded or discharged within thirty (30) days after Borrower first receives notice of such Lien  (v) such other title and survey exceptions as Lender approves in writing in Lender's discretion, and (vi) Mezzanine Loan Liens.

**Permitted Indebtedness:** the Debt and unsecured trade payables incurred in the ordinary course of business relating to the ownership and operation of the Property which do not exceed, at any time, a maximum amount of one percent (1%) of the original amount of the Principal and are paid within thirty (30) days of the date incurred.

**Permitted Transfers:** (i) a Lease entered into in accordance with the Loan Documents, (ii) a Special Transfer in accordance with the requirements set forth in Section 5.16, (iii) a Permitted Encumbrance, (iv) provided that no Default or Event of Default shall then exist, a Transfer of an interest in Borrower other than the interests in Borrower held by Borrower Representative, or a Transfer of an interest in Borrower Representative to any Person, provided that (A) such Transfer shall not (x) cause the transferee (together with its Affiliates) to acquire Control of Borrower or Borrower Representative or (y) result in Key Principal(s) no longer possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of Borrower or Borrower Representative through the ownership of voting securities,

14

by contract or otherwise, (B) after giving effect to such Transfer, Key Principal(s) shall continue to own at least fifty-one percent (51%) of all equity interests (direct or indirect) in Borrower, (C) Borrower shall give Lender notice of such Transfer together with copies of all instruments effecting such Transfer not less than ten (10) days prior to the date of such Transfer, and (D) the legal and financial structure of Borrower and its members and the single purpose nature and bankruptcy remoteness of Borrower and its members after such Transfer, shall satisfy Lender's then current applicable underwriting criteria and requirements, (v) a Transfer for estate planning purposes of any Key Principal's direct or indirect interests in Borrower to the spouse, child, parent, grandparent, grandchild, niece, nephew, aunt or uncle of such Key Principal, or to a trust for the benefit of such Key Principal or for the benefit of the spouse, child, parent, grandparent, grandchild, niece, nephew, aunt or uncle of such Key Principal so long as Key Principal continues to possess, directly or indirectly, the power to direct or cause the direction of the management and policies of Borrower through the ownership of voting securities, by contract or otherwise, or (vi) the ISLT Pledges as they exist as of the date hereof, solely to the extent that no Person shall, at any time, obtain any direct or indirect ownership or membership interest, or any voting, management or Control right, in or with respect to, ISLT, Placo, Mezzanine Borrower or Borrower pursuant to any ISLT Pledge.  Notwithstanding the foregoing or anything to the contrary contained herein, other than as a result of a Mezzanine Loan Realization, in no event shall any Transfer that results in Borrower no longer being wholly owned and controlled by Mezzanine Borrower be a Permitted Transfer.

      *Person***:**  any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other person or entity, and any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

      *Placo***:**  PLACO INVESTMENT, LLC, a Delaware limited liability company.

      *Plan***:**  (i) an employee benefit or other plan established or maintained by Borrower or any ERISA Affiliate or to which Borrower or any ERISA Affiliate makes or is obligated to make contributions and (ii) which is covered by Title IV of ERISA or Section 302 of ERISA or Section 412 of the Code.

      *Planet Fitness Lease***:** that certain Lease, dated as of April 13, 2016, by and between Borrower, as landlord, and SO CAL PF LYNWOOD, LLC, a Delaware limited liability company, as tenant, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms of the Loan Documents.

      *Planet Fitness Space***:** all of the space demised to Planet Fitness pursuant to the Planet Fitness Lease as of the date hereof.

      *Qualified Institutional Lender***:** means:

      (a)  a real estate investment trust, bank, savings and loan association, investment bank, insurance company, trust company, commercial credit corporation, pension plan, pension fund or pension advisory firm, mutual fund, government entity or plan, provided that any such Person referred to in this <u>clause (a)</u> satisfies the Eligibility Requirements;

(b)    an investment company, money management firm or "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, as amended, or an institutional "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended, provided that any such Person referred to in this <u>clause (b)</u> satisfies the Eligibility Requirements;

Notwithstanding the foregoing, in no event shall any of the Persons listed in <u>clauses (a)</u> through <u>(b)</u> above be deemed (or be deemed to be) a Qualified Institutional Lender if, on the date of determination, (i) such Person is the subject of any Bankruptcy Proceeding, or (ii) such Person is an Embargoed Person.

***Rating Agency***:  each of Standard & Poor's Ratings Services, a division of The McGraw–Hill Companies, Inc. ("***S&P***"), Moody's Investors Service, Inc. ("***Moody's***"), and Fitch, Inc. or any other nationally–recognized statistical rating organization to the extent any of the foregoing have been engaged by Lender or its designee in connection with or in anticipation of any Secondary Market Transaction.

***Rating Comfort Letter***:  a letter issued by each of the applicable Rating Agencies which confirms that the taking of the action referenced to therein will not result in any qualification, withdrawal or downgrading of any existing ratings of Securities created in a Secondary Market Transaction.

***Regulation AB***:  shall mean Regulation AB under the Securities Act and the Exchange Act, as such Regulation may be amended from time to time.

***Regulation S-K***:  shall mean Regulation S-K under the Securities Act, as such Regulation may be amended from time to time.

***Regulation S-X***:  shall mean Regulation S-X (17 C.F.R. Part 210) as it applies under the Securities Act and the Exchange Act, as such Regulation may be amended from time to time.

***Related Loan***:  shall mean a loan to an Affiliate of Borrower or secured by a Related Property, that is included in a Secondary Market Transaction with the Loan, and any other loan that is cross-collateralized with the Loan.

***Related Property***:  shall mean a parcel of real property, together with improvements thereon and personal property related thereto, that is "related" within the meaning of the definition of Significant Obligor, to the Property.

***Release Parcel***:  shall mean those certain portions of the Property as more particularly described on Schedule 6 hereto, which may be released pursuant to Section 2.4.3 hereof.

***REMIC Trust***:  a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Note, or any portion thereof.

NY:1797184.16

**Rents:** all rents, rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a Bankruptcy Proceeding) or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other payment and consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower, Manager or any of their agents or employees from any and all sources arising from or attributable to the Property and the Improvements, including all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Property or rendering of services by Borrower, Manager or any of their agents or employees and proceeds, if any, from business interruption or other loss of income insurance.

**Required Mezzanine Lender**: shall mean Waterfall Olympic Master Fund Grantor Trust Series I, and Affiliates of Waterfall Olympic Master Fund Grantor Trust Series I in the event any such entity is the holder of the Current Mezzanine Loan.

**Servicer:** a servicer selected by Lender to service the Loan.

**Significant Obligor:** shall have the meaning set forth in Item 1101(k) of Regulation AB under the Securities Act.

**Survey:** a survey of the Property prepared by a surveyor licensed in the State and satisfactory to Lender and the company or companies issuing the Title Insurance Policy, and containing a certification of such surveyor satisfactory to Lender.

**State:** the state in which the Property is located.

**Taxes:** all real estate and personal property taxes, assessments, water rates or sewer rents, maintenance charges, impositions, vault charges and license fees, now or hereafter levied or assessed or imposed against all or part of the Property.  In no event shall any PACE Loan be considered a Tax for purposes of this Agreement.

**Tenant:** any existing tenant, replacement tenant or proposed tenant under any existing Lease or any proposed Lease.

**Term:** the entire term of this Agreement, which shall expire upon repayment in full of the Debt and full performance of each and every obligation to be performed by Borrower pursuant to the Loan Documents.

**Toxic Mold**: any toxic mold or fungus at the Property which is of a type (i) that might pose a significant risk to human health or the environment or (ii) that would negatively impact the value of the Property.

**Transfer:** any sale, conveyance, transfer, lease or assignment, Lien, or the entry into any PACE Loan, or the entry into any agreement to sell, convey, transfer, lease or assign, whether by law or otherwise, including forfeiture, of, on, in or affecting (i) all or part of the

17

Property (including any legal or beneficial direct or indirect interest therein), (ii) any direct or indirect interest in Borrower (including any profit interest), (iii) any direct or indirect interest in Borrower Representative or (iv) the direct or indirect right or power to direct or cause the direction of the management and policies of Borrower or Borrower Representative, through the ownership of voting securities, by contract or otherwise.

   **UCC**:  the Uniform Commercial Code as in effect in the State or the state in which any of the Cash Management Accounts are located, as the case may be.

   ***U.S. Obligations***:  direct non–callable obligations backed by the full faith and credit of the United States of America.

   ***Welfare Plan***:  an employee welfare benefit plan, as defined in Section 3(1) of ERISA.

   ***Write-Down and Conversion Powers***: means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

   ***Yield Maintenance Premium***:  means a prepayment fee equal to the greater of (i) three percent (3%) of the amount of Principal being prepaid and (ii) the product obtained by multiplying:

     (A) the amount of Principal being prepaid,
     *by*
     (B) the excess (if any) of the Monthly Note Rate over the Assumed
          Reinvestment Rate,
     *by*
     (C) the Present Value Factor.

The following definitions shall apply:

   **Monthly Note Rate:**  one–twelfth (1/12) of the Interest Rate, expressed as a decimal calculated to five digits.

   **Assumed Reinvestment Rate:**  one–twelfth (1/12) of the yield rate equal to the lesser of (i) the yield on the U.S. Treasury issue (primary issue) with a maturity date closest to the Stated Maturity Date, or (ii) the yield on the U.S. Treasury issue (primary issue) with a term equal to the remaining average life of the Debt, with each such yield being based on the bid price for such issue as published in the Wall Street Journal on the date that is fourteen (14) days prior to the date of such prepayment (or, if such bid price is not published on that date, the next preceding date on which such bid price is so published) and converted to a monthly compounded nominal yield.

   **Present Value Factor:**  the factor that discounts to present value the costs resulting to Lender from the difference in interest rates during the months remaining between the date of prepayment and the Open Prepayment Date, using the Assumed Reinvestment Rate as the

discount rate, with monthly compounding, expressed numerically as follows:

$$\frac{1 - \left(\dfrac{1}{1 + ARR}\right)^n}{ARR}$$

**n** = number of months remaining between the date of prepayment and the Open Prepayment Date

**ARR** = Assumed Reinvestment Rate

**1.2    Index of Other Definitions.**  An index of other terms which are defined in this Agreement or in other Loan Documents is set forth on **Schedule 1**.

**1.3    Principles of Construction.**  Unless otherwise specified, (i) all references to sections and schedules are to those in this Agreement, (ii) the words "hereof," "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision, (iii) all definitions are equally applicable to the singular and plural forms of the terms defined, (iv) the word "including" means "including but not limited to," and (v) accounting terms not specifically defined herein shall be construed in accordance with GAAP.

## 2.    GENERAL LOAN TERMS

**2.1    The Loan.**  Lender is making a loan (the "*Loan*") to Borrower on the date hereof, in the original principal amount (the "*Principal*") of $106,000,000.00, which shall mature on the Stated Maturity Date.  Borrower acknowledges receipt of the Loan, the proceeds of which are being and shall be used to (i) acquire or refinance the Property, (ii) fund certain of the Subaccounts, and (iii) pay transaction costs.  Any excess proceeds may be used for any lawful purpose. No amount repaid in respect of the Loan may be reborrowed.

**2.2    Interest; Monthly Payments**.

**2.2.1    Generally.**    From and after the date hereof, interest on the unpaid Principal shall accrue at the Interest Rate and be payable as hereinafter provided.  On the date hereof, Borrower shall pay interest on the unpaid Principal from the date hereof through and including July 4, 2016.  On August 5, 2016 (the "*First Payment Date*") and each Payment Date thereafter through and including the Payment Date immediately preceding the Stated Maturity Date, Borrower shall pay an amount equal to the Monthly Debt Service Payment Amount.  The Monthly Debt Service Payment Amount due on any Payment Date shall first be applied to the payment of interest accrued from the scheduled Payment Date preceding the Payment Date on which such Monthly Debt Service Payment Amount is paid through the day of the month immediately preceding the Payment Date on which such Monthly Debt Service Payment Amount is paid, notwithstanding that the actual Payment Date may not have been the scheduled Payment Date because the scheduled Payment Date is not a Business Day.  The remainder of such

NY:1797184.16

Monthly Debt Service Payment Amount shall be applied to the reduction of the unpaid Principal. All accrued and unpaid interest shall be due and payable on the Maturity Date.  If the Loan is repaid on any date other than on a Payment Date (whether prior to or after the Stated Maturity Date), Borrower shall also pay interest that would have accrued on such repaid Principal to but not including the next Payment Date.

       **2.2.2**   **Default Rate.**   After the occurrence and during the continuance of an Event of Default, the entire unpaid Debt shall bear interest at the Default Rate, and shall be payable upon demand from time to time, to the extent permitted by applicable law.

       **2.2.3**   **Taxes.**   Any and all payments by Borrower hereunder and under the other Loan Documents shall be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding taxes imposed on Lender's income, and franchise taxes imposed on Lender by law or regulation of any Governmental Authority (all such non–excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to in this <u>Section 2.2.3</u> as "***Applicable Taxes***").  If Borrower shall be required by law to deduct any Applicable Taxes from or in respect of any sum payable hereunder to Lender, the following shall apply:  (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this <u>Section 2.2.3</u>), Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrower shall make such deductions and (iii) Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.  Payments pursuant to this <u>Section 2.2.3</u> shall be made within ten (10) days after the date Lender makes written demand therefor.

       **2.2.4**   **Requirements of Law.**

       (a)    If any Legal Requirement or any change in the interpretation or application thereof or compliance by Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

       (i)    shall subject Lender to any tax of any kind whatsoever with respect to this Agreement, the Note or the Loan (excluding net income taxes) or change the basis of taxation of payments to Lender in respect thereof;

       (ii)    shall impose, modify or hold applicable any reserve, special deposit, compulsory advance or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances or other extensions of credit by, or any other acquisition of funds by, any office of Lender;

       (iii)    shall impose on Lender any other condition;

and the result of any of the foregoing is to increase the cost to Lender, by an amount which Lender deems to be material, of making or maintaining the Loan or to reduce any amount receivable hereunder in respect thereof, then, in any such case, Borrower shall, from time to time, upon receipt of prior written notice of not less than ten (10) Business Days of such fact and

NY:1797184.16

a reasonably detailed description of the circumstances, promptly pay Lender such additional amount or amounts as will compensate Lender for such increased cost or reduced amount receivable (provided such additional amounts are then being charged by Lender to its borrowers under similar loans generally) and are not prohibited by such Legal Requirement to be charged back.

(b)    If Lender shall have determined that the adoption of or any change in any Legal Requirement regarding capital adequacy or in the interpretation or application thereof or compliance by Lender or any corporation controlling Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on Lender's or such corporation's capital as a consequence of its obligations hereunder by an amount deemed by Lender to be material (taking into consideration Lender's or such corporation's policies with respect to capital adequacy), then from time to time, Borrower shall promptly, upon notice from Lender, pay to Lender such additional amount or amounts as will compensate Lender for such reduction (provided such additional amounts are then being charged by Lender to its borrowers under similar loans generally).

(c)    If Lender becomes entitled to claim any additional amounts pursuant to this Section 2.2.4, it shall promptly notify Borrower of the event by reason of which it has become so entitled. A certificate as to any additional amounts payable pursuant to this subsection submitted by Lender to Borrower shall be conclusive in the absence of manifest error or the provision of immediate proof by Borrower to the contrary.

(d)    Notwithstanding anything to the contrary in this Agreement or in any of the other Loan Documents, Borrower acknowledges that any liability of any EEA Financial Institution, including without limitation Lender or any of its successors or assigns, arising under this Agreement or under any of the other Loan Documents, except to the extent such liability is excluded under the Bail-In Legislation from the scope of any Bail-In Action, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(i)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising under this Agreement or under any of the other Loan Documents which may be payable to it by any party hereto that is an EEA Financial Institution; and

(ii)    the effects of any Bail-in Action on any such liability, including, if applicable, (X) a reduction in full or in part or cancellation of any such liability including without limitation a reduction in any accrued or unpaid interest in respect of such liability, (Y) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or under any of the other Loan Documents, or (Z) the variation of the terms of this Agreement or under any of the other Loan Documents to give effect to the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

21

2.3     **Loan Repayment and Defeasance**.

2.3.1     **Repayment.**     Borrower shall repay the entire outstanding principal balance of the Note in full on the Maturity Date, together with interest thereon to (but excluding) the date of repayment and any other amounts due and owing under the Loan Documents. Borrower shall have no right to prepay or defease all or any portion of the Principal, except in accordance with Sections 2.3.2, 2.3.3 and 2.3.4 below.  Except during the continuance of an Event of Default, all proceeds of any repayment, including permitted prepayments, of the Loan shall be applied by Lender as follows in the following order of priority:  *First*, accrued and unpaid interest at the Interest Rate; *Second*, to Principal then due and owing; and *Third*, to any other amounts then due and owing under the Loan Documents, including the Yield Maintenance Premium (if such repayment or prepayment occurs prior to the Stated Maturity Date). Notwithstanding the foregoing, if (i) no Event of Default then exists, the Yield Maintenance Premium shall not be due in connection with a prepayment of the Loan on or after the Open Prepayment Date and (ii) there exists an Event of Default, then, irrespective of when prepayment is made, Lender shall be entitled to receive, in addition to the unpaid Principal and accrued interest and other sums due under the Loan Documents, an amount equal to the Yield Maintenance Premium.  During the continuance of an Event of Default, all proceeds of repayment, including any payment or recovery on the Property (whether through foreclosure, deed–in–lieu of foreclosure, or otherwise) shall, unless otherwise provided in the Loan Documents, be applied in such order and in such manner as Lender shall elect in Lender's discretion.

2.3.2     **Mandatory Prepayments.**  The Loan is subject to mandatory prepayment in certain instances of Insured Casualty or Condemnation (each a "*Casualty/Condemnation Prepayment*"), in the manner and to the extent set forth in Section 7.4.2.     Each Casualty/Condemnation Prepayment, after deducting Lender's costs and expenses (including reasonable attorneys' fees and expenses) in connection with the settlement or collection of the Proceeds or Award, shall be applied in the same manner as repayments under Section 2.3.1, and if such Casualty/Condemnation Payment is made on any date other than a Payment Date, then such Casualty/Condemnation Payment shall include interest that would have accrued on the Principal prepaid to but not including the next Payment Date.  Provided that no Event of Default is continuing, any such mandatory prepayment under this Section 2.3.2 shall be without the payment of the Yield Maintenance Premium.

2.3.3     **Voluntary Defeasance of the Note.**

(a)     Subject to the terms and conditions set forth in this Section 2.3.3, Borrower may defease the entire amount of the Principal (a "*Full Defeasance*") or a portion of the Principal (a "*Partial Defeasance*") (any such Full Defeasance or Partial Defeasance, a "*Defeasance*"); provided, that no Defeasance may occur (i) prior to the Start–up Date, (ii) if an Event of Default shall have occurred (unless such Event of Default will be cured by the Defeasance) and (iii) on any date other than a Payment Date.  Each Defeasance shall be subject, in each case, to the satisfaction of all of the following conditions precedent:

(i)     Borrower will give Lender not less than thirty (30) days prior written notice (the "*Defeasance Notice*") specifying a Payment Date (the "*Defeasance Date*") on

22

which a Defeasance Deposit (hereinafter defined) is to be made.

(ii)    Payment to Lender of all accrued and unpaid interest on the unpaid Principal of the Note to and including the Defeasance Date and the scheduled amortization payment due on such Defeasance Date.

(iii)    Payment to Lender of all other sums, not including scheduled interest or Principal payments, then due and payable under the Note and the other Loan Documents.

(iv)    Payment to Lender of an amount equal to the sum of (x) an amount sufficient to purchase U.S. Obligations which provide payments that will meet the Scheduled Defeasance Payments, (y) costs and expenses incurred or to be incurred in the purchase of the U.S. Obligations and (z) any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the Defeasance (the "*Defeasance Deposit*").

(v)    Payment to Lender of all costs and expenses incurred by Lender in connection with such Defeasance, including reasonable attorneys' fees.

(vi)    In the case of a Partial Defeasance, the execution and delivery by Borrower of all necessary documents to amend and restate the Note and issue two substitute notes, one having a principal balance equal to the defeased portion of the original Note (the "*Defeased Note*") and the other having a principal balance equal to the undefeased portion of the original Note (the "*Undefeased Note*").  The Defeased Note and Undefeased Note shall have terms identical to the terms of the Note, except for the principal balance and a pro rata allocation of the Monthly Debt Service Payment Amount.  (After a Partial Defeasance, all references hereunder and in the other Loan Documents to the term "Note" shall mean and be deemed to refer to the Undefeased Note, unless expressly provided to the contrary.)  A Defeased Note cannot be the subject of any further Defeasance.

(vii)    Delivery to Lender of: (A) a security agreement, in form and substance satisfactory to Lender, creating a first priority lien on the Defeasance Deposit and the U.S. Obligations (hereinafter defined) purchased on behalf of Borrower with the Defeasance Deposit in accordance with this provision of this Section 2.3.3 (the "*Security Agreement*"); (B) an Officer's Certificate of Borrower certifying that the requirements set forth in Section 2.3.3(a) have been satisfied; (C) an opinion of counsel for Borrower in form and substance satisfactory to Lender stating, among other things, that Lender has a perfected first priority security interest in the Defeasance Deposit and the U.S. Obligations purchased by Lender on behalf of Borrower, that the Security Agreement is the legal, valid and binding obligation of Borrower enforceable against Borrower in accordance with its terms and that the Defeasance will not adversely affect the status of any REMIC Trust formed in connection with a Secondary Market Transaction; (D) a certificate of an accounting firm acceptable to Lender which certifies that the U.S. Obligations are sufficient to make the Scheduled Defeasance Payments; (E) a Rating Comfort Letter from each applicable Rating Agency with respect to such Defeasance; and (F) such other certificates, documents or instruments as Lender may reasonably request.

NY:1797184.16

(viii)    Lender shall have received a written consent to the Defeasance or (x) with respect to a Full Defeasance, confirmation from the Mezzanine Lender or confirmation that the Mezzanine Loan has been (or is simultaneously being) defeased in full, or (y) with respect to a Partial Defeasance, confirmation that the Mezzanine Loan has been (or is simultaneously being) defeased by an amount equal to the product of (x) the then outstanding principal balance of the Mezzanine Loan and (y) a fraction, the numerator of which is the amount of the Loan being defeased and the denominator of which is the then-outstanding principal balance of the Loan being defeased (i.e., without taking into account the defeasance of the Loan).

In connection with the conditions set forth in this <u>Section 2.3.3(a)</u>, Borrower hereby appoints Lender as its agent and attorney–in–fact for the purpose of using the Defeasance Deposit to purchase U.S. Obligations which provide payments (A) on or prior to, but as close as possible to, all successive Payment Dates after the date of calculation through the Open Prepayment Date (and in connection therewith Borrower shall not be permitted to provide early notice of prepayment pursuant to <u>Section 2.3.4</u> hereof) and (B) in amounts sufficient to pay, (x) in the case of a Full Defeasance, the Monthly Debt Service Payment Amount required under the Note (or Undefeased Note, as the case may be) together with the unpaid Principal of the Note (or Undefeased Note, as the case may be) payable on the Open Prepayment Date and (y) in the case of a Partial Defeasance, the Monthly Debt Service Payment Amount multiplied by the Defeasance Percentage together with the unpaid Principal of the Defeased Note payable on the Open Prepayment Date (such payments, the "***Scheduled Defeasance Payments***").   Borrower, pursuant to the Security Agreement or other appropriate document, shall authorize and direct that the payments received from the U.S. Obligations may be made directly to Lender and applied to satisfy the obligations of Borrower under the Note or the Defeased Note, as applicable.   Any amounts received in respect of the U.S. Obligations in excess of the amounts necessary to make monthly payments hereunder shall be retained by Lender until payment in full of the Debt. Semi–annual payments in respect of the U.S. Obligations shall be applied to the payments under the Note or the Defeased Note, as applicable, as the same become due thereunder.

(b)    Borrower shall deliver a copy of the Defeasance Notice to Natixis, New York Branch, 1251 Avenue of the Americas, New York, New York 10020; Attention: Real Estate Administration, at the same time and in the same manner, as given to Lender.   In connection with a Defeasance of the Loan under this <u>Section 2.3.3</u>, Natixis, at its option, shall establish or designate a successor entity (the "***Successor Borrower***"), which Successor Borrower shall be a Special Purpose Entity acceptable to Lender and shall not own any other assets or have any other liabilities or operate any other property, except in connection with other defeased loans held in the same securitized pool with the Loan.  The right to establish or designate the Successor Borrower, as well as the right of the Successor Borrower to provide notice of prepayment pursuant to <u>Section 2.3.4</u> hereof, shall be retained by Natixis (but may be assigned to an Affiliate) notwithstanding the sale, assignment or transfer of this Agreement unless such obligation is expressly assigned by Natixis assumed by the transferee.  Borrower shall, in the case of a Full Defeasance, transfer and assign all obligations, rights and duties under and to the Security Agreement and to the Note or, in the case of a Partial Defeasance, transfer and assign all obligations, rights and duties under and to the Security Agreement and to the Defeased Note, as applicable, together with the pledged U.S. Obligations to the Successor Borrower.   The Successor Borrower shall assume all obligations under the Loan Documents and the Security

24

Agreement, and Borrower shall be relieved of its obligations thereunder. Borrower shall pay a $1,000 fee to any such Successor Borrower as consideration for assuming such obligations. Notwithstanding anything herein to the contrary, no other assumption fee shall be payable upon a transfer of the Note or the Defeased Note, as applicable, in accordance with this <u>Section 2.3.3</u>, but Borrower shall pay all costs and expenses incurred by Lender, including Lender's reasonable attorneys' fees and expenses and ongoing fees and expenses incurred in connection with this <u>Section 2.3.3</u>.

        **2.3.4**   **Permitted Prepayment.**  On the Open Prepayment Date or on any Payment Date thereafter prior to the Stated Maturity Date, Borrower shall have the right to pay the entire Debt upon ten (10) Business Days notice to Lender, without payment of the Yield Maintenance Premium and without effecting a Defeasance, provided that no Event of Default then exists.  If any such payment of the Debt pursuant to the preceding sentence is made on any date other than the Open Prepayment Date or any Payment Date thereafter prior to the Stated Maturity Date, such payment shall be accompanied by a payment in an amount equal to interest on the unpaid Principal through the end of the Interest Period during which such payment is made.

        **2.3.5**   <u>**Prepayments in connection with the Mezzanine Loan.**</u>

        (a)    As a condition to making any prepayment under this Section 2.3 (other than as a result of the application of funds during the continuance of an Event of Default), Borrower shall deliver evidence to Lender that simultaneously with any such prepayment, Mezzanine Borrower shall be making pro rata prepayment(s) of the Mezzanine Loan in accordance with their then-outstanding principal balances.  If such prepayment is a prepayment of the Loan in full, Lender shall have received a written consent to the repayment from the Mezzanine Lender or confirmation that the Mezzanine Loan has been (or is simultaneously being) satisfied in full.

        (b)    In the event of any partial prepayment of the Mezzanine Loan in accordance with the terms of the applicable Mezzanine Loan Documents, Borrower shall be required to prepay (or defease) a portion of the Loan in an amount equal to the product of (x) the outstanding principal balance of the Loan and (y) a fraction, the numerator of which is the amount of the Mezzanine Loan being prepaid and the denominator of which is the then-outstanding principal balance of the Mezzanine Loan being prepaid (i.e., without taking into account the prepayment of such Mezzanine Loan), which payment or defeasance shall otherwise be in accordance with Section 2.3 hereof and shall include the payment of the applicable Yield Maintenance Premium, if such repayment occurs before the Open Prepayment Date.

    **2.4**   **Release of Property.**  Except as set forth in this <u>Section 2.4</u>, no repayment, prepayment or Defeasance shall cause, give rise to a right to require, or otherwise result in, the release of the Lien of the Security Instrument.

        **2.4.1**   <u>**Release on Defeasance.**</u>  If Borrower has elected a Full Defeasance, and the requirements of <u>Section 2.3.3</u> have been satisfied, the Property shall be released from the Lien of the Security Instrument, and the U.S. Obligations pledged pursuant to the Security Agreement shall be the sole source of collateral securing the Debt.  In connection with such

release, Borrower shall submit to Lender, not less than twenty (20) days prior to the Defeasance Date, a form of release for execution by Lender appropriate in the State and satisfactory to Lender, and all other documentation Lender requires to be delivered by Borrower, together with an Officer's Certificate certifying that such documentation (i) is in compliance with all Legal Requirements and (ii) will effect such release in accordance with the terms of this Agreement.

**2.4.2    Release on Payment in Full.**  Lender shall, upon the written request and at the expense of Borrower, upon payment in full of the Debt in accordance herewith, release or, if requested by Borrower, assign to Borrower's designee (without any representation or warranty by and without any recourse against Lender whatsoever) the Lien of the Loan Documents if not theretofore released.

**2.4.3    Release of Release Parcel.**  Borrower shall have the right to cause to be released from the lien of the  Security Instrument, the Release Parcel, which, as of the date hereof, is part of the Property, on the following terms and conditions:

(a)    Borrower shall have given a written request therefor (a "***Release Request***") to Lender, accompanied by all evidence and information required by this Section, not less than sixty (60) days prior to the desired release date;

(b)    Each of the Release Parcel, and all improvements thereon, and the remaining portion of the Property (the "***Remaining Property***"), and all improvements thereon, shall comply with all applicable zoning, land use and similar laws, rules, regulations and ordinances of all governmental authorities having or claiming jurisdiction thereover, and all other applicable laws, with each such determination assuming the separate ownership and operation of each parcel;

(c)    Borrower provides evidence reasonably acceptable to Lender that (i) all zoning and subdivision approvals of governmental authorities having jurisdiction as necessary to create legally identifiable tracts of real property, and separate tax and zoning lots for all real property taxes, have been granted; and (ii) from and after the release of the Release Parcel, no acts relating to development, further subdivision, construction or use on the Release Parcel can affect in any respect the compliance of the Remaining Property with all Legal Requirements;

(d)    Borrower provides evidence satisfactory to Lender that, following any such release, the Remaining Property shall have available to it all necessary utility and other services for the development, use, occupancy and operation of the Remaining Property, and adequate, free, unimpeded and unencumbered access for pedestrian and vehicular ingress and egress onto all adjacent public roads;

(e)    Borrower provides Lender with an opinion of counsel satisfactory to Lender, which opinion shall be in form and substance satisfactory to Lender, or other evidence satisfactory to Lender, that the lien of the Security Instrument is and continues to constitute a valid lien on the Remaining Property, and that the Remaining Property is in compliance with zoning requirements of all governmental authorities claiming jurisdiction thereover;

(f)    Borrower shall procure from the title company issuing the title insurance policy insuring the Lien of the Security Instrument (the "***Title Insurance Policy***") an

endorsement to the Title Insurance Policy which shall provide, inter alia, that the lien and priority of the Security Instrument on the Remaining Property shall be unaffected as a result of the release of the Release Parcel, together with such other matters as Lender shall reasonably require;

(g)     Said Release Parcel is identified to Lender's reasonable satisfaction on the Survey delivered to Lender prior to the execution and delivery of this Agreement;

(h)     No Default, or Event of Default has occurred and is continuing;

(i)     The Remaining Property will be in compliance with all provisions of any Leases of any portion of the Property that are then in effect (including, without limitation, as to required parking spaces, restrictions on development, access and similar matters), and the Release Parcel shall be subject to a restrictive covenant prohibiting the use or development thereof in any manner that violates any provision of any then-existing Lease of the Remaining Property;

(j)     Simultaneously with the release of the Release Parcel, the Release Parcel is transferred and conveyed by Borrower to another person or entity (the "***Release Parcel Transferee***"), such that Borrower shall continue to be a Special Purpose Entity;

(k)     Borrower   (A) delivers to Lender, a restrictive covenant, in form and substance satisfactory to Lender, entered into by Borrower and the Release Parcel Transferee, which restrictive covenant shall (i) bind the Release Parcel, (ii) run with the land, (iii) expressly provides that the Release Parcel shall only be used for the sole purpose of constructing and operating a (x) parking garage, or (y) a residential tower on top of a parking garage, (iv) require in connection with any and all construction on the Release Parcel, that the Release Parcel Transferee deliver to the Lender, evidence reasonably satisfactory to Lender (which may be in the form of a binding commitment letter) that Release Parcel Transferee has obtained a construction loan with respect to the construction of the improvements for no less than fifty percent (50%) loan to cost of completion from an Qualified Institutional Lender that is not an Affiliate of Borrower and/or Guarantor improvements (the obligation in this clause (iv) shall apply for each separate construction project on the Release Parcel), and (v) require in connection with any and all construction on the Release Parcel, that the Release Parcel Transferee deliver to the Lender upon commencement of any construction activities, a payment guaranty, executed by Guarantor, in the form attached hereto as   **Schedule 12**, in an amount equal to fifteen (15%) percent of the original Principal balance of the loan, which payment guaranty shall be effective until Release Parcel Transferee delivers to Lender a permanent certificate of occupancy for the proposed improvements (the obligation in this clause (v) shall apply for each separate construction project on the Release Parcel), (B) delivers to Lender   evidence reasonably satisfactory to Lender that Borrower has no obligation with respect to the construction set forth in clause (x) or clause (y) hereof; (C) delivers to Lender   evidence reasonably satisfactory to Lender that Borrower has no obligation with respect to any construction loan obtained by Release Parcel Transferee; and (D) delivers to Lender   evidence reasonably satisfactory to Lender the Property is not collateral or security for any construction loan obtained by Release Parcel Transferee as provided in this section;

27

(l)     Borrower pays all of Lender's fees and expenses (including, without limitation, attorneys' fees and expenses) incurred in connection with the release of such Release Parcel;

(m)     If the Loan is included in a REMIC Trust, and in the event that, after giving effect to such release, the ratio of the unpaid principal balance of the Loan to the value of the remaining Property is greater than 125% (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust; and which shall exclude the value of personal property or going concern value, if any), the principal balance of the Loan must be paid down by an amount equal to the least of the following amounts: (i) the fair market value of the Release Parcel at the time of the release; and (ii) an amount such that the Loan-to-Value ratio of the Loan (as determined by Lender) does not increase after the release of the Release Parcel, unless Lender receives an opinion of counsel that if such amount is not paid, the applicable Secondary Market Transaction will not fail to maintain its status as a REMIC Trust as a result of the release of the Release Parcel; and

(n)     Each of the Release Parcel, and all improvements thereon, and the Remaining Property, and all improvements thereon shall comply with all Legal Requirements with respect to parking (without taking into account any parking demised pursuant to an easement or any other recorded document).

In connection with a Release Request pursuant to Section 2.4.3 hereof, at Borrower's sole cost and expense (including Lender's costs and expenses (including legal fees)), Borrower and Release Parcel Transferee shall be permitted to enter into a declaration of covenants, conditions and restrictions and/or a reciprocal easement agreement or other similar agreement in form and substance reasonably acceptable to Lender, which agreement shall provide solely for ingress, egress, and/or access to public streets, provided (i) such agreement does not require the owner of the Remaining Property to incur any out of pocket costs (unless such costs are deposited with Lender), (ii) the owner of the Remaining Property is not required to maintain any property other than the Remaining Property, (iii) such agreement does not reduce the amount of parking available to the Remaining Property (iv) such agreement does not violate any of the applicable provisions of any Leases in effect at the Remaining Property, (v) such agreement shall be added to Schedule A of the title policy (at Borrower's sole cost and expense), and (vi) after giving effect to such agreement, the requirements of (b), (c), (d), (i) and (k) above shall continue to have been meet in their entirety.

**2.5     Payments and Computations**.

**2.5.1     Making of Payments.**  Each payment by Borrower shall be made in funds settled through the New York Clearing House Interbank Payments System or other funds immediately available to Lender by 11:00 a.m., New York City time, on the date such payment is due, to Lender by deposit to such account as Lender may designate by written notice to Borrower.  Whenever any such payment shall be stated to be due on a day that is not a Business Day, such payment shall be made on the immediately preceding Business Day.  All such payments shall be made irrespective of, and without any deduction, set–off or counterclaim whatsoever and are payable without relief from valuation and appraisement laws and with all

28

costs and charges incurred in the collection or enforcement thereof, including attorneys' fees and court costs.

**2.5.2** **Computations.** Interest payable under the Loan Documents shall be computed on the basis of the actual number of days elapsed over a 360–day year.

**2.5.3** **Late Payment Charge.** If any Principal, interest or other sum due under any Loan Document is not paid by Borrower on the date on which it is due, subject to any applicable grace or cure period, if any, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law (the "*Late Payment Charge*"), in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. Such amount shall be secured by the Loan Documents.

## 3. CASH MANAGEMENT AND RESERVES

**3.1** **Cash Management Arrangements**. Concurrently with the execution and delivery hereof, Borrower shall deliver a notice in the form of Schedule 5, as applicable (a "*Tenant Direction Letter*"), to each existing Tenant at the Property directing each existing Tenant to remit their rent checks directly as more fully described in the Clearing Account Agreement. Borrower shall also deliver a Tenant Direction Letter to each and every tenant under a Lease entered into after the date hereof. Without in any way limiting the foregoing, all Rents received by Borrower or Manager shall be deposited into the Clearing Account within one Business Day of receipt. Funds deposited into the Clearing Account shall be swept by the Clearing Bank on a daily basis into the Deposit Account and applied and disbursed in accordance with this Agreement. Funds in the Deposit Account shall be invested at Lender's discretion only in Permitted Investments. Lender will also establish subaccounts of the Deposit Account which shall at all times be Eligible Accounts (and may be ledger or book entry accounts and not actual accounts) (such subaccounts are referred to herein as "*Subaccounts*"). The Deposit Account and any Subaccount will be under the sole control and dominion of Lender, and Borrower shall have no right of withdrawal therefrom. Borrower shall pay for all expenses of opening and maintaining all of the above accounts.

**3.2** **Required Repairs**.

**3.2.1** **Completion of Required Repairs.** Borrower shall perform and complete each item of the repairs and environmental remedial work at the Property described on **Schedule 2** (the "*Required Repairs*") within twelve (12) months of the date hereof or such shorter period of time for such item set forth on **Schedule 2**.

**3.2.2** **Required Repairs Reserves.** On the date hereof, Borrower shall deposit with Lender the aggregate amount set forth on **Schedule 2** as being required to complete the Required Repairs and Lender shall cause such amount to be transferred to a Subaccount (the "*Required Repairs Subaccount*"). Provided no Default or Event of Default has occurred and is continuing, Lender shall disburse funds held in the Required Repairs Subaccount to Borrower, within fifteen (15) days after the delivery by Borrower to Lender of a request therefor (but not

NY:1797184.16

more often than once per month), in increments of at least $5,000, accompanied by the following items (which items shall be in form and substance satisfactory to Lender): (i) an Officer's Certificate (A) certifying that the Required Repairs or any portion thereof which are the subject of the requested disbursement have been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (B) identifying each Person that supplied materials or labor in connection with such Required Repairs or any portion thereof and (C) stating that each such Person has been or, upon receipt of the requested disbursement, will be paid in full with respect to the portion of the Required Repairs which is the subject of the requested disbursement; (ii) copies of appropriate Lien waivers or other evidence of payment satisfactory to Lender; (iii) at Lender's option, a title search for the Property indicating that it is free from all Liens not previously approved by Lender; (iv) a copy of each License required to be obtained with respect to the portion of the Required Repairs which is the subject of the requested disbursement; and (v) such other evidence as Lender shall reasonably request that the Required Repairs which are the subject of the requested disbursement have been completed and paid for.

**3.3    Taxes and Insurance.**    Borrower shall pay to Lender on each Payment Date (i) one–twelfth of the Taxes that Lender estimates will be payable during the next twelve (12) months in order to accumulate with Lender sufficient funds to pay all such Taxes at least thirty (30) days prior to their respective due dates and (ii) one–twelfth of the Insurance Premiums that Lender estimates will be payable for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies. Such amounts will be transferred by Lender to a Subaccount (the "***Tax and Insurance Subaccount***"). Provided that no Default or Event of Default has occurred and is continuing, Lender will (a) apply funds in the Tax and Insurance Subaccount to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to Sections 5.2 and 7.1, provided that Borrower has promptly supplied Lender with notices of all Taxes and Insurance Premiums due, or (b) reimburse Borrower for such amounts upon presentation of evidence of payment and an Officer's Certificate in form and substance satisfactory to Lender; subject, however, to Borrower's right to contest Taxes in accordance with Section 5.2. In making any payment relating to Taxes and Insurance Premiums, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof. If Lender determines in its reasonable judgment that the funds in the Tax and Insurance Subaccount will be insufficient to pay (or in excess of) the Taxes or Insurance Premiums next coming due, Lender may increase (or decrease) the monthly contribution required to be made by Borrower to the Tax and Insurance Subaccount.

**3.4    Capital Expense Reserves.**    Borrower shall pay to Lender on each Payment Date an amount initially equal to $5,051.00. Lender will transfer such amount into a Subaccount (the "***Capital Reserve Subaccount***"). Additionally, upon thirty (30) days' prior notice to Borrower, Lender may reassess the amount of the monthly payment required under this Section 3.4 from time to time in its reasonable discretion (based upon its then current underwriting standards). Provided that no Default or Event of Default has occurred and is continuing, Lender shall disburse funds held in the Capital Reserve Subaccount to Borrower, within fifteen (15) days after the delivery by Borrower to Lender of a request therefor (but not more often than once per

30

month), in increments of at least $5,000, provided that (i) such disbursement is for an Approved Capital Expense; (ii) Lender shall have (if it desires) verified (by an inspection conducted at Borrower's expense) performance of the work associated with such Approved Capital Expense; and (iii) the request for disbursement is accompanied by (A) an Officer's Certificate certifying (v) that such funds will be used to pay or reimburse Borrower for Approved Capital Expenses and a description thereof, (w) that all outstanding trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full, (x) that the same has not been the subject of a previous disbursement, (y) that all previous disbursements have been used to pay the previously identified Approved Capital Expenses and (z) that any construction work associated with such Approved Capital Expenses has been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (B) reasonably detailed documentation satisfactory to Lender as to the amount, necessity and purpose therefor, (C) copies of appropriate Lien waivers or other evidence of payment satisfactory to Lender in connection with any construction work associated with such Approved Capital Expenses and (D) at Lender's option, a title search for the Property indicating that it is free from all Liens not previously approved by Lender.  Any such disbursement of more than $10,000 to pay (rather than reimburse) Approved Capital Expenses may, at Lender's option, be made by joint check payable to Borrower and the payee on such Approved Capital Expenses.

      **3.5**    **Rollover Reserves**.

      **3.5.1**   Borrower shall pay to Lender $33,672.00 on each Payment Date.  Lender will transfer such amount into a Subaccount (the "***Rollover Reserve Subaccount***").  Borrower shall also pay to Lender for transfer into the Rollover Reserve Subaccount all payments received from Tenants in connection with the early termination or cancellation of any Leases, including fees, penalties and commissions, provided, however, that any such payments made by Food 4 Less in connection with the Food 4 Less Lease shall be deposited into the Food 4 Less Cash Trap Reserve Subaccount.  If Lender determines in its reasonable judgment that the funds in the Rollover Reserve Subaccount will be insufficient to pay (or in excess of) the amounts due or to become due for Approved Leasing Expenses, Lender may increase (or decrease) the monthly contribution required to be made by Borrower to the Rollover Reserve Subaccount.  Provided that no Default or Event of Default has occurred and is continuing, Lender shall disburse funds held in the Rollover Reserve Subaccount to Borrower within fifteen (15) days after the delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $5,000, provided (i) such disbursement is for an Approved Leasing Expense; (ii) Lender shall have (if it desires) verified (by an inspection conducted at Borrower's expense) performance of any construction work associated with such Approved Leasing Expense; and (iii) the request for disbursement is accompanied by (A) an Officer's Certificate certifying (v) that such funds will be used only to pay (or reimburse Borrower for) Approved Leasing Expenses and a description thereof, (w) that all outstanding trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full, (x) that the same has not been the subject of a previous disbursement, (y) that all previous disbursements have been used only to pay (or reimburse Borrower for) the previously identified Approved Leasing Expenses and (z) that any construction work associated with such Approved Leasing Expenses has been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (B) reasonably detailed supporting documentation as to the amount, necessity and purpose therefor, (C) copies of appropriate Lien

waivers or other evidence of payment satisfactory to Lender in connection with any construction work associated with such Approved Leasing Expenses and (D) at Lender's option, a title search for the Property indicating that it is free from all Liens not previously approved by Lender. Any such disbursement of more than $10,000 to pay (rather than reimburse) Approved Leasing Expenses may, at Lender's option, be made by joint check payable to Borrower and the payee of such Approved Leasing Expenses.

3.5.2   Notwithstanding the foregoing, Lender shall not be required to disburse funds from the Rollover Reserve Subaccount for Approved Leasing Expenses incurred by Borrower in connection with a Food 4 Less Lease Renewal and/or a Food 4 Less Replacement Lease unless at the time of Borrower's request for such disbursement there are no funds available in the Food 4 Less Cash Trap Reserve Subaccount for the payment of same.

3.5.3   Notwithstanding the foregoing, in no event shall Borrower be required to make deposits to the Rollover Reserve Subaccount if the amount then on deposit therein equals or exceeds the sum of $1,212,192.00  (the "Rollover Reserve Cap"), provided, however, that if the balance in the Rollover Reserve Subaccount falls below $500,000.00, the monthly deposits into the Rollover Reserve Subaccount shall recommence until the amount on deposit in the Rollover Reserve Subaccount once again equals the Rollover Reserve Cap.

3.6   **Operating Expense Subaccount.**   Rents shall be transferred into a Subaccount (the "*Operating Expense Subaccount*") as provided in <u>Section 3.10</u>.  Provided no Default or Event of Default has occurred and is continuing, Lender shall disburse funds held in the Operating Expense Subaccount to Borrower, within fifteen (15) days after delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $1,000, provided (i) such disbursement is for an Approved Operating Expense; and (ii) such disbursement is accompanied by (A) an Officer's Certificate certifying (w) that such funds will be used to pay Approved Operating Expenses and a description thereof, (x) that all outstanding trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full, (y) that the same has not been the subject of a previous disbursement, and (z) that all previous disbursements have been or will be used to pay the previously identified Approved Operating Expenses, and (B) reasonably detailed documentation satisfactory to Lender as to the amount, necessity and purpose therefor.

3.7   **Casualty/Condemnation Subaccount.**   Borrower shall pay, or cause to be paid, to Lender all Proceeds or Awards due to any Casualty or Condemnation to be transferred to a Subaccount (the "*Casualty/Condemnation Subaccount*") in accordance with the provisions of <u>Section 7</u>.   All amounts in the Casualty/Condemnation Subaccount shall be disbursed in accordance with the provisions of <u>Section 7</u>.

3.8   **Security Deposits.**   Borrower shall keep all security deposits under Leases at a separately designated account under Borrower's control at the Clearing Bank so that the security deposits shall not be commingled with any other funds of Borrower (such account, the "*Security Deposit Account*").   Borrower shall, upon Lender's request, if permitted by applicable Legal Requirements, turn over to Lender the security deposits (and any interest theretofore earned thereon) under Leases, to be held by Lender in a Subaccount (the "*Security Deposit Subaccount*") subject to the terms of the Leases.  Security deposits held in the Security Deposit

Subaccount will be released by Lender upon notice from Borrower together with such evidence as Lender may reasonably request that such security deposit is required to be returned to a Tenant pursuant to the terms of a Lease or may be applied as Rent pursuant to the rights of Borrower under the applicable Lease.  Any letter of credit or other instrument that Borrower receives in lieu of a cash security deposit under any Lease entered into after the date hereof shall (i) be maintained in full force and effect in the full amount unless replaced by a cash deposit as hereinabove described and (ii)  if permitted pursuant to any Legal Requirements, name Lender as payee or mortgagee thereunder (or at Lender's option, be fully assignable to Lender).

**3.9      Grant of Security Interest; Application of Funds.**  As security for payment of the Debt and the performance by Borrower of all other terms, conditions and provisions of the Loan Documents, Borrower hereby pledges and assigns to Lender, and grants to Lender a security interest in, all of Borrower's right, title and interest in and to all Rents and in and to all payments to or monies held in the Clearing Account, the Deposit Account and all Subaccounts created pursuant to this Agreement (collectively, the "***Cash Management Accounts***").  Borrower hereby grants to Lender a continuing security interest in, and agrees to hold in trust for the benefit of Lender, all Rents in its possession prior to the (i) payment of such Rents to Lender or (ii) deposit of such Rents into the Deposit Account.  Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in any Cash Management Account, or permit any Lien to attach thereto, or any levy to be made thereon, or any UCC Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.  This Agreement is, among other things, intended by the parties to be a security agreement for purposes of the UCC.  Upon the occurrence and during the continuance of an Event of Default, Lender may apply any sums in any Cash Management Account in any order and in any manner as Lender shall elect in Lender's discretion without seeking the appointment of a receiver and without adversely affecting the rights of Lender to foreclose the Lien of the Security Instrument or exercise its other rights under the Loan Documents.  Cash Management Accounts shall not constitute trust funds and may be commingled with other monies held by Lender.  Borrower shall be entitled to receive on a semi–annual basis interest on any balance in the Deposit Account and any Subaccounts other than Subaccounts established for the collection of Escrows (including any Eligible Account maintained at a bank or other depository other than the Deposit Bank selected by Lender in accordance with Section 3.1) at a rate equal to the U.S. and Regional Composite National Bank Average Retail Savings Money Market CD Yield, from time to time.  Upon repayment in full of the Debt, all remaining funds in the Subaccounts, if any, shall be promptly disbursed to Borrower, unless the Mezzanine Loan is outstanding, in which case all such remaining funds shall be promptly disbursed to Mezzanine Lender with such funds to be disbursed or applied in accordance with the terms of the Mezzanine Loan Agreement.

**3.10      Property Cash Flow Allocation**.

(a)      Any Rents deposited into the Deposit Account up to and including the Business Day prior to a Payment Date shall be applied on such Payment Date as follows in the following order of priority:

(i)      First, to make payments into the Tax and Insurance Subaccount as required under Section 3.3;

(ii)     Second, to pay the monthly portion of the fees charged by the Deposit Bank in accordance with the Deposit Account Agreement;

(iii)     Third, to Lender to pay the Monthly Debt Service Payment Amount due on such Payment Date (plus, if applicable, interest at the Default Rate and all other amounts, other than those described under other clauses of this <u>Section 3.10(a)</u>, then due to Lender under the Loan Documents), which payments shall be made into a Subaccount (the "***Monthly Debt Service Subaccount***") to be established for such purpose under the Deposit Account Agreement;

(iv)     Fourth, to make payments into the Capital Reserve Subaccount as required under <u>Section 3.4</u>;

(v)     Fifth, to make payments into the Rollover Reserve Subaccount as required under <u>Section 3.5</u>;

(vi)     Sixth, to make payments for Approved Operating Expenses as required under <u>Section 3.6</u>;

(vii)     Seventh, after the consummation of a Secondary Market Transaction, to pay the pro rata portion of the expenses described in <u>Section 9</u>;

(viii)     Eight, if a New Mezzanine Loan (or any portion thereof) is outstanding, to the New Mezzanine Lender (at an account designated in writing by New Mezzanine Lender to Lender) an amount equal to the Monthly New Mezzanine Debt Service Payment due and owing on such Payment Date;

(ix)     Ninth, if a Current Mezzanine Loan (or any portion thereof) is outstanding, to the Current Mezzanine Lender (at an account designated in writing by Current Mezzanine Lender to Lender) an amount equal to the Monthly Current Mezzanine Debt Service Payment due and owing on such Payment Date; and

(x)     Tenth, if a Food 4 Less Cash Trap is then in effect, all amounts remaining after payments of the amounts set forth in clauses (i) through (ix) above (the "***Excess Cash***") to the Food 4 Less Cash Trap Reserve Subaccount in accordance with <u>Section 3.12</u> hereof;

(xi)     Eleventh, if a Food 4 Less Cash Trap is not then in effect, and (1) if the New Mezzanine Loan (or any portion thereof) is outstanding (regardless of whether the Current Mezzanine Loan (or any portion thereof) is outstanding), payment of any other amounts then due and payable under the New Mezzanine Loan Documents (other than the outstanding principal balance of the New Mezzanine Loan) to an account designated in writing by New Mezzanine Lender to Lender, (2) if the Current Mezzanine Loan (or any portion thereof) is outstanding (and no New Mezzanine Loan is outstanding), payment of any other amounts then due and payable under the Current Mezzanine Loan Documents (other than the outstanding principal balance of the Current Mezzanine Loan) to an account designated in writing by Current Mezzanine Lender to Lender;

(xii)    Lastly, all amounts remaining after payment of the amounts set forth in clauses (i) through (xi) above as follows:

(A)    if a Cash Trap Period is then continuing, to the Cash Collateral Reserve Subaccount as required under Section 3.12 hereof; or

(B)    if a Cash Trap Period is not then continuing, and (1) if the New Mezzanine Loan (or any portion thereof) is outstanding (regardless of whether the Current Mezzanine Loan (or any portion thereof) is outstanding), all remaining amounts shall be deposited into an account designated in writing by New Mezzanine Lender to Lender, (2) if the Current Mezzanine Loan (or any portion thereof) is outstanding, all remaining amounts shall be deposited into an account designated in writing by Current Mezzanine Lender to Lender, or (3) if the Mezzanine Loan has been paid in full, payments to Borrower of any remaining amounts.

(b)    The failure of Borrower to make all of the payments required under clauses (i) through (ix) of Section 3.10(a) in full on each Payment Date shall constitute an Event of Default under this Agreement.

(c)    Notwithstanding anything to the contrary contained in this Section 3.10, after the occurrence of a Default or an Event of Default, Lender may apply all Rents deposited into the Deposit Account and other proceeds of repayment in such order and in such manner as Lender shall elect.

(d)    If Lender receives written notice from Mezzanine Lender that an Event of Default (as defined in the Mezzanine Loan Agreement) has occurred, Lender may conclusively rely on such notice without any inquiry into the validity thereof.

**3.11    Cash Collateral Reserve.** Following the commencement, and at all times during the continuance, of a Cash Trap Period (and provided that a Food 4 Less Cash Trap Period is not then in effect), all amounts remaining in the Deposit Account after making the payments described in Section 3.10(a)(i) through (xi), if any, shall be deposited into a Subaccount (the "*Cash Collateral Reserve Subaccount*").  All funds deposited into the Cash Collateral Reserve Subaccount shall be held by Lender as additional security for the Debt and Borrower shall have no right to receive any disbursements therefrom.  Notwithstanding the foregoing, upon the termination of any Cash Trap Period, no further deposits shall be made into the Cash Collateral Reserve Subaccount and, provided that no Event of Default has occurred and is continuing, all amounts then on deposit in the Cash Collateral Reserve Subaccount shall be paid to Borrower.

**3.12    Food 4 Less Cash Trap Reserve Subaccount**.

**3.12.1**  Upon the occurrence and during the continuance of a Food 4 Less Cash Trap Period, all Excess Cash shall be collected by Lender and all such amounts shall be held by Lender as additional security for the Loan (amounts so held shall be hereinafter referred to as the "Food 4 Less Cash Trap Reserve Funds" and the Subaccount to which such amounts are held shall hereinafter be referred to as the "Food 4 Less Cash Trap Reserve Subaccount").

**3.12.2**  Provided that no Event of Default has occurred and is continuing, Lender shall disburse funds held in the Food 4 Less Cash Trap Reserve Subaccount to Borrower within

35

fifteen (15) days after the delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $5,000, provided (i) such disbursement is for an Approved Leasing Expense incurred in connection with a Food 4 Less Lease Renewal or a Food 4 Less Replacement Lease; (ii) Lender shall have (if it desires) verified (by an inspection conducted at Borrower's expense) performance of any construction work associated with such Approved Leasing Expense; and (iii) the request for disbursement is accompanied by (A) an Officer's Certificate certifying (v) that such funds will be used only to pay (or reimburse Borrower for) Approved Leasing Expenses as provided in the foregoing clause (i) and a description thereof, (w) that all outstanding trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full, (x) that the same has not been the subject of a previous disbursement, (y) that all previous disbursements have been used only to pay (or reimburse Borrower for) the previously identified Approved Leasing Expenses and (z) that any construction work associated with such Approved Leasing Expenses has been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (B) reasonably detailed supporting documentation as to the amount, necessity and purpose therefor, (C) copies of appropriate Lien waivers or other evidence of payment satisfactory to Lender in connection with any construction work associated with such Approved Leasing Expenses and (D) at Lender's option, a title search for the Property indicating that it is free from all Liens not previously approved by Lender**.** Any such disbursement of more than $10,000 to pay (rather than reimburse) Approved Leasing Expenses may, at Lender's option, be made by joint check payable to Borrower and the payee of such Approved Leasing Expenses.

**3.12.3** Upon the termination of a Food 4 Less Cash Trap Period, so long as (i) no Event of Default has occurred and is continuing and no other Cash Trap Period (including, without limitation, any other Food 4 Less Cash Trap Period) is then in effect, and (ii) all tenant improvement allowances and leasing commissions relating to the Food 4 Less Lease Renewal or Food 4 Less Replacement Lease, as applicable, have been paid and performed by Borrower, any funds then held in the Food 4 Less Cash Trap Reserve Subaccount shall be returned to Borrower (provided, however, if at such time Lender has received written notice that a Mezzanine Loan Event of Default then exists, such funds shall instead be deemed distributed to Borrower and shall be paid to Mezzanine Lender).

**3.13    Notice from Mezzanine Lender.** If Lender receives written notice from Mezzanine Lender than an "Event of Default" has occurred under the Mezzanine Loan Documents, Lender may conclusively rely on such notice without any inquiry into the validity thereof**.**

**3.14    Payments    made    to    Mezzanine    Lender    on    behalf    of    Borrower**. Notwithstanding anything to the contrary contained in this Agreement, the other Loan Documents and/or the Mezzanine Loan Documents, the parties hereto acknowledge and agree that, as to any clause or provision contained in this Agreement, the other Loan Documents and/or the Mezzanine Loan Documents to the effect that payments, distributions, or other similar effect are to be made by Borrower or Lender to Mezzanine Lender or applied to the Mezzanine Loan, such clause or provision shall be deemed to mean, and shall be construed as meaning, that Lender shall pay to Borrower, and Borrower shall then immediately distribute to Mezzanine Borrower, pursuant to an in accordance with the organizational documents of Borrower and

36

applicable law, which distribution shall be immediately payable by Mezzanine Borrower to Mezzanine Lender, and any such clause or provision shall not be construed as meaning that Borrower is acting on behalf of, holding out its credit for, or paying the obligations of, Mezzanine Borrower, directly or in any other manner that would violate any of the single purpose entity covenants contained in this Agreement or other similar covenants contained in Borrower's organizational documents or the Mezzanine Borrower's organizational documents, respectively.

**3.15    Mezzanine Loan**.

        **3.15.1**  Notwithstanding anything in this Article 3 to the contrary, for so long as a Mezzanine Loan Default has occurred and is continuing, in no event shall the remaining balance of any funds in any of the reserves established pursuant to this Article III be returned to the Borrower after all amounts have been disbursed from such reserve for the payment of the costs of all of the expenses for which such reserve was established, instead such funds shall be transferred to the Cash Collateral Reserve Subaccount**.**

        **3.15.2**  Notwithstanding anything in this Article 3 to the contrary, upon the indefeasible repayment of the Debt in full, any funds remaining on deposit in any Cash Management Account shall, (1) if the New Mezzanine Loan (or any portion thereof) is outstanding (regardless of whether the Current Mezzanine Loan (or any portion thereof) is outstanding), be transferred to an account designated in writing by New Mezzanine Lender to Lender to be held and applied in accordance with the New Mezzanine Loan Documents, (2) if the Current Mezzanine Loan (or any portion thereof) is outstanding (and no New Mezzanine Loan is outstanding), be transferred to an account designated in writing by Current Mezzanine Lender to Lender to be held and applied in accordance with the Current Mezzanine Loan Documents.

**3.16    Free Rent Reserve**.

        **3.16.1**  On the date hereof, Borrower shall deposit with Lender an amount equal to $744,438.96 (the "Free Rent Reserve Funds") and Lender shall cause such amount to be transferred to a Subaccount (the "Free Rent Reserve Subaccount").

        **3.16.2**  Attached hereto as Schedule 7 is a schedule of rent abatements due under certain Leases identified thereon (each, a "Free Rent Reserve Lease").  So long as (i) no Event of Default shall exist and be continuing, and (ii) the applicable Free Rent Reserve Lease is in full force and effect with no defaults thereunder beyond any applicable notice and cure periods, Lender shall, provided sufficient sums remain in the Free Rent Reserve Account, transfer a portion of the Free Rent Reserve Funds in the amount set forth on **Schedule 7** for the applicable Free Rent Reserve Lease into to the Deposit Account (2) Business Days prior to each Payment Date in each calendar month set forth on **Schedule 7** with respect to the applicable Free Rent Lease to be applied in accordance with <u>Section 3.10</u> hereof.

37

**3.17    Planet Fitness TI/LC Reserve**.

    **3.17.1**  On the date hereof, Borrower shall deposit with Lender an amount equal to $611,612.63 (the "Planet Fitness TI/LC Reserve Funds") and Lender shall cause such amount to be transferred to a Subaccount (the "Planet Fitness TI/LC Reserve Subaccount").

    **3.17.2**  So no long as no Event of Default shall have occurred and be continuing, Lender shall, provided sufficient sums remain in the Planet Fitness TI/LC Reserve Subaccount, disburse to Borrower the Planet Fitness TI/LC Funds deposited into the Planet Fitness TI/LC Reserve Subaccount in accordance with the provisions of Section 3.5 hereof and provided the requirements set forth therein are met, only for the payment of Approved Leasing Expenses related to the Planet Fitness Lease.

**3.18    Food 4 Less CAM Reserve**.

    **3.18.1**  On the date hereof, Borrower shall deposit with Lender an amount equal to $88,068.18 (the "Food 4 Less CAM Reserve Funds") and Lender shall cause such amount to be transferred to a Subaccount (the "Food 4 Less CAM Reserve Subaccount").

    **3.18.2**  Lender shall make a one (1) time disbursement all of the Food 4 Less CAM Reserve Funds held in the Food 4 Less CAM Reserve Subaccount to Borrower within fifteen (15) days after the delivery by Borrower to Lender of a request therefor,  provided that (i) no Event of Default has occurred and is continuing, and (ii) Borrower shall have delivered to Lender an estoppel certificate executed by Food 4 Less in form and substance satisfactory to Lender, providing, among other things, that (1) the Food 4 Less Lease is in full force and effect, (2) there are not defaults be either Borrower or Food 4 Less under the Food 4 Less Lease, and (3) all prior disputes with respect to previously paid common area maintenance charges and all other additional rent items have been resolved and no sums are due and owing to Food 4 Less, and there are no offsets or payments due to Food 4 Less under the Food 4 Less Lease, including, without limitation, any offsets or payments associated with reconciliation of common area maintenance costs.

**3.19    La Curacao CAM Reserve**.

    **3.19.1**  On the date hereof, Borrower shall deposit with Lender an amount equal to $50,000.00 (the "La Curacao CAM Reserve Funds") and Lender shall cause such amount to be transferred to a Subaccount (the "La Curacao CAM Reserve Subaccount").

    **3.19.2**  Lender shall disburse all of the La Curacao CAM Reserve Funds held in the La Curacao CAM Reserve Subaccount to Borrower within fifteen (15) days after the delivery by Borrower to Lender of a request therefor (but no more than one (1) time during the term of the Loan),  provided that (i) no Event of Default has occurred and is continuing, and (ii) Borrower shall have delivered to Lender an estoppel certificate executed by La Curacao in form and substance satisfactory to Lender, providing, among other things, that (1) the La Curacao Lease is in full force and effect, (2) there are not defaults be either Borrower or La Curacao under the La Curacao Lease and (3) all prior disputes with respect to previously paid common area maintenance charges and all other additional rent items have been resolved and no sums are due and owing to La Curacao, and  there are no offsets or payments due to La Curacao under the

La Curacao Lease, including, without limitation, any offsets or payments associated with reconciliation of common area maintenance costs.

**3.20    Litigation Reserve**.

**3.20.1** On the date hereof, Borrower shall deposit with Lender an amount equal to $56,250.00 (the "Litigation Reserve Funds") and Lender shall cause such amount to be transferred to a Subaccount (the "Litigation Reserve Subaccount"). If Lender determines in its reasonable judgment that the funds in the Litigation Reserve Subaccount will be insufficient to pay the amounts due or to become due in connection with the Pending Litigation, Lender may require Borrower, and Borrower shall deposit an addition sum into the Litigation Reserve Subaccount to cover any additional costs determined by Lender.

**3.20.2** Set forth on Schedule 10 hereof is a schedule of pending lawsuits to which Borrower is a party (individually and collectively, the "Pending Litigation") and the amounts of controversy in each such Pending Litigation.  Borrower hereby represents that such amounts of controversy are true and accurate in all respects.

**3.20.3** Lender shall disburse the Litigation Reserve Funds held in the Litigation Reserve Subaccount to Borrower within fifteen (15) days after the delivery by Borrower to Lender of a request therefor, provided that (i) no Event of Default has occurred and is continuing, (ii) Borrower shall have delivered to Lender evidence satisfactory to Lender, in Lender's sole discretion, that (x) Borrower has obtained sufficient insurance coverage to cover all costs, expenses and liabilities arising out of such Pending Litigation, and such insurance coverage is in place for such Pending Litigation, or (y) such Pending Litigation has been dismissed with prejudice by a court of competent jurisdiction, and (iii) the amount of such disbursement shall not exceed (x) the amount of the insurance policy covering such Pending Litigation (less any amount of co-insurance or applicable deductible), to the extent such Pending Litigation is covered by a sufficient insurance policy, as determined by Lender in its sole discretion, or (y) the amount of controversy set forth in Schedule 10 hereof with respect to such Pending Litigation, if such Pending Litigation is not covered by a sufficient insurance policy, as determined by Lender in its sole discretion.

**3.21    Proposed Construction Reserve.**  On the date hereof, Borrower shall deposit with Lender the aggregate amount set forth on **Schedule 11** as being required to complete the Proposed Construction and Lender shall cause such amount to be transferred to a Subaccount (the "***Proposed Construction Subaccount***"). If Lender determines in its reasonable judgment that the funds in the Proposed Construction Subaccount will be insufficient to pay the amounts due or to become due in connection with the Proposed Construction, Lender may require Borrower, and Borrower shall deposit an addition sum into the Proposed Construction Subaccount to cover any additional costs as reasonably determined by Lender. Provided no Default or Event of Default has occurred and is continuing, and provided, further, that the requirements set forth in Section 5.24 hereof have been satisfied (in Lender's sole discretion), Lender shall disburse funds held in the Proposed Construction Subaccount to Borrower, within fifteen (15) days after the delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $5,000, accompanied by the following items (which items shall be in form and substance satisfactory to Lender): (i) an Officer's Certificate

39

(A) certifying that the Proposed Construction or any portion thereof which are the subject of the requested disbursement have been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (B) identifying each Person that supplied materials or labor in connection with such Proposed Construction or any portion thereof and (C) stating that each such Person has been or, upon receipt of the requested disbursement, will be paid in full with respect to the portion of the Proposed Construction which is the subject of the requested disbursement; (ii) copies of appropriate Lien waivers or other evidence of payment satisfactory to Lender; (iii) at Lender's option, a title search for the Property indicating that it is free from all Liens not previously approved by Lender; (iv) a copy of each License required to be obtained with respect to the portion of the Proposed Construction which is the subject of the requested disbursement; (v) an estoppel certificate from Lynwood Authority in form and substance reasonably acceptable to Lender; and (vi) such other evidence as Lender shall reasonably request that the Proposed Construction which are the subject of the requested disbursement have been completed and paid for.

      **3.22**    **Earthquake Insurance Reserve**.

      **3.22.1**  On the date hereof, Borrower shall deposit with Lender an amount equal to $150,000.00 (the "Earthquake Insurance Reserve Funds") and Lender shall cause such amount to be transferred to a Subaccount (the "Earthquake Insurance Reserve Subaccount"). If Lender determines in its reasonable judgment that the funds in the Earthquake Insurance Reserve Subaccount will be insufficient to pay for the Earthquake Insurance Policies, Lender may require Borrower, and Borrower shall, within ten (10) days after Lender's written request, deposit an additional sum into the Earthquake Insurance Reserve Subaccount to cover any additional costs as reasonably determined by Lender.

      **3.22.2**  Borrower shall within three (3) Business Days after the date Lender notifies Borrower in writing that the Required Mezzanine Lender requires the Borrower to carry earthquake insurance covering the Property, (i) purchase the Earthquake Insurance Policies, (ii) deliver to Lender, copies of the Earthquake Insurance Policies, and (iii) deliver to Lender, evidence reasonably satisfactory to Lender that that all premiums associated with the Earthquake Insurance Policies have been paid in full. Lender shall make a one (1) time disbursement of the Earthquake Insurance Reserve Funds held in the Earthquake Insurance Reserve Subaccount to Borrower in connection with its purchase of the Earthquake Insurance Policies, upon satisfaction of the conditions (i) through (iii) above.

      **3.22.3**  Upon Borrower's purchase of the required Earthquake Insurance Policies (and satisfaction of clauses (i) through (iii) contained in Section 3.22.2 hereof), so long as (i) no Event of Default has occurred and is continuing and no Cash Trap Period is then in effect, any excess funds after application of the Earthquake Insurance Reserve Funds to the purchase of the Earthquake Insurance Policies then held in the Earthquake Insurance Reserve Subaccount shall be returned to Borrower (provided, however, if at such time Lender has received written notice that a Mezzanine Loan Event of Default then exists, such funds shall instead be deemed distributed to Borrower and shall be paid to Mezzanine Lender).

      **3.22.4**  Notwithstanding the foregoing, if the Lender has not notified the Borrower within three (3) months of the date hereof that the Required Mezzanine Lender requires the

Borrower to carry the Earthquake Insurance Policies, so long as (i) no Event of Default has occurred and is continuing and no Cash Trap Period is then in effect, any funds then held in the Earthquake Insurance Reserve Subaccount shall be returned to Borrower (provided, however, if at such time Lender has received written notice that a Mezzanine Loan Event of Default then exists, such funds shall instead be deemed distributed to Borrower and shall be paid to Mezzanine Lender).

## 4. REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender as of the date hereof that:

**4.1    Organization; Special Purpose.** Each of Borrower and Borrower Representative has been duly organized and is validly existing and in good standing under the laws of the state of its formation, with requisite power and authority, and all rights, licenses, permits and authorizations, governmental or otherwise, necessary to own its properties and to transact the business in which it is now engaged. Each of Borrower and Borrower Representative is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, business and operations. Each of Borrower and Borrower Representative is a Special Purpose Entity.

**4.2    Proceedings; Enforceability.** Borrower has taken all necessary action to authorize the execution, delivery and performance of the Loan Documents. The Loan Documents have been duly executed and delivered by Borrower and constitute legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and general principles of equity. The Loan Documents are not subject to, and Borrower has not asserted, any right of rescission, set–off, counterclaim or defense, including the defense of usury. No exercise of any of the terms of the Loan Documents, or any right thereunder, will render any Loan Document unenforceable.

**4.3    No Conflicts.** The execution, delivery and performance of the Loan Documents by Borrower and the transactions contemplated hereby will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien (other than pursuant to the Loan Documents) upon any of the property of Borrower pursuant to the terms of, any agreement or instrument to which Borrower is a party or by which its property is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower or any of its properties. Borrower's rights under the Licenses and the Management Agreement will not be adversely affected by the execution and delivery of the Loan Documents, Borrower's performance thereunder, the recordation of the Security Instrument, or the exercise of any remedies by Lender. Any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Borrower of the Loan Documents has been obtained and is in full force and effect.

**4.4    Litigation.** Except as previously disclosed to Lender in writing, there are no actions, suits or other proceedings at law or in equity by or before any Governmental Authority

NY:1797184.16

now pending or, to Borrower's best knowledge, threatened in writing against or affecting Borrower, Borrower Representative, the Manager or the Property, which, if adversely determined, might materially adversely affect the condition (financial or otherwise) or business of Borrower, Borrower Representative, Manager or the condition or ownership of the Property.

4.5    **Agreements.**    Borrower is not a party to any agreement or instrument or subject to any restriction which might adversely affect Borrower or the Property, or Borrower's business, properties, operations or condition, financial or otherwise. Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Permitted Encumbrance or any other agreement or instrument to which it is a party or by which it or the Property is bound.

4.6    **Title.**    Borrower has good, marketable and indefeasible title in fee to the real property and good title to the balance of the Property, free and clear of all Liens except the Permitted Encumbrances. All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements in connection with the transfer of the Property to Borrower have been paid. The Security Instrument when properly recorded in the appropriate records, together with any UCC Financing Statements required to be filed in connection therewith, will create (i) a valid, perfected first priority lien on Borrower's interest in the Property and (ii) valid and perfected first priority security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances. All mortgage, recording, stamp, intangible or other similar taxes required to be paid by any Person under applicable Legal Requirements in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents have been paid. The Permitted Encumbrances do not materially adversely affect the value, operation or use of the Property, or Borrower's ability to repay the Loan. No Condemnation or other proceeding has been commenced or, to Borrower's best knowledge, is contemplated with respect to all or part of the Property or for the relocation of roadways providing access to the Property. There are no claims for payment for work, labor or materials affecting the Property which are or may become a Lien prior to, or of equal priority with, the Liens created by the Loan Documents. There are no outstanding options to purchase or rights of first refusal affecting all or any portion of the Property. The survey for the Property delivered to Lender does not fail to reflect any material matter affecting the Property or the title thereto. All of the Improvements included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvement on an adjoining property encroaches upon the Property, and no easement or other encumbrance upon the Property encroaches upon any of the Improvements, except those insured against by the title insurance policy insuring the Lien of the Security Instrument. Each parcel comprising the Property is a separate tax lot and is not a portion of any other tax lot that is not a part of the Property. There are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, or any contemplated improvements to the Property that may result in such special or other assessments.

4.7    **No Bankruptcy Filing.**    Borrower is not contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency law or the liquidation of all or a major portion of its property (a "***Bankruptcy Proceeding***"), and Borrower has no knowledge of

any Person contemplating the filing of any such petition against it.  In addition, neither Borrower nor Borrower Representative nor any principal nor Affiliate of either has been a party to, or the subject of a Bankruptcy Proceeding for the past ten years.

      **4.8**    **Full and Accurate Disclosure.**  No statement of fact made by Borrower in any Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained therein not misleading.  There is no material fact presently known to Borrower that has not been disclosed to Lender which materially adversely affects, or, as far as Borrower can foresee, might materially adversely affect, the Property or the business, operations or condition (financial or otherwise) of Borrower.  All financial data, including the statements of cash flow and income and operating expense, that have been delivered to Lender by Borrower in respect of Borrower and the Property (excluding any such documents identified as drafts) (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of Borrower and the Property as of the date of such reports, and (iii) to the extent prepared by an independent certified public accounting firm, have been prepared in accordance with GAAP consistently applied throughout the periods covered, except as disclosed therein.  Borrower has no contingent liabilities, liabilities for taxes, unusual forward or long–term commitments, unrealized or anticipated losses from any unfavorable commitments or any liabilities or obligations not expressly permitted by this Agreement.  Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower or the Property from that set forth in said financial statements.

      **4.9**    **No Plan Assets.**  Borrower is not an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA, and none of the assets of Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3–101.

      **4.10**    **Compliance.**  Borrower and the Property and the use thereof comply in all material respects with all applicable Legal Requirements (including with respect to parking and applicable zoning and land use laws, regulations and ordinances).  Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority, the violation of which might materially adversely affect the condition (financial or otherwise) or business of Borrower.  The Property is used exclusively for a retail shopping center and other appurtenant and related uses.  In the event that all or any part of the Improvements are destroyed or damaged, said Improvements can be legally reconstructed to their condition prior to such damage or destruction, and thereafter exist for the same use without violating any zoning or other ordinances applicable thereto and without the necessity of obtaining any variances or special permits.  No legal proceedings are pending or, to the best of Borrower's knowledge, threatened with respect to the zoning of the Property.  Neither the zoning nor any other right to construct, use or operate the Property is in any way dependent upon or related to any property other than the Property. All certifications, permits, licenses and approvals, including certificates of completion and occupancy permits required for the legal use, occupancy and operation of the Property (collectively, the "*Licenses*"), have been obtained and are in full force and effect.  The use being made of the Property is in conformity with the certificate of occupancy issued for the Property and all other restrictions, covenants and conditions affecting the Property.

**4.11    Contracts.**  There are no service, maintenance or repair contracts affecting the Property that are not terminable on one month's notice or less without cause and without penalty or premium.  All service, maintenance or repair contracts affecting the Property have been entered into at arms–length in the ordinary course of Borrower's business and provide for the payment of fees in amounts and upon terms comparable to existing market rates.

**4.12    Federal Reserve Regulations; Investment Company Act.**  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose that would be inconsistent with such Regulation U or any other regulation of such Board of Governors, or for any purpose prohibited by Legal Requirements or any Loan Document.  Borrower is not (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (ii) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 2005, as amended; or (iii) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

**4.13    Utilities and Public Access.**  The Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service it for its intended uses.  All public utilities necessary or convenient to the full use and enjoyment of the Property are located in the public right–of–way abutting the Property, and all such utilities are connected so as to serve the Property without passing over other property absent a valid easement.  All roads necessary for the use of the Property for its current purpose have been completed and dedicated to public use and accepted by all Governmental Authorities.

**4.14    Physical Condition.**  To Borrower's best knowledge, except for the conditions necessitating the Required Repairs, the Property, including all Improvements, parking facilities, systems, Equipment and landscaping, are in good condition, order and repair in all material respects; there exists no structural or other material defect or damages to the Property, whether latent or otherwise.  Borrower has not received notice from any insurance company or bonding company of any defect or inadequacy in the Property, or any part thereof, which would adversely affect its insurability or cause the imposition of extraordinary premiums or charges thereon or any termination of any policy of insurance or bond.  No portion of the Property is located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards.

**4.15    Leases.**  Borrower has delivered to Lender a true, correct and complete rent roll for the Property (the "***Rent Roll***"), which includes all Leases affecting the Property.  Except as set forth on the Rent Roll: (i) each Lease is in full force and effect; (ii) the Tenants under the Leases have accepted possession of and are in occupancy of all of their respective demised premises, have commenced the payment of rent under the Leases, and there are no offsets, claims or defenses to the enforcement thereof; (iii) all rents due and payable under the Leases have been paid and no portion thereof has been paid for any period more than thirty (30) days in advance; (iv) the rent payable under each Lease is the amount of fixed rent set forth in the Rent Roll, and there is no claim or basis for a claim by the Tenant thereunder for an adjustment to the rent; (v) no Tenant has made any claim against the landlord under any Lease which remains

outstanding, there are no defaults on the part of the landlord under any Lease, and no event has occurred which, with the giving of notice or passage of time, or both, would constitute such a default; (vi) to Borrower's best knowledge, there is no present material default by the Tenant under any Lease; (vii) all security deposits under Leases are as set forth on the Rent Roll and are held consistent with Section 3.8; (viii) Borrower is the sole owner of the entire lessor's interest in each Lease; (ix) each Lease is the valid, binding and enforceable obligation of Borrower and the applicable Tenant thereunder; (x) no Person has any possessory interest in, or right to occupy, the Property except under the terms of a Lease; and (xi) each Lease is subordinate to the Loan Documents, either pursuant to its terms or pursuant to a subordination and attornment agreement. None of the Leases contains any option to purchase or right of first refusal to purchase the Property or any part thereof. Neither the Leases nor the Rents have been assigned or pledged except to Lender, and no other Person has any interest therein except the Tenants thereunder.

     **4.16**    **Fraudulent Transfer.**  Borrower has not entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor, and Borrower has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed Borrower's total liabilities, including subordinated, unliquidated, disputed or contingent liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and matured. Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of Borrower).

     **4.17**    **Ownership of Borrower.**  The organizational chart attached hereto as **Schedule 3** is complete and accurate and illustrates all Persons who have a direct or indirect ownership interest in Borrower.

     **4.18**    **Management Agreement.**  The Management Agreement is in full force and effect. There is no default, breach or violation existing thereunder, and no event has occurred (other than payments due but not yet delinquent) that, with the passage of time or the giving of notice, or both, would constitute a default, breach or violation thereunder, by either party thereto. The management fees and the terms and provisions of the Management Agreement, are subordinate to the Loan Documents.

     **4.19**    **Hazardous Substances.**  (i) The Property is not in violation of any Legal Requirement pertaining to or imposing liability or standards of conduct concerning environmental regulation, contamination or clean–up, including the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the Emergency Planning and Community Right–to–Know Act of 1986, the Hazardous Substances Transportation Act, the Solid Waste Disposal Act, the Clean Water Act, the Clean Air Act, the Toxic Substance Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act, any Legal Requirements relating to Toxic Mold, any state

45

super–lien and environmental clean–up statutes, any local law requiring related permits and licenses, any common law relating to Toxic Mold or other Hazardous Substances, and all amendments to and regulations in respect of the foregoing laws (collectively, "*Environmental Laws*"); (ii) the Property is not subject to any private or governmental Lien or judicial or administrative notice or action or inquiry, investigation or claim relating to hazardous, toxic or dangerous substances, wastes, contaminants, and pollutants, including, without limitation, petroleum, petroleum products, crude oil and fractions thereof, Toxic Mold, or any other substances or materials which are included under or regulated by, or for which liability may arise pursuant to, Environmental Laws (collectively, "*Hazardous Substances*"); (iii) to the best of Borrower's knowledge, after due inquiry, except as may be expressly set forth in the Environmental Report, no Hazardous Substances are or have been (including the period prior to Borrower's acquisition of the Property), discharged, generated, treated, disposed of or stored on, incorporated in, or removed or transported from the Property other than in compliance with all Environmental Laws; (iv) to the best of Borrower's knowledge, after due inquiry, except as may be expressly set forth in the Environmental Report, no Hazardous Substances are present in, on or under any nearby real property which could migrate to or otherwise affect the Property; (v) to the best of Borrower's knowledge, except as may be expressly set forth in the Environmental Report, no underground storage tanks exist on the Property and the Property has never been used as a landfill; and (vi) there have been no environmental investigations, studies, audits, reviews or other analyses conducted by or on behalf of Borrower with respect to the Property which have not been provided to Lender.

      **4.20    Principal Place of Business.**  The principal place of business of Borrower is its primary address for notices as set forth in <u>Section 6.1</u>, and Borrower has no other place of business.

      **4.21    Other Debt.**  There is no indebtedness with respect to the Property or any indebtedness secured over excess cash flow or any residual interest therein, whether secured or unsecured, other than Permitted Encumbrances and Permitted Indebtedness.

      **4.22    Embargoed Person.**  None of the funds or assets of Borrower, Borrower Representative or any Guarantor, as applicable, constitute property of, or are beneficially owned directly or, to Borrower's best knowledge, indirectly, by any Embargoed Person (as hereinafter defined) and no Embargoed Person has any direct interest, and to Borrower's best knowledge, as of the date hereof, based upon reasonable inquiry by Borrower, indirect interest, of any nature whatsoever in Borrower, Borrower Representative or Guarantor, as applicable, with the result that the investment in Borrower, Borrower Representative or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law.

      **4.23    Anti–Money Laundering.**  None of the funds of Borrower, Borrower Representative or any Guarantor, as applicable, that are used to consummate this transaction are derived from or are the proceeds of any unlawful activity, with the result that the investment in Borrower, Borrower Representative or any Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law or may cause any of the Property to be subject to forfeiture or seizure.  Borrower has ascertained the identity of all persons and entities who have provided funds to capitalize Borrower and has conducted verification procedures which are sufficient to establish the identity and source of such funds.

All of the representations and warranties in this Article 4 and elsewhere in the Loan Documents (i) shall survive for so long as any portion of the Debt remains owing to Lender and (ii) shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf, provided, however, that the representations, warranties and covenants set forth in Section 4.19 shall survive in perpetuity.

**4.24     OPA**.  The OPA is in full force and effect and effect and neither Borrower nor 3000 Imperial has received written notice of any default thereunder by any party thereto or of any event has occurred that, with the passage of time and/or the giving of notice would constitute a default thereunder.  The OPA has not, as of the date hereof, been amended or modified.

**4.25     ISLT Pledges.**  Pursuant to the express provisions of each ISLT Pledge, no Person, including, without limitation, any assignee or pledgee under such ISLT Pledge, has the right to obtain, and no such Person shall obtain any direct or indirect ownership or membership interest, or any voting, management or Control right, in or with respect to, ISLT, Placo, Mezzanine Borrower or Borrower pursuant to any such ISLT Pledge.

**4.26     Environmental Documents.**  Each Environmental Document is in full force and effect and neither Borrower nor, to the best of Borrower's knowledge, any other party to any Environmental Document is in default thereunder, and to the best of Borrower's knowledge after due inquiry, there are no conditions which, with the passage of time or the giving of notice, or both, would constitute a default thereunder.   Except as set forth on **Schedule 9**, no Environmental Document has been modified, amended or supplemented.

**4.27     Parking Agreement**.

**4.27.1**  Borrower is not party to any agreement or instrument in connection with parking at or otherwise serving or affecting the Property, other than the Parking Agreement.

**4.27.2**  Borrower hereby represents and warrants to Lender the following with respect to the Parking Agreement:

(a)     Recording; Modification.   A true and complete copy of the Parking Agreement has been (i) delivered to Lender, and (ii) will be duly recorded against the burdened property within two (2) Business Days of the date hereof.  The Parking Agreement permits the interest of Borrower therein to be encumbered by a mortgage.  There have not been amendments or modifications to the terms of the Parking Agreement since its recordation.  The Parking Agreement may not be canceled, terminated or surrendered, and none of the terms and provisions of the Parking Agreement may be modified, changed, supplemented, altered, amended or waived, without in each case the prior written consent of Lender.

(b)     Parking Agreement Assignable.   Borrower's interest in the Parking Agreement is assignable to Lender upon notice to, but without the consent of, the lessor thereunder.  The Parking Agreement is further assignable by Lender, its successors and assigns without the consent of the lessor thereunder.

(c)     Default.  As of the date hereof, the Parking Agreement is in full force and effect and no default has occurred under the Parking Agreement and there is no existing

condition which, but for the passage of time and/or the giving of notice, could result in a default under the terms of the Parking Agreement.  All rents, additional rents and other sums due and payable under the Parking Agreement have been paid in full.  Neither Borrower nor the lessor under the Parking Agreement has commenced any action or given or received any notice for the purpose of terminating the Parking Agreement.

(d)  Cure.  Lender is permitted the opportunity (including, where necessary, sufficient time to gain possession of the interest of Borrower under the Parking Agreement) to cure any default under the Parking Agreement which is curable after the receipt of notice of the default before the lessor thereunder may terminate the Parking Agreement.

(e)  Term.  The Parking Agreement has a term which extends not less than twenty (20) years beyond the Maturity Date.

(f)  Subleasing.  The Parking Agreement does not impose any restrictions on subleasing.

4.28  La Curacao CAM.  Borrower is under no obligation to, nor shall be under any obligation to, refund or reimburse any amounts to La Curacao for reconciliation of common area maintenance costs or any other additional rent payable under the La Curacao Lease which have been previously overpaid by La Curacao.

4.29  One Green ISLT Pledges.  Each of that certain Assignment of Distributions and Security Agreement, dated as of July 12, 2011, by and between ISLT, as grantor, in favor of One Green, LLC, a California limited liability company ("*One Green*"), as lender, as amended by that certain First Amendment to Assignment of Distributions and Security Agreement, dated as of September 22, 2011, by and between ISLT and One Green, securing that certain Guaranty, dated as of July 12, 2011, made by ISLT for the benefit of One Green in connection with that certain loan from One Green to 3171 Fair Oaks, LLC, a California limited liability company have been permanently terminated in accordance with the terms thereof and are no longer operative.

4.30  Kiosk Leases.

In addition to the representations made in Section 4.15 of the this Agreement with respect to Leases, Borrower hereby represents, warrants and covenants to Lender that with respect to the "kiosk" leases: (i) each such "kiosk" lease is on a month to month basis, renewed monthly, and (ii)  none of the "kiosk" Leases contains any option to purchase or right of first refusal to purchase the Property or any part thereof.

## 5. COVENANTS

Until the end of the Term, Borrower hereby covenants and agrees with Lender that:

5.1  Existence.  Each of Borrower and Borrower Representative shall (i) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, and franchises, (ii) continue to engage in the business presently conducted by it, (iii) obtain and maintain all Licenses, and (iv) qualify to do business and remain in good standing

48

under the laws of each jurisdiction, in each case as and to the extent required for the ownership, maintenance, management and operation of the Property.

    **5.2      Taxes.**  Borrower shall pay all Taxes as the same become due and payable, and deliver to Lender receipts for payment or other evidence satisfactory to Lender that the Taxes have been so paid no later than thirty (30) days before they would be delinquent if not paid (provided, however, that Borrower need not pay such Taxes nor furnish such receipts for payment of Taxes paid by Lender pursuant to <u>Section 3.3</u>).  Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien against the Property, and shall promptly pay for all utility services provided to the Property.  After prior notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application of any Taxes, provided that (i) no Default or Event of Default has occurred and is continuing, (ii) such proceeding shall suspend the collection of the Taxes, (iii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder, (iv) no part of or interest in the Property will be in danger of being sold, forfeited, terminated, canceled or lost, (v) Borrower shall have furnished such security as may be required in the proceeding, or as may be requested by Lender, to insure the payment of any such Taxes, together with all interest and penalties thereon, which shall not be less than one hundred twenty–five percent (125%) of the Taxes being contested, and (vi) Borrower shall promptly upon final determination thereof pay the amount of such Taxes, together with all costs, interest and penalties.  Lender may pay over any such security or part thereof held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established.

    **5.3      Repairs; Maintenance and Compliance; Alterations**.

        **5.3.1      <u>Repairs; Maintenance and Compliance.</u>**  Borrower shall at all times maintain, preserve and protect all franchises and trade names, and Borrower shall cause the Property to be maintained in a good and safe condition and repair and shall not remove, demolish or alter the Improvements or Equipment (except for alterations performed in accordance with <u>Section 5.3.2</u> and normal replacement of Equipment with Equipment of equivalent value and functionality).  Borrower shall promptly comply with all Legal Requirements and immediately cure properly any violation of a Legal Requirement.  Borrower shall notify Lender in writing within one Business Day after Borrower first receives notice of any such non–compliance. Borrower shall promptly repair, replace or rebuild any part of the Property that becomes damaged, worn or dilapidated and shall complete and pay for any Improvements at any time in the process of construction or repair.

        **5.3.2      <u>Alterations.</u>**  Borrower may, without Lender's consent, perform alterations to the Improvements and Equipment which (i) do not constitute a Material Alteration, (ii) do not adversely affect Borrower's financial condition or the value or Net Operating Income of the Property in any material respect, and (iii) are in the ordinary course of Borrower's business.  Borrower shall not perform any Material Alteration without Lender's prior written consent, which consent shall not be unreasonably withheld or delayed; provided, however, that Lender may, in its sole and absolute discretion, withhold consent to any alteration the cost of which is reasonably estimated to exceed $1,000,000 or which is likely to result in a decrease of

49

Net Operating Income by two and one–half percent (2.5%) or more for a period of thirty (30) days or longer. Lender may, as a condition to giving its consent to a Material Alteration, require that Borrower deliver to Lender security for payment of the cost of such Material Alteration in an amount equal to one hundred ten percent (110%) of the cost of the Material Alteration as reasonably estimated by Lender. Upon substantial completion of the Material Alteration, Borrower shall provide evidence satisfactory to Lender that (i) the Material Alteration was constructed in a good and workmanlike manner and in accordance with applicable Legal Requirements and substantially in accordance with plans and specifications approved by Lender (which approval shall not be unreasonably withheld or delayed), (ii) all contractors, subcontractors, materialmen and professionals who provided work, materials or services in connection with the Material Alteration have been paid in full and have delivered unconditional releases of lien and (iii) all material Licenses necessary for the use, operation and occupancy of the Material Alteration (other than those which depend on the performance of Tenant improvement work) have been issued. Borrower shall reimburse Lender upon demand for all out–of–pocket costs and expenses (including the reasonable fees of any architect, engineer or other professional engaged by Lender) incurred by Lender in reviewing plans and specifications or in making any determinations necessary to implement the provisions of this Section 5.3.2.

**5.4** **Performance of Other Agreements.** Borrower shall observe and perform each and every term to be observed or performed by it pursuant to the terms of any agreement or instrument affecting or pertaining to the Property, including the Loan Documents.

**5.5** **Cooperate in Legal Proceedings.** Borrower shall cooperate fully with Lender with respect to, and permit Lender, at its option, to participate in, any proceedings before any Governmental Authority which may in any way affect the rights of Lender under any Loan Document.

**5.6** **Further Assurances.** Borrower shall, at Borrower's sole cost and expense, (i) execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve or protect the collateral at any time securing or intended to secure the Debt or for the better and more effective carrying out of the intents and purposes of the Loan Documents, as Lender may reasonably require from time to time; and (ii) upon Lender's request therefor given from time to time after the occurrence and during the continuance of any Default or Event of Default pay for (a) reports of UCC, federal tax lien, state tax lien, judgment and pending litigation searches with respect to Borrower and Borrower Representative and (b) searches of title to the Property, each such search to be conducted by search firms reasonably designated by Lender in each of the locations reasonably designated by Lender.

**5.7** **Environmental Matters**.

**5.7.1** **Hazardous Substances.** So long as Borrower owns or is in possession of the Property, Borrower shall (i) keep the Property free from Hazardous Substances and in compliance with all Environmental Laws, (ii) promptly notify Lender if Borrower shall become aware that (A) any Hazardous Substance is on or near the Property, (B) the Property is in direct or indirect violation of any Environmental Laws or (C) any condition on or near the Property might pose a threat to the health, safety or welfare of humans and (iii) remove such Hazardous

50

Substances or cure such violations or remove such threats, as applicable, as required by law (or as shall be required by Lender in the case of removal which is not required by law, but in response to the opinion of a licensed hydrogeologist, licensed environmental engineer or other qualified environmental consulting firm engaged by Lender ("***Lender's Consultant***")), promptly after Borrower becomes aware of same, at Borrower's sole expense.  Any removal, remediation or cure of any violation relating to Toxic Mold shall include, without limitation, all acts required to clean and disinfect any portions of the Property affected by Toxic Mold and to eliminate the source(s) of Toxic Mold in or on the Property, including providing any necessary moisture control systems at the Property. Nothing herein shall prevent Borrower from recovering such expenses from any other party that may be liable for such removal, remediation or cure.

### 5.7.2    Environmental Monitoring.

(a)      Borrower shall give prompt written notice to Lender of (i) any proceeding or inquiry by any party (including any Governmental Authority) with respect to the presence of any Hazardous Substance on, under, from or about the Property, (ii) all claims made or threatened by any third party (including any Governmental Authority) against Borrower or the Property or any party occupying the Property relating to any loss or injury resulting from any Hazardous Substance, and (iii) Borrower's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property to be subject to any investigation or cleanup pursuant to any Environmental Law.  Borrower shall permit Lender to join and participate in, as a party if it so elects, any legal or administrative proceedings or other actions initiated with respect to the Property in connection with any Environmental Law or Hazardous Substance, and Borrower shall pay all reasonable attorneys' fees and disbursements incurred by Lender in connection therewith.

(b)      Upon Lender's request, at any time and from time to time, Borrower shall provide an inspection or audit of the Property prepared by a licensed hydrogeologist, licensed environmental engineer or qualified environmental consulting firm approved by Lender assessing the presence or absence of Hazardous Substances on, in or near the Property, and if Lender in its good faith judgment determines that reasonable cause exists for the performance of such environmental inspection or audit, then the cost and expense of such audit or inspection shall be paid by Borrower. Such inspections and audit may include soil borings and ground water monitoring.  If Borrower fails to provide any such inspection or audit within thirty (30) days after such request, Lender may order same, and Borrower hereby grants to Lender and its employees and agents access to the Property and a license to undertake such inspection or audit.

(c)      If any environmental site assessment report prepared in connection with such inspection or audit recommends that an operations and maintenance plan be implemented for any Hazardous Substance, whether such Hazardous Substance existed prior to the ownership of the Property by Borrower, or presently exists or is reasonably suspected of existing, Borrower shall cause such operations and maintenance plan to be prepared and implemented at its expense upon request of Lender.  If any investigation, site monitoring, containment, cleanup, removal, restoration or other work of any kind is reasonably necessary under an applicable Environmental Law ("***Remedial Work***"), Borrower shall commence all such Remedial Work within thirty (30) days after written demand by Lender and thereafter diligently prosecute to completion all such Remedial Work within such period of time as may be required under applicable law.  All

Remedial Work shall be performed by licensed contractors approved in advance by Lender and under the supervision of a consulting engineer approved by Lender.  All costs of such Remedial Work shall be paid by Borrower, including Lender's reasonable attorneys' fees and disbursements incurred in connection with the monitoring or review of such Remedial Work.  If Borrower does not timely commence and diligently prosecute to completion the Remedial Work, Lender may (but shall not be obligated to) cause such Remedial Work to be performed at Borrower's expense.   Notwithstanding the foregoing, Borrower shall not be required to commence such Remedial Work within the above specified time period: (x) if prevented from doing so by any Governmental Authority, (y) if commencing such Remedial Work within such time period would result in Borrower or such Remedial Work violating any Environmental Law, or (z) if Borrower, at its expense and after prior written notice to Lender, is contesting by appropriate legal, administrative or other proceedings, conducted in good faith and with due diligence, the need to perform Remedial Work.  Borrower shall have the right to contest the need to perform such Remedial Work, provided that, (1) Borrower is permitted by the applicable Environmental Laws to delay performance of the Remedial Work pending such proceedings, (2) neither the Property nor any part thereof or interest therein will be sold, forfeited or lost if Borrower fails to promptly perform the Remedial Work being contested, and if Borrower fails to prevail in such contest, Borrower would thereafter have the opportunity to perform such Remedial Work, (3) Lender would not, by virtue of such permitted contest, be exposed to any risk of any civil liability for which Borrower has not furnished additional security as provided in clause (4) below, or to any risk of criminal liability, and neither the Property nor any interest therein would be subject to the imposition of any Lien for which Borrower has not furnished additional security as provided in clause (4) below, as a result of the failure to perform such Remedial Work and (4) Borrower shall have furnished to Lender additional security in respect of the Remedial Work being contested and the loss or damage that may result from Borrower's failure to prevail in such contest in such amount as may be reasonably requested by Lender but in no event less than one hundred twenty–five percent (125%) of the cost of such Remedial Work as estimated by Lender or Lender's Consultant and any loss or damage that may result from Borrower's failure to prevail in such contest.

(d)     Borrower shall not install or permit to be installed on the Property any underground storage tank.

**5.8    Title to the Property; Liens.**  Borrower will warrant and defend the title to the Property, and the validity and priority of all Liens granted or otherwise given to Lender under the Loan Documents, subject only to Permitted Encumbrances, against the claims of all Persons. Without Lender's prior written consent, Borrower shall not create, incur, assume, permit or suffer to exist any Lien on all or any portion of the Property or any Lien on any direct or indirect legal or beneficial ownership interest in Borrower or Borrower Representative, except Liens in favor of Lender and Permitted Encumbrances, unless such Lien is bonded or discharged within thirty (30) days after Borrower first receives actual notice of such Lien.

**5.9    Leases**.

**5.9.1    Generally.**  Upon request, Borrower shall furnish Lender with executed copies of all Leases then in effect.  Unless otherwise approved in writing by Lender, which approval shall not be unreasonably withheld, all renewals of Leases and all proposed leases shall

provide for rental rates and terms comparable to then existing local market rates and shall be arm's length transactions with bona fide, independent third–party Tenants.

       5.9.2 **Material Leases.** Borrower shall not enter into a proposed Material Lease or a proposed renewal, extension or modification of an existing Material Lease without the prior written consent of Lender, which consent shall not, so long as no Event of Default is continuing, be unreasonably withheld or delayed, provided such Material Lease is not a Borrower Affiliated Lease. Prior to seeking Lender's consent to any Material Lease, Borrower shall deliver to Lender a copy of such proposed Material Lease (a "***Proposed Material Lease***") blacklined to show changes from the standard form of Lease approved by Lender and then being used by Borrower. Lender shall approve or disapprove each Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease for which Lender's approval is required under this Agreement within ten (10) Business Days of the submission by Borrower to Lender of a written request for such approval, accompanied by a final copy of the Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease. If requested by Borrower, Lender will grant conditional approvals of a Proposed Material Lease or a proposed renewal, extension or modification of an existing Material Lease at any stage of the leasing process, from initial "term sheet" through negotiated lease drafts, provided that Lender shall retain the right to disapprove any such Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease if subsequent to any preliminary approval material changes are made to the terms previously approved by Lender, or additional material terms are added that had not previously been considered and approved by Lender in connection with such Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease. Provided that no Event of Default is continuing, if Borrower provides Lender with a written request for approval (which written request shall specifically refer to this Section 5.9.2 and shall explicitly state that failure by Lender to approve or disapprove within ten (10) Business Days will constitute a deemed approval) and Lender fails to reject the request in writing delivered to Borrower within ten (10) Business Days after receipt by Lender of the request, the Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease shall be deemed approved by Lender, and Borrower shall be entitled to enter into such Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease.

       5.9.3 **Minor Leases.** Notwithstanding the provisions of Section 5.9.2 above, provided that no Event of Default is continuing, renewals, amendments and modifications of existing Leases and proposed leases shall not be subject to the prior approval of Lender provided (i) the proposed lease would be a Minor Lease or the existing Lease, as amended or modified, or the renewal Lease is a Minor Lease, (ii) the Lease shall be written substantially in accordance with the standard form of Lease which shall have been approved by Lender, subject to any commercially reasonable changes made in the course of negotiation with the applicable Tenant, (iii) the Lease as amended or modified or the renewal Lease or series of leases or proposed lease or series of leases: (a) shall provide for net effective rental rates comparable to then existing local market rates, (b) shall have an initial term (together with all renewal options) of not less than three (3) years or greater than ten (10) years, (c) shall provide for automatic self–operative subordination to the Security Instrument and, at Lender's option, (x) attornment to Lender and (y) if the Property is located in a jurisdiction in which the applicable law provides for the termination of leases that are subordinate to the Lien of the Security Instrument, the unilateral

right by Lender to subordinate the Lien of the Security Instrument to the Lease, and (d) shall not contain any option to purchase, any right of first refusal to purchase, any right to terminate (except in the event of the destruction or condemnation of substantially all of the Property), any requirement for a non–disturbance or recognition agreement, or any other provision which might adversely affect the rights of Lender under the Loan Documents in any material respect. Borrower shall deliver to Lender copies of all Leases which are entered into pursuant to the preceding sentence together with Borrower's certification that it has satisfied all of the conditions of the preceding sentence within ten days after the execution of the Lease.  With respect to any Lease or proposed renewal, extension or modification of an existing Lease that requires Lender's consent under this <u>Section 5.9.3</u>, provided that no Event of Default is continuing, if Borrower provides Lender with a written request for approval (which written request shall specifically refer to this <u>Section 5.9.3</u> and shall explicitly state that failure by Lender to approve or disapprove within ten (10) Business Days will constitute a deemed approval) and Lender fails to reject the request in writing delivered to Borrower within ten (10) Business Days after receipt by Lender of the request, the proposed Lease or proposed renewal, extension or modification of an existing Lease shall be deemed approved by Lender, and Borrower shall be entitled to enter into such proposed Lease or proposed renewal, extension or modification of an existing Lease.

      **5.9.4**    <u>**Additional Covenants with respect to Leases.**</u>    Borrower (i) shall observe and perform the material obligations imposed upon the lessor under the Leases and shall not do or permit anything to impair the value of the Leases as security for the Debt;  (ii) shall promptly send copies to Lender of all notices of default that Borrower shall send or receive under any Lease; (iii) shall enforce, in accordance with commercially reasonable practices for properties similar to the Property, the terms, covenants and conditions in the Leases to be observed or performed by the lessees, short of termination thereof; (iv)  shall not collect any of the Rents more than one month in advance (other than security deposits); (v) shall not execute any other assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents); (vi) shall not modify any Lease in a manner inconsistent with the Loan Documents; (vii) shall not convey or transfer or suffer or permit a conveyance or transfer of the Property so as to effect a merger of the estates and rights of, or a termination or diminution of the obligations of, lessees under Leases; (viii) shall not consent to any assignment of or subletting under any Material Lease unless required in accordance with its terms without the prior consent of Lender, which, with respect to a subletting, may not, so long as no Event of Default is continuing,  be unreasonably withheld or delayed; and  (ix) shall not cancel or terminate any Lease or accept a surrender thereof without the prior consent of Lender, which consent shall not, so long as no Event of Default is continuing, be  unreasonably withheld or delayed.

      **5.10**    **Estoppel Statement.**    After request by Lender, Borrower shall within ten (10) days furnish Lender with a statement addressed to Lender, its successors and assigns, duly acknowledged and certified, setting forth (i) the unpaid Principal, (ii) the Interest Rate, (iii) the date installments of interest or Principal were last paid, (iv) any offsets or defenses to the payment of the Debt, (v) that no Default or Event of Default exists under the Loan Documents, and (vi) that the Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification.

54

5.11    **Property Management**.

      5.11.1 <u>**Management Agreement.**</u>    Borrower shall (i) cause the Property to be managed pursuant to the Management Agreement; (ii) promptly perform and observe all of the covenants required to be performed and observed by it under the Management Agreement and do all things necessary to preserve and to keep unimpaired its rights thereunder; (iii) promptly notify Lender of any default under the Management Agreement of which it is aware; (iv) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditure plan, and property improvement plan and any other notice, report and estimate received by Borrower under the Management Agreement; and (v) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Manager under the Management Agreement. Without Lender's prior written consent, Borrower shall not (a) surrender, terminate, cancel, extend or renew the Management Agreement or otherwise replace the Manager or enter into any other management agreement (except pursuant to <u>Section 5.11.2</u>); (b) reduce or consent to the reduction of the term of the Management Agreement; (c) increase or consent to the increase of the amount of any charges under the Management Agreement; (d) otherwise modify, change, supplement, alter or amend in any material respect, or waive or release any of its rights and remedies under, the Management Agreement; or (e) suffer or permit the occurrence and continuance of a default beyond any applicable cure period under the Management Agreement (or any successor management agreement) if such default permits the Manager to terminate the Management Agreement (or such successor management agreement).

      5.11.2 <u>**Termination of Manager.**</u>    If (i) Borrower fails to maintain a Debt Service Coverage Ratio of at least 1.10:1, (ii) a Bankruptcy Action occurs with respect to Manager, (iii) an Event of Default shall be continuing, or (iv) Manager is in default under the Management Agreement, Borrower shall, at the request of Lender, terminate the Management Agreement and replace Manager with a replacement manager acceptable to Lender in Lender's reasonable discretion and the applicable Rating Agencies on terms and conditions satisfactory to Lender and the applicable Rating Agencies unless, in the case of the event described in clause (i) only, Borrower shall defease a portion of the unpaid Principal to a level such that the Debt Service Coverage Ratio of the unpaid Principal is restored to a level of not less than 1.10:1. All calculations of Debt Service Coverage Ratio for purposes of this <u>Section 5.11.2</u> shall be subject to verification by Lender. Borrower's failure to appoint an acceptable manager within thirty (30) days after Lender's request of Borrower to terminate the Management Agreement shall constitute an immediate Event of Default. Borrower may from time to time appoint a successor manager to manage the Property, which successor manager and Management Agreement shall be approved in writing by Lender in Lender's discretion and the applicable Rating Agencies.

      5.12    **Special Purpose Entity.**    Borrower and Borrower Representative shall at all times be a Special Purpose Entity. A "***Special Purpose Entity***" shall have the meaning set forth on <u>**Schedule 4**</u> hereto. Borrower covenants and agrees that Borrower shall provide Lender with thirty (30) days' prior written notice prior to the removal of an Independent Director or Independent Manager, as applicable, of any Borrower or Borrower Representative.

      5.13    **Assumption in Non–Consolidation Opinion.**    Borrower and Borrower Representative shall each conduct its business so that the assumptions (with respect to each Person) made in that certain substantive non–consolidation opinion letter dated the date hereof

delivered by Borrower's counsel in connection with the Loan, shall be true and correct in all material respects.

**5.14    Change In Business or Operation of Property.**  Borrower shall not purchase or own any real property other than the Property and shall not enter into any line of business other than the ownership and operation of the Property, or make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business or otherwise cease to operate the Property as a retail shopping center property or terminate such business for any reason whatsoever (other than temporary cessation in connection with renovations to the Property).

**5.15    Certain Prohibited Actions.**  Borrower shall not directly or indirectly do any of the following: (i) change its principal place of business or chief executive office without first giving Lender thirty (30) days' prior notice; (ii) cancel or otherwise forgive or release any claim or debt owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business in its reasonable judgment; (iii) Transfer any License required for the operation of the Property; or (iv) maintain, sponsor, contribute to or become obligated to contribute to, or suffer or permit any ERISA Affiliate of Borrower to, maintain, sponsor, contribute to or become obligated to contribute to, any Plan or any Welfare Plan or permit the assets of Borrower to become "plan assets," whether by operation of law or under regulations promulgated under ERISA.

**5.16    Prohibited Transfers.**  Borrower shall not directly or indirectly make, suffer or permit the occurrence of any Transfer other than a Permitted Transfer.  Notwithstanding the foregoing, Lender shall not unreasonably withhold its consent to a sale of the Property in its entirety (a "***Special Transfer***") to a Special Purpose Entity with organizational documents containing provisions satisfying Lender's then–current requirements of a Special Purpose Entity and otherwise acceptable to Lender (a "***Buyer***"), provided that:

(a)    No Default or Event of Default is then continuing;

(b)    Borrower gives Lender written notice of the terms of such prospective Special Transfer not less than sixty (60) days before the date on which such sale is scheduled to close, accompanied by all information concerning the proposed Buyer as Lender would require in evaluating an initial extension of credit to a borrower and such reasonable non-refundable application fee as shall be required by Lender.  Lender shall have the right to approve or disapprove the proposed Buyer in its reasonable discretion (it being acknowledged that Lender may, as a condition to approving any proposed Buyer, require a Rating Comfort Letter from each of the Rating Agencies);

(c)    Borrower pays Lender, concurrently with the closing of such Special Transfer, a non-refundable assumption fee in an amount equal to all out–of–pocket costs and expenses, including, without limitation, reasonable attorneys' fees and disbursements, incurred by Lender in connection with the Special Transfer plus an amount equal to (i) one-half of one percent (0.5%) of the then outstanding Principal on the first such completed Special Transfer, and (ii) one percent (1.0%) of the then outstanding Principal on each completed Special Transfer thereafter;

NY:1797184.16

(d)     Buyer assumes all of the obligations of Borrower under this Agreement, the Note and the other Loan Documents and, prior to or concurrently with the closing of such Special Transfer, Buyer executes, without any cost or expense to Lender, such documents and agreements as Lender shall reasonably require to evidence and effectuate said assumption and delivers such legal opinions as Lender may require;

(e)     Borrower and Buyer execute and cause to be filed in such public records as Lender deems appropriate, without any cost or expense to Lender, new financing statements or financing statement amendments and any additional documents reasonably requested by Lender;

(f)     Borrower causes to be delivered to Lender, without any cost or expense to Lender, such endorsements to Lender's title insurance policy, property and liability insurance endorsements or certificates and other similar materials as Lender may deem necessary at the time of the Special Transfer, all in form and substance satisfactory to Lender, including, without limitation, an endorsement or endorsements to Lender's title insurance policy insuring the Lien of the Security Instrument, extending the effective date of such policy to the date of execution and delivery (or, if later, of recording) of the assumption agreement referenced above in clause (d) of this Section 5.16, with no additional exceptions added to such policy and insuring that fee simple title to the Property is vested in Buyer;

(g)     Borrower executes and delivers to Lender, without any cost or expense to Lender, a release of Lender, its officers, directors, employees and agents, from all claims and liability relating to the transactions evidenced by the Loan Documents through and including the date of the closing of the Special Transfer, which agreement shall be in form and substance satisfactory to Lender and shall be binding upon Buyer;

(h)     Such Special Transfer is not construed so as to relieve Borrower of any personal liability under the Note or any of the other Loan Documents for any acts or events occurring or obligations arising prior to or simultaneously with the closing of such Special Transfer and Borrower executes, without any cost or expense to Lender, such documents and agreements as Lender shall reasonably require to evidence and effectuate the ratification of said personal liability.  Borrower shall be released from and relieved of any personal liability under the Note or any of the other Loan Documents for any acts or events occurring or obligations arising after the closing of such Special Transfer which are not caused by or arising out of any acts or events occurring or obligations arising prior to or simultaneously with the closing of such Special Transfer;

(i)     Such Special Transfer is not construed so as to relieve any Guarantor of its obligations under any Loan Document, until a direct or indirect member, partner or shareholder of Buyer approved by Lender in its sole discretion (a "***Successor Guarantor***") assumes the obligations of such Guarantor and executes such documents as may be required by Lender to evidence such assumption.  Guarantor shall be released from and relieved of any of its obligations under any indemnity or guaranty executed in connection with the Loan for any acts or events occurring or obligations arising after the closing of such Special Transfer which are not caused by or arising out of any acts or events occurring or obligations arising prior to or simultaneously with the closing of such Special Transfer;

NY:1797184.16

(j)    Buyer has furnished to Lender all appropriate documents and instruments evidencing Buyer's capacity and good standing, and the authority of the signers to execute the assumption of the Loan and the Loan Documents, which documents and instruments shall include certified copies of all documents and instruments relating to the organization and formation of Buyer and of the entities, if any, which are direct or indirect members, partners or shareholders of Buyer, all of which shall be satisfactory to Lender;

(k)    Buyer shall assume the obligations of Borrower under any management agreements pertaining to the Property, or shall cause the new manager and management agreement to satisfy the requirements of <u>Section 5.11</u> hereof, as applicable;

(l)    Buyer shall furnish an opinion of counsel satisfactory to Lender that the acquisition of the Property and the assumption of the Loan and the Loan Documents by Buyer and, to the extent applicable, Successor Guarantor, was validly authorized, and duly executed and delivered, and constitutes the legal, valid and binding obligations of Buyer and Successor Guarantor, enforceable against each of them in accordance with their respective terms, and with respect to such other matters as Lender may require;

(m)    if any Mezzanine Loan is outstanding at the time of the Special Transfer, the proposed Special Transfer shall not constitute or cause a default by Mezzanine Borrower under the applicable Mezzanine Loan Documents;

(n)    Buyer shall provide Lender with a fully executed copy of (1) a deed covering the Property, (2) a bill of sale covering the personal property constituting a part of the Property and (3) an assignment and assumption agreement in respect of the Leases, in form and substance reasonably satisfactory to Lender;

(o)    Lender shall receive evidence reasonably satisfactory to Lender that the terms of the OPA have not been and will not be violated as a result of or otherwise in connection with such Special Transfer; and

(p)    The issuer of the Gap Zoning Policy has consented in writing to the identity of the Buyer pursuant to the proposed Special Transfer.

**5.16.2  <u>Mezzanine Pledge.</u>**  Notwithstanding anything in this Section 5.16 to the contrary, the following transfers shall not be deemed to be a Transfer in violation of this Section 5.16: (i) the pledge by Mezzanine Borrower of its direct and/or indirect equity interests in Borrower (but not of any direct interest in the Property) (the "Pledged Equity") to Mezzanine Lender pursuant to the Mezzanine Loan Documents, as security for the Mezzanine Loan; and (ii) a Mezzanine Loan Realization consummated in accordance with the applicable terms and conditions of the Intercreditor Agreement.

**5.17    Expenses.**    Borrower shall reimburse Lender upon receipt of notice for all reasonable out–of–pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with the Loan, including (i) the preparation, negotiation, execution and delivery of the Loan Documents and the consummation of the transactions contemplated thereby and all the costs of furnishing all opinions by counsel for Borrower; (ii) Borrower's and Lender's ongoing performance under and compliance with the

Loan Documents, including confirming compliance with environmental and insurance requirements; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications of or under any Loan Document and any other documents or matters requested by Lender or Borrower; (iv) filing and recording of any Loan Documents; (v) title insurance, surveys, inspections and appraisals; (vi) the creation, perfection or protection of Lender's Liens on the Property and the Cash Management Accounts (including fees and expenses for title and lien searches, intangibles taxes, personal property taxes, mortgage recording taxes, due diligence expenses, travel expenses, accounting firm fees, costs of appraisals, environmental reports and Lender's Consultant, surveys and engineering reports); (vii) enforcing or preserving any rights in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, the Loan Documents, the Property, or any other security given for the Loan; (viii) fees charged by Rating Agencies in connection with the Loan or any modification thereof; (ix) enforcing any obligations of or collecting any payments due from Borrower under any Loan Document or with respect to the Property or in connection with any refinancing or restructuring of the Loan in the nature of a "work–out", or any insolvency or bankruptcy proceedings and (x) the fees and expenses of any special servicer retained in respect of the Loan.  Any costs and expenses due and payable to Lender hereunder which are not paid by Borrower within ten (10) days after demand may be paid from any amounts in the Deposit Account, with notice thereof to Borrower.  The obligations and liabilities of Borrower under this Section 5.17 shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

     **5.18    Indemnity.**  Borrower shall defend, indemnify and hold harmless Lender and each of its Affiliates and their respective successors and assigns, including the directors, officers, partners, members, shareholders, participants, employees, professionals and agents of any of the foregoing (including any Servicer) and each other Person, if any, who Controls Lender, its Affiliates or any of the foregoing (each, an "***Indemnified Party***"), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for an Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto, court costs and costs of appeal at all appellate levels, investigation and laboratory fees, consultant fees and litigation expenses), that may be imposed on, reasonably incurred by, or asserted against any Indemnified Party (collectively, the "***Indemnified Liabilities***") in any manner, relating to or arising out of or by reason of the Loan, including: (i) any breach by Borrower of its obligations under, or any misrepresentation contained in, any Loan Document; (ii) the use or intended use of the proceeds of the Loan; (iii) any information provided by or on behalf of Borrower, or contained in any documentation approved by Borrower; (iv) ownership of the Security Instrument or any of the other Loan Documents, or the Property or any interest therein, or receipt of any Rents; (v) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vi) any use, nonuse or condition in, on or about the Property or on adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vii) performance of any labor or services or the furnishing of any materials or other property in respect of the Property; (viii) the presence,

disposal, escape, seepage, leakage, spillage, discharge, emission, release, or threatened release of any Hazardous Substance on, from or affecting the Property; (ix) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous Substance; (x) any lawsuit brought or threatened, settlement reached, or government order relating to such Hazardous Substance; (xi) any violation of the Environmental Laws which is based upon or in any way related to such Hazardous Substance, including the costs and expenses of any Remedial Work; (xii) any failure of the Property to comply with any Legal Requirement; (xiii) any claim by brokers, finders or similar persons claiming to be entitled to a commission in connection with any Lease or other transaction involving the Property or any part thereof, or any liability asserted against Lender with respect thereto; and (xiv) the claims of any lessee of any portion of the Property or any Person acting through or under any lessee or otherwise arising under or as a consequence of any Lease; provided, however, that Borrower shall not have any obligation to any Indemnified Party hereunder if and to the limited extent that it is finally judicially determined that such Indemnified Liabilities arose solely from the gross negligence, illegal acts, fraud or willful misconduct of such Indemnified Party. Any amounts payable to any Indemnified Party by reason of the application of this Section 5.18 shall be payable on demand and shall bear interest at the Default Rate from the date loss or damage is sustained by any Indemnified Party until paid. The obligations and liabilities of Borrower under this Section 5.18 shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

      **5.19    Embargoed Person.** (a) At all times throughout the Term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (i) none of the funds or assets of Borrower, Borrower Representative or Guarantor, whether or not used to repay the Loan, shall constitute property of, or shall be beneficially owned directly or, to Borrower's best knowledge, indirectly, by any person, entity or government subject to sanctions or trade restrictions under United States law ("***Embargoed Person***" or "***Embargoed Persons***") that are identified on (A) the "List of Specially Designated Nationals and Blocked Persons" maintained by the Office of Foreign Assets Control ("***OFAC***"), U.S. Department of the Treasury's FINCEN list, or to Borrower's best knowledge, as of the date thereof, based upon reasonable inquiry by Borrower, on any other similar list maintained by OFAC or FINCEN pursuant to any authorizing statute including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Order or regulation promulgated thereunder, with the result that the investment in Borrower, Borrower Representative or any Guarantor, as applicable (whether directly or indirectly), is prohibited by law, or the Loan made by Lender would be in violation of law, or (B) Executive Order 13224 (September 23, 2001) issued by the President of the United States ("Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism"), any related enabling legislation or any other similar Executive Orders, and (ii) no Embargoed Person shall have any direct interest or, to Borrower's best knowledge, indirect interest, of any nature whatsoever in Borrower, Borrower Representative or any Guarantor, as applicable, with the result that the investment in Borrower, Borrower Representative or any Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law.

NY:1797184.16

(b)    At all times throughout the Term of the Loan, none of any of Borrower, Borrower Representative or Guarantor, nor any Person Controlling, Controlled by or under common Control with any of Borrower, Borrower Representative or Guarantor, nor any Person having a beneficial interest in, or for whom any of Borrower, Borrower Representative or Guarantor is acting as agent or nominee in connection with the investment, is (a) a country, territory, person or entity named on an OFAC or FINCEN list, or is a Person that resides in or has a place of business in a country or territory named on such lists; (b) a Person residing in, or organized or chartered under the laws of a jurisdiction identified as non–cooperative by the Financial Action Task Force ("*FATF*"); or (c) a Person whose funds originate from or will be routed through , an account maintained at a foreign shell bank or "offshore bank."

(c)    None of Borrower, Borrower Representative or Guarantor, nor any Person Controlling, Controlled by or under common Control with Borrower, Borrower Representative or Guarantor is a "senior foreign political figure" or an "immediate family" member or "close associate" (as all such terms are defined below) of a senior foreign political figure within the meaning of the USA PATRIOT Act (i.e., the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107–56, as may be amended).  For the purposes of this subsection (c), (i) "senior foreign political figure" means a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party or a senior executive of a foreign government–owned corporation, and such term also includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure, (ii) "immediate family" of a senior foreign political figure includes the figure's parents, siblings, spouse, children and in–laws, and (iii) "close associate" of a senior foreign political figure means a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

**5.20    Anti–Money Laundering.**    At all times throughout the Term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, none of the funds of Borrower, Borrower Representative or any Guarantor, as applicable, that are used to consummate this transaction or to repay the Loan shall be derived from or are the proceeds of any unlawful activity, with the result that the investment in Borrower, Borrower Representative or any Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law or may cause any of the Property to be subject to forfeiture or seizure. Borrower has ascertained the identity of all persons and entities who have provided funds to capitalize Borrower and has conducted verification procedures which are sufficient to establish the identity and source of such funds.

**5.21    ERISA.**    At all times throughout the Term, upon the request of Lender or any of Lender's successors, assigns or participants in the Loan, the management of Borrower shall consult with Lender or any of Lender's successors, assigns or participants on significant business issues relating to the operation of the Property and make itself available quarterly either personally or by telephone at mutually agreeable times for such consultation; provided, however, that such consultation need not result in any change in Borrower's course of action, subject to Section 8.1.  The aforementioned consultation rights are intended to satisfy the requirement of

61

management rights for purposes of the Department of Labor "plan assets" regulation 29 C.F.R., Section 2510.3–101.

**5.22    Mezzanine Loan**.

      **5.22.1**  Promptly after Mezzanine Borrower's receipt (but no more than five (5) Business Days after receipt), Borrower will deliver to Lender a true, correct and complete copy of all material notices, demands, requests or material correspondence (including electronically transmitted items) received from Mezzanine Lender by Mezzanine Borrower or any guarantor under the Mezzanine Loan Documents**.**  Without in any way limiting the foregoing, Borrower shall deliver to Lender promptly after the receipt or delivery receipt (but no more than five (5) Business Days after receipt), a copy of all notices of default received or sent by Mezzanine Borrower with respect to the Mezzanine Loan.

      **5.22.2**  Unless otherwise delivered to Lender pursuant to the provisions of Article 6 hereof, Borrower will deliver to Lender all of the financial statements and material reports, certificates and related items delivered or required to be delivered by Mezzanine Borrower to Mezzanine Lender under the Mezzanine Loan Documents as and when due under the Mezzanine Loan Documents**.**

      **5.22.3**  After written request by Lender, Borrower shall from time to time, obtain from Mezzanine Lender such estoppel certificates with respect to the status of the Mezzanine Loan and compliance by Mezzanine Borrower with the terms of the Mezzanine Loan Documents as may reasonably be requested by Lender.

      **5.23**    Borrower hereby acknowledges and agrees that (a) any intercreditor agreement entered into between Lender and Mezzanine Lender (including, without limitation, the Intercreditor Agreement) will be solely for the benefit of Lender and Mezzanine Lender, (b) neither Borrower nor Mezzanine Borrower shall be third-party beneficiaries (intended or otherwise) of any of the provisions therein, have any rights thereunder, or be entitled to rely on any of the provisions contained therein, (c) neither Borrower nor Mezzanine Borrower shall have an rights thereunder or shall be entitled to rely on any of the provisions contained therein, and (d) any such intercreditor agreement (including, without limitation, the Intercreditor Agreement) may allow Mezzanine Lender certain additional forbearances and accommodations not otherwise available to Borrower (including, among other things, additional time to cure defaults by Borrower and the right to purchase the Loan under certain circumstances) and that Borrower hereby waives any objection thereto.  Lender and Mezzanine Lender have no obligation to disclose to Borrower or Mezzanine Borrower the contents of any such intercreditor agreement (including, without limitation, the Intercreditor Agreement).  Borrower's obligations hereunder are and will be independent of any such intercreditor agreement (including, without limitation, the Intercreditor Agreement) and shall remain unmodified by the terms and provisions thereof.

**5.24    OPA**.

      **5.24.1**  Borrower shall not, without the prior written consent of Lender, amend or modify, or permit the amendment or modification of, any material term of the OPA, which for purposes of this Agreement shall include, without limitation, any amendment or modification the

NY:1797184.16

result of which is to increase the amount of monies due from Borrower thereunder or materially increases the obligations or liabilities of Borrower thereunder**.** In addition, Borrower shall not, without the prior written consent of Lender, cancel, terminate or surrender, or permit the cancelation, termination or surrender of, the OPA or any of the rights and benefits thereunder.

       **5.24.2** Borrower shall comply in all respects with all of the terms, covenants and conditions on Borrower's part to be complied with pursuant to the OPA and/or all rules and regulations that may be promulgated thereunder by any Governmental Authority**.**

       **5.24.3** Borrower shall promptly deliver to Lender a true and full copy of any notice of default given by or received by Borrower and/or 3000 Imperial with respect to the OPA.

       **5.24.4** Borrower shall not, without the prior written consent of Lender, submit (or permit the submission of) the Proposed Construction Plans (hereinafter defined) to the City (as defined in the OPA) or the Authority (as defined in the OPA) in connection with the Project (as defined in the OPA)**.**

       **5.24.5** Any proposed construction or alteration to the Property or to the Expansion Area (as defined in the OPA) in connection with the Project (as defined in the OPA) (collectively, the "Proposed Construction") by or on behalf of Borrower shall be subject to the prior written consent and approval of Lender, such consent and approval not to be unreasonably withheld, conditioned or delayed and to be based on and subject to Lender's receipt, review and approval of the following items: (i) construction drawings and plans and specifications for the Proposed Construction (the "Proposed Construction Plans"), which Proposed Construction Plans shall set forth, among other things, that the Proposed Construction shall be conducted solely within the Expansion Area (as defined in the OPA) except with respect to any necessary pedestrian circulation improvements constructed on the Property and approved by Lender; (ii) a guaranteed maximum construction contract for the Proposed Construction; (iii) intentionally omitted; (iv) evidence of adequate builder's all-risk insurance, which shall name Lender as an additional insured under all liability insurance; (v) evidence that Borrower has obtained, or caused to be obtained, all necessary governmental approvals and permits in connection with the performance of the Proposed Construction pursuant to the Proposed Construction Plans; (vi) evidence that the Proposed Construction will not adversely impact the structural integrity of the Property; (vii) an engineer's report with respect to the adequacy of the above-mentioned items; (viii) evidence that the Proposed Construction shall not affect the compliance of the Property with any applicable Legal Requirements; (ix) evidence that, at all times during the Proposed Construction, access by Tenants to and from the street, the parking at the Property and the Property itself will not be unreasonably impaired; (x) evidence that, at all times during and after the Proposed Construction, the Property will have (1) sufficient parking to meet the demands of all applicable zoning laws and ordinances and all leases affecting the Property and (2) available to it all necessary utility and other services for its use, occupancy and operation; (xi) evidence reasonably satisfactory to Lender that (1) all consents have been obtained from Tenants under any Leases where such consent is required and (2) the Proposed Construction shall not violate the terms of any Lease or give rise to the right of any Tenant of any Lease to cancel such Lease; and (xii) evidence that the Proposed Construction will not have a material adverse effect on the use or operation of the Property**.**

**5.24.6** In the event that Lender approves the Proposed Construction (such approval not to be unreasonably withheld, conditioned or delayed), Borrower shall: (i) indemnify Lender in connection with any losses, costs, damages or liabilities arising out of such Proposed Construction; (ii) perform and complete the Proposed Construction in a good and workmanlike manner in compliance with all applicable Legal Requirements and free and clear of any Liens; (iii) perform the Proposed Construction in such a manner so as not to give rise to (1) any violation of any Lease, or (2) the right of any Tenant under any Lease to cancel such Lease; (iv) not permit the Proposed Construction to materially affect the use or operation of the Property and upon completion, such Proposed Construction shall not have a material adverse effect on the access to and/or parking for the Property; and (v) if a temporary interruption in access is necessitated by such Proposed Construction or parking at the Property is impaired by such Proposed Construction, take all commercially reasonable steps to minimize the interruption and/or impairment of access and/or parking and alternative means of access and/or parking reasonably acceptable to Lender must be provided.

**5.24.7** In connection with the Proposed Construction: (i) Borrower shall, prior to final completion of the Proposed Construction, deliver or cause to be delivered to Lender evidence reasonably satisfactory to Lender that the Proposed Construction has been completed in a good and workmanlike manner in compliance with all applicable Legal Requirements and free and clear of any Liens; (ii) Lender shall have the right, at reasonable times and on reasonable advance notice (except in an emergency) to inspect, or to cause its designees to inspect, the Property in order to confirm that the Proposed Construction is being conducted as required hereunder and, promptly after completion of the Proposed Construction, to confirm that it has been completed as required hereunder; (iii) Borrower shall be responsible for the payment of all costs and expenses incurred by Lender in connection with such Proposed Construction including, without limitation, reasonable legal fees; (iv) upon the completion of the Proposed Construction, Borrower shall provide or cause to be provided to Lender (1) an updated as-built survey of the Property, and (2) copies of all certificates of occupancy required by applicable Legal Requirements as a result of the Proposed Construction and (v) Borrower shall execute and/or deliver any and all additional documents, instruments, agreements, approvals, consents, site plans or other information relating to the foregoing as Lender may reasonably request.

**5.25   Parking Agreements**.

**5.25.1** Borrower shall not, without the prior written consent of Lender, which may be granted or withheld in Lender's sole discretion, enter into any proposed agreement or instrument with respect to parking at or otherwise serving or affecting the Property.

**5.25.2** Borrower shall (a) pay all rents, additional rents and other sums required to be paid by Borrower, as tenant under and pursuant to the provisions of the Parking Agreement as and when such rent or other charge is payable, (b) diligently perform and observe all of the terms, covenants and conditions of the Parking Agreement on the part of Borrower, as tenant thereunder, to be performed and observed at least three (3) days prior to the expiration of any applicable grace period therein provided, and (c) promptly notify Lender of the giving of any written notice by the lessor under the Parking Agreement to Borrower of any default by Borrower in the performance or observance of any of the terms, covenants or conditions of the Parking Agreement on the part of Borrower, as tenant thereunder, to be performed or observed

64

and deliver to Lender a true copy of each such notice. Borrower shall not, without the prior consent of Lender, surrender the leasehold estate created by the Parking Agreement or terminate or cancel the Parking Agreement or modify, change, supplement, alter or amend, or waive any of the terms or provisions of, the Parking Agreement, in any material respect, either orally or in writing, and Borrower hereby assigns to Lender, as further security for the payment and performance of the obligations and for the performance and observance of the terms, covenants and conditions of the Loan Documents, all of the rights, privileges and prerogatives of Borrower, as tenant under the Parking Agreement, to surrender the leasehold estate created by the Parking Agreement or to terminate, cancel, modify, change, supplement, alter or amend, or waive any of the terms or provisions of, the Parking Agreement in any material respect and any such surrender of the leasehold estate created by the Parking Agreement or termination, cancellation, modification, change, supplement, alteration or amendment of, or waiver of any of the terms or provisions of, the Parking Agreement in any material respect without the prior consent of Lender shall be void and of no force and effect. If Borrower shall default in the performance or observance of any material term, covenant or condition of the Parking Agreement on the part of Borrower, as tenant thereunder, to be performed or observed, then, without limiting the generality of the other provisions of the Loan Documents, and without waiving or releasing Borrower from any of its obligations hereunder, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all of the material terms, covenants and conditions of the Parking Agreement on the part of Borrower, as tenant thereunder, to be performed or observed or to be promptly performed or observed on behalf of Borrower, to the end that the rights of Borrower in, to and under the Parking Agreement shall be kept unimpaired as a result thereof and free from default, even though the existence of such event of default or the nature thereof be questioned or denied by Borrower or by any party on behalf of Borrower. If Lender shall make any payment or perform any act or take action in accordance with the preceding sentence, Lender will notify Borrower of the making of any such payment, the performance of any such act, or the taking of any such action. In any such event, Lender and any Person designated as Lender's agent by Lender shall have, and are hereby granted, the right to enter upon the Property at any reasonable time, on reasonable notice (which may be given orally) and from time to time for the purpose of taking any such action. Lender may pay and expend such sums of money as Lender reasonably deems necessary for any such purpose and upon so doing shall be subrogated to any and all rights of the landlord under the Parking Agreement. Borrower hereby agrees to pay to Lender within five (5) days after demand, all such sums so paid and expended by Lender, together with interest thereon from the day of such payment at the Default Rate. All sums so paid and expended by Lender and the interest thereon shall be secured by the legal operation and effect of the Mortgage. If the lessor under the Parking Agreement shall deliver to Lender a copy of any notice of default sent by said lessor to Borrower, as tenant under the Parking Agreement, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender, in good faith, in reliance thereon. Borrower shall exercise each individual option, if any, to extend or renew the term of the Parking Agreement upon demand by Lender made at any time within one (1) year prior to the last day upon which any such option may be exercised, and if Borrower shall fail to do so, Borrower hereby expressly authorizes and appoints Lender its attorney-in-fact to exercise any such option in the name of and upon behalf of Borrower, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest. Borrower will not subordinate or consent to the subordination of the Parking Agreement to any mortgage, security deed, lease or

NY:1797184.16

other interest on or in the landlord's interest in all or any part of the Property, unless, in each such case, the written consent of Lender shall have been first had and obtained, which approval shall not unreasonably be withheld.

      **5.25.3** Notwithstanding anything to the contrary contained herein, Borrower shall have the one (1) time right to terminate the Parking Agreement, provided that Borrower satisfies the following conditions:

      (a)      No Event of Default has occurred and is continuing;

      (b)      Borrower delivers to Lender written notice thirty (30) days prior to the date Borrower wishes to terminate the Parking Agreement;

      (c)      Borrower has entered into a replacement parking agreement, which replacement parking agreement shall (a) provide for the leasing of the same number of parking spaces for which the Parking Agreement existing as of the date hereof provides for, provided that Borrower shall be permitted to lease a lower number of parking spaces, so long the number of parking spaces is sufficient to satisfy all zoning laws and regulations, on real property that is either the real property identified as "Parcel 1" on **Schedule 13** or other real property satisfactory to Lender in its sole discretion, (b) be in form and substance substantially similar (including without limitation, the term of such agreement, the rent and additional rent payable thereunder, and the rights of Borrower and Lender thereunder) to the Parking Agreement and is otherwise acceptable to Lender in its reasonable discretion (the "***Replacement Parking Agreement***");

      (d)      After taking into account the termination of the Parking Agreement and the execution of the Replacement Parking Agreement, the Property complies with all applicable Legal Requirements (including, without limitation, with respect to parking and applicable zoning and land use laws, regulations and ordinances); and

      (e)      Borrower remakes all of the representations, warranties and covenants contained in section 4.27 and this Section 5.25 to Lender in writing.

      **5.25.4** In the event that for any reason the Parking Agreement is terminated, Borrower shall within ten (10) Business Days of the termination of such Parking Agreement comply with clauses (a) through (e) of Section 5.25.3 hereof.

      **5.26    ISLT Pledges**. Borrower shall not cause, suffer or permit, any Person, including, without limitation, any assignee or pledgee under any ISLT Pledge, at any time, to obtain any direct or indirect ownership or membership interest, or any voting, management or Control right, in or with respect to, ISLT, Placo, Mezzanine Borrower or Borrower pursuant to any ISLT Pledge. Borrower shall not cause, suffer or permit any ISLT Pledge, the Beach Orangethorpe Guaranty or the Beach Orangethorpe II Guaranty to be amended, restated, replaced, supplemented or otherwise modified without the prior written consent of Lender, which consent shall be granted or withheld in Lender's sole and absolute discretion (it being understood and agreed that so long as no Event of Default shall be continuing, Lender shall not unreasonably withhold its consent to an amendment to an ISLT Pledge, the Beach Orangethorpe Guaranty or the Beach Orangethorpe II Guaranty if and only if the proposed amendment does not, in any way, modify or grant any direct or indirect ownership or membership interest, or any voting,

NY:1797184.16

management or Control right in or with respect to ISLT, Placo, Mezzanine Borrower or Borrower or materially increase any obligations of ISLT).

     **5.27**   **Borrower Affiliated Leases**.

        **5.27.1**  <u>**No Transfer of Borrower Affiliated Leases by Borrower.**</u>  Borrower shall not permit any Borrower Affiliated Lease, nor Borrower's interest as lessor under the Borrower Affiliated Lease, to be assigned, transferred, pledged, mortgaged or hypothecated without the prior written approval of Lender, which may be withheld in Lender's sole and absolute discretion, except that all Leases (including Borrower's interest as lessor under the Borrower Affiliated Leases) shall be (and have been) assigned to Lender as security for the Debt.

        **5.27.2**  <u>**No Transfer of Borrower Affiliated Leases by Borrower Affiliated Tenant.**</u>  Borrower shall not permit any Borrower Affiliated Tenant to assign, transfer, pledge, mortgage, hypothecate or sublet its interest under any Borrower Affiliated Lease without the prior written approval of Lender.

        **5.27.3**  <u>**No Amendments.**</u>  No Borrower Affiliated Lease (including any guaranty thereof) shall be modified, amended or altered in any way, without the prior written consent of Lender, which may be granted or withheld in Lender's sole discretion.

        **5.27.4**  <u>**No Release of Tenant.**</u>  No Borrower Affiliated Tenant (and no guarantor of the applicable Borrower Affiliated Lease) shall be released of any of its obligations imposed under any Borrower Affiliated Lease (and related lease guaranty) without in each case the prior written consent of Lender, which may be granted or withheld in Lender's sole discretion.

        **5.27.5**  <u>**No Termination.**</u>  No Borrower Affiliated Lease and no related lease guaranty shall be cancelled, surrendered or terminated in any way, without the prior written consent of Lender, which may be granted or withheld in Lender's sole discretion.

        **5.27.6**  <u>**Covenants.**</u>

        (a)      With respect to any Borrower Affiliated Lease, Borrower shall: (i) promptly and faithfully observe, perform and comply with all the terms, covenants and provisions thereof on its part to be observed, performed and complied with under each Borrower Affiliated Lease, at the times set forth therein and to do all things necessary to preserve unimpaired its rights thereunder; (ii) diligently enforce all of the terms, covenants and provisions to be observed, performed and complied with by each Borrower Affiliated Tenant under each Borrower Affiliated Lease, at the times set forth therein, provided that Borrower shall not terminate any Borrower Affiliated Lease (or any related lease guaranty) without the prior written consent of Lender, which may be granted or withheld in Lender's sole discretion; (iii) upon the written request of Lender to Borrower following the occurrence of (x) a Borrower Affiliated Lease Default Event, or (y) an Event of Default under the Loan Documents, diligently exercise Borrower's rights and remedies under any such Borrower Affiliated Lease to terminate such Borrower Affiliated Lease and evict the Borrower Affiliated Tenant from the Property, (iv) not do, permit, suffer or refrain from doing anything, as a result of which, there would be a default under any of the terms of any Borrower Affiliated Lease; (v) not exercise any right or option to cancel, surrender or otherwise terminate any Borrower Affiliated Lease without the prior written

NY:1797184.16

consent of Lender, which may be granted or withheld in Lender's sole discretion; (vi) deliver to Lender prompt written notice of any default by any party under any Borrower Affiliated Lease and promptly deliver to Lender copies of each notice of default and, after the occurrence of an Event of Default, copies of all other notices, communications, plans, specifications and other similar instruments received or delivered by Borrower in connection therewith; (vii) furnish to Lender such information and evidence as Lender may reasonably require concerning Borrower's and each Borrower Affiliated Tenant's due observance, performance and compliance with the terms, covenants and provisions of each Borrower Affiliated Lease and (viii) not collect any of the Rents more than one (1) month in advance.

(b)     If Borrower shall be in default under any Borrower Affiliated Lease, then Borrower shall grant Lender the right (but not the obligation), to cause the default or defaults under such Borrower Affiliated Lease to be remedied and otherwise exercise any and all rights of Borrower under such Borrower Affiliated Lease, as may be necessary to prevent or cure any default, and Lender shall have the right to enter all or any portion of the Property at such times and in such manner as Lender deems necessary, to prevent or to cure any such default.

(c)     The actions or payments of Lender to cure any default by Borrower under any Borrower Affiliated Lease shall not remove or waive, as between Borrower and Lender, the default that occurred under this Agreement by virtue of the default by Borrower under such Borrower Affiliated Lease.  All sums expended by Lender to cure any such default shall be paid by Borrower to Lender, within ten (10) days after written demand, with interest on such sum at the rate set forth in this Agreement from the date such sum is expended to and including the date the reimbursement payment is made to Lender.  All such indebtedness shall be deemed to be secured by the Security Instrument.

(d)     Borrower shall notify Lender promptly in writing of the occurrence of any default by any Borrower Affiliated Tenant or the occurrence of any event that, with the passage of time or service of notice, or both, would constitute a default by any Borrower Affiliated Tenant under any Borrower Affiliated Lease, and the receipt by Borrower of any notice (written or otherwise) from any Borrower Affiliated Tenant under any Borrower Affiliated Lease noting or claiming the occurrence of any default by Borrower under such Borrower Affiliated Lease or the occurrence of any event that, with the passage of time or service of notice, or both, would constitute a default by Borrower under such Borrower Affiliated Lease.

(e)     Within fifteen (15) days after receipt of written demand by Lender, Borrower shall obtain from each Borrower Affiliated Tenant and furnish to Lender the estoppel certificate of such Borrower Affiliated Tenant addressed to Lender, its successors and assigns in form and substance reasonably satisfactory to Lender stating, among other items, the date through which rent has been paid and whether or not there are any defaults thereunder and specifying the nature of such claimed defaults, if any.

    **5.27.7 <u>Subordination.</u>**     Borrower covenants and agrees that each Borrower Affiliated Lease and all of the terms, covenants and provisions thereof, and all estates, options and rights created under each Borrower Affiliated Lease shall at all times be subordinate and subject to the terms and provisions of the Loan Documents and lien of the Security Instrument

(including, without limitation, all renewals, increases, modifications, spreaders, consolidations, replacements and extensions thereof).

**5.27.8 Conflicts.** In the event of any inconsistency between the terms of this Section 5.27 and the terms of Section 5.9 of this Agreement, the terms of this Section 5.27 shall govern.

**5.28    Environmental Documents**.

**5.28.1** Borrower shall at all times (i) promptly and faithfully observe, perform and comply with all of the terms, covenants and provisions on its part to be observed, performed and complied with under the Environmental Documents, and (ii) cause the Property to remain fully compliant with all of the terms, covenants and provisions to be complied with under the Environmental Documents (in each case including, without limitation, any provision requiring (x) notice to be delivered to subsequent holders of any ownership interest in the Property of the use restrictions set forth in any Environmental Document, (y) that prior approval of the Los Angeles Water Quality Control Board (the "LAWQCB") be obtained prior to any subsurface disturbance of the engineered cap and that such subsurface disturbance be performed consistently with a site-specific health and safety plan, in accordance with all applicable Legal Requirements and/or notice to be delivered to the LAWQCB of any subsurface disturbance of the engineered cap without prior authorization of the LAWQCB, and/or (z) that access be provided to the Property as required in the Environmental Documents to the LAWQCB and EIMF California Limited Partnership IV, L.P., or any successor entities responsible for any remediation at the Property**.**

**5.28.2** Borrower shall not, without the prior written consent of Lender, amend or modify, or permit the amendment or modification of, the Environmental Documents**.**

**5.29    Tenant Insurance**.

**5.29.1** Borrower acknowledges that Borrower currently carries primary property insurance coverage for all improvements located on the Property with the exception of those improvements owned by Tenants under ground leases with Borrower, as lessor, which insurance satisfies the requirements set forth in this Agreement ("Borrower's Primary Insurance").

**5.29.2** Borrower shall continue to carry Borrower's Primary Insurance throughout the term; provided, however, that Borrower may permit Tenants to obtain primary insurance coverage for improvements located on the Property which are owned by Borrower, so long as Borrower has caused the applicable Tenant to deliver to Lender evidence in form and substance satisfactory to Lender that such Tenant has obtained property insurance which satisfies the requirements set forth in this Agreement and is otherwise acceptable to Lender in its sole discretion**.**

**5.30    Master Lease**.

**5.30.1** Borrower, as landlord, and Master Tenant, as tenant, have entered into the Master Lease for the entire Planet Fitness Space (the "Master Lease Premises") for an initial term (i) commencing, if ever, on the date upon which the Planet Fitness Lease expires or is

NY:1797184.16

surrendered, cancelled or otherwise terminated, and (ii) continuing until the earlier of (x) the Expiration Date (as defined in the Planet Fitness Lease), or (y) the date upon which Borrower has (A) entered into a Lease with a replacement tenant reasonably satisfactory to Lender (a "Replacement Master Tenant"), demising all of the Master Lease Premises, with a net effective rental rate as approved by Lender in its sole discretion, for a term of not less than such time as remained under the Planet Fitness Lease as of the date immediately preceding the date of the termination of the Planet Fitness Lease, and otherwise in form and substance and upon terms reasonably acceptable to Lender (a "Replacement Master Lease"), (B) delivered to Lender (1) a copy of the Replacement Master Lease (together with evidence reasonably satisfactory to Lender that the Replacement Master Tenant is open for business in the Master Lease Premises and paying full unabated rent in accordance with the Replacement Master Lease), (2) an Acceptable Tenant Estoppel Certificate from the Replacement Master Tenant and (3) if requested by Lender, a subordination, non-disturbance and attornment agreement from the Replacement Master Tenant in form and substance satisfactory to Lender, and (C) paid all tenant improvement allowances and leasing brokerage commissions payable by Borrower in connection with the Replacement Master Lease and delivered to Lender evidence in form and substance reasonably satisfactory to Lender of the payment of same.

      **5.30.2**  The Master Lease is for a total rent equal to not less than the sum of base rent payable under the Planet Fitness Lease plus all pass-throughs, reimbursements and other sums in addition to base rent as provided in the Planet Fitness Lease, including, without limitation, for real estate taxes and assessments, insurance and utilities, including any increases set forth therein (collectively, the "Master Lease Rent").

      **5.30.3**  Borrower shall not permit the Master Lease, nor the tenant's interest under the Master Lease to be assigned, transferred, pledged or hypothecated without the prior written approval of Lender, except that all Leases (including the Master Lease) shall be assigned as security for the Loan.  The Master Lease shall remain unmodified and in full force and effect in accordance with its terms.

      **5.30.4**  (i) No termination or cancellation of the Master Lease shall be valid (regardless of whether such termination shall be permissible under the terms of the Master Lease, applicable law or principles of equity); (ii) no modification or amendment to any term or provision of the Master Lease shall be valid; (iii) no waiver or release of the tenants under the Master Lease from any of the obligations of the tenant under the Master Lease shall be valid (including, without limitation the payment of the rent and all other amounts payable by the tenant thereunder); (iv) no abatements of the rent or any other amounts payable thereunder shall be valid (regardless of whether such abatement shall be permissible under the terms of the Master Lease, applicable law or principles of equity); and (v) no release of any or all of the Master Lease Premises shall be valid, in each instance, without the prior, written approval of Lender. Borrower further covenants and agrees that any such termination, cancellation, modification, amendment, waiver, abatement or release made or purported to be made without the prior, written approval of Lender shall be null and void ab initio and that Lender shall be made a permitted third party beneficiary of the corresponding provisions in the Master Lease, entitled to enforce the same against the landlord and tenant.

NY:1797184.16

**5.30.5** Borrower shall cause all Master Lease Rent to be deposited into the Clearing Account at the Clearing Bank.

**5.30.6** Any sublease entered into between Tenants and the Master Tenant for portions of the Master Lease Premises shall contain recognition and attornment language providing that in the event that the Master Lease is ever terminated, such Tenants shall recognize and attorn to Borrower (or to the extent that at such time, Lender shall have become the owner of the Master Lease Premises by foreclosure, conveyance in lieu of foreclosure or otherwise, then to Lender) as such Tenant's direct landlord and the sublease shall continue in full force and effect as a direct lease between such Tenant and Borrower or Lender, as applicable, upon all of the terms, covenants and conditions set forth in the sublease, except as amended by necessary implication.

**5.30.7** Without limiting anything to the contrary contained herein, if and to the extent that Borrower obtains Lender's approval to terminate any Lease, such approval may be conditioned upon the execution and delivery to Lender of an amendment to the Master Lease, in form and substance acceptable to Lender, pursuant to which the Master Lease Premises are amended to include the space that was demised to the Tenant whose lease was terminated.

**5.31**    **Gap Zoning Policy**.

**5.31.1** Gap Zoning Policy. Borrower represents and warrants that it has secured the Gap Zoning Policy. The Gap Zoning Policy shall at all times name Lender and its successors and assigns as a named insured. Borrower represents, warrants and covenants that it has paid all necessary premiums, taxes and fees and will be responsible to pay any and all applicable deductibles associated therewith.

**5.31.2** Borrower shall take no action, including allowing a change in the use of the Property that is materially different from the current use of the Property, such that coverage under the Gap Zoning Policy could be denied by the insurer under the Gap Zoning Policy.

**6.**    **NOTICES AND REPORTING.**

**6.1**    **Notices.**    All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document (a "***Notice***") shall be given in writing and shall be effective for all purposes if either hand delivered with receipt acknowledged, or by a nationally recognized overnight delivery service (such as Federal Express), or by certified or registered United States mail, return receipt requested, postage prepaid, or by facsimile and confirmed by facsimile answer back, in each case addressed as follows (or to such other address or Person as a party shall designate from time to time by Notice to the other party): If to Lender: Natixis, New York Branch, 1251 Avenue of the Americas, New York, New York 10020, Attention: Real Estate Administration, Telecopier: (212) 891–5777; with a copy to: Winston & Strawn LLP, 200 Park Avenue, New York, New York 10166, Attention: Corey A. Tessler, Esq., Telecopier: (212) 294-4700; if to Borrower: Plamex Investment, LLC, 3100 East Imperial Highway, Lynwood, California 90262, Attention: Min Chae and Donald Chae, Telecopier: (310) 631-6999; with a copy to: Lim, Ruger & Kim, LLP, 1055 West Seventh Street, Suite 2800, Los Angeles, California 90017, Attention: John Lim, Esq., Telecopier: (213) 955-9511. A Notice shall be

deemed to have been given: (a) in the case of hand delivery, at the time of delivery; (b) in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; (c) in the case of overnight delivery, upon the first attempted delivery on a Business Day; or (d) in the case of facsimile transmission, when sent and electronically confirmed.

**6.2    Borrower Notices and Deliveries.**  Borrower shall (a) give prompt written notice to Lender of: (i) any litigation, governmental proceedings or claims or investigations pending or threatened against Borrower or Borrower Representative which might materially adversely affect Borrower's or Borrower Representative's condition (financial or otherwise) or business or the Property; (ii) any material adverse change in Borrower's or Borrower Representative's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Borrower has knowledge; and (b) furnish and provide to Lender: (i) any Securities and Exchange Commission or other public filings, if any, of Borrower, Borrower Representative, Manager, or any Affiliate of any of the foregoing within two (2) Business Days of such filing and (ii) all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, reasonably requested, from time to time, by Lender.  In addition, after request by Lender (but no more frequently than twice in any year), Borrower shall furnish to Lender (x) within ten (10) days, a certificate addressed to Lender, its successors and assigns reaffirming all representations and warranties of Borrower set forth in the Loan Documents as of the date requested by Lender or, to the extent of any changes to any such representations and warranties, so stating such changes, and (y) within thirty (30) days, Tenant estoppel certificates addressed to Lender, its successors and assigns from each Tenant at the Property in form and substance reasonably satisfactory to Lender.

**6.3    Financial Reporting**.

**6.3.1   Bookkeeping.**   Borrower shall keep on a calendar year basis, in accordance with GAAP or any other accounting method, consistently applied, proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense and any services, Equipment or furnishings provided in connection with the operation of the Property, whether such income or expense is realized by Borrower, Manager or any Affiliate of Borrower.  Lender shall have the right from time to time during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Borrower or other Person maintaining them, and to make such copies or extracts thereof as Lender shall reasonably require.  After an Event of Default, Borrower shall pay any costs incurred by Lender to examine such books, records and accounts, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

**6.3.2   Annual Reports.**   Borrower shall furnish to Lender annually within one hundred twenty (120) days after each calendar year, a complete copy of Borrower's annual financial statements audited by a "big four" accounting firm or another certified public accountant (accompanied by an unqualified opinion from such accounting firm or independent certified public accountant) in form and content reasonably acceptable to Lender, prepared in accordance with GAAP or any other accounting method, consistently applied, and containing balance sheets and statements of profit and loss for Borrower and the Property in such detail as Lender may reasonably request.  Each such statement (x) shall be in form and substance reasonably satisfactory to Lender, (y) shall set forth the financial condition and the income and

expenses for the Property for the immediately preceding calendar year, including statements of annual Net Operating Income as well as (1) a list of Tenants, if any, occupying more than twenty percent (20%) of the rentable space of the Property, (2) a breakdown showing (a) the year in which each Lease then in effect expires, (b) the percentage of rentable space covered by such Lease, (c) the percentage of base rent with respect to which Leases shall expire in each such year, expressed both on a per year and a cumulative basis and (z) shall be accompanied by an Officer's Certificate certifying (1) that such statement is true, correct, complete and accurate in all material respects and presents fairly the financial condition of the Property and has been prepared in accordance with GAAP or any other accounting method consistently applied and (2) whether there exists a Default or Event of Default, and if so, the nature thereof, the period of time it has existed and the action then being taken to remedy it.

6.3.3    **Monthly/Quarterly Reports.**  Borrower shall furnish to Lender within twenty (20) days after the end of each calendar month or quarter, as applicable, the following items: (i) monthly (provided, however, that monthly reports shall only be required prior to "start-up day" (within the meaning of Section 860G(a)(9) of the Code), quarterly  and year–to–date operating statements, noting Net Operating Income and other information necessary and sufficient under GAAP or any other accounting method, consistently applied to fairly represent the financial position and results of operation of the Property during such calendar month, all in form satisfactory to Lender; (ii) quarterly, a balance sheet for such calendar quarter; (iii) quarterly, a comparison of the budgeted income and expenses and the actual income and expenses for each quarter and year–to–date for the Property, together with a detailed explanation of any variances of ten percent (10%) or more between budgeted and actual amounts for such period and year to date; (iv) quarterly, a statement of the actual Capital Expenses made by Borrower during each calendar quarter as of the last day of such calendar quarter; (v) quarterly, a statement that Borrower has not incurred any indebtedness other than indebtedness permitted hereunder; (vi) quarterly, an aged receivables report; and (vii) monthly (provided, however, that monthly reports shall only be required prior to "start-up day" (within the meaning of Section 860G(a)(9) of the Code) and quarterly rent rolls identifying the leased premises, names of all Tenants, units leased, monthly rental and all other charges payable under each Lease, date to which paid, term of Lease, date of occupancy, date of expiration, material special provisions, concessions or inducements granted to Tenants, and a year–by–year schedule showing by percentage the rentable area of the Improvements and the total base rent attributable to Leases expiring each year) and a delinquency report for the Property.  Each such statement shall be accompanied by an Officer's Certificate certifying (1) that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower and the Property in accordance with GAAP or any other accounting method, consistently applied (subject to normal year–end adjustments) and (2) whether there exists a Default or Event of Default, and if so, the nature thereof, the period of time it has existed and the action then being taken to remedy it.

6.3.4    **Other Reports.**    Borrower shall furnish to Lender, within ten (10) Business Days after request, such further detailed information with respect to the operation of the Property and the financial affairs of Borrower, Borrower Representative or Manager as may be reasonably requested by Lender or any applicable Rating Agency.

73

**6.3.5    Annual Budget.**    Borrower shall prepare and submit (or shall cause Manager to prepare and submit) to Lender by November 15th of each year during the Term for approval by Lender, which approval shall not be unreasonably withheld or delayed, a proposed pro forma budget for the Property for the succeeding calendar year (the "*Annual Budget*"), and, promptly after preparation thereof, any revisions to such Annual Budget.  Lender's failure to approve or disapprove any Annual Budget or revision within thirty (30) days after Lender's receipt thereof shall be deemed to constitute Lender's approval thereof.  The Annual Budget shall consist of (i) an operating expense budget (the "*Operating Budget*") showing, on a month–by–month basis, in reasonable detail, each line item of Borrower's anticipated operating income and operating expenses (on a cash and accrual basis), including amounts required to establish, maintain or increase any monthly payments required hereunder, and (ii) a Capital Expense budget (the "*Capital Budget*") showing, on a month–by–month basis, in reasonable detail, each line item of anticipated Capital Expenses.

**6.3.6    Breach.**  If Borrower fails to provide to Lender or its designee any of the financial statements, certificates, reports or information (the "*Required Records*") required by this Section 6.3 within thirty (30) days after the date upon which such Required Record is due, Borrower shall pay to Lender, at Lender's option and in its discretion, an amount equal to $10,000 for each Required Record that is not delivered; provided Lender has given Borrower at least fifteen (15) days prior notice of such failure.  In addition, thirty (30) days after Borrower's failure to deliver any Required Records, Lender shall have the option, upon fifteen (15) days' notice to Borrower to gain access to Borrower's books and records and prepare or have prepared at Borrower's expense, any Required Records not delivered by Borrower.

# 7.    INSURANCE; CASUALTY; AND CONDEMNATION

## 7.1    Insurance.

**7.1.1    Coverage.**  Borrower, at its sole cost, for the mutual benefit of Borrower and Lender, shall obtain and maintain during the Term the following policies of insurance:

(a)    Property insurance insuring against loss or damage customarily included under so called "all risk" or "special form" policies including fire, lightning, flood, earthquake, windstorm/hail, vandalism, and malicious mischief, boiler and machinery and coverage for damage or destruction caused by "War", if available, and the acts of terrorists, both foreign and domestic, whether considered "certified" under applicable laws and legislation or otherwise (or such policies shall have no exclusion from coverage with respect thereto) and such other insurable hazards as, under good insurance practices, from time to time are insured against for other property and buildings similar to the Property in nature, use, location, height, and type of construction.  Such insurance policy shall also provide coverage for Ordinance or Law, coverage for loss to the Improvements, demolition and increased cost of construction (which insurance for demolition and increased cost of construction may contain a sub–limit satisfactory to Lender).  Each such insurance policy shall (i) be in an amount equal to the greater of (A) one hundred percent (100%) of the then replacement cost of the Improvements without deduction for physical depreciation, and (B) such amount as is necessary so that the insurer would not deem Borrower a co–insurer under such policies, (ii) have deductibles no greater than $10,000 per occurrence, (iii) be paid annually in advance and (iv) contain either no coinsurance or an agreed amount

74

endorsement and a replacement cost endorsement with a waiver of depreciation, and shall cover, without limitation, all Tenant improvements and betterments that Borrower is required to insure pursuant to any Lease on a replacement cost basis. If the insurance required under this subsection is not obtained by blanket insurance policies, the insurance policy shall be endorsed to also provide guaranteed building replacement cost to the Improvements and such Tenant improvements in an amount to be subject to the consent of Lender, which consent shall not be unreasonably withheld, but in all events, not less than would be required to restore the Property following a Casualty. If policy is written as part of a blanket, Borrower will provide Lender with a complete schedule of locations and values for properties associated with the blanket policy. Lender shall be named Mortgagee and Lender's Loss Payee on a Standard Mortgagee Endorsement.

(b)     Flood insurance if any part of the Property is located in an area identified by the Federal Emergency Management Agency as an area having special flood hazards, in an amount at least equal to the lesser of: (i) the greater of (A) the then full replacement cost of the Property without deduction for physical depreciation and (B) the unpaid Principal and (ii) the maximum limit of coverage available under the National Flood Insurance Plan with respect to the Property; provided, however, that Lender shall be entitled to require flood insurance in amounts greater than the foregoing, in its discretion. If flood insurance is required, the maximum deductible allowable on the primary layer of coverage shall be $10,000.

(c)     Public liability insurance, including terrorism, to be written on an occurrence basis with no deductible or self–insured retention, including (i) "Commercial General Liability Insurance", (ii) "Owned", "Hired" and "Non Owned Auto Liability"; and (iii) umbrella liability coverage for personal injury, bodily injury, death, accident and property damage, such insurance providing in combination not less than $1,000,000 per occurrence, not less than $2,000,000 in the annual aggregate and not less than $15,000,000 umbrella, each on a per location basis. If aggregate limits are shared with other locations the coverage shall include either (A) a "Per Location Aggregate Endorsement" or (B) the amount of umbrella liability insurance to be provided shall be not less than $5,000,000 in excess of the umbrella coverage set forth in the preceding sentence. The policies described in this subsection shall also include coverage for elevators, escalators, independent contractors, "Contractual Liability" (covering, to the maximum extent permitted by law, Borrower's obligation to indemnify Lender as required under this Agreement and the other Loan Documents), "Products" and "Completed Operations Liability" coverage.

(d)     Rental loss or business interruption insurance including terrorism (i) with Lender being named as "Lender Loss Payee", (ii) in an amount equal to one hundred percent (100%) of the projected Rents from the Property during the period of restoration but not less than eighteen (18) months; and (iii) containing an extended period of indemnity endorsement of not less than six (6) months which provides that after the physical loss to the Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twenty-four (24) months from the date that the Property is damaged, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period. The amount of such insurance shall be increased from time to time during the Term as and when the estimated or actual Rents increase.

(e)     To the extent such equipment exists on the Property, comprehensive boiler and machinery insurance covering all mechanical and electrical equipment against physical damage, rent loss and improvements loss and covering, without limitation, all Tenant improvements and betterments that Borrower is required to insure pursuant to the lease on a replacement cost basis or such other amount as approved by Lender in its discretion.

(f)     Worker's compensation insurance with respect to any employees of Borrower, as required by any Legal Requirement.

(g)     During any period of repair or restoration, builder's "all–risk" insurance on a "Completed Value Basis" in an amount equal to not less than the full, completed insurable value of the Property, against such risks (including fire and extended coverage and collapse of the Improvements to agreed limits) as Lender may request, in form and substance acceptable to Lender, and consistent with the insurance requirements set forth in Section 7.1.1(a).

(h)     Such other insurance or higher limits on the Property or on any replacements or substitutions thereof or additions thereto as may from time to time be required by Lender against other insurable hazards or casualties which at the time are commonly insured against in the case of property similarly situated including, without limitation, sinkhole, mine subsidence and environmental insurance, due regard being given to the height and type of buildings, their construction, location, use and occupancy.

(i)     "Zoning Restriction Protector Policy", on the "Lender's Non-conforming Use Form".

(j)     If notified in writing by Lender that the Required Mezzanine Lender is requiring the Borrower to carry earthquake insurance, earthquake insurance, in form and substance reasonably acceptable to Lender, in an amount of no less than the total insurable value of the Property and including business income coverage with not less than an eighteen (18) month period of restoration and a six (6) month extended period of indemnity, with a deductible no greater than five (5%) percent of the total insurable value of the Property.

**7.1.2    Policies.**  Unless otherwise approved by Lender in writing in advance of placement, all policies of insurance (the "Policies") required pursuant to Section 7.1.1 shall (i) be issued by companies approved by Lender and licensed and/or authorized to do business in the State, with a claims paying ability rating of "A" or better by S&P (and the equivalent by any other Rating Agency) and a rating of A:X or better in the current Best's Insurance Reports; (ii) name Lender and its successors or assigns as their interests may appear as the Mortgagee (in the case of property) Lender's Loss Payee (in the case of rent loss or business interruption insurance) and an additional insured (in the case of liability insurance); (iii) contain (in the case of property insurance) a Non–Contributory Standard Mortgagee Clause and a Lender's Loss Payable Endorsement, or their equivalents, naming Lender as the Person to which all payments made by such insurance company shall be paid; (iv) contain provisions permitting Borrower to waive its right of subrogation against Lender; (v) be assigned and the originals thereof delivered to Lender; (vi) contain such provisions as Lender deems reasonably necessary or desirable to protect its interest, including (A) endorsements providing that neither Borrower, Lender nor any other party shall be a co–insurer under the Policies, (B) that Lender shall receive at least thirty

76

(30) days' prior written notice of cancellation of any of the Property Policies, and when available, liability policies (provided, however, that if such notice provisions are not available in any of the liability Policies, Borrower shall provide the required notice to Lender), (C) an agreement whereby the insurer waives any right to claim any premiums and commissions against Lender, provided that the policy need not waive the requirement that the premium be paid in order for a claim to be paid to the insured, and (D) providing that Lender is permitted to make payments to effect the continuation of such Policy upon notice of cancellation due to non–payment of premiums; (vii) in the event any insurance policy (except for general public and other liability and workers compensation insurance) shall contain breach of warranty provisions, such policy shall provide that with respect to the interest of Lender, such insurance policy shall not be invalidated by and shall insure Lender regardless of (A) any act, failure to act or negligence of or violation of warranties, declarations or conditions contained in such policy by any named insured, (B) the occupancy or use of the premises for purposes more hazardous than permitted by the terms thereof, or (C) any foreclosure or other action or proceeding taken by Lender pursuant to any provision of the Loan Documents; and (viii) be satisfactory in form and substance to Lender and approved by Lender as to amounts, form, risk coverage, deductibles, loss payees and insureds.  Borrower shall pay the premiums for such Policies (the "***Insurance Premiums***") as the same become due and payable and furnish to Lender evidence of the renewal of each of the Policies together with (unless such Insurance Premiums have been paid by Lender pursuant to <u>Section 3.3</u>) receipts for or other evidence of the payment of the Insurance Premiums reasonably satisfactory to Lender.  If Borrower does not furnish such evidence and receipts at least thirty (30) days prior to the expiration of any expiring Policy, then Lender may, but shall not be obligated to, procure such insurance and pay the Insurance Premiums therefor, and Borrower shall reimburse Lender for the cost of such Insurance Premiums promptly on demand, with interest accruing at the Default Rate.  Borrower shall deliver to Lender a certified copy of each Policy within thirty (30) days after its effective date.  Within thirty (30) days after request by Lender, Borrower shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by Lender, taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices and the like.

      **7.2**    **Casualty**.

          **7.2.1**  <u>**Notice; Restoration.**</u>  If the Property is damaged or destroyed, in whole or in part, by fire or other casualty (a "***Casualty***"), Borrower shall give prompt notice thereof to Lender.  Following the occurrence of a Casualty, Borrower, regardless of whether insurance proceeds are available, shall promptly proceed to restore, repair, replace or rebuild the Property in accordance with Legal Requirements to be of at least equal value and of substantially the same character as prior to such damage or destruction.

          **7.2.2**  <u>**Settlement of Proceeds.**</u>  If a Casualty covered by any of the Policies (an "***Insured Casualty***") occurs where the loss does not exceed $250,000, provided no Default or Event of Default has occurred and is continuing, Borrower may settle and adjust any claim without the prior consent of Lender; provided such adjustment is carried out in a competent and timely manner, and Borrower is hereby authorized to collect and receipt for the insurance proceeds (the "***Proceeds***").  In the event of an Insured Casualty where the loss equals or exceeds $250,000 (a "***Significant Casualty***"), Lender may, in its sole discretion, settle and adjust any

77

claim without the consent of Borrower and agree with the insurer(s) on the amount to be paid on the loss.  All Proceeds shall be due and payable solely to Lender and held by Lender in the Casualty/Condemnation Subaccount and disbursed in accordance herewith.  If Borrower or any party other than Lender is a payee on any check representing Proceeds with respect to a Significant Casualty, Borrower shall immediately endorse, and cause all such third parties to endorse, such check payable to the order of Lender.  Borrower hereby irrevocably appoints Lender as its attorney–in–fact, coupled with an interest, to endorse such check payable to the order of Lender.  The expenses incurred by Lender in the settlement, adjustment and collection of the Proceeds shall become part of the Debt and shall be reimbursed by Borrower to Lender upon demand.

> **7.3    Condemnation**.

> > **7.3.1    Notice; Restoration.**  Borrower shall promptly give Lender notice of the actual or threatened commencement of any condemnation or eminent domain proceeding affecting the Property (a "***Condemnation***") and shall deliver to Lender copies of any and all papers served in connection with such Condemnation.   Following the occurrence of a Condemnation, Borrower, regardless of whether an Award is available, shall promptly proceed to restore, repair, replace or rebuild the Property in accordance with Legal Requirements to the extent practicable to be of at least equal value and of substantially the same character (and to have the same utility) as prior to such Condemnation.

> > **7.3.2    Collection of Award.**    Lender is hereby irrevocably appointed as Borrower's attorney–in–fact, coupled with an interest, with exclusive power to collect, receive and retain any award or payment in respect of a Condemnation (an "***Award***") and to make any compromise, adjustment or settlement in connection with such Condemnation.  Notwithstanding any Condemnation (or any transfer made in lieu of or in anticipation of such Condemnation), Borrower shall continue to pay the Debt at the time and in the manner provided for in the Loan Documents, and the Debt shall not be reduced unless and until any Award shall have been actually received and applied by Lender to expenses of collecting the Award and to discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided in the Note (or Undefeased Note, as the case may be).  If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of such Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall be recoverable or shall have been sought, recovered or denied, to receive all or a portion of the Award sufficient to pay the Debt.  Borrower shall cause any Award that is payable to Borrower to be paid directly to Lender.  Lender shall hold such Award in the Casualty/Condemnation Subaccount and disburse such Award in accordance with the terms hereof.

> **7.4    Application of Proceeds or Award**.

> > **7.4.1    Application to Restoration.**  If an Insured Casualty or Condemnation occurs where (i) the loss is in an aggregate amount less than twenty percent (20%) of the unpaid Principal, (ii) in the reasonable judgment of Lender, the Property can be restored within the earliest to occur of (x) six (6) months from the date of the Insured Casualty or Condemnation or the date of Lender's notice to Borrower that the Proceeds or the Award, as applicable, shall be

applied to restoration, whichever occurs last, (y) six (6) months before the Stated Maturity Date and (z) the expiration of the rental or business interruption insurance with respect thereto, to the Property's pre–existing condition and utility as existed immediately prior to such Insured Casualty or Condemnation and to an economic unit not less valuable and not less useful than the same was immediately prior to the Insured Casualty or Condemnation, and after such restoration will adequately secure the Debt and (iii) no Default or Event of Default shall have occurred and be then continuing, then the Proceeds or the Award, as the case may be (after reimbursement of any expenses incurred by Lender), shall be applied to reimburse Borrower for the cost of restoring, repairing, replacing or rebuilding the Property (the "***Restoration***"), in the manner set forth herein.    Borrower shall commence and diligently prosecute such Restoration. Notwithstanding the foregoing, in no event shall Lender be obligated to apply the Proceeds or Award to reimburse Borrower for the cost of Restoration unless, in addition to satisfaction of the foregoing conditions, both (x) Borrower shall pay (and if required by Lender, Borrower shall deposit with Lender in advance) all costs of such Restoration in excess of the net amount of the Proceeds or the Award to be made available pursuant to the terms hereof; and (y) Lender shall have received evidence reasonably satisfactory to it that during the period of the Restoration, the Rents (which may at Borrower's election be supplemented with additional funds deposited by Borrower with Lender to be disbursed by Lender in connection with such Restoration) will be at least equal to the sum of the operating expenses and Debt Service, as reasonably determined by Lender.

          **7.4.2**   **Application to Debt.**   Except as provided in <u>Section 7.4.1</u>, any Proceeds or Award may, at the option of Lender in its discretion, be applied to the payment of (i) accrued but unpaid interest on the Note, (ii) the unpaid Principal and (iii) other charges due under the Note or any of the other Loan Documents, or applied to reimburse Borrower for the cost of any Restoration, in the manner set forth in <u>Section 7.4.3,</u> and to remit any remaining Proceeds or Award, if any, to Mezzanine Lender to be applied in accordance with the terms of the Mezzanine Loan Documents.  Any such prepayment of the Loan shall be without any Yield Maintenance Premium, unless an Event of Default has occurred and is continuing at the time the Proceeds are received from the insurance company or the Award is received from the condemning authority, as the case may be, in which event Borrower shall pay to Lender an additional amount equal to the Yield Maintenance Premium, if any, that may be required with respect to the amount of the Proceeds or Award applied to the unpaid Principal.  After any such application to the unpaid Principal, the remaining unpaid Principal shall be reamortized over the remaining Term hereof.

          **7.4.3**   **Procedure for Application to Restoration.**   If Borrower is entitled to reimbursement out of the Proceeds or an Award held by Lender, such Proceeds or Award shall be disbursed from time to time from the Casualty/Condemnation Subaccount upon Lender being furnished with (i) evidence satisfactory to Lender of the estimated cost of completion of the Restoration, (ii) a fixed price or guaranteed maximum cost construction contract for Restoration satisfactory to Lender, (iii) prior to the commencement of Restoration, all immediately available funds in addition to the Proceeds or Award that in Lender's judgment are required to complete the proposed Restoration, (iv) such architect's certificates, waivers of lien, contractor's sworn statements, title insurance endorsements, bonds, plats of survey, permits, approvals, licenses and such other documents and items as Lender may reasonably require and approve in Lender's discretion, and (v) all plans and specifications and construction contracts for such Restoration, such plans and specifications and construction contracts to be approved by Lender prior to

79

commencement of any work. Lender may, at Borrower's expense, retain a consultant to review and approve all requests for disbursements, which approval shall also be a condition precedent to any disbursement. No payment made prior to the final completion of the Restoration shall exceed ninety percent (90%) of the value of the work performed from time to time; funds other than the Proceeds or Award shall be disbursed prior to disbursement of such Proceeds or Award; and at all times, the undisbursed balance of such Proceeds or Award remaining in the hands of Lender, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Lender by or on behalf of Borrower for that purpose, shall be at least sufficient in the reasonable judgment of Lender to pay for the cost of completion of the Restoration, free and clear of all Liens or claims for Lien. Provided no Default or Event of Default then exists, any surplus that remains out of the Proceeds held by Lender after payment of such costs of Restoration shall be paid to Borrower (or, if applicable, first shall be disbursed to Mezzanine Lender for application in accordance with the Mezzanine Loan Documents if the Mezzanine Loan is outstanding, and then shall be disbursed to Borrower so long as no Event of Default then exists). Except as provided in the preceding sentence, any surplus that remains out of the Award received by Lender after payment of such costs of Restoration shall, in the discretion of Lender, be retained by Lender and applied to payment of the Debt or returned to Borrower.

7.4.4  **Prepayment upon Partial Condemnation.**    Notwithstanding the foregoing provisions in this Section 7, if the Loan or any portion thereof is included in a REMIC Trust and immediately following a release of any portion of the Lien of the Security Instrument in connection with a Condemnation (but taking into account any proposed Restoration of the remaining portion of the Property that remains subject to the Lien), the Loan-to-Value ratio of the remaining portion of the Property that remains subject to the Lien is greater than 125% (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust, based solely on real property and excluding any personal property and going concern value, if any), then the principal balance of the Loan must be paid down by an amount equal to the least of the following amounts: (i) the net Condemnation Award, (ii) the fair market value of the released property at the time of the release, or (iii) an amount such that the Loan-to-Value ratio (as so determined by Lender) does not increase after the release unless Lender receives an opinion of counsel that if such amount is not paid, the securitization will not fail to maintain its status as a REMIC Trust as a result of the related release of such portion of the Lien of the Security Instrument.

## 8.    DEFAULTS

8.1    **Events of Default.**  An "*Event of Default*" shall exist with respect to the Loan if any of the following shall occur:

(a)    any portion of the Debt is not paid when due or any other amount under Section 3.10(a) is not paid in full when due (unless sufficient funds are available in the relevant Subaccount on the applicable date);

(b)    any of the Taxes are not paid when due (unless Lender is paying such Taxes pursuant to Section 3.3), subject to Borrower's right to contest Taxes in accordance with Section 5.2;

NY:1797184.16

(c)      the Policies are not kept in full force and effect, or are not delivered to Lender upon request;

(d)      a Transfer other than a Permitted Transfer occurs;

(e)      any representation or warranty made in any Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished by Borrower or Guarantor in connection with any Loan Document, shall be false or misleading in any material respect as of the date the representation or warranty was made;

(f)      Borrower, Borrower Representative or Guarantor shall (i) make a general assignment for the benefit of creditors or (ii) generally not be paying its debts as they become due;

(g)      a receiver, liquidator or trustee shall be appointed for Borrower, Borrower Representative or Guarantor; or Borrower, Borrower Representative or Guarantor shall be adjudicated a bankrupt or insolvent; or any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower, Borrower Representative or Guarantor, as the case may be; or any proceeding for the dissolution or liquidation of Borrower, Borrower Representative or Guarantor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower, Borrower Representative or Guarantor, as the case may be, only upon the same not being discharged, stayed or dismissed within sixty (60) days;

(h)      any covenant contained in <u>Sections 5.11.1 (a) – (e)</u>, <u>5.12</u>, <u>5.14</u>, <u>5.15</u> or <u>5.16</u> is breached;

(i)      except as expressly permitted hereunder, the alteration, improvement, demolition or removal of all or any of portion of the Improvements without the prior written consent of Lender where such consent is required under this Agreement or the physical waste of any portion of the Property;

(j)      an Event of Default as defined or described elsewhere in this Agreement or in any other Loan Document occurs; or any other event shall occur or condition shall exist, if the effect of such event or condition is to accelerate or to permit Lender to accelerate the maturity of any portion of the Debt;

(k)      a default occurs under any term, covenant or provision set forth herein or in any other Loan Document which specifically contains a notice requirement or grace period and such notice has been given and such grace period has expired;

(l)      any of the assumptions contained in any substantive non–consolidation opinion, delivered to Lender by Borrower's counsel in connection with the Loan or otherwise hereunder, were not true and correct in any material respect as of the date of such opinion or thereafter became untrue or incorrect in any material respect;

(m)      a default shall be continuing under any of the other terms, covenants or

NY:1797184.16

conditions of this Agreement or any other Loan Document not otherwise specified in this <u>Section 8.1</u>, for ten (10) days after notice to Borrower (or Guarantor, if applicable) from Lender, in the case of any default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other default; provided, however, that if such non–monetary default is susceptible of cure but cannot reasonably be cured within such thirty (30)–day period, and Borrower (or Guarantor, if applicable) shall have commenced to cure such default within such thirty (30)–day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30)–day period shall be extended for an additional period of time as is reasonably necessary for Borrower (or Guarantor, if applicable) in the exercise of due diligence to cure such default, such additional period not to exceed sixty (60) days;

(n)    Borrower fails to comply fully, completely and timely with the covenants and agreements set forth in <u>Article 9</u>;

(o)    any amendment or modification of the OPA in violation of <u>Section 5.24</u> hereof or the termination of the OPA prior to the expiration thereof without Lender's consent;

(p)    the breach by Borrower or 3000 Imperial of any of the material terms and conditions of the OPA;

(q)    any representation, warranty or covenant contained in <u>Section 5.24</u> is breached;

(r)    any representation, warranty or covenant contained in <u>Sections 4.26</u> and/or <u>5.28</u> is breached;

(s)    any covenant contained in <u>Section 5.26</u> is breached;

(t)    any representation, warranty or covenant contained in <u>Sections 5.30</u> and/or <u>5.28</u> is breached;

(u)    a default by Borrower or the Master Tenant under the Master Lease; or

(v)    if (A) Borrower shall fail in the payment of any rent, additional rent or other charge mentioned in or made payable by the Parking Agreement as and when such rent or other charge is payable, (B) there shall occur any default by Borrower, as tenant under the Parking Agreement, in the observance or performance of any term, covenant or condition of the Parking Agreement on the part of Borrower, to be observed or performed, (C) if any one or more of the events referred to in the Parking Agreement shall occur which would cause the Parking Agreement to terminate without notice or action by the landlord under the Parking Agreement or which would entitle the landlord to terminate the Parking Agreement and the term thereof by giving notice to Borrower, as tenant thereunder, (D) if the leasehold estate created by the Parking Agreement shall be surrendered or the Parking Agreement shall be terminated or canceled for any reason or under any circumstances whatsoever, or (E) if any of the terms, covenants or conditions of the Parking Agreement shall in any manner be modified, changed, supplemented, altered, amended or waived without the consent of Lender.

**8.2    Remedies**.

NY:1797184.16

**8.2.1    Acceleration.**  Upon the occurrence of an Event of Default (other than an Event of Default described in subsection (f) or (g) of Section 8.1) and at any time and from time to time thereafter, in addition to any other rights or remedies available to it pursuant to the Loan Documents or at law or in equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property; including declaring the Debt to be immediately due and payable (including unpaid interest), Default Rate interest, Late Payment Charges, Yield Maintenance Premium and any other amounts owing by Borrower), without notice or demand; and upon any Event of Default described in subsection  (f) or (g) of Section 8.1, the Debt (including unpaid interest, Default Rate interest, Late Payment Charges, Yield Maintenance Premium and any other amounts owing by Borrower) shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained in any Loan Document to the contrary notwithstanding.

**8.2.2    Remedies Cumulative.**  Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under the Loan Documents or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared, or be automatically, due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth in the Loan Documents.  Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing, (i) to the extent permitted by applicable law, Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property, the Security Instrument has been foreclosed, the Property has been sold or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.  To the extent permitted by applicable law, nothing contained in any Loan Document shall be construed as requiring Lender to resort to any portion of the Property for the satisfaction of any of the Debt in preference or priority to any other portion, and Lender may seek satisfaction out of the entire Property or any part thereof, in its discretion.

**8.2.3    Severance.**  Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents (and, in connection therewith, to bifurcate or otherwise modify the nature of the collateral that secures such notes) in such denominations and priorities of payment and liens as Lender shall determine in its discretion for purposes of evidencing and enforcing its rights and remedies.  Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender.  Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and

83

execute all documents necessary or desirable to effect such severance, Borrower ratifying all that such attorney shall do by virtue thereof.

**8.2.4    Delay.**    No delay or omission to exercise any remedy, right or power accruing upon an Event of Default, or the granting of any indulgence or compromise by Lender shall impair any such remedy, right or power hereunder or be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default shall not be construed to be a waiver of any subsequent Default or Event of Default or to impair any remedy, right or power consequent thereon.  Notwithstanding any other provision of this Agreement, Lender reserves the right to seek a deficiency judgment or preserve a deficiency claim in connection with the foreclosure of the Security Instrument to the extent necessary to foreclose on all or any portion of the Property, the Rents, the Cash Management Accounts or any other collateral.

**8.2.5    Lender's Right to Perform.**    If Borrower fails to perform any covenant or obligation contained herein and such failure shall continue for a period of five (5) Business Days after Borrower's receipt of written notice thereof from Lender, without in any way limiting Lender's right to exercise any of its rights, powers or remedies as provided hereunder, or under any of the other Loan Documents, Lender may, but shall have no obligation to, perform, or cause performance of, such covenant or obligation, and all costs, expenses, liabilities, penalties and fines of Lender incurred or paid in connection therewith shall be payable by Borrower to Lender upon demand and if not paid shall be added to the Debt (and to the extent permitted under applicable laws, secured by the Security Instrument and other Loan Documents) and shall bear interest thereafter at the Default Rate.  Notwithstanding the foregoing, Lender shall have no obligation to send notice to Borrower of any such failure.

**9.    SECONDARY MARKET PROVISIONS**

**9.1    Transfer of Loan**.

(a)    Lender may, at any time, sell, transfer or assign the Loan, the Loan Documents and any or all servicing rights with respect thereto, or grant participations therein or issue mortgage pass–through certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (the "*Securities*") secured by or evidencing ownership interests in the Note and the Security Instrument (each such sale, assignment, participation or securitization, a "***Secondary Market Transaction***").  Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor in such Securities or any NRSRO (all of the foregoing entities collectively referred to as the "***Investor***") and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Loan and to Borrower, Borrower Representative and Guarantor and the Property, whether furnished by Borrower, Borrower Representative, Guarantor or otherwise, as Lender determines necessary or appropriate.

(b)    If requested by Lender, Borrower shall assist Lender in satisfying the market standards to which Lender customarily adheres or which may be reasonably required in the marketplace or by the Rating Agencies or applicable Legal Requirements in connection with any Secondary Market Transactions, including to:

NY:1797184.16

(i)    (A) provide updated financial and other information with respect to the Property, the business operated at the Property, Borrower, Borrower Representative, Guarantor, any Affiliate of Borrower, Borrower Representative, Guarantor or Manager, (B) provide updated budgets and rent rolls (including itemized percentage of floor area occupied and percentage of aggregate base rent for each Tenant) relating to the Property, and (C) provide updated appraisals, market studies, environmental reviews (Phase I's and, if appropriate, Phase II's), property condition reports and other due diligence investigations of the Property (the information referred to in clauses (A), (B) and (C) shall hereinafter be referred to collectively as "***Updated Information***"), together, if customary, with appropriate verification of the Updated Information through letters of auditors, certificates of third party service providers or opinions of counsel acceptable to Lender and the Rating Agencies;

(ii)    provide opinions of counsel, which may be relied upon by Lender and the NRSROs, and their respective counsel, agents and representatives, as to bankruptcy non-consolidation, fraudulent conveyance and true sale, or any other opinion customary in Secondary Market Transactions or required by the Rating Agencies with respect to the Property, Borrower, Borrower Representative, Guarantor and any Affiliate of Borrower, Borrower Representative or Guarantor, which counsel and opinions shall be satisfactory to Lender and the Rating Agencies;

(iii)    provide updated (as of the closing date of any Secondary Market Transaction) representations and warranties made in the Loan Documents and such additional representations and warranties as Lender or the Rating Agencies may reasonably require;

(iv)    subject to Section 9.4 hereof, execute modifications and amendments to the Loan Documents and Borrower's organizational documents as Lender or the Rating Agencies may reasonably require (provided that such modification and amendment do not materially limit Borrower's rights or materially expand Borrower's obligations), including, without limitation, the addition of one or more Independent Directors pursuant to the terms and provisions of Schedule 3 attached hereto;

(v)    provide access to, and conduct tours of, the Property; and

(vi)    provide certifications or other evidence of reliance acceptable to Lender and the Rating Agencies with respect to third party reports and other information obtained in connection with the origination of the Loan or any Updated Information.

(c)    If, at the time a Disclosure Document (as hereinafter defined) is being prepared for a Secondary Market Transaction, Lender expects that Borrower alone or Borrower and one or more Affiliates of Borrower (including Guarantor or other Person that is directly or indirectly committed by contract or otherwise to make payments on all or a part of the Loan) collectively, or the Property alone or the Property and any Related Property collectively, will be a Significant Obligor, the Borrower shall furnish to Lender upon request the following financial information:

(i)    if Lender expects that the principal amount of the Loan together with any Related Loans, as of the cut-off date for such Secondary Market Transaction, may equal or exceed ten percent (10%) (but less than twenty percent (20%)) of the aggregate principal

amount of all mortgage loans included or expected to be included in the Secondary Market Transaction, net operating income for the Property and any Related Property for the most recent fiscal year and interim period as required under Item 1112(b)(1) of Regulation AB (or, if the Loan is not treated as a non-recourse loan under Instruction 3 for Item 1101(k) of Regulation AB, selected financial data meeting the requirements and covering the time periods specified in Item 301 of Regulation S-K and Item 1112(b)(1) of Regulation AB); or

(ii)     if Lender expects that the principal amount of the Loan together with any Related Loans, as of the cut-off date for such Secondary Market Transaction, may equal or exceed twenty percent (20%) of the aggregate principal amount of all mortgage loans included or expected to be included in the Secondary Market Transaction, the financial statements required under Item 1112(b)(2) of Regulation AB (which includes, but may not be limited to, a balance sheet with respect to the entity that Lender determines to be a Significant Obligor for the two most recent Fiscal Years and applicable interim periods, meeting the requirements of Rule 3-01 of Regulation S-X (17 C.F.R. Part 210), and statements of income and statements of cash flows with respect to the Property for the three most recent Fiscal Years and applicable interim periods, meeting the requirements of Rule 3-02 of Regulation S-X (or if Lender determines that the Property is the Significant Obligor and the Property (other than properties that are hotels, nursing homes, or other properties that would be deemed to constitute a business and not real estate under Regulation S-X or other legal requirements) was acquired from an unaffiliated third party and the other conditions set forth in Rule 3-14 of Regulation S-X have been met, the financial statements required by Rule 3-14 of Regulation S-X)).

(d)     Further, if requested by Lender, Borrower shall, promptly upon Lender's request, furnish to Lender financial data or financial statements meeting the requirements of Item 1112(b)(1) or (2) of Regulation AB, as specified by Lender, for any Tenant of the Property if, in connection with a Secondary Market Transaction, Lender expects there to be, as of the cutoff date for such Secondary Market Transaction, a concentration with respect to such Tenant or group of Affiliated Tenants within all of the mortgage loans included or expected to be included in the Secondary Market Transaction such that such Tenant or group of Affiliated Tenants would constitute a Significant Obligor. Borrower shall furnish to Lender, in connection with the preparation of the Disclosure Documents and on an ongoing basis, financial data and/or financial statements with respect to such Tenants meeting the requirements of Item 1112(b)(1) or (2) of Regulation AB, as specified by Lender, but only for so long as such entity or entities are a Significant Obligor and either (x) filings pursuant to the Exchange Act in connection with or relating to the Secondary Market Transaction (an "***Exchange Act Filing***") are required to be made under applicable Legal Requirements or (y) comparable information is required to otherwise be "available" to holders of the Securities under Regulation AB or applicable Legal Requirements.

(e)     If Lender determines that Borrower alone or Borrower and one or more Affiliates of Borrower collectively, or the Property alone or the Property and any Related Property collectively, are a Significant Obligor, then Borrower shall furnish to Lender, on an ongoing basis, selected financial data or financial statements meeting the requirements of Item 1112(b)(1) or (2) of Regulation AB, as specified by Lender, but only for so long as such entity or entities are a Significant Obligor and either (x) Exchange Act Filings are required to be made under applicable Legal Requirements or (y) comparable information is required to otherwise be

"available" to holders of the Securities under Regulation AB or applicable Legal Requirements.

(f)    Any financial data or financial statements provided pursuant to this Section 9.1 shall be furnished to Lender within the following time periods:

(i)    with respect to information requested in connection with the preparation of Disclosure Documents for a Secondary Market Transaction, within ten (10) Business Days after notice from Lender; and

(ii)    with respect to ongoing information required under Section 9.1(d) and (e) above, (A) not later than thirty (30) days after the end of each fiscal quarter of Borrower and (B) not later than seventy-five (75) days after the end of each fiscal year of Borrower.

(g)    If requested by Lender, Borrower shall provide Lender, promptly, and in any event within three (3) Business Days following Lender's request therefor, with any other or additional financial statements, or financial, statistical or operating information, as Lender shall reasonably determine to be required pursuant to Regulation S-K or Regulation S-X, as applicable, Regulation AB, or any amendment, modification or replacement thereto or other Legal Requirements relating to a Secondary Market Transaction or as shall otherwise be reasonably requested by the Lender.

(h)    If requested by Lender, whether in connection with a Secondary Market Transaction or at any time thereafter during which the Loan and any Related Loans are included in a Secondary Market Transaction, the Borrower shall provide Lender, promptly upon request, a list of Tenants (including all affiliates of such Tenants) that in the aggregate (1) occupy 10% or more (but less than 20%) of the total floor area of the improvements or represent 10% or more (but less than 20%) of aggregate base rent, and (2) occupy 20% or more of the total floor area of the Improvements or represent 20% or more of aggregate base.

(i)    All financial statements provided by Borrower pursuant to this Section 9.1(c), (d), (e) or (f) shall be prepared in accordance with GAAP and shall meet the requirements of Regulation S-K or Regulation S-X, as applicable, Regulation AB, and other applicable Legal Requirements. All financial statements relating to a Fiscal Year shall be audited by independent accountants in accordance with generally accepted auditing standards, Regulation S-X or Regulation S-K, as applicable, Regulation AB, and all other applicable Legal Requirements, shall be accompanied by the manually executed report of the independent accountants thereon, which report shall meet the requirements of Regulation S-K or Regulation S-X, as applicable, Regulation AB, and all other applicable Legal Requirements, and shall be further accompanied by a manually executed written consent of the independent accountants, in form and substance acceptable to Lender, to the inclusion of such financial statements in any Disclosure Document and any Exchange Act Filing and to the use of the name of such independent accountants and the reference to such independent accountants as "experts" in any Disclosure Document and Exchange Act Filing (or comparable information is required to otherwise be available to holders of the Securities under Regulation AB or applicable Legal Requirements), all of which shall be provided at the same time as the related financial statements are required to be provided. All other financial statements shall be certified by the chief financial officer of Borrower, which certification shall state that such financial statements meet the requirements set forth in the first

sentence of this paragraph.

**9.2    Use of Information.**  Borrower understands that information provided to Lender by Borrower and its agents, counsel and representatives may be included in preliminary and final disclosure documents in connection with the Secondary Market Transaction, including an offering circular, a prospectus, prospectus supplement, private placement memorandum or other offering document (each, a "*Disclosure Document*") and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "*Securities Act*"), or the Securities and Exchange Act of 1934, as amended (the "*Exchange Act*"), and may be made available to investors or prospective investors in the Securities, investment banking firms, NRSROs, accounting firms, law firms and other third-party advisory and service providers relating to the Secondary Market Transaction.  Borrower also understands that the findings and conclusions of any third-party due diligence report obtained by the Lender, the Issuer (as hereinafter defined) or the placement agent or underwriter of the Secondary Market Transaction may be made publicly available if required, and in the manner prescribed, by Section 15E(s)(4)(A) of the Exchange Act and any rules promulgated thereunder.

**9.3    Borrower Indemnity**.

(a)    Borrower hereby agrees to indemnify Natixis, including its officers, directors, Affiliates and each Person who controls Natixis within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "*Natixis Group*"), the issuer of the Securities (the "*Issuer*" and for purposes of this Section 9.3, Issuer shall include its officers, director and each Person who controls the Issuer within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act), and any placement agent or underwriter with respect to the Secondary Market Transaction, each of their respective officers and directors and each Person who controls the placement agent or underwriter within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "*Underwriter Group*") for any losses, claims, damages or liabilities (collectively, the "*Liabilities*") to which Natixis, the Natixis Group, the Issuer or the Underwriter Group may become subject insofar as the Liabilities arise out of, or are based upon, (i) any untrue statement of any material fact contained in the information provided to Natixis by Borrower and its agents, counsel and representatives, (ii) the omission to state therein a material fact required to be stated in such information or necessary in order to make the statements in such information, in light of the circumstances under which they were made, not misleading, or (iii) a breach of the representations and warranties made by Borrower in Section 4.8 of this Agreement (Full and Accurate Disclosure).  Borrower also agrees to reimburse Natixis, the Natixis Group, the Issuer and/or the Underwriter Group for any legal or other expenses reasonably incurred by Natixis, the Natixis Group, the Issuer and/or the Underwriter Group in connection with investigating or defending the Liabilities.  Borrower's liability under this paragraph will be limited to Liabilities that arise out of, or are based upon, an untrue statement or omission made in reliance upon, and in conformity with, written information furnished to Natixis by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including financial statements of Borrower, operating statements and rent rolls with respect to the Property.  This indemnification provision will be in addition to any liability which Borrower may otherwise have.

(b)    In connection with any Exchange Act Filing or other reports containing comparable information that is required to be made "available" to holders of the Securities under Regulation AB or applicable Legal Requirements, Borrower agrees to (i) indemnify Natixis, the Natixis Group, the Issuer and the Underwriter Group for Liabilities to which Natixis, the Natixis Group, the Issuer and/or the Underwriter Group may become subject insofar as the Liabilities arise out of, or are based upon, an untrue statement or omission made in reliance upon, and in conformity with, written information furnished to Natixis by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including financial statements of Borrower, operating statements and rent rolls with respect to the Property, and (ii) reimburse Natixis, the Natixis Group, the Issuer and/or the Underwriter Group for any legal or other expenses reasonably incurred by Natixis, the Natixis Group, the Issuer and/or the Underwriter Group in connection with defending or investigating the Liabilities.

(c)    Promptly after receipt by an indemnified party under this Section 9.3 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 9.3, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party.  In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel satisfactory to such indemnified party.  After notice from the indemnifying party to such indemnified party under this Section 9.3, such indemnified party shall pay for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party at the cost of the indemnifying party.  The indemnifying party shall not be liable for the expenses of more than one separate counsel unless an indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to the indemnifying party.  Without the prior written consent of Natixis (which consent shall not be unreasonably withheld or delayed), no indemnifying party shall settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (whether or not any indemnified party is an actual or potential party to such claim, action, suit or proceeding) unless the indemnifying party shall have given Natixis reasonable prior written notice thereof and shall have obtained an unconditional release of each indemnified party hereunder from all liability arising out of such claim, action, suit or proceedings.

89

(d)     In order to provide for just and equitable contribution in circumstances in which the indemnity agreement provided for in Section 9.3(a) or (b) is for any reason held to be unenforceable as to an indemnified party in respect of any Liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Section 9.3(a) or (b), the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such Liabilities (or action in respect thereof); provided, however, that no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.  In determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered: (i) the Issuer's and Borrower's relative knowledge and access to information concerning the matter with respect to which the claim was asserted; (ii) the opportunity to correct and prevent any statement or omission; and (iii) any other equitable considerations appropriate in the circumstances.  Natixis and Borrower hereby agree that it would not be equitable if the amount of such contribution were determined by pro rata or per capita allocation.

(e)     The liabilities and obligations of both Borrower and Natixis under this Section 9.3 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

**9.4     Restructuring of Loan**.

**9.4.1**     Lender, without in any way limiting Lender's other rights hereunder, in its sole and absolute discretion, shall have the right at any time to require Borrower to restructure the Loan into multiple notes (which may include component notes or senior and junior notes) or to create participation interests in the Loan, and which restructuring may include reallocation of principal amounts of the Loan (including, by way of example, the increase or decrease in the principal amount of the senior note and instrument securing same, and the corresponding decrease or increase in the principal amounts of the junior note(s) and the security instrument(s) securing same) or the restructuring of a portion of the Loan into a mezzanine loan (the "New Mezzanine Loan") to the owners of the direct equity interests in Borrower, secured by a pledge of such direct equity interests, the establishment of different interest rates and debt service payments for the Loan and the New Mezzanine Loan and the payment of the Loan and the New Mezzanine Loan in such order of priority as may be designated by Lender; provided, that (i) the total amounts of the Loan and the New Mezzanine Loan shall equal the amount of the Loan immediately prior to the restructuring, (ii) except in the case of an Event of Default under the Loan or the New Mezzanine Loan, the weighted average interest rate of the Loan and the New Mezzanine Loan, if any, shall, in the aggregate, equal the interest rate which was applicable to the Loan immediately prior to the restructuring and (iii) except in the case of an Event of Default under the Loan or the New Mezzanine Loan, the debt service payments on the Loan and the New Mezzanine Loan shall equal the debt service payment which was due under the Loan immediately prior to the restructuring; provided that any such restructuring carried out after the closing of the Loan shall be at Borrower's sole cost and expense (provided, however, that Borrower shall not be required to reimburse Lender for Lender's costs and expenses incurred in connection with the same)**.**  Borrower shall cooperate with all reasonable requests of Lender in order to restructure the Loan and create the New Mezzanine Loan and shall (A) execute and deliver such documents including, in the case of the New Mezzanine Loan, a mezzanine note, a

NY:1797184.16

mezzanine loan agreement, a pledge and security agreement and a mezzanine deposit account agreement, all in substantially the form executed by Borrower concurrently with the execution of this Agreement, (B) cause Borrower's counsel to deliver such legal opinions and (C) create such newly formed bankruptcy remote borrower under the New Mezzanine Loan as, in the case of each of (A), (B) and (C) above, shall be reasonably required by Lender and required by any Rating Agency in connection therewith, all in form and substance reasonably satisfactory to Lender and satisfactory to any such Rating Agency, including the severance of this Agreement, the Security Instrument and other Loan Documents if requested.  In the event Borrower fails to execute and deliver such documents to Lender within fifteen (15) Business Days following such request by Lender, Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such transactions, Borrower ratifying all that such attorney shall do by virtue thereof.  It shall be an Event of Default if Borrower fails to comply with any of the terms, covenants or conditions of this Section 9 after the expiration of fifteen (15) Business Days after notice thereof.  Borrower covenants and agrees that any such reallocation (as described above) will be in compliance with the representations and warranties set forth in Section 4.1 and Section 5.12 hereof.

       **9.4.2**    Borrower further agrees that Lender may reallocate principal amounts between the Loan and any Mezzanine Loan, including, but not limited to, reallocating the entire principal balance of any Mezzanine Loan to the Loan and terminating any Mezzanine Loan; provided, that (i) the total amount of the Loan and the Mezzanine Loan(s) shall equal the total amount of the Loan and the Mezzanine Loan(s) immediately prior to the reallocation, (ii) except in the case of an Event of Default under the Loan and/or any Mezzanine Loan or any voluntary or involuntary prepayment of the Loan and/or any Mezzanine Loan (including, but not limited to a full or partial prepayment of the Loan and/or the Mezzanine Loan(s) in connection with a casualty or condemnation), the weighted average interest rate of the Loan and the Mezzanine Loan(s) shall, in the aggregate, equal the weighted average interest rate which was applicable to the Loan and the Mezzanine Loan(s), in the aggregate, immediately prior to the reallocation and (iii) except in the case of an Event of Default under the Loan and/or any Mezzanine Loan or any voluntary or involuntary prepayment of the Loan and/or any Mezzanine Loan (including, but not limited to a full or partial prepayment of the Loan and/or any Mezzanine Loan in connection with a casualty or condemnation), the aggregate of the debt service payments on the Loan and the Mezzanine Loan(s) shall equal the aggregate of the debt service payments which were due under the Loan and the Mezzanine Loan(s) immediately prior to the reallocation**.**  If, as a result of a reallocation, the principal amount of the Loan is decreased, then (i) the Borrower shall take all actions as are necessary to effect the "resizing" of the Mezzanine Loan(s) and the Loan, (ii) the Borrower shall cause the Mezzanine Borrower to comply with its agreements to effect a "resizing", and (iii) Lender shall on the date of the "resizing" of the Loan lend to the Mezzanine Borrower (by way of a reallocation of the principal amount of the Loan and the Mezzanine Loan(s)) such additional amount equal to the amount of the principal reduction of the Loan provided that Borrower and Mezzanine Borrower execute and deliver any and all amendments or modifications to the Loan Documents and the Mezzanine Loan Documents reasonably required by Lender.  If, as a result of a reallocation, the principal amount of the Loan is increased, then (i) Borrower shall take all actions as are necessary to effect the "resizing" of the Loan and the Mezzanine Loan(s), (ii) Borrower shall cause the Mezzanine Borrower to comply with its agreements to effect a "resizing" and (iii) Lender shall on the date of the "resizing" of the Loan

lend to the Borrower (by way of a reallocation of the principal amount of the Loan and the Mezzanine Loan(s)) an additional amount equal to the amount of principal reduction of the Mezzanine Loan(s), provided that Borrower and Mezzanine Borrower execute and deliver any and all modifications to the Loan Documents and Mezzanine Loan Documents reasonably required by Lender.  In connection with the foregoing, Borrower agrees, at Borrower's sole cost and expense, to (x) execute and deliver such documents and other agreements reasonably required by Mezzanine Lender(s) and/or Lender to "re-size" the Loan and the Mezzanine Loan(s), including, without limitation, an amendment to this Agreement, the Note, the Security Instrument and the other Loan Documents and, if the principal amount of the Loan is increased, an endorsement to the Title Policy reflecting an increase in the insured amount thereunder and (y) pay any mortgage recording tax due in connection with any re-sizing of the Loan.  Borrower agrees to reimburse Lender for all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Lender in connection with any "resizing" of the Loan. Notwithstanding anything to the contrary contained herein, all costs and expenses (including, without limitation, attorneys' fees) incurred by Borrower and all costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by Lender in connection with the transactions contemplated by this <u>Section 9.4.2</u> shall be the responsibility of, and paid by, Borrower.

**9.5**     Notwithstanding anything to the contrary in this Article 9, Borrower shall pay (i) its own costs and expenses incurred in connection with a Secondary Market Transaction pursuant to Sections 9.1 through 9.3, a restructuring of the Loan pursuant to Section 9.4 and/or the Mezzanine Loan and (ii) all actual third party costs and expenses (including reasonable attorneys' fees and expenses) of Lender in connection with a Secondary Market Transaction involving the Mezzanine Loan or a restructuring of the Loan or Mezzanine Loan pursuant to Section 9.4 above carried out in connection with such Secondary Market Transaction, whether incurred prior to or after the date hereof, including but not limited to costs and expenses (including attorneys' fees) incurred in connection with the negotiation of an intercreditor agreement related to the Loan and the Mezzanine Loan, any additional mortgage tax due in connection with any increase in the principal amount of the Loan and any costs or expenses incurred in obtaining a replacement title insurance policy on the Loan in the amount of the increased principal amount of the Loan or in connection with obtaining a replacement title insurance policy on the Loan in connection with any increased interest rate of the Loan.

## 10.    <u>MISCELLANEOUS</u>

**10.1     Exculpation.**  Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest and rights under the Loan Documents, or in the Property, the Rents or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender, and Lender shall not sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding under or by reason of or under or in

connection with any Loan Document.  The provisions of this <u>Section 10.1</u> shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any Loan Document; (ii) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Security Instrument; (iii) affect the validity or enforceability of any of the Loan Documents or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; (iv) impair the right of Lender to obtain the appointment of a receiver; (v) impair the enforcement of the Assignment of Leases; (vi) constitute a prohibition against Lender to commence any other appropriate action or proceeding in order for Lender to fully realize the security granted by the Security Instrument or to exercise its remedies against the Property; or (vii) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following (all such liability and obligation of Borrower for any or all of the following being referred to herein as "***Borrower's Recourse Liabilities***"):

(a)      fraud or intentional misrepresentation by Borrower or any guarantor in connection with the Loan;

(b)      the gross negligence or willful misconduct of Borrower;

(c)      the breach of any representation, warranty, covenant or indemnification in any Loan Document concerning Environmental Laws or Hazardous Substances, including <u>Sections 4.19</u> and <u>5.7</u>, and clauses (viii) through (xi) of <u>Section 5.18</u>;

(d)      physical waste or after an Event of Default, the removal or disposal of any portion of the Property;

(e)      the misapplication or conversion by Borrower of (x) any Proceeds paid by reason of any Insured Casualty, (y) any Award received in connection with a Condemnation, or (z) any Rents, refund of Taxes or amounts in any Subaccount (including any distributions or payments to members/partners/shareholders of Borrower during a period which Lender did not receive the full amounts required to be paid to Lender under the Loan Documents);

(f)      failure to pay charges for labor or materials or other charges that can create Liens on any portion of the Property unless such charges are the subject of a bona fide dispute in which Borrower is contesting the amount or validity thereof;

(g)      any security deposits collected with respect to the Property which are not delivered to Lender upon a foreclosure of the Security Instrument or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof;

(h)      an act or omission of any of Borrower, Borrower Representative or Guarantor which hinders, delays or interferes with Lender's enforcement of its rights hereunder or under any other Loan Document or the realization of the collateral, including the assertion by any of Borrower, Borrower Representative or Guarantor of defenses or counterclaims;

NY:1797184.16

(i)        Borrower's indemnifications of Lender set forth in <u>Section 9.3</u>;

(j)        any representation or warranty made in <u>Section 4.15</u> hereof with respect to any Borrower Affiliated Lease or Borrower Affiliated Tenant shall be false or misleading in any material respect as of the date made;

(k)        a breach of any representation, warranty and/or covenant in <u>Section 5.27</u> hereof;

(l)        failure by any Borrower Affiliated Tenant to promptly vacate the Property following a Borrower Affiliated Lease Default Event;

(m)        any petition for the bankruptcy or insolvency of any Borrower Affiliated Tenant is filed by or consented to by such Borrower Affiliated Tenant;

(n)        failure by Borrower to diligently pursue its remedies pursuant to the Borrower Affiliated Lease following a Borrower Affiliated Lease Default Event;

(o)        any amendment or modification of the OPA in violation of <u>Section 5.24</u> hereof, or the termination of the OPA without Lender's consent, except an assignment thereof to a transferee who assumes all of the obligations of Borrower under the Loan Documents in accordance with the terms of this Agreement;

(p)        the breach by Borrower or 3000 Imperial of any of the material terms and conditions of the OPA;

(q)        after a casualty or destruction of any portion of the Property, the inability to fully reconstruct the Improvements on the Property or to use the Property for the uses that existed immediately prior to such casualty or destruction;

(r)        a breach of any representation, warranty and/or covenant in <u>Sections 4.26</u> and/or <u>5.28</u> hereof;

(s)        (i) a breach of any representation, warranty and/or covenant in <u>Sections 4.27</u> and <u>5.25</u> hereof, (ii) any default by landlord under the Parking Agreement, if at the time of such default the landlord under the Parking Agreement is an Affiliate of Borrower and/or Guarantor, and (iii) Borrower fails to make any payment of rent to landlord under the Parking Agreement;

(t)        the amendment, modification, termination, cancellation or acceptance of a surrender of the Parking Agreement, or the waiver of any of the terms or provisions of the Parking Agreement, in each case without Lender's prior written consent

(u)        a breach of any representation, warranty and/or covenant in <u>Section 4.28</u> hereof;

(v)        a breach of any representation, warranty and/or covenant in <u>Section 5.24</u> hereof;

94

(w)    a breach of any representation, warranty and/or covenant in <u>Section 5.30</u> hereof; or

(x)    a breach of any representation, warranty and/or covenant in <u>Section 4.30</u> hereof.

Notwithstanding anything to the contrary in this Agreement or any of the Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt in accordance with the Loan Documents, and (B) Lender's agreement not to pursue personal liability of Borrower as set forth above SHALL BECOME NULL AND VOID and shall be of no further force and effect, and the Debt shall be fully recourse to Borrower in the event that one or more of the following occurs (each, a "***Springing Recourse Event***"):

(2)    an Event of Default described in <u>Section 8.1(d)</u> shall have occurred;

(3)    a breach of the covenant set forth in <u>Section 5.12</u>;

(4)    the occurrence of any condition or event described in either (y) <u>Section 8.1(f)</u> unless, with respect to the occurrence of the event described in clause (ii) of <u>Section 8.1(f)</u>, Borrower is unable to pay its debts generally as they become due, or (z) <u>Section 8.1(g)</u> and, with respect to such condition or event described in <u>Section 8.1(g)</u>, either Borrower, Borrower Representative, Guarantor or any Person owning an interest (directly or indirectly) in Borrower, Borrower Representative or Guarantor causes such event or condition to occur (by way of example, but not limitation, such Person seeks the appointment of a receiver or files a bankruptcy petition), consents to, aids, solicits, supports, or otherwise cooperates or colludes to cause such condition or event or fails to contest such condition or event;

(5)    a breach of any of the covenants set forth in <u>Section 5.26</u>; or

(6)    in the event that for any reason the Parking Agreement is terminated, and Borrower fails within ten (10) Business Days of the termination of such Parking Agreement to comply with clauses (a) through (f) of Section 5.25.3 hereof.

**10.2    Brokers and Financial Advisors.**  Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders who will not be paid from the proceeds of the Loan at closing.  Borrower shall indemnify and hold Lender harmless from and against any and all claims, liabilities, costs and expenses (including attorneys' fees, whether incurred in connection with enforcing this indemnity or defending claims of third parties) of any kind in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower in connection with the transactions contemplated herein.  The provisions of this <u>Section 10.2</u> shall survive the expiration and termination of this Agreement and the repayment of the Debt.  Borrower, Borrower Representative, Key Principal and any sponsor of Borrower acknowledge and agree that Lender and any of Lender's agents or correspondents, reserve the right, in their sole and absolute discretion, to provide additional compensation to any broker, correspondent or originator of the Loan.

NY:1797184.16

**10.3** **Retention of Servicer.** Lender reserves the right to retain the Servicer and any special servicer to act as its agent(s) hereunder with such powers as are specifically delegated to the Servicer and any special servicer by Lender, whether pursuant to the terms of this Agreement, any pooling and servicing agreement or similar agreement entered into as a result of a Secondary Market Transaction, the Deposit Account Agreement or otherwise, together with such other powers as are reasonably incidental thereto. Borrower shall pay any fees and expenses of the Servicer and any reasonable third-party fees and expenses, including, without limitation, special servicing fees, work-out fees, liquidation fees and attorney's fees and disbursements and fees and expenses in connection with a prepayment, release of the Property, approvals under the Loan Documents requested by Borrower, assumption of Borrower's obligations or modification of the Loan, special servicing or work-out of the Loan or enforcement of the Loan Documents.

**10.4** **Survival.** This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as any of the Debt is unpaid or such longer period if expressly set forth in this Agreement. All Borrower's covenants and agreements in this Agreement shall inure to the benefit of the respective legal representatives, successors and assigns of Lender.

**10.5** **Lender's Discretion.** Whenever pursuant to this Agreement or any other Loan Document, Lender exercises any right given to it to approve or disapprove, or consent or withhold consent, or any arrangement or term is to be satisfactory to Lender or is to be in Lender's discretion, the decision of Lender to approve or disapprove, to consent or withhold consent, or to decide whether arrangements or terms are satisfactory or not satisfactory, or acceptable or unacceptable or in Lender's discretion shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive.

**10.6** **Governing Law**.

(a)    THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK AND THE PROCEEDS OF THE NOTE DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIENS CREATED PURSUANT TO THE LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE VALIDITY AND THE ENFORCEABILITY OF ALL LOAN DOCUMENTS AND THE DEBT.   TO THE FULLEST EXTENT

NY:1797184.16

PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT AND THE NOTE, AND THIS AGREEMENT AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO § 5–1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN NEW YORK COUNTY, NEW YORK AND BORROWER WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT CORPORATION SERVICE COMPANY AT 1180 AVENUE OF THE AMERICAS, SUITE 210, NEW YORK, NEW YORK, AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE OF BORROWER MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER (UNLESS LOCAL LAW REQUIRES ANOTHER METHOD OF SERVICE), IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. BORROWER (i) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (ii) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH OFFICE SHALL BE DESIGNATED AS THE ADDRESS FOR SERVICE OF PROCESS), AND (iii) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

**10.7    Modification, Waiver in Writing.**  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to or demand on Borrower shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.  Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under any other Loan Document, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount

payable under any Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under the Loan Documents, or to declare an Event of Default for failure to effect prompt payment of any such other amount.

**10.8    Trial by Jury.**    BORROWER AND LENDER HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EITHER PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION 10.8 IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER.

**10.9    Headings/Exhibits.**    The Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.  The Exhibits attached hereto, are hereby incorporated by reference as a part of the Agreement with the same force and effect as if set forth in the body hereof.

**10.10    Severability.**    Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**10.11    Preferences.**    Upon the occurrence and continuance of an Event of Default, Lender shall have the continuing and exclusive right to apply or reverse and reapply (or having so applied, to reverse and reapply) any and all payments by Borrower to any portion of the Debt. To the extent Borrower makes a payment to Lender, or Lender receives proceeds of any collateral, which is in whole or in part subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Debt or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.  This provision shall survive the expiration or termination of this Agreement and the repayment of the Debt.

**10.12    Waiver of Notice.**    Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or any other Loan Document specifically and expressly requires the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.  Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which no Loan Document specifically and expressly requires the giving of notice by Lender to Borrower.

NY:1797184.16

**10.13   Remedies of Borrower.**  If a claim or adjudication is made that Lender or any of its agents, including Servicer, has acted unreasonably or unreasonably delayed acting in any case where by law or under any Loan Document, Lender or any such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents, including Servicer, shall be liable for any monetary damages, and Borrower's sole remedy shall be to commence an action seeking injunctive relief or declaratory judgment.  Any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.  Borrower specifically waives any claim against Lender and its agents, including Servicer, with respect to actions taken by Lender or its agents on Borrower's behalf.

**10.14   Prior Agreements.**  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements, understandings and negotiations among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

**10.15   Offsets, Counterclaims and Defenses.**  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents, including Servicer, or otherwise offset any obligations to make payments required under the Loan Documents.  Any assignee of Lender's interest in and to the Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which Borrower may otherwise have against any assignor of such documents, and no such offset, counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents, and any such right to interpose or assert any such offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**10.16   Publicity.**  All news releases, publicity or advertising by Borrower or its Affiliates through any media intended to reach the general public, which refers to the Loan Documents, the Loan, Lender, a Loan purchaser, the Servicer or the trustee in a Secondary Market Transaction, shall be subject to the prior written approval of Lender.  Lender shall have the right to issue any of the foregoing without Borrower's approval.

**10.17   No Usury.**  Borrower and Lender intend at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under state law) and that this Section 10.17 shall control every other agreement in the Loan Documents.  If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under the Note or any other Loan Document, or contracted for, charged, taken, reserved or received with respect to the Debt, or if Lender's exercise of the option to accelerate the maturity of the Loan or any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by applicable law, then it is Borrower's and Lender's express intent that all excess amounts theretofore collected by Lender shall be credited against the unpaid Principal and all other Debt (or, if the Debt has been or would thereby be paid in full, refunded to Borrower), and the provisions of the Loan Documents immediately be deemed reformed and the amounts thereafter collectible thereunder reduced, without the necessity of the execution of any

new document, so as to comply with applicable law, but so as to permit the recovery of the fullest amount otherwise called for thereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance or detention of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate from time to time in effect and applicable to the Debt for so long as the Debt is outstanding.  Notwithstanding anything to the contrary contained in any Loan Document, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

**10.18   Conflict; Construction of Documents.**  In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that each is represented by separate counsel in connection with the negotiation and drafting of the Loan Documents and that the Loan Documents shall not be subject to the principle of construing their meaning against the party that drafted them.

**10.19   No Third Party Beneficiaries.**  The Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in any Loan Document shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained therein.

**10.20   Yield Maintenance Premium.**   Borrower acknowledges that (a) Lender is making the Loan in consideration of the receipt by Lender of all interest and other benefits intended to be conferred by the Loan Documents that is not prepayable prior to the Open Prepayment Date and (b) if payments of Principal are made to Lender prior to the regularly scheduled due date for such payment, for any reason whatsoever, including as a result of Lender's acceleration of the Loan after an Event of Default, by operation of law or otherwise, Lender will not receive all such interest and other benefits and may, in addition, incur costs.  For these reasons, and to induce Lender to make the Loan, Borrower expressly waives any right or privilege to prepay the Loan except as otherwise may be specifically permitted herein and agrees that, except as expressly provided in Sections 2.3.4 and 7.4.2, all prepayments, if any, will be accompanied by the Yield Maintenance Premium.  Such Yield Maintenance Premium shall be required whether payment is made by Borrower, by a Person on behalf of Borrower, or by the purchaser at any foreclosure sale, and may be included in any bid by Lender at such sale.  Borrower further acknowledges that (A) it is a knowledgeable real estate developer or investor; (B) it fully understands the effect of the provisions of this Section 10.20, as well as the other provisions of the Loan Documents; (C) the making of the Loan by Lender at the Interest Rate and other terms set forth in the Loan Documents are sufficient consideration for Borrower's obligation to pay a Yield Maintenance Premium (if required); and (D) Lender would not make the Loan on the terms set forth herein without the inclusion of such provisions.  Borrower also acknowledges that the provisions of this Agreement limiting the right of prepayment and providing for the payment of the Yield Maintenance Premium and other charges specified herein were independently negotiated and bargained for, and constitute a specific material part of the consideration given by Borrower to Lender for the making of the Loan except as expressly permitted hereunder.

NY:1797184.16

**10.21   Assignment.**   The Loan, the Note, the Loan Documents or Lender's rights, title, obligations and interests therein may be assigned by Lender and any of its successors and assigns to any Person at any time in its discretion, in whole or in part, whether by operation of law (pursuant to a merger or other successor in interest) or otherwise.   Upon such assignment, all references to Lender in this Agreement and in any Loan Document shall be deemed to refer to such assignee or successor in interest and such assignee or successor in interest shall thereafter stand in the place of Lender.   Borrower may not assign its rights, title, interests or obligations under this Agreement or under any of the Loan Documents.

**10.22   Counterparts.**   This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

[THE REMAINDER OF THE PAGE IS INTENTIONALLY BLANK]

101

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER**:

**PLAMEX INVESTMENT, LLC,**
a Delaware limited liability company

By:    3100 E. Imperial Investment, LLC,
       a Delaware limited liability company

    By:    Placo Investment, LLC,
         a Delaware limited liability company

       By: _____
           Name:  Donald Chae
           Title:    Manager

**LENDER**:

NATIXIS, New York Branch,
a direct branch of Natixis S.A., a société anonyme à
conseil d'administration (public limited company)
organized and existing under the laws of France

By: _____
    Name: Andrew Levine
    Title:  Managing Director

By: _____
    Name: Timothy Bachman
    Title:  Director

*[Signature Page to Loan Agreement – Plaza Mexico]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER**:

**PLAMEX INVESTMENT, LLC,**
a Delaware limited liability company

By:   3100 E. Imperial Investment, LLC,
      a Delaware limited liability company

      By:  Placo Investment, LLC,
          a Delaware limited liability company

          By:  _____
                Name:  Donald Chae
                Title:   Manager

**LENDER**:

NATIXIS, New York Branch,
a direct branch of Natixis S.A., a société anonyme à conseil d'administration (public limited company) organized and existing under the laws of France

By: _____
    Name: Andrew Levine
    Title:  Managing Director

By: _____
    Name: Timothy Bachman
    Title:  Director

## Schedule 1

### Index of Other Definitions

"*Act*" – Schedule 4
"*Annual Budget*" – 6.3.5
"*Applicable Taxes*" – 2.2.3
"*Award*" – 7.3.2
"*Bankruptcy Action*" – Schedule 4
"*Bankruptcy Code*" – Security Instrument
"*Bankruptcy Proceeding*" – 4.7
"*Beach Orangethorpe*" – Definition of ISLT Pledge
"*Beach Orangethorpe Guaranty*" – Definition of ISLT Pledge
"*Beach Orangethorpe II*" – Definition of ISLT Pledge
"*Beach Orangethorpe II Guaranty*" – Definition of ISLT Pledge
"*Borrower's Primary Insurance*" – 5.29.1
"*Borrower's Recourse Liabilities*" – 10.1
"*Buyer*" – 5.16
"*Capital Budget*" – 6.3.5
"*Capital Reserve Subaccount*" – 3.4
"*Cash Collateral Reserve Subaccount*" – 3.11
"*Cash Management Accounts*" – 3.9
"*Casualty*" – 7.2.1
"*Casualty/Condemnation Prepayment*" – 2.3.2
"*Casualty/Condemnation Subaccount*" – 3.7
"*Condemnation*" – 7.3.1
"*Defeasance*" – 2.3.3(a)
"*Defeasance Date*" – 2.3.3(a)(i)
"*Defeasance Deposit*" – 2.3.3(a)(iv)
"*Defeasance Notice*" – 2.3.3(a)(i)
"*Defeased Note*" – 2.3.3(a)(vi)
"*Disclosure Document*" – 9.2
"*Embargoed Person*" – 5.19(a)
"*Environmental CCR*" – Schedule 9
"*Environmental Easement*" – Schedule 9
"*Environmental Laws*" – 4.19
"*Equipment*" – Security Instrument
"*Exchange Act*" – 9.2
"*Exchange Act Filing*" – 9.1(d)
"*Excess Cash*" – 3.10(a)
"*Event of Default*" – 8.1
"*FATF*" – 5.19(b)
"*First Payment Date*" – 2.2.1
"*Food 4 Less Bankruptcy Trigger*" – Definition of Food 4 Less Cash Trap Trigger Event
"*Food 4 Less Cash Trap Reserve Funds*" – 3.12.1
"*Food 4 Less Cash Trap Reserve Subaccount*" – 3.12.1
"*Food 4 Less Default Trigger*" -  Definition of Food 4 Less Cash Trap Trigger Event
"*Food 4 Less Go Dark Trigger*" -  Definition of Food 4 Less Cash Trap Trigger Event
"*Food 4 Less Lease Renewal*" – Definition of Food 4 Less Cash Trap Cure Event
"*Food 4 Less Non-Renewal Trigger*" – Definition of Food 4 Less Cash Trap Trigger Event
"*Food 4 Less CAM Reserve Funds*"-3.18.1

Schedule 1 - 1

*"Food 4 Less CAM Reserve Subaccount"* – 3.18.1
*"Food 4 Less Replacement Lease"* – Definition of Food 4 Less Cash Trap Cure Event
*"Food 4 Less Replacement Tenant"* – Definition of Food 4 Less Cash Trap Cure Event
*"Free Rent Reserve Funds"*-3.16.1
*"Free Rent Reserve Lease"* – 3.16.2
*"Free Rent Reserve Subaccount"* – 3.16.1
*"Full Defeasance"* – 2.3.3(a)
*"Hazardous Substances"* – 4.19
*"Improvements"* – Security Instrument
*"Indemnified Liabilities"* – 5.18
*"Indemnified Party"* – 5.18
*"Independent Director"* – Schedule 4
*"Independent Manager"* – Schedule 4
*"Planet Fitness TI/LC Reserve Funds"* – 3.17.1
*"Planet Fitness TI/LC Reserve Subaccount"* – 3.17.1
*"Insurance Premiums"* – 7.1.2
*"Insured Casualty"* – 7.2.2
*"Issuer"* – 9.3(a)
*"Investor"* – 9.1
*"La Curacao CAM Reserve Funds"* – 3.19.1
*"La Curacao CAM Reserve Subaccount"* – 3.19.1
*"Late Payment Charge"* – 2.5.3
*"LAWQCB"* – 5.28.1
*"Lender's Consultant"* – 5.7.1
*"Liabilities"* – 9.3(a)
*"Licenses"* – 4.10
*"Litigation Reserve Funds"* – 3.20.1
*"Litigation Reserve Subaccount"* – 3.20.1
*"Loan"* – 2.1
*"Master Lease Premises"* – 5.30.1
*"Master Lease Rent"* – 5.30.2
*"Monthly Debt Service Subaccount"* – 3.10(a)
*"Natixis Group"* – 9.3(a)
*"New Mezzanine Loan"* – 9.4
*"Notice"* – 6.1
*"OFAC"* – 5.19(a)
*"One Green"* – 4.29
*"Operating Budget"* – 6.3.5
*"Operating Expense Subaccount"* – 3.6
*"Partial Defeasance"* – 2.3.3(a)
*"Pending Litigation"* – 3.20.2
*"Permitted Investments"* – Deposit Account Agreement
*"Policies"* – 7.1.2
*"Principal"* – 2.1
*"Proceeds"* – 7.2.2
*"Proposed Construction"* – 5.24.5
*"Proposed Construction Plans"* – 5.24.5
*"Proposed Construction Subaccount"* – 3.21
*"Proposed Material Lease"* – 5.9.2
*"Release Request"* – 2.4.3(a)
*"Remaining Property"* – 2.4.3(b)

NY:1797184.16

"*Remedial Work*" – 5.7.2(c)
"*Rent Roll*" – 4.15
"*Replacement Master Lease*" – 5.30.1
"*Replacement Master Tenant*" – 5.30.1
"*Replacement Parking Agreement*" – 5.25.3
"*Required Records*" – 6.3.6
"*Required Repairs*" – 3.2.1
"*Required Repairs Subaccount*" – 3.2.2
"*Restoration*" – 7.4.1
      "*Rollover Reserve Cap*" 3.5.3
"*Rollover Reserve Subaccount*" – 3.5
"*Scheduled Defeasance Payments*" – 2.3.3(a)
"*Secondary Market Transaction*" – 9.1
"*Securities*" – 9.1
"*Securities Act*" – 9.2
"*Security Agreement*" – 2.3.3(a)(vii)
"*Security Deposit Account*" – 3.8
"*Security Deposit Subaccount*" – 3.8
"*Significant Casualty*" – 7.2.2
"*Single Member Bankruptcy Remote LLC*" – Schedule 4
"*Sole Member*" – Schedule 4
"*Special Member*" – Schedule 4
"*Special Purpose Entity*" – Schedule 4
"*Special Transfer*" – 5.16
"*Springing Recourse Event*" – 10.1
"*Subaccounts*" – 3.1
"*Successor Borrower*" – 2.3.3(b)
"*Successor Guarantor*" – 5.16(i)
"*Tax and Insurance Subaccount*" – 3.3
"*Title Insurance Policy*" – 2.4.3(f)
"*Undefeased Note*" – 2.3.3(a)(vi)
"*Underwriter Group*" – 9.3(a)

NY:1797184.16

**<u>Schedule 2</u>**

**Required Repairs**

| Repair Item | Deadline for Completion | Reserve Amount |
|---|---|---|
| Parking lot repair | 12 months after the date hereof | $6,250.00 |
| Roof repairs | 12 months after the date hereof | $44,250.00 |
| | | |
| **Total Escrow Amount** | | **50,500.00** |

Schedule 2 - 1

NY:1797184.16

**<u>Schedule 3</u>**

**Organization of Borrower**

(Attached)

NY:1797184.16

# ORGANIZATIONAL CHART
**PLAZA MEXICO**
June 7, 2016



**Schedule 4**

**Definition of Special Purpose Entity**

A "*Special Purpose Entity*" means either (1) a limited liability company that is a Single Member Bankruptcy Remote LLC (as hereinafter defined) or (2) a corporation, limited partnership or limited liability company which at all times since its formation and at all times thereafter:

      (i)     was and will be organized solely for the purpose of (A) owning the Property or (B) acting as a general partner of the limited partnership that owns the Property or member of the limited liability company that owns the Property;

      (ii)     has not engaged and will not engage in any business unrelated to (A) the ownership of the Property, (B) acting as general partner of the limited partnership that owns the Property or (C) acting as a member of the limited liability company that owns the Property, as applicable;

      (iii)     has not had and will not have any assets other than those related to the Property or its partnership or member interest in the limited partnership or limited liability company that owns the Property, as applicable;

      (iv)     has not engaged, sought or consented to and will not engage in, seek or consent to any dissolution, winding up, liquidation, consolidation, merger, asset sale (except as expressly permitted by this Agreement), transfer of partnership or membership interests or the like, or amendment of its limited partnership agreement, articles of incorporation, articles of organization, certificate of formation or operating agreement (as applicable);

      (v)     if such entity is a limited partnership, has and will have, as its only general partner a Special Purpose Entity that is a corporation;

      (vi)     if such entity is a corporation, has and will have at least two (2) Independent Directors, and has not caused or allowed and will not cause or allow the board of directors of such entity to take any action requiring the unanimous affirmative vote of one hundred percent (100%) of the members of its board of directors unless all of the directors (including any Independent Directors) shall have participated in such vote;

      (vii)     if such entity is a limited liability company other than a single member limited liability company, has and will have as its only managing member a Special Purpose Entity that is a corporation;

      (viii)     if such entity is a limited liability company, has and will have articles of organization, a certificate of formation or an operating agreement, as applicable, providing that (A) such entity will dissolve only upon the bankruptcy of the managing member, (B) the vote of a majority–in–interest of the remaining members is sufficient to continue the life of the limited liability company in the event of such bankruptcy of the managing member and (C) if the vote of a majority–in–interest of the remaining members to continue the life of the limited liability company following the bankruptcy of the managing member is not obtained, the limited liability company may not liquidate the Property without the consent of the applicable Rating Agencies

Schedule 4 - 1

for as long as the Loan is outstanding;

(ix)    has not, and without the unanimous consent of all of its partners, directors or members (including any Independent Director or Independent Manager), as applicable, will not, with respect to itself or to any other entity in which it has a direct or indirect legal or beneficial ownership interest, take any Bankruptcy Action;

(x)    has maintained and will intend to maintain adequate capital in light of its contemplated business operations, provided, however, the foregoing shall not require any direct or indirect member, partner or shareholder of Borrower to make any additional capital contributions to Borrower;

(xi)    has not failed and will not fail to correct any known misunderstanding regarding the separate identity of such entity;

(xii)    has maintained and will maintain its accounts, books and records separate from any other Person and will file its own tax returns separate from any other Person;

(xiii)    has maintained and will maintain its books, records, resolutions and agreements as official records separate from any other Person;

(xiv)    has not commingled and will not commingle its funds or assets with those of any other Person;

(xv)    has held and will hold its assets in its own name;

(xvi)    has conducted and will conduct its business in its name only, and has not and will not use any trade name;

(xvii)    has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other Person;

(xviii) has paid and will pay its own liabilities, including the salaries of its own employees, out of its own funds and assets;

(xix)    has observed and will observe all partnership, corporate or limited liability company formalities, as applicable;

(xx)    has maintained and will maintain an arm's–length relationship with its Affiliates;

(xxi)    (a)    if such entity owns the Property, has and will have no indebtedness other than the Permitted Indebtedness, or

(b)    if such entity acts as the general partner of a limited partnership which owns the Property, has and will have no indebtedness other than unsecured trade payables in the ordinary course of business relating to acting as general partner of the limited partnership which owns the Property which (1) do not exceed, at any time, $10,000 and (2) are paid within thirty (30) days of the date incurred, or

Schedule 4 - 2

NY:1797184.16

(c)    if such entity acts as a managing member of a limited liability company which owns the Property, has and will have no indebtedness other than unsecured trade payables in the ordinary course of business relating to acting as a member of the limited liability company which owns the Property which (1) do not exceed, at any time, $10,000 and (2) are paid within thirty (30) days of the date incurred;

(xxii)   has not and will not assume or guarantee or become obligated for the debts or obligations of any other Person or hold out its credit or assets as being available to satisfy the debts or obligations of any other Person except for the Loan;

(xxiii)  has not and will not acquire obligations or securities of its partners, members or shareholders;

(xxiv)   has allocated and will allocate fairly and reasonably shared expenses, including shared office space, and uses separate stationery, invoices and checks bearing its own name;

(xxv)    except in connection with the Loan, has not pledged and will not pledge its assets for the benefit of any other Person;

(xxvi)   has held itself out and identified itself and will hold itself out and identify itself as a separate and distinct entity under its own name and not as a division or part of any other Person;

(xxvii) has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xxviii)has not made and will not make loans to any Person;

(xxix)   has not identified and will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it;

(xxx)    has not entered into or been a party to, and will not enter into or be a party to, any transaction, contract or agreement with its partners, members, shareholders or Affiliates except in the ordinary course of its business and on terms which are intrinsically fair and are no less favorable to it than would be obtained in a comparable arm's–length transaction with an unrelated third party;

(xxxi)   has and will have no obligation to indemnify its partners, officers, directors, members or Special Members, as the case may be, or has such an obligation that is fully subordinated to the Debt and will not constitute a claim against it if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation; and

(xxxii)  will consider the interests of its creditors in connection with all corporate, partnership or limited liability company actions, as applicable.

"*Independent Director*" means in the case of a corporation, a natural person who, for the five (5) year period prior to his or her appointment as Independent Director has not been, and during the

Schedule 4 - 3

continuation of his or her service as Independent Director is not, directly or indirectly:

(i)        an employee, manager, stockholder, director, member, partner, officer, attorney or counsel of the corporation or any of its Affiliates (other than his or her service as an Independent Director of the corporation),

(ii)       a creditor, customer of, or supplier or other Person who derives any of its purchases or revenues from its activities with the corporation or any of its shareholders or Affiliates (other than his or her service as an Independent Director if such Person has been provided by a nationally–recognized company that provides professional independent directors),

(iii)      a Person controlling or under common Control with any such employee, manager, stockholder, director, member, partner, officer, attorney, counsel, customer, supplier or other Person, or

(iv)      any member of the immediate family (including a grandchild or sibling) of a person described in clauses (i), (ii) or (iii) immediately above.  A natural person who otherwise satisfies the foregoing definition shall not be disqualified from serving as an Independent Director of the corporation because such person is an independent director of a "Special Purpose Entity" affiliated with the corporation that does not own a direct or indirect equity interest in the corporation or any entity that is a co–borrower with the corporation if such individual is an independent director provided by a nationally–recognized company that provides professional independent directors.

"*Independent Manager*" means in the case of a limited liability company, (a) a member that is a single purpose entity, (b) a single purpose entity  that is not a member or (c) a natural person who, for the five (5) year period prior to his or her appointment as Independent Manager is not, directly or indirectly:

(i)        an employee, manager, stockholder, director, member, partner, officer, attorney or counsel of the limited liability company or any of its Affiliates (other than his or her service as an Independent Manager or Special Member of the limited liability company),

(ii)       a creditor, customer of, or supplier or other Person who derives any of its purchases or revenues from its activities with the limited liability company or any of its members or Affiliates (other than his or her service as an Independent Manager if such Person has been provided by a nationally–recognized company that provides professional independent managers),

(iii)      a Person controlling or under common Control with any such employee, manager, stockholder, director, member, partner, officer, attorney, counsel, customer, supplier or other Person, or

(iv)      any member of the immediate family (including grandchildren or siblings) of a person described in clauses (i), (ii) or (iii) immediately above.  A natural person who otherwise satisfies the foregoing definition shall not be disqualified from serving as an Independent Manager of the limited liability company because such person is an independent manager of a "Special Purpose Entity" affiliated with the limited liability company that does not own a direct or indirect equity interest in the limited liability company or any entity that is a co–borrower with

NY:1797184.16

the limited liability company if such individual is an independent manager provided by a nationally–recognized company that provides professional independent managers.

"***Single Member Bankruptcy Remote LLC***" means a limited liability company organized under the laws of the State of Delaware which at all times since its formation and at all times thereafter

(i)    complies with the following clauses of the definition of Special Purpose Entity above:  (i)(A), (ii)(A), (iii), (iv), (ix), (x), (xi) and (xiii) through (xxxii);

(ii)    has maintained and will maintain its accounts, books and records separate from any other person;

(iii)    has and will have an operating agreement which provides that the business and affairs of Borrower shall be managed by or under the direction of:

(A)    a board of one (1) or more managers designated by the sole member of the Single Member Bankruptcy Remote LLC (the "***Sole Member***"), and at all times there shall be at least two (2) duly appointed Independent Managers on the board of managers, and the board of managers will not take any action requiring the unanimous affirmative vote of one hundred percent (100%) of the members of its board of managers unless, at the time of such action there are at least two (2) members of the board of managers who are Independent Managers, and all of the managers and the Independent Managers shall have participated in such vote; or

(B)    Sole Member, provided that at all times there shall be at least two (2) Independent Managers designated by Sole Member and the operating agreement provides that Sole Member shall not take any Bankruptcy Actions without the affirmative vote of the Independent Managers;

(iv)    has and will have an operating agreement which provides that, as long as any portion of the Debt remains outstanding:

(A)    upon the occurrence of any event that causes Sole Member to cease to be a member of Borrower (other than (x) upon an assignment by Sole Member of all of its limited liability company interest in Borrower and the admission of the transferee, if permitted pursuant to the organizational documents of Borrower and the Loan Documents, or (y) the resignation of Sole Member and the admission of an additional member of Borrower, if permitted pursuant to the organizational documents of Borrower and the Loan Documents), one of the Independent Managers shall, without any action of any Person and simultaneously with Sole Member ceasing to be a member of Borrower, automatically be admitted as the sole member of Borrower (the "***Special Member***") and shall preserve and continue the existence of Borrower without dissolution;

(B)    no Special Member may resign or transfer its rights as Special Member unless (x) a successor Special Member has been admitted to Borrower as a Special Member, and (y) such successor Special Member has also accepted its appointment as an Independent Manager; and

NY:1797184.16

(C)    except as expressly permitted pursuant to the terms of this Agreement, Sole Member may not resign and no additional member shall be admitted to Borrower;

(v)    has and will have an operating agreement which provides that, as long as any portion of the Debt remains outstanding:

(A)    Borrower shall be dissolved, and its affairs shall be would up only upon the first to occur of the following: (x) the termination of the legal existence of the last remaining member of Borrower or the occurrence of any other event which terminates the continued membership of the last remaining member of Borrower in Borrower unless the business of Borrower is continued in a manner permitted by its operating agreement or the Delaware Limited Liability Company Act (the "*Act*") or (y) the entry of a decree of judicial dissolution under Section 18–802 of the Act;

(B)    upon the occurrence of any event that causes the last remaining member of Borrower to cease to be a member of Borrower or that causes Sole Member to cease to be a member of Borrower (other than (x) upon an assignment by Sole Member of all of its limited liability company interest in Borrower and the admission of the transferee, if permitted pursuant to the organizational documents of Borrower and the Loan Documents, or (y) the resignation of Sole Member and the admission of an additional member of Borrower, if permitted pursuant to the organizational documents of Borrower and the Loan Documents), to the fullest extent permitted by law, the personal representative of such member shall be authorized to, and shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of such member in Borrower, agree in writing to continue the existence of Borrower and to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Borrower, effective as of the occurrence of the event that terminated the continued membership of such member in Borrower;

(C)    the bankruptcy of Sole Member or a Special Member shall not cause such member or Special Member, respectively, to cease to be a member of Borrower and upon the occurrence of such an event, the business of Borrower shall continue without dissolution;

(D)    in the event of dissolution of Borrower, Borrower shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of Borrower in an orderly manner), and the assets of Borrower shall be applied in the manner, and in the order of priority, set forth in Section 18–804 of the Act; and

(E)    to the fullest extent permitted by law, each of Sole Member and the Special Members shall irrevocably waive any right or power that they might have to cause Borrower or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of Borrower, to compel any sale of all or any portion of the assets of Borrower pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of Borrower.

"*Bankruptcy Action*" means, with respect to any Person, if such Person:

(i)    makes an assignment for the benefit of creditors;

(ii)      files a voluntary petition in bankruptcy;

(iii)      is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings;

(iv)      consents to or files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

(v)      files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any bankruptcy or insolvency proceeding;

(vi)      seeks, consents to or acquiesces in the appointment of a trustee, receiver, liquidator, sequestrator, custodian or any similar official of or for such Person or of all or any substantial part of its properties;

(vii)      one hundred twenty (120) days after the commencement of any proceeding against such Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, if the proceeding has not been dismissed;

(viii)      within ninety (90) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within ninety (90) days after the expiration of any such stay, the appointment is not vacated; or

(ix)      takes any action in furtherance of any of the foregoing.

Schedule 4 - 7

**Schedule 5**
**Tenant Direction Letter**

[BORROWER'S NAME AND ADDRESS]
_____, 20__

*Certified Mail*
*Return Receipt Requested*
[Name and Address of Tenant]

   Re: Lease of Space at _____ (the "***Building***")

Ladies and Gentlemen:

   The undersigned is the owner of the Building and the landlord under your lease of space in the Building (your "***Lease***").  By this letter, you are hereby directed all payments of rent and other sums due to the landlord under your Lease by wire transfer to the following account:

     Bank Name:   _____
     ABA No.:    _____
     Account No.:   _____

   The foregoing directions are irrevocable, except with the written consent of our mortgagee, Natixis, New York Branch (or its successors or assigns), notwithstanding any future contrary request or direction from the undersigned or any other person (other than Natixis, New York Branch (or its successors or assigns)).

   This letter also serves as notice that Natixis, New York Branch is the mortgagee of the Building and as such is entitled to all mortgagee protections and rights, if any, set forth in your Lease.  Natixis, New York Branch's address for purposes of any notices under your Lease is as follows:

     Natixis, New York Branch
     1251 Avenue of the Americas
     New York, New York 10020
     Attention:  Real Estate Administration

Thank you for your cooperation.

     Very truly yours,

     [INSERT SIGNATURE BLOCK]

NY:1797184.16

**<u>Schedule 6</u>**

**Release Parcel**

(Attached)

NY:1797184.16

SHT. 1 OF 2 SHTS

# EXHIBIT 'A'

IN THE CITY OF LYNWOOD
COUNTY OF LOS ANGELES, STATE OF CALIFORNIA

# LEGAL DESCRIPTION PLAZA MEXICO RESIDENCES

PARCEL 3 AND A PORTION OF PARCEL 1, BOTH OF PARCEL MAP NO. 26625, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP FILED IN BOOK 356 PAGES 38 TO 69 INCLUSIVE, OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS A WHOLE AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF SAID PARCEL 3 OF SAID PARCEL MAP NO. 26625, AS SHOWN ON SAID MAP FILED IN BOOK 356 PAGES 38 TO 69 INCLUSIVE OF PARCEL MAPS, IN SAID COUNTY RECORDER'S OFFICE;  THENCE ALONG THE NORTH LINE OF SAID PARCEL 3 AND OF SAID PARCEL 1 OF SAID PARCEL MAP S84°12'05"E 579.92 FEET;  THENCE LEAVING SAID LINE S28°15'01"E 2.26 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE WESTERLY AND HAVING A RADIUS OF 9.00 FEET;  THENCE SOUTHERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 26°44'32" AN ARC LENGTH OF 4.20 FEET TO A TANGENT LINE;  THENCE ALONG SAID TANGENT LINE S1°30'29"E 4.83 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE WESTERLY AND HAVING A RADIUS OF 125.00 FEET; THENCE SOUTHERLY AND SOUTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 15°50'33" AN ARC LENGTH OF 34.56 FEET TO A TANGENT LINE;  THENCE ALONG SAID TANGENT LINE S14°20'04"W 136.43 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE NORTHWESTERLY AND HAVING A RADIUS OF 17.00 FEET;  THENCE SOUTHWESTERLY AND WESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 93°39'45" AN ARC LENGTH OF 27.79 FEET TO A TANGENT LINE;  THENCE ALONG SAID TANGENT LINE N72°00'11"W 359.22 FEET;  THENCE N84°12'05"W 43.96 FEET;  THENCE S19°45'18"W 99.13 FEET; THENCE S14°03'05"W 40.92 FEET; THENCE S17°54'14"W 8.96 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE NORTHWESTERLY AND HAVING A RADIUS OF 15.00 FEET;  THENCE SOUTHWESTERLY AND WESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 90°01'06" AN ARC LENGTH OF 23.57 FEET TO A TANGENT LINE;  THENCE ALONG SAID TANGENT LINE N72°04'40"W 89.89 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE NORTHEASTERLY AND HAVING A RADIUS OF 25.00 FEET; THENCE ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 41°08'12" AN ARC LENGTH OF 17.95 FEET TO A POINT ON THE WESTERLY LINE OF SAID PARCEL 1 OF SAID PARCEL MAP, A RADIAL

| DATE: FEBRUARY 25, 2015 | **HENNON** Surveying & Mapping, Inc. | 601 E. GLENOAKS BLVD., SUITE 208 GLENDALE, CALIFORNIA  91207 PH. (818)243-0640 FAX: (818)243-0650 EMAIL:HENNON@AOL.COM   WEB: HENNON.COM |
|---|---|---|
| THOM. GDE: N/A | | |
| FILE: 3382-EX-A.DWG | | |
| PROJECT NO:3382 | | |

SHT. 2 OF 2 SHTS — EXHIBIT 'A'

LEGAL DESCRIPTION CONTINUED:

BEARING OF SAID CURVE AT SAID POINTS BEARS S59°03'32"W;

THENCE ALONG SAID WESTERLY LINE N16°23'47"E 27.04 FEET;
THENCE ALONG SAID WESTERLY LINE OF SAID PARCEL 1 AND OF
SAID PARCEL 3 N5°47'45"E 220.15 FEET TO SAID POINT OF
BEGINNING.

CONTAINING 102,823 SQUARE FEET OR 2.360 ACRES, MORE OF LESS.

SEE ATTACHED EXHIBIT 'B' "EXHIBIT MAP PLAZA MEXICO RESIDENCES"
MADE A PART HEREOF BY REFERENCE HEREIN FOR INFORMATIONAL
PURPOSES.

THIS LEGAL DESCRIPTION WAS PREPARED BY ME OR UNDER MY
DIRECTION IN CONFORMANCE WITH PROVISIONS OF THE LAND
SURVEYORS' ACT OF THE STATE OF CALIFORNIA.  FOR THIS LEGAL
DESCRIPTION TO BE USED IN THE FEE TITLE TRANSFER OF REAL
PROPERTY IT MUST BE APPROVED BY THE LOCAL AGENCY IN
CONFORMANCE WITH PROVISIONS OF THE SUBDIVISION MAP ACT OF
THE STATE OF CALIFORNIA.

_____
ROBERT HENNON, PLS 5573
LICENSE EXPIRES 9-30-2017



| DATE: FEBRUARY 25, 2015 | HENNON | 601 E. GLENOAKS BLVD., SUITE 208 |
|---|---|---|
| THOM. GDE: N/A | | GLENDALE, CALIFORNIA  91207 |
| FILE: 3382-EX-A.DWG | Surveying & Mapping, Inc. | PH. (818)243-0640 FAX: (818)243-0650 |
| PROJECT NO:3382 | | EMAIL:HENNON@AOL.COM   WEB: HENNON.COM |

EXHIBIT 'B'

EXHIBIT MAP PLAZA MEXICO RESIDENCES

IN THE CITY OF LYNWOOD
COUNTY OF LOS ANGELES, STATE OF CALIFORNIA

STATE STREET

PARCEL 3

PLAZA MEXICO RESIDENCES
AREA = 102,823 SQ. FT.
2.360 Ac

PARCEL 1
PM NO 26625
PMB 356-38/69

IMPERIAL HIGHWAY

DETAIL "A"
NOT TO SCALE

SCALE: 1" = 80'
0'    80'    160'

WEST LINE PARCEL 1 OF PM 26625

HENNON
Surveying & Mapping, Inc.
601 E. GLENOAKS BLVD., SUITE 208
GLENDALE, CALIFORNIA    91207
PH: (818)243-0640  FAX: (818)243-0650
EMAIL:HENNON@AOL.COM  WEB: HENNON.COM

DATE: FEBRUARY 25, 2015
THOM. GDE: N/A
FILE: 3382-EX-A.DWG
PROJECT NO:3382

SHT. 1 OF 1 SHTS

**Schedule 7**

**Free Rent Abatement Schedule**

| Lease | Amount Deposited in the Free Rent Reserve Account with Respect to such Lease | Disbursement Amounts/Dates |
|---|---|---|
| Kickin' Crab Lease | $37,959.84 | $12,653.28 on each of the Payment Dates occurring in October, 2016, November, 2016, and December 2016. |
| Children's Place Lease | $67,500.00 | $1,125.00 on each Payment Date during the term of the Loan |
| Planet Fitness Lease | $638,979.12 | $53,248.26 on each on the first twelve (12) Payment Dates |

NY:1797184.16

## **Schedule 8**

### **Intentionally Omitted**

NY:1797184.16

## Schedule 9

### Environmental Documents

1.      That certain Covenant and Environmental Restriction on Property, dated as of September __, 2011, by Borrower (as successor-in-interest to Placo), which was recorded on October 12, 2011 in the Official Records of Los Angeles County, California as Instrument No. 20111382577 (the "***Environmental CCR***").

2.      That certain Easement, Remediation and Indemnification Agreement, dated as of December 27, 1999, by and between Borrower (as successor-in-interest to LTC DEVELOPMENT, INC, a California corporation), and EMIF CALIFORNIA LIMITED PARTNERSHIP IV, L.P., a California limited partnership, which was recorded on December 30, 1999 in the Official Records of Los Angeles County, California as Instrument No. 992398599 (the "***Environmental Easement***").

NY:1797184.16

## Schedule 10

**Pending Litigation**

| Pending Litigation Item | Amount in Controversy |
|---|---|
| *Rivers-Greer v. Placo Investment LLC et. al.*, filed in Los Angeles Superior & Metro Courts, on June 8, 2011, as case no. 11CC3877 | $25,000.00 |
| *Walker v. Plamex Investment, LLC et. al.*, filed in Los Angeles Superior & Metro Courts, on December 12, 2014, as case no. BC566565 | $10,000.00 |
| *Trujillo v. Plaza Mexico Foundation et. al.*, Los Angeles Superior & Metro Courts, on April 20, 2015, as case no. BC579283 | $10,000.00 |
| *Amount Reserve (125%)* | $56,250.00 |

NY:1797184.16

**Schedule 11**

**Proposed Construction**

| Proposed Construction Item | Escrow Amount |
|---|---|
| Building Façade Improvements | $23,905.00 |
| Pedestrian Circulation Improvements | $46,903.75 |
|  |  |
| **Total Escrow Amount** | **$69,998.75** |

Schedule 11 - 1

**Schedule 12**
**Form of Payment Guaranty**

**PARTIAL PAYMENT GUARANTY**

made by

**MIN CHAE and DONALD CHAE**,
jointly and severally, as Guarantor,

in favor of

**NATIXIS, NEW YORK BRANCH**,
as Lender

Dated as of [_____], 2016

NY:1797184.16

# PAYMENT GUARANTY

This PARTIAL PAYMENT GUARANTY (this "*Guaranty*"), dated as of [_____], 2016, is made by MIN CHAE, a natural person, having an address at 8790 Los Coyotes Drive, Buena Park, California 80262, and DONALD CHAE, a natural person, having an address at 2200 Sherwood Road, San Marino, California 91108 (individually and collectively, "*Guarantor*"), jointly and severally, in favor of NATIXIS, NEW YORK BRANCH, a direct branch of Natixis S.A., a société anonyme à conseil d'administration (public limited company) organized and existing under the laws of France, having an address at 1251 Avenue of the Americas, New York, New York 10020 (together with its successors and assigns, "*Lender*").

R E C I T A L S:

WHEREAS, pursuant to that certain Loan Agreement, dated as of the [_____], 2016 (as the same may be amended, modified, supplemented, restated or replaced from time to time, the "*Loan Agreement*"), between [_____], a Delaware limited liability company ("*Borrower*") and Lender, Lender has agreed to make a loan (the "Loan") to Borrower in an original principal amount of $[_____], subject to the terms and conditions of the Loan Agreement

[RECITALS TO BE ADDED UPON EXECUTION]

1.     Definitions.

(a)     All capitalized terms used and not defined herein shall have the respective meanings given such terms in the Loan Agreement.

(b)     The term "*Guaranteed Obligations*" means (i) the due and punctual payment in full (and not merely the collectability) of the Debt and (ii) the due and punctual payment in full (and not merely the collectability) of all other sums and charges which may at any time be due and payable under and in accordance with the Note, Loan Agreement and the other Loan Documents; *provided, however* that in no event shall Guarantor's liability under this Guaranty exceed an amount equal to fifteen (15%) of the original principal balance of the Loan, plus any amount due pursuant to the provisions of Section 16 below.

2.     Guaranty.

(a)     Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Lender the full, prompt and complete payment when due of the Guaranteed Obligations.

(b)     All sums payable to Lender under this Guaranty shall be payable on demand and without reduction for any offset, claim, counterclaim or defense.

(c)     Guarantor hereby agrees to indemnify, defend and save harmless Lender from and against any and all costs, losses, liabilities, claims, causes of action, expenses and damages, including reasonable attorneys' fees and disbursements, which Lender may suffer or which otherwise may arise in connection with the enforcement by Lender of the Loan

NY:1797184.16

Documents and/or by reason of Borrower's failure to pay any of the Guaranteed Obligations when due, irrespective of whether such costs, losses, liabilities, claims, causes of action, expenses or damages are incurred by Lender prior or subsequent to (i) Lender's declaring the Principal, interest and other sums evidenced or secured by the Loan Documents to be due and payable, (ii) Lender's exercise of its remedies under the Pledge or (iii) the conveyance to Lender of all or any portion of the Collateral by the voluntary action of Borrower.

(d)     Guarantor agrees that no portion of any sums applied (other than sums received from Guarantor in full or partial satisfaction of its obligations hereunder), from time to time, in reduction of the Debt shall be deemed to have been applied in reduction of the Guaranteed Obligations until such time as the Debt has been paid in full, or Guarantor shall have made the full payment required hereunder, it being the intention hereof that the Guaranteed Obligations shall be the last portion of the Debt to be deemed satisfied.

3.      Representations and Warranties.  Guarantor hereby represents and warrants to Lender as follows (which representations and warranties shall be given as of the date hereof and shall survive the execution and delivery of this Guaranty):

(a)     Execution.  This Guaranty has been duly executed and delivered by Guarantor.

(b)     Enforceability.  This Guaranty constitutes a legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally.

(c)     No Violation.  The execution, delivery and performance by Guarantor of its obligations under this Guaranty does not and will not violate any law, regulation, order, writ, injunction or decree of any court or governmental body, agency or other instrumentality applicable to Guarantor, or result in a breach of any of the terms, conditions or provisions of, or constitute a default under, or result in the creation or imposition of any mortgage, lien, charge or encumbrance of any nature whatsoever upon any of the assets of Guarantor pursuant to the terms of any mortgage, indenture, agreement or instrument to which Guarantor is a party or by which it or any of its properties is bound.  Guarantor is not in default under any other guaranty which it has provided to Lender.

(d)     No Litigation.  There are no actions, suits or proceedings at law or in equity, pending or, to Guarantor's knowledge, threatened against or affecting Guarantor or which involve or might involve the validity or enforceability of this Guaranty or which might materially adversely affect the financial condition of Guarantor or the ability of Guarantor to perform any of its obligations under this Guaranty.  Guarantor is not in default beyond any applicable grace or cure period with respect to any order, writ, injunction, decree or demand of any Governmental Authority which might materially adversely affect the financial condition of Guarantor or the ability of Guarantor to perform any of its obligations under this Guaranty.

(e)     Consents.  All consents, approvals, orders or authorizations of, or registrations, declarations or filings with, all Governmental Authorities (collectively, the

"*Consents*") that are required in connection with the valid execution, delivery and performance by Guarantor of this Guaranty have been obtained and Guarantor agrees that all Consents required in connection with the carrying out or performance of any of Guarantor's obligations under this Guaranty will be obtained when required.

(f)    Financial Statements and Other Information.  All financial statements of Guarantor heretofore delivered to Lender are true and correct in all material respects and fairly present the financial condition of Guarantor as of the respective dates thereof, and no materially adverse change has occurred in the financial conditions reflected therein since the respective dates thereof.  None of the aforesaid financial statements or any certificate or statement furnished to Lender by or on behalf of Guarantor in connection with the transactions contemplated hereby, and none of the representations and warranties in this Guaranty contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein or herein not misleading.  Guarantor is not insolvent within the meaning of the United States Bankruptcy Code or any other applicable law, code or regulation and the execution, delivery and performance of this Guaranty will not render Guarantor insolvent.

(g)    Consideration.  Guarantor is the owner, directly or indirectly, of legal and beneficial ownership interests in Borrower.

4.    Financial Statements.  Guarantor shall deliver to Lender, (a) within ninety (90) days after the end of each fiscal year of Guarantor, a complete copy of Guarantor's annual financial statements audited by a "big four" accounting firm or another independent certified public accountant reasonably acceptable to Lender and (b) within twenty (20) days after request by Lender, such other financial information with respect to Guarantor as Lender may reasonably request.

5.    Unconditional Character of Obligations of Guarantor.

(a)    The obligations of Guarantor hereunder shall be irrevocable, absolute and unconditional, irrespective of the validity, regularity or enforceability, in whole or in part, of the other Loan Documents or any provision thereof, or the absence of any action to enforce the same, any waiver or consent with respect to any provision thereof, the recovery of any judgment against Borrower, Guarantor or any other Person or any action to enforce the same, any failure or delay in the enforcement of the obligations of Borrower under the other Loan Documents or Guarantor under this Guaranty, or any setoff or counterclaim, and irrespective of any other circumstances which might otherwise limit recourse against Guarantor by Lender or constitute a legal or equitable discharge or defense of a guarantor or surety.  Lender may enforce the obligations of Guarantor under this Guaranty by a proceeding at law, in equity or otherwise, independent of any loan foreclosure or similar proceeding or any deficiency action against Borrower or any other Person at any time, either before or after an action against the Collateral or any part thereof, Borrower or any other Person.  This Guaranty is a guaranty of payment and performance and not merely a guaranty of collection.  Guarantor waives diligence, notice of acceptance of this Guaranty, filing of claims with any court, any proceeding to enforce any provision of any other Loan Document against Guarantor, Borrower or any other Person, any right to require a proceeding first against Borrower or any other Person, or to exhaust any security (including, without limitation, the Collateral) for the performance of the Guaranteed

Obligations or any other obligations of Borrower or any other Person, or any protest, presentment, notice of default or other notice or demand whatsoever (except to the extent expressly provided to the contrary in this Guaranty).

(b)     The obligations of Guarantor under this Guaranty, and the rights of Lender to enforce the same by proceedings, whether by action at law, suit in equity or otherwise, shall not be in any way affected by any of the following:

(i)     any insolvency, bankruptcy, liquidation, reorganization, readjustment, composition, dissolution, receivership, conservatorship, winding up or other similar proceeding involving or affecting Borrower, Owner, the Collateral, the Property or any part thereof, Guarantor or any other Person;

(ii)     any failure by Lender or any other Person, whether or not without fault on its part, to perform or comply with any of the terms of the Loan Agreement, or any other Loan Documents or the Senior Loan Documents, or any document or instrument relating thereto;

(iii)     the sale, transfer or conveyance of the Property, the Collateral, or any interest therein to any Person, whether now or hereafter having or acquiring an interest in the Property, the Collateral, or any part thereof and whether or not pursuant to any foreclosure, trustee sale or similar proceeding against Borrower, Owner or the Property, the Collateral, or any interest therein;

(iv)     the conveyance to Lender, any Affiliate of Lender or Lender's nominee of the Property, the Collateral or any interest therein by an assignment-in-lieu of foreclosure;

(v)     the release of Borrower, Owner or any other Person from the performance or observance of any of the agreements, covenants, terms or conditions contained in any of the Loan Documents by operation of law or otherwise; or

(vi)     the release in whole or in part of any collateral for any or all Guaranteed Obligations or for the Loan or any portion thereof.

(c)     Except as otherwise specifically provided in this Guaranty, Guarantor hereby expressly and irrevocably waives all defenses in an action brought by Lender to enforce this Guaranty based on claims of waiver, release, surrender, alteration or compromise and all setoffs, reductions, or impairments, whether arising hereunder or otherwise.

(d)     Lender may deal with Borrower and Affiliates of Borrower in the same manner and as freely as if this Guaranty did not exist and shall be entitled, among other things, to grant Borrower or any other Person such extension or extensions of time to perform any act or acts as may be deemed advisable by Lender, at any time and from time to time, without terminating, affecting or impairing the validity of this Guaranty or the obligations of Guarantor hereunder.

(e)     No compromise, alteration, amendment, modification, extension, renewal, release or other change of, or waiver, consent, delay, omission, failure to act or other action with respect to, any liability or obligation under or with respect to, or of any of the terms, covenants

or conditions of, the Loan Documents shall in any way alter, impair or affect any of the
obligations of Guarantor hereunder, and Guarantor agrees that if any Loan Document is modified
with Lender's consent, the Guaranteed Obligations shall automatically be deemed modified to
include such modifications.

      (f)    Lender may proceed to protect and enforce any or all of its rights under
this Guaranty by suit in equity or action at law, whether for the specific performance of any
covenants or agreements contained in this Guaranty or otherwise, or to take any action
authorized or permitted under applicable law, and shall be entitled to require and enforce the
performance of all acts and things required to be performed hereunder by Guarantor. Each and
every remedy of Lender shall, to the extent permitted by law, be cumulative and shall be in
addition to any other remedy given hereunder or now or hereafter existing at law or in equity.

      (g)    No waiver shall be deemed to have been made by Lender of any rights
hereunder unless the same shall be in writing and signed by Lender, and any such waiver shall be
a waiver only with respect to the specific matter involved and shall in no way impair the rights of
Lender or the obligations of Guarantor to Lender in any other respect or at any other time.

      (h)    At the option of Lender, Guarantor may be joined in any action or
proceeding commenced by Lender against Borrower in connection with or based upon any other
Loan Documents and recovery may be had against Guarantor in such action or proceeding or in
any independent action or proceeding against Guarantor to the extent of Guarantor's liability
hereunder, without any requirement that Lender first assert, prosecute or exhaust any remedy or
claim against Borrower or any other Person, or any security for the obligations of Borrower or
any other Person.

      (i)    Guarantor agrees that this Guaranty shall continue to be effective or shall
be reinstated, as the case may be, if at any time any payment is made by Borrower or Guarantor
to Lender and such payment is rescinded or must otherwise be returned by Lender (as
determined by Lender in its sole and absolute discretion) upon insolvency, bankruptcy,
liquidation, reorganization, readjustment, composition, dissolution, receivership,
conservatorship, winding up or other similar proceeding involving or affecting Borrower or
Guarantor, all as though such payment had not been made.

      (j)    In the event that Guarantor shall advance or become obligated to pay any
sums under this Guaranty or in connection with the Guaranteed Obligations or in the event that
for any reason whatsoever Borrower, Owner or any subsequent owner of the Collateral or the
Property or any part thereof is now, or shall hereafter become, indebted to Guarantor, Guarantor
agrees that (i) the amount of such sums and of such indebtedness and all interest thereon shall at
all times be subordinate as to lien, the time of payment and in all other respects to all sums,
including principal and interest and other amounts, at any time owed to Lender under the Loan
Documents, and (ii) Guarantor shall not be entitled to enforce or receive payment thereof until
the Debt has been indefeasibly paid in full.  Nothing herein contained is intended or shall be
construed to give Guarantor any right of subrogation in or under the Loan Documents or any
right to participate in any way therein, or in the right, title or interest of Lender in or to any
collateral for the Loan, notwithstanding any payments made by Guarantor under this Guaranty,
until the actual and irrevocable receipt by Lender of payment in full of all of the Debt.  If any

NY:1797184.16

amount shall be paid to Guarantor on account of such subrogation rights at any time when any such sums due and owing to Lender shall not have been fully paid, such amount shall be paid by Guarantor to Lender for credit and application against such sums due and owing to Lender.

(k)    To the extent permitted by applicable law, Guarantor's obligations hereunder shall survive a foreclosure, assignment-in-lieu of foreclosure or similar proceeding involving the Collateral and the exercise by Lender of any of all of its remedies pursuant to the Loan Documents.

**6.**    Covenants.

(a)    As used in this Section 6, the following terms shall have the respective meanings set forth below:

(b)    "*GAAP*" shall mean generally accepted accounting principles, consistently applied.

(c)    "*Liquid Assets*" shall mean the liquid assets of Guarantor in the form of cash, readily marketable securities traded on a national exchange or on the National Association of Securities Dealers Automatic Quotations (NASDAQ), obligations of the United States of America, or guaranteed by the United States of America, corporate debt securities traded on a national exchange, Guarantor's cash in partnerships in which Guarantor is a partner (but only to the extent that such cash is available for distribution to Guarantor and unencumbered), and such other investments as may be acceptable to Lender in its sole discretion.

(d)    "*Net Worth*" shall mean, as of a given date, (x) the total assets of Guarantor (excluding the value of Guarantor's direct and indirect interests in Borrower and the Property) as of such date less (y) Guarantor's total liabilities as of such date, determined in accordance with GAAP.

(e)    Until all of the Guaranteed Obligations have been paid in full, Guarantor (i) shall maintain a Net Worth in excess of $60,000,000.00 and shall maintain Liquid Assets in excess of $6,000,000.00, and (ii) shall not sell, pledge, mortgage or otherwise transfer any of its assets, or any interest therein, on terms materially less favorable than would be obtained in an arms-length transaction.

(f)    Guarantor shall not, at any time while a default in the payment of the Guaranteed Obligations has occurred and is continuing, either (i) enter into or effectuate any transaction with any Affiliate which would reduce the Net Worth of Guarantor or (ii) sell, pledge, mortgage or otherwise transfer to any Person any of Guarantor's  assets, or any interest therein.

NY:1797184.16

7.     Entire Agreement/Amendments.   This instrument represents the entire agreement between the parties with respect to the subject matter hereof.  The terms of this Guaranty shall not be waived, altered, modified, amended, supplemented or terminated in any manner whatsoever except by written instrument signed by Lender and Guarantor.

8.     Successors and Assigns.   This Guaranty shall be binding upon Guarantor, and Guarantor's estate, heirs, personal representatives, successors and assigns, may not be assigned or delegated by Guarantor and shall inure to the benefit of Lender and its successors and assigns.

9.     Applicable Law and Consent to Jurisdiction.  This Guaranty shall be governed by, and construed and enforced in accordance with, the substantive laws of the State of New York. Guarantor irrevocably (a) agrees that any suit, action or other legal proceeding arising out of or relating to this Guaranty may be brought in a court of record in the City and County of New York or in the Courts of the United States of America located in the Southern District of New York, (b) consents to the jurisdiction of each such court in any such suit, action or proceeding and (c) waives any objection which it may have to the laying of venue of any such suit, action or proceeding in any of such courts and any claim that any such suit, action or proceeding has been brought in an inconvenient forum.  Guarantor irrevocably consents to the service of any and all process in any such suit, action or proceeding by service of copies of such process to Guarantor at its address provided in Section 14 hereof.  Nothing in this Section 9, however, shall affect the right of Lender to serve legal process in any other manner permitted by law or affect the right of Lender to bring any suit, action or proceeding against Guarantor or its property in the courts of any other jurisdictions.

10.    Section Headings.  The headings of the sections and paragraphs of this Guaranty have been inserted for convenience of reference only and shall in no way define, modify, limit or amplify any of the terms or provisions hereof.

11.    Severability.   Any provision of this Guaranty which may be determined by any competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, Guarantor hereby waives any provision of law which renders any provision hereof prohibited or unenforceable in any respect.

12.    WAIVER OF TRIAL BY JURY.  GUARANTOR HEREBY WAIVES THE RIGHT OF TRIAL BY JURY IN ANY LITIGATION, ACTION OR PROCEEDING ARISING HEREUNDER OR IN CONNECTION HEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR, AND IS INTENDED TO ENCOMPASS EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER OF TRIAL BY JURY BY GUARANTOR.

13.    Other Guaranties.  The obligations of Guarantor hereunder are separate and distinct from, and in addition to, the obligations of Guarantor now or hereafter arising under any other

NY:1797184.16

guaranties, pursuant to which Guarantor has guaranteed payment and performance of certain other obligations of Borrower described therein.

**14.**     Notices.  All notices, demands, requests, consents, approvals or other communications (collectively called "*Notices*") required or permitted to be given hereunder to Lender or Guarantor or which are given to Lender or Guarantor with respect to this Guaranty shall be in writing and shall be sent by (a) hand delivery, (b) nationally recognized overnight delivery service (such as Federal Express), (c) United States registered or certified mail, return receipt requested, postage prepaid, or (d) by facsimile and confirmed by facsimile answer back, in each case addressed as set forth below, or to such other address(es) as the party in question shall have specified most recently by like Notice.

If to Lender, to:

Natixis, New York Branch
1251 Avenue of the Americas
New York, New York 10020
Attention: Real Estate Administration

with a copy to:

Winston & Strawn, LLP
200 Park Avenue
New York, New York 10166
Attention: Corey A. Tessler, Esq.

If to Guarantor, to:

Min Chae
8790 Los Coyotes Drive
Buena Park, California 90621

Donald Chae
2200 Sherwood Road
San Marino, California 91108

with a copy to:

Lim, Ruger & Kim LLP
1055 West Seventh Street, 28th Floor
Los Angeles, California 90017
Attention: John Lim, Esq.

Notices which are given in the manner aforesaid shall be deemed to have been given or served for all purposes hereunder (i) if by hand, at the time of delivery, (ii) in the case of overnight delivery, upon the first attempted delivery on a Business Day, (iii) in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day, and (iv) in the case of facsimile transmission, when sent and electronically confirmed.

Schedule 12 - 9

NY:1797184.16

**15.** Guarantor's Receipt of Loan Documents. Guarantor by its execution hereof acknowledges receipt of true copies of all of the Loan Documents, the terms and conditions of which are hereby incorporated herein by reference.

**16.** Interest; Expenses.

(a) If Guarantor fails to pay all or any sums due hereunder upon demand by Lender, the amount of such sums payable by Guarantor to Lender shall bear interest from the date of demand until paid at the Default Rate in effect from time to time.

(b) Guarantor hereby agrees to pay all costs, charges and expenses, including reasonable attorneys' fees and disbursements, which may be incurred by Lender in enforcing the covenants, agreements, obligations and liabilities of Guarantor under this Guaranty.

**17.** Joint and Several Obligations. If Guarantor consists of more than one Person, each such Person shall have joint and several liability for the obligations of Guarantor hereunder.

**18.** Specific Limitation on Guaranty and Indemnity Obligations. Guarantor and Lender hereby confirm that it is the intention of Guarantor and Lender that this Guaranty not constitute a fraudulent transfer or fraudulent conveyance (a "*Fraudulent Conveyance*") under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act or any other debtor relief law or insolvency law (whether statutory, common law, case law or otherwise) or any jurisdiction whatsoever (collectively, the "*Bankruptcy Laws*"). To give effect to the foregoing intention of Guarantor and Lender, each of such parties hereby irrevocably agrees that the Guaranteed Obligations shall be limited to (but shall not be less than) such maximum amount as will, after giving effect to the maximum amount of such obligations and all other liabilities (whether contingent or otherwise) of Guarantor that are relevant under such Bankruptcy Laws, result in the Guaranteed Obligations not constituting a Fraudulent Conveyance under the Bankruptcy Laws, as of the date of execution and delivery of this Guaranty.

**19.** Counterparts. This Guaranty may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

**20.** State Specific Provisions. Solely to the extent that, and despite the express intent of Guarantor and Lender that the laws of the State of New York govern this Guaranty, a court of competent jurisdiction finds that the laws of the State of California apply to this Guaranty, the following provisions shall govern and control in the event of a conflict with any other provision in this Guaranty:

(a) Without limiting any other rights provided to Lender herein or in any of the Loan Documents, Lender shall have the benefits of California Code of Civil Procedure § 736, as the same may be amended from time to time.

(b) Guarantor hereby waives and agrees not to assert or take advantage of the following:

(i) Any defense of Guarantor based upon Lender's election of any remedy against

Guarantor or Borrower or both, including, without limitation, the defense to enforcement of this Guaranty (the "Gradsky" defense, based upon Union Bank v. Gradsky, 265 Cal. App. 2d 40 (1968) or subsequent cases), which, absent this waiver, Guarantor would have by virtue of an election by Lender to conduct a non-judicial foreclosure sale of the Property, it being understood by Guarantor that any such non-judicial foreclosure sale will destroy, by operation of California Code of Civil Procedure Section 580d, all rights of any party to a deficiency judgment against the Borrower, and, as a consequence, will destroy all rights which Guarantor would otherwise have (including, without limitation, the right of subrogation, the right of reimbursement, and the right of contribution) to proceed against the Borrower and to recover any such amount, and that Lender could be otherwise estopped from pursuing Guarantor for a deficiency judgment after a non-judicial foreclosure sale on the theory that a guarantor should be exonerated if a lender elects a remedy that eliminates the guarantor's subrogation, reimbursement or contribution rights;

(ii)    Any rights under California Code of Civil Procedure Sections 580a and 726(b), which provide, among other things: that a creditor must file a complaint for deficiency within three (3) months of a non-judicial foreclosure sale or judicial foreclosure sale, as applicable; that a fair market value hearing must be held; and that the amount of the deficiency judgment shall be limited to the amount by which the unpaid debt exceeds the fair market value of the security, but not more than the amount by which the unpaid debt exceeds the sale price of the security; and

(iii)    Without limiting the generality of the foregoing or any other provision hereof, Guarantor expressly waives any and all benefits which might otherwise be available to Guarantor under California Civil Code Sections 2809, 2810, 2819, 2839, 2845, 2846, 2847, 2848, 2849, 2850, 2899 and 3433 and California Code of Civil Procedure Sections 580a, 580b, 580d and 726, or any of such sections.

(c)    Guarantor's Waiver Pursuant to California Civil Code Section 2856.  In addition to all the other waivers agreed to and made by Guarantor as set forth in this Guaranty, and pursuant to the provisions of California Civil Code Section 2856, Guarantor hereby waives all rights and defenses that Guarantor may have because Borrower's debt is secured by real property.  This means, among other things:

(i)    Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower.

(ii)    If Lender forecloses on any real property collateral pledged by Borrower:

A.    The amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price.

B.    Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower.

(d)    Further Waivers.  This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's debt is secured by real property.

Schedule 12 - 11

These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.  Guarantor further hereby waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a non-judicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the principal by the operation of Section 580d of the Code of Civil Procedure or otherwise.

(e)    Judicial Reference.  If any action or proceeding is filed in a court of the State of California by or against any party hereto in connection with any of the transactions contemplated by this Guaranty or any other Loan Document, (a) the court shall, and is hereby directed to, make a general reference pursuant to California Code of Civil Procedure Section 638 to a referee (who shall be a single active or retired judge) to hear and determine all of the issues in such action or proceeding (whether of fact or of law) and to report a statement of decision, provided that at the option of any party to such proceeding, any such issues pertaining to a "provisional remedy" as defined in California Code of Civil Procedure Section 1281.8 shall be heard and determined by the court, and (b) Guarantor shall be solely responsible to pay all reasonable fees and expenses of any referee appointed in such action or proceeding.

[THE REMAINDER OF THE PAGE IS INTENTIONALLY BLANK]

NY:1797184.16

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the date first above written.

**GUARANTOR**:

_____

**MIN CHAE**, a natural person

_____

**DONALD CHAE**, a natural person

NY:1797184.16

**Schedule 13**
**Preapproved Replacement Parking Area**

(Attached)

NY:1797184.16



**Exhibit 2**

THIS INSTRUMENT PREPARED BY
AND WHEN RECORDED RETURN TO:

Winston & Strawn, LLP
200 Park Avenue
New York, New York 10166
Attention: Corey A. Tessler, Esq.

*(SPACE ABOVE THIS LINE FOR RECORDER'S USE)*

**PLAMEX INVESTMENT, LLC**
(Trustor)

to

**STEWART TITLE OF CALIFORNIA, INC.**
(Trustee)

for the Benefit of

**NATIXIS, NEW YORK BRANCH**
(Beneficiary)

**DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS,
SECURITY AGREEMENT AND FIXTURE FILING**

Dated:             June 16, 2016


Property Location:    3100 E. Imperial Highway
                      Lynwood, California 90262
                      Los Angeles County

**DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS,
SECURITY AGREEMENT AND FIXTURE FILING**

This DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING (this "***Security Instrument***"), is made as of June 16, 2016, by **PLAMEX INVESTMENT, LLC**, a Delaware limited liability company, having an office at 3100 E. Imperial Highway, Lynwood, California 90262, as trustor ("***Borrower***"), to **STEWART TITLE OF CALIFORNIA, INC.**, a California corporation, having an address at 525 North Brand Boulevard, Glendale, California 91203, as trustee ("***Trustee***"), for the benefit of **NATIXIS, NEW YORK BRANCH**, a direct branch of Natixis S.A., a société anonyme à conseil d'administration (public limited company) organized and existing under the laws of France, having an address at 1251 Avenue of the Americas, New York, New York 10020, as beneficiary (together with its successors and assigns, hereinafter referred to as "***Lender***").

Borrower and Lender have entered into that certain Loan Agreement, dated as of the date hereof (as amended, modified, restated, consolidated, replaced or supplemented from time to time, the "***Loan Agreement***"), pursuant to which Lender is making a secured loan to Borrower in the aggregate original principal amount of $106,000,000.00 (the "***Loan***"). Capitalized terms used herein without definition are used as defined in the Loan Agreement. The Loan is evidenced by that certain Promissory Note, dated as of the date hereof, made by Borrower to Lender in such principal amount (as the same may be amended, modified, restated, severed, consolidated, renewed, replaced, or supplemented from time to time, the "***Note***").

To secure the payment of the Note and all sums which may or shall become due thereunder or under any of the other documents evidencing, securing or executed in connection with the Loan (the Note, this Security Instrument, the Loan Agreement and such other documents, as any of the same may, from time to time, be modified, amended, restated, replaced or supplemented, being hereinafter collectively referred to as the "***Loan Documents***"), including (i) the payment of interest and other amounts which would accrue and become due but for the filing of a petition in bankruptcy (whether or not a claim is allowed against Borrower for such interest or other amounts in any such bankruptcy proceeding) or the operation of the automatic stay under Section 362(a) of Title 11 of the United States Code (the "***Bankruptcy Code***"), and (ii) the costs and expenses of enforcing any provision of any Loan Document (all such sums being hereinafter collectively referred to as the "***Debt***"), Borrower has given, granted, bargained, sold, alienated, enfeoffed, conveyed, confirmed, warranted, pledged, assigned and hypothecated and by these presents does hereby give, grant, bargain, sell, alien, enfeoff, convey, confirm, warrant, pledge, assign and hypothecate unto Trustee, in trust for the benefit of Lender, WITH POWER OF SALE, all of Borrower's right, title and interest in and to the land described in **Exhibit "A"** (the "***Premises***"), and the buildings, structures, fixtures and other improvements now or hereafter located thereon (the "***Improvements***");

TOGETHER WITH:  all right, title, interest and estate of Borrower now owned, or hereafter acquired, in and to the following property, rights, interests and estates (the Premises, the Improvements, and the property, rights, interests and estates hereinafter described are collectively referred to herein as the "***Property***"):

22
NY:1795920.5

(a)      all easements, rights-of-way, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, rights to oil, gas, minerals, coal and other substances of any kind or character, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining to the Premises and the Improvements; and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road, highway, alley or avenue, opened, vacated or proposed, in front of or adjoining the Premises, to the center line thereof; and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Premises and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(b)      all machinery, furniture, furnishings, equipment, computer software and hardware, fixtures (including all heating, air conditioning, plumbing, lighting, communications and elevator fixtures), inventory, materials, supplies and other articles of personal property and accessions thereof, renewals and replacements thereof and substitutions therefor, and other property of every kind and nature, tangible or intangible, owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Premises or the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Premises and the Improvements (hereinafter collectively referred to as the "*Equipment*"), including any leases of, deposits in connection with, and proceeds of any sale or transfer of any of the foregoing, and the right, title and interest of Borrower in and to any of the Equipment that may be subject to any "*security interest*" as defined in the Uniform Commercial Code, as in effect in the State where the Property is located (the "*UCC*"), superior in lien to the lien of this Security Instrument;

(c)      all awards or payments, including interest thereon, that may heretofore or hereafter be made with respect to the Premises or the Improvements, whether from the exercise of the right of eminent domain or condemnation (including any transfer made in lieu of or in anticipation of the exercise of such right), or for a change of grade, or for any other injury to or decrease in the value of the Premises or Improvements;

(d)      all leases and other agreements or arrangements heretofore or hereafter entered into affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the Premises or the Improvements, including any extensions, renewals, modifications or amendments thereof (hereinafter collectively referred to as the "*Leases*") and all rents, rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a Bankruptcy Proceeding) or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources arising from or attributable to the Premises and/or the Improvements, including all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Premises or the Improvements, or rendering of services by Borrower or any of its agents or employees, and proceeds, if any, from business interruption

or other loss of income insurance (hereinafter collectively referred to as the "*Rents*"), together with all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;

(e)      all proceeds of and any unearned premiums on any insurance policies covering the Property, including the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property;

(f)      the right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property;

(g)      all accounts (including reserve accounts), escrows, documents, instruments, chattel paper, claims, deposits and general intangibles, as the foregoing terms are defined in the UCC, and all franchises, trade names, trademarks, symbols, service marks, books, records, plans, specifications, designs, drawings, surveys, title insurance policies, permits, consents, licenses, management agreements, contract rights (including any contract with any architect or engineer or with any other provider of goods or services for or in connection with any construction, repair or other work upon the Property), approvals, actions, refunds of real estate taxes and assessments (and any other governmental impositions related to the Property) and causes of action that now or hereafter relate to, are derived from or are used in connection with the Property, or the use, operation, maintenance, occupancy or enjoyment thereof or the conduct of any business or activities thereon (hereinafter collectively referred to as the "*Intangibles*");

(h)      the OPA;

(i)      the Parking Agreement; and

(j)      all proceeds, products, offspring, rents and profits from any of the foregoing, including those from sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

Without limiting the generality of any of the foregoing, in the event that a case under the Bankruptcy Code is commenced by or against Borrower, pursuant to Section 552(b)(2) of the Bankruptcy Code, the security interest granted by this Security Instrument shall automatically extend to all Rents acquired by Borrower after the commencement of the case and shall constitute cash collateral under Section 363(a) of the Bankruptcy Code.

TO HAVE AND TO HOLD the Property unto and to the use and benefit of Lender and its successors and assigns, forever;

PROVIDED, HOWEVER, these presents are upon the express condition that, if Borrower shall well and truly pay to Lender the Debt at the time and in the manner provided in the Loan Documents and shall well and truly abide by and comply with each and every covenant and condition set forth in the Loan Documents in a timely manner, these presents and the estate hereby granted shall cease, terminate and be void;

AND Borrower represents and warrants to and covenants and agrees with Lender as follows:

**1.    Payment of Debt and Incorporation of Covenants, Conditions and Agreements.** Borrower shall pay the Debt at the time and in the manner provided in the Loan Documents. All the covenants, conditions and agreements contained in the Loan Documents are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein. Without limiting the generality of the foregoing, Borrower (i) agrees to insure, repair, maintain and restore damage to the Property, pay Taxes, and comply with Legal Requirements, in accordance with the Loan Agreement, and (ii) agrees that the Proceeds of Insurance and Awards for Condemnation shall be settled, held and applied in accordance with the Loan Agreement.

**2.    Leases and Rents.**

a.    Borrower does hereby absolutely and unconditionally assign to Lender all of Borrower's right, title and interest in all current and future Leases and Rents, it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Such assignment shall not be construed to bind Lender to the performance of any of the covenants or provisions contained in any Lease or otherwise impose any obligation upon Lender. Nevertheless, subject to the terms of this Section 2(a), Lender grants to Borrower a revocable license to operate and manage the Property and to collect the Rents subject to the requirements of the Loan Agreement (including the deposit of Rents into the Clearing Account). Upon an Event of Default, without the need for notice or demand, the license granted to Borrower herein shall automatically be revoked, and Lender shall immediately be entitled to possession of all Rents in (or required by the terms of the Loan Documents to be deposited in) the Clearing Account, the Deposit Account (including all Subaccounts thereof) and all Rents collected thereafter (including Rents past due and unpaid), whether or not Lender enters upon or takes control of the Property. Borrower hereby grants and assigns to Lender the right, at its option, upon revocation of the license granted herein, to enter upon the Property in person, by agent or by court-appointed receiver to collect the Rents. Any Rents collected after the revocation of such license may be applied toward payment of the Debt in such priority and proportions as Lender in its sole discretion shall deem proper.

b.    Borrower shall not enter into, modify, amend, cancel, terminate or renew any Lease except as provided in Section 5.9 of the Loan Agreement.

**3.    Use of Property.** Borrower shall not initiate, join in, acquiesce in or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Property. If under applicable zoning provisions the use of the Property is or shall become a nonconforming use, Borrower shall not cause or permit such nonconforming use to be discontinued or abandoned without the consent of Lender. Borrower shall not (i) change the use of the Property, (ii) permit or suffer to occur any waste on or to the Property or (iii) take any steps to convert the Property to a condominium or cooperative form of ownership.

**4.    Transfer or Encumbrance of the Property.**

a.      Borrower acknowledges that (i) Lender has examined and relied on the creditworthiness and experience of the principals of Borrower in owning and operating properties such as the Property in agreeing to make the Loan, (ii) Lender will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for the Debt, and (iii) Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the repayment of the Debt, Lender can recover the Debt by a sale of the Property.  Borrower shall not sell, convey, alienate, mortgage, encumber, pledge or otherwise transfer the Property or any part thereof, or suffer or permit any Transfer to occur, other than a Permitted Transfer.

b.      Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon any Transfer in violation of this <u>Section 4</u>.  This provision shall apply to every sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Property (and every other Transfer other than a Permitted Transfer) regardless of whether voluntary or not.  Any Transfer made in contravention of this <u>Section 4</u> shall be null and void and of no force and effect.  Borrower agrees to bear and shall pay or reimburse Lender on demand for all reasonable expenses (including reasonable attorneys' fees and disbursements, title search costs and title insurance endorsement premiums) incurred by Lender in connection with the review, approval and documentation of any Permitted Transfer.

**5.      <u>Changes in Laws Regarding Taxation.</u>**  If any law is enacted or adopted or amended after the date of this Security Instrument which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay such tax, with interest and penalties thereon, if any.  If Lender is advised by its counsel that the payment of such tax or interest and penalties by Borrower would be unlawful, taxable to Lender or unenforceable, or would provide the basis for a defense of usury, then Lender shall have the option, by notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

**6.      <u>No Credits on Account of the Debt.</u>**  Borrower shall not claim or demand or be entitled to any credit on account of the Debt for any part of the Taxes assessed against the Property, and no deduction shall otherwise be made or claimed from the assessed value of the Property for real estate tax purposes by reason of this Security Instrument or the Debt.  If such claim, credit or deduction shall be required by law, Lender shall have the option, by notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

**7.      <u>Further Acts, Etc.</u>**   Borrower shall, at its sole cost, perform, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignment, transfers and assurances as Lender shall, from time to time, require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the property and rights hereby mortgaged, given, granted, bargained, sold, alienated, enfeoffed, conveyed, confirmed, pledged, assigned and hypothecated or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Security Instrument, or for filing, registering or recording this Security Instrument or for facilitating the sale and transfer of the Loan and the Loan Documents in connection with a "***Secondary Market***

*Transaction*" as described in Section 9.1 of the Loan Agreement.  Upon foreclosure, the appointment of a receiver or any other relevant action, Borrower shall, at its sole cost, cooperate fully and completely to effect the assignment or transfer of any license, permit, agreement or any other right necessary or useful to the operation of the Property.  Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law and in equity, including such rights and remedies available to Lender pursuant to this Section 7.

        **8.**    **Recording of Security Instrument, Etc.**  Borrower forthwith upon the execution and delivery of this Security Instrument and thereafter, from time to time, shall cause this Security Instrument, and any security instrument creating a lien or security interest or evidencing the lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect the lien or security interest hereof upon, and the interest of Lender in, the Property.  Borrower shall pay all filing, registration or recording fees, all expenses incident to the preparation, execution and acknowledgment of and all federal, state, county and municipal, taxes, duties, imposts, documentary stamps, assessments and charges arising out of or in connection with the execution and delivery of, this Security Instrument, any supplemental hereto, any security instrument with respect to the Property or any instrument of further assurance, except where prohibited by law so to do.  Borrower shall hold harmless and indemnify Lender, its successors and assigns, against any liability incurred by reason of the imposition of any tax on the making or recording of this Security Instrument.

        **9.**    **Right to Cure Defaults.**  Upon the occurrence of any Event of Default, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, perform the obligations in Default in such manner and to such extent as Lender may deem necessary to protect the security hereof. Lender is authorized to enter upon the Property for such purposes or appear in, defend or bring any action or proceeding to protect its interest in the Property or to foreclose this Security Instrument or collect the Debt, and the cost and expense thereof (including reasonable attorneys' fees and disbursements to the extent permitted by law), with interest thereon at the Default Rate for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender, shall constitute a portion of the Debt, shall be secured by this Security Instrument and the other Loan Documents and shall be due and payable to Lender upon demand.

        **10.**    **Remedies.**

        a.    Upon the occurrence of any Event of Default, Lender may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Borrower and in and to the Property, by Lender itself or otherwise, including the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

        i.    declare the entire Debt to be immediately due and payable;

ii.    institute a proceeding or proceedings, judicial or nonjudicial, to the extent permitted by law, by advertisement or otherwise, for the complete foreclosure of this Security Instrument, in which case the Property may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

iii.    with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Security Instrument for the portion of the Debt then due and payable, subject to the continuing lien of this Security Instrument for the balance of the Debt not then due;

iv.    sell for cash or upon credit the Property and all estate, claim, demand, right, title and interest of Borrower therein and rights of redemption thereof, pursuant to the power of sale, to the extent permitted by law, or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required by law;

v.    institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein or in any other Loan Document;

vi.    recover judgment on the Note either before, during or after any proceeding for the enforcement of this Security Instrument;

vii.    apply for the appointment of a trustee, receiver, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of the Borrower or of any Person liable for the payment of the Debt;

viii.    enforce Lender's interest in the Leases and Rents and enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and employees therefrom, and Lender may (A) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with the Property and conduct the business thereat; (B) complete any construction on the Property in such manner and form as Lender deems advisable; (C) make alterations, additions, renewals, replacements and improvements to or on the Property; (D) exercise all rights and powers of Borrower with respect to the Property, whether in the name of Borrower or otherwise, including the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive Rents; and (E) apply the receipts from the Property to the payment of the Debt, after deducting therefrom all expenses (including reasonable attorneys' fees and disbursements) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, insurance and other charges in connection with the Property, as well as just and reasonable compensation for the services of Lender, and its counsel, agents and employees;

ix.    require Borrower to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of any portion of the Property occupied by Borrower, and require Borrower to vacate

and surrender possession of the Property to Lender or to such receiver, and, in default thereof, evict Borrower by summary proceedings or otherwise; or

x.      pursue such other rights and remedies as may be available at law or in equity or under the UCC, including the right to receive and/or establish a lock box for all Rents and proceeds from the Intangibles and any other receivables or rights to payments of Borrower relating to the Property.

In the event of a sale, by foreclosure or otherwise, of less than all of the Property, this Security Instrument shall continue as a lien on the remaining portion of the Property.

b.      The proceeds of any sale made under or by virtue of this Section 10, together with any other sums which then may be held by Lender under this Security Instrument, whether under the provisions of this Section 10 or otherwise, shall be applied by Lender to the payment of the Debt in such priority and proportion as Lender in its sole discretion shall deem proper.

c.      Lender may adjourn from time to time any sale by it to be made under or by virtue of this Security Instrument by announcement at the time and place appointed for such sale or for such adjourned sale or sales; and, except as otherwise provided by any applicable law, Lender, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

d.      Upon the completion of any sale or sales pursuant hereto, Lender, or an officer of any court empowered to do so, shall execute and deliver to the accepted purchaser or purchasers a good and sufficient instrument, or good and sufficient instruments, conveying, assigning and transferring all estate, right, title and interest in and to the property and rights sold. Lender is hereby irrevocably appointed the true and lawful attorney of Borrower, which appointment is coupled with an interest, in its name and stead, to make all necessary conveyances, assignments, transfers and deliveries of the Property and rights so sold and for that purpose Lender may execute all necessary instruments of conveyance, assignment and transfer, and may substitute one or more persons with like power, Borrower hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof.  Any sale or sales made under or by virtue of this Section 10, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of Borrower in and to the properties and rights so sold, and shall be a perpetual bar both at law and in equity against Borrower and against any and all persons claiming or who may claim the same, or any part thereof, from, through or under Borrower.

e.      Upon any sale made under or by virtue of this Section 10, whether made under a power of sale or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, Lender may bid for and acquire the Property or any part thereof and in lieu of paying cash therefor may make settlement for the purchase price by crediting upon the Debt the net sales price after deducting therefrom the expenses of the sale and costs of the action and

99
NY:1795920.5

any other sums which Lender is authorized to deduct under this Security Instrument or any other Loan Document.

f.    No recovery of any judgment by Lender and no levy of an execution under any judgment upon the Property or upon any other property of Borrower shall affect in any manner or to any extent the lien of this Security Instrument upon the Property or any part thereof, or any liens, rights, powers or remedies of Lender hereunder, but such liens, rights, powers and remedies of Lender shall continue unimpaired as before.

g.    Lender may terminate or rescind any proceeding or other action brought in connection with its exercise of the remedies provided in this Section 10 at any time before the conclusion thereof, as determined in Lender's sole discretion and without prejudice to Lender.

h.    Lender may resort to any remedies and the security given by this Security Instrument or in any other Loan Document in whole or in part, and in such portions and in such order as determined in Lender's sole discretion.  No such action shall in any way be considered a waiver of any rights, benefits or remedies evidenced or provided by any Loan Document.  The failure of Lender to exercise any right, remedy or option provided in any Loan Document shall not be deemed a waiver of such right, remedy or option or of any covenant or obligation secured by any Loan Document.  No acceptance by Lender of any payment after the occurrence of any Event of Default and no payment by Lender of any obligation for which Borrower is liable hereunder shall be deemed to waive or cure any Event of Default, or Borrower's liability to pay such obligation.  No sale of all or any portion of the Property, no forbearance on the part of Lender, and no extension of time for the payment of the whole or any portion of the Debt or any other indulgence given by Lender to Borrower, shall operate to release or in any manner affect the interest of Lender in the remaining Property or the liability of Borrower to pay the Debt.  No waiver by Lender shall be effective unless it is in writing and then only to the extent specifically stated.  All costs and expenses of Lender in exercising its rights and remedies under this Section 10 (including reasonable attorneys' fees and disbursements to the extent permitted by law), shall be paid by Borrower immediately upon notice from Lender, with interest at the Default Rate for the period after notice from Lender, and such costs and expenses shall constitute a portion of the Debt and shall be secured by this Security Instrument.

i.    The interests and rights of Lender under the Loan Documents shall not be impaired by any indulgence, including (x) any renewal, extension or modification which Lender may grant with respect to any of the Debt, (y) any surrender, compromise, release, renewal, extension, exchange or substitution which Lender may grant with respect to the Property or any portion thereof or (z) any release or indulgence granted to any maker, endorser, guarantor or surety of any of the Debt.

**11.    Right of Entry.**  In addition to any other rights or remedies granted under this Security Instrument, Lender and its agents shall have the right upon no less than twenty-four (24) hours' prior written notice to Borrower to enter and inspect the Property at any reasonable time during the term of this Security Instrument, subject to the rights of Tenants under Leases.  The cost of such inspections or audits shall be borne by Borrower should Lender determine that an Event of Default exists, including the cost of all follow up or additional investigations or inquiries deemed reasonably necessary by Lender.  The cost of such inspections, if not paid for

by Borrower following demand, may be added to the principal balance of the sums due under the Note and this Security Instrument and shall bear interest thereafter until paid at the Default Rate.

    12.    **Security Agreement.**  This Security Instrument is both a real property deed of trust and a "*security agreement*" within the meaning of the UCC.  The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Borrower in the Property.  Borrower by executing and delivering this Security Instrument has granted and hereby grants to Lender, as security for the Debt, a security interest in the Property to the full extent that the Property may be subject to the UCC (such portion of the Property so subject to the UCC being called in this Section 12 the "*Collateral*").  This Security Instrument shall also constitute a "*fixture filing*" for the purposes of the UCC.  As such, this Security Instrument covers all items of the Collateral that are or are to become fixtures.  Information concerning the security interest herein granted may be obtained from the parties at the addresses of the parties set forth in the first paragraph of this Security Instrument.  If an Event of Default shall occur, Lender, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the UCC, including, without limiting the generality of the foregoing, the right to take possession of the Collateral or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Collateral.  Upon request or demand of Lender, Borrower shall at its expense assemble the Collateral and make it available to Lender at a convenient place acceptable to Lender.  Borrower shall pay to Lender on demand any and all expenses, including reasonable attorneys' fees and disbursements, incurred or paid by Lender in protecting the interest in the Collateral and in enforcing the rights hereunder with respect to the Collateral.  Any notice of sale, disposition or other intended action by Lender with respect to the Collateral, sent to Borrower in accordance with the provisions hereof at least ten days prior to such action, shall constitute commercially reasonable notice to Borrower.  The proceeds of any disposition of the Collateral, or any part thereof, may be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its sole discretion shall deem proper.  In the event of any change in name, identity, structure or place of incorporation, organization or formation of Borrower, Borrower shall notify Lender thereof and promptly after request shall file and record such UCC forms as are necessary to maintain the priority of Lender's lien upon and security interest in the Collateral, and shall pay all expenses and fees in connection with the filing and recording thereof.  If Lender shall require the filing or recording of additional UCC forms or continuation statements, Borrower shall, promptly after request, file and record such UCC forms or continuation statements as Lender shall deem necessary, and shall pay all expenses and fees in connection with the filing and recording thereof, it being understood and agreed, however, that no such additional documents shall increase Borrower's obligations under the Loan Documents.  Borrower hereby irrevocably appoints Lender as its attorney-in-fact, coupled with an interest, to file with the appropriate public office on its behalf any financing or other statements naming Lender, as secured party, and Borrower, as debtor, in connection with the Collateral covered by this Security Instrument.

    13.    **Actions and Proceedings.**  Lender has the right to appear in and defend any action or proceeding brought with respect to the Property and to bring any action or proceeding, in the name and on behalf of Borrower, which Lender, in its sole discretion, decides should be brought to protect its or their interest in the Property.  Lender shall, at its option, be subrogated to

the lien of any mortgage, deed of trust or other security instrument discharged in whole or in part by the Debt, and any such subrogation rights shall constitute additional security for the payment of the Debt.

14.  **Marshaling and Other Matters.**    Borrower hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshaling in the event of any sale hereunder of the Property or any part thereof or any interest therein.  Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Security Instrument on behalf of Borrower, and on behalf of each and every Person acquiring any interest in or title to the Property subsequent to the date of this Security Instrument and on behalf of all Persons to the extent permitted by applicable law.  The lien of this Security Instrument shall be absolute and unconditional and shall not in any manner be affected or impaired by any acts or omissions whatsoever of Lender and, without limiting the generality of the foregoing, the lien hereof shall not be impaired by (i) any acceptance by Lender of any other security for any portion of the Debt, (ii) any failure, neglect or omission on the part of Lender to realize upon or protect any portion of the Debt or any collateral security therefor or (iii) any release (except as to the property released), sale, pledge, surrender, compromise, settlement, renewal, extension, indulgence, alteration, changing, modification or disposition of any portion of the Debt or of any of the collateral security therefor;  and Lender may foreclose, or exercise any other remedy available to Lender under other Loan Documents without first exercising or enforcing any of its remedies under this Security Instrument, and any exercise of the rights and remedies of Lender hereunder shall not in any manner impair the Debt or the liens of any other Loan Document or any of Lender's rights and remedies thereunder.

15.  **Notices.**    All notices, consents, approvals and requests required or permitted hereunder (a "*Notice*") shall be given in writing and shall be effective for all purposes if either hand delivered with receipt acknowledged, or by a nationally recognized overnight delivery service (such as Federal Express), or by certified or registered United States mail, return receipt requested, postage prepaid, or by facsimile and confirmed by facsimile answer back, in each case addressed as follows (or to such other address or Person as a party shall designate from time to time by Notice to the other party):  If to Lender: Natixis, New York Branch, 1251 Avenue of the Americas, New York, NY 10020; Attention: Real Estate Administration, Telecopier: (212) 891-5777 with copies to: Winston & Strawn LLP, 200 Park Avenue, New York, New York 10166, Attention: Corey A. Tessler, Esq., Telecopier: (212) 294-4700; if to Borrower: Plamex Investment, LLC, 3100 East Imperial Highway, Lynwood, California 90262, Attention: Min Chae and Donald Chae, Telecopier: (310) 631-6999, with a copy to: Lim, Ruger & Kim LLP, 1055 West Seventh Street, 28th Floor, Los Angeles, California 90017, Attention: John Lim, Esq., Telecopier: (213) 955-9511.  A Notice shall be deemed to have been given: (a) in the case of hand delivery, at the time of delivery; (b) in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; (c) in the case of overnight delivery, upon the first attempted delivery on a Business Day; or (d) in the case of facsimile transmission, when sent and electronically confirmed.

16.  **Inapplicable Provisions.**    If any term, covenant or condition of this Security Instrument is held to be invalid, illegal or unenforceable in any respect, this Security Instrument shall be construed without such provision.

**17.**    **Headings.**  The section headings in this Security Instrument are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

**18.**    **Duplicate Originals.**  This Security Instrument may be executed in any number of duplicate originals and each such duplicate original shall be deemed to be an original.

**19.**    Definitions.   Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in singular or plural form; and the word "***Borrower***" shall mean "***each Borrower and any subsequent owner or owners of the Property or any part thereof or any interest therein***," the word "***Lender***" shall mean "***Lender and any subsequent holder of the Note***," the words "***Property***" shall include any portion of the Property and any interest therein, the word "***including***" means "***including but not limited to***" and the words "***attorneys' fees***" shall include any and all attorneys' fees, paralegal and law clerk fees, including, fees at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property and collateral and enforcing its rights hereunder.

**20.**    **Homestead.**    Borrower hereby waives and renounces all homestead and exemption rights provided by the Constitution and the laws of the United States and of any state, in and to the Property as against the collection of the Debt, or any part thereof.

**21.**    **Assignments.**  Lender shall have the right to assign or transfer its rights under this Security Instrument without limitation.  Any assignee or transferee shall be entitled to all the benefits afforded Lender under this Security Instrument.

**22.**    **Waiver of Jury Trial.  BORROWER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS SECURITY INSTRUMENT OR ANY OTHER LOAN DOCUMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS <u>SECTION 22</u> IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.**

**23.**    **Consents.** Any consent or approval by Lender in any single instance shall not be deemed or construed to be Lender's consent or approval in any like matter arising at a subsequent date, and the failure of Lender to promptly exercise any right, power, remedy, consent or approval provided herein or at law or in equity shall not constitute or be construed as a waiver of the same nor shall Lender be estopped from exercising such right, power, remedy, consent or approval at a later date.  Any consent or approval requested of and granted by Lender pursuant hereto shall be narrowly construed to be applicable only to Borrower and the matter identified in such consent or approval and no third party shall claim any benefit by reason

thereof, and any such consent or approval shall not be deemed to constitute Lender a venturer or partner with Borrower nor shall privity of contract be presumed to have been established with any such third party.  If Lender deems it to be in its best interest to retain assistance of persons, firms or corporations (including attorneys, title insurance companies, appraisers, engineers and surveyors) with respect to a request for consent or approval, Borrower shall reimburse Lender for all costs reasonably incurred in connection with the employment of such persons, firms or corporations.

24.    **Employee Benefit Plan.**  During the term of this Security Instrument, unless Lender shall have previously consented in writing, (i) Borrower shall take no action that would cause it to become an "*employee benefit plan*" as defined in 29 C.F.R. Section 2510.3-101, or "*assets of a governmental plan*" subject to regulation under the state statutes, and (ii) Borrower shall not sell, assign or transfer the Property, or any portion thereof or interest therein, to any transferee that does not execute and deliver to Lender its written assumption of the obligations of this covenant.  Borrower shall protect, defend, indemnify and hold Lender harmless from and against all loss, cost, damage and expense (including all attorneys' fees, excise taxes and costs of correcting any prohibited transaction or obtaining an appropriate exemption) that Lender may incur as a result of Borrower's breach of this covenant.  This covenant and indemnity shall survive the extinguishment of the lien of this Security Instrument by foreclosure or action in lieu thereof; furthermore, the foregoing indemnity shall supersede any limitations on Borrower's liability under any of the Loan Documents.

25.    **Loan Repayment and Defeasance.**  Provided no Event of Default exists, this Security Instrument will be satisfied and discharged of record by Lender prior to the Maturity Date only in accordance with the terms and provisions set forth in Section 2.3 of the Loan Agreement.

26.    **Intentionally Omitted.**

27.    **Governing Law.**  WITH RESPECT TO MATTERS RELATING TO THE CREATION, PERFECTION AND PROCEDURES RELATING TO THE ENFORCEMENT OF THIS SECURITY INSTRUMENT, THIS SECURITY INSTRUMENT SHALL BE GOVERNED BY, AND BE CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, EXCEPT AS EXPRESSLY SET FORTH ABOVE IN THIS SECTION AND TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN ALL MATTERS RELATING TO THIS SECURITY INSTRUMENT AND THE OTHER LOAN DOCUMENTS AND ALL OF THE INDEBTEDNESS OR OBLIGATIONS ARISING HEREUNDER OR THEREUNDER.  ALL PROVISIONS OF THE LOAN AGREEMENT INCORPORATED HEREIN BY REFERENCE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, AS SET FORTH IN THE GOVERNING LAW PROVISION OF THE LOAN AGREEMENT.

28.    **Exculpation.**  The liability of Borrower hereunder is limited pursuant to Section 10.1 of the Loan Agreement.

29.     **Trustee; Successor Trustee.**    Trustee shall not be liable for any error of judgment or act done by Trustee, or be otherwise responsible or accountable under any circumstances whatsoever, except if the result of Trustee's gross negligence or willful misconduct.  Trustee shall not be personally liable in case of entry by him or anyone acting by virtue of the powers herein granted him upon the Property for debts contracted or liability or damages or damages incurred in the management or operation of the Property.  Trustee shall have the right to rely on any instrument, document or signature authorizing or supporting any action taken or proposed to be taken by him hereunder or believed by him to be genuine.  Trustee shall be entitled to reimbursement for actual expenses incurred by him in the performance of his duties hereunder and to reasonable compensation for such of his services hereunder as shall be rendered.  Borrower will, from time to time, reimburse Trustee for and save and hold him harmless from and against any and all loss, cost, liability, damage and reasonable expense whatsoever incurred by him in the performance of his duties.  All monies received by Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other monies (except to the extent required by law) and Trustee shall be under no liability for interest on any monies received by him hereunder.  Trustee may resign by giving of notice of such resignation in writing to Lender.  If Trustee shall die, resign or become disqualified from acting in the execution of this trust or shall fail or refuse to exercise the same when requested by Lender or if for any or no reason and without cause Lender shall prefer to appoint a substitute trustee to act instead of the original Trustee named herein, or any prior successor or substitute trustee, Lender shall, without any formality or notice to Borrower or any other person, have full power to appoint a substitute trustee and, if Lender so elects, several substitute trustees in succession who shall succeed to all the estate, rights, powers and duties of the aforenamed Trustee.  Each appointment and substitution shall be evidenced by an instrument in writing which shall recite the parties to, and the book and page of record of, this Security Instrument, and the description of the real property herein described, which instrument, executed and acknowledged by Lender, shall (a) be conclusive proof of the proper substitution and appointment of such successor Trustee or Trustees, (b) duly assign and transfer all the estates, properties, rights, powers and trusts of Trustee so ceasing to act and (c) be notice of such proper substitution and appointment to all parties in interest.  In addition, such Trustee ceasing to act shall duly assign, transfer, and deliver any of the property and monies held by Trustee to the successor Trustee so appointed in its or his place.  The Trustee may act in the execution of this trust and may authorize one or more parties to act on his behalf to perform the ministerial functions required of him hereunder, including without limitation, the transmittal and posting of any notices and it shall not be necessary for any Trustee to be present in person at any foreclosure sale.

30.     **State Specific Provisions**.  In the event of any inconsistencies between the terms and conditions of this Section 30 and the terms and conditions of this Security Instrument, the terms and conditions of this Section 30 shall control and be binding:

a.     By exercising any of Lender's rights or remedies hereunder (including, without limitation, taking possession of the Reserves), Borrower acknowledges and agrees that Lender shall not be deemed to have exercised any equitable right of setoff, foreclosed any statutory banker's lien, initiated or prosecuted any "action" to enforce the rights and obligations secured by this Security Instrument, or the Loan Documents, as the term "action" is used in California Code of Civil Procedure Section 726 ("***Section 726***"), or to have violated the "security

first" principle of Section 726.  Accordingly, the exercise of any or all of Lender's rights and remedies hereunder shall not in any way prejudice or affect Lender's right to initiate and complete a judicial or non-judicial foreclosure under this Security Instrument.  This Security Instrument evidences the consensual granting of a personal property security interest in the Reserves as permitted by the California Commercial Code; the parties do not intend that the exercise by Lender of any of its rights or remedies hereunder shall have any different consequences under Section 726 than the exercise of rights or remedies under any other security agreement under which a secured party has been granted a security interest in other types of personal property.

b.     Lender may at any time and from time to time by specific written instrument intended for such purpose, unilaterally subordinate the lien of this Security Instrument to any Lease, without joinder or consent of, or notice to, Borrower, any tenant or any other person.  Notice is hereby given to each tenant under a Lease of such right to subordinate.  No subordination referred to herein shall constitute a subordination to any lien or other encumbrance, whenever arising, or improve the right of any junior lienholder.  Nothing herein shall be construed as subordinating this Security Instrument to any Lease.

c.     Borrower and Lender agree that:  (i) Lender has requested information (and Borrower's response) concerning the environmental condition of the real property security as required by California Code of Civil Procedure Section 726.5; and (ii) each representation and warranty and covenant of Borrower herein, or in any Loan Document (together with any indemnity applicable to a breach of any such representation and warranty), with respect to the environmental condition of the Property is intended by Lender and Borrower to be an "environmental provision" for purposes of California Code of Civil Procedure Section 736.

d.     Should Lender have elected to accelerate the indebtedness secured hereby during the continuance of an Event of Default, Lender may initiate foreclosure of the Property by requesting the Trustee to effectuate a non-judicial foreclosure sale.  Trustee shall give and record such notice, as the law then requires as a condition precedent to a trustee's sale.  When the minimum period of time required by law after such notice has elapsed, Trustee, without notice to or demand upon Borrower except as required by law, shall sell the Property at the time and place of sale fixed by it in the notice of sale, at one or several sales, either as a whole or in separate parcels and in such manner and order, all as Lender in its sole discretion may determine, at public auction to the highest bidder for cash, in lawful money of the United States, payable at time of sale.  Neither Borrower nor any other person or entity other than Lender shall have the right to direct the order in which the Property is sold.  Subject to requirements and limits imposed by law, Trustee may, from time to time, postpone the sale of all or any portion of the Property by public announcement at such time and place of sale, and from time to time may postpone the sale by public announcement at the time and place fixed by the preceding postponement.  A sale of less than the whole of the Property on any defective or irregular sale made hereunder shall not exhaust the power of sale provided for herein.  Trustee shall deliver to the purchaser at such sale a deed conveying the Property or portion thereof so sold, but without any covenant or warranty, express or implied.  The recitals in the deed of any matters or facts shall be conclusive proof of the truthfulness thereof.  Lender shall have the right to become the purchaser at any sale held by any Trustee or substitute or successor Trustee, or by any receiver or public officer.  Any Lender purchasing at any such sale shall have the right to credit the secured

indebtedness owing to such Lender upon the amount of its bid entered at such sale to the extent necessary to satisfy such bid.  Said Trustee may appoint an attorney-in-fact to act in its stead as Trustee to conduct sale as hereinbefore provided.  Borrower authorizes and empowers the Trustee to sell the Property, in lots or parcels or as a whole, and to execute and deliver to the purchaser or purchasers thereof good and sufficient deeds of conveyance thereto of the estate of title then existing on the Property and bills of sale with covenants of general warranty.  Borrower binds himself to warrant and forever defend the title of such purchaser or purchasers when so made by the Trustee, and agrees to accept proceeds of said sale, if any, which are payable to Borrower as provided herein.

e.     Some or all of the Property may be or become a fixture in which Lender has a security interest hereunder, and the purpose of this provision is to create a fixture filing under Sections 9313 and 9402 of the California Uniform Commercial Code, as amended or recodified from time to time.  The rights, remedies and interests of Lender hereunder are independent and cumulative, and there shall be no merger of any security interest created hereby with any lien created under the other provisions of this Security Instrument.  During the continuance of an Event of Default, Lender may elect to exercise or enforce any of its rights, remedies, or interests hereunder and under the other provisions of this Security Instrument as Lender may from time to time deem appropriate.

f.     Borrower  is hereby notified that Section 2955.5(a) of the California Civil Code provides, in relevant part, as follows:  "No lender shall require a borrower, as a condition of receiving or maintaining a loan secured by real property, to provide hazard insurance coverage against risks to the improvements on that real property in an amount exceeding the replacement value of the improvements on the property."

g.     Borrower hereby waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to the security for the obligations secured by this Security Instrument, has destroyed such Borrower's rights of subrogation and reimbursement against the principal by the operation of Section 580d of the California Code of Civil Procedure.

[THE REMAINDER OF THE PAGE IS INTENTIONALLY BLANK]

IN WITNESS WHEREOF, Borrower has executed this Security Instrument as of the day and year first above written.

**BORROWER**:

**PLAMEX INVESTMENT, LLC**
a Delaware limited liability company

By:    3100 E. Imperial Investment, LLC,
       a Delaware limited liability company

       By:  Placo Investment, LLC,
          a Delaware limited liability company

       By:_____
           Name: Donald Chae
           Title:  Manager

*[Signature Page to Deed of Trust – Plaza Mexico]*

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA                    )
                                       )
COUNTY OF _Los ANGELES_              )

On _6-8-16_ , 2016, before me, _JUAN JOSE ENCISO_
(insert name and title of the officer), personally appeared Donald Chae, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____    (Seal)

JUAN JOSE ENCISO
Commission # 2128912
Notary Public - California
Los Angeles County
My Comm. Expires Oct 24, 2019

*[Signature Page to Deed of Trust – Plaza Mexico]*

**Exhibit "A"**
[LEGAL DESCRIPTION]

**LEGAL**
**DESCRIPTION**

The land referred to herein is situated in the State of California, County of Los Angeles,   and
described as follows:


PARCEL 1: PORTION OF APN: 6171-001-054

THOSE PORTIONS OF THE MODJESKA PARK, IN THE CITY OF LYNWOOD, COUNTY OF LOS
ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143
INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY,
DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWESTERLY CORNER OF LOT 17 IN BLOCK 15 OF SAID MODJESKA
PARK; THENCE NORTH 17° 59' 30' EAST ALONG THE WESTERLY LINE OF SAID BLOCK 362.90
FEET TO THE NORTHWESTERLY CORNER OF SAID BLOCK 15; THENCE NORTH 16° 19' 15" EAST
50.86 FEET TO THE SOUTHWESTERLY CORNER OF LOT 10 IN BLOCK 18 OF SAID MODJESKA
PARK; THENCE NORTH 5° 47' 00" EAST ALONG THE WESTERLY LINE OF SAID BLOCK 18, A
DISTANCE OF 230.13 FEET TO THE SOUTHERLY LINE OF IMPERIAL HIGHWAY 100 FEET;
THENCE EASTERLY ALONG SAID HIGHWAY, SOUTH 84° 13' 00" EAST, 830.37 FEET TO THE
BEGINNING OF A TANGENT CURVE CONCAVE NORTHERLY AND HAVING A RADIUS OF 697.35
FEET; THENCE ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 5° 44' 21", AN ARC
LENGTH OF 69.85 FEET TO THE WESTERLY LINE OF PEACH STREET; THENCE SOUTHERLY
ALONG SAID WESTERLY LINE OF PEACH STREET, SOUTH 14° 37' 33" EAST, 14.39 FEET; THENCE
SOUTH 5° 45' 40" WEST, 89.52 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE
WESTERLY AND HAVING A RADIUS OF 583.89 FEET; THENCE ALONG SAID CURVE THROUGH A
CENTRAL ANGLE OF 12° 13' 10", AN ARC LENGTH OF 124.53 FEET; THENCE SOUTH 17° 58' 50"
WEST, 6.92 FEET TO A POINT ON THE SOUTHERLY LINE OF BLOCK 18 IN SAID MODJESKA PARK;
THENCE SOUTH 26° 03' 45" WEST 53.29 FEET TO THE NORTHEAST CORNER OF LOT 1 IN BLOCK
17 OF SAID MODJESKA PARK; THENCE SOUTH 17° 58' 50" WEST 111.30 FEET TO THE
SOUTHEASTERLY CORNER OF LOT 3 IN BLOCK 17 OF SAID MODJESKA PARK; THENCE NORTH
72° 04' 03" WEST ALONG THE SOUTHERLY LINE OF SAID LOT, 130.64 FEET TO THE
NORTHEASTERLY CORNER OF LOT 46 IN BLOCK 17; THENCE SOUTH 17° 57' 05" WEST ALONG
THE EASTERLY LINE OF LOTS 46, 45, 44, 43, 42 AND 41, IN SAID BLOCK 17, 15094 FEET TO THE
SOUTHEASTERLY CORNER OF SAID LOT 41; THENCE NORTH 72° 04' 32" WEST ALONG THE
SOUTHERLY LINE OF SAID LOT 41 AND ITS WESTERLY PROLONGATION 170.59 FEET TO THE
EASTERLY LINE OF BLOCK 16 OF SAID MODJESKA PARK; THENCE SOUTH 17° 55' 20" WEST
ALONG SAID EASTERLY LINE, 234.84 FEET TO THE SOUTHEASTERLY CORNER OF LOT 16 IN
SAID BLOCK 16; THENCE NORTH 72° 01'41" WEST ALONG THE SOUTHERLY LINE OF SAID LOT,
130.15 FEET TO THE SOUTHWESTERLY CORNER OF SAID LOT; THENCE NORTH 17° 56' 17" EAST
ALONG THE WESTERLY LINE OF LOTS 16, 15, 14 AND 13 IN SAID BLOCK 16, A DISTANCE OF
99.98 FEET TO THE SOUTHEASTERLY CORNER OF LOT 30 IN SAID BLOCK 16; THENCE NORTH
72° 01' 43" WEST ALONG THE SOUTHERLY LINE OF SAID LOT AND ITS WESTERLY
PROLONGATION, 170.13 FEET TO THE EASTERLY LINE OF SAID BLOCK 15; THENCE SOUTH 17°
57' 15" WEST 196.60 FEET AND NORTH 62° 29'70' WEST, 263.86 FEET ALONG THE BOUNDARY
LINES OF SAID BLOCK 15 AND TO THE POINT OF BEGINNING.

EXCEPT LOTS 53 AND 54 INCLUSIVE, IN BLOCK 18 OF SAID MODJESKA PARK.

ALSO EXCEPT THEREFROM THOSE PORTIONS INCLUDED WITHIN THE LINES OF GRAPE
STREET, APRICOT STREET AND BEECHWOOD AVENUE AS SHOWN ON THE MAP OF SAID
MODJESKA PARK.

ALSO EXCEPT THEREFROM THAT PORTION THEREOF LYING WITHIN SAID BLOCK 17.

ALSO EXCEPT ALL CRUDE OIL, PETROLEUM, MINERALS AND KINDRED SUBSTANCES LYING BELOW A DEPTH OF 500 FEET FROM THE SURFACE THEREOF, BUT WITHOUT RIGHT OF SURFACE ENTRY, AS RESERVED BY HAROLD L. BABB AND SADIE M. BABB, BY DEED RECORDED JUNE 1, 1971, IN BOOK D-5074 PAGE 5, OFFICIAL RECORDS, AS TO LOT 11, BLOCK 18 OF SAID TRACT, AND RESERVED BY CARL A. NORDBAK, ET AL., BY DEED RECORDED JUNE 1, 1971, IN BOOK D-5074 PAGE 112, OFFICIAL RECORDS, AS TO LOTS 59, 60 AND THE EAST 15 FEET OF LOT 61, IN SAID BLOCK 18, AND RESERVED BY WILLIE G. MEANY, AN UNMARRIED WOMAN, BY DEED RECORDED JUNE 1, 1971, IN BOOK D-5074 PAGE 79, OFFICIAL RECORDS, AS TO LOTS 69 AND 70, IN BLOCK 18 OF SAID TRACT.

ALSO EXCEPT ALL CRUDE OIL, PETROLEUM, MINERALS AND KINDRED SUBSTANCES IN AND UNDER LOTS 23 AND 24 AND THE WESTERLY 7 FEE OF LOT 25, ALL IN BLOCK 18 OF SAID TRACT, LYING BELOW A DEPTH OF 300 FEET FROM THE SURFACE THEREOF, BUT WITHOUT RIGHT OF SURFACE ENTRY, AS RESERVED BY DELORES JUNE RATZLAFF SMITH, ET AL., BY DEED RECORDED JUNE 1, 1971, IN BOOK D-5074 PAGE 83, OF OFFICIAL RECORDS.

PARCEL 2: PORTION OF APN: 6171-001-054

THOSE PORTIONS OF BEECHWOOD AVENUE AND GRAPE STREET IN MODJESKA PARK, AS VACATED BY RESOLUTION NO. 71-34, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, A CERTIFIED COPY THEREOF BEING RECORDED MAY 20, 1971 AS INSTRUMENT NO. 3445, IN BOOK D-5063 PAGE 937, OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCELS 1 AND 2 ARE ALSO DESCRIBED AS FOLLOWS:

THOSE PORTIONS OF THE MODJESKA PARK, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWESTERLY CORNER OF LOT 17 IN BLOCK 15 OF SAID MODJESKA PARK; THENCE NORTH 18° 01' 23" EAST ALONG THE WESTERLY LINE OF SAID BLOCK 352.97 FEET TO THE NORTHWESTERLY CORNER OF SAID BLOCK 15; THENCE NORTH 16° 23' 16" EAST 50.87 FEET TO THE SOUTHWESTERLY CORNER OF LOT 10 IN BLOCK 18 OF SAID MODJESKA PARK; THENCE NORTH 5° 48' 32" EAST ALONG THE WESTERLY LINE OF SAID BLOCK 18, A DISTANCE OF 230.02 FEET TO THE SOUTHERLY LINE OF IMPERIAL HIGHWAY 100 FEET WIDE; THENCE EASTERLY ALONG SAID HIGHWAY, SOUTH 84° 12' 05" EAST, 630.08 FEET TO THE NORTHWESTERLY LINE OF LOT 54 OF SAID MODJESKA PARK; THENCE SOUTH 05° 46' 54" WEST 99.95 FEET TO THE SOUTHWESTERLY CORNER OF LOT 54; THENCE SOUTH 84° 12' 24" EAST 50.01 FEET TO THE SOUTHEASTERLY CORNER OF LOT 53 OF SAID MODJESKA PARK; THENCE NORTHERLY ALONG THE EASTERLY LINE OF SAID LOT 53 NORTH 05° 46' 54" EAST 99.95 FEET TO SAID SOUTHERLY LINE IMPERIAL HIGHWAY 100 FEET WIDE; THENCE EASTERLY ALONG SAID SOUTHERLY LINE SOUTH 84° 12' 05" EAST 150.27 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE NORTHERLY AND HAVING A RADIUS OF 697.35 FEET; THENCE ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 5° 43' 54" AN ARC LENGTH OF 69.76 FEET TO THE WESTERLY LINE OF PEACH STREET; THENCE SOUTHERLY ALONG SAID WESTERLY LINE OF PEACH STREET, SOUTH 15° 03' 26" EAST, 14.39 FEET; THENCE SOUTH 5° 46' 23" WEST, 89.52 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE WESTERLY AND HAVING A RADIUS OF 583.89 FEET; THENCE ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 12° 13' 22", AN ARC LENGTH OF 124.56 FEET; THENCE SOUTH 17° 59' 45" WEST, 6.88 FEET TO A POINT ON THE SOUTHERLY LINE OF BLOCK 18 IN SAID MODJESKA PARK; THENCE SOUTH 26° 05' 00"

WEST 53.31 FEET TO THE NORTHEAST CORNER OF LOT 1 IN BLOCK 17 OF SAID MODJESKA
PARK; THENCE SOUTH 17° 59' 45" WEST 111.29 FEET TO THE SOUTHEASTERLY CORNER OF
LOT 3 IN BLOCK 17 OF SAID MODJESKA PARK; THENCE NORTH 72° 03' 58" WEST ALONG THE
SOUTHERLY LINE OF SAID LOT, 130.66 FEET TO THE NORTHEASTERLY CORNER OF LOT 46 IN
BLOCK 17; THENCE SOUTH 17° 58' 08" WEST ALONG THE EASTERLY LINE OF LOTS 46, 45, 44,
43, 42 AND 41 IN SAID BLOCK 17, 150.07 FEET TO THE SOUTHEASTERLY CORNER OF SAID LOT
41; THENCE NORTH 72° 03' 10" WEST ALONG THE SOUTHERLY LINE OF SAID LOT 41 AND ITS
WESTERLY PROLONGATION 170.60 FEET TO THE EASTERLY LINE OF BLOCK 16 OF SAID
MODJESKA PARK; THENCE SOUTH 17° 56' 15" WEST ALONG SAID EASTERLY LINE, 234.89 FEET
TO THE SOUTHEASTERLY CORNER OF LOT 16 IN SAID BLOCK 16; THENCE NORTH 72° 00' 18"
WEST ALONG THE SOUTHERLY LINE OF SAID LOT, 130.16 FEET TO THE SOUTHWESTERLY
CORNER OF SAID LOT; THENCE NORTH 17° 57' 20" EAST ALONG THE WESTERLY LINE OF LOTS
16, 15, 14 AND 13 IN SAID BLOCK 16, A DISTANCE OF 99.99 FEET TO THE SOUTHEASTERLY
CORNER OF LOT 30 IN SAID BLOCK 16; THENCE NORTH 72° 01' 04" WEST ALONG THE
SOUTHERLY LINE OF SAID LOT AND ITS WESTERLY PROLONGATION, 170.13 FEET TO THE
EASTERLY LINE OF SAID BLOCK 15; THENCE SOUTH 17° 58' 39" WEST 196.61 FEET AND NORTH
62° 27' 15" WEST, 264.09 FEET ALONG THE BOUNDARY LINES OF SAID BLOCK 15 AND TO THE
POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS INCLUDED WITHIN THE LINES OF APRICOT STREET
AND BEECHWOOD AVENUE AS SAID STREETS ARE SHOWN ON MAP RECORDED IN BOOK 102
PAGE 32 OF RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID
COUNTY.

ALSO EXCEPT THEREFROM THAT PORTION THEREOF LYING WITHIN SAID BLOCK 17.

ALSO EXCEPT THEREFROM THAT PORTION LYING WITHIN LOTS 44 TO 52 INCLUSIVE OF SAID
BLOCK 18.

PARCEL 3: PORTION OF APN: 6171-001-054

THOSE PORTIONS OF BEECHWOOD AVENUE AND APRICOT STREET IN MODJESKA PARK, AS
VACATED BY RESOLUTION NO. 99.108 OF THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES,
STATE OF CALIFORNIA, A CERTIFIED COPY THEREOF BEING RECORDED ON AUGUST 24, 1999
AS INSTRUMENT NO. 99-1593013 AND VACATED BY RESOLUTION NO. 99.108, RECORDED
NOVEMBER 14, 2001 AS INSTRUMENT NO. 01-2173406 OFFICIAL RECORDS, IN THE OFFICE OF
THE COUNTY RECORDER OF SAID COUNTY', DESCRIBED AS FOLLOWS:

THOSE PORTIONS OF APRICOT STREET SOUTH OF BEECHWOOD AVENUE AND BEECHWOOD
AVENUE BETWEEN APRICOT STREET AND PEACH STREET OF MODJESKA PARK TRACT, IN THE
CITY OF LYN WOOD COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, MAP BOOK 9 PAGES
142 AND 143 OF MAPS, IN THE OFFICE OF THE LOS ANGELES COUNTY RECORDER, MORE
CLOSELY DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST NORTHEASTERLY CORNER OF LOT 1, BLOCK 17 OF SAID TRACT;
THENCE NORTH 84° 13' WEST 266 FEET ALONG THE NORTHERLY LINE OF SAID LOT 1 AND LOT
48, BEING THE SOUTHERLY RIGHT-OF-WAY LINE OF BEECH WOOD AVENUE, TO THE
NORTHWESTERLY CORNER OF LOT 48; THENCE SOUTH 17° 59' WEST 205 FEET ALONG THE
EASTERLY RIGHT-OF-WAY LINE OF APRICOT STREET TO THE SOUTHWESTERLY CORNER OF
LOT 41; THENCE NORTH 72° 01' WEST 40 FEET TO A POINT ON THE WESTERLY RIGHT-OF-WAY
LINE OF APRICOT STREET; THENCE ALONG SAID LINE NORTH 17° 59' EAST TO A POINT
LOCATED ON THE SOUTHERLY LINE OF LOT 28, BLOCK 18 OF SAID TRACT, SAID POINT BEING
5.64 FEET WEST OF THE SOUTHEASTERLY CORNER OF LOT 28; THENCE ALONG THE
NORTHERLY LINE OF BEECHWOOD AVENUE SOUTH 84° 13' EAST 316.02 FEET TO A POINT ON
THE SOUTHERLY LINE OF LOT 41 OF SAID TRACT, SAID POINT BING 10.38 FEET FROM THE

SOUTHWESTERLY CORNER OF SAID LOT; THENCE SOUTHWESTERLY IN A DIRECT LINE TO THE NORTHEASTERLY CORNER OF LOT 1 OF SAID TRACT BEING THE POINT OF BEGINNING.

PARCEL 4: PORTION OF APN: 6171-001-054

LOTS 53 AND 54, BLOCK 18 OF MODJESKA PARK, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 5: PORTION OF APN: 6171-001-052

LOTS 28 AND 29, IN BLOCK 16, CF MODJESKA PARK, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT ALL OIL, GAS, PETROLEUM AND OTHER MINERAL OR HYDROCARBON SUBSTANCES IN AND UNDER OR WHICH MAY BE PRODUCED FROM SAID LAND, TOGETHER WITH THE RIGHT TO USE THAT PORTION ONLY OF SAID LAND WHICH UNDERLIES A PLANE PARALLEL WITH AND 500 FEE BELOW THE PRESENT SURFACE OF SAID LAND, FOR THE PURPOSE OF PROSPECTING FOR DEVELOPING AND/OR EXTRACTING SAID OIL, GAS, PETROLEUM AND OTHER MINERAL OR HYDROCARBON SUBSTANCES FROM SAID LAND BY MEANS OF WELLS DRILLED INTO SAID SUBSURFACE OF SAID LAND FROM DRILL SITES LOCATED ON OTHER LAND, IT BEING EXPRESSLY UNDERSTOOD AND AGREED THAT EDISON SECURITIES COMPANY, ITS SUCCESSORS AND ASSIGNS, SHALL HAVE NO RIGHT TO ENTER UPON THE SURFACE OF SAID LAND, OR TO USE SAID LAND OR ANY PORTION THEREOF TO SAID DEPTH OF 500 FEET FOR ANY PURPOSE WHATSOEVER, AS RESERVED BY EDISON SECURITIES COMPANY, A CORPORATION, IN DEED RECORDED DECEMBER 16, 1958 AS INSTRUMENT NO. 4046 OFFICIAL RECORDS.

PARCEL 6: REMAINDER OF APN: 6171-001-052

THE NORTHERLY 13 FEET OF LOT 27 OF BLOCK 16 OF "MODJESKA PARK", IN THE RANCHO SAN ANTONIO, IN THE CITY OF LYNWOOD, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM, ALL OIL, GAS, PETROLEUM AND OTHER MINERAL OR HYDROCARBON SUBSTANCES IN AND UNDER, OR WHICH MAY BE PRODUCED FROM SAID LAND, TOGETHER WITH THE RIGHT TO USE THAT PORTION ONLY OF SAID LAND WHICH UNDERLIES A PLANE PARALLEL WITH AND 500 FEET BELOW THE PRESENT SURFACE OF SAID LAND, FOR THE PURPOSE OF PROSPECTING FOR DEVELOPING AND/OR EXTRACTING SAID OIL GAS, PETROLEUM AND OTHER MINERAL AND HYDROCARBON SUBSTANCES FROM SAID LAND, BY MEANS OF WELLS DRILLED INTO SAID SUBSURFACE OF SAID LAND FROM DRILL SITES LOCATED ON OTHER LAND, IT BEING EXPRESSLY UNDERSTOOD AND AGREED THAT SAID EDISON SECURITIES COMPANY, ITS SUCCESSORS AND ASSIGNS, SHALL HAVE NO RIGHT TO ENTER UPON THE SURFACE OF SAID LAND, OR TO USE SAID LAND OR ANY PORTION THEREOF, TO SAID DEPTH OF 500 FEET, FOR ANY PURPOSE WHATSOEVER, AS RESERVED IN DEED FROM EDISON SECURITIES COMPANY, RECORDED SEPTEMBER 5, 1956 AS INSTRUMENT NO. 18, IN BOOK 52213 PAGE 275, OFFICIAL RECORDS.

PARCEL 7: PORTION OF APN: 6171-001-054

THE EASTERLY 20.00 FEET OF THAT PORTION OF GRAPE STREET VACATED BY RESOLUTION NO. 2002.050 OF THE CITY COUNCIL OF THE CITY OF LYNWOOD, RECORDED APRIL 30, 2002 AS INSTRUMENT NO. 02- 995125, LYING SOUTHERLY OF THE WESTERLY PROLONGATION OF THE NORTHERLY LINE OF LOT 29 AND LYING NORTHERLY OF THE WESTERLY PROLONGATION OF A

LINE PARALLEL WITH AND 13.00 FEET SOUTHERLY OF THE NORTHERLY LINE OF LOT 27, ALL IN BLOCK 16 OF MODJESKA PARK, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 8: APN: 6171-001-056 AND 6171-007-57

LOTS 1 THROUGH 48 INCLUSIVE OF BLOCK 17 OF MODJESKA PARK, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT ALL GAS, OIL AND OTHER HYDROCARBON SUBSTANCES IN, UNDER AND/OR THAT MAY BE PRODUCED FROM A DEPTH OF 500 FEET BELOW THE SURFACE OF SAID LAND BUT WITHOUT ANY USE OF OR RIGHT IN OR TO ANY PORTION OF THE SURFACE THEREOF, TO A DEPTH OF 500 FEET, AS RESERVED BY HELMER J. RONNING AND ADAH J. RONNING, HIS WIFE, AS JOINT TENANTS, THEIR HEIRS, SUCCESSORS AND ASSIGNS, IN DEED RECORDED NOVEMBER 4, 1959 AS INSTRUMENT NO. 622, IN BOOK D - 563 PAGE 872 OFFICIAL RECORDS.

ALSO EXCEPT THEREFROM, ALL OIL, OIL RIGHTS, MINERALS, MINERAL RIGHTS, NATURAL GAS, NATURAL GAS RIGHTS, AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN THAT MAY BE WITHIN OR UNDER THE HEREIN CONVEYED PARCEL OF LAND, AND THE RIGHTS THERETO, TOGETHER WITH CERTAIN OTHER CONDITIONS, AS EXCEPTED IN THE DEED (STATE PARCEL 62085), TO THE STATE OF CALIFORNIA RECORDED NOVEMBER 26, 1971 AS INSTRUMENT NO. 931, IN BOOK D 5269 PAGE 230 OFFICIAL RECORDS.

ALSO EXCEPT THEREFROM, ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES LYING BELOW A DEPTH OF 500 FEET FROM THE SURFACE OF SAID LAND WITHOUT THE RIGHT OF SURFACE ENTRY, AS RESERVED IN THE DEED RECORDED JUNE 21, 1978 AS INSTRUMENT NO. 78-671620, OFFICIAL RECORDS.

PARCEL 9: PORTION OF APN: 6171-001-056 AND PORTION OF APN: 6171-001-057

THAT PORTION OF APRICOT STREET, AS DEDICATED BY THE MAP OF MODJESKA PARK, IN THE CITY OF LYNWOOD COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 OF MAPS, VACATED BY RESOLUTION NO. 2001.124, RECORDED NOVEMBER 14, 2001 AS INSTRUMENT NO. 01-2173405, OFFICIAL RECORDS, DESCRIBED IN SAID RESOLUTION AS BEING BOUNDED TO THE SOUTH BY THE NORTHERLY RIGHT OF WAY LINE OF FERNWOOD AVENUE, AND TO THE NORTH BY THE EXTENSION OF THE SOUTHERLY LINE OF LOT 41 OF MODJESKA PARK TRACT.

PARCEL 10: PORTION OF APN: 6171-001-057

THE WESTERLY HALF OF THAT PORTION OF PEACH STREET, AS DEDICATED BY THE MAP OF MODJESKA PARK, EN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 OF MAPS, VACATED BY RESOLUTION NO. 2002 023, RECORDED MARCH 6, 2002 AS INSTRUMENT NO. 02-536754 OFFICIAL RECORDS, SAID VACATED PORTION OF PEACH STREET DESCRIBED AS:

PEACH STREET, AS SHOWN ON MAP OF MODJESKA PARK TRACT, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, AND TRACT NO. 2551, AS PER MAP RECORDED IN BOOK 24 PAGES 78 AND 79 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER, DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE EASTERLY LINE OF PEACH STREET, 40 FEET WIDE, WITH THE SOUTHERLY LINE OF BEECHWOOD AVENUE, 50 FEET WIDE, BEING THE NORTHWEST CORNER OF LOT 249 OF SAID TRACT NO. 2551; THENCE NORTH 84° 12′ 40″ WEST 40.93 FEET MORE OR LESS, TO THE INTERSECTION OF THE WESTERLY LINE OF PEACH STREET, 40 FEET WIDE, WITH SAID SOUTHERLY LINE OF BEECHWOOD AVENUE, BEING THE NORTHEAST CORNER OF LOT 1 OF BLOCK 17 OF SAID MODJESKA PARK TRACT; THENCE ALONG SAID WESTERLY LINE OF PEACH STREET AND THE EASTERLY LINE OF LOTS 1 AND 12 INCLUSIVE, OF SAID BLOCK 17 OF SAID MODJESKA PARK TRACT, SOUTH 17° 59′ 45″ WEST 327.58 FEET TO THE WESTERLY PROLONGATION OF THE CENTERLINE OF SANBORN AVENUE, 40 FEET WIDE; THENCE ALONG LAST MENTIONED WESTERLY PROLONGATION SOUTH 84° 10′ 55″ EAST, 40.92 FEET TO SAID EASTERLY LINE OF PEACH STREET; THENCE ALONG SAID EASTERLY LINE OF SAID PEACH STREET AND THE WESTERLY LINES OF LOTS 249 AND 250 OF SAID TRACT NO. 2551, NORTH 17° 49′ 45″ EAST 327.51 FEET TO THE POINT OF BEGINNING.

PARCEL 11:  APN: 6171-001-056 AND PORTION OF 6171-001-055

LOTS 17, 18 AND 19, IN BLOCK 16 OF MODJESKA PARK, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 OF MAPS, IN THE OFFICE OF THE COUNTY' RECORDER OF SAID COUNTY.

EXCEPT THEREFROM, ALL OIL, OIL RIGHTS, MINERALS, MINERAL RIGHTS, NATURAL GAS, NATURAL GAS RIGHTS, AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN THAT MAY BE WITHIN OR UNDER THE HEREIN CONVEYED PARCEL OF LAND, AND THE RIGHTS THERETO, TOGETHER WITH CERTAIN OTHER CONDITIONS, AS EXCEPTED IN THE DEED (STATE PARCEL 62083-1), TO THE STATE OF CALIFORNIA RECORDED MAY 14, 1974 AS INSTRUMENT NO. 958, IN BOOK  D-6270 PAGE 472 OF OFFICIAL RECORDS.

PARCEL 12: PORTION OF APN: 6171-001-054

THAT PORTION OF THE WEST ONE-HALF OF GRAPE STREET, VACATED BY RESOLUTION NO. 2002.050. OF THE CITY COUNCIL OF THE CITY OF LYNWOOD RECORDED APRIL 30, 2002 AS INSTRUMENT NO. 02995125 OF OFFICIAL RECORDS.

SAID VACATED GRAPE STREET DESCRIBED AS:

THAT PORTION OF GRAPE STREET LOCATED IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, BOUNDED TO THE NORTH BY THE EXTENSION OF THE SOUTHERLY LINE OF LOT 30, BLOCK 16, TO THE WEST BY THE EASTERLY LINE OF LOTS 10 THROUGH 16 INCLUSIVE, TO THE SOUTH BY THE NORTHERLY RIGHT OF WAY LINE OF FERNWOOD AVENUE, AND TO THE EAST BY THE WESTERLY LINE OF LOTS 26 THROUGH 29 INCLUSIVE, AS SHOWN ON MAPS OF MODJESKA PARK TRACT, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 13: APN: 6171-001-046, PORTION OF APN: 6171-001-055, PORTION OF APN: 6171-007-052

THAT PORTION OF FERN WOOD AVENUE, AS DEDICATED BY THE MAP OF MODJESKA PARK, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 OF MAPS, VACATED BY RESOLUTION NO. 2002.050, RECORDED APRIL 30, 2002 AS INSTRUMENT NO. 02995125 OFFICIAL RECORDS, LYING NORTHWESTERLY OF THE SOUTHWESTERLY PROLONGATION OF THE SOUTHEASTERLY LINE OF PEACH STREET AS SHOWN ON THE MAP OF SAID MODJESKA TRACT.

EXCEPT THEREFROM THAT PORTION OF THE NORTHERLY HALF OF SAID FERNWOOD AVENUE THAT WOULD PASS WITH A LEGAL CONVEYANCE OF LOTS 20, 21, 22, 23, 24, 25 AND 26, IN BLOCK 16, OF SAID MODJESKA PARK.

PARCEL 14: APN: 6171-010-002

THAT PORTION OF RANCHO SAN ANTONIO, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, DESCRIBED AS THOSE CERTAIN STRIPS OF LAND 100.00 FEET WIDE, DESCRIBED IN DEEDS TO LOS ANGELES INTER-URBAN RAILWAY COMPANY, RECORDED IN BOOK 2509 PAGE 240 OF DEEDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, AS ACQUIRED BY THE STATE OF CALIFORNIA BY FINAL ORDER OF CONDEMNATION (STATE PARCEL 58202), RECORDED DECEMBER 6, 1990 AS INSTRUMENT NO. 90-2019955 OF OFFICIAL RECORDS IN SAID OFFICE, BOUNDED AS FOLLOWS:

ON THE WEST BY THE EASTERLY LINE OF STATE STREET 105.00 FEET WIDE; FORMERLY LONG BEACH BOULEVARD, AS DESCRIBED IN DEED RECORDED IN BOOK 2773 PAGE 311 OF DEEDS, IN SAID OFFICE AND SEGMENT 14 OF THE HIGHWAY RIGHT OF WAY RELINQUISHED TO THE CITY OF LYNWOOD BY RESOLUTION OF THE CALIFORNIA HIGHWAY COMMISSION, A CERTIFIED COPY OF WHICH RESOLUTION IS RECORDED APRIL 25, 1996 AS DOCUMENT NO. 96-650665 OF OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, AND AS SHOWN ON MAP RECORDED MARCH 6, 1995, IN SPATE HIGHWAY MAP BOOK 19 PAGES 54 AND 55, IN SAID OFFICE; ON THE NORTHEAST BY THE NORTHEASTERLY LINE OF SAID 100 FOOT STRIP; ON THE SOUTHWEST AND THE SOUTH BY THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT ON SAID EASTERLY LINE OF STATE STREET, FORMERLY LONG BEACH BOULEVARD, DISTANT SOUTH 18° 00' 3211 WEST, 44.42 FEET FROM THE INTERSECTION OF SAID EASTERLY LINE OF STATE STREET WITH THE NORTHEASTERLY LINE OF SAID 100.00 FOOT STRIP; THENCE SOUTH 62° 00' 06" EAST 432.77 FEET; THENCE SOUTH 64° 13' 52" EAST, 986.02 FEET; THENCE SOUTH 79° 10' 45" EAST TO THE SAID NORTHEASTERLY LINE OF THE 100.00 FOOT STRIP AND END OF THE HEREIN DESCRIBED LINE.

PARCEL 15: PORTION OF APN: 6171-006-035

LOTS 450, 451, 452 AND 453 OF TRACT NO. 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78, 79 AND 80 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 16: PORTION OF APN: 6171-006-037 AND UNASSIGNED APN FOR WEST HALF OF PEACH STREET

THAT PORTION OF PEACH STREET BOUNDED BY THE NORTHERLY RIGHT OF WAY LINE OF FERNWOOD AVENUE (VACATED) AND THE ELONGATION OF THE CENTERLINE OF SANBORN AVENUE, 40 FEET WIDE; AS SHOWN ON TRACT NO. 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78, 79 AND 80 OF INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, AS VACATED BY RESOLUTION NO. 2003.064, OF THE CITY' COUNCIL OF THE CITY OF LYNWOOD, RECORDED MAY 1, 2003 AS INSTRUMENT NO. 03-1251383 OF OFFICIAL RECORDS.

EXCEPT THE EASTERLY ONE-HALF OF SAID PEACH STREET, LYING NORTHERLY OF THE WESTERLY PROLONGATION OF THE SOUTHERLY LINE OF LOT 449 OF SAID TRACT NO. 2551 AND SOUTHERLY OF THE WESTERLY PROLONGATION OF THE CENTER LINE OF SAID SANBORN AVENUE.

PARCEL 17: PORTION OF APN: 6171-006-038

THAT PORTION OF FERN WOOD AVENUE, AS DEDICATED BY THE MAP OF MODJESKA TRACT, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 OF MAPS, AND TRACT NO. 2551, AS PER MAP RECORDED IN BOOK 24 PAGES 78 TO 80 INCLUSIVE OF MAPS, VACATED BY RESOLUTION NO. 2002.050, RECORDED APRIL 30, 2002 AS INSTRUMENT NO. 02-995125, OF OFFICIAL RECORDS, BOUNDED ON THE WEST BY THE SOUTHWESTERLY PROLONGATION OF THE SOUTHEASTERLY LINE OF PEACH STREET AS SHOWN ON THE MAP OF SAID MODJESKA TRACT THAT WOULD PASS WITH A LEGAL CONVEYANCE OF LOT 453 OF SAID TRACT NO. 2551.

PARCEL 18: PORTION OF APN: 6171-006-037

THAT PORTION OF CHESTER STREET 50 FEET WIDE, AS DEDICATED BY THE MAP OF TRACT NO. 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78, 79 AND 80 OF MAPS, AS VACATED BY RESOLUTION NO. 2003.180, RECORDED OCTOBER 6, 2003 AS INSTRUMENT NO. 03-2974163 OF OFFICIAL RECORDS.

SAID CHESTER STREET DESCRIBED ON SAID VACATION AS BEING BOUNDED BY THE SOUTHEASTERLY EXTENSION OF THE SOUTHERLY PROPERTY LINE OF LOT 439 AND THE NORTHERLY RIGHT OF WAY LINE OF FERNWOOD AVENUE (VACATED), AS SHOWN ON TRACT NO. 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78, 79 AND 80 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, THAT WOULD PASS WITH A LEGAL CONVEYANCE OF PARCEL 15 SHOWN ABOVE.

PARCEL 19: APN: 6171-004-017, 022, PORTION OF APN: 6171-004-032; PORTION OF APN: 6171-006-037, APN: 6171-003-035, 6171-003-039

THAT PORTION OF TRACT NO. 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA. AS PER MAP RECORDED IN BOOK 24 PAGES 78, 79 AND 80 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, TOGETHER WITH THOSE PORTIONS OF SANBORN AVENUE, PEACH STREET, COURT STREET, CHESTER STREET, PLAZA STREET, LONG BEACH BOULEVARD AND THE UNNAMED ALLEY LYING WITHIN SAID TRACT, ALL MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE CENTERLINE INTERSECTION OF LONG BEACH BOULEVARD ORIGINALLY 80 FEET WIDE, WITH THE CENTERLINE OF BEECHWOOD AVENUE, 50 FEET WIDE, AS SHOWN ON SAID MAP; THENCE SOUTH 14° 36′ 19″ EAST ALONG SAID CENTERLINE OF LONG BEACH BOULEVARD 715.17 FEET; THENCE SOUTH 75° 23′ 41″ WEST AT RIGHT ANGLES TO SAID CENTERLINE 65.00 FEET TO A POINT OF INTERSECTION IN THE NORTHERLY LINE OF LOT 312 IN SAID TRACT, WITH THE NORTHWESTERLY LINE OF THAT PARTICULAR PARCEL OF LAND ACQUIRED BY THE STATE OF CALIFORNIA PER DEED RECORDED JUNE 20, 1986 AS INSTRUMENT NO. 86-771435, FOR THE PROPOSED "CENTURY FREEWAY" AND SHOWN ON A STATE OF CALIFORNIA DIVISION OF HIGHWAYS RIGHT-OF-WAY MAP NO. F1150-6; THENCE SOUTH 02° 00′ 07″ WEST ALONG SAID NORTHWESTERLY LINE 26.09 FEET TO A POINT IN THE NORTHERLY LINE OF LOT 311 IN SAID TRACT; THENCE SOUTH 75° 23′ 53″ WEST ALONG SAID LAST MENTIONED NORTHERLY LINE, THE NORTHERLY LINE OF LOT 338 IN SAID TRACT AND THE WESTERLY PROLONGATION THEREOF, 203.56 FEET TO A POINT IN THE CENTERLINE OF PLAZA STREET, 40 FEET WIDE, AS SHOWN ON SAID TRACT; THENCE NORTH 14° 351 48" WEST ALONG SAID CENTERLINE 130.00 FEET; THENCE SOUTH 75° 23′ 41″ WEST, AT RIGHT ANGLES TO SAID CENTERLINE OF LONG BEACH BOULEVARD, 20.00 FEET TO A POINT IN THE EASTERLY LINE OF LOT 413 IN SAID TRACT; THENCE NORTH 14° 35' 48" ALONG SAID EASTERLY LINE, 21.81

FEET TO THE MOST NORTHERLY CORNER OF SAID LOT 413; THENCE SOUTH 28° 51' 11" WEST ALONG THE WESTERLY LINE OF SAID LOT 413, A DISTANCE OF 30.01 FEET; THENCE LEAVING SAID WESTERLY LINE SOUTH 75° 23' 41" WEST AT RIGHT ANGLES TO SAID CENTERLINE OF LONG BEACH BOULEVARD, 34.44 FEET TO A POINT IN THE CENTERLINE OF COURT STREET 50 FEET WIDE AS SHOWN ON SAID TRACT; THENCE SOUTH 28° 51' 11" WEST, ALONG SAID CENTERLINE 94.03 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE NORTHWESTERLY AND HAVING A RADIUS OF 519.71 FEET; THENCE SOUTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 08° 41' 10" AN ARC LENGTH OF 78.79 FEET NORTH 52° 27' 02" WEST ALONG A RADIAL LINE TO SAID CURVE, 25.00 FEET TO THE MOST EASTERLY CORNER OF LOT 424 OF SAID TRACT; THENCE NORTH 52° 24' 33" WEST ALONG THE NORTHEASTERLY LINE OF SAID LOT, 100,03 FEET TO THE NORTHERLY CORNER THEREOF, SAID NORTHERLY CORNER ALSO BEING IN THE SOUTHEASTERLY LINE OF LOT B, 18,5 FEET WIDE, AS SHOWN ON SAID TRACT; THENCE NORTH 53° 12' 47" WEST 43.48 FEET TO A POINT IN WE CURVED CENTERLINE OF CHESTER STREET, 50 FEET WIDE, AS SHOWN ON SAID TRACT, SAID CURVE HAVING A RADIUS OF 351.21 FEET, WITH A RADIAL LINE TO SAID POINT BEING SOUTH 52° 22' 05" EAST; THENCE NORTHEASTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 08° 46' 07", AN ARC LENGTH OF 53.75 FEET TO A POINT OF TANGENCY IN SAID CENTERLINE, SAID POINT ALSO BEING THE INTERSECTION WITH THE SOUTHEASTERLY PROLONGATION OF THE NORTHEASTERLY LINE OF LOT 439 IN SAID TRACT; THENCE NORTH 61° 08' 12" WEST ALONG SAID NORTHEASTERLY LINE AND SAID PROLONGATION THEREOF, 168.09 FEET TO AN ANGLE POINT THEREIN; THENCE 84° 10' 24" WEST ALONG THE MOST NORTHERLY LINE THEREOF 67.21 FEET TO THE MOST WESTERLY CORNER THEREOF, ALSO BEING THE SOUTHEAST CORNER OF LOT 447 IN SAID TRACT; THENCE NORTH 05° 49' 36" EAST ALONG THE EASTERLY LINE OF SAID LOT 447 AND THE NORTHERLY PROLONGATION THEREOF, 170.00 FEET TO A POINT IN THE CENTERLINE OF SANBORN AVENUE, 40 FEET WIDE, AS SHOWN ON SAID MAP; THENCE NORTH 84° 10' 24" WEST ALONG SAID CENTERLINE, 166.15 FEET TO THE INTERSECTION WITH THE CENTERLINE OF PEACH STREET, 40 FEET WIDE AS SHOWN ON SAID MAP; THENCE NORTH 17° 59' 42" EAST ALONG SAID LAST MENTIONED CENTERLINE, 353,12 FEET TO THE INTERSECTION WITH SAID CENTERLINE OF BEECHWOOD AVENUE; THENCE SOUTH 84° 12' 40" EAST ALONG SAID LAST MENTIONED CENTERLINE, 261.79 FEET TO AN ANGLE POINT THEREIN; THENCE NORTH 75° 25' 12" EAST ALONG SAID CENTERLINE, 383.75 FEET TO THE POINT OF BEGINNING.

EXCEPT THEREFROM, THOSE PORTIONS OF COURT STREET AND PLAZA STREET THAT WOULD PASS WITH THE CONVEYANCE OF LOT 413 OF SAID TRACT NO, 2551.

ALSO EXCEPT FROM PORTIONS OF LOTS 226 TO 228, ALL OIL, GAS AND OTHER MINERAL RIGHTS IN AND UNDER SAID PROPERTY, TOGETHER WITH THE EXCLUSIVE RIGHT TO USE SUCH PORTION OF SAID PROPERTY LYING MORE THAN 500 FEET BELOW THE SURFACE THEREOF FOR THE EXTRACTION OF OIL, GAS AND MINERALS FROM SAID PROPERTY OR PROPERTY IN THE VICINITY THEREOF; HOWEVER, WITH NO RIGHT OF SURFACE ENTRY WHATSOEVER, AS RESERVED AND EXCEPTED IN DEED RECORDED NOVEMBER 21, 1962 AS INSTRUMENT NO. 2511, IN BOOK D-1830 PAGE 16, OFFICIAL RECORDS.

ALSO EXCEPT FROM PORTIONS OF LOTS 229 TO 233, ALL OIL, GAS, HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND OR PRODUCED AND SAVED THEREFROM, WITHOUT ANY RIGHTS IN THE GRANTOR TO THE USE OF THE SURFACE AND THE SUBSURFACE AREAS OF SAID LAND TO A DEPTH OF 500 FEET FOR ANY PURPOSE TO PRODUCE, PROSPECT FOR AND DEVELOP ANY OF SUCH SUBSTANCES; AND ALSO SPECIFICALLY RESERVING UNTO THE GRANTOR THEREIN, RIGHTS OF WAY AND EASEMENTS IN AND THROUGH THE SUBSURFACE STRATA OF SAID LAND LYING BELOW A PLANE 500 FEET BELOW THE PRESENT SURFACE OF SAID LAND FOR THE PURPOSE OF DRILLING, PROSPECTING FOR AND DEVELOPING OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS LYING IN AND UNDER, AND THE PRODUCING INTERVALS OF WHICH ARE IN LANDS OTHER THAN THE LAND ABOVE DESCRIBED AND FROM THE SURFACE OF LANDS

OTHER THAN THE LAND ABOVE DESCRIBED, AS RESERVED BY JACKSON O. LAW, JR., IN DEED RECORDED DECEMBER 11, 1972 AS INSTRUMENT NO. 63, OFFICIAL RECORDS.

ALSO EXCEPT FROM PORTIONS OF LOTS 234 AND 235, ALL OIL, GAS, HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND OR PRODUCED AND SAVED THEREFROM, WITHOUT ANY RIGHTS IN THE (DEFENDANT OR GRANTOR) TO THE USE OF THE SURFACE AND THE SUBSURFACE AREA OF SAID LAND TO A DEPTH OF 500 FEET FOR ANY PURPOSE TO PRODUCE, PROSPECT FOR AND DEVELOP ANY SUCH SUBSTANCES; AND ALSO SPECIFICALLY RESERVING UNTO THE (DEFENDANT DR GRANTOR) THEREIN, RIGHTS OF WAY AND EASEMENTS IN AND THROUGH THE SUBSURFACE STRATA OF SAID LAND LYING BELOW A PLANE 500 FEET BELOW THE SURFACE OF SAID LAND FOR THE PURPOSE OF DRILLING, PROSPECTING FOR AND DEVELOPING OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS LYING IN AND UNDER, AND THE PRODUCING INTERVALS OF WHICH ARE IN LANDS OTHER THAN THE LAND ABOVE DESCRIBED AND FROM THE SURFACE OF LANDS OTHER THAN THE LAND ABOVE DESCRIBED, EXCEPTED BY B. DEAN CLANTON, AS HIS SEPARATE PROPERTY, IN DEED RECORDED NOVEMBER 15, 1972 AS INSTRUMENT NO. 73, OFFICIAL RECORDS.

ALSO EXCEPT FROM LOTS 246, ALL OIL, GAS, HYDROCARBON SUBSTANCES AND MINERALS OF EVERY KIND AND CHARACTER LYING MORE THAN 500 FEET BELOW THE SURFACE OF SAID LAND, TOGETHER WITH THE RIGHT TO DRILL INTO, THROUGH, AND TO USE AND OCCUPY ALL PARTS OF SAID LAND LYING MORE THAN 500 FEET BELOW THE SURFACE THEREOF FOR ANY AND ALL PURPOSES INCIDENTAL TO THE EXPLORATION FOR AND PRODUCTION OF OIL, GAS, HYDROCARBON SUBSTANCES OR MINERALS FROM SAID LAND OR OTHER LANDS BUT WITHOUT, HOWEVER, ANY RIGHT TO USE EITHER THE SURFACE OF SAID LAND OR ANY PORTION OF SAID LAND WITHIN 500 FEET OF THE SURFACE FOR ANY PURPOSE OR PURPOSES WHATSOEVER, IN DEED RECORDED JANUARY 5, 1978 AS INSTRUMENT NO. 78-11639, OFFICIAL RECORDS.

ALSO EXCEPT FROM LOTS 249, ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES IN UPON OR UNDERLYING SAID LAND WITHOUT THE RIGHT OF ENTRY ABOVE THE DEPTH OF 100 FEET BELOW THE SURFACE OF SAID LAND, AS RESERVED BY ALICE M. WILLIS, A MARRIED WOMAN WHO ACQUIRED TITLE AS ALICE M. MATYSHAK, A WIDOW AND HAROLD L. WILLIS, HER HUSBAND, RECORDED MAY 5, 1959 AS INSTRUMENT NO. 1535, IN BOOK D-455 PAGE 928 OF OFFICIAL RECORDS.

ALSO EXCEPT FROM LOT 253, ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES LYING BELOW A VERTICAL DEPTH OF 500 FEET FROM THE SURFACE OF SAID LAND WITHOUT THE RIGHT OF SURFACE ENTRY THEREOF, IN DEED RECORDED DECEMBER 22, 1977 AS INSTRUMENT NO. 77-1411432, OFFICIAL RECORDS.

ALSO EXCEPT FROM SAID LOT 321 THEREFROM, ALL OIL, GAS, HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND OR PRODUCED AND SAVED THEREFROM WITHOUT ANY RIGHTS IN AND TO THE USE OF THE SURFACE AND THE SUBSURFACE AREAS OF SAID LAND TO A DEPTH OF 500 FEET FOR ANY PURPOSE TO PRODUCE PROSPECT FOR AND DEVELOP ANY OF SUCH SUBSTANCES AND ALSO SPECIFICALLY RESERVING THE HEREIN RIGHTS OF WAY AND EASEMENTS IN AND THROUGH THE SUBSURFACE STRATA OF SAID LAND LYING BELOW A PLANE 500 FEET BELOW THE SURFACE OF SAID LAND, FOR THE PURPOSE OF DRILLING, PROSPECTING FOR AND DEVELOPING OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS LYING IN AND UNDER, AND THE PRODUCING INTERVALS OF WHICH ARE IN LANDS OTHER THAN THE LAND ABOVE DESCRIBED AND FROM THE SURFACE OF LANDS OTHER THAN THE LAND ABOVE DESCRIBED, AS PROVIDED IN THE DEED RECORDED APRIL 10, 1974 AS INSTRUMENT NO. 11, OFFICIAL RECORDS.

ALSO EXCEPT FROM LOT 133, ALL OIL, GAS, HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND OR PRODUCED AND SAVED THEREFROM WITHOUT ANY RIGHTS IN THE GRANTOR TO THE USE OF THE SURFACE AND THE SUBSURFACE AREAS OF SAID LAND TO A DEPTH OF 500 FEET FOR ANY PURPOSE TO PRODUCE, PROSPECT FOR AND DEVELOP ANY OF SUCH SUBSTANCES; AND ALSO SPECIFICALLY RESERVING UNTO THE GRANTOR THEREIN, RIGHTS OF WAY AND EASEMENTS IN AND THROUGH THE SUBSURFACE STRATA OF SAID LAND LYING BELOW A PLANE 500 FEET BELOW THE SURFACE OF SAID LAND FOR THE PURPOSE OF DRILLING, PROSPECTING FOR AND DEVELOPING OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS LYING IN AND UNDER, AND THE PRODUCING INTERVALS OF WHICH ARE IN LANDS OTHER THAN THE LAND ABOVE DESCRIBED AND FROM THE SURFACE OF LANDS OTHER THAN THE LAND ABOVE DESCRIBED, AS RESERVED BY JACKSON O. LAW, JR., RECORDED DECEMBER 11, 1972 AS INSTRUMENT NO. 63, OFFICIAL RECORDS.

ALSO EXCEPT THAT PORTION THEREOF LYING BELOW A DEPTH OF 500 FEET, MEASURED VERTICALLY, FROM THE CONTOUR OF THE SURFACE OF SAID PROPERTY HOWEVER, GRANTOR, OR ITS SUCCESSORS AND ASSIGNS, SHALL NOT HAVE THE RIGHT FOR ANY PURPOSE WHOSOEVER TO ENTER UPON INTO OR THROUGH THE SURFACE OF SAID PROPERTY OR ANY PART THEREOF LYING BETWEEN SAID SURFACE AND 500 FEET BELOW THE SURFACE, AS RESERVED IN DEED RECORDED DECEMBER 15, 1986 AS INSTRUMENT NO. 86-1733235, OFFICIAL RECORDS.

EXCEPT THEREFROM ALL OIL, OIL RIGHTS, MINERALS, MINERAL RIGHTS, NATURAL GAS, NATURAL GAS RIGHTS, AND OTHER HYDROCARBON BY WHATSOEVER NAME KNOWN THAT MAY BE WITHIN OR UNDER THE PARCEL OF LAND HEREIN ABOVE DESCRIBED, TOGETHER WITH THE PERPETUAL RIGHT OF DRILLING, MINING, EXPLORING, AND OPERATING THEREFORE AND REMOVING THE SAME FROM SAID LAND OR ANY OTHER LAND, INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL AND MINE FROM LANDS OTHER THAT THOSE HEREINABOVE DESCRIBED, OIL OR GAS WELLS, TUNNELS, AND SHAFTS INTO, THROUGH OR ACROSS THE SUBSURFACE OF THE LAND HEREINABOVE DESCRIBED, AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS, TUNNELS AND SHAFTS UNDER AND BENEATH OR BEYOND THE EXTERIOR LINES THEREOF, AND TO REDRILL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE ANY SUCH WELLS OR MINES, WITHOUT, HOWEVER, THE RIGHT TO DRILL, MINE, EXPLORE AND OPERATE THROUGH THE SURFACE OR THE UPPER 100 FEET
OF THE SUBSURFACE OF THE LAND HEREINABOVE DESCRIBED OR OTHERWISE IN SUCH MANNER AS TO ENDANGER THE SAFETY OF ANY HIGHWAY THAT MAY BE CONSTRUCTED ON SAID LANDS, AS RESERVED BY MARTHA L. FUHRMAN, A WIDOW, IN DEED RECORDED AUGUST 17, 1973 AS INSTRUMENT NO. 1068, OFFICIAL RECORDS.

PARCEL 20: PORTION OF APN: 6171-004-032

LOT 413, TRACT 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78 TO 80 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 21: PORTION OF APN: 6171-006-037

LOT 449 OF TRACT NO. 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78 TO 80 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM THE SOUTHERLY 55 FEET, MEASURED ALONG THE EASTERLY LINE OF SAID LOT.

PARCEL 22: PORTION OF APN: 6171-006-037

LOT 447 OF TRACT NO. 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78 TO 80 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 23: PORTION OF APN: 6171-006-037

THE NORTH 95 FEET OF LOT 448 OF TRACT NO. 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78 TO 80 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 24: PORTION OF APN: 6171-006-037

THE SOUTH 55 FEET OF LOTS 448 AND 449 OF TRACT NO, 2551, IN THE CITY OF LYNWOOD, COUNTY' OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78, 79 AND 80 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 25: PORTION OF APN: 6171-006-037

LOTS 424 THROUGH 427 INCLUSIVE OF TRACT NO. 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78 TO 80 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 26: PORTION OF APN: 6171-006-037

LOT B OF TRACT NO, 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78 TO 80 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM, THAT PORTION LYING NORTHEASTERLY OF THE NORTHWESTERLY PROLONGATION OF THE NORTHEASTERLY LINE OF LOT 424 OF SAID TRACT NO, 2551.

ALSO EXCEPT THEREFROM THAT PORTION THEREOF LYING BELOW A DEPTH OF 500 FEET MEASURED VERTICALLY, FROM THE CONTOUR OF THE SURFACE OF SAID PROPERTY; HOWEVER, GRANTOR, OR ITS SUCCESSORS AND ASSIGNS, SHALL NOT HAVE THE RIGHT FOR ANY PURPOSE WHATSOEVER TO ENTER UPON INTO OR THROUGH THE SURFACE OF SAID PROPERTY, OR ANY PART THEREOF LYING BETWEEN SAID SURFACE AND 500 FEET BELOW SAID SURFACE, AS RESERVED BY SOUTHERN PACIFIC TRANSPORTATION COMPANY, A DELAWARE CORPORATION SUCCESSOR BY MERGER TO SOUTHERN PACIFIC COMPANY, A DELAWARE CORPORATION WHICH ACQUIRED TITLE AS PACIFIC ELECTRIC RAILWAY CO., IN DEED RECORDED DECEMBER 15, 1986 AS INSTRUMENT NO. 86-1733235, OFFICIAL RECORDS.

PARCEL 27: PORTION OF APN: 6171-006-037

LOTS 434 THROUGH 439 INCLUSIVE, OF TRACT 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78, 79 AND 80 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY'.

EXCEPT THEREFROM THAT PORTION OF LOTS 436, 437 AND 438 OF SAID TRACT 2551. QUITCLAIMED TO THE CITY OF LYNWOOD BY DEED RECORDED FEBRUARY 27, 2007 AS INSTRUMENT NO. 07-0424849, OF OFFICIAL RECORDS.

PARCEL 28: PORTION OF APN: 6171-006-037

THE EASTERLY ONE-HALF OF THAT PORTION OF PEACH STREET (VACATED) BOUNDED SOUTHERLY BY THE WESTERLY PROLONGATION OF THE SOUTHERLY LINE OF LOT 449 OF SAID TRACT NO. 2551, AND NORTHERLY BY THE ELONGATION OF THE CENTERLINE OF SANBORN AVENUE, 40 FEET WIDE; TOGETHER WITH THE SOUTHERLY HALF OF SANBORN AVENUE BOUNDED BY THE EASTERLY RIGHT OF WAY LINE OF SAID PEACH STREET AND THE ELONGATION OF THE EASTERLY LINE OF LOT 447, AS SHOWN ON TRACT NO. 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78 TO SO INCLUSIVE OF MAPS, IN THE OFFICE OF THE LOS ANGELES COUNTY RECORDER, AS VACATED BY RESOLUTION ND. 2003-064, OF THE CITY COUNCIL OF THE CITY OF LYNWOOD, RECORDED MAY 1, 2003 AS INSTRUMENT NO. 03-1251383, OF OFFICIAL RECORDS.

PARCEL 29: PORTION OF APN: 6171-006-037

THAT PORTION OF CHESTER STREET BOUNDED BY THE EASTERLY PROPERTY LINE OF LOT 439, THE SOUTHEASTERLY EXTENSION OF THE SOUTHERLY PROPERTY LINE OF LOT 439, THE CENTERLINE OF CHESTER STREET (50 FEET WIDE), AND THE SOUTHEASTERLY EXTENSION OF THE NORTHERLY PROPERTY LINE OF LOT 439, AS SHOWN ON TRACT NO. 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78 TO 80 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, AS VACATED BY RESOLUTION NO. 2003-076, CITY COUNCIL OF THE CITY OF LYNWOOD, RECORDED MAY 29, 2003 AS INSTRUMENT NO. 03-1533727, OF OFFICIAL RECORDS.

PARCEL 30: PORTION OF APN: 6171-004-032

THAT PORTION OF COURT STREET AND PLAZA STREET BOUNDED BY THE NORTHWESTERLY EXTENSION OF THE NORTHERLY RIGHT OF WAY LINE OF MULFORD AVENUE (40 FEET WIDE), THE CENTERLINE OF COURT STREET (50 FEET WIDE AND PARTIALLY VACATED) FROM MULFORD AVENUE TO THE CENTERLINE OF PLAZA STREET (40 FEET WIDE AND PARTIALLY VACATED), THE CENTERLINE OF PLAZA STREET FROM COURT STREET TO THE SOUTHWESTERLY EXTENSION OF THE SOUTHERLY PROPERTY LINE OF LOT 337, THE EASTERLY PROPERTY' LINE OF 413, AND THE WESTERLY PROPERTY LINE OF LOT 413, AS SHOWN ON TRACT NO, 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78 TO 80 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, AS VACATED BY RESOLUTION NO. 2003-076, CITY COUNCIL, CITY OF LYNWOOD, RECORDED MAY 29, 2003 AS INSTRUMENT NO. 03-1533727, OF OFFICIAL RECORDS.

PARCEL 31: PORTION OF APN: 6171-006-038

THAT PORTION OF FERN WOOD AVENUE, AS DEDICATED BY THE MAP OF MODJESKA TRACT, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 OF MAPS, AND TRACT NO, 2551, AS PER MAP RECORDED IN BOOK 24 PAGES 78 TO 80 INCLUSIVE OF MAPS, VACATED BY RESOLUTION NO. 2002.050, RECORDED APRIL 30, 2002 AS INSTRUMENT NO. 02-995125 OF OFFICIAL RECORDS, THAT WOULD PASS WITH A LEGAL CONVEYANCE OF PARCELS 26, 27 AND 32 SHOWN HEREIN.

PARCEL 32: PORTION OF APN: 6171-006-035

THAT PORTION OF CHESTER STREET, 50 FEET WIDE, AS DEDICATED BY THE MAP OF TRACT NO. 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS

PER MAP RECORDED IN BOOK 24 PAGES 78, 79 AND 80 OF MAPS, AS VACATED BY RESOLUTION NO. 2003.180, RECORDED OCTOBER 6, 2003 AS INSTRUMENT NO. 03-2974163 OF OFFICIAL RECORDS, SAID CHESTER DESCRIBED ON SAID VACATION AS BEING BOUNDED BY THE SOUTHEASTERLY EXTENSION OF THE SOUTHERLY PROPERTY LINE OF LOT 439 AND THE NORTHERLY RIGHT OF WAY LINE OF FERNWOOD AVENUE (VACATED), AS SHOWN ON TRACT NO, 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78 TO 80 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM THAT PORTION THEREOF THAT WOULD PASS WITH A LEGAL CONVEYANCE OF LOT 453 OF SAID TRACT NO. 2551.

SAID PARCELS 1 THROUGH 32 INCLUSIVE ARE ALSO KNOWN AS PARCELS 1 THROUGH 5 INCLUSIVE OF PARCEL MAP NO. 26625, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP FILED IN BOOK 356 PAGES 38 TO 69 INCLUSIVE OF PARCEL MAPS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 33:

A NON-EXCLUSIVE RECIPROCAL ACCESS INGRESS AND EGRESS EASEMENT, SUBJECT TO ALL THE TERMS, PROVISIONS, AND CONDITIONS THEREIN CONTAINED, IN THAT CERTAIN EASEMENT AGREEMENT RECORDED AUGUST 22, 1991 AS INSTRUMENT NO. 91-1323309, OF OFFICIAL RECORDS.

**Exhibit 3**

# Delaware

*Page 1*

### The First State

CERTIFICATE

SEARCHED APRIL 9, 2021 AT 4:40 P.M.
FOR DEBTOR, PLAMEX INVESTMENT LLC

| 1 OF 1 | FINANCING STATEMENT | 20163673454 |

EXPIRATION DATE: 06/17/2026

DEBTOR:       PLAMEX INVESTMENT, LLC

              3100 E. IMPERIAL HIGHWAY          ADDED    06-17-16

              LYNWOOD, CA US 90302

SECURED:      NATIXIS, NEW YORK BRANCH

              1251 AVENUE OF THE AMERICAS       ADDED    06-17-16

              NEW YORK, NY US 10020

SECURED:      NATIXIS REAL ESTATE CAPITAL LLC

              1251 AVENUE OF THE AMERICAS       ADDED    06-23-16

              NEW YORK, NY US 10020

SECURED:      WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE*

              9062 OLD ANNAPOLIS ROAD           ADDED    09-23-16

              COLUMBIA, MD US 21045


F I L I N G   H I S T O R Y



Jeffrey W. Bullock, Secretary of State

# Delaware

*Page 2*

### The First State

| | | | |
|---|---|---|---|
| *20163673454* | *FILED 06-17-16* | *AT 7:05 P.M.* | *FINANCING STATEMENT* |
| *20163787213* | *FILED 06-23-16* | *AT 4:00 P.M.* | *FULL ASSIGNMENT* |
| *20165848021* | *FILED 09-23-16* | *AT 4:12 P.M.* | *FULL ASSIGNMENT* |
| *20210170002* | *FILED 01-07-21* | *AT 12:45 P.M.* | *CONTINUATION* |

**E N D   O F   F I L I N G   H I S T O R Y**

*THE UNDERSIGNED FILING OFFICER HEREBY CERTIFIES THAT THE ABOVE
LISTING IS A RECORD OF ALL PRESENTLY EFFECTIVE FINANCING STATEMENTS,
LAPSED FINANCING STATEMENTS, FEDERAL TAX LIENS AND UTILITY SECURITY
INSTRUMENTS FILED IN THIS OFFICE WHICH NAME THE ABOVE DEBTOR, PLAMEX
INVESTMENT LLC AS OF APRIL 5, 2021 AT 11:59 P.M.*



Jeffrey W. Bullock, Secretary of State

20216732878-UCC11
SR# 20211244233

Authentication: 202936172
Date: 04-09-21

You may verify this certificate online at corp.delaware.gov/authver.shtml

**STEWART TITLE**

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

*Delaware*

Delaware Department of State
U.C.C. Filing Section
Filed: 07:05 PM 06/17/2016
U.C.C. Initial Filing No: 2016 3673454

Service Request No:  20164527814

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Winston & Strawn LLP
200 Park Avenue
New York, New York 10166
Attention: Corey A. Tessler, Esq.

01180- 206422

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME |  |  |  |
|---|---|---|---|
| PLAMEX INVESTMENT, LLC |  |  |  |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3100 East Imperial Highway | Lynwood | CA | 90302 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME |  |  |  |
|---|---|---|---|
|  |  |  |  |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME |  |  |  |
|---|---|---|---|
| NATIXIS, NEW YORK BRANCH |  |  |  |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1251 Avenue of the Americas | New York | NY | 10020 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

**ALL OF THE DEBTOR'S RIGHT, TITLE AND INTEREST, WHETHER NOW EXISTING OR HEREAFTER
ACQUIRED, IN AND TO ALL PERSONAL PROPERTY OF DEBTOR, WHEREVER LOCATED AND THE PROCEEDS
AND PRODUCTS, WHETHER TANGIBLE OR INTANGIBLE, THEREOF.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
85499.82   (To be filed with the Delaware Secretary of State)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

STEWART TITLE

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

⌐  Winston & Strawn LLP
   200 Park Avenue
   New York, New York 10166
   Attention: Corey A. Tessler, Esq.

L   01180 - 2006422                                                   ⌐

**Delaware Department of State**
**U.C.C. Filing Section**
Filed: 04:00 PM 06/23/2016
U.C.C. Initial Filing No: 2016 3673454
Amendment No: 20163787213
Service Request No:  20164617339

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # 2016 3673454 , Filed 6/17/2016 | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☒ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor  or  ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party. | ☐ DELETE name: Give record name to be deleted in item 6a or 6b. | ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME  NATIXIS REAL ESTATE CAPITAL LLC | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 7c. MAILING ADDRESS 1251 Avenue of the Americas | CITY New York | STATE NY | POSTAL CODE 10020 | COUNTRY USA |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION limited liability company | 7f. JURISDICTION OF ORGANIZATION Delaware | 7g. ORGANIZATIONAL ID #, if any ☐ NONE |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted  or  ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME  NATIXIS, NEW YORK BRANCH | | | |
|---|---|---|---|
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA
(85499.82 - Senior Loan)   To be filed with the Delaware Secretary of State    Debtor: PLAMEX INVESTMENT, LLC

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)
NYUCC3PNAT - 12/10/2002 C T System Online

## UCC FINANCING STATEMENT **AMENDMENT**

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
VANESSA A. ORTA (405)236-0003

B. E-MAIL CONTACT AT FILER (optional)
MMAGGIO@MCCOY-ORTA.COM

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

MCCOY & ORTA

100 N. BROADWAY

26TH FLOOR

OKLAHOMA CITY, OK 73102

**Delaware Department of State**
**U.C.C. Filing Section**
Filed: 04:12 PM 09/23/2016
**U.C.C. Initial Filing No: 2016 3673454**
**Amendment No: 20165848021**
**Service Request No: 20165924513**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
**20163673454**

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]
(or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☑ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:
This Change affects ☐ Debtor or ☐ Secured Party of record

**AND** Check one of these three boxes to:
☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | **WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE*** | | | |
| OR | 7b. INDIVIDUAL'S SURNAME | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **9062 OLD ANNAPOLIS ROAD** | **COLUMBIA** | **MD** | **21045** | **US** |

8. ☑ **COLLATERAL CHANGE:** Also check one of these four boxes:  ☐ ADD collateral   ☐ DELETE collateral   ☐ RESTATE covered collateral   ☑ ASSIGN collateral
Indicate collateral:
**All Collateral Assigned as in Original UCC.        *FOR MORGAN STANLEY CAPITAL I TRUST 2016-UBS11, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2016-UBS11, AND ON BEHALF OF THE HOLDERS OF ANY RELATED SERVICED SUBORDINATE COMPANION LOAN OR SERVICED COMPANION LOAN**

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | **NATIXIS REAL ESTATE CAPITAL LLC** | | | |
| OR | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |

10. OPTIONAL FILER REFERENCE DATA:
**6826.002 - PLAZA MEXICO - LOS ANGELES  (DE SOS)**

International Association of Commercial Administrators

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

Delaware Department of State
U.C.C. Filing Section
Filed: 12:45 PM 01/07/2021
U.C.C. Initial Filing No: 2016 3673454
Amendment No: 2021 0170002
Service Request No: 20210048607

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
CSC    1-800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**
SPRFiling@cscglobal.com

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

2042 56394
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Delaware
(S.O.S.)

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
2016 3673454 06/17/2016

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]
(or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT** (full or partial):  Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☑ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:
This Change affects ☐ Debtor or ☐ Secured Party of record

AND  Check one of these three boxes to:
☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

6a. ORGANIZATION'S NAME Plamex Investment, LLC

OR

| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

7a. ORGANIZATION'S NAME

OR

7b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
|---|---|---|---|
| | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | USA |

8. ☐ COLLATERAL CHANGE:  Also check one of these four boxes:  ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral
Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

9a. ORGANIZATION'S NAME Wells Fargo Bank, National Association, as Trustee **

OR

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

10. OPTIONAL FILER REFERENCE DATA 030311372/tc Debtor:Plamex Investment, LLC

2042 56394

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

# UCC FINANCING STATEMENT AMENDMENT ADDENDUM
FOLLOW INSTRUCTIONS

11. INITIAL FINANCING STATEMENT FILE NUMBER:  Same as item 1a on Amendment form
2016 3673454 06/17/2016

12. NAME OF PARTY AUTHORIZING THIS AMENDMENT:  Same as item 9 on Amendment form

12a. ORGANIZATION'S NAME
Wells Fargo Bank, National Association, as Trustee **

OR

12b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

13. Name of DEBTOR on related financing statement (Name of a current Debtor of record required for indexing purposes only in some filing offices - see Instruction item 13):  Provide only one Debtor name (13a or 13b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); see Instructions if name does not fit

13a. ORGANIZATION'S NAME Debtor:Plamex Investment, LLC

OR

13b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

14. ADDITIONAL SPACE FOR ITEM 8 (Collateral):
** for Morgan Stanley Capital I Trust 2016-UBS11, Commercial Mortgage Pass-Through Certificates, Series 2016-UBS11, and on behalf of the holders of any related serviced subordinate companion loan or serviced companion loan

15. This FINANCING STATEMENT AMENDMENT:
☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing

16. Name and address of a RECORD OWNER of real estate described in item 17 (if Debtor does not have a record interest):

17. Description of real estate:

18. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT ADDENDUM (Form UCC3Ad) (Rev. 04/20/11)

**Exhibit 4**

Search Date: April 09, 2021

## CLAS
WORLDWIDE INFORMATION SERVICES

Better
Intelligence
Better
Decisions™

2020 Hurley Way, Suite 350  Sacramento, CA 95825
Local: (916) 564-7800  Fax: (916) 564-7900  Toll Free: (800) 952-5696

**Ask us about UCC eZFILE®**

## UCC Search Report

| | |
|---:|---|
| **Type of Search** | UCCs, Federal Tax Liens, State Tax Liens, and Judgments |
| **Jurisdiction/Filing Office** | State of California, Secretary of State Uniform Commercial Code Division |
| **Indexed Through** | Mar. 25, 2021 |
| **Subject Search Name** | PLAMEX INVESTMENT LLC |
| **Search Key Entered** | PLAMEX* |

## Results

Based on a search of the indices of the Uniform Commercial Code Division of the Secretary of State of California, there are no active liens of record other than those set out below. Liens reflected in this report were based on the searcher's individual search parameters, the search key entered, as well as the searcher's choice of the liens ultimately included or excluded herein. Certification can only be obtained through the office of the California Secretary of State.

 **Clear, no matches were found for the search key as detailed above.**

We assume no liability with respect to the identity of any party named or referred to in this report, nor with respect to the validity, legal effect or priority of any matter shown herein; nor, due to our inability to independently verify the accuracy of this data as provided by government and other sources, do we make any guaranty or representation as to its accuracy.

---------- **END OF REPORT** ----------

## Report Parameters

The UCC Revised Article 9 Model Administrative Rules (MARS) provide state filing offices with a set of guidelines for producing a legally compliant UCC lien search report. The search tool used to create this search report was designed to satisfy the requirements under MARS while providing the searcher with increased flexibility.

Flexible search logic generates a more inclusive search report and addresses the inconsistencies in searches performed within states that did not effectively adopt the MARS guidelines. Further, these specially designed broad-based searching features aid in the location of involuntary liens such as Federal and State Tax Liens and Judgment Liens and liens that may not be located in state databases limited to the MARS guidelines for the reporting of UCCs.

**Exhibit 5**

_____

**MEZZANINE LOAN AGREEMENT**

Dated as of June 16, 2016

Between

**3100 E. IMPERIAL INVESTMENT, LLC**,

as Borrower

and

**NATIXIS, NEW YORK BRANCH**,

as Lender

_____

NY:1814691.9

# Table of Contents

**Page**

1. DEFINITIONS; PRINCIPLES OF CONSTRUCTION ................................................... 1
   1.1 Terms and Definitions................................................................................... 1
      1.1.1 Key Terms and Definitions............................................................... 1
      1.1.2 Additional Terms and Definitions ................................................... 2
   1.2 Index of Other Definitions .......................................................................... 14
   1.3 Principles of Construction............................................................................ 14

2. GENERAL LOAN TERMS ......................................................................................... 15
   2.1 The Loan ....................................................................................................... 15
   2.2 Interest; Monthly Payments ......................................................................... 16
      2.2.1 Generally........................................................................................... 16
      2.2.2 Default Rate ...................................................................................... 16
      2.2.3 Taxes ................................................................................................. 16
      2.2.4 Requirements of Law ....................................................................... 16
   2.3 Loan Repayment and Defeasance ................................................................ 18
      2.3.1 Repayment ........................................................................................ 18
      2.3.2 Liquidation Events. .......................................................................... 18
      2.3.3 Voluntary Defeasance of the Note. ................................................. 19
      2.3.4 Permitted Prepayment ..................................................................... 21
   2.4 Release of Collateral .................................................................................... 21
      2.4.1 Release on Defeasance ..................................................................... 21
      2.4.2 Release on Payment in Full. ............................................................ 22
      2.4.3 Release of Release Parcel ................................................................ 22
   2.5 Payments and Computations ........................................................................ 24
      2.5.1 Making of Payments ........................................................................ 24
      2.5.2 Computations .................................................................................... 24
      2.5.3 Late Payment Charge ....................................................................... 24

3. CASH MANAGEMENT AND RESERVES ................................................................ 24
   3.1 Cash Management Arrangements ................................................................. 24
   3.2 Reserves ........................................................................................................ 25
   3.3 Distributions from Owner ............................................................................ 26

4. REPRESENTATIONS AND WARRANTIES............................................................. 26
   4.1 Organization; Special Purpose ..................................................................... 26
   4.2 Proceedings; Enforceability ......................................................................... 26
   4.3 No Conflicts .................................................................................................. 26
   4.4 Litigation ...................................................................................................... 27
   4.5 Agreements ................................................................................................... 27
   4.6 Title ............................................................................................................... 27
   4.7 No Bankruptcy Filing ................................................................................... 27
   4.8 Full and Accurate Disclosure....................................................................... 27
   4.9 No Plan Assets ............................................................................................. 28

i

4.10    Compliance ................................................................................................ 28
4.11    Contracts ................................................................................................... 28
4.12    Federal Reserve Regulations; Investment Company Act ............................ 28
4.13    Intentionally Omitted ............................................................................... 29
4.14    Intentionally Omitted ............................................................................... 29
4.15    Leases ...................................................................................................... 29
4.16    Fraudulent Transfer ................................................................................. 29
4.17    Ownership of Borrower and Owner .......................................................... 29
4.18    Management Agreement ............................................................................ 29
4.19    Hazardous Substances .............................................................................. 29
4.20    Principal Place of Business ...................................................................... 30
4.21    Other Debt ............................................................................................... 30
4.22    Embargoed Person .................................................................................... 30
4.23    Anti–Money Laundering ........................................................................... 30
4.24    Pledged Collateral .................................................................................... 31
4.25    Contractual Obligations ........................................................................... 31
4.26    Senior Loan Representations .................................................................... 31
4.27    Material Agreements ................................................................................ 32
4.28    OPA .......................................................................................................... 32
4.29    ISLT Pledges ............................................................................................ 32
4.30    Environmental Documents. ...................................................................... 32
4.31    Parking Agreement. .................................................................................. 32
4.32    La Curacao CAM. ..................................................................................... 33
4.33    One Green ISLT Pledges. ......................................................................... 33

5.    COVENANTS .................................................................................................... 34
5.1    Existence .................................................................................................. 34
5.2    Taxes ........................................................................................................ 34
5.3    Repairs; Maintenance and Compliance; Alterations .................................. 34
        5.3.1    Repairs; Maintenance and Compliance ......................................... 34
        5.3.2    Alterations ................................................................................... 35
5.4    Performance of Other Agreements ............................................................ 35
5.5    Cooperate in Legal Proceedings ............................................................... 35
5.6    Further Assurances ................................................................................... 36
5.7    Environmental Matters .............................................................................. 36
        5.7.1    Hazardous Substances .................................................................. 36
        5.7.2    Environmental Monitoring ............................................................ 36
5.8    Title to the Pledged Collateral .................................................................. 38
5.9    Leases ...................................................................................................... 38
        5.9.1    Generally ..................................................................................... 38
        5.9.2    Material Leases ............................................................................ 38
        5.9.3    Minor Leases ................................................................................ 39
        5.9.4    Additional Covenants with respect to Leases ................................ 40
5.10    Estoppel Statement. ................................................................................. 40
5.11    Property Management ............................................................................... 40
        5.11.1  Management Agreement ................................................................ 40
        5.11.2  Termination of Manager ............................................................... 41

ii

| 5.12 | Special Purpose Entity | 41 |
|---|---|---|
| 5.13 | Assumption in Non–Consolidation Opinion | 41 |
| 5.14 | Change In Business or Operation of Property | 41 |
| 5.15 | Certain Prohibited Actions | 42 |
| 5.16 | Prohibited Transfers | 42 |
| 5.17 | Expenses | 45 |
| 5.18 | Indemnity | 45 |
| 5.19 | Embargoed Person | 46 |
| 5.20 | Anti–Money Laundering | 47 |
| 5.21 | ERISA | 48 |
| 5.22 | Approved Capital Expenses | 48 |
| 5.23 | Approved Operating Expenses | 48 |
| 5.24 | Material Agreements | 48 |
| 5.25 | Notices | 49 |
| 5.26 | Special Distributions | 49 |
| 5.27 | Compliance with Senior Loan Documents | 49 |
| 5.28 | Refinancing or Repayment of the Senior Loan | 49 |
| 5.29 | Limitations on Securities Issuances | 49 |
| 5.30 | Limitations on Distributions | 49 |
| 5.31 | Bankruptcy-Related Covenants | 49 |
| 5.32 | Contractual Obligations | 50 |
| 5.33 | No Amendments to Senior Loan Documents | 50 |
| 5.34 | OPA | 50 |
| 5.35 | Parking Agreements | 52 |
| 5.36 | ISLT Pledges | 54 |
| 5.37 | Owner Affiliated Leases. | 54 |
| 5.39 | Tenant Insurance. | 57 |
| 5.40 | Master Lease. | 57 |

| 6. | NOTICES AND REPORTING | 59 |
|---|---|---|
| 6.1 | Notices | 59 |
| 6.2 | Borrower Notices and Deliveries | 59 |
| 6.3 | Financial Reporting | 60 |
| 6.3.1 | Bookkeeping | 60 |
| 6.3.2 | Annual Reports | 60 |
| 6.3.3 | Monthly/Quarterly Reports | 60 |
| 6.3.4 | Other Reports | 61 |
| 6.3.5 | Annual Budget | 61 |
| 6.3.6 | Breach | 62 |

| 7. | INSURANCE; CASUALTY; AND CONDEMNATION | 62 |
|---|---|---|
| 7.1 | Insurance | 62 |
| 7.1.1 | Coverage | 62 |
| 7.2 | Casualty | 62 |
| 7.2.1 | Notice; Restoration | 62 |
| 7.2.2 | Settlement | 62 |
| 7.3 | Condemnation | 63 |

NY:1814691.9

|  |  | 7.3.1 | Notice; Restoration | 63 |
|  |  | 7.3.2 | Collection of Award | 63 |
|  | 7.4 | Restoration | | 63 |
| 8. | DEFAULTS | | | 63 |
|  | 8.1 | Events of Default | | 63 |
|  | 8.2 | Remedies | | 66 |
|  |  | 8.2.1 | Acceleration | 66 |
|  |  | 8.2.2 | Remedies Cumulative | 66 |
|  |  | 8.2.3 | Severance | 67 |
|  |  | 8.2.4 | Delay | 67 |
|  |  | 8.2.5 | Lender's Right to Perform | 67 |
|  |  | 8.2.6 | Additional Mezzanine Loan Remedies | 67 |
| 9. | SENIOR LOAN | | | 69 |
|  | 9.1 | Senior Loan Estoppels | | 69 |
|  | 9.2 | Acquisition of the Senior Loan | | 69 |
|  | 9.3 | Intercreditor Agreement | | 69 |
|  | 9.4 | Deed in Lieu of Foreclosure | | 70 |
| 10. | SECONDARY MARKET PROVISIONS | | | 70 |
|  | 10.1 | Transfer of Loan | | 70 |
|  | 10.2 | Use of Information | | 71 |
|  | 10.3 | Borrower Indemnity | | 71 |
|  | 10.4 | Restructuring of Loan | | 71 |
| 11. | MISCELLANEOUS | | | 72 |
|  | 11.1 | Exculpation | | 72 |
|  | 11.2 | Brokers and Financial Advisors | | 74 |
|  | 11.3 | Retention of Servicer | | 74 |
|  | 11.4 | Survival | | 75 |
|  | 11.5 | Lender's Discretion | | 75 |
|  | 11.6 | Governing Law | | 75 |
|  | 11.7 | Modification, Waiver in Writing | | 76 |
|  | 11.8 | Trial by Jury | | 76 |
|  | 11.9 | Headings/Exhibits | | 77 |
|  | 11.10 | Severability | | 77 |
|  | 11.11 | Preferences | | 77 |
|  | 11.12 | Waiver of Notice | | 77 |
|  | 11.13 | Remedies of Borrower | | 77 |
|  | 11.14 | Prior Agreements | | 77 |
|  | 11.15 | Offsets, Counterclaims and Defenses | | 78 |
|  | 11.16 | Publicity | | 78 |
|  | 11.17 | No Usury | | 78 |
|  | 11.18 | Conflict; Construction of Documents | | 78 |
|  | 11.19 | No Third Party Beneficiaries | | 79 |
|  | 11.20 | Yield Maintenance Premium | | 79 |

iv

11.21    Assignment ........................................................................................................ 79
11.22    Counterparts ...................................................................................................... 79

Schedule 1 –    Index of Other Definitions
Schedule 2 –    Organization of Borrower
Schedule 3 –    Definition of Special Purpose Entity
Schedule 4 –    Form of Payment Guaranty
Schedule 5 –    Preapproved Replacement Parking Area

v

<u>**MEZZANINE LOAN AGREEMENT**</u>

This **MEZZANINE LOAN AGREEMENT** (as the same may be modified, supplemented, amended or otherwise changed, this "***Agreement***") , is made as of June 16, 2016, by and between **3100 E. IMPERIAL INVESTMENT, LLC**, a Delaware limited liability company (together with its permitted successors and assigns, "***Borrower***"), and **NATIXIS, NEW YORK BRANCH**, a direct branch of Natixis S.A., a société anonyme à conseil d'administration (public limited company) organized and existing under the laws of France (together with its successors and assigns, "***Lender***").

1.    **DEFINITIONS; PRINCIPLES OF CONSTRUCTION**.

    1.1    <u>**Terms and Definitions**</u>.  The following terms have the meanings set forth below:

        1.1.1    <u>**Key Terms and Definitions**</u>.

        ***Deposit Bank***:  PNC Bank,  National Association, or such other bank or depository selected by Lender in its discretion.

        ***Guarantor***:  individually and collectively, as the context may require, DONALD CHAE, a natural person, and MIN CHAE, a natural person.

        ***Interest Rate***:  a rate of interest equal to 12.50% per annum.

        ***Key Principals***:  individually and collectively, as the context may require, MIN CHAE, a natural person, and DONALD CHAE, a natural person.

        ***Manager***:  GREENLAND PROPERTY MANAGEMENT, LLC, a California limited liability company, or any successor, assignee or replacement manager appointed by Borrower in accordance with <u>Section</u> 5.11 hereof.

        ***Monthly Debt Service Payment Amount***:  shall mean interest on the unpaid Principal accrued and accruing through the last day of the Interest Period.

        ***Owner***:  PLAMEX INVESTMENT, LLC, a Delaware limited liability company.

        ***Principal***:  maximum original principal amount of $14,000,000.00.

        ***Property***:  the parcel of real property and Improvements thereon owned by Owner and encumbered by the Security Instrument; together with all rights pertaining to such real property and Improvements, and all other collateral for the Loan as more particularly described in the Granting Clauses of the Security Instrument.  The Property is located in Lynwood, Los Angeles County, California.

        ***Start–up Date***:  the earlier of (a) the third (3rd) anniversary of the date hereof and (b) the date that is two (2) years from the "start–up day" (within the meaning of Section 860G(a)(9) of the Code) of the REMIC Trust holding the Senior Note, or if more than one Senior

Note exists evidencing the Senior Loan the REMIC Trust holding the final portion of the Senior Note to be securitized.

*Stated Maturity Date*:  July 5, 2021.

**1.1.2    Additional Terms and Definitions**.

*3000 Imperial*:  3000 E. IMPERIAL, LLC, a California limited liability company.

*Affiliate*:  as to any Person, any other Person that, directly or indirectly, is in Control of, is Controlled by or is under common Control with such Person or is a director or officer of such Person or of an Affiliate of such Person.

*Approved Capital Expenses*:  Capital Expenses incurred by Owner provided that, such Capital Expenses shall either be (i) included in the approved Capital Budget for the current calendar month or (ii) approved by Lender and Senior Lender.

*Approved Leasing Expenses*:  actual out-of-pocket expenses incurred by Owner and payable to third parties that are not Affiliates of Owner, Borrower or Guarantor in leasing space at the Property pursuant to Leases entered into in accordance with the Senior Loan Documents, including brokerage commissions and Tenant improvements, which expenses (i) are (A) specifically approved by Lender and Senior Lender in connection with approving the applicable Lease, (B) incurred in the ordinary course of business and on market terms and conditions in connection with Leases which do not require Lender's or Senior Lender's approval under the Loan Documents or the Senior Loan Documents, or (C) otherwise approved by Lender, which approval shall not be unreasonably withheld or delayed, and Senior Lender, and (ii) are substantiated by executed Lease documents and brokerage agreements.

*Approved Operating Expenses*:  operating expenses incurred by Borrower or Owner which (i) are included in the approved Operating Budget for the current calendar month, (ii) are for real estate taxes, insurance premiums, electric, gas, oil, water, sewer or other utility service to the Property, or (iii) have been approved by Lender and Senior Lender.

*Bail-In Action*:  means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

*Bail-In Legislation*:  means, (a) with respect to any EEA Member Country implementing Article 55 of the Bank Recovery and Resolution Directive, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) the then applicable Commission Delegated Regulation (if any) supplementing the Bank Recovery and Resolution Directive in relation to Article 55 thereof.

*Bank Recovery and Resolution Directive*:  means Directive 2014/59/EU of the European Parliament and of the Council of the European Union.

*Bankruptcy Code*: Section 362(a) of Title 11 of the United States Code, as amended or replaced from time to time.

2

***Borrower Company Agreement***: the limited liability company agreement of Borrower.

***Business Day***:  any day other than a Saturday or a Sunday or  any day on which commercial banks in New York, New York are authorized or required to close.

***Capital Expenses***:  expenses that are capital in nature or required under GAAP to be capitalized.

***Cash Trap Period***:  has the meaning set forth in the Senior Loan Agreement.

***Clearing Account***:  the account established by Owner for the benefit of Senior Lender at the Clearing Bank for the direct deposit by Tenants of all Rents.

***Clearing Account Agreement***: that certain agreement by and among Senior Lender, Owner, Manager and Clearing Bank setting forth Owner's, Clearing Bank's and Manager's obligations relating to the establishment of the Clearing Account and the direct deposit by Tenants of all Rents to the Clearing Account.

***Clearing Bank***:  the bank selected by Owner and approved by Lender and Senior Lender, in their discretion at which the Clearing Account is established.

***Code***:  the Internal Revenue Code of 1986, as amended and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

***Collateral***:  all collateral securing or intended to secure the Debt, including the Pledged Collateral  and the Cash Management Accounts (as defined in the Senior Loan Agreement).

***Contractual Obligation***: as to any Person, any provision of any security issued by such Person or of any agreement, instrument or undertaking to which such Person is a party or by which it or any of its property is bound, or any provision of the foregoing.

***Control***:  with respect to any Person, either (i) ownership, directly or indirectly, of forty-nine percent (49%) or more of all equity interests in such Person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, through the ownership of voting securities, by contract or otherwise.

***Debt***:  the unpaid Principal, all interest accrued and unpaid thereon, any Yield Maintenance Premium and all other sums due to Lender in respect of the Loan or under any Loan Document.

***Debt Service***:  with respect to any particular period, the scheduled Principal and interest payments due under the Senior Note and Note in such period.

3

***Debt Service Coverage Ratio***:  as of any date, the ratio calculated by Lender of (i) the Net Operating Income for the twelve (12) month period ending with the most recently completed calendar month to (ii) the Debt Service with respect to such period.

***Default***:  the occurrence of any event under any Loan Document which, with the giving of notice or passage of time, or both, would be an Event of Default.

***Default Rate***:  a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law, or (ii) five percent (5%) above the Interest Rate, compounded monthly.

***Defeasance Percentage***:  the percentage derived by dividing, (i) in the case of an initial Partial Defeasance, the original principal amount of the Defeased Note by the original principal amount of the Note or (ii) in the case of a subsequent Defeasance, the amount of the subsequent Defeased Note by the original principal amount of its corresponding Undefeased Note.

***Deposit Account***:  the Eligible Account at the Deposit Bank established and controlled by Senior Lender to receive Rents from the Clearing Bank.

***Deposit Account Agreement***:  that certain agreement by and among Senior Lender, Owner and Deposit Bank establishing the Deposit Account and setting forth the parties' obligations relating to the funds transferred from the Clearing Account pursuant to the provisions of the Senior Loan Agreement.

***EEA Financial Institution***:  means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

***EEA Member Country***:  means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

***EEA Resolution Authority***:  means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

***Eligibility Requirements***:  means, with respect to any Person, that such Person (i) has total assets (in name or under management or advisement) in excess of $500,000,000 and (except with respect to a pension advisory firm, asset manager, registered investment advisor or manager or similar fiduciary) either (x) capital/statutory surplus or shareholder's equity of at least $200,000,000 or (y) market capitalization of at least $350,000,000, and (ii) is regularly engaged in the business of making or owning (or, in the case of a pension advisory firm, asset manager, registered investment advisor or manager or similar fiduciary, regularly engaged in managing investments in) commercial real estate loans (including participation interests in commercial real estate loans and mezzanine loans to direct or indirect owners of commercial

4

properties, which loans are secured by pledges of direct or indirect ownership interests in the owners of such commercial properties), originating preferred equity investments, owning or operating commercial properties or making investments in commercial real estate.

*Eligible Account*: has the meaning set forth in the Senior Loan Agreement.

*Environmental Documents*: individually and collectively, as the context may require, the Environmental CCR and the Environmental Easement.

*Environmental Report*: shall mean that certain Phase I Environmental Site Assessment Report, dated as of March 18, 2016, prepared by Partner Assessment Corporation as Partner Project No. 16-155867.1.

*ERISA*: the Employment Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

*ERISA Affiliate*: all members of a controlled group of corporations and all trades and business (whether or not incorporated) under common Control and all other entities which, together with Borrower, are treated as a single employer under any or all of Section 414(b), (c), (m) or (o) of the Code.

*Escrows*: amounts paid by Owner into Subaccounts (as defined in the Senior Loan Agreement) established for the purpose of paying Taxes, the premiums for Policies, ground rents, franchise and license fees.

*EU Bail-In Legislation Schedule*: means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

*Fiscal Year*: shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the term of the Loan.

*GAAP*: generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

*Gap Zoning Policy*: that certain Zoning Restriction Protector Policy on the Senior Lender's Non-conforming Use Form issued by Lexington Insurance Company with Lender as named insured dated as of the date hereof.

*Governmental Authority*: any court, board, agency, commission, office or authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) now or hereafter in existence.

*Intercreditor Agreement*: shall mean the intercreditor agreement between Lender, as mezzanine lender, and Senior Lender, as senior lender, as the same may be amended, restated, supplemented or otherwise modified from time to time.

5

***Interest Period***:  (i) the period from the date hereof through the next day of a calendar month that is the fourth (4th) day of such calendar month, and (ii) each period thereafter from the fifth (5th) day of each calendar month through the fourth (4th) day of the next calendar month; except that the Interest Period, if any, that would otherwise commence before and end after the Maturity Date shall end on the Maturity Date.  Notwithstanding the foregoing, in the event Senior Lender shall have elected to change the date on which scheduled payments under the Senior Loan are due, as described in the definition of "Payment Date" under the Senior Loan Agreement, from and after the effective date of such election, each Interest Period shall commence on the day of each month in which occurs such changed Payment Date under the Senior Loan Agreement and end on the day immediately preceding the following Payment Date under the Senior Loan Agreement, as so changed.

***ISLT***: ISLT INVESTMENTS LLC, a Delaware limited liability company.

***ISLT Pledge(s)***: shall mean, individually and collectively as the context may require, (a) that certain Assignment of Distributions and Security Agreement, dated as of February 1, 2011, by and between ISLT, as grantor, in favor of Beach Orangethorpe, LLC, a California limited liability company ("***Beach Orangethorpe***"), as lender, as amended by that certain First Amendment to Assignment of Distributions and Security Agreement, dated as of September 22, 2011, by and between ISLT and Beach Orangethorpe, securing that certain Guaranty, dated as of February 1, 2011, made by ISLT, MIN SEOK CHAE, an individual, and DONALD CHAE, an individual, for the benefit of Beach Orangethorpe (the "***Beach Orangethorpe Guaranty***") in connection with that certain loan from Beach Orangethorpe to The Source At Beach, LLC, a California limited liability company; and (b) that certain Assignment of Distributions and Security Agreement, dated as of February 1, 2011, by and between ISLT, as grantor, in favor of Beach Orangethorpe II, LLC, a California limited liability company ("***Beach Orangethorpe II***"), as lender, as amended by that certain First Amendment to Assignment of Distributions and Security Agreement, dated as of September 22, 2011, by and between ISLT and Beach Orangethorpe II, securing that certain Guaranty, dated as of February 1, 2011, made by ISLT, MIN SEOK CHAE, an individual, and DONALD CHAE, an individual, for the benefit of Beach Orangethorpe II (the "***Beach Orangethorpe II Guaranty***") in connection with that certain loan from Beach Orangethorpe II to The Source At Beach, LLC, a California limited liability company; each as may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms and conditions of this Agreement.

***Leases***:  all leases and other agreements or arrangements heretofore or hereafter entered into affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the Property or the Improvements, including any guarantees, extensions, renewals, modifications or amendments thereof and all additional remainders, reversions and other rights and estates appurtenant thereunder.

***Legal Requirements***: statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting Borrower, Owner, any Loan Document, any Senior Loan Document, or all or part of the Collateral or the Property or the construction, ownership, use, alteration or operation thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instrument, either

6

of record or known to Borrower or Owner, at any time in force affecting all or part of the Collateral or the Property.

***Lien***: any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest, PACE Loan or any other encumbrance, charge or transfer of, or any agreement to enter into or create any of the foregoing, on or affecting all or any part of the Collateral or the Property or any interest therein,  or any direct or indirect interest  in Borrower or Owner, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

***Loan Documents***:  this Agreement and all other documents, agreements and instruments now or hereafter evidencing, securing or delivered to Lender in connection with the Loan, including the following, each of which is dated as of the date hereof:  (i) Promissory Note made by Borrower to Lender in the principal amount equal to the Loan (the "***Note***"), (ii) the Pledge and Security Agreement (the "***Pledge***") made by Borrower in favor of Lender which covers 100% of the membership interests in Owner (the "***Pledged Collateral***") and (iii) the Guaranty of Recourse Obligations made by Guarantor; as each of the foregoing may be (and each of the foregoing defined terms shall refer to such documents as they may be) amended, restated, replaced, supplemented or otherwise modified from time to time.

***Lynwood Authority***: LYNWOOD HOUSING AUTHORITY.

***Lynwood City***: CITY OF LYNWOOD, a municipal corporation.

***Management Agreement***:  the management agreement between Owner and Manager, pursuant to which Manager is to manage the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with Section 5.11.

***Master Lease***: that certain Lease, dated as of as of the date hereof, by and between Owner, as landlord, and Master Tenant, as tenant, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms of the Loan Documents.

***Master Tenant***: PLACO FITNESS, LLC, a California limited liability company.

***Material Agreement***: each contract and agreement relating to the ownership, management, development, use, leasing, maintenance, repair or improvement of the Property, other than the Management Agreement and the Leases under which there is an obligation of Owner to pay more than $200,000 per annum or which is not terminable by its terms upon thirty (30) days written notice.

***Material Alteration***: any (i) individual alteration affecting (A) structural elements of the Property, (B) a roof of the Property or (C) any building system of the Property, or (ii) non-structural alteration the cost of which exceeds $300,000; provided, however, that in no event shall any of the following constitute a Material Alteration: (a) any Required Repairs, (b) any

7

tenant improvement work performed pursuant to any Lease (except for any tenant improvement work to be completed by Borrower or the Tenant under the Planet Fitness Lease pursuant to the Planet Fitness Lease) existing on the date hereof or entered into hereafter in accordance with the provisions of this Agreement, (c) alterations performed as part of a Restoration, or (d) any repairs or maintenance to existing structural or non-structural elements performed in the ordinary course of business that do not in the aggregate exceed $300,000. Notwithstanding the foregoing or anything to the contrary contained herein, (i) any work to be performed by or on behalf of Owner and/or Planet Fitness in connection with the construction of the premises demised under the Planet Fitness Lease, and/or (ii) any alterations, improvements and/or construction in, on, or to, the "No-Build Zone" (as defined in the Planet Fitness Lease) shall be deemed to constitute a Material Alteration.

*Material Lease*: (x) any Owner Affiliated Lease, (y) the Master Lease, or (z) any Leases which individually or in the aggregate with respect to the same Tenant and its Affiliates (i) constitute five percent (5%) or more of the Property's gross leaseable area, (ii) have a gross annual rent of five percent (5%) or more of the total annual Rents, (iii) demise at least one full floor of the Improvements, or (iv) for multifamily residential property, any Lease which is not for the residential use of the lessee thereunder.

*Maturity Date*: the date on which the final payment of principal of the Note (or the Defeased Note, if applicable) becomes due and payable as therein provided, whether at the Stated Maturity Date, by declaration of acceleration, or otherwise.

*Minor Lease*: any Lease that is not a Material Lease.

*Net Liquidation Proceeds after Debt Service*: with respect to any Liquidation Event, all amounts paid to or received by or on behalf of Owner in connection with such Liquidation Event, including, without limitation, proceeds of any sale, refinancing or other disposition or liquidation, less (a) Lender's and/or Senior Lender's reasonable and actual, out-of-pocket costs incurred in connection with the recovery thereof, (b) the costs incurred by Owner in connection with a restoration of all or any portion of the Property made in accordance with the Senior Loan Documents, (c) amounts required or permitted to be deducted therefrom and amounts paid pursuant to the Senior Loan Documents to Senior Lender, (d) in the case of a foreclosure sale, disposition or Transfer of the Property in connection with realization thereon following a Senior Loan Event of Default, such reasonable and customary costs and expenses of sale or other disposition (including attorneys' fees and brokerage commissions), (e) in the case of a foreclosure sale, such costs and expenses incurred by Senior Lender under the Senior Loan Documents as Senior Lender shall be entitled to receive reimbursement for under the terms of the Senior Loan Documents and (f) in the case of a refinancing of the Senior Loan, such costs and expenses (including attorneys' fees) of such refinancing as shall be reasonably approved by Lender.

*Net Operating Income*: for any period, the actual net operating income of the Property after deducting therefrom deposits to (but not withdrawals from) any reserves required under this Agreement and/or the Senior Loan Agreement (provided however, there shall be no deduction for deposits to the Tax and Insurance Subaccount (as defined in the Senior Loan

8

Agreement) on account of the Earthquake Insurance Policies (as defined in the Senior Loan Agreement)).

*NRSRO*: shall mean any credit rating agency that has elected to be treated as a nationally-recognized statistical rating agency for purposes of the Exchange Act irrespective of whether or not such credit rating agency has been engaged by Lender or another Indemnified Party to rate any of the Securities issued in connection with a Secondary Market Transaction involving the Loan or any portion thereof.

*Officer's Certificate*:  a certificate delivered to Lender by Borrower which is signed by a senior executive officer of Borrower.

*OPA***:** that certain Owner Participation Agreement, dated as of February 2, 2016, by and between Lynwood City, Lynwood Authority, 3000 Imperial, and Owner, as the same may be further amended, restated, consolidated, pledged and/or assigned from time to time.

*Open Prepayment Date*:  the Payment Date which is closest to the ninetieth (90th) day prior to the Stated Maturity Date for the Loan.

*Owner Affiliated Lease*: any Lease, now or hereafter, in which the Tenant is an Owner Affiliated Tenant.

*Owner Affiliated Lease Default Event*: the occurrence of any (x) monetary default or (y) material non-monetary default by an Owner Affiliated Tenant under its respective Owner Affiliated Lease.

*Owner Affiliated Tenant*: any Tenant under a Lease who is an Affiliate of Owner or Guarantor.

*Owner Company Agreement*: the limited liability company agreement of Borrower.

*PACE Loan***:** (x) any "Property-Assessed Clean Energy loan" or (y) any other indebtedness, without regard to the name given to such indebtedness, which is (i) incurred for improvements to the Property for the purpose of increasing energy efficiency, increasing use of renewable energy sources, resource conservation, or a combination of the foregoing, and (ii) repaid through multi-year assessments against the Property.

*Parking Agreement:* that certain Lease Agreement, dated as of as of the date hereof, by and between Owner and 3000 Imperial.  References in this Agreement to the Parking Agreement shall be deemed to mean the Replacement Parking Agreement, upon the replacement of the Parking Agreement pursuant to one or more Replacement Parking Agreements.

*Payment Date*:  the fifth (5th) day of each calendar month or, if such day is not a Business Day, the  immediately preceding Business Day; provided, however, that Senior Lender may elect once during the term of the Senior Loan, in its sole discretion, to change the date on which scheduled payments are due under the Senior Loan upon written notice thereof to Owner

9

setting forth such changed date, in which event, upon the effective date of such notice, the Payment Date hereunder shall be the date set forth in the Senior Loan Agreement.

**Permitted Encumbrances**: (i) the Liens created by the Loan Documents , (ii) the Liens created by the Senior Loan  Documents , (iii)  all Liens and other matters disclosed in the title insurance policy insuring the Lien of  the  Security Instrument, (iv) Liens, if any, for Taxes or other charges not yet due and payable and not delinquent , (v) any workers', mechanics' or other similar Liens on the Property provided that any such Lien is bonded or discharged within thirty (30) days after Owner first receives notice of such Lien , and (vi) such other title and survey exceptions as Lender approves in writing in Lender's discretion.

**Permitted Indebtedness**:  the Debt and unsecured trade payables incurred in the ordinary course of business relating to the ownership of the Collateral which do not exceed, at any time, a maximum amount of $25,000 and are paid within thirty (30) days of the date incurred.

**Permitted Transfers**: (i) a Lease entered into in accordance with the Loan Documents and the Senior Loan Documents,  (ii) a Special Transfer in accordance with the requirements set forth in Section 5.16, (iii) a Permitted Encumbrance, (iv) provided that no Default or Event of Default shall then exist, a Transfer of an interest in Borrower, provided that (A) such Transfer shall not (x) cause the transferee (together with its Affiliates) to acquire Control of Borrower or (y) result in Key Principal(s) no longer possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of Borrower through the ownership of voting securities, by contract or otherwise, (B) after giving effect to such Transfer, Key Principal(s) shall continue to own at least fifty-one percent (51%) of all equity interests (direct or indirect) in Borrower, (C) Borrower shall give Lender notice of such Transfer together with copies of all instruments effecting such Transfer not less than ten (10) days prior to the date of such Transfer, and (D) the legal and financial structure of Borrower and its members and the single purpose nature and bankruptcy remoteness of Borrower and its members after such Transfer, shall satisfy Lender's then current applicable underwriting criteria and requirements,  (v) a Transfer for estate planning purposes of any Key Principal's direct or indirect interests in Borrower to the spouse, child, parent, grandparent, grandchild, niece, nephew, aunt or uncle of such Key Principal, or to a trust for the benefit of such Key Principal or for the benefit of the spouse, child, parent, grandparent, grandchild, niece, nephew, aunt or uncle of such Key Principal so long as Key Principal continues to possess, directly or indirectly, the power to direct or cause the direction of the management and policies of Borrower through the ownership of voting securities, by contract or otherwise, or (vi) the ISLT Pledges as they exist as of the date hereof, solely to the extent that no Person shall, at any time, obtain any direct or indirect ownership or membership interest, or any voting, management or Control right, in or with respect to, ISLT, Placo, Owner or Borrower pursuant to any ISLT Pledge.

**Person**:  any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other person or entity, and any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

**Placo**:  PLACO INVESTMENT, LLC, a Delaware limited liability company.

10

***Plan***:  (i) an employee benefit or other plan established or maintained by Owner or Borrower or any ERISA Affiliate or to which Owner or Borrower or any ERISA Affiliate makes or is obligated to make contributions and (ii) which is covered by Title IV of ERISA or Section 302 of ERISA or Section 412 of the Code.

***Planet Fitness Lease***: that certain Lease, dated as of April 13, 2016, by and between Owner, as landlord, and SO CAL PF LYNWOOD, LLC, a Delaware limited liability company, as tenant, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms of the Senior Loan Documents.

***Qualified Institutional Lender***:

(a)     a real estate investment trust, bank, savings and loan association, investment bank, insurance company, trust company, commercial credit corporation, pension plan, pension fund or pension advisory firm, mutual fund, government entity or plan, provided that any such Person referred to in this <u>clause (a)</u> satisfies the Eligibility Requirements; or

(b)     an investment company, money management firm or "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, as amended, or an institutional "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended, provided that any such Person referred to in this <u>clause (b)</u> satisfies the Eligibility Requirements;

Notwithstanding the foregoing, in no event shall any of the Persons listed in <u>clauses (a)</u> through <u>(b)</u> above be deemed (or be deemed to be) a Qualified Institutional Lender if, on the date of determination, (i) such Person is the subject of any Bankruptcy Proceeding, or (ii) such Person is an Embargoed Person.

***Rating Agency***: each of Standard & Poor's Ratings Services, a division of The McGraw–Hill Companies, Inc. ("***S&P***"), Moody's Investors Service, Inc.  ("***Moody's***"), and Fitch, Inc. or any other nationally–recognized statistical rating organization to the extent any of the foregoing have been engaged by Lender or Senior Lender or its designee in connection with or in anticipation of any Secondary Market Transaction hereunder or under the Senior Loan.

***Rating Comfort Letter***:  a letter issued by each of the applicable Rating Agencies which confirms that the taking of the action referenced to therein will not result in any qualification, withdrawal or downgrading of any existing ratings of Securities created in a Secondary Market Transaction.

***Release Parcel***: shall mean those certain portions of the Property as more particularly described on Schedule 6 hereto, which may be released pursuant to Section 2.4.3 hereof.

***REMIC Trust***:  a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Senior Note, or any portion thereof.

***Rents***:   all rents, rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a Bankruptcy Proceeding) or in lieu of rent or

rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other payment and consideration of whatever form or nature received by or paid to or for the account of or benefit of Owner, Manager or any of their agents or employees from any and all sources arising from or attributable to the Property and the Improvements, including all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Property or rendering of services by Owner, Manager or any of their agents or employees and proceeds, if any, from business interruption or other loss of income insurance.

*Security Documents*:  collectively, (i) the Pledge, (ii) a notice of pledge to Owner, (iii) all Uniform Commercial Code financing statements required by this Agreement to be filed with respect to the security interests in personal property created pursuant to the other Security Documents and (iv) all other documents and agreements executed or delivered to Lender by Borrower in connection with any of the foregoing documents.

*Security Instrument*:  the Security Instrument as defined in the Senior Loan Agreement.

*Senior Lender*:  Natixis, New York Branch, a société anonyme à conseil d'administration (public limited company) organized and existing under the laws of France, its successors and assigns.

*Senior Loan*:  the $106,000,000.00 mortgage loan made by Senior Lender to Owner in accordance with the Senior Loan Agreement.

*Senior Loan Agreement*: the Loan Agreement dated as of June 16, 2016, by and between Senior Lender and Owner, as the same has heretofore and may hereafter be amended, restated, replaced, supplemented or otherwise modified from time to time, with the consent of Lender.

*Senior Loan Documents*:  the "Loan Documents" as defined in the Senior Loan Agreement.

*Senior Loan Event of Default*: an Event of Default under and as defined in the Senior Loan Agreement.

*Senior Note*:  the Promissory Note dated June 16, 2016, in the original principal amount of $106,000,000.00 made by Owner payable to Senior Lender, as the same has heretofore and may hereafter be amended, restated, replaced, supplemented or otherwise modified from time to time.

*Servicer*:  a servicer selected by Lender to service the Loan.

*State*:  the state of New York.

12

*Taxes*:  all real estate and personal property taxes, assessments, water rates or sewer rents, maintenance charges, impositions, vault charges and license fees, now or hereafter levied or assessed or imposed against all or part of the Property.  In no event shall any PACE Loan be considered a Tax for purposes of this Agreement.

*Tenant*:  any existing tenant, replacement tenant or proposed tenant under any existing Lease or any proposed Lease.

*Term*:  the entire term of this Agreement, which shall expire upon repayment in full of the Debt and full performance of each and every obligation to be performed by Borrower pursuant to the Loan Documents.

*Toxic Mold*:  any toxic mold or fungus at the Property which is of a type (i) that might pose a significant risk to human health or the environment or (ii) that would negatively impact the value of the Property.

*Transfer*:  any sale, conveyance, transfer, lease or assignment, Lien, or the entry into any PACE Loan, or the entry into any agreement to sell, convey, transfer, lease or assign, whether by law or otherwise, including forfeiture, of, on, in or affecting (i) all or part of the Property (including any legal or beneficial direct or indirect interest therein), (ii) any direct or indirect interest in Borrower or Owner (including any profit interest), (iii) the direct or indirect right or power to direct or cause the direction of the management and policies of Borrower, through the ownership of voting securities, by contract or otherwise, or (iv) all or any part of the Collateral including any legal or beneficial direct or indirect interest therein.

*UCC*:  the Uniform Commercial Code as in effect in the State or the state in which any of the Collateral is located.

*U.S. Obligations*:  direct non–callable obligations backed by the full faith and credit of the United States of America.

*Welfare Plan*:  an employee welfare benefit plan, as defined in Section 3(1) of ERISA.

*Write-Down and Conversion Powers*:  means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

*Yield Maintenance Premium*:  means a prepayment fee equal to the greater of (i) three percent (3%) of the amount of Principal being prepaid and (ii) the product obtained by multiplying:

(A)    the amount of Principal being prepaid,

*by*

13

(B)      the excess (if any) of the Monthly Note Rate over the Assumed Reinvestment Rate for the period prior to the Open Prepayment Date,

*by*

(C)      the Present Value Factor.

The following definitions shall apply:

**Monthly Note Rate:** one–twelfth (1/12) of the Interest Rate, expressed as a decimal calculated to five digits.

**Assumed Reinvestment Rate:** one–twelfth (1/12) of the yield rate equal to the lesser of (i) the yield on the U.S. Treasury issue (primary issue) with a maturity date closest to the Stated Maturity Date, or (ii) the yield on the U.S. Treasury issue (primary issue) with a term equal to the remaining average life of the Debt, with each such yield being based on the bid price for such issue as published in the Wall Street Journal on the date that is fourteen (14) days prior to the date of such prepayment (or, if such bid price is not published on that date, the next preceding date on which such bid price is so published) and converted to a monthly compounded nominal yield.

**Present Value Factor:** the factor that discounts to present value the costs resulting to Lender from the difference in interest rates during the months remaining between the date of prepayment and the Open Prepayment Date, using the Assumed Reinvestment Rate as the discount rate, with monthly compounding, expressed numerically as follows:

$$\frac{1 - \left(\dfrac{1}{1+ARR}\right)^{n}}{ARR}$$

$n$ = number of months remaining between the date of prepayment and the Open Prepayment Date

**ARR** = Assumed Reinvestment Rate

1.2    **Index of Other Definitions**.  An index of other terms which are defined in this Agreement or in other Loan Documents is set forth on Schedule 1.

1.3    **Principles of Construction**.  (a)  Unless otherwise specified, (i) all references to sections and schedules are to those in this Agreement, (ii) the words "hereof," "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision, (iii) all definitions are equally applicable to the singular and plural forms of the terms defined, (iv) the word "including" means "including but not limited to," and (v) accounting terms not specifically defined herein shall be construed in accordance with GAAP. For the purposes of this Agreement the phrases "knowledge of" or "awareness of" the Borrower

14

shall be deemed to include the knowledge or awareness of Owner.  Any term used herein and not defined herein shall have the meaning ascribed to such term in the Senior Loan Agreement.

(a)    With respect to references to the Senior Loan Documents (including, without limitation, terms defined by cross-reference to the Senior Loan Documents), such references shall refer to the Senior Loan Documents as in effect on the date of this Agreement (and any such defined terms shall have the definitions set forth in the Senior Loan Documents as of the date hereof) and no amendments, restatements, replacements, supplements, waivers or other modifications to or of the Senior Loan Documents shall have the effect of changing such references (including, without limitation, any such definitions) for the purposes of this Agreement unless Lender expressly agrees in writing that such references or definitions, as appearing, incorporated into or used in this Agreement, have been revised.

(b)    Notwithstanding anything stated herein to the contrary, any provisions in this Agreement cross-referencing provisions of the Senior Loan Documents shall be effective notwithstanding the termination of the Senior Loan Documents by payment in full of the Senior Loan or otherwise.

(c)    To the extent that any terms, provisions or definitions of any Senior Loan Documents that are incorporated herein by reference are incorporated into the Senior Loan Documents by reference to any other document or instrument, such terms, provisions or definitions that are incorporated herein by reference shall at all times be deemed to incorporate each such term, provision and definition of the applicable other document or instrument as the same is set forth in such other document or instrument as of the date hereof, without regard to any amendments, restatements, replacements, supplements, waivers or other modifications to or of such other document or instrument occurring after the date hereof, unless Lender expressly agrees that such term, provision or definition as appearing, incorporated into, or used in this Agreement have been revised.

(d)    The words "Borrower shall cause", or "Borrower shall not permit" (or words of similar meaning) shall mean "Borrower shall cause Owner" to" or "Borrower shall not permit Owner to", as the case may be, to so act or not to so act, as applicable.

## 2.    **GENERAL LOAN TERMS**.

**2.1    The Loan**.  Lender is making a loan (the "***Loan***") to Borrower on the date hereof, in the original principal amount (the "***Principal***") of $14,000,000.00, which shall mature on the Stated Maturity Date.  Borrower acknowledges receipt of the Loan, the proceeds of which are being and shall be used to (i) repay and discharge any loans secured by or relating to the Collateral, (ii) make a contribution to Owner to refinance the Property or as otherwise specified in Section 2.1 of the Senior Loan Agreement, and (iii) pay transaction costs.  Any excess proceeds may be used for any lawful purpose. No amount repaid in respect of the Loan may be reborrowed.

NY:1814691.9

2.2    **Interest; Monthly Payments**.

     2.2.1   **Generally**. From and after the date hereof, interest on the unpaid Principal shall accrue at the Interest Rate and be payable as hereinafter provided. On the date hereof, Borrower shall pay interest on the unpaid Principal from the date hereof through and including July 4, 2016. On August 5, 2016 (the "***First Payment Date***") and each Payment Date thereafter through and including the Payment Date immediately preceding the Stated Maturity Date, Borrower shall pay an amount equal to the Monthly Debt Service Payment Amount. The Monthly Debt Service Payment Amount due on any Payment Date shall first be applied to the payment of interest accrued from the scheduled Payment Date preceding the Payment Date on which such Monthly Debt Service Payment Amount is paid through the day of the month immediately preceding the Payment Date on which such Monthly Debt Service Payment Amount is paid, notwithstanding that the actual Payment Date may not have been the scheduled Payment Date because the scheduled Payment Date is not a Business Day. The remainder of such Monthly Debt Service Payment Amount shall be applied to the reduction of the unpaid Principal. All accrued and unpaid interest shall be due and payable on the Maturity Date. If the Loan is repaid on any date other than on a Payment Date (whether prior to or after the Stated Maturity Date), Borrower shall also pay interest that would have accrued on such repaid Principal to but not including the next Payment Date.

     2.2.2   **Default Rate**. After the occurrence and during the continuance of an Event of Default, the entire unpaid Debt shall bear interest at the Default Rate, and shall be payable upon demand from time to time, to the extent permitted by applicable law.

     2.2.3   **Taxes**. Any and all payments by Borrower hereunder and under the other Loan Documents shall be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding taxes imposed on Lender's income, and franchise taxes imposed on Lender by law or regulation of any Governmental Authority (all such non–excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to in this Section 2.2.3 as "***Applicable Taxes***"). If Borrower shall be required by law to deduct any Applicable Taxes from or in respect of any sum payable hereunder to Lender, the following shall apply: (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.2.3), Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrower shall make such deductions and (iii) Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law. Payments pursuant to this Section 2.2.3 shall be made within ten (10) days after the date Lender makes written demand therefor.

     2.2.4   **Requirements of Law**.

     (a)   If any Legal Requirement or any change in the interpretation or application thereof or compliance by Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

16

NY:1814691.9

(i)        shall subject Lender to any tax of any kind whatsoever with respect to this Agreement, the Note or the Loan (excluding net income taxes) or change the basis of taxation of payments to Lender in respect thereof;

(ii)        shall impose, modify or hold applicable any reserve, special deposit, compulsory advance or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances or other extensions of credit by, or any other acquisition of funds by, any office of Lender;

(iii)        shall impose on Lender any other condition;

and the result of any of the foregoing is to increase the cost to Lender, by an amount which Lender deems to be material, of making or maintaining the Loan or to reduce any amount receivable hereunder in respect thereof, then, in any such case, Borrower shall, from time to time, upon receipt of prior written notice of not less than ten (10) Business Days of such fact and a reasonably detailed description of the circumstances, promptly pay Lender such additional amount or amounts as will compensate Lender for such increased cost or reduced amount receivable (provided such additional amounts are then being charged by Lender to its borrowers under similar loans generally) and are not prohibited by such Legal Requirement to be charged back.

(b)        If Lender shall have determined that the adoption of or any change in any Legal Requirement regarding capital adequacy or in the interpretation or application thereof or compliance by Lender or any corporation controlling Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on Lender's or such corporation's capital as a consequence of its obligations hereunder by an amount deemed by Lender to be material (taking into consideration Lender's or such corporation's policies with respect to capital adequacy), then from time to time, Borrower shall promptly, upon notice from Lender, pay to Lender such additional amount or amounts as will compensate Lender for such reduction (provided such additional amounts are then being charged by Lender to its borrowers under similar loans generally).

(c)        If Lender becomes entitled to claim any additional amounts pursuant to this Section 2.2.4, it shall promptly notify Borrower of the event by reason of which it has become so entitled. A certificate as to any additional amounts payable pursuant to this subsection submitted by Lender to Borrower shall be conclusive in the absence of manifest error or the provision of immediate proof by Borrower to the contrary.

(d)        Notwithstanding anything to the contrary in this Agreement or in any of the other Loan Documents, Borrower acknowledges that any liability of any EEA Financial Institution, including without limitation Lender or any of its successors or assigns, arising under this Agreement or under any of the other Loan Documents, except to the extent such liability is excluded under the Bail-In Legislation from the scope of any Bail-In Action, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

17

(i)       the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising under this Agreement or under any of the other Loan Documents which may be payable to it by any party hereto that is an EEA Financial Institution; and

(ii)      the effects of any Bail-in Action on any such liability, including, if applicable, (X) a reduction in full or in part or cancellation of any such liability including without limitation a reduction in any accrued or unpaid interest in respect of such liability, (Y) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or under any of the other Loan Documents, or (Z) the variation of the terms of this Agreement or under any of the other Loan Documents to give effect to the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

## 2.3    **Loan Repayment and Defeasance**.

**2.3.1    Repayment**.    Borrower shall repay the entire outstanding principal balance of the Note in full on the Maturity Date, together with interest thereon to (but excluding) the date of repayment and any other amounts due and owing under the Loan Documents. Borrower shall have no right to prepay or defease all or any portion of the Principal, except in accordance with <u>Sections 2.3.2</u>, <u>2.3.3</u> and 2.3.4 below.  Except during the continuance of an Event of Default, all proceeds of any repayment, including permitted prepayments, of the Loan shall be applied by Lender as follows in the following order of priority:  *First*, accrued and unpaid interest at the Interest Rate; *Second*, to Principal then due and owing; and *Third*, to any other amounts then due and owing under the Loan Documents, including the Yield Maintenance Premium (if such repayment or prepayment occurs prior to the Stated Maturity Date). Notwithstanding the foregoing, if (i) no Event of Default then exists, the Yield Maintenance Premium shall not be due in connection with a prepayment of the Loan on or after the Open Prepayment Date and (ii) there exists an Event of Default, then, irrespective of when prepayment is made, Lender shall be entitled to receive, in addition to the unpaid Principal and accrued interest and other sums due under the Loan Documents, an amount equal to the Yield Maintenance Premium.  During the continuance of an Event of Default, all proceeds of repayment, including any payment or recovery on the Collateral (whether through foreclosure, assignment-in-lieu of foreclosure or otherwise) shall, unless otherwise provided in the Loan Documents, be applied in such order and in such manner as Lender shall elect in Lender's discretion.

## 2.3.2    **Liquidation Events.**

(a)       In the event of (i) any Casualty to all or any portion of the Property, (ii) any Condemnation of all or any portion of the Property, (iii) a Transfer of the Property in connection with realization thereon following an Event of Default under the Senior Loan, including without limitation, a foreclosure sale, (iv) any refinancing of the Property or the Senior Loan, or (v) the receipt by Owner of any excess proceeds realized under its owner's title insurance policy after application of such proceeds by Owner to cure any title defect (each, a

18

"*Liquidation Event*"), Owner shall cause the related Net Liquidation Proceeds After Debt Service to be paid to Borrower in accordance with the cash management and other provisions of the Senior Loan Documents, and if such payment is not prohibited thereby, deposit such Net Liquidation Proceeds After Debt Service directly with Lender.  On each date on which Lender actually receives a distribution of Net Liquidation Proceeds After Debt Service, Borrower shall prepay the outstanding principal balance of the Loan in an amount equal to one hundred percent (100%) of such Net Liquidation Proceeds After Debt Service, together with interest that would have accrued on such amount through the next Payment Date, other than in connection with a Liquidation Event occurring under subclauses (i), (ii) or (v) above.  Provided that no Event of Default is continuing, any such mandatory prepayment under this Section 2.3.2 shall be without the payment of the Yield Maintenance Premium.

(b)     Borrower shall promptly notify Lender of any Liquidation Event once Borrower has knowledge of such event.  Borrower shall be deemed to have knowledge of (i) a sale (other than a foreclosure sale) of the Property on the date on which a contract of sale for such sale is entered into, and a foreclosure sale, on the date notice of such foreclosure sale is given to Borrower or Owner, and (ii) a refinancing of the Property, on the date on which a commitment for such refinancing has been entered into.  The provisions of this Section 2.3.2 shall not be construed to contravene in any manner the restrictions and other provisions regarding refinancing of the Senior Loan or Transfer of the Property set forth in this Agreement and the other Loan Documents.

### 2.3.3    <u>Voluntary Defeasance of the Note.</u>

(a)     Subject to the terms and conditions set forth in this Section 2.3.3, Borrower may defease the entire amount of the Principal (a "*Full Defeasance*") or a portion of the Principal (a "*Partial Defeasance*") (any such Full Defeasance or Partial Defeasance, a "*Defeasance*"); provided, that no Defeasance may occur (i) prior to the Start–up Date, (ii) if an Event of Default shall have occurred (unless such Event of Default will be cured by the Defeasance) and (iii) on any date other than a Payment Date.  Each Defeasance shall be subject, in each case, to the satisfaction of all of the following conditions precedent:

(i)     Borrower will give Lender not less than thirty (30) days prior written notice specifying a Payment Date (the "*Defeasance Date*") on which a Defeasance Deposit (hereinafter defined) is to be made.

(ii)     Payment to Lender of all accrued and unpaid interest on the unpaid Principal of the Note to and including the Defeasance Date and the scheduled amortization payment due on such Defeasance Date.

(iii)     Payment to Lender of all other sums, not including scheduled interest or Principal payments, then due and payable under the Note and the other Loan Documents.

(iv)     Payment to Lender of an amount equal to the sum of (x) an amount sufficient to purchase U.S. Obligations which provide payments that will meet the Scheduled Defeasance Payments, (y) costs and expenses incurred or to be incurred in the

19

purchase of the U.S. Obligations and (z) any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the Defeasance (the "***Defeasance Deposit***").

        (v)     Payment to Lender of all costs and expenses incurred by Lender in connection with such Defeasance, including reasonable attorneys' fees.

        (vi)     In the case of a Partial Defeasance, the execution and delivery by Borrower of all necessary documents to amend and restate the Note and issue two substitute notes, one having a principal balance equal to the defeased portion of the original Note (the "***Defeased Note***") and the other having a principal balance equal to the undefeased portion of the original Note (the "***Undefeased Note***").  The Defeased Note and Undefeased Note shall have terms identical to the terms of the Note, except for the principal balance and a pro rata allocation of the Monthly Debt Service Payment Amount.  (After a Partial Defeasance, all references hereunder and in the other Loan Documents to the term "Note" shall mean and be deemed to refer to the Undefeased Note, unless expressly provided to the contrary.)  A Defeased Note cannot be the subject of any further Defeasance.

        (vii)     Delivery to Lender of: (A) a security agreement, in form and substance satisfactory to Lender, creating a first priority lien on the Defeasance Deposit and the U.S. Obligations (hereinafter defined) purchased on behalf of Borrower with the Defeasance Deposit in accordance with this provision of this Section 2.3.3 (the "***Security Agreement***"); (B) an Officer's Certificate of Borrower certifying that the requirements set forth in Section 2.3.3(a) have been satisfied; (C) an opinion of counsel for Borrower in form and substance satisfactory to Lender stating, among other things, that Lender has a perfected first priority security interest in the Defeasance Deposit and the U.S. Obligations purchased by Lender on behalf of Borrower, that the Security Agreement is the legal, valid and binding obligation of Borrower enforceable against Borrower in accordance with its terms and that the Defeasance will not adversely affect the status of any REMIC Trust formed in connection with a Secondary Market Transaction where the Loan has been securitized; (D) a certificate of an accounting firm acceptable to Lender which certifies that the U.S. Obligations are sufficient to make the Scheduled Defeasance Payments; (E) a Rating Comfort Letter from each applicable Rating Agency with respect to such Defeasance and (F) such other certificates, documents or instruments as Lender may reasonably request.

        (viii)     Lender shall have received a written consent to a Full Defeasance from the Senior Lender or confirmation that the Senior Loan has been (or is simultaneously being) satisfied in full.

In connection with the conditions set forth in this Section 2.3.3(a), Borrower hereby appoints Lender as its agent and attorney–in–fact for the purpose of using the Defeasance Deposit to purchase U.S. Obligations which provide payments (A) on or prior to, but as close as possible to, all successive Payment Dates after the date of calculation through the Open Prepayment Date (and in connection therewith Borrower shall not be permitted to provide early notice of prepayment pursuant to Section 2.3.4 hereof) and (B) in amounts sufficient to pay, (x) in the case of a Full Defeasance, the Monthly Debt Service Payment Amount required under the Note (or Undefeased Note, as the case may be) together with the unpaid Principal of the Note (or Undefeased Note, as the case may be) payable on the Open Prepayment Date and (y) in the case

20

of a Partial Defeasance, the Monthly Debt Service Payment Amount multiplied by the Defeasance Percentage together with the unpaid Principal of the Defeased Note payable on the Open Prepayment Date (such payments, the "***Scheduled Defeasance Payments***").  Borrower, pursuant to the Security Agreement or other appropriate document, shall authorize and direct that the payments received from the U.S. Obligations may be made directly to Lender and applied to satisfy the obligations of Borrower under the Note or the Defeased Note, as applicable.  Any amounts received in respect of the U.S. Obligations in excess of the amounts necessary to make monthly payments hereunder shall be retained by Lender until payment in full of the Debt.  Semi–annual payments in respect of the U.S. Obligations shall be applied to the payments under the Note or the Defeased Note, as applicable, as the same become due thereunder.

(b)     In connection with a Full Defeasance, at Lender's direction, Borrower shall establish or designate a successor entity, which successor entity shall be acceptable to Lender (the "***Successor Borrower***") and Borrower shall transfer and assign all obligations, rights and duties under and to the Note or the Defeased Note, as applicable, together with the pledged U.S. Obligations to the Successor Borrower.  The right of Lender to establish or designate a Successor Borrower, as well as the right of the Successor Borrower to provide notice of prepayment pursuant to Section 2.3.4 hereof, shall be retained by Natixis, New York Branch (but may be assigned to an Affiliate) notwithstanding the sale, assignment or transfer of this Agreement unless such obligation is specifically assumed by the transferee.  The Successor Borrower shall assume all obligations under the Loan Documents and the Security Agreement, and Borrower shall be relieved of its obligations thereunder. Borrower shall pay a $1,000 fee to any such Successor Borrower as consideration for assuming such obligations.  Notwithstanding anything herein to the contrary, no other assumption fee shall be payable upon a transfer of the Note or the Defeased Note, as applicable, in accordance with this Section 2.3.3, but Borrower shall pay all costs and expenses incurred by Lender, including Lender's reasonable attorneys' fees and expenses and ongoing fees and expenses incurred in connection with this Section 2.3.3.

2.3.4   **Permitted Prepayment**.   On the Open Prepayment Date or on any Payment Date thereafter prior to the Stated Maturity Date, Borrower shall have the right to pay the entire Debt upon ten (10) Business Days notice to Lender, without  payment of the Yield Maintenance Premium and without effecting a Defeasance, provided that no Event of Default then exists.  If any such payment of the Debt pursuant to the preceding sentence is made on any date other than the Open Prepayment Date or any Payment Date thereafter prior to the Stated Maturity Date, such payment shall be accompanied by a payment in an amount equal to interest on the unpaid Principal through the end of the Interest Period during which such payment is made. It shall be a condition to a prepayment made pursuant to this Section 2.3.4 that the Debt under and as defined in the Senior Loan Agreement shall simultaneously be prepaid and satisfied in full.

2.4    **Release of Collateral**.   Except as set forth in this Section 2.4, no repayment, prepayment or Defeasance shall cause, give rise to a right to require, or otherwise result in, the release of the Lien of the Pledge and other Security Documents.

2.4.1   **Release on Defeasance**.   If Borrower has elected a Full Defeasance, and the requirements of Section 2.3.3 have been satisfied, the Collateral shall be released from the Lien of the Pledge and other Security Documents, and the U.S. Obligations pledged pursuant to

21

the Security Agreement shall be the sole source of collateral securing the Debt.  In connection with such release, Borrower shall submit to Lender, not less than twenty (20) days prior to the Defeasance Date, a form of release for execution by Lender appropriate in the State and satisfactory to Lender, and all other documentation Lender requires to be delivered by Borrower, together with an Officer's Certificate certifying that such documentation (i) is in compliance with all Legal Requirements and (ii) will effect such release in accordance with the terms of this Agreement.

2.4.2    **Release on Payment in Full**.  Lender shall, upon the written request and at the expense of Borrower, upon payment in full of the Debt in accordance herewith, release the Liens of the Pledge and other Security Documents if not theretofore released.

2.4.3    **Release of Release Parcel**.  Borrower shall have the right to cause Owner to obtain the release of the Release Parcel from the Lien of the Senior Loan Documents, which, as of the date hereof, is part of the Property, on the following terms and conditions:

(a)    Borrower shall have given a written request therefor (a "***Release Request***") to Lender, accompanied by all evidence and information required by this Section, not less than sixty (60) days prior to the desired release date;

(b)    Each of the Release Parcel, and all improvements thereon, and the remaining portion of the Property (the "***Remaining Property***"), and all improvements thereon, shall comply with all applicable zoning, land use and similar laws, rules, regulations and ordinances of all governmental authorities having or claiming jurisdiction thereover, and all other applicable laws, with each such determination assuming the separate ownership and operation of each parcel;

(c)    Borrower provides evidence reasonably acceptable to Lender that (i) all zoning and subdivision approvals of governmental authorities having jurisdiction as necessary to create legally identifiable tracts of real property, and separate tax and zoning lots for all real property taxes, have been granted; and (ii) from and after the release of the Release Parcel, no acts relating to development, further subdivision, construction or use on the Release Parcel can affect in any respect the compliance of the Remaining Property with all Legal Requirements;

(d)    Borrower provides evidence satisfactory to Lender that, following any such release, the Remaining Property shall have available to it all necessary utility and other services for the development, use, occupancy and operation of the Remaining Property, and adequate, free, unimpeded and unencumbered access for pedestrian and vehicular ingress and egress onto all adjacent public roads;

(e)    Intentionally left blank;

(f)    Intentionally left blank;

(g)    Said Release Parcel is identified to Lender's reasonable satisfaction on the Survey delivered to Lender prior to the execution and delivery of this Agreement;

(h)    No Default, or Event of Default has occurred and is continuing;

22

(i)      The Remaining Property will be in compliance with all provisions of any Leases of any portion of the Property that are then in effect (including, without limitation, as to required parking spaces, restrictions on development, access and similar matters), and the Release Parcel shall be subject to a restrictive covenant prohibiting the use or development thereof in any manner that violates any provision of any then-existing Lease of the Remaining Property;

(j)      Simultaneously with the release of the Release Parcel, the Release Parcel is transferred and conveyed by Borrower to another person or entity (the "***Release Parcel Transferee***"), such that Owner shall continue to be a Special Purpose Entity;

(k)      Borrower (A) delivers to Lender, a restrictive covenant, in form and substance satisfactory to Lender, entered into by Owner and the Release Parcel Transferee, which restrictive covenant shall (i) bind the Release Parcel, (ii) run with the land, (iii) expressly provides that the Release Parcel shall only be used for the sole purpose of constructing and operating a (x) parking garage, or (y) a residential tower on top of a parking garage, (iv) require in connection with any and all construction on the Release Parcel, that the Release Parcel Transferee deliver to the Lender, evidence reasonably satisfactory to Lender (which may be in the form of a binding commitment letter) that Release Parcel Transferee has obtained a construction loan with respect to the construction of the improvements for no less than fifty percent (50%) loan to cost of completion from a Qualified Institutional Lender that is not an Affiliate of Borrower, Owner and/or Guarantor (the obligation in this clause (iv) shall apply for each separate construction project on the Release Parcel), and (v) require in connection with any and all construction on the Release Parcel, that the Release Parcel Transferee deliver to the Lender upon commencement of any construction activities a payment guaranty, executed by Guarantor, in the form attached hereto as **Schedule 4**, in an amount equal to fifteen percent (15%) of the original Principal balance of the Loan, which payment guaranty shall be effective until Release Parcel Transferee delivers to Lender a permanent certificate of occupancy for the proposed improvements (the obligation in this clause (v) shall apply for each separate construction project on the Release Parcel), (B) delivers to Lender evidence reasonably satisfactory to Lender that neither Borrower nor Owner has any obligation with respect to the construction set forth in clause (x) or clause (y) hereof; (C) delivers to Lender  evidence reasonably satisfactory to Lender that neither Borrower nor Owner has any obligation with respect to any construction loan obtained by Release Parcel Transferee; and (D) delivers to Lender  evidence reasonably satisfactory to Lender the Property is not collateral or security for any construction loan obtained by Release Parcel Transferee as provided in this section.

(l)      Borrower pays all of Lender's fees and expenses (including, without limitation, attorneys' fees and expenses) incurred in connection with the release of such Release Parcel;

(m)      Owner shall have satisfied each of the terms and conditions to the release of the Release Parcel in accordance with the Senior Loan Agreement; and

(n)      Each of the Release Parcel, and all improvements thereon, and the Remaining Property, and all improvements thereon shall comply with all Legal Requirements

23

with respect to parking (without taking into account any parking demised pursuant to an easement or any other recorded document).

In connection with a Release Request pursuant to Section 2.4.3 hereof, at Borrower's sole cost and expense (including Lender's costs and expenses (including legal fees)), Owner and Release Parcel Transferee shall be permitted to enter into a declaration of covenants, conditions and restrictions and/or a reciprocal easement agreement or other similar agreement in form and substance reasonably acceptable to Lender, which agreement shall provide solely for ingress, egress, and/or access to public streets, provided (i) such agreement does not require the owner of the Remaining Property to incur any out of pocket costs (unless such costs are deposited with Lender), (ii) the owner of the Remaining Property is not required to maintain any property other than the Remaining Property, (iii) such agreement does not reduce the amount of parking available to the Remaining Property (iv) such agreement does not violate any of the applicable provisions of any Leases in effect at the Remaining Property, (v) such agreement shall be added to Schedule A of the mortgage title policy (at Borrower's sole cost and expense), and (vi) after giving effect to such agreement, the requirements of (b), (c), (d), (i) and (k) above shall continue to have been meet in their entirety.

### 2.5    **Payments and Computations**.

**2.5.1   Making of Payments**.  Each payment by Borrower shall be made in funds settled through the New York Clearing House Interbank Payments System or other funds immediately available to Lender by 11:00 a.m., New York City time, on the date such payment is due, to Lender by deposit to such account as Lender may designate by written notice to Borrower.  Whenever any such payment shall be stated to be due on a day that is not a Business Day, such payment shall be made on the immediately preceding Business Day.  All such payments shall be made irrespective of, and without any deduction, set–off or counterclaim whatsoever and are payable without relief from valuation and appraisement laws and with all costs and charges incurred in the collection or enforcement thereof, including attorneys' fees and court costs.

**2.5.2   Computations**.  Interest payable under the Loan Documents shall be computed on the basis of the actual number of days elapsed over a 360–day year.

**2.5.3   Late Payment Charge**.  If any Principal, interest or other sum due under any Loan Document is not paid by Borrower on the date on which it is due, subject to any applicable grace or cure period, if any, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law (the "*Late Payment Charge*"), in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.  Such amount shall be secured by the Loan Documents.

### 3.    **CASH MANAGEMENT AND RESERVES**.

### 3.1    **Cash Management Arrangements**.

NY:1814691.9

(a)     Borrower shall cause Owner to establish and maintain the Clearing Account with the Clearing Bank pursuant to the Clearing Account Agreement.

(b)     Borrower shall cause Owner to establish and maintain the Deposit Account with the Deposit Bank pursuant to the Deposit Account Agreement.  Funds deposited into the Clearing Account shall be swept by the Clearing Bank on a daily basis into the Deposit Account and applied and disbursed in accordance with  the Senior Loan Agreement.  Borrower shall not permit Owner to amend the terms of the Clearing Account Agreement or the Deposit Account Agreement without the prior written consent of Lender.

(c)     In addition to the foregoing, Borrower shall cause Owner to deposit and maintain each of the Senior Loan Subaccounts as more particularly set forth in the Senior Loan Agreement and to perform and comply with all the terms and provisions relating thereto.  Borrower shall cause Owner to pay all costs and expenses incurred in maintaining the Cash Management Accounts (as defined in the Senior Loan Agreement).

(d)     Notwithstanding anything to the contrary contained herein, provided no Event of Default shall have occurred and be continuing, on each Payment Date (or, if such Payment Date is not a Business Day, on the immediately preceding Business Day) all funds deposited with Lender pursuant to Section 3.10(a) of the Senior Loan Agreement shall be paid by Lender and/or applied by Lender to the payment of the following items in the order indicated:

(i)     First, to Lender to pay the Monthly Debt Service Payment Amount due on such Payment Date (plus, if applicable, interest at the Default Rate and all other amounts, other than those described under other clauses of this Section 3.1(d), then due to Lender under the Loan Documents (other than the outstanding principal balance of the Loan));

(ii)     Second, to Lender, for purposes of funding any reserves, if required under Section 3.2; and

(iii)     Lastly, payments to Borrower of any remaining amounts.

(b) The failure of Borrower to make all of the payments required under clauses (i) and (ii) of Section 3.1(d) in full on each Payment Date shall constitute an Event of Default under this Agreement.

(c) Notwithstanding anything to the contrary contained in this Section 3.1 or elsewhere in the Loan Documents, after the occurrence of an Event of Default, Lender may apply all proceeds in such order and in such manner as Lender shall elect.

**3.2     Reserves**.  If at any time during the Term, (a) Senior Lender is not requiring Owner to make the required deposits pursuant to  Article III of the Senior Loan Agreement of Escrows or other reserves or has otherwise waived any such Escrows or other reserves, or if the Senior Loan shall have been repaid in full, and such Escrows and reserves are not required under any new mortgage financing,  or (b) Lender reasonably determines that the Escrows and any other reserves being maintained pursuant to the Senior Loan Agreement are insufficient for the

25

purposes for which they are to be used, then Lender shall have the right, at its option, to require Borrower to enter into a new clearing account agreement and deposit account agreement substantially similar to the arrangements then entered into between the Senior Lender and Owner, and to establish and maintain all accounts (and subaccounts) required thereunder for the benefit of Lender, and thereafter to make all deposits required by the Senior Loan Agreement therein, with all funds deposited in such accounts (or subaccounts) to be disbursed by Lender substantially in accordance with applicable terms and provisions of the Senior Loan Agreement.

   **3.3** **Distributions from Owner**.  All funds transferred to or for the benefit of Lender pursuant to this Agreement, the Senior Loan Agreement or any of the other Loan Documents or Senior Loan Documents are intended by Borrower and Owner to constitute, and shall constitute, distributions from Owner to Borrower.  No provision of the Loan Documents or the Senior Loan Documents shall create a debtor-creditor relationship between Borrower and Owner.

**4.**  **REPRESENTATIONS AND WARRANTIES**.

Borrower represents and warrants to Lender as of the date hereof that:

   **4.1** **Organization; Special Purpose**.  Each of Borrower and Owner has been duly organized and is validly existing and in good standing under the laws of the state of its formation, with requisite power and authority, and all rights, licenses, permits and authorizations, governmental or otherwise, necessary to own its properties and to transact the business in which it is now engaged.  Each of Borrower and Owner is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, business and operations.  Borrower is a Special Purpose Entity and Owner is a Special Purpose Entity (under and as defined in the Senior Loan Agreement).

   **4.2** **Proceedings; Enforceability**.  Borrower has taken all necessary action to authorize the execution, delivery and performance of the Loan Documents.  The Loan Documents have been duly executed and delivered by Borrower and constitute legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and general principles of equity.  The Loan Documents are not subject to, and Borrower has not asserted, any right of rescission, set–off, counterclaim or defense, including the defense of usury.  No exercise of any of the terms of the Loan Documents, or any right thereunder, will render any Loan Document unenforceable.

   **4.3** **No Conflicts**.  The execution, delivery and performance of the Loan Documents by Borrower and the transactions contemplated hereby will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien (other than pursuant to the Loan Documents) upon any of the property of Borrower or Owner pursuant to the terms of, any agreement or instrument to which Borrower or Owner is a party or by which its property is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower or any of its properties.  Any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the

26

execution, delivery and performance by Borrower of the Loan Documents has been obtained and is in full force and effect.

4.4    **Litigation**.  Except as previously disclosed to Lender in writing, there are no actions, suits or other proceedings at law or in equity by or before any Governmental Authority now pending or, to Borrower's best knowledge, threatened in writing against or affecting Borrower, Owner, the Manager or the Property, which, if adversely determined, might materially adversely affect the condition (financial or otherwise) or business of Borrower, Owner, Manager or the condition or ownership of the Property or the Collateral.

4.5    **Agreements**.  Borrower is not a party to any agreement or instrument or subject to any restriction which might adversely affect Borrower, Owner or the Property, or Borrower's or Owner's business, properties, operations or condition, financial or otherwise.  Neither Borrower nor Owner is in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Permitted Encumbrance or any other agreement or instrument to which it is a party or by which it or the Property is bound.

4.6    **Title**.  Borrower is record owner of and has good title to the Collateral, free and clear of all Liens whatsoever.  Owner has good, marketable and indefeasible title in fee to the real property and good title to the balance of the Property, free and clear of all Liens except the Permitted Encumbrances.  All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements in connection with the transfer of the Property to Owner have been paid.  The Pledge, together with any UCC Financing Statements required to be filed in connection therewith, will create a valid, perfected first priority lien on Borrower's interest in the Pledged Collateral.  The Permitted Encumbrances do not materially adversely affect the value, operation or use of the Property, or Borrower's ability to repay the Loan.

4.7    **No Bankruptcy Filing**.  Neither Borrower nor Owner is contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency law or the liquidation of all or a major portion of its property (a "***Bankruptcy Proceeding***"), and Borrower has no knowledge of any Person contemplating the filing of any such petition against Borrower or Owner.  In addition, none of Borrower, Owner or any principal nor Affiliate of Borrower or Owner has been a party to, or the subject of a Bankruptcy Proceeding for the past ten years.

4.8    **Full and Accurate Disclosure**.  No statement of fact made by Borrower in any Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained therein not misleading.  There is no material fact presently known to Borrower that has not been disclosed to Lender which materially adversely affects, or, as far as Borrower can foresee, might materially adversely affect, the Property, the Pledged Collateral or the business, operations or condition (financial or otherwise) of Borrower or Owner.  All financial data, including the statements of cash flow and income and operating expense, that have been delivered to Lender by Borrower in respect of each of Borrower, Owner, the Collateral and the Property (excluding any such documents identified as drafts) (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of Borrower, Owner, the Collateral and the Property as of the date of such reports, and (iii) to the

27

extent prepared by an independent certified public accounting firm, have been prepared in accordance with GAAP consistently applied throughout the periods covered, except as disclosed therein. Neither Borrower nor Owner has any contingent liabilities, liabilities for taxes, unusual forward or long–term commitments, unrealized or anticipated losses from any unfavorable commitments or any liabilities or obligations not expressly permitted by this Agreement. Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower or the Collateral from that set forth in said financial statements.

      **4.9**   **No Plan Assets**.  Neither Borrower nor Owner is an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA, and none of the assets of Borrower or Owner constitute or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3–101.

      **4.10**   **Compliance**.  Borrower, Owner, the Collateral and the Property and the use thereof comply in all material respects with all applicable Legal Requirements (including with respect to parking and applicable zoning and land use laws, regulations and ordinances).  Neither Borrower nor Owner is in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority, the violation of which might materially adversely affect the condition (financial or otherwise) or business of Borrower or Owner.  The Property is used exclusively for a retail shopping center and other appurtenant and related uses.  In the event that all or any part of the Improvements are destroyed or damaged, said Improvements can be legally reconstructed to their condition prior to such damage or destruction, and thereafter exist for the same use without violating any zoning or other ordinances applicable thereto and without the necessity of obtaining any variances or special permits.  No legal proceedings are pending or, to the best of Borrower's knowledge, threatened with respect to the zoning of the Property.  Neither the zoning nor any other right to construct, use or operate the Property is in any way dependent upon or related to any property other than the Property.  All certifications, permits, licenses and approvals, including certificates of completion and occupancy permits required for the legal use, occupancy and operation of the Property (collectively, the "*Licenses*"), have been obtained and are in full force and effect.  The use being made of the Property is in conformity with the certificate of occupancy issued for the Property and all other restrictions, covenants and conditions affecting the Property.

      **4.11**   **Contracts**.  There are no service, maintenance or repair contracts affecting the Property that are not terminable on one month's notice or less without cause and without penalty or premium.  All service, maintenance or repair contracts affecting the Property have been entered into at arms–length in the ordinary course of Owner's business and provide for the payment of fees in amounts and upon terms comparable to existing market rates.

      **4.12**   **Federal Reserve Regulations; Investment Company Act**.  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose that would be inconsistent with such Regulation U or any other regulation of such Board of Governors, or for any purpose prohibited by Legal Requirements or any Loan Document.  Neither Owner nor Borrower is (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act

28

of 1940, as amended; (ii) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 2005, as amended; or (iii) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

**4.13**   **Intentionally Omitted**.

**4.14**   **Intentionally Omitted**.

**4.15**   **Leases**.  Each Lease is subordinate to the Senior Loan Documents, either pursuant to its terms or pursuant to a subordination and attornment agreement.  None of the Leases contains any option to purchase or right of first refusal to purchase the Property or any part thereof.  Neither the Leases nor the Rents have been assigned or pledged except to Senior Lender in accordance with the Senior Loan Documents, and no other Person has any interest therein except the Tenants thereunder.

**4.16**   **Fraudulent Transfer**.  Borrower has not entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor, and Borrower has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed Borrower's total liabilities, including subordinated, unliquidated, disputed or contingent liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and matured.  Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of Borrower).

**4.17**   **Ownership of Borrower and  Owner**.  The organizational chart attached hereto as Schedule 3 is complete and accurate and illustrates all Persons who have a direct or indirect ownership interest in Borrower and Owner as of the date of this Agreement.

**4.18**   **Management Agreement**.  The Management Agreement is in full force and effect.  There is no default, breach or violation existing thereunder, and no event has occurred (other than payments due but not yet delinquent) that, with the passage of time or the giving of notice, or both, would constitute a default, breach or violation thereunder, by either party thereto. The management fees and the terms and provisions of the Management Agreement, are subordinate to the Loan Documents.

**4.19**   **Hazardous Substances**.  (i) The Property is not in violation of any Legal Requirement pertaining to or imposing liability or standards of conduct concerning environmental regulation, contamination or clean–up, including the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and

NY:1814691.9

Recovery Act, the Emergency Planning and Community Right–to–Know Act of 1986, the Hazardous Substances Transportation Act, the Solid Waste Disposal Act, the Clean Water Act, the Clean Air Act, the Toxic Substance Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act, any Legal Requirements relating to Toxic Mold, any state super–lien and environmental clean–up statutes, any local law requiring related permits and licenses, any common law relating to Toxic Mold or other Hazardous Substances, and all amendments to and regulations in respect of the foregoing laws (collectively, "***Environmental Laws***"); (ii) the Property is not subject to any private or governmental Lien or judicial or administrative notice or action or inquiry, investigation or claim relating to hazardous, toxic or dangerous substances, wastes, contaminants, and pollutants, including, without limitation, petroleum, petroleum products, crude oil and fractions thereof, Toxic Mold, or any other substances or materials which are included under or regulated by, or for which liability may arise pursuant to, Environmental Laws (collectively, "***Hazardous Substances***"); (iii) to the best of Borrower's knowledge, after due inquiry, except as may be expressly set forth in the Environmental Report, no Hazardous Substances are or have been (including the period prior to Owner's acquisition of the Property), discharged, generated, treated, disposed of or stored on, incorporated in, or removed or transported from the Property other than in compliance with all Environmental Laws; (iv) to the best of Borrower's knowledge, after due inquiry, except as may be expressly set forth in the Environmental Report, no Hazardous Substances are present in, on or under any nearby real property which could migrate to or otherwise affect the Property; (v) to the best of Borrower's knowledge, except as may be expressly set forth in the Environmental Report, no underground storage tanks exist on the Property and the Property has never been used as a landfill; and (vi) there have been no environmental investigations, studies, audits, reviews or other analyses conducted by or on behalf of Borrower or Owner which have not been provided to Lender.

**4.20    Principal Place of Business**.  The principal place of business of Borrower and Owner is its primary address for notices as set forth in Section 6.1, and neither Borrower nor Owner has any other place of business.

**4.21    Other Debt**.  There is no indebtedness with respect to the Property, the Collateral or any indebtedness secured over excess cash flow or any residual interest therein, whether secured or unsecured, other than Permitted Encumbrances and Permitted Indebtedness.

**4.22    Embargoed Person**.  None of the funds or assets of Borrower, Owner or any Guarantor, as applicable, constitute property of, or are beneficially owned directly or, to Borrower's best knowledge, indirectly, by any Embargoed Person (as hereinafter defined) and no Embargoed Person has any direct interest, and to Borrower's best knowledge, as of the date hereof, based upon reasonable inquiry by Borrower, indirect interest, of any nature whatsoever in Borrower, Owner or Guarantor, as applicable, with the result that the investment in Borrower, Owner or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law.

**4.23    Anti–Money Laundering**.  None of the funds of Borrower, Owner or any Guarantor, as applicable, that are used to consummate this transaction are derived from or are the proceeds of any unlawful activity, with the result that the investment in Borrower, Owner or any Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in

30

violation of law or may cause any of the Property to be subject to forfeiture or seizure. Borrower has ascertained the identity of all persons and entities who have provided funds to capitalize Borrower and has conducted verification procedures which are sufficient to establish the identity and source of such funds.

**4.24    Pledged Collateral**.

(a)    Borrower is the sole beneficial owner of the Pledged Collateral and no Lien exists or will exist upon the Pledged Collateral at any time (and no right or option to acquire the same exists in favor of any other Person).

(b)    The Pledged Collateral is not and will not be subject to any contractual restriction upon the Transfer thereof (except for any such restriction contained in the Pledge).

(c)    The chief place of business of Borrower and the office where Borrower keeps its records concerning the Pledged Collateral will be located at all times at the address specified as Borrower's address in Section 6.1.

(d)    The certificate(s) representing the Pledged Collateral have been pledged to Lender.

(e)    The Security Documents create a valid security interest in the Pledged Collateral, securing the payment of the Debt, and upon the filing in the appropriate filing offices of the UCC financing statements authorized to be filed pursuant to this Agreement or the Pledge, such security interests will be perfected, first priority security interests, and all filing and other actions necessary to perfect such security interests will have been duly taken. Upon the exercise of its rights and remedies under the Pledge, Lender and/or its designee will succeed to all of the rights, titles and interest of Borrower in Owner without the consent of any other Person and will, without the consent of any other Person, be admitted as the sole owner in the Owner.

**4.25    Contractual Obligations**.    Other than the Loan Documents, the Borrower Company Agreement and the Owner Company Agreement, as of the date of this Agreement, Borrower is not subject to any Contractual Obligations and has not entered into any agreement, instrument or undertaking by which it or its assets are bound or incurred any indebtedness, and prior to the date of this Agreement. Borrower has not entered into any Contractual Obligation, or any agreement, instrument or undertaking by which it or its assets are bound or incurred any indebtedness.

**4.26    Senior Loan Representations**.    The outstanding principal balance of the Senior Loan, as of the date hereof, is $106,000,000.00.  No Default, breach, violation or Event of Default has occurred under the Senior Loan Documents which remains uncured or unwaived. All of the representations and warranties contained in the Senior Loan Documents are hereby incorporated into this Agreement and deemed made hereunder as and when made thereunder and shall remain incorporated herein without regard to any waiver, amendment or other modification

31

thereof by the Senior Lender or to whether the related Senior Loan Document has been repaid or otherwise terminated, unless otherwise consented to in writing by Lender.

      **4.27**   **Material Agreements** . As of the date of this Agreement, other than those certain agreements, true, correct and complete copies of which have been delivered to Lender prior to the date hereof, neither Owner nor Borrower is a party to any Material Agreements.

      **4.28**   **OPA**. The OPA is in full force and effect and effect and neither Borrower, Owner nor 3000 Imperial has received written notice of any default thereunder by any party thereto or of any event has occurred that, with the passage of time and/or the giving of notice would constitute a default thereunder. The OPA has not, as of the date hereof, been amended or modified.

      **4.29**   **ISLT Pledges**. Pursuant to the express provisions of each ISLT Pledge, no Person, including, without limitation, any assignee or pledgee under such ISLT Pledge, has the right to obtain, and no such Person shall obtain any direct or indirect ownership or membership interest, or any voting, management or Control right, in or with respect to, ISLT, Placo, Owner or Borrower pursuant to any such ISLT Pledge.

      **4.30**   **Environmental Documents**. Each Environmental Document is in full force and effect and neither Owner nor, to the best of Borrower's knowledge, any other party to any Environmental Document is in default thereunder, and to the best of Borrower's knowledge after due inquiry, there are no conditions which, with the passage of time or the giving of notice, or both, would constitute a default thereunder. Except as set forth on Schedule 9, no Environmental Document has been modified, amended or supplemented.

      **4.31**   **Parking Agreement.**

      **4.31.1** Neither Borrower nor Owner is a party to any agreement or instrument in connection with parking at or otherwise serving or affecting the Property, other than the Parking Agreement.

      **4.31.2** Borrower hereby represents and warrants to Lender the following with respect to the Parking Agreement:

      (a)   Recording; Modification. A true and complete copy of the Parking Agreement has been (i) delivered to Lender, and (ii) will be duly recorded against the burdened Property within two (2) Business Days of the date hereof. The Parking Agreement permits the interest of Borrower to be encumbered by a mortgage. There have not been amendments or modifications to the terms of the Parking Agreement since its recordation. The Parking Agreement may not be canceled, terminated or surrendered, and none of the terms and provisions of the Parking Agreement may be modified, changed, supplemented, altered, amended or waived, without in each case the prior written consent of Lender.

      (b)   Parking Agreement Assignable. Owner's interest in the Parking Agreement is assignable to Senior Lender upon notice to, but without the consent of, the lessor thereunder. The Parking Agreement is further assignable by Senior Lender, its successors and assigns without the consent of the lessor thereunder.

32

(c)    <u>Default</u>.  As of the date hereof, the Parking Agreement is in full force and effect and no default has occurred under the Parking Agreement and there is no existing condition which, but for the passage of time and/or the giving of notice, could result in a default under the terms of the Parking Agreement.  All rents, additional rents and other sums due and payable under the Parking Agreement have been paid in full.  Neither Owner nor the lessor under the Parking Agreement has commenced any action or given or received any notice for the purpose of terminating the Parking Agreement.

(d)    <u>Cure</u>.  Senior Lender is permitted the opportunity (including, where necessary, sufficient time to gain possession of the interest of Owner under the Parking Agreement) to cure any default under the Parking Agreement which is curable after the receipt of notice of the default before the lessor thereunder may terminate the Parking Agreement.

(e)    <u>Term</u>.  The Parking Agreement has a term which extends not less than twenty (20) years beyond the Maturity Date.

(f)    <u>Subleasing</u>.  The Parking Agreement does not impose any restrictions on subleasing.

**4.32    La Curacao CAM.**  Neither Borrower nor Owner is under any obligation to, or shall be under any obligation to, refund or reimburse any amounts to La Curacao (as defined in the Senior Loan Agreement) for reconciliation of common area maintenance costs or any other additional rent payable under the La Curacao Lease (as defined in the Senior Loan Agreement) which have been previously overpaid by La Curacao (as defined in the Senior Loan Agreement).

**4.33    One Green ISLT Pledges.**  Each of that certain Assignment of Distributions and Security Agreement, dated as of July 12, 2011, by and between ISLT, as grantor, in favor of One Green, LLC, a California limited liability company ("***One Green***"), as lender, as amended by that certain First Amendment to Assignment of Distributions and Security Agreement, dated as of September 22, 2011, by and between ISLT and One Green, securing that certain Guaranty, dated as of July 12, 2011, made by ISLT for the benefit of One Green in connection with that certain loan from One Green to 3171 Fair Oaks, LLC, a California limited liability company have been permanently terminated in accordance with the terms thereof and are no longer operative.

**4.34    Kiosk Leases.**  In addition to the representations made in Section 4.15 of this Agreement with respect to Leases, Borrower hereby represents, warrants and covenants to Lender that with respect to the "kiosk" leases: (i) each such "kiosk" lease is on a month to month basis, renewed monthly, and (ii)  none of the "kiosk" Leases contains any option to purchase or right of first refusal to purchase the Property or any part thereof.

All of the representations and warranties in this Article 4 and elsewhere in the Loan Documents (i) shall survive for so long as any portion of the Debt remains owing to Lender and (ii) shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf, provided, however, that the representations, warranties and covenants set forth in <u>Section 4.19</u> shall survive in perpetuity.

33

5.    **COVENANTS**.

Until the end of the Term, Borrower hereby covenants and agrees with Lender that:

**5.1    Existence**.  Borrower shall, and shall cause Owner to , (i) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, and franchises, (ii) continue to engage in the business presently conducted by it, (iii)obtain and maintain all Licenses, and (iv) qualify to do business and remain in good standing under the laws of each jurisdiction, in each case as and to the extent required for the ownership, maintenance, management and operation of the Collateral and the Property, as applicable.

**5.2    Taxes**.  Borrower shall, or shall cause Owner to , pay all Taxes as the same become due and payable, and deliver to Lender receipts for payment or other evidence satisfactory to Lender that the Taxes have been so paid no later than thirty (30) days before they would be delinquent if not paid (provided, however, that Borrower need not pay (or cause Owner to pay) such Taxes nor furnish (nor cause Owner to furnish) such receipts for payment of Taxes paid by Senior Lender pursuant to the Senior Loan Documents).  Borrower shall promptly pay, or cause Owner to pay, all franchise fees, income taxes and other impositions and taxes imposed by Governmental Authorities on Owner and/or Borrower.Borrower shall not suffer and shall promptly cause to be paid and discharged, or cause Owner to pay and discharge , any Lien against the Property, and shall promptly pay, or cause Owner to pay , for all utility services provided to the Property.  After prior notice to Lender, Borrower may, or may cause Owner, at Owner's expense, to contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application of any Taxes, provided that (i) no Default or Event of Default has occurred and is continuing, (ii) such proceeding shall suspend the collection of the Taxes, (iii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower or Owner is subject, and shall not constitute a default thereunder, (iv) no part of or interest in the Property will be in danger of being sold, forfeited, terminated, canceled or lost, (v) Borrower or Owner shall have furnished such security as may be required in the proceeding, or as may be requested by Lender, to insure the payment of any such Taxes, together with all interest and penalties thereon, which shall not be less than one hundred twenty–five percent (125%) of the Taxes being contested, and (vi) Borrower shall promptly upon final determination thereof pay, or cause Owner to pay , the amount of such Taxes, together with all costs, interest and penalties. Lender may pay over any such security or part thereof held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established.  Borrower shall not be required to provide any security to the extent same is furnished by Owner pursuant to the Senior Loan Documents.

**5.3    Repairs; Maintenance and Compliance; Alterations**.

**5.3.1    Repairs; Maintenance and Compliance**.  Borrower shall, or shall cause Owner to , at all times maintain, preserve and protect all franchises and trade names, and Borrower shall cause the Property to be maintained in a good and safe condition and repair and shall not, and shall not permit Owner to , remove, demolish or alter the Improvements or Equipment (except for alterations performed in accordance with Section 5.3.2 of this Agreement and  Section 5.3.2 of the Senior Loan Agreement and normal replacement of Equipment with

34

Equipment of equivalent value and functionality).  Borrower shall, or shall cause Owner to , promptly comply with all Legal Requirements and immediately cure properly any violation of a Legal Requirement.  Borrower shall notify Lender in writing within one Business Day after Borrower first receives notice of any such non–compliance.  Borrower shall, or shall cause Owner to , promptly repair, replace or rebuild any part of the Property that becomes damaged, worn or dilapidated and shall, or shall cause Owner to , complete and pay for any Improvements at any time in the process of construction or repair.

    5.3.2 <u>**Alterations**</u>.  Borrower may, without Lender's consent, perform, or cause Owner to perform , alterations to the Improvements and Equipment which (i) do not constitute a Material Alteration, (ii) do not adversely affect Borrower's or Owner's financial condition or the value or Net Operating Income of the Property in any material respect, and (iii) are in the ordinary course of Borrower's or Owner's business.  Borrower shall not perform, nor permit Owner to perform , any Material Alteration without Lender's prior written consent, which consent shall not be unreasonably withheld or delayed; provided, however, that Lender may, in its sole and absolute discretion, withhold consent to any alteration the cost of which is reasonably estimated to exceed $1,000,000 or which is likely to result in a decrease of Net Operating Income by two and one–half percent (2.5%) or more for a period of thirty (30) days or longer.  Lender may, as a condition to giving its consent to a Material Alteration, require that Borrower deliver to Lender security for payment of the cost of such Material Alteration in an amount equal to one hundred ten percent (110%) of the cost of the Material Alteration as reasonably estimated by Lender, provided such requirement shall be waived if such security is provided to Senior Lender pursuant to the Senior Loan Documents.  Upon substantial completion of the Material Alteration, Borrower shall provide evidence satisfactory to Lender that (i) the Material Alteration was constructed in a good and workmanlike manner and in accordance with applicable Legal Requirements and substantially in accordance with plans and specifications approved by Lender (which approval shall not be unreasonably withheld or delayed), (ii) all contractors, subcontractors, materialmen and professionals who provided work, materials or services in connection with the Material Alteration have been paid in full and have delivered unconditional releases of lien and (iii) all material Licenses necessary for the use, operation and occupancy of the Material Alteration (other than those which depend on the performance of Tenant improvement work) have been issued.  Borrower shall reimburse Lender upon demand for all out–of–pocket costs and expenses (including the reasonable fees of any architect, engineer or other professional engaged by Lender) incurred by Lender in reviewing plans and specifications or in making any determinations necessary to implement the provisions of this Section 5.3.2.

    5.4 <u>**Performance of Other Agreements**</u>.  Borrower shall observe and perform and cause Owner to observe and perform each and every term to be observed or performed by it pursuant to the terms of any agreement or instrument affecting or pertaining to the  Collateral or the Property, including the Loan Documents and the Senior Loan Documents.

    5.5 <u>**Cooperate in Legal Proceedings**</u>.  Borrower shall, and shall cause Owner to , cooperate fully with Lender with respect to, and permit Lender, at its option, to participate in, any proceedings before any Governmental Authority which may in any way affect the rights of Lender under any Loan Document.

35

NY:1814691.9

**5.6** **Further Assurances**.  Borrower shall, at Borrower's sole cost and expense, (i) execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve or protect the collateral at any time securing or intended to secure the Debt or for the better and more effective carrying out of the intents and purposes of the Loan Documents, as Lender may reasonably require from time to time; and (ii) upon Lender's request therefor given from time to time after the occurrence and during the continuance of any Default or Event of Default pay for (a) reports of UCC, federal tax lien, state tax lien, judgment and pending litigation searches with respect to Borrower and Owner and (b) searches of title to the Property, each such search to be conducted by search firms reasonably designated by Lender in each of the locations reasonably designated by Lender.

**5.7** **Environmental Matters**.

**5.7.1** **Hazardous Substances**.  So long as Owner owns or is in possession of the Property, Borrower shall, or shall cause Owner to , (i) keep the Property free from Hazardous Substances and in compliance with all Environmental Laws, (ii) promptly notify Lender if Borrower shall become aware that (A) any Hazardous Substance is on or near the Property, (B) the Property is in direct or indirect violation of any Environmental Laws or (C) any condition on or near the Property might pose a threat to the health, safety or welfare of humans and (iii) remove such Hazardous Substances or cure such violations or remove such threats, as applicable, as required by law (or as shall be required by Lender in the case of removal which is not required by law, but in response to the opinion of a licensed hydrogeologist, licensed environmental engineer or other qualified environmental consulting firm engaged by Lender ("***Lender's Consultant***")), promptly after Borrower becomes aware of same, at Borrower's or Owner's sole expense.  Any removal, remediation or cure of any violation relating to Toxic Mold shall include, without limitation, all acts required to clean and disinfect any portions of the Property affected by Toxic Mold and to eliminate the source(s) of Toxic Mold in or on the Property, including providing any necessary moisture control systems at the Property. Nothing herein shall prevent Borrower from recovering such expenses from any other party that may be liable for such removal, remediation or cure.

**5.7.2** **Environmental Monitoring**.

(a)    Borrower shall give prompt written notice to Lender of (i) any proceeding or inquiry by any party (including any Governmental Authority) with respect to the presence of any Hazardous Substance on, under, from or about the Property, (ii) all claims made or threatened by any third party (including any Governmental Authority) against Borrower, Owner or the Property or any party occupying the Property relating to any loss or injury resulting from any Hazardous Substance, and (iii) Borrower's or Owner's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property to be subject to any investigation or cleanup pursuant to any Environmental Law. Borrower shall permit, and shall cause Owner to permit , Lender to join and participate in, as a party if it so elects, any legal or administrative proceedings or other actions initiated with respect to the Property in connection with any Environmental Law or Hazardous Substance, and Borrower shall pay all reasonable attorneys' fees and disbursements incurred by Lender in connection therewith.

36

(b)      Upon Lender's request, at any time and from time to time, Borrower shall provide, or cause Owner to provide , an inspection or audit of the Property prepared by a licensed hydrogeologist, licensed environmental engineer or qualified environmental consulting firm approved by Lender assessing the presence or absence of Hazardous Substances on, in or near the Property , and if Lender in its good faith judgment determines that reasonable cause exists for the performance of such environmental inspection or audit, then the cost and expense of such audit or inspection shall be paid by Borrower or Owner.Such inspections and audit may include soil borings and ground water monitoring.  If Borrower or Owner fails to provide any such inspection or audit within thirty (30) days after such request, Lender may order same, and Borrower hereby grants, and shall cause Owner to grant , to Lender and its employees and agents access to the Property and a license to undertake such inspection or audit.

(c)      If any environmental site assessment report prepared in connection with such inspection or audit recommends that an operations and maintenance plan be implemented for any Hazardous Substance, whether such Hazardous Substance existed prior to the ownership of the Property by Owner, or presently exists or is reasonably suspected of existing, Borrower shall cause such operations and maintenance plan to be prepared and implemented at its expense upon request of Lender.  If any investigation, site monitoring, containment, cleanup, removal, restoration or other work of any kind is reasonably necessary under an applicable Environmental Law ("***Remedial Work***"), Borrower shall commence, or cause Owner to commence , all such Remedial Work within thirty (30) days after written demand by Lender and thereafter diligently prosecute to completion all such Remedial Work within such period of time as may be required under applicable law.  All Remedial Work shall be performed by licensed contractors approved in advance by Lender and under the supervision of a consulting engineer approved by Lender.  All costs of such Remedial Work shall be paid by Borrower or Owner, including Lender's reasonable attorneys' fees and disbursements incurred in connection with the monitoring or review of such Remedial Work.  If Borrower does not, or does not cause Owner to , timely commence and diligently prosecute to completion the Remedial Work, Lender may (but shall not be obligated to) cause such Remedial Work to be performed at Borrower's expense.    Notwithstanding the foregoing, Borrower shall not be required to commence, or cause Owner to commence , such Remedial Work within the above specified time period: (x) if prevented from doing so by any Governmental Authority, (y) if commencing such Remedial Work within such time period would result in Borrower or Owner or such Remedial Work violating any Environmental Law, or (z) if Borrower or Owner, at its expense and after prior written notice to Lender, is contesting by appropriate legal, administrative or other proceedings, conducted in good faith and with due diligence, the need to perform Remedial Work.  Borrower or Owner shall have the right to contest the need to perform such Remedial Work, provided that, (1) Borrower or Owner is permitted by the applicable Environmental Laws to delay performance of the Remedial Work pending such proceedings, (2) neither the Property nor any part thereof or interest therein will be sold, forfeited or lost if Borrower or Owner fails to promptly perform the Remedial Work being contested, and if Borrower or Owner fails to prevail in such contest, Borrower or Owner would thereafter have the opportunity to perform such Remedial Work, (3) Lender would not, by virtue of such permitted contest, be exposed to any risk of any civil liability for which Borrower has not furnished additional security as provided in clause (4) below, or to any risk of criminal liability, and neither the Property nor any interest therein would be subject to the imposition of any Lien for which Borrower has not furnished

37

NY:1814691.9

additional security as provided in clause (4) below, as a result of the failure to perform such Remedial Work and (4) Borrower shall have, or shall have caused Owner to have furnished, to Lender additional security in respect of the Remedial Work being contested and the loss or damage that may result from Borrower's or Owner's failure to prevail in such contest in such amount as may be reasonably requested by Lender but in no event less than one hundred twenty–five percent (125%) of the cost of such Remedial Work as estimated by Lender or Lender's Consultant and any loss or damage that may result from Borrower's or Owner's failure to prevail in such  contest.  Borrower shall not be required to provide any security to the extent same is furnished by Owner pursuant to the Senior Loan Documents.

         (d)    Borrower shall not install or permit to be installed on the Property any underground storage tank.

**5.8**    **Title to the Pledged Collateral**.  Borrower will warrant and defend the title to the Collateral, and the validity and priority of all Liens granted or otherwise given to Lender under the Loan Documents, subject only to Permitted Encumbrances, against the claims of all Persons. Without Lender's prior written consent, Borrower shall not create, incur, assume, permit or suffer to exist any Lien on all or any portion of the Collateral or any direct or indirect legal or beneficial ownership interest in Borrower, except Liens in favor of Lender and Permitted Encumbrances, unless such Lien is bonded or discharged within thirty (30) days after Borrower first receives notice of such Lien.

**5.9**    **Leases**.

**5.9.1**    **Generally**.  Upon request, Borrower shall furnish (or cause Owner to furnish) Lender with executed copies of all Leases then in effect.  Unless otherwise approved in writing by Lender, which approval shall not be unreasonably withheld, all renewals of Leases and all proposed leases shall provide for rental rates and terms comparable to then existing local market rates and shall be arm's length transactions with bona fide, independent third–party Tenants.

**5.9.2**    **Material Leases**.  Borrower shall not enter or allow Owner to enter into a proposed Material Lease or a proposed renewal, extension or modification of an existing Material Lease without the prior written consent of Lender, which consent shall not, so long as no Event of Default is continuing, be unreasonably withheld or delayed, provided such Material Lease is not an Owner Affiliated Lease.  Prior to seeking Lender's consent to any Material Lease, Borrower shall deliver, or cause Owner to deliver , to Lender a copy of such proposed Material Lease (a "***Proposed Material Lease***") blacklined to show changes from the standard form of Lease approved by Lender and Senior Lender and then being used by Owner.  Lender shall approve or disapprove each Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease for which Lender's approval is required under this Agreement within ten (10) Business Days of the submission by Borrower to Lender of a written request for such approval, accompanied by a final copy of the Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease.  If requested by Borrower, Lender will grant conditional approvals of a Proposed Material Lease or a proposed renewal, extension or modification of an existing Material Lease at any stage of the leasing process, from initial "term sheet" through negotiated lease drafts, provided that Lender shall

38

retain the right to disapprove any such Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease if subsequent to any preliminary approval material changes are made to the terms previously approved by Lender, or additional material terms are added that had not previously been considered and approved by Lender in connection with such Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease.  Provided that no Event of Default is continuing, if Borrower provides Lender with a written request for approval (which written request shall specifically refer to this Section 5.9.2 and shall explicitly state that failure by Lender to approve or disapprove within ten (10) Business Days will constitute a deemed approval) and Lender fails to reject the request in writing delivered to Borrower within ten (10) Business Days after receipt by Lender of the request, the Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease shall be deemed approved by Lender, and Borrower shall be entitled to enter into such Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease.

          5.9.3   **Minor Leases**.  Notwithstanding the provisions of Section 5.9.2 above, provided that no Event of Default is continuing, renewals, amendments and modifications of existing Leases and proposed leases shall not be subject to the prior approval of Lender provided (i) the proposed lease would be a Minor Lease or the existing Lease, as amended or modified, or the renewal Lease is a Minor Lease, (ii) the Lease shall be written substantially in accordance with the standard form of Lease which shall have been approved by Lender, subject to any commercially reasonable changes made in the course of negotiation with the applicable Tenant, (iii) the Lease as amended or modified or the renewal Lease or series of leases or proposed lease or series of leases: (a) shall provide for net effective rental rates comparable to then existing local market rates, (b) shall have an initial term (together with all renewal options) of not less than three (3) years or greater than ten (10) years, (c) shall provide for automatic self–operative subordination to the Security Instrument and, at Lender's option, (x) attornment to Lender and (y) if the Property is located in a jurisdiction in which the applicable law provides for the termination of leases that are subordinate to the Lien of the Security Instrument, the unilateral right by Lender to subordinate the Lien of the Security Instrument to the Lease, and (d) shall not contain any option to purchase, any right of first refusal to purchase, any right to terminate (except in the event of the destruction or condemnation of substantially all of the Property), any requirement for a non–disturbance or recognition agreement, or any other provision which might adversely affect the rights of Lender under the Loan Documents in any material respect. Borrower shall, or cause Owner to , deliver to Lender copies of all Leases which are entered into pursuant to the preceding sentence together with Borrower's certification that it has satisfied all of the conditions of the preceding sentence within ten days after the execution of the Lease. With respect to any Lease or proposed renewal, extension or modification of an existing Lease that requires Lender's consent under this Section 5.9.3, provided that no Event of Default is continuing, if Borrower provides Lender with a written request for approval (which written request shall specifically refer to this Section 5.9.3 and shall explicitly state that failure by Lender to approve or disapprove within ten (10) Business Days will constitute a deemed approval) and Lender fails to reject the request in writing delivered to Borrower within ten (10) Business Days after receipt by Lender of the request, the proposed Lease or proposed renewal, extension or modification of an existing Lease shall be deemed approved by Lender, and Borrower shall be entitled to enter into such proposed Lease or proposed renewal, extension or modification of an existing Lease.

**5.9.4    Additional Covenants with respect to Leases**.  Borrower shall cause Owner to (i)  observe and perform the material obligations imposed upon the lessor under the Leases and shall not do or permit anything to impair the value of the Leases as security for the Debt;  (ii) promptly send copies to Lender of all notices of default that Owner shall send or receive under any Lease; (iii) enforce, in accordance with commercially reasonable practices for properties similar to the Property, the terms, covenants and conditions in the Leases to be observed or performed by the lessees, short of termination thereof; (iv) not collect any of the Rents more than one month in advance (other than security deposits); (v) not execute any other assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents); (vi) not modify any Lease in a manner inconsistent with the Loan Documents; (vii) not convey or transfer or suffer or permit a conveyance or transfer of the Property so as to effect a merger of the estates and rights of, or a termination or diminution of the obligations of, lessees under Leases; (viii) not consent to any assignment of or subletting under any Material Lease unless required in accordance with its terms without the prior consent of Lender, which, with respect to a subletting, may not, so long as no Event of Default is continuing,  be unreasonably withheld or delayed; and  (ix) not cancel or terminate any Lease or accept a surrender thereof without the prior consent of Lender, which consent shall not, so long as no Event of Default is continuing, be  unreasonably withheld or delayed.

**5.10    Estoppel Statement**.  After request by Lender, Borrower shall within ten (10) days furnish Lender with a statement addressed to Lender, its successors and assigns, duly acknowledged and certified, setting forth (i) the unpaid Principal, (ii) the Interest Rate, (iii) the date installments of interest or Principal were last paid, (iv) any offsets or defenses to the payment of the Debt, (v) that no Default or Event of Default exists under the Loan Documents, and (vi) that the Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification.

**5.11    Property Management**.

**5.11.1 Management Agreement**.  Borrower shall (i) cause the Property to be managed pursuant to the Management Agreement; (ii) cause Owner to promptly perform and observe all of the covenants required to be performed and observed by it under the Management Agreement and do all things necessary to preserve and to keep unimpaired its rights thereunder; (iii) promptly notify Lender of any default under the Management Agreement of which it is aware; (iv) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditure plan, and property improvement plan and any other notice, report and estimate received by Owner under the Management Agreement; and (v) cause Owner to promptly enforce the performance and observance of all of the covenants required to be performed and observed by Manager under the Management Agreement.  Without Lender's prior written consent, Borrower shall not permit Owner to (a) surrender, terminate, cancel, extend or renew the Management Agreement or otherwise replace the Manager or enter into any other management agreement (except pursuant to Section 5.11.2); (b) reduce or consent to the reduction of the term of the Management Agreement; (c) increase or consent to the increase of the amount of any charges under the Management Agreement; (d) otherwise modify, change, supplement, alter or amend in any material respect, or waive or release any of its rights and remedies under, the Management Agreement; or (e) suffer or permit the occurrence and continuance of a default beyond any applicable cure period under the Management Agreement (or any successor

40

management agreement) if such default permits the Manager to terminate the Management Agreement (or such successor management agreement).

5.11.2 **Termination of Manager**. If (i) Borrower fails to maintain a Debt Service Coverage Ratio of at least 1.10:1, (ii) a Bankruptcy Action occurs with respect to Manager, (iii) an Event of Default shall be continuing, or (iv) Manager is in default under the Management Agreement, Borrower shall, at the request of Lender, cause Owner to terminate the Management Agreement and replace Manager with a replacement manager acceptable to Lender in Lender's reasonable discretion and the applicable Rating Agencies on terms and conditions satisfactory to Lender and the applicable Rating Agencies unless, in the case of the event described in clause (i) only, Borrower shall defease a portion of the unpaid Principal in accordance with Section 2.3.3 hereof, or Owner shall defease a portion of the unpaid Principal of the Senior Loan in accordance with Section 2.3.3 of the Senior Loan Agreement) to a level such that the Debt Service Coverage Ratio of the aggregate of the unpaid Principal and the unpaid Principal under the Senior Loan is restored to a level of not less than 1.10:1.  All calculations of Debt Service Coverage Ratio for purposes of this Section 5.11.2 shall be subject to verification by Lender.  Borrower's failure to appoint an acceptable manager within thirty (30) days after Lender's request of Borrower to terminate the Management Agreement shall constitute an immediate Event of Default.  Borrower may from time to time appoint a successor manager to manage the Property, which successor manager and Management Agreement shall be approved in writing by Lender in Lender's discretion and the applicable Rating Agencies. .

5.12 **Special Purpose Entity**.  Borrower shall at all times be a Special Purpose Entity and Owner shall at all times be a Special Purpose Entity(under and as defined in the Senior Loan Agreement).  A "*Special Purpose Entity*" shall have the meaning set forth on Schedule 3 hereto. Borrower covenants and agrees that Borrower shall provide Lender with thirty (30) days' prior written notice prior to the removal of an Independent Director or Independent Manager, as applicable, of Borrower.

5.13 **Assumption in Non–Consolidation Opinion**.  Borrower and Owner shall each conduct its business so that the assumptions (with respect to each Person) made in that certain substantive non–consolidation opinion letter dated the date hereof delivered by Borrower's counsel in connection with the Loan, shall be true and correct in all material respects.

5.14 **Change In Business or Operation of Property**.  Borrower shall not, and shall not permit Owner to, purchase or own any real property other than the Property and shall not enter into any line of business other than the ownership and operation of the Property, or make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business or otherwise cease to operate the Property as  a retail shopping center property or terminate such business for any reason whatsoever (other than temporary cessation in connection with renovations to the Property).  Borrower shall not purchase or own any property or asset other than the Collateral and shall not engage in any other activity other than its ownership of the Collateral, or make any change in the scope or nature of its business objective, purposes or operations, or undertake or participate in activities other than the continuance of its present business or otherwise cease to own the Collateral.

41

NY:1814691.9

**5.15** <u>**Certain Prohibited Actions**</u>.  Borrower shall not directly or indirectly do any of the following: (i) change its or Owner's principal place of business or chief executive office without first giving Lender thirty (30) days' prior notice; (ii) cancel or otherwise forgive or release any claim or debt owed to Borrower or Owner by any Person, except for adequate consideration and in the ordinary course of Borrower's or Owner's business in its reasonable judgment ; (iii) Transfer or allow Owner to Transfer any License required for the operation of the Property; or (iv) maintain, sponsor, contribute to or become obligated to contribute to, or suffer or permit any ERISA Affiliate of Borrower or Owner to, maintain, sponsor, contribute to or become obligated to contribute to, any Plan or any Welfare Plan or permit the assets of Borrower or Owner to become "plan assets," whether by operation of law or under regulations promulgated under ERISA.

**5.16** <u>**Prohibited Transfers**</u>.  Borrower shall not directly or indirectly make, suffer or permit the occurrence of any Transfer other than a Permitted Transfer; provided, that, notwithstanding anything to the contrary contained herein, under no circumstances shall Borrower permit the Transfer of any direct interests in Owner or any other portion of the Collateral.  Notwithstanding the foregoing, Lender shall not unreasonably withhold its consent to a sale of the Property in its entirety (a "*Special Transfer*") to a Special Purpose Entity with organizational documents containing provisions satisfying Lender's then–current requirements of a Special Purpose Entity and otherwise acceptable to Lender (a "*Buyer*"); provided that:

(a)     No Default or Event of Default is then continuing;

(b)     The transfer of the Property to Buyer who shall be a new mortgage borrower acceptable to Lender, and Buyer shall be wholly-owned by a new mezzanine borrower (the "*New Mezzanine Borrower*").  Both New Mezzanine Buyer and Buyer shall each be a Special Purpose Entity (as such term is defined herein and in the Senior Loan Agreement, respectively) with organizational documents containing provisions satisfying Lender's then–current requirements of a Special Purpose Entity (as such term is defined herein and in the Senior Loan Agreement, respectively) and otherwise acceptable to Lender, and with an organizational structure otherwise acceptable to Lender;

(c)     New Mezzanine Borrower shall have pledged its entire ownership interest in the Buyer to Lender pursuant to a pledge agreement in substantially the same form as the Pledge and New Mezzanine Borrower shall have delivered to Lender any certificates evidencing the equity interests in Buyer;

(d)     Borrower gives Lender written notice of the terms of such prospective Special Transfer not less than sixty (60) days before the date on which such sale is scheduled to close, accompanied by all information concerning the proposed Buyer and New Mezzanine Borrower as Lender would require in evaluating an initial extension of credit to a borrower and such reasonable non–refundable application fee as shall be required by Lender. Lender shall have the right to approve or disapprove the proposed Buyer and New Mezzanine Borrower in its reasonable discretion (it being acknowledged that Lender may, as a condition to approving any proposed Buyer and New Mezzanine Buyer, if the Loan has been securitized, require a Rating Comfort Letter from each of the applicable Rating Agencies);

42

(e)    Borrower pays Lender, concurrently with the closing of such Special Transfer, a non-refundable assumption fee in an amount equal to all out–of–pocket costs and expenses, including, without limitation, reasonable attorneys' fees and disbursements, incurred by Lender in connection with the Special Transfer plus an amount equal to (i) one-half of one percent (0.5%) of the then outstanding Principal on the first such completed Special Transfer, and (ii) one percent (1.0%) of the then outstanding Principal on each completed Special Transfer thereafter;

(f)    New Mezzanine Borrower assumes all of the obligations of Borrower under this Agreement, the Note and the other Loan Documents and Buyer assumes all of the obligations of Owner under the Senior Loan Documents pursuant to the terms and provisions of Section 5.16 of the Senior Loan Agreement, and, prior to or concurrently with the closing of such Special Transfer, New Mezzanine Borrower executes, without any cost or expense to Lender, an assumption agreement in form and substance reasonably satisfactory to Lender and such other documents and agreements as Lender shall reasonably require to evidence and effectuate said assumption and delivers such legal opinions as Lender may require;

(g)    Borrower and New Mezzanine Borrower execute and cause to be filed in such public records as Lender deems appropriate, without any cost or expense to Lender, new financing statements or financing statement amendments and any additional documents reasonably requested by Lender;

(h)    Borrower causes to be delivered to Lender, without any cost or expense to Lender, such endorsements to Lender's UCC title insurance policy and mezzanine endorsements to Owner's title insurance policies, property and liability insurance endorsements or certificates and other similar materials as Lender may deem necessary at the time of the Special Transfer, all in form and substance satisfactory to Lender, including, without limitation, an endorsement or endorsements to Lender's title insurance policy insuring the Lien of the Security Instrument, extending the effective date of such policy to the date of execution and delivery (or, if later, of recording) of the assumption agreement referenced above in clause (d) of this Section 5.16, with no additional exceptions added to such policy and insuring that fee simple title to the Property is vested in Buyer. Borrower shall also cause a new owner's title insurance policy to be issued to Buyer with a mezzanine lender's endorsement in favor of Lender;

(i)    Borrower executes and delivers to Lender, without any cost or expense to Lender, a release of Lender, its officers, directors, employees and agents, from all claims and liability relating to the transactions evidenced by the Loan Documents through and including the date of the closing of the Special Transfer, which agreement shall be in form and substance satisfactory to Lender and shall be binding upon New Mezzanine Buyer;

(j)    Such Special Transfer is not construed so as to relieve Borrower of any personal liability under the Note or any of the other Loan Documents for any acts or events occurring or obligations arising prior to or simultaneously with the closing of such Special Transfer and Borrower executes, without any cost or expense to Lender, such documents and agreements as Lender shall reasonably require to evidence and effectuate the ratification of said personal liability. Borrower shall be released from and relieved of any personal liability under the Note or any of the other Loan Documents for any acts or events occurring or obligations

43

arising after the closing of such Special Transfer which are not caused by or arising out of any acts or events occurring or obligations arising prior to or simultaneously with the closing of such Special Transfer;

(k)    Such Special Transfer is not construed so as to relieve any Guarantor of its obligations under any Loan Document, until a direct or indirect member, partner or shareholder of New Mezzanine Borower approved by Lender in its sole discretion (a "*Successor Guarantor*") assumes the obligations of such Guarantor under any guaranty and environmental indemnity and executes such documents as may be required by Lender to evidence such assumption.  Guarantor shall be released from and relieved of any of its obligations under any indemnity or guaranty executed in connection with the Loan for any acts or events occurring or obligations arising after the closing of such Special Transfer which are not caused by or arising out of any acts or events occurring or obligations arising prior to or simultaneously with the closing of such Special Transfer;

(l)    New Mezzanine Borrower has furnished to Lender all appropriate documents and instruments evidencing New Mezzanine Borrower's capacity and good standing, and the authority of the signers to execute the assumption of the Loan and the Loan Documents, which documents and instruments shall include certified copies of all documents and instruments relating to the organization and formation of New Mezzanine Borrower and of the entities, if any, which are direct or indirect members, partners or shareholders of New Mezzanine Borrower, all of which shall be satisfactory to Lender;

(m)    Buyer shall assume, or cause its wholly-owned subsidiary to assume, the obligations of Owner under any management agreements pertaining to the Property, or shall cause the new manager and management agreement to satisfy the requirements of Section 5.11 hereof, as applicable;

(n)    New Mezzanine Borrower shall furnish an opinion of counsel satisfactory to Lender that the acquisition and assumption of the Collateral, the Loan and the Loan Documents by New Mezzanine Borrower and of the Property, the Senior Loan and Senior Loan Documents by Buyer and, to the extent applicable, Successor Guarantor, was validly authorized, and duly executed and delivered, and constitutes the legal, valid and binding obligations of Buyer and New Mezzanine Borrower, respectively, and Successor Guarantor, enforceable against each of them in accordance with their respective terms, and with respect to such other matters as Lender may require;

(o)    New Mezzanine Borrower shall provide Lender with a fully executed copies of all transfer documents in connection with the Special Transfer, in form and substance reasonably satisfactory to Lender;

(p)    Buyer shall have satisfied all of the conditions to the Special Transfer pursuant to the terms and provisions of the Senior Loan Documents and taken title to the Property and assumed the Senior Loan pursuant thereto;

44

(q)    Lender shall receive evidence reasonably satisfactory to Lender that the terms of the OPA have not been and will not be violated as a result of or otherwise in connection with such Special Transfer; and

(r)    The issuer of the Gap Zoning Policy has consented in writing to the identity of the Buyer pursuant to the proposed Special Transfer.

**5.17    Expenses**.    Borrower shall reimburse Lender upon receipt of notice for all reasonable out–of–pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with the Loan, including (i) the preparation, negotiation, execution and delivery of the Loan Documents and the consummation of the transactions contemplated thereby and all the costs of furnishing all opinions by counsel for Borrower; (ii) Borrower's and Lender's ongoing performance under and compliance with the Loan Documents, including confirming compliance with environmental and insurance requirements; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications of or under any Loan Document and any other documents or matters requested by Lender or Borrower; (iv) filing and recording of any Loan Documents; (v) title insurance with respect to the Pledged Collateral, surveys, inspections and appraisals; (vi) the creation, perfection or protection of Lender's Liens on the Collateral and the Cash Management Accounts (as defined in the Senior Loan Agreement) (including fees and expenses for title and lien searches, intangibles taxes, personal property taxes, mortgage recording taxes, due diligence expenses, travel expenses, accounting firm fees, costs of appraisals, environmental reports and Lender's Consultant, surveys and engineering reports); (vii) enforcing or preserving any rights in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, the Loan Documents, the Collateral, or any other security given for the Loan; (viii) fees charged by Rating Agencies in connection with the Loan or any modification thereof; (ix) enforcing any obligations of or collecting any payments due from Borrower under any Loan Document or with respect to the Collateral or in connection with any refinancing or restructuring of the Loan in the nature of a "work–out", or any insolvency or bankruptcy proceedings; (x) the fees and expenses of any special servicer retained in respect of the Loan and (xi) any amounts paid or advanced by Lender pursuant to  Article 8, including, but not limited to, all amounts incurred by Lender pursuant to Section 8.2.6.  Any costs and expenses due and payable to Lender hereunder which are not paid by Borrower within ten (10) days after demand may be paid from any amounts then being held by Lender, if any, with notice thereof to Borrower.  The obligations and liabilities of Borrower under this Section 5.17 shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Collateral by foreclosure or assignment in lieu of foreclosure.

**5.18    Indemnity**.    Borrower shall defend, indemnify and hold harmless Lender and each of its Affiliates and their respective successors and assigns, including the directors, officers, partners, members, shareholders, participants, employees, professionals and agents of any of the foregoing (including any Servicer) and each other Person, if any, who Controls Lender, its Affiliates or any of the foregoing (each, an ***Indemnified Party***"), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for an Indemnified Party in connection with any investigative,

45

administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto, court costs and costs of appeal at all appellate levels, investigation and laboratory fees, consultant fees and litigation expenses), that may be imposed on, reasonably incurred by, or asserted against any Indemnified Party (collectively, the "*Indemnified Liabilities*") in any manner, relating to or arising out of or by reason of the Loan, including: (i) any breach by Borrower of its obligations under, or any misrepresentation contained in, any Loan Document; (ii) the use or intended use of the proceeds of the Loan; (iii) any information provided by or on behalf of Borrower, or contained in any documentation approved by Borrower; (iv) ownership of the Security Documents, the Collateral or any of the other Loan Documents, or the Property or any interest therein, or receipt of any Rents; (v) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vi) any use, nonuse or condition in, on or about the Property or on adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vii) performance of any labor or services or the furnishing of any materials or other property in respect of the Property; (viii) the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release, or threatened release of any Hazardous Substance on, from or affecting the Property; (ix) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous Substance; (x) any lawsuit brought or threatened, settlement reached, or government order relating to such Hazardous Substance; (xi) any violation of the Environmental Laws which is based upon or in any way related to such Hazardous Substance, including the costs and expenses of any Remedial Work; (xii) any failure of the Property to comply with any Legal Requirement; (xiii) any claim by brokers, finders or similar persons claiming to be entitled to a commission in connection with any Lease or other transaction involving the Property or any part thereof, or any liability asserted against Lender with respect thereto; (xiv) the claims of any lessee of any portion of the Property or any Person acting through or under any lessee or otherwise arising under or as a consequence of any Lease; and (xv) Indemnified Liabilities arising out of any action taken by Lender pursuant to Article 8, including, but not limited to, Section 8.2.6; provided, however, that Borrower shall not have any obligation to any Indemnified Party hereunder if and to the limited extent that it is finally judicially determined that such Indemnified Liabilities arose solely from the gross negligence, illegal acts, fraud or willful misconduct of such Indemnified Party.  Any amounts payable to any Indemnified Party by reason of the application of this  Section 5.18 shall be payable on demand and shall bear interest at the Default Rate from the date loss or damage is sustained by any Indemnified Party until paid.  The obligations and liabilities of Borrower under this <u>Section</u> 5.18 shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Collateral by foreclosure or an assignment in lieu of foreclosure.

   **5.19** <u>**Embargoed Person**</u>.  (a)  At all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (i) none of the funds or assets of Borrower, Owner or Guarantor, whether or not used to repay the Loan, shall constitute property of, or shall be beneficially owned directly or, to Borrower's best knowledge, indirectly, by any person, entity or government subject to sanctions or trade restrictions under United States law ("*Embargoed Person*" or "*Embargoed Persons*") that are identified on (A) the "List of Specially Designated Nationals and Blocked Persons" maintained by the Office of Foreign Assets Control ("*OFAC*"), U.S. Department of the Treasury's FINCEN list, or to Borrower's best knowledge, as of the date thereof, based upon reasonable inquiry by Borrower,

on any other similar list maintained by OFAC or FINCEN pursuant to any authorizing statute including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Order or regulation promulgated thereunder, with the result that the investment in Borrower, Owner or any Guarantor, as applicable (whether directly or indirectly), is prohibited by law, or the Loan made by Lender would be in violation of law, or (B) Executive Order 13224 (September 23, 2001) issued by the President of the United States ("Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism"), any related enabling legislation or any other similar Executive Orders, and (ii) no Embargoed Person shall have any direct interest or, to Borrower's best knowledge, indirect interest, of any nature whatsoever in Borrower, Owner or any Guarantor, as applicable, with the result that the investment in Borrower, Owner or any Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law.

(b)     At all times throughout the term of the Loan, none of any of Borrower, Owner or Guarantor, nor any Person Controlling, Controlled by or under common Control with any of Borrower, Owner or Guarantor, nor any Person having a beneficial interest in, or for whom any of Borrower, Owner or Guarantor is acting as agent or nominee in connection with the investment, is (a) a country, territory, person or entity named on an OFAC or FINCEN list, or is a Person that resides in or has a place of business in a country or territory named on such lists; (b) a Person residing in, or organized or chartered under the laws of a jurisdiction identified as non–cooperative by the Financial Action Task Force ("**FATF**"); or (c) a Person whose funds originate from or will be routed through , an account maintained at a foreign shell bank or "offshore bank.".

(c)     None of Borrower, Owner or Guarantor, nor any Person Controlling, Controlled by or under common Control with Borrower, Owner or Guarantor is a "senior foreign political figure" or an "immediate family" member or "close associate" (as all such terms are defined below) of a senior foreign political figure within the meaning of the USA PATRIOT Act (i.e., the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107–56, as may be amended).  For the purposes of this subsection (c), (i) "senior foreign political figure" means a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party or a senior executive of a foreign government–owned corporation, and such term also includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure, (ii) "immediate family" of a senior foreign political figure includes the figure's parents, siblings, spouse, children and in–laws, and (iii) "close associate" of a senior foreign political figure means a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

**5.20    Anti–Money Laundering**.    At all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, none of the funds of Borrower, Owner or any Guarantor, as applicable, that are used to consummate this transaction or to repay the Loan shall be derived from or are the proceeds of any unlawful

activity, with the result that the investment in Borrower, Owner or any Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law or may cause any of the Collateral or the Property to be subject to forfeiture or seizure.  Borrower has ascertained the identity of all persons and entities who have provided funds to capitalize Borrower and has conducted verification procedures which are sufficient to establish the identity and source of such funds.

  **5.21**   **ERISA**.  At all times throughout the Term, upon the request of Lender or any of Lender's successors, assigns or participants in the Loan, the management of Borrower shall consult, or cause Owner to consult , with Lender or any of Lender's successors, assigns or participants on significant business issues relating to the operation of the Property and make itself available quarterly either personally or by telephone at mutually agreeable times for such consultation; provided, however, that such consultation need not result in any change in Borrower's course of action, subject to Section 8.1.  The aforementioned consultation rights are intended to satisfy the requirement of management rights for purposes of the Department of Labor "plan assets" regulation 29 C.F.R., Section 2510.3–101.

  **5.22**   **Approved Capital Expenses**.  Borrower shall not incur, or permit Owner to incur, any Capital Expenses unless such Capital Expenses (i) are included in the approved Capital Budget for the current calendar month or (ii) have been approved by Lender (which approval shall not be unreasonably withheld, conditioned or delayed as it relates to Capital Expenses required for compliance with Legal Requirements, or for addressing of emergency conditions (meaning those which have an imminent threat of  injury or damage to persons or property if not so addressed) or in order to comply with Owner's obligations under a Lease).

  **5.23**   **Approved Operating Expenses**.  Borrower shall not incur, or permit Owner to incur, any operating expenses unless such operating expenses (i) are included in the approved Operating Budget for the current calendar month, (ii) are for real estate taxes, insurance premiums, electric, gas, oil, water, sewer or other utility service to the Property or (iii) have been approved by Lender (which approval shall not be unreasonably withheld, conditioned or delayed as it relates to operating expenses required for compliance with Legal Requirements, or for addressing of emergency conditions (meaning those which have an imminent threat of  injury or damage to persons or property if not so addressed) or in order to comply with Owner's obligations under a Lease).

  **5.24**   **Material Agreements**.  Borrower shall not, and shall cause Owner not to, without Lender's prior written consent, not to be unreasonably withheld, conditioned or delayed:  (a) surrender or terminate any Material Agreement to which it is a party (unless the other party thereto is in material default and the termination of such agreement would be commercially reasonable), (b) increase or consent to the increase of the amount of any charges under any Material Agreement to which it is a party; (c) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under any Material Agreement to which it is a party in any material respect; or (d) enter into any Material Agreement which is not included as part of an Annual Budget.

NY:1814691.9

5.25    **Notices**.    Borrower shall give notice, or cause notice to be given to Lender, promptly upon the occurrence of:

(a)    any Senior Loan Event of Default; and

(b)    any default or event of default under any Contractual Obligation of Borrower or Owner or, to the knowledge of Borrower or Owner, that could reasonably be expected to have a material adverse effect on Borrower, the ability of Borrower to perform under the Loan Documents or the rights and remedies of Lender under the Loan Documents.

5.26    **Special Distributions**.    On each date on which amounts are required to be disbursed to Lender pursuant to the terms of Senior Loan Agreement or are required to be paid to Lender under any of the Loan Documents, Borrower shall exercise its rights under the Owner Company Agreement to cause Owner to make to Borrower a distribution in an aggregate amount such that Lender shall receive the amount required to be disbursed to Lender on such date.

5.27    **Compliance with Senior Loan Documents**.    Borrower shall cause Owner to timely (a) pay all principal, interest and other sums required to be paid by Owner under and pursuant to the provisions of the Senior Loan Documents; (b) diligently perform and observe all of the terms, covenants, obligations and conditions of the Senior Loan Documents on the part of Owner to be performed and observed, unless such performance or observance shall be waived in writing by Senior Lender; (c) promptly notify Lender of the giving of any notice by Senior Lender to Owner or Borrower of any Default by Owner in the performance or observance of any of the terms, covenants or conditions of the Senior Loan Documents on the part of Owner to be performed or observed and deliver to Lender a true copy of each such notice; and (d) deliver a true, correct and complete copy of all material notices, demands, requests or correspondence (including electronically transmitted items) given or received by Owner or Guarantor to or from the Senior Lender or its agent.

5.28    **Refinancing or Repayment of the Senior Loan**.    Except as permitted hereunder, neither Borrower nor Owner shall, without the prior written consent of Lender, (a) make any prepayment of the Senior Loan without making a pro rata prepayment of the Loan, or (b) refinance the Senior Loan, in each case unless the Loan is simultaneously repaid in full.

5.29    **Limitations on Securities Issuances**.    Without limiting the generality of any applicable restrictions set forth in Section 5.16, neither Borrower nor Owner shall issue any limited liability company interests or other equity securities other than those issued and outstanding as of the date hereof.

5.30    **Limitations on Distributions**.    Following the occurrence and during the continuance of an Event of Default, Borrower shall not make any distributions to its members, partners or shareholders, as applicable.

5.31    **Bankruptcy-Related Covenants**.

(a)    To the extent permitted by applicable law, Borrower shall not, nor shall Borrower cause Owner to, seek substantive consolidation of Borrower or Owner into the

49

bankruptcy estate of Guarantor in connection with a proceeding under the Bankruptcy Code or under any other federal, state or foreign insolvency law involving Guarantor.

(b)     To the extent permitted by applicable law, Borrower shall not, nor shall Borrower cause Owner to, contest, oppose or object to any motion made by Lender to obtain relief from the automatic stay or seek to reinstate the automatic stay in connection with a proceeding under the Bankruptcy Code or under any other federal, state or foreign insolvency law involving Guarantor.

(c)     To the extent permitted by applicable law, Borrower shall not, nor shall Borrower cause Owner to provide, originate, acquire an interest in or solicit (in writing) or accept from Guarantor or any Affiliate of Guarantor, any debtor-in-possession financing on behalf of Guarantor in the event that Guarantor is the subject of a proceeding under the Bankruptcy Code or under any other federal, state or foreign insolvency law involving Guarantor.

**5.32    Contractual Obligations**. Other than the Loan Documents and the Owner Company Agreement (and the limited liability company interests in Borrower issued pursuant thereto), neither Borrower nor any of its assets shall be subject to any Contractual Obligations, and Borrower shall not enter into any agreement, instrument or undertaking by which it or its assets are bound, except for such liabilities that are incidental to its activities as a member of Owner and owner of the Collateral.

**5.33    No Amendments to Senior Loan Documents**. Without obtaining the prior written consent of Lender, Borrower shall not cause or permit Owner to enter into any amendment or modification of any of the Senior Loan Documents. Borrower shall cause Owner to provide Lender with a copy of any amendment or modification to the Senior Loan Documents within five (5) days after the execution thereof.

**5.34    OPA.**

**5.34.1**  Borrower shall not, without the prior written consent of Lender, amend or modify, or permit the amendment or modification of, any material term of the OPA, which for purposes of this Agreement shall include, without limitation, any amendment or modification the result of which is to increase the amount of monies due from Borrower or Owner thereunder or materially increases the obligations or liabilities of Borrower or Owner thereunder.  In addition, Borrower shall not and shall not permit Owner to, without the prior written consent of Lender, cancel, terminate or surrender, or permit the cancelation, termination or surrender of, the OPA or any of the rights and benefits thereunder.

**5.34.2**  Borrower shall cause Owner to comply in all respects with all of the terms, covenants and conditions on Owner's part to be complied with pursuant to the OPA and/or all rules and regulations that may be promulgated thereunder by any Governmental Authority.

**5.34.3**  Borrower shall promptly deliver to Lender a true and full copy of any notice of default given by or received by Owner and/or 3000 Imperial with respect to the OPA.

NY:1814691.9

**5.34.4** Borrower shall not, and shall not permit Owner to, without the prior written consent of Lender, submit (or permit the submission of) the Proposed Construction Plans (hereinafter defined) to the City (as defined in the OPA) or the Authority (as defined in the OPA) in connection with the Project (as defined in the OPA).

**5.34.5** Any proposed construction or alteration to the Property or to the Expansion Area (as defined in the OPA) in connection with the Project (as defined in the OPA) (collectively, the "***Proposed Construction***") by or on behalf of Borrower or Owner shall be subject to the prior written consent and approval of Lender, such consent and approval not to be unreasonably withheld, conditioned or delayed and to be based on and subject to Lender's receipt, review and approval of the following items: (i) construction drawings and plans and specifications for the Proposed Construction (the "***Proposed Construction Plans***"), which Proposed Construction Plans shall set forth, among other things, that the Proposed Construction shall be conducted solely within the Expansion Area (as defined in the OPA) except with respect to any necessary pedestrian circulation improvements constructed on the Property and approved by Lender; (ii) a guaranteed maximum construction contract for the Proposed Construction; (iii) intentionally omitted; (iv) evidence of adequate builder's all-risk insurance, which shall name Lender as an additional insured under all liability insurance; (v) evidence that Owner has obtained, or caused to be obtained, all necessary governmental approvals and permits in connection with the performance of the Proposed Construction pursuant to the Proposed Construction Plans; (vi) evidence that the Proposed Construction will not adversely impact the structural integrity of the Property; (vii) an engineer's report with respect to the adequacy of the above-mentioned items; (viii) evidence that the Proposed Construction shall not affect the compliance of the Property with any applicable Legal Requirements; (ix) evidence that, at all times during the Proposed Construction, access by Tenants to and from the street, the parking at the Property and the Property itself will not be unreasonably impaired; (x) evidence that, at all times during and after the Proposed Construction, the Property will have (1) sufficient parking to meet the demands of all applicable zoning laws and ordinances and all leases affecting the Property and (2) available to it all necessary utility and other services for its use, occupancy and operation; (xi) evidence reasonably satisfactory to Lender that (1) all consents have been obtained from Tenants under any Leases where such consent is required and (2) the Proposed Construction shall not violate the terms of any Lease or give rise to the right of any Tenant of any Lease to cancel such Lease; and (xii) evidence that the Proposed Construction will not have a material adverse effect on the use or operation of the Property.

**5.34.6** In the event that Lender approves the Proposed Construction (such approval not to be unreasonably withheld, conditioned or delayed), Borrower shall indemnify Lender in connection with any losses, costs, damages or liabilities arising out of such Proposed Construction; and Borrower shall and shall cause Owner to: (i) perform and complete the Proposed Construction in a good and workmanlike manner in compliance with all applicable Legal Requirements and free and clear of any Liens; (ii) perform the Proposed Construction in such a manner so as not to give rise to (1) any violation of any Lease, or (2) the right of any Tenant under any Lease to cancel such Lease; (iii) not permit the Proposed Construction to materially affect the use or operation of the Property and upon completion, such Proposed Construction shall not have a material adverse effect on the access to and/or parking for the Property; and (iv) if a temporary interruption in access is necessitated by such Proposed Construction or parking at the Property is impaired by such Proposed Construction, take all

51

commercially reasonable steps to minimize the interruption and/or impairment of access and/or parking and alternative means of access and/or parking reasonably acceptable to Lender must be provided.

5.34.7  In connection with the Proposed Construction: (i) Borrower shall, prior to final completion of the Proposed Construction, deliver or cause to be delivered to Lender evidence reasonably satisfactory to Lender that the Proposed Construction has been completed in a good and workmanlike manner in compliance with all applicable Legal Requirements and free and clear of any Liens; (ii) Lender shall have the right, at reasonable times and on reasonable advance notice (except in an emergency) to inspect, or to cause its designees to inspect, the Property in order to confirm that the Proposed Construction is being conducted as required hereunder and, promptly after completion of the Proposed Construction, to confirm that it has been completed as required hereunder; (iii) Borrower shall be responsible for the payment of all costs and expenses incurred by Lender in connection with such Proposed Construction including, without limitation, reasonable legal fees; (iv) upon the completion of the Proposed Construction, Borrower shall provide or cause to be provided to Lender (1) an updated as-built survey of the Property, and (2) copies of all certificates of occupancy required by applicable Legal Requirements as a result of the Proposed Construction and (v) Borrower shall, and shall cause Owner to, execute and/or deliver any and all additional documents, instruments, agreements, approvals, consents, site plans or other information relating to the foregoing as Lender may reasonably request.

**5.35**   **Parking Agreements.**

5.35.1  Borrower shall not, without the prior written consent of Lender, which may be granted or withheld in Lender's sole discretion, enter into (or permit Owner to enter into) any proposed agreement or instrument with respect to parking at or otherwise serving or affecting the Property.

5.35.2  Borrower shall cause Owner to (a) pay all rents, additional rents and other sums required to be paid by Owner, as tenant under and pursuant to the provisions of the Parking Agreement as and when such rent or other charge is payable, (b) diligently perform and observe all of the terms, covenants and conditions of the Parking Agreement on the part of Owner, as tenant thereunder, to be performed and observed at least three (3) days prior to the expiration of any applicable grace period therein provided, and (c) promptly notify Lender of the giving of any written notice by the lessor under the Parking Agreement to Owner of any default by Owner in the performance or observance of any of the terms, covenants or conditions of the Parking Agreement on the part of Owner, as tenant thereunder, to be performed or observed and deliver to Lender a true copy of each such notice.  Borrower shall not, without the prior consent of Lender, permit Owner to surrender the leasehold estate created by the Parking Agreement or terminate or cancel the Parking Agreement or modify, change, supplement, alter or amend, or waive any of the terms or provisions of, the Parking Agreement, in any material respect, either orally or in writing.  If Owner shall default in the performance or observance of any material term, covenant or condition of the Parking Agreement on the part of Owner, as tenant thereunder, to be performed or observed, then, without limiting the generality of the other provisions of the Loan Documents, and without waiving or releasing Borrower from any of its obligations hereunder, Lender shall have the right, but shall be under no obligation, to pay any

sums and to perform any act or take any action as may be appropriate to cause all of the material terms, covenants and conditions of the Parking Agreement on the part of Owner, as tenant thereunder, to be performed or observed or to be promptly performed or observed on behalf of Owner, to the end that the rights of Owner in, to and under the Parking Agreement shall be kept unimpaired as a result thereof and free from default, even though the existence of such event of default or the nature thereof be questioned or denied by Borrower or Owner or by any party on behalf of Borrower or Owner.  If Lender shall make any payment or perform any act or take action in accordance with the preceding sentence, Lender will notify Borrower of the making of any such payment, the performance of any such act, or the taking of any such action.  In any such event, Lender and any Person designated as Lender's agent by Lender shall have, and are hereby granted, the right to enter upon the Property at any reasonable time, on reasonable notice (which may be given orally) and from time to time for the purpose of taking any such action.  Lender may pay and expend such sums of money as Lender reasonably deems necessary for any such purpose and upon so doing shall be subrogated to any and all rights of the landlord under the Parking Agreement.  Borrower hereby agrees to pay to Lender within five (5) days after demand, all such sums so paid and expended by Lender, together with interest thereon from the day of such payment at the Default Rate.  All sums so paid and expended by Lender and the interest thereon shall be secured by the legal operation and effect of the Pledge.  If the lessor under the Parking Agreement shall deliver to Lender a copy of any notice of default sent by said lessor to Owner, as tenant under the Parking Agreement, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender, in good faith, in reliance thereon. Borrower shall cause Owner to exercise each individual option, if any, to extend or renew the term of the Parking Agreement upon demand by Lender made at any time within one (1) year prior to the last day upon which any such option may be exercised, and if Borrower shall fail to do so, Borrower hereby expressly authorizes and appoints Lender its attorney-in-fact to exercise any such option in the name of and upon behalf of Borrower and Owner, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest.  Subject to the terms of the Senior Loan Documents, Borrower will not permit Owner to subordinate or consent to the subordination of the Parking Agreement to any mortgage, security deed, lease or other interest on or in the landlord's interest in all or any part of the Property, unless, in each such case, the written consent of Lender shall have been first had and obtained, which approval shall not unreasonably be withheld.

**5.35.3**  Notwithstanding anything to the contrary contained herein, Borrower shall have the one (1) time right to cause Owner to terminate the Parking Agreement, provided that Borrower satisfies the following conditions:

(a)      No Event of Default has occurred and is continuing;

(b)      Borrower delivers to Lender written notice thirty (30) days prior to the date Borrower wishes to cause Owner to terminate the Parking Agreement;

(c)      Borrower has caused Owner to enter into a replacement parking agreement, which replacement parking agreement shall (a) provide for the leasing of the same number of parking spaces for which the Parking Agreement existing as of the date hereof provides for, provided that Borrower shall be permitted to lease a lower number of parking spaces, so long as the number of parking spaces is sufficient to satisfy all zoning laws and

53

regulations, on real property that is either the real property identified as "Parcel 1" on **Schedule 5** or other real property satisfactory to Lender in its sole discretion, (b) be in form and substance substantially similar (including without limitation, the term of such agreement, the rent and additional rent payable thereunder, and the rights of Owner and Lender thereunder) to the Parking Agreement and is otherwise acceptable to Lender in its reasonable discretion (the "*Replacement Parking Agreement*");

(d)    After taking into account the termination of the Parking Agreement and the execution of the Replacement Parking Agreement, the Property complies with all applicable Legal Requirements (including, without limitation, with respect to parking and applicable zoning and land use laws, regulations and ordinances); and

(e)    Borrower remakes all of the representations, warranties and covenants contained in section 4.31 and this Section 5.35 to Lender in writing.

5.35.4    In the event that for any reason the Parking Agreement is terminated, Borrower shall within ten (10) Business Days of the termination of such Parking Agreement comply with clauses (a) through (e) of Section 5.35.3 hereof.

**5.36    ISLT Pledges.**  Borrower shall not, and shall not permit Owner to, cause, suffer or permit, any Person, including, without limitation, any assignee or pledgee under any ISLT Pledge, at any time, to obtain any direct or indirect ownership or membership interest, or any voting, management or Control right, in or with respect to, ISLT, Placo, Owner or Borrower pursuant to any ISLT Pledge. Borrower shall not, and shall not permit Owner to, cause, suffer or permit any ISLT Pledge, the Beach Orangethorpe Guaranty or the Beach Orangethorpe II Guaranty to be amended, restated, replaced, supplemented or otherwise modified without the prior written consent of Lender, which consent shall be granted or withheld in Lender's sole and absolute discretion (it being understood and agreed that so long as no Event of Default shall be continuing, Lender shall not unreasonably withhold its consent to an amendment to an ISLT Pledge, the Beach Orangethorpe Guaranty or the Beach Orangethorpe II Guaranty if and only if the proposed amendment does not, in any way, modify or grant any direct or indirect ownership or membership interest, or any voting, management or Control right in or with respect to ISLT, Placo, Owner or Borrower or materially increase any obligations of ISLT).

**5.37    Owner Affiliated Leases**.

**5.37.1  No Transfer of Owner Affiliated Leases by Owner**.  Borrower shall not permit any Owner Affiliated Lease, nor Owner's interest as lessor under the Owner Affiliated Lease, to be assigned, transferred, pledged, mortgaged or hypothecated without the prior written approval of Lender, which may be withheld in Lender's sole and absolute discretion, except that all Leases (including Owner's interest as lessor under the Owner Affiliated Leases) shall be (and have been) assigned to Senior Lender as security for the Debt (as defined in the Senior Loan Agreement).

**5.37.2  No Transfer of Owner Affiliated Leases by Owner Affiliated Tenant.** Borrower shall not permit any Owner Affiliated Tenant to assign, transfer, pledge, mortgage,

NY:1814691.9

hypothecate or sublet its interest under any Owner Affiliated Lease without the prior written approval of Lender.

**5.37.3  No Amendments.**  No Owner Affiliated Lease (including any guaranty thereof) shall be modified, amended or altered in any way, without the prior written consent of Lender, which may be granted or withheld in Lender's sole discretion.

**5.37.4  No Release of Tenant.**  No Owner Affiliated Tenant (and no guarantor of the applicable Owner Affiliated Lease) shall be released of any of its obligations imposed under any Owner Affiliated Lease (and related lease guaranty) without in each case the prior written consent of Lender, which may be granted or withheld in Lender's sole discretion.

**5.37.5  No Termination.**  No Owner Affiliated Lease and no related lease guaranty shall be cancelled, surrendered or terminated in any way, without the prior written consent of Lender, which may be granted or withheld in Lender's sole discretion.

### 5.37.6  Covenants.

(a)    With respect to any Owner Affiliated Lease, Borrower shall: (i) cause Owner to promptly and faithfully observe, perform and comply with all the terms, covenants and provisions thereof on its part to be observed, performed and complied with under each Owner Affiliated Lease, at the times set forth therein and to do all things necessary to preserve unimpaired its rights thereunder; (ii) cause Owner to diligently enforce all of the terms, covenants and provisions to be observed, performed and complied with by each Owner Affiliated Tenant under each Owner Affiliated Lease, at the times set forth therein, provided that Borrower shall not permit Owner to terminate any Owner Affiliated Lease (or any related lease guaranty) without the prior written consent of Lender, which may be granted or withheld in Lender's sole discretion; (iii) upon the written request of Lender to Borrower following the occurrence of (x) an Owner Affiliated Lease Default Event, or (y) an Event of Default under the Loan Documents, cause Owner to diligently exercise Owner's rights and remedies under any such Owner Affiliated Lease to terminate such Owner Affiliated Lease and evict the Owner Affiliated Tenant from the Property, (iv) not permit Owner to do, permit, suffer or refrain from doing anything, as a result of which, there would be a default under any of the terms of any Owner Affiliated Lease; (v) not permit Owner to exercise any right or option to cancel, surrender or otherwise terminate any Owner Affiliated Lease without the prior written consent of Lender, which may be granted or withheld in Lender's sole discretion; (vi) deliver to Lender prompt written notice of any default by any party under any Owner Affiliated Lease and promptly deliver to Lender copies of each notice of default and, after the occurrence of an Event of Default, copies of all other notices, communications, plans, specifications and other similar instruments received or delivered by Borrower in connection therewith; (vii) furnish to Lender such information and evidence as Lender may reasonably require concerning Owner's and each Owner Affiliated Tenant's due observance, performance and compliance with the terms, covenants and provisions of each Owner Affiliated Lease and (viii) not collect any of the Rents more than one (1) month in advance.

(b)    If Owner shall be in default under any Owner Affiliated Lease, then Borrower shall cause Owner to grant Lender the right (but not the obligation), to cause the

default or defaults under such Owner Affiliated Lease to be remedied and otherwise exercise any and all rights of Owner under such Owner Affiliated Lease, as may be necessary to prevent or cure any default, and Lender shall have the right to enter all or any portion of the Property at such times and in such manner as Lender deems necessary, to prevent or to cure any such default.

(c)      The actions or payments of Lender to cure any default by Owner under any Owner Affiliated Lease shall not remove or waive, as between Borrower and Lender, the default that occurred under this Agreement by virtue of the default by Owner under such Owner Affiliated Lease.  All sums expended by Lender to cure any such default shall be paid by Borrower to Lender, within ten (10) days after written demand, with interest on such sum at the rate set forth in this Agreement from the date such sum is expended to and including the date the reimbursement payment is made to Lender.  All such indebtedness shall be deemed to be secured by the Security Instrument.

(d)      Borrower shall notify Lender promptly in writing of the occurrence of any default by any Owner Affiliated Tenant or the occurrence of any event that, with the passage of time or service of notice, or both, would constitute a default by any Owner Affiliated Tenant under any Owner Affiliated Lease, and the receipt by Owner of any notice (written or otherwise) from any Owner Affiliated Tenant under any Owner Affiliated Lease noting or claiming the occurrence of any default by Owner under such Owner Affiliated Lease or the occurrence of any event that, with the passage of time or service of notice, or both, would constitute a default by Owner under such Owner Affiliated Lease.

(e)      Within fifteen (15) days after receipt of written demand by Lender, Borrower shall obtain from each Owner Affiliated Tenant and furnish to Lender the estoppel certificate of such Owner Affiliated Tenant addressed to Lender, its successors and assigns in form and substance reasonably satisfactory to Lender stating, among other items, the date through which rent has been paid and whether or not there are any defaults thereunder and specifying the nature of such claimed defaults, if any.

**5.37.7  Conflicts.**   In the event of any inconsistency between the terms of this Section 5.37 and the terms of Section 5.9 of this Agreement, the terms of this Section 5.37 shall govern.

## 5.38      Environmental Documents.

**5.38.1** Borrower shall at all times (i) cause Owner to promptly and faithfully observe, perform and comply with all of the terms, covenants and provisions on its part to be observed, performed and complied with under the Environmental Documents, and (ii) cause the Property to remain fully compliant with all of the terms, covenants and provisions to be complied with under the Environmental Documents (in each case including, without limitation, any provision requiring (x) notice to be delivered to subsequent holders of any ownership interest in the Property of the use restrictions set forth in any Environmental Document, (y) that prior approval of the Los Angeles Water Quality Control Board (the "*LAWQCB*") be obtained prior to any subsurface disturbance of the engineered cap and that such subsurface disturbance be performed consistently with a site-specific health and safety plan, in accordance with all

56

applicable Legal Requirements and/or notice to be delivered to the LAWQCB of any subsurface disturbance of the engineered cap without prior authorization of the LAWQCB, and/or (z) that access be provided to the Property as required in the Environmental Documents to the LAWQCB and EIMF California Limited Partnership IV, L.P., or any successor entities responsible for any remediation at the Property.

**5.38.2**  Borrower shall not, without the prior written consent of Lender, amend or modify, or permit the amendment or modification of, the Environmental Documents.

**5.39**    **Tenant Insurance.**

**5.39.1**  Borrower acknowledges that Owner currently carries primary property insurance coverage for all improvements located on the Property with the exception of those improvements owned by Tenants under ground leases with Owner, as lessor, which insurance satisfies the requirements set forth in this Agreement ("***Owner's Primary Insurance***").

**5.39.2**  Borrower shall cause Owner to continue to carry Owner's Primary Insurance throughout the term; provided, however, that Borrower may permit Tenants to obtain primary insurance coverage for improvements located on the Property which are owned by Owner, so long as Borrower has caused the applicable Tenant to deliver to Lender evidence in form and substance satisfactory to Lender that such Tenant has obtained property insurance which satisfies the requirements set forth in this Agreement and is otherwise acceptable to Lender in its sole discretion.

**5.40**    **Master Lease.**

**5.40.1**  Owner, as landlord, and Master Tenant, as tenant, have entered into the Master Lease for the entire Planet Fitness Space (as defined in the Senior Loan Agreement) (the "***Master Lease Premises***") for an initial term (i) commencing, if ever, on the date upon which the Planet Fitness Lease (as defined in the Senior Loan Agreement) expires or is surrendered, cancelled or otherwise terminated, and (ii) continuing until the earlier of (x) the Expiration Date (as defined in the Planet Fitness Lease), or (y) the date upon which Owner has (A) entered into a Lease with a replacement tenant reasonably satisfactory to Lender (a "***Replacement Master Tenant***"), demising all of the Master Lease Premises, with a net effective rental rate as approved by Lender in its sole discretion, for a term of not less than such time as remained under the Planet Fitness Lease as of the date immediately preceding the date of the termination of the Planet Fitness Lease, and otherwise in form and substance and upon terms reasonably acceptable to Lender (a "***Replacement Master Lease***"), (B) delivered to Lender (1) a copy of the Replacement Master Lease (together with evidence reasonably satisfactory to Lender that the Replacement Master Tenant is open for business in the Master Lease Premises and paying full unabated rent in accordance with the Replacement Master Lease), (2) an Acceptable Tenant Estoppel Certificate from the Replacement Master Tenant and (3) if requested by Lender, a recognition agreement from the Replacement Master Tenant in form and substance satisfactory to Lender, and (C) paid all tenant improvement allowances and leasing brokerage commissions payable by Owner in connection with the Replacement Master Lease and delivered to Lender evidence in form and substance reasonably satisfactory to Lender of the payment of same.

57

**5.40.2** The Master Lease is for a total rent equal to not less than the sum of base rent payable under the Planet Fitness Lease plus all pass-throughs, reimbursements and other sums in addition to base rent as provided in the Planet Fitness Lease, including, without limitation, for real estate taxes and assessments, insurance and utilities, including any increases set forth therein (collectively, the "***Master Lease Rent***").

**5.40.3** Borrower shall not permit Owner to permit the Master Lease, nor the tenant's interest under the Master Lease to be assigned, transferred, pledged or hypothecated without the prior written approval of Lender, except that all Leases (including the Master Lease) shall be assigned as security for the Loan. The Master Lease shall remain unmodified and in full force and effect in accordance with its terms.

**5.40.4** (i) No termination or cancellation of the Master Lease shall be valid (regardless of whether such termination shall be permissible under the terms of the Master Lease, applicable law or principles of equity); (ii) no modification or amendment to any term or provision of the Master Lease shall be valid; (iii) no waiver or release of the tenants under the Master Lease from any of the obligations of the tenant under the Master Lease shall be valid (including, without limitation the payment of the rent and all other amounts payable by the tenant thereunder); (iv) no abatements of the rent or any other amounts payable thereunder shall be valid (regardless of whether such abatement shall be permissible under the terms of the Master Lease, applicable law or principles of equity); and (v) no release of any or all of the Master Lease Premises shall be valid, in each instance, without the prior, written approval of Lender. Borrower further covenants and agrees that any such termination, cancellation, modification, amendment, waiver, abatement or release made or purported to be made without the prior, written approval of Lender shall be null and void ab initio and that Lender shall be made a permitted third party beneficiary of the corresponding provisions in the Master Lease, entitled to enforce the same against the landlord and tenant.

**5.40.5** Borrower shall cause Owner to cause all Master Lease Rent to be deposited into the Clearing Account at the Clearing Bank.

**5.40.6** Any sublease entered into between Tenants and the Master Tenant for portions of the Master Lease Premises shall contain recognition and attornment language providing that in the event that the Master Lease is ever terminated, such Tenants shall recognize and attorn to Borrower (or to the extent that at such time, Senior Lender shall have become the owner of the Master Lease Premises by foreclosure, conveyance in lieu of foreclosure or otherwise, then to Senior Lender) as such Tenant's direct landlord and the sublease shall continue in full force and effect as a direct lease between such Tenant and Borrower or Senior Lender, as applicable, upon all of the terms, covenants and conditions set forth in the sublease, except as amended by necessary implication.

**5.40.7** Without limiting anything to the contrary contained herein, if and to the extent that Borrower obtains Lender's approval to terminate any Lease, such approval may be conditioned upon the execution and delivery to Lender of an amendment to the Master Lease, in form and substance acceptable to Lender, pursuant to which the Master Lease Premises are amended to include the space that was demised to the Tenant whose lease was terminated.

NY:1814691.9

5.41    **Gap Zoning Policy**.

       5.41.1 <u>Gap Zoning Policy</u>. Borrower represents and warrants that it has caused Owner to secure the Gap Zoning Policy.  The Gap Zoning Policy shall at all times name Lender and its successors and assigns as a named insured.  Borrower represents, warrants and covenants that it has caused Owner to pay all necessary premiums, taxes and fees and will be responsible to cause Owner to pay any and all applicable deductibles associated therewith.

       5.41.2 Borrower shall take not permit Owner to take any action, including allowing a change in the use of the Property that is materially different from the current use of the Property, such that coverage under the Gap Zoning Policy could be denied by the insurer under the Gap Zoning Policy.

**6.**    **<u>NOTICES AND REPORTING</u>**.

       **6.1**    **<u>Notices</u>**.   All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document (a "***Notice***") shall be given in writing and shall be effective for all purposes if either hand delivered with receipt acknowledged, or by a nationally recognized overnight delivery service (such as Federal Express), or by certified or registered United States mail, return receipt requested, postage prepaid, or by facsimile and confirmed by facsimile answer back, in each case addressed as follows (or to such other address or Person as a party shall designate from time to time by Notice to the other party):  If to Lender: Natixis, New York Branch, 1251 Avenue of the Americas, New York, New York 10020; Attention: Real Estate Administration, Telecopier: (212) 891–5777 with a copy to: Winston & Strawn LLP, 200 Park Avenue, New York, New York 10166, Attention: Corey A. Tessler, Esq., Telecopier: (212) 294-4700; if to Borrower: Plamex Investment, LLC, 3100 East Imperial Highway, Lynwood, California 90262, Attention: Min Chae and Donald Chae, Telecopier: (310) 631-6999; with a copy to: Lim, Ruger & Kim, LLP, 1055 West Seventh Street, Suite 2800, Los Angeles, California 90017, Attention: John Lim, Esq., Telecopier: (213) 955-9511.  A Notice shall be deemed to have been given: (a) in the case of hand delivery, at the time of delivery; (b) in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; (c) in the case of overnight delivery, upon the first attempted delivery on a Business Day; or (d) in the case of facsimile transmission, when sent and electronically confirmed.

       **6.2**    **<u>Borrower Notices and Deliveries</u>**.   Borrower shall (a) give prompt written notice to Lender of: (i) any litigation, governmental proceedings or claims or investigations pending or threatened against Borrower or Owner which might materially adversely affect Borrower's or Owner's condition (financial or otherwise) or business, the Property or the Collateral; (ii) any material adverse change in Borrower's or Owner's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Borrower has knowledge; and (b) furnish and provide to Lender: (i) any Securities and Exchange Commission or other public filings, if any, of Borrower, Owner, Manager, or any Affiliate of any of the foregoing within two (2) Business Days of such filing and (ii) all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, reasonably requested, from time to time, by Lender.  In addition, after request by Lender (but no more frequently than twice in any year), (x) Borrower shall furnish to Lender within ten (10) days, a certificate addressed to Lender, its successors and assigns

59

reaffirming all representations and warranties of Borrower set forth in the Loan Documents as of the date requested by Lender or, to the extent of any changes to any such representations and warranties, so stating such changes and (y) Borrower shall use commercially reasonable efforts to obtain, or cause Owner to obtain (but subject in all respects to any restrictions contained in the applicable Leases), within thirty (30) days of such request, Tenant estoppel certificates addressed to Lender, its successors and assigns, from each Tenant at the Property in form and substance reasonably satisfactory to Lender.

### 6.3    Financial Reporting.

**6.3.1    Bookkeeping.**  Borrower shall keep, and shall cause Owner to keep, on a calendar year basis, in accordance with GAAP or any other accounting method, consistently applied, proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and Owner and all items of income and expense and any services, Equipment or furnishings provided in connection with the operation of the Property and the ownership of the Collateral, whether such income or expense is realized by Borrower, Owner, Manager or any Affiliate of Borrower.  Lender shall have the right from time to time during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Borrower or other Person maintaining them, and to make such copies or extracts thereof as Lender shall reasonably require.  After an Event of Default, Borrower shall pay any costs incurred by Lender to examine such books, records and accounts, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

**6.3.2    Annual Reports.**  Borrower shall furnish to Lender annually within one hundred twenty (120) days after each calendar year, a complete copy of Borrower's and Owner's annual financial statements audited by a "big four" accounting firm or another certified public accountant (accompanied by an unqualified opinion from such accounting firm or independent certified public accountant) in form and content reasonably acceptable to Lender, prepared in accordance with GAAP or any other accounting method, consistently applied, and containing balance sheets and statements of profit and loss for Borrower, Owner, the Collateral and the Property in such detail as Lender may reasonably request.  Each such statement (x) shall be in form and substance reasonably satisfactory to Lender, (y) shall set forth the financial condition and the income and expenses for the Collateral and the Property for the immediately preceding calendar year, including statements of annual Net Operating Income as well as (1) a list of Tenants, if any, occupying more than twenty percent (20%) of the rentable space of the Property, (2) a breakdown showing (a) the year in which each Lease then in effect expires, (b) the percentage of rentable space covered by such Lease, (c) the percentage of base rent with respect to which Leases shall expire in each such year, expressed both on a per year and a cumulative basis and (z) shall be accompanied by an Officer's Certificate certifying (1) that such statement is true, correct, complete and accurate in all material respects and presents fairly the financial condition of the Property and the Collateral and has been prepared in accordance with GAAP or any other accounting method consistently applied and (2) whether there exists a Default or Event of Default, and if so, the nature thereof, the period of time it has existed and the action then being taken to remedy it.

**6.3.3    Monthly/Quarterly Reports.**  Borrower shall furnish to Lender within twenty (20) days after the end of each calendar month or quarter, as applicable, the following

NY:1814691.9

items: (i) monthly provided, however, that monthly reports shall only be required prior to "start-up day" (within the meaning of Section 860G(a)(9) of the Code), quarterly and year–to–date operating statements, noting Net Operating Income and other information necessary and sufficient under GAAP or any other accounting method, consistently applied to fairly represent the financial position and results of operation of the Property and the Collateral during such calendar month, all in form satisfactory to Lender; (ii) quarterly, a balance sheet for such calendar quarter; (iii) quarterly, a comparison of the budgeted income and expenses and the actual income and expenses for each quarter and year–to–date for the Property and the Collateral, together with a detailed explanation of any variances of ten percent (10%) or more between budgeted and actual amounts for such period and year to date; (iv) quarterly, a statement of the actual Capital Expenses made by Borrower and Owner during each calendar quarter as of the last day of such calendar quarter; (v) quarterly, a statement that neither Borrower nor Owner has incurred any indebtedness other than indebtedness permitted hereunder or under the Senior Loan Documents; (vi) quarterly, an aged receivables report; and (vii) monthly (provided, however, that monthly reports shall only be required prior to "start-up day" (within the meaning of Section 860G(a)(9) of the Code), rent rolls identifying the leased premises, names of all Tenants, units leased, monthly rental and all other charges payable under each Lease, date to which paid, term of Lease, date of occupancy, date of expiration, material special provisions, concessions or inducements granted to Tenants, and a year–by–year schedule showing by percentage the rentable area of the Improvements and the total base rent attributable to Leases expiring each year) and a delinquency report for the Property.  Each such statement shall be accompanied by an Officer's Certificate certifying (1) that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower, the Owner, the Collateral and the Property in accordance with GAAP or any other accounting method, consistently applied (subject to normal year–end adjustments) and (2) whether there exists a Default or Event of Default, and if so, the nature thereof, the period of time it has existed and the action then being taken to remedy it.

    **6.3.4    Other Reports**.  Borrower shall furnish, or cause Owner to furnish , to Lender, within ten (10) Business Days after request, such further detailed information with respect to the operation of the Property and the financial affairs of Borrower, Owner or Manager as may be reasonably requested by Lender or any applicable Rating Agency.

    **6.3.5    Annual Budget**.  Borrower shall prepare and submit (or shall cause Owner or Manager to prepare and submit) to Lender by November 15th of each year during the Term for approval by Lender, which approval shall not be unreasonably withheld or delayed, a proposed pro forma budget for the Property for the succeeding calendar year (the "***Annual Budget***"), and, promptly after preparation thereof, any revisions to such Annual Budget. Lender's failure to approve or disapprove any Annual Budget or revision within thirty (30) days after Lender's receipt thereof shall be deemed to constitute Lender's approval thereof.  The Annual Budget shall consist of (i) an operating expense budget (the "***Operating Budget***") showing, on a month–by–month basis, in reasonable detail, each line item of Borrower's and Owner's anticipated operating income and operating expenses (on a cash and accrual basis), including amounts required to establish, maintain or increase any monthly payments required hereunder and under the Senior Loan Documents, and (ii) a Capital Expense budget (the "***Capital Budget***") showing, on a month–by–month basis, in reasonable detail, each line item of anticipated Capital Expenses.

61

      **6.3.6**  **Breach**.  If Borrower fails to provide to Lender or its designee any of the financial statements, certificates, reports or information (the "***Required Records***") required by this Section 6.3 within thirty (30) days after the date upon which such Required Record is due, Borrower shall pay to Lender, at Lender's option and in its discretion, an amount equal to $10,000 for each Required Record that is not delivered; provided Lender has given Borrower at least fifteen (15) days prior notice of such failure.  In addition, thirty (30) days after Borrower's failure to deliver any Required Records, Lender shall have the option, upon fifteen (15) days notice to Borrower to gain access to Borrower's books and records and prepare or have prepared at Borrower's expense, any Required Records not delivered by Borrower.

**7.**      **INSURANCE; CASUALTY; AND CONDEMNATION**.

    **7.1**    **Insurance**.

      **7.1.1**  **Coverage**.  Borrower, at its sole cost, or at Owner's sole cost, for the mutual benefit of Borrower and Owner, on the one hand, and Lender, on the other hand, shall cause Owner to obtain and maintain during the Term those policies of insurance required under Section 7.1 of the Senior Loan Agreement and to meet all insurer requirements thereunder. In addition, Borrower shall cause Lender and Borrower to each be named as an additional insured or loss payee, as applicable, on each Policy. Borrower shall also cause all Policies required under Section 7.1 of the Senior Loan Agreement to provide for at least thirty (30) days' prior notice to Lender in the event of any Policy cancellation or expiration or material changes.  Borrower shall provide Lender with evidence of insurance required under the Senior Loan Agreement simultaneously with Owner's provision of evidence to Senior Lender.

    **7.2**    **Casualty**.

      **7.2.1**  **Notice; Restoration**.  If the Property is damaged or destroyed, in whole or in part, by fire or other casualty (a "*Casualty*"), Borrower shall give prompt notice thereof to Lender. Following the occurrence of a Casualty, subject to the requirements of the Senior Loan Documents, Borrower, regardless of whether insurance proceeds are available, shall promptly proceed to restore, repair, replace or rebuild, or shall cause the Owner to promptly proceed to restore, repair or rebuild , the Property in accordance with Legal Requirements to be of at least equal value and of substantially the same character as prior to such damage or destruction.

      **7.2.2**  **Settlement**.  If a Casualty covered by any of the Policies (an "*Insured Casualty*") occurs where the loss does not exceed $ 250,000; provided no Default or Event of Default has occurred and is continuing, Borrower may cause Owner to settle and adjust any claim without the prior consent of Lender; provided such adjustment is carried out in a competent and timely manner, and Borrower is hereby authorized to permit Owner to collect and receipt for the insurance proceeds (the "*Proceeds*").  In the event of an Insured Casualty where the loss equals or exceeds $250,000 (a "*Significant Casualty*"), Lender may, in its sole discretion, but subject to the prior rights of the Senior Lender, settle and adjust any claim without the consent of Borrower or Owner and agree with the insurer(s) on the amount to be paid on the loss, and the Proceeds shall, if required by Senior Lender be due and payable solely to Senior Lender and held by Senior Lender and disbursed in accordance with the terms of the Senior Loan Agreement.  Subject to the prior rights of Senior Lender, if Borrower or any party other than

Lender is a payee on any check representing Proceeds with respect to a Significant Casualty, Borrower shall immediately endorse, and cause all such third parties to endorse, such check payable to the order of Lender.  Borrower hereby irrevocably appoints Lender as its attorney–in–fact, coupled with an interest, to endorse such check payable to the order of Lender.  The expenses incurred by Lender in the settlement, adjustment and collection of the Proceeds shall become part of the Debt and shall be reimbursed by Borrower to Lender upon demand.

**7.3**    **Condemnation**.

**7.3.1**    **Notice; Restoration**.  Borrower shall promptly give Lender notice of the actual or threatened commencement of any condemnation or eminent domain proceeding affecting the Property (a "***Condemnation***") and shall cause Owner to deliver to Lender copies of any and all papers served in connection with such Condemnation.  Following the occurrence of a Condemnation, Borrower, regardless of whether an Award is available, shall promptly cause Owner to promptly proceed to restore, repair, replace or rebuild the Property in accordance with Legal Requirements to the extent practicable to be of at least equal value and of substantially the same character (and to have the same utility) as prior to such Condemnation.

**7.3.2**    **Collection of Award**.  Subject to the prior rights of Senior Lender, Lender is hereby irrevocably appointed as Borrower's attorney–in–fact, coupled with an interest, with exclusive power on behalf of Owner to collect, receive and retain any award or payment in respect of a Condemnation (an "***Award***") and to make any compromise, adjustment or settlement in connection with such Condemnation.  Notwithstanding any Condemnation (or any transfer made in lieu of or in anticipation of such Condemnation), Borrower shall continue to pay the Debt at the time and in the manner provided for in the Loan Documents, and the Debt shall not be reduced unless and until any Net Liquidation Proceeds After Debt Service shall have been actually received and applied by Lender to expenses of collecting the Award and to discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Net Liquidation proceeds After Debt Service interest at the rate or rates provided in the Note(or Undefeased Note, as the case may be).

**7.4**    **Restoration**.  Borrower shall cause Owner to comply in all respects with the terms and provisions of Section 7.4 of the Senior Loan Agreement in connection with a Restoration (as defined in the Senior Loan Agreement) following a casualty or Condemnation.

# 8.    DEFAULTS.

**8.1**    **Events of Default**.  An "***Event of Default***" shall exist with respect to the Loan if any of the following shall occur:

(a)    any portion of the Debt is not paid when due or any other amount under the Loan Documents is not paid in full when due (unless sufficient funds are available in the relevant Subaccount on the applicable date);

(b)    any of the Taxes are not paid when due (unless Senior Lender is paying such Taxes pursuant to Section 3.3 of the Senior Loan Agreement), subject to Borrower's

63

and Owner's right to contest Taxes in accordance with <u>Section 5.2</u> hereof and Section 5.2 of the Senior Loan Documents, as applicable;

(c)    the Policies are not kept in full force and effect, or are not delivered to Lender upon request;

(d)    a Transfer other than a Permitted Transfer occurs;

(e)    any representation or warranty made in any Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished by Borrower, Owner or Guarantor in connection with any Loan Document, shall be false or misleading in any material respect as of the date the representation or warranty was made;

(f)    Borrower, Owner or Guarantor shall (i) make a general assignment for the benefit of creditors or (ii) generally not be paying its debts as they become due;

(g)    a receiver, liquidator or trustee shall be appointed for Borrower, Owner or Guarantor; or Borrower, Owner or Guarantor shall be adjudicated a bankrupt or insolvent; or any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower, Owner or Guarantor, as the case may be; or any proceeding for the dissolution or liquidation of Borrower, Owner or Guarantor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower, Owner or Guarantor, as the case may be, only upon the same not being discharged, stayed or dismissed within sixty (60) days;

(h)    any covenant contained in <u>Sections 5.11.1 (a)</u> – <u>(e)</u>, <u>5.12</u>, <u>5.14</u>, <u>5.15</u> or <u>5.16</u>, <u>5.22</u>, <u>5.24</u> – <u>5.31</u>, <u>9.1</u> or <u>9.2</u> – <u>9.4</u> is breached;

(i)    except as expressly permitted hereunder, the alteration, improvement, demolition or removal of all or any of portion of the Improvements without the prior written consent of Lender where such consent is required under this Agreement or the physical waste of any portion of the Property;

(j)    an Event of Default as defined or described elsewhere in this Agreement or in any other Loan Document occurs; or any other event shall occur or condition shall exist, if the effect of such event or condition is to accelerate or to permit Lender to accelerate the maturity of any portion of the Debt;

(k)    a default occurs under any term, covenant or provision set forth herein or in any other Loan Document which specifically contains a notice requirement or grace period and such notice has been given and such grace period has expired;

(l)    any of the assumptions contained in any substantive non–consolidation opinion, delivered to Lender by Borrower's counsel in connection with the Loan or otherwise hereunder, were not true and correct in any material respect as of the date of such opinion or thereafter became untrue or incorrect in any material respect;]

64

(m)    a default shall be continuing under any of the other terms, covenants or conditions of this Agreement or any other Loan Document not otherwise specified in this <u>Section 8.1</u>, for ten (10) days after notice to Borrower (or Guarantor, if applicable) from Lender, in the case of any default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other default; provided, however, that if such non–monetary default is susceptible of cure but cannot reasonably be cured within such thirty (30) – day period, and Borrower (or Guarantor, if applicable) shall have commenced to cure such default within such thirty (30) – day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) – day period shall be extended for an additional period of time as is reasonably necessary for Borrower (or Guarantor, if applicable) in the exercise of due diligence to cure such default, such additional period not to exceed sixty (60) days.

(n)    Borrower fails to comply fully, completely and timely with the covenants and agreements set forth in <u>Section</u> 10.4;

(o)    a breach of any of the representations in Section 4.24 of this Agreement and/or Section 3 of the Pledge occurs;

(p)    the Senior Loan is prepaid other than on a pro rata basis with the Loan without the Lender's prior written consent;

(q)    a Senior Loan Event of Default occurs, or any other event shall occur or condition shall exist, if the effect of such event or condition is to accelerate or permit Senior Lender to accelerate the maturity of any portion of the Senior Loan;

(r)    any amendment or modification of the OPA in violation of <u>Section 5.34</u> hereof or the termination of the OPA prior to the expiration thereof without Lender's consent;

(s)    the breach by Owner or 3000 Imperial of any of the material terms and conditions of the OPA;

(t)    any representation, warranty or covenant contained in <u>Section 5.34</u> is breached;

(u)    any representation, warranty or covenant contained in <u>Sections 4.30</u> and/or <u>5.38</u> is breached; or

(v)    any covenant contained in <u>Section 5.36</u> is breached;

(w)    any representation, warranty or covenant contained in <u>Sections 5.38</u> and/or <u>5.40</u> is breached;

(x)    a default by Owner or the Master Tenant under the Master Lease; or

65

(y)      if (A) Owner shall fail in the payment of any rent, additional rent or other charge mentioned in or made payable by the Parking Agreement as and when such rent or other charge is payable, (B) there shall occur any default by Owner, as tenant under the Parking Agreement, in the observance or performance of any term, covenant or condition of the Parking Agreement on the part of Owner, to be observed or performed, (C) if any one or more of the events referred to in the Parking Agreement shall occur which would cause the Parking Agreement to terminate without notice or action by the landlord under the Parking Agreement or which would entitle the landlord to terminate the Parking Agreement and the term thereof by giving notice to Owner, as tenant thereunder, (D) if the leasehold estate created by the Parking Agreement shall be surrendered or the Parking Agreement shall be terminated or canceled for any reason or under any circumstances whatsoever, or (E) if any of the terms, covenants or conditions of the Parking Agreement shall in any manner be modified, changed, supplemented, altered, amended or waived without the consent of Lender.

8.2    **Remedies**.

8.2.1    **Acceleration**.  Upon the occurrence of an Event of Default (other than an Event of Default described in subsection (f) or (g) of Section 8.1) and at any time and from time to time thereafter, in addition to any other rights or remedies available to it pursuant to the Loan Documents or at law or in equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Collateral; including declaring the Debt to be immediately due and payable (including unpaid interest), Default Rate interest, Late Payment Charges, Yield Maintenance Premium and any other amounts owing by Borrower), without notice or demand; and upon any Event of Default described in subsection (f) or (g) of Section 8.1, the Debt (including unpaid interest, Default Rate interest, Late Payment Charges, Yield Maintenance Premium and any other amounts owing by Borrower) shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained in any Loan Document to the contrary notwithstanding.

8.2.2    **Remedies Cumulative**.  Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under the Loan Documents or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared, or be automatically, due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth in the Loan Documents.  Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing, (i) to the extent permitted by applicable law, Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Collateral, the Pledge and other Security Documents has been foreclosed, the Collateral has been sold or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.  To

66

the extent permitted by applicable law, nothing contained in any Loan Document shall be construed as requiring Lender to resort to any portion of the Collateral for the satisfaction of any of the Debt in preference or priority to any other portion, and Lender may seek satisfaction out of the entire Property or any part thereof, in its discretion.

      **8.2.3**   **Severance**.   Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, pledge and security agreements and other security documents (and, in connection therewith, to bifurcate or otherwise modify the nature of the collateral that secures such notes) in such denominations and priorities of payment and liens as Lender shall determine in its discretion for purposes of evidencing and enforcing its rights and remedies.   Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender.   Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such severance, Borrower ratifying all that such attorney shall do by virtue thereof.

      **8.2.4**   **Delay**.   No delay or omission to exercise any remedy, right or power accruing upon an Event of Default, or the granting of any indulgence or compromise by Lender shall impair any such remedy, right or power hereunder or be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.   A waiver of one Default or Event of Default shall not be construed to be a waiver of any subsequent Default or Event of Default or to impair any remedy, right or power consequent thereon.   Notwithstanding any other provision of this Agreement, Lender reserves the right to seek a deficiency judgment or preserve a deficiency claim in connection with the foreclosure on any portion of the Collateral to the extent necessary to foreclose on all or less than all of any portion of the  Collateral.

      **8.2.5**   **Lender's Right to Perform**.   If Borrower fails to, or fails to cause Owner to , perform any covenant or obligation contained herein and such failure shall continue for a period of five Business Days after Borrower's receipt of written notice thereof from Lender, without in any way limiting Lender's right to exercise any of its rights, powers or remedies as provided hereunder, or under any of the other Loan Documents, Lender may, but shall have no obligation to, perform, or cause performance of, such covenant or obligation, and all costs, expenses, liabilities, penalties and fines of Lender incurred or paid in connection therewith shall be payable by Borrower to Lender upon demand and if not paid shall be added to the Debt (and to the extent permitted under applicable laws, secured by the Security Documents and other Loan Documents) and shall bear interest thereafter at the Default Rate.   Notwithstanding the foregoing, Lender shall have no obligation to send notice to Borrower of any such failure.

      **8.2.6**   **Additional Mezzanine Loan Remedies**.   (a)  Without limitation to its rights otherwise set forth herein with respect to any other Event of Default, if any Event of Default is continuing as a result of the occurrence of an Event of Default under the Senior Loan, Lender shall have the right, upon prior notice to Borrower (which notice Lender shall make good faith efforts to provide to Borrower, provided, that, (i) Lender shall have no liability to Borrower or any other Person for any failure to so notify Borrower and (ii) Lender's failure to so notify

Borrower shall not affect Lender's rights and remedies under this Agreement, the Pledge and the other Loan Documents or the validity of any action which Lender is entitled to take in furtherance of its rights and remedies under this Agreement, the Pledge and the other Loan Documents), but shall be under no obligation to, (A) pay all sums and perform any act or take any action on behalf of Borrower and/or Owner as may be appropriate to cure such Event of Default under the Senior Loan and (B) pay any other amounts and take any other action as Lender, in its sole and absolute discretion, shall deem advisable to protect or preserve the rights and interests of Lender in the Loan and/or the Pledged Collateral. Borrower shall not impede, interfere with, hinder or delay, and shall not permit, cause or allow Owner to impede, interfere with, hinder or delay, any effort or action on the part of Lender to take any action in accordance with the immediately foregoing sentence.

(b)    Subject to the terms of the Senior Loan Documents and the rights of Senior Lender, Borrower hereby grants to Lender and  its designees the right, upon prior notice to Borrower (which notice Lender shall make good faith efforts to provide to Borrower, provided, that, (i) Lender shall have no liability to Borrower or any other Person for any failure to so notify Borrower and (ii) Lender's failure to so notify Borrower shall not affect Lender's rights and remedies under this Agreement, the Pledge and the other Loan Documents or the validity of any action which Lender is entitled to take in furtherance of its rights and remedies under this Agreement, the Pledge and the other Loan Documents) to enter upon the Property at any time during the continuance of any Event of Default for the purpose of taking any action pursuant to Lender's exercise of its remedies in accordance hereof or to appear in, defend or bring any action or proceeding to protect or preserve the rights and interests of Lender in the Loan and/or the Pledged Collateral. Lender may take such action as Lender deems reasonably necessary or desirable to carry out the intents and purposes of this  Section 8.2.6 (including communicating with Senior Lender with respect to the applicable Event of Default under the Senior Loan), upon prior notice to (which notice Lender shall make good faith efforts to provide to Borrower, provided, that, (i) Lender shall have no liability to Borrower or any other Person for any failure to so notify Borrower and (ii) Lender's failure to so notify Borrower shall not affect Lender's rights and remedies under this Agreement, the Pledge and the other Loan Documents or the validity of any action which Lender is entitled to take in furtherance of its rights and remedies under this Agreement, the Pledge and the other Loan Documents), but without consent from, Borrower or Owner. Lender shall have no obligation to complete any cure or attempted cure undertaken or commenced by Lender pursuant to this Section 8.2.6.

(c)    If Lender shall receive a copy of any notice of any Event of Default under the Senior Loan from Senior Lender, Borrower or Owner, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender, in good faith, in reliance thereon.

(d)    For the purpose of carrying out the provisions and exercising the rights, powers and privileges granted in this Section 8.2.6, Borrower hereby irrevocably constitutes and appoints Lender its true and lawful attorney-in-fact to, during the continuance of an Event of Default, execute, acknowledge and deliver any instruments and do and perform any acts such as are referred to in this Section 8.2.6 in the name and on behalf of Borrower.  This power of attorney is a power coupled with an interest and cannot be revoked.

68

NY:1814691.9

(e)      All sums paid by Lender and the costs and expenses incurred by Lender in exercising its rights under this Section (including, without limitation, reasonable attorneys' and other professional fees), and shall constitute a portion of the Debt, shall be secured by the Pledge.

(f)      Any default or breach by Owner under the Senior Loan Documents which is not cured prior to the expiration of any applicable grace, notice or cure period afforded to Owner under the Senior Loan Documents shall constitute an Event of Default, without regard to any subsequent payment or performance of any such obligations by Lender.

## 9.    **SENIOR LOAN**.

**9.1      Senior Loan Estoppels**.  Borrower shall, or shall cause Owner to, from time to time, obtain from Senior Lender such certificates of estoppel with respect to compliance by Owner with the terms of the Senior Loan Documents as may be reasonably requested by Lender. In the event or to the extent that Senior Lender is not legally obligated to deliver such certificates of estoppel and is unwilling to deliver the same, then Borrower shall not be in breach of this provision so long as Borrower furnishes to Lender an estoppel executed by Borrower and Owner expressly representing to Lender the information requested by Lender regarding compliance by Owner with the terms of the Senior Loan Documents.  Borrower hereby indemnifies Lender from and against all liabilities, obligations, losses, damages, penalties, assessments, actions, or causes of action, judgments, suits, claims, demands, costs, expenses (including attorneys' and other professional fees, whether or not suit is brought, and settlement costs) and disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against Lender based in whole or in part upon any fact, event, condition, or circumstances relating to the Senior Loan which was misrepresented in, or which warrants disclosure and was omitted from such estoppel executed by Borrower and Owner.

**9.2      Acquisition of the Senior Loan**.  Neither Borrower, Owner nor any Affiliate of any of them shall acquire or agree to acquire, the Senior Loan, or any portion thereof or any interest therein, or any direct or indirect ownership interest in the holder of the Senior Loan, whether by purchase, transfer, exchange or otherwise, and any breach or attempted breach of this provision shall constitute an Event of Default hereunder. If, solely by operation of applicable subrogation law, Borrower, Owner or any Affiliate of any of them shall have failed to comply with the foregoing, then Borrower: (a) shall immediately notify Lender of such failure; (b) shall cause any and all such prohibited parties acquiring any interest in the Senior Loan Documents: (i) not to enforce the Senior Loan Documents; and (ii) upon the request of Lender, to the extent any of such prohibited parties has or have the power or authority to do so, to promptly: ( A) cancel the promissory note evidencing the Senior Loan, ( B) reconvey and release the lien securing the Senior Loan and any other collateral under the Senior Loan Documents, and ( C) discontinue and terminate any enforcement proceeding(s) under the Senior Loan Documents.

**9.3      Intercreditor Agreement**.  Borrower hereby acknowledges and agrees that any intercreditor agreement entered into between Lender and Senior Lender will be solely for the benefit of Lender and Senior Lender, and that Borrower and Owner shall not be intended third–party beneficiaries of any of the provisions thereof, shall have no rights thereunder, shall not be entitled to rely on any of the provisions contained therein and shall not be entitled to receive a

69

copy thereof.  Lender and Senior Lender shall have no obligation to disclose to Borrower the contents of the Intercreditor Agreement.  Borrower's obligations hereunder are and will be independent of such Intercreditor Agreement and shall remain unmodified by the terms and provisions thereof.

**9.4**    **Deed in Lieu of Foreclosure.**    Without the express prior written consent of Lender, Borrower shall not, and Borrower shall not cause, suffer or permit Owner to, enter into any deed–in–lieu or consensual foreclosure with or for the benefit of Senior Lender or any of its affiliates. Without the express prior written consent of Lender, Borrower shall not, and Borrower shall not cause, suffer or permit Owner to, enter into any consensual sale or other transaction in connection with the Senior Loan which could diminish, modify, terminate, impair or otherwise adversely affect the interests of Lender or Borrower, the Collateral or any portion thereof or any interest therein or of Owner in the Property or portion thereof or any interest therein.

## 10.    SECONDARY MARKET PROVISIONS .

**10.1**    **Transfer of Loan**.  (a)  Lender may, at any time, sell, transfer or assign the Loan, the Loan Documents and any or all servicing rights with respect thereto, or grant participations therein or issue mortgage pass – through certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (the "***Securities***") secured by or evidencing ownership interests in the Note and the Security Instrument (each such sale, assignment, participation or securitization, a "***Secondary Market Transaction***").  Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor in such Securities or any NRSRO (all of the foregoing entities collectively referred to as the "***Investor***") and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Loan and to Borrower, Owner and Guarantor, the Collateral and the Property, whether furnished by Borrower, Owner, Guarantor or otherwise, as Lender determines necessary or appropriate.

(b)    Borrower, Owner and Guarantor agree to cooperate with Lender in connection with any transfer made or any Securities created pursuant to this Section 9.1. Borrower shall also promptly furnish and Borrower, Owner and Guarantor consent to Lender furnishing, to such Investors or such prospective Investors or Rating Agency any and all available information concerning the Property, the Leases, the financial condition of Borrower, Owner and Guarantor as may be requested by Lender, any Investor or any prospective Investor or Rating Agency (including, but not limited to, copies of information previously supplied to Lender) in connection with any sale, transfer or participation interest.  In addition to any other obligations Borrower may have hereunder, Borrower shall execute such amendments to the Loan Documents and Borrower's organizational documents as may be requested by the holder of the Note or any Investor to effect the assignment of the Note and the other Loan Documents or issuance of Securities including (i) bifurcating the Note into two or more notes or splitting the Security Documents as determined by and acceptable to Lender or (ii) dividing the Note into multiple components corresponding to tranches of certificates to be issued in a Secondary Market Transaction each having a notional balance and an interest rate determined by Lender; provided, however, that Borrower shall not be required to modify or amend any Loan Document if the overall effect of such modification or amendment would (y) change the initial weighted

70

average interest rate, the maturity or the amortization of principal set forth in the Note, or (z) modify or amend any other material economic term of the Note or the other Loan Documents.

      **10.2**   **Use of Information**.  Borrower understands that all or any portion of the Provided Information may be included in disclosure documents in connection with a Secondary Market Transaction.  Lender may require Borrower to review a brief narrative asset summary of the Loan, Manager, the Property and Borrower (and its ownership) and provide comments thereon to correct any inaccurate information contained therein known to Borrower, and Borrower shall cooperate with Lender in updating the Provided Information for inclusion or summary in the narrative asset summary or for other use reasonably required in connection with a Secondary Market Transaction by providing all current information pertaining to the Loan, Borrower, Manager and the Property necessary to keep the narrative asset summary accurate and complete in all material respects with respect to such matters.

      **10.3**   **Borrower Indemnity**.  Borrower shall indemnify Lender or any issuer or underwriter in a Secondary Market Transaction for any losses, claims, damages or liabilities ("*Liabilities*") arising out of or based upon the omission of any material fact in the Provided Information or the failure to correct any misstatement in the Provided Information in order to make the statements in the Provided Information, in light of the circumstances under which they were made, not misleading and shall reimburse Lender or any issuer or underwriter in a Secondary Market Transaction for any legal or other expenses actually incurred by Lender or any issuer or underwriter in a Secondary Market Transaction in connection with defending or investigating the Liabilities.

      **10.4**   **Restructuring of Loan**.  Lender, without in any way limiting Lender's other rights hereunder, in its sole and absolute discretion, shall have the right at any time to require Borrower to restructure the Loan into multiple notes (which may include component notes or senior and junior notes) or to create participation interests in the Loan, and which restructuring may include reallocation of principal amounts of the Loan (including, by way of example, the increase or decrease in the principal amount of the senior note and instrument securing same, and the corresponding decrease or increase in the principal amounts of the junior note(s) and the security instrument(s) securing same) or the restructuring of a portion of the Loan into a mezzanine loan (the "*New Mezzanine Loan*") to the owners of the direct equity interests in Borrower, secured by a pledge of such direct equity interests, the establishment of different interest rates and debt service payments for the Loan and the New Mezzanine Loan and the payment of the Loan and the New Mezzanine Loan in such order of priority as may be designated by Lender; provided, that (a) the total amounts of the Loan and the New Mezzanine Loan shall equal the amount of the Loan immediately prior to the restructuring, (b) except in the case of an Event of Default under the Loan or the New Mezzanine Loan, the weighted average interest rate of the Loan and the New Mezzanine Loan, if any, shall, in the aggregate, equal the interest rate which was applicable to the Loan immediately prior to the restructuring and (c) except in the case of an Event of Default under the Loan or the New Mezzanine Loan, the debt service payments on the Loan and the New Mezzanine Loan shall equal the debt service payment which was due under the Loan immediately prior to the restructuring; provided that any such restructuring carried out after the closing of the Loan shall be at Borrower's sole cost and expense (*provided, however*, that Borrower shall not be required to reimburse Lender for Lender's costs and expenses incurred in connection with the same).  Borrower shall cooperate

71

with all reasonable requests of Lender in order to restructure the Loan and create the New Mezzanine Loan and shall (i) execute and deliver such documents including, in the case of the New Mezzanine Loan, a mezzanine note, a mezzanine loan agreement, a pledge and security agreement and a mezzanine deposit account agreement, all in substantially the form executed by Borrower concurrently with the execution of this Agreement, (ii) cause Borrower's counsel to deliver such legal opinions and (iii) create such bankruptcy remote borrower under the New Mezzanine Loan as, in the case of each of (i), (ii) and (iii above, shall be reasonably required by Lender and required by any Rating Agency in connection therewith, all in form and substance reasonably satisfactory to Lender and satisfactory to any such Rating Agency, including the severance of this Agreement, the Security Documents and other Loan Documents if requested. In the event Borrower fails to execute and deliver such documents to Lender within fifteen (15) Business Days following such request by Lender, Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such transactions, Borrower ratifying all that such attorney shall do by virtue thereof.  It shall be an Event of Default if Borrower fails to comply with any of the terms, covenants or conditions of this Section 9 after the expiration of fifteen (15)  Business Days after notice thereof.

**11.    MISCELLANEOUS**.

**11.1    Exculpation**.  Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a UCC foreclosure, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest and rights under the Loan Documents, or in any or all of the Collateral; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Collateral, and Lender shall not sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding under or by reason of or under or in connection with any Loan Document.  The provisions of this <u>Section</u> 11.1 shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any Loan Document; (ii) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under any of the Security Documents; (iii) affect the validity or enforceability of any of the Loan Documents or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; (iv) impair the right of Lender to obtain the appointment of a receiver; (v) constitute a prohibition against Lender to commence any other appropriate action or proceeding in order for Lender to fully realize the security granted by the Pledge or the other Security Documents or to exercise its remedies against all or any portion of the Collateral; or (vi) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following (all such liability and obligation of Borrower for any or all of the following being referred to herein as "*Borrower's Recourse Liabilities*"): (a) fraud or intentional misrepresentation by Borrower or any guarantor in connection with the Loan; (b) the forfeiture by Borrower of the Property, or any portion thereof, because of the conduct or purported conduct of criminal activity by Borrower or

72

Guarantor or any of their respective agents or representatives in connection therewith; (c) the gross negligence or willful misconduct of Borrower or Owner; (d) the breach of any representation, warranty, covenant or indemnification in any Loan Document concerning Environmental Laws or Hazardous Substances, including Sections 4.19 and 5.7, and clauses (viii) through (xi) of Section 5.18; (e) physical waste or after an Event of Default, the removal or disposal of any portion of the Property; (f) the misapplication or conversion by Borrower or Owner of (w) any Proceeds paid by reason of any Insured Casualty, (x) any Award received in connection with a Condemnation, or (y) any Rents, refund of Taxes or amounts in any Subaccount (including any distributions or payments to members/partners/shareholders of Borrower during a period which Lender did not receive the full amounts required to be paid to Lender under the Loan Documents) or (z) the Proceeds of any sale of any portion of or all of the Collateral or the Property; (g) failure to pay charges for labor or materials or other charges that can create Liens on any portion of the Property unless such charges are the subject of a bona fide dispute in which Owner is contesting the amount or validity thereof; (h) any security deposits collected with respect to the Property which are not delivered to Lender upon a foreclosure of the Pledge or any other Security Document or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof; (i) an act or omission of any of Borrower, Owner or Guarantor which hinders, delays or interferes with Lender's enforcement of its rights hereunder or under any other Loan Document or the realization of the collateral, including the assertion by any of Borrower, Owner or Guarantor of defenses or counterclaims; (j) Borrower's indemnifications of Lender set forth in Section 10.3; (k) any breach of the representations set forth in Section 4.24 hereof and/or Section 3 of the Pledge; (l) payment of any transfer taxes in connection with an exercise of remedies by Lender or realization on the Pledged Collateral; (m) any representation or warranty made in Section 4.15 hereof with respect to any Owner Affiliated Lease or Owner Affiliated Tenant shall be false or misleading in any material respect as of the date made; (n) a breach of any representation, warranty and/or covenant in Section 5.37 hereof; (o) failure by any Owner Affiliated Tenant to promptly vacate the Property following an Owner Affiliated Lease Default Event; (p) any petition for the bankruptcy or insolvency of any Owner Affiliated Tenant is filed by or consented to by such Owner Affiliated Tenant; (q) failure by Owner to diligently pursue its remedies pursuant to the Owner Affiliated Lease following an Owner Affiliated Lease Default Event; (r) any amendment or modification of the OPA in violation of Section 5.37 hereof, or the termination of the OPA without Lender's consent, except an assignment thereof to a transferee who assumes all of the obligations of Borrower under the Loan Documents in accordance with the terms of this Agreement; (s) the breach by Owner or 3000 Imperial of any of the material terms and conditions of the OPA; (t) after a casualty or destruction of any portion of the Property, the inability to fully reconstruct the Improvements on the Property or to use the Property for the uses that existed immediately prior to such casualty or destruction; (u) a breach of any representation, warranty and/or covenant in Sections 4.30 and/or 5.38 hereof; (v) (i) a breach of any representation, warranty and/or covenant in Sections 4.31 and 5.35 hereof, (ii) any default by landlord under the Parking Agreement, if at the time of such default the landlord under the Parking Agreement is an Affiliate of Borrower, Owner and/or Guarantor, and (iii) Borrower fails to cause Owner to make any payment of rent to landlord under the Parking Agreement; (w) the amendment, modification, termination, cancellation or acceptance of a surrender of the Parking Agreement, or the waiver of any of the terms or provisions of the

73

Parking Agreement, in each case without Lender's prior written consent; (x) a breach of any representation, warranty and/or covenant in Section 4.32 hereof; (y) a breach of any representation, warranty and/or covenant in Section 5.34 hereof; (z) a breach of any representation, warranty and/or covenant in Section 5.40 hereof; or (aa) a breach of any representation, warranty and/or covenant in Section 4.34 hereof.

Notwithstanding anything to the contrary in this Agreement or any of the Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt in accordance with the Loan Documents, and (B) Lender's agreement not to pursue personal liability of Borrower as set forth above SHALL BECOME NULL AND VOID and shall be of no further force and effect, and the Debt shall be fully recourse to Borrower in the event that one or more of the following occurs (each, a "*Springing Recourse Event*"): (i) an Event of Default described in <u>Section 8.1(d)</u> or Section 8.1(d) of the Senior Loan Agreement shall have occurred, (ii) a breach of the covenant set forth in <u>Section 5.12</u>, (iii) the occurrence of any condition or event described in either (y) <u>Section 8.1(f)</u> unless, with respect to the occurrence of the event described in clause (ii) of <u>Section 8.1(f)</u>, Borrower or Owner is unable to pay its debts generally as they become due, or (z) <u>Section 8.1(g)</u> and, with respect to such condition or event described in <u>Section 8.1(g)</u>, either Borrower, Owner, Guarantor or any Person owning an interest (directly or indirectly) in Borrower, Owner or Guarantor causes such event or condition to occur (by way of example, but not limitation, such Person seeks the appointment of a receiver or files a bankruptcy petition), consents to, aids, solicits, supports, or otherwise cooperates or colludes to cause such condition or event or fails to contest such condition or event, (iv) a breach of any of the covenants set forth in <u>Section 5.36</u>, or (v) in the event that for any reason the Parking Agreement is terminated, and Borrower fails to, within ten (10) Business Days of the termination of such Parking Agreement, comply with clauses (a) through (f) of Section 5.35.3 hereof.

**11.2    <u>Brokers and Financial Advisors</u>**.  Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders who will not be paid from the proceeds of the Loan at closing.  Borrower shall indemnify and hold Lender harmless from and against any and all claims, liabilities, costs and expenses (including attorneys' fees, whether incurred in connection with enforcing this indemnity or defending claims of third parties) of any kind in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower in connection with the transactions contemplated herein.  The provisions of this Section 10.2 shall survive the expiration and termination of this Agreement and the repayment of the Debt.  Borrower, Owner, Key Principal and any sponsor of Borrower acknowledge and agree that Lender and any of Lender's agents or correspondents, reserve the right, in their sole and absolute discretion, to provide additional compensation to any broker, correspondent or originator of the Loan.

**11.3    <u>Retention of Servicer</u>**.  Lender reserves the right to retain the Servicer and any special servicer to act as its agent(s) hereunder with such powers as are specifically delegated to the Servicer and any special servicer by Lender, whether pursuant to the terms of this Agreement, any pooling and servicing agreement or similar agreement entered into as a result of a Secondary Market Transaction or otherwise, together with such other powers as are reasonably incidental thereto.  Borrower shall pay any fees and expenses of the Servicer and any reasonable

NY:1814691.9

third-party fees and expenses, including, without limitation, special servicing fees, work-out fees, liquidation fees and attorney's fees and disbursements and fees and expenses in connection with a prepayment, release of any portion of the Collateral, approvals under the Loan Documents requested by Borrower, assumption of Borrower's obligations or modification of the Loan, special servicing or work-out of the Loan or enforcement of the Loan Documents.

**11.4**   __Survival__.   This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as any of the Debt is unpaid or such longer period if expressly set forth in this Agreement.   All Borrower's covenants and agreements in this Agreement shall inure to the benefit of the respective legal representatives, successors and assigns of Lender.

**11.5**   __Lender's Discretion__.   Whenever pursuant to this Agreement or any other Loan Document, Lender exercises any right given to it to approve or disapprove, or consent or withhold consent, or any arrangement or term is to be satisfactory to Lender or is to be in Lender's discretion, the decision of Lender to approve or disapprove, to consent or withhold consent, or to decide whether arrangements or terms are satisfactory or not satisfactory, or acceptable or unacceptable or in Lender's discretion shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive.

**11.6**   __Governing Law__.   (a)   THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK AND THE PROCEEDS OF THE NOTE DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT AND THE NOTE, AND THIS AGREEMENT AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO § 5–1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)   ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN NEW YORK COUNTY, NEW YORK AND BORROWER WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT CORPORATION SERVICE COMPANY AT 1180 AVENUE OF THE AMERICAS, SUITE 210, NEW YORK, NEW

75

YORK, AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE OF BORROWER MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER (UNLESS LOCAL LAW REQUIRES ANOTHER METHOD OF SERVICE), IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. BORROWER (i) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (ii) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH OFFICE SHALL BE DESIGNATED AS THE ADDRESS FOR SERVICE OF PROCESS), AND (iii) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

     **11.7**   **Modification, Waiver in Writing**.  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to or demand on Borrower shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.  Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under any other Loan Document, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under any Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under the Loan Documents, or to declare an Event of Default for failure to effect prompt payment of any such other amount.

     **11.8**   **Trial by Jury**.  BORROWER AND LENDER HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  EITHER PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS   SECTION 10.8 IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER.

NY:1814691.9

**11.9    Headings/Exhibits**.  The Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.  The Exhibits attached hereto, are hereby incorporated  by reference as a part of the Agreement with the same force and effect as if set forth in the body hereof.

**11.10    Severability**.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**11.11    Preferences**.  Upon the occurrence and continuance of an Event of Default, Lender shall have the continuing and exclusive right to apply or reverse and reapply (or having so applied, to reverse and reapply) any and all payments by Borrower to any portion of the Debt.  To the extent Borrower makes a payment to Lender, or Lender receives proceeds of any collateral, which is in whole or in part subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Debt or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.  This provision shall survive the expiration or termination of this Agreement and the repayment of the Debt.

**11.12    Waiver of Notice**.  Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or any other Loan Document specifically and expressly requires the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.  Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which no Loan Document specifically and expressly requires the giving of notice by Lender to Borrower.

**11.13    Remedies of Borrower**.  If a claim or adjudication is made that Lender or any of its agents, including Servicer, has acted unreasonably or unreasonably delayed acting in any case where by law or under any Loan Document, Lender or any such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents, including Servicer, shall be liable for any monetary damages, and Borrower's sole remedy shall be to commence an action seeking injunctive relief or declaratory judgment.  Any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.  Borrower specifically waives any claim against Lender and its agents, including Servicer, with respect to actions taken by Lender or its agents on Borrower's behalf.

**11.14    Prior Agreements**.  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements, understandings and negotiations among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

77

**11.15  Offsets, Counterclaims and Defenses**.  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents, including Servicer, or otherwise offset any obligations to make payments required under the Loan Documents.  Any assignee of Lender's interest in and to the Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which Borrower may otherwise have against any assignor of such documents, and no such offset, counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents, and any such right to interpose or assert any such offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**11.16  Publicity**.  All news releases, publicity or advertising by Borrower or its Affiliates through any media intended to reach the general public, which refers to the Loan Documents, the Loan, Lender, a Loan purchaser, the Servicer or the trustee in a Secondary Market Transaction, shall be subject to the prior written approval of Lender.  Lender shall have the right to issue any of the foregoing without Borrower's approval.

**11.17  No Usury**.  Borrower and Lender intend at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under state law) and that this Section 10.17 shall control every other agreement in the Loan Documents.  If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under the Note or any other Loan Document, or contracted for, charged, taken, reserved or received with respect to the Debt, or if Lender's exercise of the option to accelerate the maturity of the Loan or any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by applicable law, then it is Borrower's and Lender's express intent that all excess amounts theretofore collected by Lender shall be credited against the unpaid Principal and all other Debt (or, if the Debt has been or would thereby be paid in full, refunded to Borrower), and the provisions of the Loan Documents immediately be deemed reformed and the amounts thereafter collectible thereunder reduced, without the necessity of the execution of any new document, so as to comply with applicable law, but so as to permit the recovery of the fullest amount otherwise called for thereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance or detention of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate from time to time in effect and applicable to the Debt for so long as the Debt is outstanding.  Notwithstanding anything to the contrary contained in any Loan Document, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

**11.18  Conflict; Construction of Documents**.  In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that each is represented by separate counsel in connection with the negotiation and drafting of the Loan Documents and that the Loan Documents shall not be subject to the principle of construing their meaning against the party that drafted them.

NY:1814691.9

**11.19**   **No Third Party Beneficiaries**.  The Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in any Loan Document shall be deemed to confer upon anyone other than the Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained therein.

**11.20**   **Yield Maintenance Premium**.    Borrower acknowledges that (a) Lender is making the Loan in consideration of the receipt by Lender of all interest and other benefits intended to be conferred by the Loan Documents that is not prepayable prior to the Open Prepayment Date and (b) if payments of Principal are made to Lender prior to the regularly scheduled due date for such payment, for any reason whatsoever, including as a result of Lender's acceleration of the Loan after an Event of Default, by operation of law or otherwise, Lender will not receive all such interest and other benefits and may, in addition, incur costs.  For these reasons, and to induce Lender to make the Loan, Borrower expressly waives any right or privilege to prepay the Loan except as otherwise may be specifically permitted herein and agrees that, except as expressly provided in Sections 2.3.2 and 2.3.4, all prepayments, if any, will be accompanied by the Yield Maintenance Premium.  Such Yield Maintenance Premium shall be required whether payment is made by Borrower, by a Person on behalf of Borrower, or by the purchaser at any foreclosure sale, and may be included in any bid by Lender at such sale.  Borrower further acknowledges that (A) it is a knowledgeable real estate developer or investor; (B) it fully understands the effect of the provisions of this Section 10.20, as well as the other provisions of the Loan Documents; (C) the making of the Loan by Lender at the Interest Rate and other terms set forth in the Loan Documents are sufficient consideration for Borrower's obligation to pay a Yield Maintenance Premium (if required); and (D) Lender would not make the Loan on the terms set forth herein without the inclusion of such provisions.  Borrower also acknowledges that the provisions of this Agreement limiting the right of prepayment and providing for the payment of the Yield Maintenance Premium and other charges specified herein were independently negotiated and bargained for, and constitute a specific material part of the consideration given by Borrower to Lender for the making of the Loan except as expressly permitted hereunder.

**11.21**   **Assignment**.  The Loan, the Note, the Loan Documents or Lender's rights, title, obligations and interests therein may be assigned by Lender and any of its successors and assigns to any Person at any time in its discretion, in whole or in part, whether by operation of law (pursuant to a merger or other successor in interest) or otherwise.  Upon such assignment, all references to Lender in this Agreement and in any Loan Document shall be deemed to refer to such assignee or successor in interest and such assignee or successor in interest shall thereafter stand in the place of Lender.  Borrower may not assign its rights, title, interests or obligations under this Agreement or under any of the Loan Documents.

**11.22**   **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

*[The Remainder of the Page is Intentionally Blank]*

NY:1814691.9

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER**:

**3100 E. IMPERIAL INVESTMENT, LLC**
a Delaware limited liability company

By:    Placo Investment, LLC,
        a Delaware limited liability company,
        its sole managing member

        By: _____
           Name: Donald Chae
           Title:  Manager

**LENDER:**

**NATIXIS, NEW YORK BRANCH,**
a direct branch of Natixis S.A., a société anonyme à conseil d'administration (public limited company) organized and existing under the laws of France

By: _____
     Name: Andrew Levine
     Title:  Director

By: _____
     Name: Timothy Bachman
     Title:  Director

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**3100 E. IMPERIAL INVESTMENT, LLC**
a Delaware limited liability company

By:    Placo Investment, LLC,
       a Delaware limited liability company,
       its sole managing member

       By: _____
          Name: Donald Chae
          Title:  Manager

**LENDER:**

**NATIXIS, NEW YORK BRANCH**,
a direct branch of Natixis S.A., a société anonyme à conseil d'administration (public limited company) organized and existing under the laws of France

By: _____
    Name: Andrew Levine
    Title:  Director

By: _____
    Name: Timothy Bachman
    Title:  Director

## Schedule 1

### Index of Other Definitions

Annual Budget ........................................... 44
Applicable Taxes ...................................... 13
Award....................................................... 46
Bankruptcy Action ..................................... 8
Bankruptcy Proceeding............................. 21
Borrower's Recourse Liabilities ............... 55
Buyer......................................................... 34
Capital Budget .......................................... 45
Casualty..................................................... 45
Condemnation ........................................... 46
Defeasance ................................................ 15
Defeasance Date........................................ 16
Defeasance Deposit................................... 16
Defeased Note ........................................... 16
Embargoed Person .................................... 38
Embargoed Persons................................... 38
Environmental Laws ................................. 23
Event of Default........................................ 47
FATF......................................................... 39
First Payment Date.................................... 12
Full Defeasance......................................... 15
Hazardous Substances............................... 23
Indemnified Liabilities.............................. 37
Indemnified Party...................................... 37
Independent Director ................................. 5
Independent Manager................................. 5
Insured Casualty........................................ 45
Investor ..................................................... 53
Late Payment Charge................................ 18
Lender's Consultant .................................. 28
Liabilities ................................................. 53

Licenses..................................................... 22
Liquidation Event...................................... 15
Loan .......................................................... 12
New Mezzanine Borrower ......................... 34
New Mezzanine Loan ............................... 54
Notice........................................................ 42
OFAC......................................................... 38
Operating Budget ...................................... 44
Partial Defeasance..................................... 15
Pledge ....................................................... 6
Pledged Collateral ..................................... 6
Principal .................................................... 12
Proceeds .................................................... 45
Proposed Material Lease............................ 30
Remedial Work .......................................... 29
Required Records....................................... 45
Scheduled Defeasance Payments............... 17
Secondary Market Transaction ................. 53
Securities................................................... 52
Security Agreement ................................... 16
Significant Casualty .................................. 46
Single Member Bankruptcy Remote LLC.. 6
Sole Member ............................................. 6
Special Member ......................................... 7
Special Purpose Entity .............................. 2
Special Transfer ........................................ 34
Springing Recourse Event......................... 56
Successor Borrower ................................... 17
Successor Guarantor .................................. 36
Undefeased Note........................................ 16

"Annual Budget" – 6.3.5
"Applicable Taxes" – 2.2.3
"Award" – 7.3.2
"Bankruptcy Action" –  Schedule 3
"Bankruptcy Proceeding" – 4.7
"Beach Orangethorpe" – Definition of ISLT Pledge
"Beach Orangethorpe Guaranty" – Definition of ISLT Pledge
"Beach Orangethorpe II" – Definition of ISLT Pledge
"Beach Orangethorpe II Guaranty" – Definition of ISLT Pledge
"Borrower's Recourse Liabilities" – 11.1
"Buyer" – 5.16
"Capital Budget" – 6.3.5
"Casualty" – 7.2.1
"Casualty/Condemnation Prepayment" – 2.3.2
"Condemnation" – 7.3.1
"Defeasance" – 2.3.3(a)
"Defeasance Date" – 2.3.3(a)(i)
"Defeasance Deposit" – 2.3.3(a)(iv)
"Defeased Note" – 2.3.3(a)(vi)
"Deposit Bank" – 3.1
"Embargoed Person" – 5.19
"Environmental CCR" – Senior Loan Agreement
"Environmental Easement" – Senior Loan Agreement
"Environmental Laws" – 4.19
"Equipment" – Security Instrument
"Event of Default" – 8.1
"FATF" – 5.19(b)
"First Payment Date" – 2.2.1
"Full Defeasance" – 2.3.3(a)
"Hazardous Substances" – 4.19
"Improvements" – Security Instrument
"Indemnified Liabilities" – 5.18
"Indemnified Party" – 5.18
"Independent Director" – Schedule 3
"Independent Manager" – Schedule 3
"Insured Casualty" – 7.2.2
"Investor" – 9.1(a)
"Late Payment Charge" – 2.5.3
"LAWQCB" – 5.38.1
"Lender's Consultant" – 5.7.1
"Liabilities" – 9.3
"Licenses" – 4.10
"Liquidation Event": 2.3.1(a)
"Loan" – 2.1
"Master Lease Premises" – 5.40.1
"Master Lease Rent" – 5.40.2

"New Mezzanine Borrower" – 5.16
"New Mezzanine Loan" – 9.4
"Notice" – 6.1
"OFAC" – 5.19(a)
"Operating Budget" – 6.3.5
"One Green" – 4.33
"Partial Defeasance" – 2.3.3(a)
"Partial Release" – 2.4.2
"Pledge" – Definition of "Loan Documents"
"Pledged Collateral" – Definition of "Loan Documents"
"Principal" – 2.1
"Proceeds" – 7.2.2
"Property Release" – 2.4.4
"Proposed Construction" – 5.34.5
"Proposed Construction Plans" – 5.34.5
"Proposed Material Lease" – 5.9.2
"Release Request" – 2.4.3(a)
"Remaining Property" – 2.4.3(b)
"Remedial Work" – 5.7.2(c)
"Replacement Master Lease" – 5.40.1
"Replacement Master Tenant" – 5.40.1
"Replacement Parking Agreement" – 5.35.3
"Required Records" – 6.3.6
"Restoration" – 7.4.1
"Rules" – 5.22(a)
"Scheduled Defeasance Payments" – 2.3.3(a)
"Secondary Market Transaction" – 9.1
"Securities" – 9.1
"Security Agreement" – 2.3.3(a)(vii)
"Senior Loan Buyer" – 5.1
"Senior Loan Special Transfer" – 5.16
"Significant Casualty" – 7.2.2
"Single Member Bankruptcy Remote LLC" – Schedule 3
"Sole Member" – Schedule 3
"Special Member" – Schedule 3
"Special Purpose Entity" – Schedule 3
"Special Transfer" – 5.16
"Springing Recourse Event" – 11.1
"Successor Borrower" – 2.3.3(b)
"Successor Guarantor" – 5.16(j)
"Title Insurance Policy" – 2.4.3(f)
"Undefeased Note" – 2.3.3(a)(vi)

**<u>Schedule 2</u>**

**Organization of Borrower**

(Attached)

# ORGANIZATIONAL CHART
## PLAZA MEXICO
June 7, 2016



**Schedule 3**

**Definition of Special Purpose Entity**

A "*Special Purpose Entity*" means either (1) a limited liability company that is a Single Member Bankruptcy Remote LLC (as hereinafter defined) or (2) a corporation, limited partnership or limited liability company which at all times since its formation and at all times thereafter :

      (i)     was and will be organized solely for the purpose of (A) owning the Collateral or (B) acting as a general partner of the limited partnership that owns the Collateral or member of the limited liability company that owns the Collateral;

      (ii)    has not engaged and will not engage in any business unrelated to (A) the ownership of the Collateral, (B) acting as general partner of the limited partnership that owns the Collateral or (C) acting as a member of the limited liability company that owns the Collateral, as applicable;

      (iii)   has not had and will not have any assets other than those related to the Collateral or its partnership or member interest in the limited partnership or limited liability company that owns the Collateral, as applicable;

      (iv)   has not engaged, sought or consented to and will not engage in, seek or consent to any dissolution, winding up, liquidation, consolidation, merger, asset sale (except as expressly permitted by this Agreement), transfer of partnership or membership interests or the like, or amendment of its limited partnership agreement, articles of incorporation, articles of organization, certificate of formation or operating agreement (as applicable);

      (v)    if such entity is a limited partnership, has and will have, as its only general partner a Special Purpose Entity that is a corporation;

      (vi)   if such entity is a corporation, has and will have at least two (2) Independent Directors, and has not caused or allowed and will not cause or allow the board of directors of such entity to take any action requiring the unanimous affirmative vote of one hundred percent (100%) of the members of its board of directors unless all of the directors (including any Independent Directors) shall have participated in such vote;

      (vii)  if such entity is a limited liability company other than a single member limited liability company, has and will have as its only managing member a Special Purpose Entity that is a corporation;

      (viii) if such entity is a limited liability company, has and will have articles of organization, a certificate of formation or an operating agreement, as applicable, providing that (A) such entity will dissolve only upon the bankruptcy of the managing member, (B) the vote of a majority–in–interest of the remaining members is sufficient to continue the life of the limited liability company in the event of such bankruptcy of the managing member and (C) if the vote of a majority–in–interest of the remaining members to continue the life of the limited liability

company following the bankruptcy of the managing member is not obtained, the limited liability company may not liquidate the Collateral without the consent of the applicable Rating Agencies if the Loan has been securitized, for as long as the Loan is outstanding;

(ix)    has not, and without the unanimous consent of all of its partners, directors or members (including any Independent Director or Independent Manager), as applicable, will not, with respect to itself or to any other entity in which it has a direct or indirect legal or beneficial ownership interest, take any Bankruptcy Action;

(x)    has maintained and will maintain adequate capital in light of its contemplated business operations, provided, however, the foregoing shall not require any direct or indirect member, partner or shareholder of Borrower to make any additional capital contributions to Borrower;

(xi)    has not failed and will not fail to correct any known misunderstanding regarding the separate identity of such entity;

(xii)    has maintained and will maintain its accounts, books and records separate from any other Person and will file its own tax returns;

(xiii)    has maintained and will maintain its books, records, resolutions and agreements as official records;

(xiv)    has not commingled and will not commingle its funds or assets with those of any other Person;

(xv)    has held and will hold its assets in its own name;

(xvi)    has conducted and will conduct its business in its name only, and has not and will not use any trade name,

(xvii)    has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other Person;

(xviii)    has paid and will pay its own liabilities, including the salaries of its own employees, out of its own funds and assets;

(xix)    has observed and will observe all partnership, corporate or limited liability company formalities, as applicable;

(xx)    has maintained and will maintain an arm's length relationship with its Affiliates;

(xxi)    (a)    if such entity owns the Collateral, has and will have no indebtedness other than the Permitted Indebtedness, or

(b)    if such entity acts as the general partner of a limited partnership which owns the Property, has and will have no indebtedness other than unsecured trade payables

in the ordinary course of business relating to acting as general partner of the limited partnership which owns the Collateral which (1) do not exceed, at any time, $10,000 and (2) are paid within thirty (30) days of the date incurred, or

(c)    if such entity acts as a managing member of a limited liability company which owns the Property, has and will have no indebtedness other than unsecured trade payables in the ordinary course of business relating to acting as a member of the limited liability company which owns the Collateral which (1) do not exceed, at any time, $10,000 and (2) are paid within thirty (30) days of the date incurred;

(xxii)   has not and will not assume or guarantee or become obligated for the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person except for the Loan;

(xxiii) has not and will not acquire obligations or securities of its partners, members or shareholders;

(xxiv) has allocated and will allocate fairly and reasonably shared expenses, including shared office space, and uses separate stationery, invoices and checks;

(xxv)   except in connection with the Loan, has not pledged and will not pledge its assets for the benefit of any other Person;

(xxvi) has held itself out and identified itself and will hold itself out and identify itself as a separate and distinct entity under its own name and not as a division or part of any other Person;

(xxvii) has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xxviii) has not made and will not make loans to any Person;

(xxix) has not identified and will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it;

(xxx)   has not entered into or been a party to, and will not enter into or be a party to, any transaction with its partners, members, shareholders or Affiliates except in the ordinary course of its business and on terms which are intrinsically fair and are no less favorable to it than would be obtained in a comparable arm's–length transaction with an unrelated third party;

(xxxi) has and will have no obligation to indemnify its partners, officers, directors, members or Special Members, as the case may be, or has such an obligation that is fully subordinated to the Debt and will not constitute a claim against it if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation; and

(xxxii) will consider the interests of its creditors in connection with all corporate, partnership or limited liability company actions, as applicable.

"*Independent Director*" means in the case of a corporation, a natural person who, for the five (5) year period prior to his or her appointment as Independent Director has not been, and during the continuation of his or her service as Independent Director is not, directly or indirectly:

(i)     an employee, manager, stockholder, director, member, partner, officer, attorney or counsel of the corporation or any of its Affiliates (other than his or her service as an Independent Director of the corporation),

(ii)     a creditor, customer of, or supplier or other Person who derives any of its purchases or revenues from its activities with the corporation or any of its shareholders or Affiliates (other than his or her service as an Independent Director if such Person has been provided by a nationally–recognized company that provides professional independent directors),

(iii)     a Person controlling or under common Control with any such employee, manager, stockholder, director, member, partner, officer, attorney, counsel, customer, supplier or other Person, or

(iv)     any member of the immediate family (including a grandchild or sibling) of a person described in clauses (i), (ii) or (iii) immediately above.  A natural person who otherwise satisfies the foregoing definition shall not be disqualified from serving as an Independent Director of the corporation because such person is an independent director of a "Special Purpose Entity" affiliated with the corporation that does not own a direct or indirect equity interest in the corporation or any entity that is a co–borrower with the corporation if such individual is an independent director provided by a nationally–recognized company that provides professional independent directors.

"*Independent Manager*" means in the case of a limited liability company, (a) a member that is a single purpose entity, (b) a single purpose entity  that is not a member or (c) a natural person who, for the five (5) year period prior to his or her appointment as Independent Manager is not, directly or indirectly:

(i)     an employee, manager, stockholder, director, member, partner, officer, attorney or counsel of the limited liability company or any of its Affiliates (other than his or her service as an Independent Manager or Special Member of the limited liability company),

(ii)     a creditor, customer of, or supplier or other Person who derives any of its purchases or revenues from its activities with the limited liability company or any of its members or Affiliates (other than his or her service as an Independent Manager if such Person has been provided by a nationally–recognized company that provides professional independent managers),

(iii)     a Person controlling or under common Control with any such employee, manager, stockholder, director, member, partner, officer, attorney, counsel, customer, supplier or other Person, or

(iv)     any member of the immediate family (including grandchildren or siblings) of a person described in clauses (i), (ii) or (iii) immediately above.  A natural person who otherwise satisfies the foregoing definition shall not be disqualified from serving as an

Independent Manager of the limited liability company because such person is an independent manager of a "Special Purpose Entity" affiliated with the limited liability company that does not own a direct or indirect equity interest in the limited liability company or any entity that is a co–borrower with the limited liability company if such individual is an independent manager provided by a nationally–recognized company that provides professional independent managers.

"*Single Member Bankruptcy Remote LLC*" means a limited liability company organized under the laws of the State of Delaware which at all times since its formation and at all times thereafter

(i)    complies with the following clauses of the definition of Special Purpose Entity above:  (i)(A), (ii)(A), (iii), (iv), (ix), (x), (xi) and (xiii) through (xxxii);

(ii)    has maintained and will maintain its accounts, books and records separate from any other person;

(iii)    has and will have an operating agreement which provides that the business and affairs of Borrower shall be managed by or under the direction of :

(A)    a board of one (1) or more managers designated by the sole member of the Single Member Bankruptcy Remote LLC (the "*Sole Member*"), and at all times there shall be at least two (2) duly appointed Independent Managers on the board of managers, and the board of managers will not take any action requiring the unanimous affirmative vote of one hundred percent (100%) of the members of its board of managers unless, at the time of such action there are at least two (2) members of the board of managers who are Independent Managers, and all of the managers and the Independent Managers shall have participated in such vote; or

(B)    Sole Member, provided that at all times there shall be at least two (2) Independent Managers designated by Sole Member and the operating agreement provides that Sole Member shall not take any Bankruptcy Actions without the affirmative vote of the Independent Managers;

(iv)    has and will have an operating agreement which provides that, as long as any portion of the Debt remains outstanding:

(A)    upon the occurrence of any event that causes Sole Member to cease to be a member of Borrower (other than (x) upon an assignment by Sole Member of all of its limited liability company interest in Borrower and the admission of the transferee, if permitted pursuant to the organizational documents of Borrower and the Loan Documents, or (y) the resignation of Sole Member and the admission of an additional member of Borrower, if permitted pursuant to the organizational documents of Borrower and the Loan Documents), one of the Independent Managers shall, without any action of any Person and simultaneously with Sole Member ceasing to be a member of Borrower, automatically be admitted as the sole member of Borrower (the "*Special Member*") and shall preserve and continue the existence of Borrower without dissolution;

(B)     no Special Member may resign or transfer its rights as Special Member unless (x) a successor Special Member has been admitted to Borrower as a Special Member, and (y) such successor Special Member has also accepted its appointment as an Independent Manager; and

(C)     except as expressly permitted pursuant to the terms of this Agreement, Sole Member may not resign and no additional member shall be admitted to Borrower;

(v)     has and will have an operating agreement which provides that, as long as any portion of the Debt remains outstanding:

(A)     Borrower shall be dissolved, and its affairs shall be would up only upon the first to occur of the following: (x) the termination of the legal existence of the last remaining member of Borrower or the occurrence of any other event which terminates the continued membership of the last remaining member of Borrower in Borrower unless the business of Borrower is continued in a manner permitted by its operating agreement or the Delaware Limited Liability Company Act (the "*Act*") or (y) the entry of a decree of judicial dissolution under Section 18–802 of the Act;

(B)     upon the occurrence of any event that causes the last remaining member of Borrower to cease to be a member of Borrower or that causes Sole Member to cease to be a member of Borrower (other than (x) upon an assignment by Sole Member of all of its limited liability company interest in Borrower and the admission of the transferee, if permitted pursuant to the organizational documents of Borrower and the Loan Documents, or (y) the resignation of Sole Member and the admission of an additional member of Borrower, if permitted pursuant to the organizational documents of Borrower and the Loan Documents), to the fullest extent permitted by law, the personal representative of such member shall be authorized to, and shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of such member in Borrower, agree in writing to continue the existence of Borrower and to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Borrower, effective as of the occurrence of the event that terminated the continued membership of such member in Borrower;

(C)     the bankruptcy of Sole Member or a Special Member shall not cause such member or Special Member, respectively, to cease to be a member of Borrower and upon the occurrence of such an event, the business of Borrower shall continue without dissolution;

(D)     in the event of dissolution of Borrower, Borrower shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of Borrower in an orderly manner), and the assets of Borrower shall be applied in the manner, and in the order of priority, set forth in Section 18–804 of the Act; and

(E)     to the fullest extent permitted by law, each of Sole Member and the Special Members shall irrevocably waive any right or power that they might have to cause Borrower or any of its assets to be partitioned, to cause the appointment of a receiver for all or

any portion of the assets of Borrower, to compel any sale of all or any portion of the assets of Borrower pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of Borrower.

"***Bankruptcy Action***" means, with respect to any Person, if such Person :

> (i)      makes an assignment for the benefit of creditors;

> (ii)     files a voluntary petition in bankruptcy;

> (iii)    is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings;

> (iv)     consents to or files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

> (v)      files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any bankruptcy or insolvency proceeding;

> (vi)     seeks, consents to or acquiesces in the appointment of a trustee, receiver, liquidator, sequestrator, custodian or any similar official of or for such Person or of all or any substantial part of its properties;

> (vii)    one hundred twenty (120) days after the commencement of any proceeding against such Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, if the proceeding has not been dismissed;

> (viii)   within ninety (90) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within ninety (90) days after the expiration of any such stay, the appointment is not vacated; or

> (ix)     takes any action in furtherance of any of the foregoing.

**<u>Schedule 4</u>**

**Form of Payment Guaranty**

**PARTIAL PAYMENT GUARANTY**

made by

**MIN CHAE and DONALD CHAE**,

jointly and severally, as Guarantor,

in favor of

**NATIXIS, NEW YORK BRANCH**,

as Lender

Dated as of [_____], 2016

NY:1814691.9

# PAYMENT GUARANTY

This PARTIAL PAYMENT GUARANTY (this "*Guaranty*"), dated as of [_____], 2016, is made by MIN CHAE, a natural person, having an address at 8790 Los Coyotes Drive, Buena Park, California 80262, and DONALD CHAE, a natural person, having an address at 2200 Sherwood Road, San Marino, California 91108 (individually and collectively, "*Guarantor*"), jointly and severally, in favor of NATIXIS, NEW YORK BRANCH, a direct branch of Natixis S.A., a société anonyme à conseil d'administration (public limited company) organized and existing under the laws of France, having an address at 1251 Avenue of the Americas, New York, New York 10020 (together with its successors and assigns, "*Lender*").

## R E C I T A L S:

WHEREAS, pursuant to that certain Loan Agreement, dated as of the [_____], 2016 (as the same may be amended, modified, supplemented, restated or replaced from time to time, the "*Loan Agreement*"), between [_____], a Delaware limited liability company ("*Borrower*") and Lender, Lender has agreed to make a loan (the "Loan") to Borrower in an original principal amount of $[_____], subject to the terms and conditions of the Loan Agreement

[RECITALS TO BE ADDED UPON EXECUTION]

**1.**     Definitions.

(a)     All capitalized terms used and not defined herein shall have the respective meanings given such terms in the Loan Agreement.

(b)     The term "*Guaranteed Obligations*" means (i) the due and punctual payment in full (and not merely the collectability) of the Debt and (ii) the due and punctual payment in full (and not merely the collectability) of all other sums and charges which may at any time be due and payable under and in accordance with the Note, Loan Agreement and the other Loan Documents; *provided, however* that in no event shall Guarantor's liability under this Guaranty exceed an amount equal to fifteen (15%) of the original principal balance of the Loan, plus any amount due pursuant to the provisions of Section 16 below.

**2.**     Guaranty.

(a)     Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Lender the full, prompt and complete payment when due of the Guaranteed Obligations.

(b)     All sums payable to Lender under this Guaranty shall be payable on demand and without reduction for any offset, claim, counterclaim or defense.

(c)    Guarantor hereby agrees to indemnify, defend and save harmless Lender from and against any and all costs, losses, liabilities, claims, causes of action, expenses and damages, including reasonable attorneys' fees and disbursements, which Lender may suffer or which otherwise may arise in connection with the enforcement by Lender of the Loan Documents and/or by reason of Borrower's failure to pay any of the Guaranteed Obligations when due, irrespective of whether such costs, losses, liabilities, claims, causes of action, expenses or damages are incurred by Lender prior or subsequent to (i) Lender's declaring the Principal, interest and other sums evidenced or secured by the Loan Documents to be due and payable, (ii) Lender's exercise of its remedies under the Pledge or (iii) the conveyance to Lender of all or any portion of the Collateral by the voluntary action of Borrower.

(d)    Guarantor agrees that no portion of any sums applied (other than sums received from Guarantor in full or partial satisfaction of its obligations hereunder), from time to time, in reduction of the Debt shall be deemed to have been applied in reduction of the Guaranteed Obligations until such time as the Debt has been paid in full, or Guarantor shall have made the full payment required hereunder, it being the intention hereof that the Guaranteed Obligations shall be the last portion of the Debt to be deemed satisfied.

**3.**    Representations and Warranties.  Guarantor hereby represents and warrants to Lender as follows (which representations and warranties shall be given as of the date hereof and shall survive the execution and delivery of this Guaranty):

(a)    Execution.  This Guaranty has been duly executed and delivered by Guarantor.

(b)    Enforceability.  This Guaranty constitutes a legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally.

(c)    No Violation.  The execution, delivery and performance by Guarantor of its obligations under this Guaranty does not and will not violate any law, regulation, order, writ, injunction or decree of any court or governmental body, agency or other instrumentality applicable to Guarantor, or result in a breach of any of the terms, conditions or provisions of, or constitute a default under, or result in the creation or imposition of any mortgage, lien, charge or encumbrance of any nature whatsoever upon any of the assets of Guarantor pursuant to the terms of any mortgage, indenture, agreement or instrument to which Guarantor is a party or by which it or any of its properties is bound.  Guarantor is not in default under any other guaranty which it has provided to Lender.

(d)    No Litigation.  There are no actions, suits or proceedings at law or in equity, pending or, to Guarantor's knowledge, threatened against or affecting Guarantor or which involve or might involve the validity or enforceability of this

Guaranty or which might materially adversely affect the financial condition of Guarantor or the ability of Guarantor to perform any of its obligations under this Guaranty. Guarantor is not in default beyond any applicable grace or cure period with respect to any order, writ, injunction, decree or demand of any Governmental Authority which might materially adversely affect the financial condition of Guarantor or the ability of Guarantor to perform any of its obligations under this Guaranty.

(e)     Consents.  All consents, approvals, orders or authorizations of, or registrations, declarations or filings with, all Governmental Authorities (collectively, the "*Consents*") that are required in connection with the valid execution, delivery and performance by Guarantor of this Guaranty have been obtained and Guarantor agrees that all Consents required in connection with the carrying out or performance of any of Guarantor's obligations under this Guaranty will be obtained when required.

(f)     Financial Statements and Other Information.  All financial statements of Guarantor heretofore delivered to Lender are true and correct in all material respects and fairly present the financial condition of Guarantor as of the respective dates thereof, and no materially adverse change has occurred in the financial conditions reflected therein since the respective dates thereof.  None of the aforesaid financial statements or any certificate or statement furnished to Lender by or on behalf of Guarantor in connection with the transactions contemplated hereby, and none of the representations and warranties in this Guaranty contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein or herein not misleading.  Guarantor is not insolvent within the meaning of the United States Bankruptcy Code or any other applicable law, code or regulation and the execution, delivery and performance of this Guaranty will not render Guarantor insolvent.

(g)     Consideration.  Guarantor is the owner, directly or indirectly, of legal and beneficial ownership interests in Borrower.

**4.**     Financial Statements.  Guarantor shall deliver to Lender, (a) within ninety (90) days after the end of each fiscal year of Guarantor, a complete copy of Guarantor's annual financial statements audited by a "big four" accounting firm or another independent certified public accountant reasonably acceptable to Lender and (b) within twenty (20) days after request by Lender, such other financial information with respect to Guarantor as Lender may reasonably request.

**5.**     Unconditional Character of Obligations of Guarantor.

(a)     The obligations of Guarantor hereunder shall be irrevocable, absolute and unconditional, irrespective of the validity, regularity or enforceability, in whole or in part, of the other Loan Documents or any provision thereof, or the absence of any action to enforce the same, any waiver or consent with respect to any provision thereof, the recovery of any judgment against Borrower, Guarantor or any other Person or any action to enforce the same, any failure or delay in the enforcement of the obligations of Borrower under the other Loan Documents or Guarantor under this Guaranty, or any

setoff or counterclaim, and irrespective of any other circumstances which might otherwise limit recourse against Guarantor by Lender or constitute a legal or equitable discharge or defense of a guarantor or surety.  Lender may enforce the obligations of Guarantor under this Guaranty by a proceeding at law, in equity or otherwise, independent of any loan foreclosure or similar proceeding or any deficiency action against Borrower or any other Person at any time, either before or after an action against the Collateral or any part thereof, Borrower or any other Person.  This Guaranty is a guaranty of payment and performance and not merely a guaranty of collection. Guarantor waives diligence, notice of acceptance of this Guaranty, filing of claims with any court, any proceeding to enforce any provision of any other Loan Document against Guarantor, Borrower or any other Person, any right to require a proceeding first against Borrower or any other Person, or to exhaust any security (including, without limitation, the Collateral) for the performance of the Guaranteed Obligations or any other obligations of Borrower or any other Person, or any protest, presentment, notice of default or other notice or demand whatsoever (except to the extent expressly provided to the contrary in this Guaranty).

(b)    The obligations of Guarantor under this Guaranty, and the rights of Lender to enforce the same by proceedings, whether by action at law, suit in equity or otherwise, shall not be in any way affected by any of the following:

(i)    any insolvency, bankruptcy, liquidation, reorganization, readjustment, composition, dissolution, receivership, conservatorship, winding up or other similar proceeding involving or affecting Borrower, Owner, the Collateral, the Property or any part thereof, Guarantor or any other Person;

(ii)    any failure by Lender or any other Person, whether or not without fault on its part, to perform or comply with any of the terms of the Loan Agreement, or any other Loan Documents or the Senior Loan Documents, or any document or instrument relating thereto;

(iii)    the sale, transfer or conveyance of the Property, the Collateral, or any interest therein to any Person, whether now or hereafter having or acquiring an interest in the Property, the Collateral, or any part thereof and whether or not pursuant to any foreclosure, trustee sale or similar proceeding against Borrower, Owner or the Property, the Collateral, or any interest therein;

(iv)    the conveyance to Lender, any Affiliate of Lender or Lender's nominee of the Property, the Collateral or any interest therein by an assignment-in-lieu of foreclosure;

(v)    the release of Borrower, Owner or any other Person from the performance or observance of any of the agreements, covenants, terms or conditions contained in any of the Loan Documents by operation of law or otherwise; or

(vi)    the release in whole or in part of any collateral for any or all Guaranteed Obligations or for the Loan or any portion thereof.

(c)     Except as otherwise specifically provided in this Guaranty, Guarantor hereby expressly and irrevocably waives all defenses in an action brought by Lender to enforce this Guaranty based on claims of waiver, release, surrender, alteration or compromise and all setoffs, reductions, or impairments, whether arising hereunder or otherwise.

(d)     Lender may deal with Borrower and Affiliates of Borrower in the same manner and as freely as if this Guaranty did not exist and shall be entitled, among other things, to grant Borrower or any other Person such extension or extensions of time to perform any act or acts as may be deemed advisable by Lender, at any time and from time to time, without terminating, affecting or impairing the validity of this Guaranty or the obligations of Guarantor hereunder.

(e)     No compromise, alteration, amendment, modification, extension, renewal, release or other change of, or waiver, consent, delay, omission, failure to act or other action with respect to, any liability or obligation under or with respect to, or of any of the terms, covenants or conditions of, the Loan Documents shall in any way alter, impair or affect any of the obligations of Guarantor hereunder, and Guarantor agrees that if any Loan Document is modified with Lender's consent, the Guaranteed Obligations shall automatically be deemed modified to include such modifications.

(f)     Lender may proceed to protect and enforce any or all of its rights under this Guaranty by suit in equity or action at law, whether for the specific performance of any covenants or agreements contained in this Guaranty or otherwise, or to take any action authorized or permitted under applicable law, and shall be entitled to require and enforce the performance of all acts and things required to be performed hereunder by Guarantor.  Each and every remedy of Lender shall, to the extent permitted by law, be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity.

(g)     No waiver shall be deemed to have been made by Lender of any rights hereunder unless the same shall be in writing and signed by Lender, and any such waiver shall be a waiver only with respect to the specific matter involved and shall in no way impair the rights of Lender or the obligations of Guarantor to Lender in any other respect or at any other time.

(h)     At the option of Lender, Guarantor may be joined in any action or proceeding commenced by Lender against Borrower in connection with or based upon any other Loan Documents and recovery may be had against Guarantor in such action or proceeding or in any independent action or proceeding against Guarantor to the extent of Guarantor's liability hereunder, without any requirement that Lender first assert, prosecute or exhaust any remedy or claim against Borrower or any other Person, or any security for the obligations of Borrower or any other Person.

(i)     Guarantor agrees that this Guaranty shall continue to be effective or shall be reinstated, as the case may be, if at any time any payment is made by Borrower or Guarantor to Lender and such payment is rescinded or must otherwise be

returned by Lender (as determined by Lender in its sole and absolute discretion) upon insolvency, bankruptcy, liquidation, reorganization, readjustment, composition, dissolution, receivership, conservatorship, winding up or other similar proceeding involving or affecting Borrower or Guarantor, all as though such payment had not been made.

(j)     In the event that Guarantor shall advance or become obligated to pay any sums under this Guaranty or in connection with the Guaranteed Obligations or in the event that for any reason whatsoever Borrower, Owner or any subsequent owner of the Collateral or the Property or any part thereof is now, or shall hereafter become, indebted to Guarantor, Guarantor agrees that (i) the amount of such sums and of such indebtedness and all interest thereon shall at all times be subordinate as to lien, the time of payment and in all other respects to all sums, including principal and interest and other amounts, at any time owed to Lender under the Loan Documents, and (ii) Guarantor shall not be entitled to enforce or receive payment thereof until the Debt has been indefeasibly paid in full.  Nothing herein contained is intended or shall be construed to give Guarantor any right of subrogation in or under the Loan Documents or any right to participate in any way therein, or in the right, title or interest of Lender in or to any collateral for the Loan, notwithstanding any payments made by Guarantor under this Guaranty, until the actual and irrevocable receipt by Lender of payment in full of all of the Debt.  If any amount shall be paid to Guarantor on account of such subrogation rights at any time when any such sums due and owing to Lender shall not have been fully paid, such amount shall be paid by Guarantor to Lender for credit and application against such sums due and owing to Lender.

(k)     To the extent permitted by applicable law, Guarantor's obligations hereunder shall survive a foreclosure, assignment-in-lieu of foreclosure or similar proceeding involving the Collateral and the exercise by Lender of any of all of its remedies pursuant to the Loan Documents.

**6.**     Covenants.

(a)     As used in this Section 6, the following terms shall have the respective meanings set forth below:

(b)     "*GAAP*" shall mean generally accepted accounting principles, consistently applied.

(c)     "*Liquid Assets*" shall mean the liquid assets of Guarantor in the form of cash, readily marketable securities traded on a national exchange or on the National Association of Securities Dealers Automatic Quotations (NASDAQ), obligations of the United States of America, or guaranteed by the United States of America, corporate debt securities traded on a national exchange, Guarantor's cash in partnerships in which Guarantor is a partner (but only to the extent that such cash is available for distribution to Guarantor and unencumbered), and such other investments as may be acceptable to Lender in its sole discretion.

(d)    "*Net Worth*" shall mean, as of a given date, (x) the total assets of Guarantor (excluding the value of Guarantor's direct and indirect interests in Borrower and the Property) as of such date less (y) Guarantor's total liabilities as of such date, determined in accordance with GAAP.

(e)    Until all of the Guaranteed Obligations have been paid in full, Guarantor (i) shall maintain a Net Worth in excess of $60,000,000.00 and shall maintain Liquid Assets in excess of $6,000,000.00, and (ii) shall not sell, pledge, mortgage or otherwise transfer any of its assets, or any interest therein, on terms materially less favorable than would be obtained in an arms-length transaction.

(f)    Guarantor shall not, at any time while a default in the payment of the Guaranteed Obligations has occurred and is continuing, either (i) enter into or effectuate any transaction with any Affiliate which would reduce the Net Worth of Guarantor or (ii) sell, pledge, mortgage or otherwise transfer to any Person any of Guarantor's assets, or any interest therein.

**7.**    Entire Agreement/Amendments.  This instrument represents the entire agreement between the parties with respect to the subject matter hereof.  The terms of this Guaranty shall not be waived, altered, modified, amended, supplemented or terminated in any manner whatsoever except by written instrument signed by Lender and Guarantor.

**8.**    Successors and Assigns.  This Guaranty shall be binding upon Guarantor, and Guarantor's estate, heirs, personal representatives, successors and assigns, may not be assigned or delegated by Guarantor and shall inure to the benefit of Lender and its successors and assigns.

**9.**    Applicable Law and Consent to Jurisdiction.  This Guaranty shall be governed by, and construed and enforced in accordance with, the substantive laws of the State of New York.  Guarantor irrevocably (a) agrees that any suit, action or other legal proceeding arising out of or relating to this Guaranty may be brought in a court of record in the City and County of New York or in the Courts of the United States of America located in the Southern District of New York, (b) consents to the jurisdiction of each such court in any such suit, action or proceeding and (c) waives any objection which it may have to the laying of venue of any such suit, action or proceeding in any of such courts and any claim that any such suit, action or proceeding has been brought in an inconvenient forum.  Guarantor irrevocably consents to the service of any and all process in any such suit, action or proceeding by service of copies of such process to Guarantor at its address provided in Section 14 hereof.  Nothing in this Section 9, however, shall affect the right of Lender to serve legal process in any other manner permitted by law or affect the right of Lender to bring any suit, action or proceeding against Guarantor or its property in the courts of any other jurisdictions.

**10.**    Section Headings.  The headings of the sections and paragraphs of this Guaranty have been inserted for convenience of reference only and shall in no way define, modify, limit or amplify any of the terms or provisions hereof.

**11.**    Severability.  Any provision of this Guaranty which may be determined by any competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  To the extent permitted by applicable law, Guarantor hereby waives any provision of law which renders any provision hereof prohibited or unenforceable in any respect.

**12.**    WAIVER OF TRIAL BY JURY.  GUARANTOR HEREBY WAIVES THE RIGHT OF TRIAL BY JURY IN ANY LITIGATION, ACTION OR PROCEEDING ARISING HEREUNDER OR IN CONNECTION HEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR, AND IS INTENDED TO ENCOMPASS EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  LENDER IS HEREBY AUTHORIZED TO FILE A COPY

OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF
THIS WAIVER OF TRIAL BY JURY BY GUARANTOR.

**13.**     Other Guaranties.   The obligations of Guarantor hereunder are separate and
distinct from, and in addition to, the obligations of Guarantor now or hereafter arising
under any other guaranties, pursuant to which Guarantor has guaranteed payment and
performance of certain other obligations of Borrower described therein.

**14.**     Notices.     All notices, demands, requests, consents, approvals or other
communications (collectively called "*Notices*") required or permitted to be given
hereunder to Lender or Guarantor or which are given to Lender or Guarantor with respect
to this Guaranty shall be in writing and shall be sent by (a) hand delivery, (b) nationally
recognized overnight delivery service (such as Federal Express), (c) United States
registered or certified mail, return receipt requested, postage prepaid, or (d) by facsimile
and confirmed by facsimile answer back, in each case addressed as set forth below, or to
such other address(es) as the party in question shall have specified most recently by like
Notice.

If to Lender, to:

Natixis, New York Branch

1251 Avenue of the Americas

New York, New York 10020

Attention: Real Estate Administration

with a copy to:

Winston & Strawn, LLP

200 Park Avenue

New York, New York 10166

Attention: Corey A. Tessler, Esq.


If to Guarantor, to:

Min Chae

8790 Los Coyotes Drive

Buena Park, California 90621

NY:1814691.9

Donald Chae

2200 Sherwood Road

San Marino, California 91108


with a copy to:

Lim, Ruger & Kim LLP

1055 West Seventh Street, 28th Floor

Los Angeles, California 90017

Attention: John Lim, Esq.

Notices which are given in the manner aforesaid shall be deemed to have been given or served for all purposes hereunder (i) if by hand, at the time of delivery, (ii) in the case of overnight delivery, upon the first attempted delivery on a Business Day, (iii) in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day, and (iv) in the case of facsimile transmission, when sent and electronically confirmed.

**15.**     Guarantor's Receipt of Loan Documents.  Guarantor by its execution hereof acknowledges receipt of true copies of all of the Loan Documents, the terms and conditions of which are hereby incorporated herein by reference.

**16.**     Interest; Expenses.

(a)     If Guarantor fails to pay all or any sums due hereunder upon demand by Lender, the amount of such sums payable by Guarantor to Lender shall bear interest from the date of demand until paid at the Default Rate in effect from time to time.

(b)     Guarantor hereby agrees to pay all costs, charges and expenses, including reasonable attorneys' fees and disbursements, which may be incurred by Lender in enforcing the covenants, agreements, obligations and liabilities of Guarantor under this Guaranty.

**17.**     Joint and Several Obligations.  If Guarantor consists of more than one Person, each such Person shall have joint and several liability for the obligations of Guarantor hereunder.

**18.**     Specific Limitation on Guaranty and Indemnity Obligations.  Guarantor and Lender hereby confirm that it is the intention of Guarantor and Lender that this Guaranty not constitute a fraudulent transfer or fraudulent conveyance (a "*Fraudulent Conveyance*") under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act or

any other debtor relief law or insolvency law (whether statutory, common law, case law or otherwise) or any jurisdiction whatsoever (collectively, the "*Bankruptcy Laws*").  To give effect to the foregoing intention of Guarantor and Lender, each of such parties hereby irrevocably agrees that the Guaranteed Obligations shall be limited to (but shall not be less than) such maximum amount as will, after giving effect to the maximum amount of such obligations and all other liabilities (whether contingent or otherwise) of Guarantor that are relevant under such Bankruptcy Laws, result in the Guaranteed Obligations not constituting a Fraudulent Conveyance under the Bankruptcy Laws, as of the date of execution and delivery of this Guaranty.

**19.**    Counterparts.  This Guaranty may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

**20.**    State Specific Provisions. Solely to the extent that, and despite the express intent of Guarantor and Lender that the laws of the State of New York govern this Guaranty, a court of competent jurisdiction finds that the laws of the State of California apply to this Guaranty, the following provisions shall govern and control in the event of a conflict with any other provision in this Guaranty:

(a)    Without limiting any other rights provided to Lender herein or in any of the Loan Documents, Lender shall have the benefits of California Code of Civil Procedure § 736, as the same may be amended from time to time.

(b)    Guarantor hereby waives and agrees not to assert or take advantage of the following:

(i)    Any defense of Guarantor based upon Lender's election of any remedy against Guarantor or Borrower or both, including, without limitation, the defense to enforcement of this Guaranty (the "Gradsky" defense, based upon Union Bank v. Gradsky, 265 Cal. App. 2d 40 (1968) or subsequent cases), which, absent this waiver, Guarantor would have by virtue of an election by Lender to conduct a non-judicial foreclosure sale of the Property, it being understood by Guarantor that any such non-judicial foreclosure sale will destroy, by operation of California Code of Civil Procedure Section 580d, all rights of any party to a deficiency judgment against the Borrower, and, as a consequence, will destroy all rights which Guarantor would otherwise have (including, without limitation, the right of subrogation, the right of reimbursement, and the right of contribution) to proceed against the Borrower and to recover any such amount, and that Lender could be otherwise estopped from pursuing Guarantor for a deficiency judgment after a non-judicial foreclosure sale on the theory that a guarantor should be exonerated if a lender elects a remedy that eliminates the guarantor's subrogation, reimbursement or contribution rights;

(ii)    Any rights under California Code of Civil Procedure Sections 580a and 726(b), which provide, among other things: that a creditor must file a complaint for deficiency within three (3) months of a non-judicial foreclosure sale or judicial foreclosure sale, as applicable; that a fair market value hearing must be held; and that the

amount of the deficiency judgment shall be limited to the amount by which the unpaid debt exceeds the fair market value of the security, but not more than the amount by which the unpaid debt exceeds the sale price of the security; and

(iii)    Without limiting the generality of the foregoing or any other provision hereof, Guarantor expressly waives any and all benefits which might otherwise be available to Guarantor under California Civil Code Sections 2809, 2810, 2819, 2839, 2845, 2846, 2847, 2848, 2849, 2850, 2899 and 3433 and California Code of Civil Procedure Sections 580a, 580b, 580d and 726, or any of such sections.

(c)    Guarantor's Waiver Pursuant to California Civil Code Section 2856.  In addition to all the other waivers agreed to and made by Guarantor as set forth in this Guaranty, and pursuant to the provisions of California Civil Code Section 2856, Guarantor hereby waives all rights and defenses that Guarantor may have because Borrower's debt is secured by real property.  This means, among other things:

(i)    Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower.

(ii)    If Lender forecloses on any real property collateral pledged by Borrower:

A.    The amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price.

B.    Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower.

(d)    Further Waivers.  This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's debt is secured by real property.  These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.  Guarantor further hereby waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a non-judicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the principal by the operation of Section 580d of the Code of Civil Procedure or otherwise.

(e)    Judicial Reference.  If any action or proceeding is filed in a court of the State of California by or against any party hereto in connection with any of the transactions contemplated by this Guaranty or any other Loan Document, (a) the court shall, and is hereby directed to, make a general reference pursuant to California Code of Civil Procedure Section 638 to a referee (who shall be a single active or retired judge) to hear and determine all of the issues in such action or proceeding (whether of fact or of law) and to report a statement of decision, provided that at the option of any party to such proceeding, any such issues pertaining to a "provisional remedy" as defined in California Code of Civil Procedure Section 1281.8 shall be heard and determined by the court, and

(b) Guarantor shall be solely responsible to pay all reasonable fees and expenses of any referee appointed in such action or proceeding.

[THE REMAINDER OF THE PAGE IS INTENTIONALLY BLANK]

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the date first above written.

**GUARANTOR**:

_____

**MIN CHAE**, a natural person

_____

**DONALD CHAE**, a natural person

**Schedule 5**

**Preapproved Replacement Parking Area**

(Attached)



**Exhibit 6**

## PLEDGE AND SECURITY AGREEMENT
### (Mezzanine Loan)

This PLEDGE AND SECURITY AGREEMENT (this "*Agreement*"), is made effective as of June 16, 2016 by 3100 E. IMPERIAL INVESTMENT, LLC, a Delaware limited liability company ("*Pledgor*"), for the benefit of NATIXIS, NEW YORK BRANCH, a direct branch of Natixis S.A., a société anonyme à conseil d'administration (public limited company) organized and existing under the laws of France (together with its successors and assigns, "*Mezzanine Lender*").

## RECITALS

A.    Pursuant to that certain Mezzanine Loan Agreement (as same may be amended, restated, replaced, supplemented, consolidated or otherwise modified, the "*Loan Agreement*"), dated as of the date hereof, between Mezzanine Lender and Pledgor, Mezzanine Lender has agreed to make a loan to Pledgor in the principal amount of $14,000,000.00 (the "*Loan*").  All capitalized terms used in this Agreement that are not otherwise defined herein shall have the respective meanings ascribed thereto in the Loan Agreement.

B.    Pledgor is the sole member of, and owns one hundred percent (100%) of the membership interests in, PLAMEX INVESTMENT, LLC, a Delaware limited liability company ("*Owner*").

C.    To induce Mezzanine Lender to make the Loan to Pledgor, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Pledgor has agreed to pledge and grant a first priority security interest in the Collateral (as defined below) as security for the Obligations (as defined below).

Accordingly, the parties hereto agree as follows:

Section 1.    Definitions.

"*Collateral*" shall have the meaning ascribed thereto in Section 2 hereof.

"*Obligations*" shall mean all of the obligations of Pledgor under the Loan Documents.

"*Pledged Interests*" shall have the meaning ascribed thereto in Section 2(a) hereof.

"*Relevant Documents*" shall mean collectively, (i) the Certificate of Formation of Owner, (ii) the Limited Liability Company Agreement of Owner, and (iii) all other organizational documents of Owner from time to time.

"*UCC Financing Statements*" shall mean the UCC Financing Statements filed to perfect the security interests granted herein.

"**_Uniform Commercial Code_**" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York.

Section 2. <u>Pledge and Delivery of Collateral</u>.

2.1 <u>The Pledge</u>. As collateral security for the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise) of the Obligations, Pledgor hereby pledges and grants to Mezzanine Lender as hereinafter provided, a security interest in all of Pledgor's right, title and interest in the following property, whether now owned by Pledgor or hereafter acquired by Pledgor and whether now existing or hereafter coming into existence (all being collectively referred to herein as "**_Collateral_**"):

(a) all of Pledgor's membership interests in Owner, together with the certificates (if any) evidencing the same (collectively, the "**_Pledged Interests_**");

(b) all ownership interests, membership interests, shares, securities, moneys, instruments or property representing a dividend, a distribution or return of capital upon or in respect of the Pledged Interests, or otherwise received in exchange therefor, and any warrants, rights or options issued to the holders of, or otherwise in respect of, the Pledged Interests;

(c) all rights of Pledgor under the Relevant Documents or any other agreement or instrument relating to the Pledged Interests, including, without limitation, (i) all rights of Pledgor to receive moneys or distributions with respect to the Pledged Interests due and to become due under or pursuant to the Relevant Documents, (ii) all rights of Pledgor to receive proceeds of any insurance, indemnity, warranty or guaranty with respect to the Pledged Interests, (iii) all claims of Pledgor for damages arising out of or for breach of or default under a Relevant Document, (iv) any right of Pledgor to perform under the Relevant Documents and to compel performance and otherwise exercise all rights and remedies under the Relevant Documents, and (v) all rights to vote and give approvals, consents, decisions and directions and to exercise any other similar right as a member of Owner and/or in respect of the Pledged Interests and/or the business or affairs of Owner and/or to otherwise participate in the operation and management of Owner, including to act as manager of Owner, and all rights of Pledgor under or in respect of the limited liability company agreement of Owner and any other agreement relating to Pledgor's ownership of equity in Owner; and

(d) all proceeds of and to any of the property of Pledgor described in clauses (a) through (c) above and, to the extent related to any property or proceeds described in clauses (a) through (c) above or such proceeds, all books, correspondence, credit files, records, invoices and other papers.

2.2 <u>Delivery of the Collateral</u>. All certificates or instruments, if any, representing or evidencing the Collateral shall be delivered to and held by or on behalf of Mezzanine Lender pursuant to this Agreement and shall be in suitable form for transfer by delivery, and shall be accompanied by duly executed instruments of transfer endorsed by Pledgor in blank, or assignments in blank, all in form and substance satisfactory to Mezzanine Lender. Upon the occurrence and during the continuance of an Event of Default under the Loan Documents, Mezzanine Lender shall have the right, at any time, in its discretion upon notice to

Pledgor, to transfer to or to register in the name of Mezzanine Lender or its nominee any or all of the Collateral.  Concurrently with the execution and delivery of this Agreement, Pledgor is delivering to Mezzanine Lender an assignment of membership interests, in blank (the "***Assignment of Interest***"), in the form set forth on **Exhibit A** hereto, for the Pledged Interests, transferring all of the Pledged Interests in blank, duly executed by Pledgor and undated. Mezzanine Lender shall have the right, at any time in its discretion upon the occurrence and during the continuance of an Event of Default and without notice to Pledgor, to transfer to, and to designate on the Assignment of Interest, any Person to whom the Pledged Interests are sold in accordance with the provisions hereof.  In addition, Mezzanine Lender shall have the right at any time to exchange any Assignment of Interest representing or evidencing the Pledged Interests or any portion thereof for one or more additional or substitute Assignments of Interest representing or evidencing smaller or larger percentages of the Pledged Interests represented or evidenced thereby, subject to the terms thereof.

        2.3    <u>Irrevocable Proxy</u>.  Solely with respect to Article 8 Matters (as defined below), Pledgor hereby irrevocably grants and appoints Mezzanine Lender, from the date of this Agreement until the termination of this Agreement in accordance with its terms, as Pledgor's true and lawful proxy, for and in Pledgor's name, place and stead to vote the Pledged Interests, whether directly or indirectly, beneficially or of record, now owned or hereafter acquired, with respect to such Article 8 Matters.  The proxy granted and appointed in this <u>Section 2.3</u> shall include the right to sign Pledgor's name (as member of the Owner) to any consent, certificate or other document relating to an Article 8 Matter and the Pledged Interests that applicable law may permit or require, to cause the Pledged Interests to be voted in accordance with the preceding sentence.  Pledgor hereby represents and warrants that there are no other proxies and powers of attorney with respect to an Article 8 Matter that Pledgor may have granted or appointed to any other Person.  Pledgor will not give a subsequent proxy or power of attorney or enter into any other voting agreement with respect to the Pledged Interests with respect to any Article 8 Matter to any other Person and any attempt to do so with respect to an Article 8 Matter shall be void and of no effect.  The proxies and powers granted by Pledgor pursuant to this Agreement are coupled with an interest and are given to secure the performance of Pledgor's obligations.  As used herein, "***Article 8 Matter***" means any action, decision, determination or election by Owner or its member(s) that its limited liability company interests or other equity interests, or any of them, be, or cease to be, a "security" as defined in and governed by Article 8 of the Uniform Commercial Code, and all other matters related to any such action, decision, determination or election.

        Section 3.   <u>Representations and Warranties</u>.  Pledgor represents and warrants as of the date hereof that:

        (a)    this Agreement has been duly authorized, executed and delivered by Pledgor, is the legal, valid and binding obligation of Pledgor, and is enforceable as to Pledgor in accordance with its terms, subject, however, to bankruptcy, insolvency and other rights of creditors generally and to general principles of equity.

        (b)    the execution, delivery, observance and performance by Pledgor of this Agreement and the transactions contemplated hereby will not result in any violation of any of the Relevant Documents or, to Pledgor's knowledge, of any constitutional provision, law, statute, ordinance, rule or regulation applicable to it; or of any judgment, decree or order applicable to it and will not conflict with, or cause a breach of, or default under, any such term or, except for the

liens created or contemplated hereby, result in the creation of any mortgage lien, pledge, charge or encumbrance upon any of its properties or assets pursuant to any such term.

(c)      it is not necessary for Pledgor to obtain or make any (i) governmental consent, approval or authorization, registration or filing from or with any governmental authorities or (ii) consent, approval, waiver or notification of partners, creditors, lessors or other nongovernmental persons, in each case, in connection with the execution and delivery of this Agreement or the consummation of the transactions herein presently contemplated which has not been filed or obtained.

(d)      all the Pledged Interests have been duly and validly issued and are fully paid and nonassessable;

(e)      the Pledged Interests constitute all of the issued and outstanding membership interests in Owner;

(f)      Pledgor is the record and beneficial owner of, and has good and marketable title to the Pledged Interests, as applicable, free and clear of any and all Liens or options in favor of, or claims of, any other Person, except the Lien created by this Agreement;

(g)      Pledgor is organized under the laws of the State of Delaware and has all requisite power and authority to execute, deliver and perform this Agreement and the Formation Agreements and to consummate the transactions contemplated hereby;

(h)      Pledgor shall deliver all certificates, instruments or writings representing the Pledged Interests to Mezzanine Lender, a true and correct copy of which is attached hereto as Exhibit B (the "*Certificate*");

(i)      the Pledged Interests (i) are not "financial assets" (within the meaning of Section 8-102(a)(9) of the Uniform Commercial Code) and (ii) are not credited to a "securities account" within the meaning of Section 8-501(a) of the Uniform Commercial Code;

(j)      upon delivery to Mezzanine Lender of the Certificate evidencing the Pledged Interests, the Lien granted pursuant to this Agreement will constitute a valid perfected first priority Lien on such Pledged Interests and related proceeds, enforceable as such against all creditors of Pledgor and any Persons purporting to purchase any Pledged Interests and related proceeds from Pledgor;

(k)      the principal place of business and chief executive office of Pledgor is, and, since Pledgor was formed, has been, located at 3100 East Imperial Highway, Lynwood, California 90262;

(l)      the exact legal name of Pledgor is 3100 E. IMPERIAL INVESTMENT, LLC, a Delaware limited liability company;

(m)      Pledgor covenants and agrees to defend, at its sole cost and expense, Lender's right, title and security interest in and to the Pledged Interests and the proceeds thereof, created pursuant hereto, against the claims and demands of all Persons whomsoever;

(n)    The Pledged Interests constitute 100% of the interests in capital, profits, distribution, management and voting rights in Owner;

(o)    Pledgor has not changed its name, or used, adopted or discontinued the use of any trade name, fictitious name or other trade name or trade style; and

(p)    Pledgor shall perform all of its obligations under the Relevant Documents and shall not materially amend the Relevant Documents in contravention of the Loan Agreement or any of the other Loan Documents or in any manner that would reduce or impede Lender's rights or remedies hereunder without obtaining the Lender's prior written consent.

Section 4.    Further Assurances; Remedies.  In furtherance of the grant of the pledge and security interest pursuant to Section 2 hereof, Pledgor hereby agrees with Mezzanine Lender as follows:

4.1    Delivery and Other Perfection.  Pledgor shall:

(a)    if any of the above-described ownership interests, shares, securities, monies, instruments or property required to be pledged by Pledgor under Section 2.1 hereof are received by Pledgor, Pledgor shall forthwith either (x) promptly transfer and deliver to Mezzanine Lender such ownership interests, shares or securities so received by Pledgor (together with the certificates (if any) for any such ownership interests, membership interests, shares and securities and assignments duly endorsed in blank and accompanied by undated certificate powers duly executed in blank) all of which thereafter shall be held by Mezzanine Lender, pursuant to the terms of this Agreement, as part of the Collateral or (y) take such other action as Mezzanine Lender shall deem reasonably necessary or appropriate to duly record the lien created hereunder in such ownership interests, shares, securities, monies, instruments or property referred to in said Section 2.1;

(b)    give, execute, deliver, file and/or record any financing statement, notice, instrument, document, agreement or other papers that may be necessary (in the reasonable judgment of Mezzanine Lender) to create, preserve or perfect the security interest granted pursuant hereto or, after the occurrence and during the continuance of an Event of Default under the Loan Documents, to enable Mezzanine Lender to exercise and enforce its rights hereunder with respect to such pledge and security interest, including, without limitation, causing any or all of the Collateral to be transferred of record into the name of Mezzanine Lender or its nominee (and Mezzanine Lender agrees that if any Collateral is transferred into its name or the name of its nominee, Mezzanine Lender will thereafter promptly give to Pledgor copies of any notices and communications received by it with respect to the Collateral).  Pledgor hereby authorizes Mezzanine Lender to file any financing statement or continuation statement without the signature of Pledgor to the extent permitted by law if Pledgor fails to do so within ten (10) days of Mezzanine Lender's request therefore; and

(c)    permit representatives of Mezzanine Lender, upon reasonable notice, at any time during normal business hours to inspect and make abstracts from its books and records pertaining to the Collateral, and permit representatives of Mezzanine Lender to be present at Pledgor's place of business to receive copies of all communications and remittances relating to the Collateral, and forward copies of any notices or communications received by

Pledgor with respect to the Collateral, all in such manner as Mezzanine Lender may reasonably require.

4.2    <u>Preservation of Rights</u>.    Except in accordance with applicable law, Mezzanine Lender shall not be required to take steps necessary to preserve any rights against prior parties to any of the Collateral.

4.3    <u>Pledged Collateral</u>.

(a)    So long as no Event of Default shall have occurred and be continuing, Pledgor shall have the right to exercise all of Pledgor's respective rights under the Relevant Documents for all purposes not inconsistent with the terms of this Agreement, or any other Loan Document or any other instrument or agreement referred to herein or therein, including the right to exercise any and all voting rights, the right to receive distributions on the Collateral and other rights relating to the Pledged Interests; and Mezzanine Lender shall execute and deliver to Pledgor or cause to be executed and delivered to Pledgor all such proxies, powers of attorney, distribution and other orders, and all such instruments, without recourse, as Pledgor may reasonably request for the purpose of enabling Pledgor to exercise the rights and powers which it is entitled to exercise pursuant to this <u>Section 4.3(a)</u>.

(b)    If any Event of Default shall have occurred, then so long as such Event of Default shall continue, and whether or not Mezzanine Lender exercises any available right to declare any of the Obligations due and payable or seeks or pursues any other relief or remedy available to it under applicable law or under this Agreement or any other Loan Document, (i) all distributions on the Collateral shall be paid directly to Mezzanine Lender for application to the Obligations pursuant to the terms hereof and the Loan Agreement and (ii) if Mezzanine Lender shall so request in writing, Pledgor agrees to execute and deliver to Mezzanine Lender appropriate distribution and other orders and documents to that end.  In addition, Pledgor hereby irrevocably authorizes and directs Owner, from and after the occurrence of an Event of Default, to pay all such distributions on the Collateral directly to the Mezzanine Lender for application to the Obligations in the order, priority and manner set forth herein and in the Loan Agreement.  The foregoing authorization and instructions are irrevocable, may be relied upon by Owner and may not be modified in any manner other than by Mezzanine Lender sending to Owner a notice terminating such authorization and direction.

(c)    Anything herein to the contrary notwithstanding, (i) Pledgor shall remain liable under the Relevant Documents to perform all of its respective duties and obligations thereunder to the same extent as if this Agreement had not been executed, (ii) the exercise by Mezzanine Lender of any of the rights hereunder shall not release Pledgor from any of its duties or obligations under the Relevant Documents and (iii) Mezzanine Lender shall have no obligation or liability under any of the Relevant Documents by reason of this Agreement, nor shall Mezzanine Lender be obligated to perform any of the obligations or duties of Pledgor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder, except as provided by applicable law.

4.4    Events of Default, etc.    From and after the occurrence of an Event of Default shall have occurred and be continuing:

(a)    Mezzanine Lender shall have all of the rights and remedies with respect to the Collateral of a secured party under the Uniform Commercial Code (whether or not said Uniform Commercial Code is in effect in the jurisdiction where the rights and remedies are asserted) and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, including, without limitation, the right, to the maximum extent permitted by law, to exercise all voting, consensual and other powers of ownership pertaining to the Collateral as if Mezzanine Lender were the sole and absolute owner thereof (and Pledgor agrees to take all such action as may be appropriate to give effect to such right).

(b)    Mezzanine Lender in its discretion may, in its name or in the name of Pledgor or otherwise, demand, sue for, collect or receive any money or property at any time payable or receivable on account of or in exchange for any of the Collateral, but shall be under no obligation to do so.

(c)    Mezzanine Lender may, upon ten (10) days' prior written notice to Pledgor of the time and place (which notice Pledgor acknowledges as reasonable and sufficient), with respect to the Collateral or any part thereof which shall then be or shall thereafter come into the possession, custody or control of Mezzanine Lender or any of its agents, sell, assign or otherwise dispose of all or any part of such Collateral, at such place or places as Mezzanine Lender deems best, and for cash or on credit or for future delivery (without thereby assuming any credit risk), at public or private sale, without demand of performance or notice of intention to effect any such disposition or of time or place thereof (except such notice as is required above or by applicable statute and cannot be waived) and Mezzanine Lender or anyone else may be the purchaser, assignee or recipient of any or all of the Collateral so disposed of at any public sale (or, to the extent permitted by law, at any private sale), and thereafter hold the same absolutely, free from any claim or right of whatsoever kind, including any right or equity of redemption (statutory or otherwise), of Pledgor, any such demand, notice or right and equity being hereby expressly waived and released.  Unless prohibited by applicable law, Mezzanine Lender may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the same may be so adjourned.

(d)    Mezzanine Lender may exercise all membership, corporate or other ownership rights, powers and privileges of Owner, including any and all voting rights of Pledgor with respect to Owner.

(e)    Upon notice to Pledgor, Mezzanine Lender may cause the Pledged Interests to be sold in accordance with Subsection (c) above and, in connection therewith, cause each purchaser of all or any part of any Pledged Interests to be admitted as a new member of Owner, as the case may be, to the extent of such Pledged Interests, and cause Pledgor to withdraw as a member of Owner, as the case may be, to the extent such Pledged Interests are sold (in accordance with Subsection (c) above), and complete by inserting the Effective Date (as defined in each Assignment of Interest) and the name of the assignee thereunder and deliver to such assignee each Assignment of Interest executed and delivered by Pledgor and, if appropriate,

7

cause one or more amended or restated certificates of formation, certificates of limited membership or articles of incorporation, as applicable, to be filed with respect to Owner.

(f)     Mezzanine Lender may exercise any and all rights and remedies of Pledgor under or in connection with the Relevant Documents or otherwise in respect of the Collateral, including, without limitation, any and all rights of Pledgor to demand or otherwise require payment of any amount under, or performance of any provisions of, any of the Relevant Documents.

(g)     All payments received by Pledgor under or in connection with the Relevant Documents or otherwise in respect of the Collateral shall be received in trust for the benefit of Mezzanine Lender, shall be segregated from other funds of Pledgor and shall be forthwith paid over to Mezzanine Lender in the same form as so received (with any necessary endorsement).

The proceeds of each collection, sale or other disposition under this Section 4.4 shall be applied by Mezzanine Lender to the Obligations pursuant to Section 4.6 hereof.

Pledgor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, as amended, and applicable state securities laws, Mezzanine Lender may be compelled, with respect to any sale of all or any part of the Collateral, to limit purchasers to those who will agree, among other things, to acquire the Collateral for their own account, for investment and not with a view to the distribution or resale thereof. Pledgor acknowledges that any such private sales may be at prices and on terms less favorable to Mezzanine Lender than those obtainable through a public sale without such restrictions, and that Mezzanine Lender shall have no obligation to engage in public sales and no obligation to delay the sale of any Collateral for the period of time necessary to permit the issuer thereof to register it for public sale.

4.5     Private Sale. Mezzanine Lender shall not incur any liability as a result of the sale of the Collateral, or any part thereof, at any private sale pursuant to Section 4.4 hereof conducted in a commercially reasonable manner. Pledgor hereby waives any claims against Mezzanine Lender arising by reason of the fact that the price at which the Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Obligations, even if Mezzanine Lender accepts the first offer received and does not offer the Collateral to more than one offeree.

4.6     Application of Proceeds. Except as otherwise herein expressly provided, the proceeds of any collection, sale or other realization of all or any part of the Collateral pursuant hereto, and any other cash at the time held by Mezzanine Lender under this Section 4, shall be applied by Mezzanine Lender:

(i)     First, to the payment of the costs and expenses of such collection, sale or other realization, including, without limitation, reasonable out-of-pocket costs and expenses of Mezzanine Lender and the fees and expenses of their respective agents and counsel, and all expenses, and advances made or incurred by Mezzanine Lender in connection therewith;

(ii)     Next, to the payment in full of the Obligations; and

(iii)    <u>Finally</u>, to the payment to Pledgor, or its successors or assigns, or as a court of competent jurisdiction may direct, of any surplus then remaining.

As used in this <u>Section 4</u>, "***proceeds***" of Collateral shall mean cash, securities and other property realized in respect of, and distributions in kind of, Collateral, including any thereof received under any reorganization, liquidation or adjustment of debt of Pledgor or any issuer of or obligor on any of the Collateral.

4.7    <u>Attorney-in-Fact</u>.  Without limiting any rights or powers granted by this Agreement to Mezzanine Lender, Mezzanine Lender is hereby appointed, which appointment as attorney-in-fact is irrevocable and coupled with an interest, the attorney-in-fact of Pledgor for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instruments which Mezzanine Lender may deem necessary or advisable to accomplish the purposes hereof if Pledgor fails to do so within ten (10) days of Mezzanine Lender's request therefor (except that no such notice shall be required after the occurrence and during the continuance of an Event of Default), including, without limitation, (a) asking, demanding, collecting, suing for, recovering, compromising, receiving and giving acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral, (b) receiving, endorsing and collecting any drafts or other instruments, documents and chattel paper in connection with clause (a) above, (c) filing any claims or taking any action or instituting any proceedings that the Mezzanine Lender may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of the Mezzanine Lender with respect to any of the Collateral, (d) executing in connection with the sale provided for in <u>Section 4.4</u> hereof any endorsement, assignments or other instruments of conveyance or transfer with respect to the Collateral and (e) exercising any and all voting rights granted to Mezzanine Lender hereunder, including, without limitation, all voting rights granted pursuant to <u>Section 2.1(c)(v)</u> hereunder. Without limiting the generality of the foregoing, so long as Mezzanine Lender shall be entitled under this <u>Section 4</u> to make collections in respect of the Collateral, Mezzanine Lender shall have the right and power to receive, endorse and collect all checks made payable to the order of Pledgor representing any payment or other distribution in respect of the Collateral or any part thereof and to give full discharge for the same.

4.8    <u>Termination</u>.  When all Obligations shall have been indefeasibly paid in full in cash and at Pledgor's sole cost and expense, Mezzanine Lender shall forthwith cause to be assigned, transferred and delivered, against receipt but without any recourse, warranty or representation whatsoever (except that Mezzanine Lender has not sold, created or suffered to exist thereon any lien, security interest or encumbrance in favor of any third party which continues in effect) any remaining Collateral and money received in respect thereof, to or on the order of Pledgor.

4.9    <u>Further Assurances</u>.  Pledgor agrees that, from time to time upon the written request of Mezzanine Lender, Pledgor will execute and deliver such further documents and do such other acts and things as Mezzanine Lender may reasonably request in order fully to effect the purposes of this Agreement.

Section 5.  <u>Covenants</u>.

(a)      Pledgor will not, unless (i) it shall have given thirty (30) days' prior written notice to such effect to Mezzanine Lender and (ii) all action necessary or advisable, in Mezzanine Lender's opinion, to protect and perfect the Liens and security interests intended to be created hereunder with respect to the Pledged Interests shall have been taken, (A) change the location of its chief executive office or principal place of business from that specified in Section 3(h), (B) change its organizational structure or jurisdiction of organization, whether by merger, consolidation or otherwise, (C) change its name, identity or structure, or (D) reorganize or reincorporate under the laws of another jurisdiction or otherwise change its state of formation.

(b)      Pledgor shall pay, and save Mezzanine Lender harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other similar taxes (but specifically excluding income taxes and the like) which may be payable or determined to be payable with respect to any of the Collateral or in connection with any of the transactions contemplated by this Agreement.

(c)      The Pledged Interests (i) will not become "financial assets" (within the meaning of Section 8-102(a)(9) of the Uniform Commercial Code) and (ii) will not be credited to a "securities account" (within the meaning of Section 8-501(a) of the Uniform Commercial Code).

(d)      Without the prior written consent of Mezzanine Lender, Pledgor shall not, directly or indirectly, (i) vote to enable, or take any other action to permit, Owner to issue any membership interests, or to issue any other securities convertible into or granting the right to purchase or exchange for any membership interests in Owner, or (ii) except as permitted by the Mezzanine Loan Agreement, sell, assign, transfer, exchange or otherwise dispose of, or grant any option with respect to, the Collateral, or (iii) create, incur, authorize or permit to exist any lien or option in favor of, or any claim of any person with respect to, any of the Collateral, or any interest therein, except for the lien provided for by this Agreement.  Pledgor shall defend the right, title and interest of Mezzanine Lender in and to the Collateral against the claims and demands of all persons whomsoever.

(e)      Pledgor will not create, incur or permit to exist, will defend the Pledged Interests against, and will take all such other action as is necessary to remove, any lien or claim on or to the Pledged Interests, other than the liens created hereby, and will defend the right, title and interest of Mezzanine Lender in, to and under the Pledged Interests against the claims and demands of all persons whomsoever.

Section 6.      <u>Additional Agreements Concerning Collateral and UCC's</u>:

(a)      The parties acknowledge and agree that the Pledged Interests do not constitute "general intangibles" (as defined in Section 9-102 of the Code).  Pledgor further covenants and agrees that (i) the Pledged Interests are not and will not be traded, dealt in or traded on securities exchanges or securities markets and (ii) the Pledged Interests are not and will not be investment company securities within the meaning of Section 8-103 of the Uniform Commercial Code as in effect in any jurisdiction.

(b)      The parties represent, acknowledge and agree that all of the Pledged Interests have been "certificated", are "securities" governed by Article 8 of the Uniform

Commercial Code pursuant to the Relevant Documents, that the Owner has not "opted out" of Article 8 of the UCC. Pledgor shall deliver possession of the Certificate with all necessary instruments of transfer or assignment, duly executed in blank, to Mezzanine Lender and authorizes Mezzanine Lender to file one or more financing statements under the Uniform Commercial Code with such jurisdiction as determined by Mezzanine Lender from time to time in its sole discretion. During the term of this Agreement, the Pledged Interests are and will be deemed to be securities under Article 8 of the Uniform Commercial Code, including, without limitation, Section 8-103(c) thereof.

(c)     On the date hereof, Pledgor shall deliver to Mezzanine Lender UCC Financing Statements with respect to the Collateral suitable for filing in such jurisdictions as Mezzanine Lender shall request.  Pledgor authorizes Mezzanine Lender to file UCC Financing Statements and any and all other financing statements describing the Collateral and evidencing and/or perfecting the security interest in the Collateral granted by Pledgor to Mezzanine Lender pursuant to this Agreement. Pledgor agrees to deliver any other document or instrument which Mezzanine Lender may reasonably request with respect to the Collateral for the purposes of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted.  Without limiting the generality of the foregoing, Pledgor hereby authorizes the filing of financing statements (and amendments of financing statements and continuation statements) that name Pledgor as debtor and Mezzanine Lender as secured party and that cover all personal property or all assets of Borrower.

(d)     If Pledgor fails to perform or comply with any of its agreements contained herein within any applicable grace period with respect thereto provided for herein or in the Mezzanine Loan Agreement, and Mezzanine Lender, as provided for by the terms of this Agreement, shall itself perform or comply, or otherwise cause performance or compliance, with such agreement, the expenses of Mezzanine Lender incurred in connection with such performance or compliance, together with interest at the Default Rate if such expenses are not paid on demand, shall be payable by Pledgor to Mezzanine Lender on demand and shall constitute obligations secured hereby.

Section 7.  Miscellaneous.

7.1     No Waiver.  No failure on the part of Mezzanine Lender or any of its agents to exercise, and no course of dealing with respect to, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise by Mezzanine Lender or any of its agents of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The remedies provided herein are cumulative and are not exclusive of any remedies provided by law.

7.2     Governing Law.  This Agreement shall be governed by, and construed and enforced in accordance with, the substantive laws of State of New York (without regard to conflict of laws principles thereof).

7.3     Notices.   All notices, consents, approvals and requests required or permitted hereunder shall be given in the manner and to the addresses set forth in the Loan Agreement.

7.4    <u>Waivers, etc</u>.  The terms of this Agreement may be waived, altered or amended only by an instrument in writing duly executed by Pledgor and Mezzanine Lender. Any such amendment or waiver shall be binding upon Mezzanine Lender and Pledgor.

7.5    <u>Successors and Assigns</u>.  This Agreement shall be binding upon the successors and assigns of Pledgor and inure to the benefit of the successors and assigns of Mezzanine Lender; *provided*, *however*, that Pledgor shall not assign or transfer its rights hereunder without the prior written consent of Mezzanine Lender.  Without limiting the foregoing, Mezzanine Lender may at any time and from time to time without the consent of Pledgor, assign or otherwise transfer all or any portion of its rights and remedies under this Agreement to any other person or entity, either separately or together with other property of Pledgor for such purposes in connection with a transfer of Mezzanine Lender's interest in the other Loan Documents and on such terms as Mezzanine Lender shall elect, and such other person or entity shall thereupon become vested with all of the rights and obligations in respect thereof granted to Mezzanine Lender herein or otherwise.  Each representation and agreement made by Pledgor in this Agreement shall be deemed to run to, and each reference in this Agreement to Mezzanine Lender shall be deemed to refer to, Mezzanine Lender and each of its successors and assigns.

7.6    <u>Indemnification</u>.  Pledgor hereby agrees to indemnify Mezzanine Lender and its directors, officers, employees and agents from, and hold each of them harmless against, any and all losses, liabilities, claims, damages or expenses incurred by any of them arising out of or by reason of any claim of any Person (a) relating to or arising out of the acts or omissions of Pledgor under this Agreement or the Relevant Documents (but excluding any such losses, liabilities, claims, damages or expenses to the extent incurred by reason of the fraud, gross negligence or willful misconduct of the Person to be indemnified as finally judicially determined by a court of competent jurisdiction), or (b) resulting from the ownership of or lien on any Collateral, including, without limitation, the reasonable fees and disbursements of counsel incurred in connection with any such investigation or litigation or other proceedings (but excluding any such losses, liabilities, claims, damages or expenses to the extent incurred by reason of the fraud, gross negligence or willful misconduct of the Person to be indemnified as finally judicially determined by a court of competent jurisdiction).

7.7    <u>Severability</u>.  If any provision hereof is invalid and unenforceable in any jurisdiction, then, to the fullest extent permitted by law, (a) the other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in favor of Mezzanine Lender in order to carry out the intentions of the parties hereto as nearly as may be possible and (b) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provision in any other jurisdiction.

7.8    <u>Cumulative Rights and Remedies</u>.  All remedies afforded to Mezzanine Lender by reason of this Agreement are separate and cumulative remedies and it is agreed that no one of such remedies shall be deemed to be in exclusion of any other remedies available to Mezzanine Lender and shall not in any manner limit or prejudice any other legal or equitable remedies which Mezzanine Lender may have.  The rights, powers and remedies given to Mezzanine Lender by this Agreement shall be in addition to all rights, powers and remedies given to Mezzanine Lender by virtue of any statute or rule of law and all such rights, powers and remedies are cumulative and not alternative, and may be exercised and enforced successively or

concurrently.  Any forbearance or failure or delay by Mezzanine Lender in exercising any right, power or remedy hereunder shall not he deemed to be a waiver of such right, power or remedy, and any single or partial exercise of any right, power or remedy hereunder shall not preclude the further exercise thereof, and every right, power and remedy of Mezzanine Lender hereunder shall continue in full force and effect until such right, power or remedy is specifically waived by an instrument in writing executed by Mezzanine Lender

[THE REMAINDER OF THE PAGE IS INTENTIONALLY BLANK]

IN WITNESS WHEREOF, Pledgor has caused this Agreement to be duly executed as of the day and year first above written.

PLEDGOR:

**3100 E. IMPERIAL INVESTMENT, LLC**
a Delaware limited liability company

By:     Placo Investment, LLC,
        a Delaware limited liability company,
        its sole managing member

        By: _____
             Name: Donald Chae
             Title:  Manager

<u>EXHIBIT A</u>

**FORM OF ASSIGNMENT OF INTERESTS**

This **ASSIGNMENT OF MEMBERSHIP** (this "*Assignment*") is made effective as of _____, 201__ (the "*Effective Date*"), by _____, a _____ ("*Assignor*"), in favor of _____, a _____ (together with its successors and assigns, the "*Assignee*").

<u>RECITALS</u>

(A)     Assignor has entered into that certain Pledge and Security Agreement, dated as of _____, 201__ (such Agreement, as it may be amended or otherwise modified from time to time, the "*Pledge Agreement*"), with Natixis, New York Branch, a direct branch of Natixis S.A., a société anonyme à conseil d'administration (public limited company) organized and existing under the laws of France (together with its successors and assigns, "*Mezzanine Lender*").   Unless otherwise noted, terms defined in the Pledge Agreement are used herein as defined therein.

(B)     Assignor is the sole member of, and owns one hundred percent (100%) of the **[shares/partnership interests/membership interests]** in, _____, a _____ ("*Owner*"), an entity existing under and evidenced by the **[Bylaws/Limited Partnership Agreement/Limited Liability Company Agreement]** dated as of _____, ____ (such agreement, as it may be amended, supplemented or otherwise modified from time to time, the "*Operating Agreement*").

(C)     Under the Operating Agreement, Assignor has certain rights, title and interests in and to the Owner and the property and assets of Owner (collectively, the "*Interest*").

(D)     Mezzanine Lender has required that Assignor shall have executed and delivered this Assignment.

NOW THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto agree as follows:

1.     <u>Assignment and Acceptance of Assigned Interest</u>.   As of the Effective Date, Assignor hereby sells, transfers, conveys and assigns (collectively, the "*Assignment*") to Assignee all of Assignor's right, title and interest in and to the Interest and all of its rights under the Operating Agreement, including, without limitation, all its (a) rights to receive moneys due and to become due under or pursuant to the Operating Agreement, (b) rights to receive proceeds of any insurance, indemnity, warranty or guaranty with respect to the Operating Agreement, (c) claims for damages arising out of or for breach of or default under the Operating Agreement, and (d) rights to perform thereunder and to compel performance, and otherwise exercise all rights and remedies thereunder (collectively, all such rights, titles and interests are hereinafter referred to as the "*Assigned Interest*").   Assignee, upon the execution of this Assignment, hereby

accepts from Assignor the Assigned Interest and agrees to become a successor in the place and stead of Assignor to the extent of the Assigned Interest and to be bound by the terms and provisions of the Operating Agreement.

2.     Representations and Warranties of the Assignor.    Assignor represents to Mezzanine Lender, as of the date of the Pledge Agreement, and to Mezzanine Lender and Assignee as of the Effective Date, that:

(a)     this Assignment has been duly executed and delivered by Assignor and is a valid and binding obligation of Assignor, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and general principles of equity;

(b)     Assignor is the sole owner of the Interest, free and clear of any liens, except for the liens created by the Pledge Agreement; and

(c)     No consent of any Person is required in connection with the execution, delivery, performance or effectiveness of this Assignment.

3.     Filings.   On or as soon as practicable after the Effective Date, Assignee shall file and record or cause to be filed and recorded with all proper offices or agencies all documents and instruments required to effect the terms herein, if any, including, without limitation, (a) this Assignment and (b) any assumed or fictitious name certificate or certificates and any amendments thereto.

4.     Future Assurances.   Assignor and Assignee mutually agree to cooperate at all times from and after the Effective Date with respect to any of the matters described herein, and to execute such further deeds, bills of sale, assignments, releases, assumptions, notifications or other documents as may be reasonably requested for the purpose of giving effect to, evidencing or giving notice of the assignment evidenced hereby.

5.     Successors and Assigns.   This Assignment shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

6.     Modification and Waiver.    No supplement, modification, waiver or termination of this Assignment or any provisions hereof shall be binding unless executed in writing by all parties hereto and the original of such writing has been delivered to Assignee.

7.     Counterparts.   Any number of counterparts of this Assignment may be executed.  Each counterpart will be deemed to be an original instrument and all counterparts taken together will constitute one agreement.  Delivery of an executed counterpart of a signature page to this Assignment by facsimile of as a portable data file (PDF) shall be as effective as delivery of a manually executed counterpart of this Assignment.

8.     Governing Law.   This Assignment will be governed by the laws of the State of New York (without regard to conflict of law principles thereof).

[THE REMAINDER OF THE PAGE IS INTENTIONALLY BLANK]

A-2

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be executed and delivered.

ASSIGNOR:

**3100 E. IMPERIAL INVESTMENT, LLC**
a Delaware limited liability company

By:    Placo Investment, LLC,
       a Delaware limited liability company,
       its sole managing member

By: _____
       Name: Donald Chae
       Title:  Manager

A-1

ASSIGNEE:

_____

By:_____
      Name:_____
      Title:_____

A-2

## **EXHIBIT B**

### **CERTIFICATES OF LLC INTEREST**

NY:1799515.6

CERTIFICATE FOR LIMITED LIABILITY COMPANY INTERESTS IN
PLAMEX INVESTMENT, LLC

**THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE. THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF. ANY TRANSFER OF THIS CERTIFICATE OR ANY LIMITED LIABILITY COMPANY INTEREST REPRESENTED HEREBY IS SUBJECT TO THE TERMS, RESTRICTIONS AND CONDITIONS OF THE LIMITED LIABILITY COMPANY AGREEMENT (AS DEFINED BELOW).**

Certificate Number 002                                               100% Percentage Interest

Plamex Investment, LLC, a Delaware limited liability company (the "Company"), hereby certifies that 3100 E. Imperial Investment, LLC (the "Holder") is the registered owner of one hundred percent of the limited liability company interests in the Company. The rights, powers, preferences, restrictions and limitations of the limited liability company interests in the Company are set forth in, and this Certificate and the limited liability company interests in the Company represented hereby are issued and shall in all respects be subject to the terms and provisions of, the Amended and Restated Limited Liability Company Agreement of the Company dated as of June ___, 2016, as the same may be amended or restated from time to time (the "Limited Liability Company Agreement"). By acceptance of this Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the limited liability company interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all of the terms and conditions of the Limited Liability Company Agreement. The Company will furnish a copy of the Limited Liability Company Agreement to the Holder without charge upon written request to the Company at its principal place of business. Transfer of any or all of the limited liability company interests in the Company evidenced by this Certificate is subject to certain restrictions in the Limited Liability Company Agreement and can be effected only after compliance with all of those restrictions and the presentation to the Company of this Certificate, accompanied by an assignment in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferor in such transfer and an application for transfer in the form appearing on the reverse side of this Certificate, duly completed and executed by and on behalf of the transferee in such transfer.

Each limited liability company interest in the Company represented by this Certificate evidences an interest in the Company and shall constitute a "security" within the meaning of, and governed by, (i) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the States of Delaware and New York and (ii) the corresponding provisions of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 (and each limited liability company interest in the Company shall be treated as such a "security" for all purposes, including, without limitation perfection of the security interest therein under Article 8 of each applicable Uniform Commercial Code as the Company has "opted-in" to such provisions).

This Certificate and the limited liability company interests evidenced hereby shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws.

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth below.

Plamex Investment, LLC

Dated: June ___, 2016                         By: _____
                                                           Name: Donald Chae
                                                           Title: Authorized Signatory

{01083654}

## (REVERSE SIDE OF CERTIFICATE)

FOR   VALUE   RECEIVED,   the   undersigned   hereby   sells,   assigns   and   transfers   unto
_____   (print   or   typewrite   name   of   transferee),
_____ (insert Social Security or other taxpayer identification number of transferee), the following specified
percentage of limited liability company interests in the Company: _____ (identify the percentage interest being transferred)
effective as of the date specified in the Application for Transfer of Interests below, and irrevocably constitutes and appoints
_____ and its authorized officers, as attorney-in-fact, to transfer the same on the
books and records of the Company, with full power of substitution in the premises.

Dated: _____

3100 E. Imperial Investment, LLC

By: _____

Name: Donald Chae
Title: Authorized Signatory

### APPLICATION FOR TRANSFER OF INTERESTS

The undersigned applicant (the "Applicant") hereby (a) applies for a transfer of the percentage of limited liability company interests in the Company described above (the "Transfer") and applies to be admitted to the Company as a substitute member of the Company, (b) agrees to comply with and be bound by all of the terms and provisions of the Limited Liability Company Agreement, represents that the Transfer complies with the terms and conditions of the Limited Liability Company Agreement, (d) represents that the Transfer does not violate any applicable any applicable laws and regulations, and (e) agrees to execute and acknowledge such instruments (including, without limitation, a counterpart of the Limited Liability Company Agreement), in form and substance satisfactory to the Company, as the Company reasonably deems necessary or desirable to effect the Applicant's admission to the Company as a substitute member of the Company and to confirm the agreement of the Applicant to be bound by all the terms and provisions of the Limited Liability Company Agreement with respect to the limited liability company interests in the Company described above. Initially capitalized terms used herein and not otherwise defined herein are used as defined in the Limited Liability Company Agreement.

The Applicant directs that the foregoing Transfer and the Applicant's admission to the Company as a substitute member shall be effective upon the registration of such Transfer in the books and records of the Company.

APPLICANT:

_____

By:_____
Name:
Title:

Dated: _____

Address of Applicant: _____
_____
_____

The Company has determined (a) that the Transfer described above is permitted by the Limited Liability Company Agreement, (b) hereby agrees to effect such Transfer and the admission of the Applicant as a substitute member of the Company effective upon the registration of such Transfer in the books and records of the Company, and (c) agrees to record, as promptly as possible, in the books and records of the Company the Transfer and the admission of the Applicant as a substitute member.

Plamex Investment, LLC

By: _____

Name: Donald Chae
Title: Authorized Signatory

{01083654}

**Exhibit 7**

# Delaware

*Page 1*

## The First State

*CERTIFICATE*

*SEARCHED APRIL 9, 2021 AT 4:40 P.M.*
*FOR DEBTOR, 3100 E. IMPERIAL INVESTMENT LLC*

*1 OF 1          FINANCING STATEMENT              20163637707*

*EXPIRATION DATE: 06/16/2026*

*DEBTOR:      3100 E. IMPERIAL INVESTMENT, LLC*

*3100 EAST IMPERIAL HIGHWAY          ADDED    06-16-16*

*LYNWOOD, CA US 90302*

*SECURED:     NATIXIS, NEW YORK BRANCH*

*1251 AVENUE OF THE AMERICAS          ADDED    06-16-16*

*NEW YORK, NY US 10020*

*SECURED:     NATIXIS REAL ESTATE CAPITAL LLC*

*1251 AVENUE OF THE AMERICAS          ADDED    06-23-16*

*NEW YORK, NY US 10020*

*SECURED:     WATERFALL OLYMPIC MASTER FUND GRANTOR TRUST, SERIES III*

*1140 AVENUE OF THE AMERICAS, 7TH     ADDED    08-15-16*
*FLOOR*

*NEW YORK, NY US 10036*

*SECURED:     QUARRY HEAD 2017-1 GRANTOR TRUST*

*WATERFALL ASSET MANAGEMENT           ADDED    07-13-17*



Jeffrey W. Bullock, Secretary of State

20216732837-UCC11
SR# 20211244218

Authentication: 202936163
Date: 04-09-21

You may verify this certificate online at corp.delaware.gov/authver.shtml



# Delaware

*Page 2*

### The First State

1140 AVENUE OF THE AMERICAS 7FL

NEW YORK, NY US 10036

## F I L I N G   H I S T O R Y

| | | | |
|---|---|---|---|
| 20163637707 | FILED 06-16-16 | AT 4:18 P.M. | FINANCING STATEMENT |
| 20163787007 | FILED 06-23-16 | AT 3:55 P.M. | FULL ASSIGNMENT |
| 20164952337 | FILED 08-15-16 | AT 6:10 P.M. | FULL ASSIGNMENT |
| 20174602295 | FILED 07-13-17 | AT 9:38 A.M. | FULL ASSIGNMENT |
| 20210264359 | FILED 01-11-21 | AT 3:30 P.M. | CONTINUATION |

## E N D   O F   F I L I N G   H I S T O R Y

THE UNDERSIGNED FILING OFFICER HEREBY CERTIFIES THAT THE ABOVE
LISTING IS A RECORD OF ALL PRESENTLY EFFECTIVE FINANCING STATEMENTS,
LAPSED FINANCING STATEMENTS, FEDERAL TAX LIENS AND UTILITY SECURITY
INSTRUMENTS FILED IN THIS OFFICE WHICH NAME THE ABOVE DEBTOR, 3100 E.
IMPERIAL INVESTMENT LLC AS OF APRIL 5, 2021 AT 11:59 P.M.



Jeffrey W. Bullock, Secretary of State

20216732837-UCC11
SR# 20211244218

Authentication: 202936163
Date: 04-09-21

You may verify this certificate online at corp.delaware.gov/authver.shtml

███████████
███████████
███████████
███████████

Delaware Department of State
U.C.C. Filing Section
Filed: 04:18 PM 06/16/2016
U.C.C. Initial Filing No: 2016 3637707

Service Request No: 20164503335

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

⌐ **Winston & Strawn LLP**
**200 Park Avenue**
**New York, New York 10166**
**Attn: Corey A. Tessler, Esq.** ⌐

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **3100 E. IMPERIAL INVESTMENT, LLC** | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **3100 East Imperial Highway** | **Lynwood** | **CA** | **90302** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **NATIXIS, NEW YORK BRANCH** | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **1251 Avenue of the Americas** | **New York** | **NY** | **10020** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

**ALL OF THE DEBTOR'S RIGHT, TITLE AND INTEREST, WHETHER NOW EXISTING OR HEREAFTER
ACQUIRED, IN AND TO ALL PERSONAL PROPERTY OF DEBTOR, WHEREVER LOCATED AND THE PROCEEDS
AND PRODUCTS, WHETHER TANGIBLE OR INTANGIBLE, THEREOF.**

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative |
|---|

| 6a. Check only if applicable and check only one box: | | | 6b. Check only if applicable and check only one box: | |
|---|---|---|---|---|
| ☐ Public-Finance Transaction | ☐ Manufactured-Home Transaction | ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien | ☐ Non-UCC Filing |

| 7. ALTERNATIVE DESIGNATION (if applicable): | ☐ Lessee/Lessor | ☐ Consignee/Consignor | ☐ Seller/Buyer | ☐ Bailee/Bailor | ☐ Licensee/Licensor |
|---|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA:
**Plaza Mexico (85499.82)**   **Delaware Secretary of State (Mezzanine Loan)**

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Winston & Strawn LLP
200 Park Avenue
New York, New York 10166
Attention: Corey A. Tessler, Esq.

0180-206422

**Delaware Department of State**
**U.C.C. Filing Section**
Filed: 03:55 PM 06/23/2016
U.C.C. Initial Filing No: 2016 3637707
Amendment No: 20163787007
Service Request No:   20164617183

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE #
**2016 3637707, Filed 6/16/2016**

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☒ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.

☐ DELETE name: Give record name to be deleted in item 6a or 6b.

☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **NATIXIS REAL ESTATE CAPITAL LLC** | | | |
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **1251 Avenue of the Americas** | **New York** | **NY** | **10020** | **USA** |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION limited liability company | 7f. JURISDICTION OF ORGANIZATION Delaware | 7g. ORGANIZATIONAL ID #, if any ☐ NONE |
|---|---|---|---|---|

8. **AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **NATIXIS, NEW YORK BRANCH** | | | |
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA
**(85499.82- Mezz Loan)   To be filed with the Delaware Secretary of State         Debtor: 3100 E. Imperial Investment, LLC**

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)
NYUCC3FNAT - 12/10/2002 C T System Online

▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓

Delaware Department of State
U.C.C. Filing Section
Filed: 06:10 PM 08/15/2016
U.C.C. Initial Filing No: 2016 3637707
Amendment No: 20164952337
Service Request No:  20165370791

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

⌐                                             ¬
Haynes & Boone LLP
30 Rockefellar Plaza, 26th Floor
New York, New York 10112
Attn: Walter F. Schleimer, Esq.
└                                             ┘

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] |
|---|---|
| 2016 3637707, Filed 6/16/2016 | (or recorded) in the REAL ESTATE RECORDS<br>Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☑ ASSIGNMENT (full ☒☒☒☒☒): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ PARTY INFORMATION CHANGE:

Check one of these two boxes:                     AND Check one of these three boxes to:
This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete    ☐ ADD name: Complete item    ☐ DELETE name: Give record name
                                            item 6a or 6b; and item 7a or 7b and item 7c    7a or 7b, and item 7c    to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **OR** 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Waterfall Olympic Master Fund Grantor Trust, Series III | | | |
| **OR** 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1140 Avenue of the Americas, 7th floor | New York | NY | 10036 | USA |

8. ☐ COLLATERAL CHANGE:  Also check one of these four boxes:   ☐ ADD collateral   ☐ DELETE collateral   ☐ RESTATE covered collateral   ☐ ASSIGN collateral
indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐  and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| NATIXIS REAL ESTATE CAPITAL LLC | | | |
| **OR** 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
(39457.144)    To be filed with the Delaware Secretary of State          Debtor:  3100 E. Imperial Investment, LLC

International Association of Commercial Administrators (IACA)

## UCC FINANCING STATEMENT **AMENDMENT**

FOLLOW INSTRUCTIONS

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER (optional)**<br>BEAU A BAKER  (904)665-3631 | |
| **B. E-MAIL CONTACT AT FILER (optional)**<br>LUZ.ROMAN@NELSONMULLINS.COM | |
| **C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**<br><br>NELSON MULLINS RILEY & SCARBOROUGH LLP<br>50 NORTH LAURA STREET 41ST FLOOR<br>JACKSONVILLE, FL 32202<br>US | **Delaware Department of State**<br>**U.C.C. Filing Section**<br>**Filed: 09:38 AM 07/13/2017**<br>**U.C.C. Initial Filing No: 2016 3637707**<br>**Amendment No: 2017 4602295**<br>**Service Request No:  20175211203** |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| | |
|---|---|
| **1a.** INITIAL FINANCING STATEMENT FILE NUMBER<br>**20163637707** | **1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]<br>(or recorded) in the REAL ESTATE RECORDS<br>Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☑ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, **and** address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 **and** also indicate affected collateral in item 8

**4.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**

Check **one** of these two boxes:                    **AND** Check **one** of these three boxes to:

This Change affects ☐ Debtor **or** ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b; **and** item 7a or 7b **and** item 7c    ☐ ADD name: Complete item 7a or 7b, **and** item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only **one** name (6a or 6b)

| | | | | |
|---|---|---|---|---|
| **6a.** ORGANIZATION'S NAME | | | | |
| OR **6b.** INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only **one** name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | | | | |
|---|---|---|---|---|
| **7a.** ORGANIZATION'S NAME<br>QUARRY HEAD 2017-1 GRANTOR TRUST | | | | |
| OR **7b.** INDIVIDUAL'S SURNAME | | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |

| | | | | | |
|---|---|---|---|---|---|
| **7c.** MAILING ADDRESS<br>WATERFALL ASSET MANAGEMENT, 1140 AVENUE OF THE AMERICAS | CITY<br>NEW YORK | STATE<br>NY | POSTAL CODE<br>10036 | | COUNTRY<br>US |

**8.** ☑ **COLLATERAL CHANGE:** Also check **one** of these four boxes:  ☐ ADD collateral    ☐ DELETE collateral    ☐ RESTATE covered collateral    ☑ ASSIGN collateral

Indicate collateral:
**THIS IS A FULL ASSIGNMENT.**

**9. NAME** OF **SECURED PARTY** OF **RECORD AUTHORIZING THIS AMENDMENT:** Provide only **one** name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a **DEBTOR**, check here ☐ and provide name of authorizing Debtor

| | | | | |
|---|---|---|---|---|
| **9a.** ORGANIZATION'S NAME<br>WATERFALL OLYMPIC MASTER FUND GRANTOR TRUST, SERIES III | | | | |
| OR **9b.** INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:**
DE SOS - WATERFALL_PLAZA MEXICO

International Association of Commercial Administrators

**FILING OFFICE COPY** — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

# UCC FINANCING STATEMENT **AMENDMENT**

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
LIEN SOLUTIONS 800-331-3282

**B. E-MAIL CONTACT AT FILER (optional)**
UCCFILINGRETURN@WOLTERSKLUWER.COM

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

P.O. BOX 29071

GLENDALE, CA 91209-9071

US

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 03:30 PM 01/11/2021**
**U.C.C. Initial Filing No: 2016 3637707**
**Amendment No: 2021 0264359**
**Service Request No:  20210078211**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| **1a.** INITIAL FINANCING STATEMENT FILE NUMBER | **1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS |
|---|---|
| 20163637707 | Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☑ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:     **AND** Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. ☐ **CURRENT RECORD INFORMATION:**  Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. ☐ **CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 7b. INDIVIDUAL'S SURNAME | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE. | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

8. ☐ **COLLATERAL CHANGE:**  Also check one of these four boxes.  ☐ ADD collateral    ☐ DELETE collateral    ☐ RESTATE covered collateral    ☐ ASSIGN collateral
Indicate collateral:

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a **DEBTOR,** check here ☐ and provide name of authorizing Debtor

| | 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | QUARRY HEAD 2017-1 GRANTOR TRUST | | | |
| | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
DE-0-78476044-60498965- DEBTOR: 3100 E. IMPERIAL I

International Association of Commercial Administrator

**FILING OFFICE COPY** — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

**Exhibit 8**

Search Date: April 09, 2021

## CLAS
WORLDWIDE INFORMATION SERVICES

Better
Intelligence
Better
Decisions™

2020 Hurley Way, Suite 350  Sacramento, CA 95825
Local: (916) 564-7800  Fax: (916) 564-7900  Toll Free: (800) 952-5696

**Ask us about UCC eZFILE®**

## UCC Search Report

|  |  |
|---|---|
| **Type of Search** | UCCs, Federal Tax Liens, State Tax Liens, and Judgments |
| **Jurisdiction/Filing Office** | State of California, Secretary of State Uniform Commercial Code Division |
| **Indexed Through** | Mar. 25, 2021 |
| **Subject Search Name** | 3100 E. IMPERIAL INVESTMENT LLC |
| **Search Key Entered** | 3100* |

## Results

Based on a search of the indices of the Uniform Commercial Code Division of the Secretary of State of California, there are no active liens of record other than those set out below. Liens reflected in this report were based on the searcher's individual search parameters, the search key entered, as well as the searcher's choice of the liens ultimately included or excluded herein. Certification can only be obtained through the office of the California Secretary of State.

**Clear, no matches were found for the search key as detailed above.**
Similar name(s) found. Please refer to attached listing.

We assume no liability with respect to the identity of any party named or referred to in this report, nor with respect to the validity, legal effect or priority of any matter shown herein; nor, due to our inability to independently verify the accuracy of this data as provided by government and other sources, do we make any guaranty or representation as to its accuracy.

---------- **END OF REPORT** ----------

## Report Parameters

The UCC Revised Article 9 Model Administrative Rules (MARS) provide state filing offices with a set of guidelines for producing a legally compliant UCC lien search report. The search tool used to create this search report was designed to satisfy the requirements under MARS while providing the searcher with increased flexibility.

Flexible search logic generates a more inclusive search report and addresses the inconsistencies in searches performed within states that did not effectively adopt the MARS guidelines. Further, these specially designed broad-based searching features aid in the location of involuntary liens such as Federal and State Tax Liens and Judgment Liens and liens that may not be located in state databases limited to the MARS guidelines for the reporting of UCCs.

Search Date: April 09, 2021



2020 Hurley Way, Suite 350  Sacramento, CA 95825
Local: (916) 564-7800  Fax: (916) 564-7900  Toll Free: (800) 952-5696

**Ask us about UCC eZFILE®**

## California Similar Name Report

| | |
|---|---|
| **Subject Search Name** | 3100 E. IMPERIAL INVESTMENT LLC |
| **Truncated Search Name** | 3100* |
| **Indexed Through** | March 25, 2021 |

Contains all debtor names not included on the final results report.

| Filing # | Debtor Name | Address | City | State | Zip | Type |
|---|---|---|---|---|---|---|
| U200007584327 | 3100 BENEDICT CANYON RD LLC | 1061 1/2 N SPAULDING AVENUE | W HOLLYWOOD | CA | 90046 | UCC |
| 20137389243858 | 3100 FIFTH LLC | 5030 BUSINESS CENTER DRIVE, SUITE 260 | FAIRFIELD | CA | 94534 | UCC |
| U200020167320 | 3100 NORMANDIE AVE LLC | 2905 SOUTH VERMONT AVE #204 | LOS ANGELES | CA | 90007 | UCC |
| U200023245319 | 3100 NORMANDIE AVE LLC | 2905 SOUTH VERMONT AVENUE #204 | LOS ANGELES | CA | 90007 | UCC |
| 20177599010251 | 3100 ORANGE GROVE, LLC | 7345 TERRACINA LN | LOOMIS | CA | 95650-7705 | UCC |
| 20177613257009 | 3100 STOCKER MANAGEMENT, LLC | 3100 STOCKER STREET | LOS ANGELES | CA | 90008 | UCC |
| U200007718323 | 3100 STOCKER MANAGEMENT, LLC | 9100 WILSHIRE BLVD. SUITE 880 WEST TOWER | BEVERLY HILLS | CA | 90212 | UCC |
| 20197723741667 | 3100 WEST SUNSET BOULEVARD LLC | 3100, 3110 AND 3118 W. SUNSET BLVD. | LOS ANGELES | CA | 90026 | UCC |

**Exhibit 9**

# INTERCREDITOR AGREEMENT

by and between

## NATIXIS, NEW YORK BRANCH, a branch of NATIXIS, S.A.

as Senior Lender

and

## NATIXIS, NEW YORK BRANCH, a branch of NATIXIS, S.A.

as Mezzanine Lender

Dated as of June 16, 2016

Premises:  the Premises described on Exhibit A attached hereto

15749457_11

## INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT (this "*Agreement*"), dated as of June 16, 2016 by and between **NATIXIS, NEW YORK BRANCH,** a branch of NATIXIS, S.A., having an office at 1251 Avenue of the Americas, 36th Floor, New York, New York 10020 (together with its successors and assigns, "*Senior Lender*"), and **NATIXIS, NEW YORK BRANCH,** a branch of NATIXIS, S.A., having an office at 1251 Avenue of the Americas, 36th Floor, New York, New York 10020 (together with its successors and assigns, "*Mezzanine Lender*").

## RECITALS

WHEREAS, pursuant to the terms, provisions and conditions set forth in that certain Loan Agreement, dated as of the date hereof, by and between PLAMEX INVESTMENT, LLC, a Delaware limited liability company ("*Borrower*"), and Senior Lender (as the same may be amended, restated or modified pursuant to the terms of this Agreement, collectively, the "*Senior Loan Agreement*"), Senior Lender has made or is about to make a loan to Borrower in the original principal amount of $106,000,000 (the "*Senior Loan*"), which Senior Loan is evidenced by a certain Promissory Note, dated as of the date hereof, made by Borrower to Senior Lender in the amount of the Senior Loan (the "*Senior Note*"), and secured by, among other things, that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of the date hereof, made by Borrower in favor of Senior Lender (the "*Senior Mortgage*"), which Senior Mortgage encumbers the real property described on Exhibit A hereto and made a part hereof, and all improvements thereon and appurtenances thereto (collectively, the "*Premises*"); and

WHEREAS, pursuant to the terms, provisions and conditions set forth in that certain Mezzanine Loan Agreement, dated as of the date hereof, between 3100 E. IMPERIAL INVESTMENT, LLC, a Delaware limited liability company ("*Mezzanine Borrower*"), and Mezzanine Lender (as may be amended, restated or modified pursuant to the terms of this Agreement, the "*Mezzanine Loan Agreement*"), Mezzanine Lender has made or is about to make a mezzanine loan to Mezzanine Borrower in the original principal amount of $14,000,000 (the "*Mezzanine Loan*"), which Mezzanine Loan is evidenced by a certain Promissory Note, dated as of the date hereof, made by Mezzanine Borrower in the amount of the Mezzanine Loan (the "*Mezzanine Note*"), and secured by, among other things, a Pledge and Security Agreement, dated as of the date hereof, from Mezzanine Borrower pursuant to which Mezzanine Lender is granted a first priority security interest in all of Mezzanine Borrower's ownership interests in Borrower (the "*Pledge Agreement*"); and

WHEREAS, Senior Lender and Mezzanine Lender desire to enter into this Agreement to provide for the relative priority of the Senior Loan Documents (as such term is hereinafter defined) and the Mezzanine Loan Documents (as such term is hereinafter defined) on the terms and conditions set forth hereinbelow, and to evidence certain agreements with respect to the relationship between the Mezzanine Loan and the Mezzanine Loan Documents, on the one hand, and the Senior Loan and the Senior Loan Documents, on the other hand.

15749457_11

**NOW, THEREFORE**, in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Senior Lender and Mezzanine Lender hereby agree as follows:

1. **Certain Definitions; Rules of Construction.**

(a)     As used in this Agreement, the following capitalized terms shall have the following meanings:

"*Acceptable New Guarantor*" has the meaning provided in Section 5(a) hereof.

"*Active Control*" means the exercise by Mezzanine Lender or its nominee or designee of any control and/or proxy rights and/or its power of attorney with respect to the Equity Collateral or Borrower.

"*Affiliate*" means, with respect to any specified Person, any other Person that, directly or indirectly, (1) owns more than twenty-five percent (25%) of such Person or (2) is in control of, is controlled by or is under common ownership or control with such Person or is a director or officer of such Person or of an Affiliate of such Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise.

"*Agreement*" means this Agreement, as the same may be amended, modified and in effect from time to time, pursuant to the terms hereof.

"*Approved Servicer*" has the meaning provided in the definition "Qualified Transferee".

"*Award*" has the meaning provided in Section 9(c) hereof.

"*Bail-In Action*" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"*Bail-In Legislation*" means, (a) with respect to any EEA Member Country implementing Article 55 of the Bank Recovery and Resolution Directive, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) the then applicable Commission Delegated Regulation (if any) supplementing the Bank Recovery and Resolution Directive in relation to Article 55 thereof.

"*Bank Recovery and Resolution Directive*" means Directive 2014/59/EU of the European Parliament and of the Council of the European Union.

"*Borrower*" has the meaning provided in the Recitals hereto.

"*Borrower Group*" has the meaning provided in Section 10(c) hereof.

15749457_11                                                    2

"*Borrower Party*" means any Person that, directly or indirectly, (1) owns more than ten percent (10%) of, or (2) is in control of, is controlled by or is under common ownership or control with, Borrower or Mezzanine Borrower.  As used in this definition, the term "control" has the meaning assigned to such term in the definition of "Affiliate".

"*Business Day*" means any day other than a Saturday, Sunday or any other day on which national banks in New York, New York are not open for business.

"*Certificates*" means any securities (including all classes thereof) representing beneficial ownership interests in the Senior Loan or in a pool of mortgage loans including the Senior Loan issued in connection with a Securitization of the Senior Loan.

"*Continuing Senior Loan Event of Default*" means an Event of Default under the Senior Loan for which (i) Senior Lender has provided notice of such Event of Default to Mezzanine Lender in accordance with Section 11(a) of this Agreement and (ii) the cure period provided to Mezzanine Lender in Section 11(a) of this Agreement has expired and such Event of Default has not been cured by Mezzanine Borrower or Mezzanine Lender or waived in writing by Senior Lender.

"*Control*" means (i) the ownership, directly or indirectly, in the aggregate of more than fifty percent (50%) of the beneficial ownership interests of a Person and (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlled by," "Controlling" and "under common Control with" shall have the respective correlative meaning thereto.

"*Crowdfunded Entity*" means any Person engaged in Crowdfunding.

"*Crowdfunding*" means the practice of funding a business, project or venture with debt and/or equity financing and/or raising monetary or other capital contributions from a number of persons or entities through the practice of syndication, advertising or general or broad solicitation, including, without limitation, (i) in reliance upon Regulation Crowdfunding promulgated by the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended and/or (ii) via primarily internet-mediated registries, platforms, portals, mail-order subscriptions, benefit events and/or other similar methods.

"*DBRS*" means DBRS, Inc. and its successors.

"*Directing Mezzanine Lender*" has the meaning provided in Section 4(c) hereof.

"*Directing Senior Lender*" has the meaning provided in Section 4(f) hereof.

"*DST*" means a Delaware Statutory Trust.

"*EEA Financial Institution*" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of

an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"*EEA Member Country*" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"*EEA Resolution Authority*" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"*Eligibility Requirements*" means, with respect to any Person, that such Person (i) has total assets (in name or under management) in excess of $500,000,000 and (except with respect to a pension advisory firm or similar fiduciary) capital/statutory surplus or shareholder's equity of $250,000,000 and (ii) is regularly engaged in the business of making or owning (or, in the case of a pension advisory firm or similar fiduciary, regularly engaged in managing investments in) commercial real estate loans (including mezzanine loans to direct or indirect owners of commercial properties, which loans are secured by pledges of direct or indirect ownership interests in the owners of such commercial properties).

"*Enforcement Action*" means any (i) judicial or non-judicial foreclosure proceeding, the exercise of any power of sale, the taking of a deed or assignment in lieu of foreclosure, the obtaining of a receiver or the taking of any other enforcement action against the Premises or any portion thereof or Borrower, including, without limitation, the taking of possession or control of the Premises or any portion thereof, (ii) acceleration of, or demand or action taken in order to collect, all or any indebtedness secured by all or any portion of the Premises (other than giving of notices of default and statements of overdue amounts) or (iii) exercise of any right or remedy available to Senior Lender under the Senior Loan Documents, at law, in equity or otherwise with respect to Borrower and/or any portion of the Premises, other than (a) the giving of notices of default and statements of overdue amounts, (b) assessing, and collecting default interest and late fees, and (c) declaring a cash trap period or similar term.

"*Equity Collateral*" means the equity interests of Borrower pledged pursuant to the Pledge Agreement.

"*Equity Collateral Enforcement Action*" means any action or proceeding or other exercise of Mezzanine Lender's rights and remedies commenced by Mezzanine Lender, in law or in equity, or otherwise, in order to realize upon the Equity Collateral, in whole or in part, or any transaction, whether in the nature of a transfer in lieu of foreclosure or otherwise, in order to acquire the Equity Collateral, in whole or in part, other than the giving of notices of default and statements of overdue amounts.

"*Event of Default*" as used herein means (i) with respect to the Senior Loan and the Senior Loan Documents, any Event of Default thereunder and (ii) with respect to the Mezzanine Loan and the Mezzanine Loan Documents, any Event of Default thereunder.

"*Fitch*" means Fitch, Inc. and its successors.

"*Guarantor*" means Min Chae, a natural person, and Donald Chae, a natural person.

"*Guaranty Claim*" has the meaning set forth in Section 5(c) hereof.

"*Kicker Conditions*" means any additional contingent interest, additional interest or so-called "kicker" measured on the basis of the cash flow or appreciation of the Premises (or similar equity participation) that does not (i) become payable or otherwise impose monetary obligations prior to the date the Senior Loan Liabilities are fully and indefeasibly paid in full, and (ii) violate applicable law.

"*Kroll*" means Kroll Bond Ratings and its successors.

"*Loan Pledgee*" has the meaning provided in Section 15 hereof.

"*Loan Purchase Price*" has the meaning provided in Section 13(a) hereof.

"*Mezzanine Borrower*" has the meaning provided in the Recitals hereto.

"*Mezzanine Guaranty*" means that certain Guaranty of Recourse Obligations (Mezzanine Loan) made by Guarantor in favor of Mezzanine Lender, and any other guaranty or indemnity provided by Guarantor in favor of Mezzanine Lender, as the same may be amended, restated, replaced, supplemented or modified.

"*Mezzanine Lender*" has the meaning provided in the first paragraph of this Agreement.

"*Mezzanine Loan*" has the meaning provided in the Recitals hereto.

"*Mezzanine Loan Agreement*" has the meaning provided in the Recitals hereto.

"*Mezzanine Loan Documents*" means the Mezzanine Loan Agreement, the Mezzanine Note, the Pledge Agreement, together with any and all other documents and instruments set forth on Exhibit C hereto, as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement.

"*Mezzanine Loan Modification*" has the meaning provided in Section 7(b) hereof.

"*Mezzanine Note*" has the meaning provided in the Recitals hereto.

"*Monetary Cure Period*" has the meaning provided in Section 11(a) hereof.

"*Moody's*" means Moody's Investors Service, Inc. and its successors.

"*Morningstar*" means Morningstar Credit Ratings, LLC, or any of its successors in interest, assigns, and/or changed entity name or designation resulting from any acquisition by

Morningstar, Inc. or other similar entity of Morningstar Credit Ratings, LLC.    If neither Morningstar nor any successor remains in existence, "Morningstar" shall be deemed to refer to such other nationally recognized statistical rating agency or other comparable Person designated under the pooling and servicing agreement governing a Securitization and specific ratings of Morningstar herein referenced shall be deemed to refer to the equivalent ratings of the party so designated.

"*New Guaranty*" has the meaning provided in <u>Section 5(a)</u> hereof.

"*Permitted Fund Manager*" means any Person that on the date of determination is (i) one of the entities listed on <u>Exhibit D</u> or any other nationally-recognized manager of investment funds investing in debt or equity interests relating to commercial real estate, (ii) investing through a fund with committed capital of at least $250,000,000 and (iii) not subject to a Proceeding.

"*Permitted Investment Fund*" shall have the meaning set forth in the definition of "Qualified Transferee".

"*Person*" means any individual, sole proprietorship, corporation, general partnership, limited partnership, limited liability company or partnership, joint venture, association, joint stock company, bank, trust, estate unincorporated organization, any federal, state, county or municipal government (or any agency or political subdivision thereof) endowment fund or any other form of entity.

"*Pledge*" has the meaning provided in <u>Section 15</u> hereof.

"*Pledge Agreement*" has the meaning provided in the <u>Recitals</u> hereto.

"*Premises*" has the meaning provided in the <u>Recitals</u> hereto.

"*Proceeding*" has the meaning provided in <u>Section 10(c)</u> hereof.

"*Property Manager*" means Greenland Property Management, LLC, a California limited liability company, or any successor thereto as property manager of the Premises.

"*Protective Advances*" means all sums advanced for the purpose of payment of real estate taxes (including special assessments or payments in lieu of real estate taxes), maintenance costs, condominium common charges and assessments, insurance premiums, ground rents or other items (including capital expenses and leasing costs such as (without limitation) leasing commissions and tenant improvement allowances) reasonably necessary to protect the Premises or any portion thereof (including, but not limited to, all reasonable attorneys' fees, costs relating to the entry upon the Premises or any portion thereof to make repairs and the payment, purchase, contest or compromise of any encumbrance, charge or lien which in the judgment of Senior Lender or Mezzanine Lender appear to be prior or superior to the Senior Loan Documents) or the Separate Collateral, respectively, from forfeiture, casualty, loss or waste, or to protect, preserve or defend the lien of the Senior Loan Documents or the

Mezzanine Loan Documents, as applicable (including, without limitation, amounts advanced by Mezzanine Lender to effect a cure pursuant to Section 11 hereof).

"*Purchase Option Event*" has the meaning provided in Section 13(a) hereof.

"*Purchase Option Notice*" has the meaning provided in Section 13(a) hereof.

"*Qualified Manager*" shall mean a manager which is not the subject of a bankruptcy or similar insolvency proceeding and, in the reasonable judgment of Senior Lender, which is a reputable and experienced management company having at least five (5) years' experience in the management of commercial properties with similar uses and similar size as the Premises and in the jurisdiction in which the Premises are located, and, either (i) if required by Senior Lender, has a Rating Agency Confirmation obtained with respect to such manager or (ii) such manager has, for at least five (5) years prior to its engagement as property manager for the Premises, managed at least five (5) properties of the same property type, size, scope, class and use as the Premises.

"*Qualified Transferee*" means one or more of the following (other than a member of the Borrower Group or an Affiliate thereof):

(A)    a real estate investment trust, bank, saving and loan association, investment bank, insurance company, trust company, commercial credit corporation, pension plan, pension fund or pension advisory firm, mutual fund, government entity or plan, provided that any such Person referred to in this clause (A) satisfies the Eligibility Requirements;

(B)    an investment company, money management firm or "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, as amended, or an institutional "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended, provided that any such Person referred to in this clause (B) satisfies the Eligibility Requirements;

(C)    an institution substantially similar to any of the foregoing entities described in clauses (A) or (B) that satisfies the Eligibility Requirements;

(D)    any entity which Controls, is Controlled by, or is under common Control with any of the entities described in clauses (A), (B) or (C) above or (E) below;

(E)    an investment fund, limited liability company, limited partnership or general partnership (a "*Permitted Investment Fund*") where a Permitted Fund Manager or an entity that is otherwise a Qualified Transferee under clauses (A), (B), (C) or (D) of this definition investing through a fund with committed capital of at least $250,000,000 acts as the general partner, managing member or fund manager and at least 50% of the equity interests in such Permitted Investment Fund are owned, directly or indirectly, by one or more of the following: a Qualified Transferee under clauses (A), (B), (C) or (D) of this definition, an institutional "accredited investor" within the meaning of Regulation D promulgated under the Securities Act of 1933, as amended, and/or a "qualified

institutional buyer" or both within the meaning of Rule 144A promulgated under the Securities Exchange Act of 1934, as amended, provided such institutional "accredited investors" or "qualified institutional buyers" that are used to satisfy the 50% test set forth in this clause (E) satisfy the financial tests in clause (i) of the definition of Eligibility Requirements; or

(F)    any other lender or Person (including opportunity funds) that has been approved as a Qualified Transferee by the Rating Agencies or Senior Lender pursuant to this Agreement.

Notwithstanding anything to the contrary contained in this definition of Qualified Transferee, (i) in no event shall Borrower, Mezzanine Borrower, a Borrower Party or any Affiliate of Borrower or Mezzanine Borrower be deemed or permitted to be a "Qualified Transferee" for the purposes of this Agreement and (ii) other than in connection with the transfer of the Mezzanine Loan from Natixis Real Estate Capital LLC to a DST (in which event such DST shall be deemed to be a Qualified Transferee), in no event shall any TIC, Crowdfunded Entity or subsequent DST be a Qualified Transferee notwithstanding that such Person otherwise satisfies the definition of Qualified Transferee or a Rating Agency Confirmation is obtained.

"*Rating Agencies*" shall mean, prior to the final Securitization, Moody's, S&P, Morningstar, Kroll, DBRS and Fitch or any other nationally-recognized statistical rating agency which has been designated by Senior Lender and, after the final Securitization, shall mean any of the foregoing that have rated any of the Certificates.

"*Rating Agency Confirmation*" means each of the Rating Agencies shall have confirmed in writing that the occurrence of the event with respect to which such Rating Agency Confirmation is sought shall not result in a downgrade, qualification or withdrawal of the applicable rating or ratings ascribed by such Rating Agency to any of the Certificates then outstanding. For the purposes of this Agreement, if any Rating Agency shall, in writing, waive, decline or refuse to review or otherwise engage, any request for a Rating Agency Confirmation hereunder, such waiver, declination, refusal or failure to respond shall be deemed to eliminate, for such request only, the condition that a Rating Agency Confirmation by such Rating Agency (only) be obtained for purposes of this Agreement and, in such circumstances, the written consent of Senior Lender (not to be unreasonably withheld, conditioned or delayed) shall be substituted for such Rating Agency Confirmation from such Rating Agency (only). In the event that no Certificates are outstanding or the Senior Loan is not part of a Securitization, any action that would otherwise require a Rating Agency Confirmation shall require the consent of the Senior Lender, which consent (unless the context otherwise provides) shall be granted in Senior Lender's sole discretion. For purposes of clarity, any such waiver, declination or refusal to review or otherwise engage in any request for a Rating Agency Confirmation hereunder shall not be deemed a waiver, declination or refusal to review or otherwise engage in any subsequent request for a Rating Agency Confirmation hereunder and the condition for Rating Agency Confirmation pursuant to this Agreement for any subsequent request shall apply regardless of any previous waiver or refusal to review or otherwise engage in such prior request.

"*Redirection Notice*" has the meaning provided in Section 15 hereof.

"*S&P*" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and its successors.

"*Securitization*" means the sale or securitization of the Senior Loan (or any portion thereof) in one or more transactions through the issuance of securities, which securities may be assigned ratings by the Rating Agencies.

"*Senior Guaranty*" means individually or collectively, as the context may require, that certain Guaranty of Recourse Obligations made by Guarantor in favor of Senior Lender (the "*Senior Recourse Carve-out Guaranty*"), and any other guaranty or indemnity provided by Guarantor in favor of Senior Lender.

"*Senior Lender*" has the meaning provided in the first paragraph of this Agreement.

"*Senior Loan*" has the meaning provided in the Recitals hereto.

"*Senior Loan Agreement*" has the meaning provided in the Recitals hereto.

"*Senior Loan Cash Management Agreement*" means the cash management provisions of the Senior Loan Documents.

"*Senior Loan Default Notice*" has the meaning provided in Section 11(a) hereof.

"*Senior Loan Documents*" means the Senior Loan Agreement, the Senior Note, the Senior Mortgage and the other instruments and documents set forth on Exhibit B hereto, as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement.

"*Senior Loan Liabilities*" shall mean, collectively, all of the indebtedness, liabilities and obligations of Borrower evidenced by the Senior Loan Documents and all amounts due or to become due pursuant to the Senior Loan Documents, including interest thereon and any other amounts payable in respect thereof or in connection therewith, including, without limitation, any late charges, default interest, prepayment fees or premiums, exit fees, advances, post-petition interest and special servicing, workout and liquidation fees paid to any special servicer.

"*Senior Loan Modification*" has the meaning provided in Section 7(a) hereof.

"*Senior Mortgage*" has the meaning provided in the Recitals hereto.

"*Senior Note*" has the meaning provided in the Recitals hereto.

"*Separate Collateral*" means (i) the Equity Collateral, (ii) any accounts (and monies therein from time to time) established by Mezzanine Borrower and all amounts deposited therein, (iii) the Mezzanine Guaranty and (iv) any other collateral, including any interest rate cap or other hedging agreements, given as security for the Mezzanine Loan pursuant to the

Mezzanine Loan Documents (subject to Section 9(b) hereof), in each case not directly constituting security for the Senior Loan.

"*TIC*" means multiple Persons that, acting in concert, acquire title to the Equity Collateral, directly or indirectly, as tenants in common.

"*Transfer*" means any assignment, pledge, conveyance, sale, transfer, mortgage, encumbrance, lien, grant of a security interest, issuance of a participation interest, or other disposition, either directly or indirectly, by operation of law or otherwise.

"*Write-Down and Conversion Powers*" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

(b)     For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(i)     all capitalized terms defined in the recitals to this Agreement shall have the meanings ascribed thereto whenever used in this Agreement and the terms defined in this Agreement have the meanings assigned to them in this Agreement, and the use of any gender herein shall be deemed to include the other genders;

(ii)     capitalized terms not otherwise defined herein shall have the meaning assigned to them in the Senior Loan Agreement;

(iii)     all references in this Agreement to designated Sections, Subsections, Paragraphs, Articles, Exhibits, Schedules and other subdivisions or addenda without reference to a document are to the designated sections, subsections, paragraphs and articles and all other subdivisions of and exhibits, schedules and all other addenda to this Agreement, unless otherwise specified;

(iv)     a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall apply to Paragraphs and other subdivisions;

(v)     the terms "includes" or "including" shall mean without limitation by reason of enumeration;

(vi)     the words "herein", "hereof", "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision;

(vii)     the headings and captions used in this Agreement are for convenience of reference only and do not define, limit or describe the scope or intent of the provisions of this Agreement;

(viii)    unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined;

(ix)    the use of the term "Mezzanine Lender" to refer to any Person shall include, as applicable, each designee of Mezzanine Lender that takes title to (a) Equity Collateral, or (b) the Senior Loan pursuant to a purchase thereof in accordance with Section 13;

(x)    the words "to Mezzanine Lender's knowledge" or "to the knowledge of Mezzanine Lender" (or words of similar meaning) shall mean to the actual knowledge of officers of Mezzanine Lender with direct oversight responsibility for the Mezzanine Loan without independent investigation or inquiry and without any imputation whatsoever; and

(xi)    the words "to Senior Lender's knowledge" or "to the knowledge of Senior Lender" (or words of similar meaning) shall mean to the actual knowledge of officers of Senior Lender with direct oversight responsibility for the Senior Loan without independent investigation or inquiry and without any imputation whatsoever.

## 2.    Approval of Loans and Loan Documents.

(a)    Mezzanine Lender hereby acknowledges that (i) it has received and reviewed and, subject to the terms and conditions of this Agreement, hereby consents to and approves of the making of the Senior Loan and, subject to the terms and provisions of this Agreement, all of the terms and provisions of the Senior Loan Documents, (ii) the execution, delivery and performance of the Senior Loan Documents will not constitute a default or an event which, with the giving of notice or the lapse of time, or both, would constitute a default under the Mezzanine Loan Documents, (iii) Senior Lender is under no obligation or duty to, nor has Senior Lender represented that it will, see to the application of the proceeds of the Senior Loan by Borrower or any other Person to whom Senior Lender disburses such proceeds, and (iv) any application or use of the proceeds of the Senior Loan for purposes other than those provided in the Senior Loan Documents shall not affect, impair or defeat the terms and provisions of this Agreement or the Senior Loan Documents.

(b)    Senior Lender hereby acknowledges that (i) it has received and reviewed, and, subject to the terms and conditions of this Agreement, hereby consents to and approves of the making of the Mezzanine Loan and, subject to the terms and provisions of this Agreement, all of the terms and provisions of the Mezzanine Loan Documents, (ii) the execution, delivery and performance of the Mezzanine Loan Documents will not constitute a default or an event which, with the giving of notice or the lapse of time, or both, would constitute a default under the Senior Loan Documents, (iii) Mezzanine Lender is under no obligation or duty to, nor has Mezzanine Lender represented that it will, see to the application of the proceeds of the Mezzanine Loan by Mezzanine Borrower or any other Person to whom Mezzanine Lender disburses such proceeds and (iv) any application or use of the proceeds of the Mezzanine Loan for purposes other than those provided in the Mezzanine Loan Documents shall not affect, impair or defeat the terms and provisions of this Agreement or the Mezzanine Loan Documents.    Senior Lender hereby acknowledges and agrees that any conditions precedent to Senior Lender's consent to mezzanine

financing as set forth in the Senior Loan Documents or any other agreements with the Borrower, as they apply to the Mezzanine Loan Documents or the making of the Mezzanine Loan, have been either satisfied or waived.

**3.      Representations and Warranties.**

(a)      Mezzanine Lender hereby represents and warrants as follows:

(i)      As of the date hereof, the Mezzanine Loan has been fully funded in the principal amount of $14,000,000.00. Exhibit C attached hereto and made a part hereof is a true, correct and complete listing of all of the Mezzanine Loan Documents as of the date hereof. To Mezzanine Lender's knowledge, there currently exists no default or event which, with the giving of notice or the lapse of time, or both, would constitute a default under any of the Mezzanine Loan Documents.

(ii)      Mezzanine Lender is the legal and beneficial owner of the entire Mezzanine Loan free and clear of any lien, security interest, option or other charge or encumbrance, other than any lien or security interest granted to any Loan Pledgee (as hereinafter defined) as contemplated by the provisions of Section 15 hereof.

(iii)      There are no conditions precedent to the effectiveness of this Agreement against Mezzanine Lender that have not been satisfied or waived.

(iv)      Mezzanine Lender has, independently and without reliance upon Senior Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.

(v)      Mezzanine Lender is duly organized and is validly existing under the laws of the jurisdiction under which it was organized with full power to execute, deliver, and perform this Agreement and consummate the transactions contemplated hereby.

(vi)      All actions necessary to authorize the execution, delivery, and performance of this Agreement on behalf of Mezzanine Lender have been duly taken, and all such actions continue in full force and effect as of the date hereof.

(vii)      Mezzanine Lender has duly executed and delivered this Agreement and this Agreement constitutes the legal, valid, and binding agreement of Mezzanine Lender enforceable against Mezzanine Lender in accordance with its terms subject to (x) applicable bankruptcy, reorganization, insolvency and moratorium laws, and (y) general principles of equity which may apply regardless of whether a proceeding is brought in law or in equity.

(viii)      To Mezzanine Lender's knowledge, no consent of any other Person and no consent, license, approval, or authorization of, or exemption by, or registration or declaration or filing with, any governmental authority, bureau or agency is required in connection with the execution, delivery or performance by Mezzanine Lender of this Agreement or consummation by Mezzanine Lender of the transactions contemplated by this Agreement.

(ix)    None of the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated by this Agreement will (v) violate or conflict with any provision of the organizational or governing documents of Mezzanine Lender, (w) to Mezzanine Lender's knowledge, violate, conflict with, or result in the breach or termination of, or otherwise give any other Person the right to terminate, or constitute (or with the giving of notice or lapse of time, or both, would constitute) a default under the terms of any material contract, mortgage, lease, bond, indenture, agreement, or other instrument to which Mezzanine Lender is a party or to which any of its properties are subject, (x) to Mezzanine Lender's knowledge, result in the creation of any lien, charge, encumbrance, mortgage, lease, claim, security interest, or other right or interest upon the properties or assets of Mezzanine Lender pursuant to the terms of any such material contract, mortgage, lease, bond, indenture, agreement, franchise, or other instrument (provided, however, that Mezzanine Lender shall have the right to grant a lien, charge, encumbrance, claim or security interest in the Mezzanine Loan or any portion thereof to a Loan Pledgee as contemplated by the provisions of Section 15 hereof), (y) violate any judgment, order, injunction, decree, or award of any court, arbitrator, administrative agency or governmental or regulatory body of which Mezzanine Lender has knowledge against, or binding upon, Mezzanine Lender or upon any of the securities, properties, assets, or business of Mezzanine Lender or (z) to Mezzanine Lender's knowledge, constitute a violation by Mezzanine Lender of any statute, law or regulation that is applicable to Mezzanine Lender.

(x)    The Mezzanine Loan is not cross-defaulted with any loan other than the Senior Loan.  The Premises do not secure any loan from Mezzanine Lender to Mezzanine Borrower or any other Affiliate of Borrower.

(xi)    Mezzanine Lender is a "Qualified Transferee" as such term is defined herein other than solely as a result of Mezzanine Lender being (A) expressly named in such definition or (B) majority-owned and/or controlled by a Person that is a "Qualified Transferee" solely as a result of being expressly named in such definition.

(b)    Senior Lender hereby represents and warrants as follows:

(i)    As of the date hereof, the Senior Loan has been fully funded in the principal amount of $106,000,000.  Exhibit B attached hereto and made a part hereof is a true, correct and complete listing of the Senior Loan Documents as of the date hereof.  To Senior Lender's knowledge, there currently exists no default or event which, with the giving of notice or the lapse of time, or both, would constitute a default under any of the Senior Loan Documents.

(ii)    Senior Lender is the legal and beneficial owner of the Senior Loan free and clear of any lien, security interest, option or other charge or encumbrance.

(iii)    There are no conditions precedent to the effectiveness of this Agreement against Senior Lender that have not been satisfied or waived.

(iv)    Senior Lender has, independently and without reliance upon Mezzanine Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.

(v)    Senior Lender is duly organized and is validly existing under the laws of the jurisdiction under which it was organized with full power to execute, deliver, and perform this Agreement and consummate the transactions contemplated hereby.

(vi)    All actions necessary to authorize the execution, delivery, and performance of this Agreement on behalf of Senior Lender have been duly taken, and all such actions continue in full force and effect as of the date hereof.

(vii)    Senior Lender has duly executed and delivered this Agreement and this Agreement constitutes the legal, valid, and binding agreement of Senior Lender enforceable against Senior Lender in accordance with its terms subject to (x) applicable bankruptcy, reorganization, insolvency and moratorium laws and (y) general principles of equity which may apply regardless of whether a proceeding is brought in law or in equity.

(viii)    To Senior Lender's knowledge, no consent of any other Person and no consent, license, approval, or authorization of, or exemption by, or registration or declaration or filing with, any governmental authority, bureau or agency is required in connection with the execution, delivery or performance by Senior Lender of this Agreement or consummation by Senior Lender of the transactions contemplated by this Agreement.

(ix)    None of the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated by this Agreement will (v) violate or conflict with any provision of the organizational or governing documents of Senior Lender, (w) to Senior Lender's knowledge, violate, conflict with, or result in the breach or termination of, or otherwise give any other Person the right to terminate, or constitute (or with the giving of notice or lapse of time, or both, would constitute) a default under the terms of any material contract, mortgage, lease, bond, indenture, agreement, or other instrument to which Senior Lender is a party or to which any of its properties are subject, (x) to Senior Lender's knowledge, result in the creation of any lien, charge, encumbrance, mortgage, lease, claim, security interest, or other right or interest upon the properties or assets of Senior Lender pursuant to the terms of any such material contract, mortgage, lease, bond, indenture, agreement, franchise or other instrument, (y) violate any judgment, order, injunction, decree or award of any court, arbitrator, administrative agency or governmental or regulatory body of which Senior Lender has knowledge against, or binding upon, Senior Lender or upon any of the securities, properties, assets, or business of Senior Lender or (z) to Senior Lender's knowledge, constitute a violation by Senior Lender of any statute, law or regulation that is applicable to Senior Lender.

(x)    The Senior Loan is not cross-defaulted with any other loan.  The Premises do not secure any other loan from Senior Lender to Borrower, Mezzanine Borrower or any other Affiliate of Borrower.

4.    **Transfer of Mezzanine Loan or Senior Loan.**

(a)    Mezzanine Lender shall not Transfer in the aggregate (taking into account prior Transfers) more than 49% of its beneficial interest in the Mezzanine Loan unless either (i) a Rating Agency Confirmation has been given with respect to such Transfer, in which case the

related transferee shall thereafter be deemed to be a "Qualified Transferee" for all purposes of this Agreement, (ii) such Transfer is to a Qualified Transferee, (iii) such Transfer is a Pledge in compliance with the terms and conditions of <u>Section 15</u> hereof, (iv) such Transfer has been approved by Senior Lender in its sole discretion (provided, that any such approval may be conditioned upon the issuance of a Rating Agency Confirmation if a Rating Agency Confirmation is required pursuant to the terms of the applicable pooling and servicing agreement), in which case the related transferee shall thereafter be deemed to be a "Qualified Transferee" for all purposes of this Agreement or (v) such transfer complies with <u>Section 5</u>. Any transferee of a direct interest in the Mezzanine Loan must assume in writing the obligations of Mezzanine Lender hereunder arising from and after such Transfer and agree to be bound by the terms and provisions hereof. Such proposed transferee (other than a Loan Pledgee (prior to its realization on its Pledge) or a participant in connection with a participation of a portion of the Mezzanine Loan) shall also remake each of the representations and warranties made by Mezzanine Lender herein for the benefit of the Senior Lender; provided, that (x) in the case of the representations in Section 3(a)(i), such representations relating to the Mezzanine Loan Documents shall be limited to the knowledge of such transferee and such transferee shall not be required to make any representations regarding the existence of any default, (y) the representations contained in Section 3(a)(ii), shall only be required with respect to the portion of the Mezzanine Loan that such transferee is acquiring, and (z) in the case of the representations in Section 3(a)(xi), such representations shall not be required to be made by a transferee in the case of a Transfer made expressly pursuant to clauses (i) or (iv) of Section 4(a). Notwithstanding anything contained herein to the contrary, neither Mezzanine Lender nor any Loan Pledgee may Transfer all or any portion of its beneficial interest in the Mezzanine Loan to Borrower or Mezzanine Borrower or any Borrower Party, and any Transfer of any interest in the Mezzanine Loan in breach of the provisions of the foregoing shall be null and void and shall constitute a breach of this Agreement.

(b)      No later than (5) Business Days prior to a Transfer of more than 49% (or a Transfer which when taken together with prior Transfers is a Transfer of more than 49%) of its beneficial interest in the Mezzanine Loan, the Mezzanine Lender shall provide to Senior Lender and, if any Certificates are outstanding, to the Rating Agencies, an assumption and assignment agreement and a certification that such Transfer shall be made in accordance with this <u>Section 4</u>, such certification to include the name and contact information of the Qualified Transferee.

(c)      If more than one Person shall hold a direct interest in the Mezzanine Loan, the holder(s) of more than 50% of the principal amount of the Mezzanine Loan (or if none of the Persons holding a direct interest in the Mezzanine Loan own more than 50% of the principal therein, then the holder of a plurality of such interests, unless the applicable co-lender agreement or participation agreement, as applicable, among the holders of the Mezzanine Loan provides a different designation mechanism, which different mechanism shall be specified in such notice and upon which Senior Lender shall be entitled to rely without independent investigation) shall designate by written notice to Senior Lender one of such Persons (the "***Directing Mezzanine Lender***") to act on behalf of all such Persons holding an interest in the Mezzanine Loan. The Directing Mezzanine Lender shall have the sole right to receive any notices which are required to

be given or which may be given to Mezzanine Lender pursuant to this Agreement and to exercise the rights and power given to Mezzanine Lender hereunder, including any approval rights of Mezzanine Lender; provided, that until the Directing Mezzanine Lender has been so designated, the last Person known to the Senior Lender to hold more than a 50% direct interest in the Mezzanine Loan (or if none of the Persons holding a direct interest own more than 50% of the principal amount therein, then the last Person known to the Senior Lender to hold a plurality of such interests) shall be deemed to be the Directing Mezzanine Lender.  Once the Directing Mezzanine Lender has been designated hereunder, Senior Lender shall be entitled to rely on such designation until it has received written notice from the holder(s) of more than 50% of the principal amount of the Mezzanine Loan (or if none of the Persons holding a direct interest own more than 50%, then the Person holding a plurality of such interests, unless the applicable co-lender agreement or participation agreement, as applicable, among the holders of the Mezzanine Loan provides a different designation mechanism, which different mechanism shall be specified in such notice and upon which Senior Lender shall be entitled to rely upon without independent investigation) of the designation of a different Person to act as the Directing Mezzanine Lender.

(d)    Mezzanine Lender acknowledges that any Rating Agency Confirmation may be granted or denied by the Rating Agencies in their sole and absolute discretion and that such Rating Agencies may charge customary fees in connection with any such action, which fees shall be paid by Mezzanine Lender.

(e)    Senior Lender may, from time to time, in its sole discretion Transfer all or any of the Senior Loan or any interest therein (including, without limitation, a pledge of the Senior Loan) without the consent of Mezzanine Lender; provided that any such direct transferee (excluding any transferee that is only purchasing a participation interest in the Senior Loan) assumes in writing (or, in connection with a Securitization, provided the Transfer is made subject to) the obligations of Senior Lender hereunder accruing from and after such Transfer and (except in connection with a Securitization) agrees to be bound by the terms and provisions hereof, and notwithstanding any such Transfer or subsequent Transfer, the Senior Loan and the Senior Loan Documents shall be and remain a senior obligation in the respects set forth in this Agreement to the Mezzanine Loan and the Mezzanine Loan Documents in accordance with the terms and provisions of this Agreement.  Notwithstanding anything contained herein to the contrary, Senior Lender may not Transfer all or any portion of its beneficial interest in the Senior Loan to Borrower or Mezzanine Borrower or any Affiliate of Borrower or Mezzanine Borrower provided, however, that (i) the aforesaid prohibition shall not apply to a Transfer in accordance with the terms of Section 13 below by Senior Lender to Mezzanine Lender or an Affiliate of Mezzanine Lender that has acquired title to the Equity Collateral, and (ii) notwithstanding the aforesaid prohibition, unless prohibited by the applicable pooling and servicing agreement, Borrower, Mezzanine Borrower, any Affiliate of Borrower or any Affiliate of Mezzanine Borrower may purchase Certificates in connection with a Securitization of any part of the Senior Loan (provided, that under no circumstances shall such Person acquire Certificates which afford such Person "controlling holder" rights under such Securitization) and no such purchase by Borrower, Mezzanine Borrower, any Affiliate of Borrower or any Affiliate of Mezzanine

Borrower shall cause the trustee of any Securitization of the Senior Loan or any portion thereof (or the Securitization Vehicle holding the Senior Loan or any portion thereof) to be deemed to be an Affiliate of Borrower. If requested by Senior Lender (and at Senior Lender's expense), Mezzanine Lender shall reasonably cooperate with efforts to preserve mortgage recording tax benefits by taking an assignment of the Senior Mortgage as additional collateral for the Mezzanine Loan.

(f)    If more than one Person shall hold a direct interest in the Senior Loan, the holder(s) of more than 50% of the principal amount of the Senior Loan (or if none of the Persons holding a direct interest own more than 50%, then the holder of a plurality of such interests) shall designate by written notice to Mezzanine Lender one of such Persons (the "***Directing Senior Lender***") to act on behalf of all such Persons holding an interest in the Senior Loan. The Directing Senior Lender shall have the sole right to receive any notices which are required to be given or which may be given to Senior Lender pursuant to this Agreement and to exercise the rights and power given to Senior Lender hereunder, including any approval rights of Senior Lender; provided, that until the Directing Senior Lender has been so designated, the last Person known to the Mezzanine Lender to hold more than a 50% direct interest in the Senior Loan (or if none of the Persons holding a direct interest own more than 50%, then the last Person known to the Mezzanine Lender to hold a plurality of such interests) shall be deemed to be the Directing Senior Lender. Once the Directing Senior Lender has been designated hereunder, Mezzanine Lender shall be entitled to rely on such designation until it has received written notice from the holder(s) of more than 50% of the principal amount of the Senior Loan (or if none of the Persons holding a direct interest own more than 50%, then the Person holding a plurality of such interests) of the designation of a different Person to act as the Directing Senior Lender. Notwithstanding the foregoing, in the event of a syndication or Securitization of the Senior Loan, the Directing Senior Lender shall be designated in accordance with the terms of any co-lender agreement or pooling and servicing agreement entered into in connection with such syndication or Securitization, and shall have the rights afforded to it thereunder.

5.    **Foreclosure of Separate Collateral.**

(a)    Mezzanine Lender shall not complete a foreclosure, assignment in lieu or other realization upon the Equity Collateral (including, without limitation, obtaining title to the Equity Collateral or selling or otherwise transferring the Equity Collateral) or take Active Control without a Rating Agency Confirmation unless (i) the transferee of title to the Equity Collateral is a Qualified Transferee, (ii) the Premises will be managed by a Qualified Manager promptly after the transfer of title to the Equity Collateral, and (iii) if not in place prior to the transfer of title to the Equity Collateral, hard cash management will be implemented under the Senior Loan promptly after the transfer of title to the Equity Collateral (upon the same terms and conditions, and with identical reserves (which shall be replenished to the levels required by the Senior Loan Documents as of the date hereof), set forth in the Senior Loan Documents), provided that the implementation of such hard cash management shall not cause a "significant modification" as defined in Treasury Regulations Section 1.8606-2(b). Additionally, if a non-consolidation opinion was delivered in connection with the closing of the Senior Loan, the transferee of the

Equity Collateral shall deliver a new non-consolidation opinion relating to the transferee acceptable to Senior Lender and meeting the then-current criteria of the Rating Agencies within fifteen (15) Business Days after the transfer of title to the Equity Collateral.  The Mezzanine Lender shall provide notice of the transfer and an officer's certificate from an officer of Mezzanine Lender certifying that all conditions set forth in this Section 5(a) have been (or will be, in which case Mezzanine Lender shall provide one or more additional officer's certificates upon satisfaction of such conditions) satisfied to Senior Lender and, after a Securitization, the Rating Agencies upon consummation of any transfer of title to the Equity Collateral pursuant to this Section 5(a) .   Senior Lender may request reasonable evidence that the foregoing requirements have been satisfied and an opinion of counsel regarding the authorization and enforceability in connection with an Acceptable New Guarantor's execution and delivery of a New Guaranty.  Additionally, as a condition precedent to the taking of Active Control or the completion of a foreclosure or other realization upon the Equity Collateral, an Acceptable New Guarantor (hereinafter defined) shall (i) execute and deliver to Senior Lender, a guaranty (the "*New Guaranty*") in a form substantially similar to the Senior Recourse Carve-out Guaranty (and no less favorable to Senior Lender than the then-current Senior Recourse Carve-out Guaranty), pursuant to which the Acceptable New Guarantor shall assume the obligations set forth therein with respect to events first arising from and after the date of such transfer of title to the Equity Collateral, and (ii) if there are Certificates then outstanding, deliver (or cause to be delivered) to Senior Lender and each Rating Agency, an opinion of counsel that the issuance and/or substitution of the original guarantor and the original Senior Recourse Carve-out Guaranty with a substitute Acceptable New Guarantor and a substitute New Guaranty, would not cause a "significant modification" of the Senior Loan, as such term is defined in Treasury Regulations Section 1.860G-2(b).  As used herein, an "*Acceptable New Guarantor*" means a Person that owns, directly or indirectly, at least 20% of the ownership interest in and controls (as described in clause (ii) of the definition of Control) the transferee of title to the Equity Collateral that (A) has a net worth (excluding Guarantor's interest in the Premises) of at least $60,000,000.00 and liquid assets of at least $12,000,000.00, (B) is or is Controlled by a Qualified Transferee; (C) would not be in breach of Section 5.19 of the Senior Loan Agreement, (D) is not then the subject of a Proceeding; and (E) is an entity which has organizational documents that require it to have a minimum term of existence ending no earlier than twelve (12) months after the then applicable Stated Maturity Date (as defined in the Senior Loan Agreement).

(b)    Subject to the provisions of this Section 5, Mezzanine Lender may take any Equity Collateral Enforcement Action; provided, however, that (i) Mezzanine Lender shall, prior to commencing any Equity Collateral Enforcement Action, give the Senior Lender not less than five (5) Business Days prior written notice of the default which would permit Mezzanine Lender to commence such Equity Collateral Enforcement Action, and (ii) Mezzanine Lender shall provide Senior Lender with copies of any and all material notices, pleadings, agreements, motions and briefs served upon, or delivered to any party to any Equity Collateral Enforcement Action and otherwise keep Senior Lender reasonably apprised as to the status of any Equity Collateral Enforcement Action and (iii) if and to the extent that Mezzanine Lender or any Qualified Transferee acquires all of the ownership interest in Borrower pursuant to an Equity Collateral Enforcement Action in accordance with the terms of this Agreement, including, without limitation, this Section 5, then upon, from and after the vesting of title thereto, subject to

Section 29 hereof, this Agreement shall terminate with respect to Mezzanine Lender or such Qualified Transferee.

(c)     Nothing contained herein shall limit or restrict the right of Mezzanine Lender to exercise its rights and remedies, at law or in equity, or otherwise, in order to realize on any Separate Collateral that is not Equity Collateral (including exercising any remedy against Guarantor under the Mezzanine Guaranty (a "*Guaranty Claim*")) in accordance with this Agreement and to apply the proceeds therefrom as it deems appropriate in its discretion (i.e., without payment subordination); *provided, however*, Mezzanine Lender agrees that it shall not pursue the enforcement of any judgments against any Guarantor that is also a guarantor, indemnitor or obligor under any Senior Guaranty (but shall not be precluded from obtaining a judgment in any event) pursuant to this <u>Section 5(c)</u>) unless (i) it delivers to Senior Lender notice forty-five (45) days prior to commencing any action or otherwise pursuing or settling any such Guaranty Claim identifying the nature of such claim and the basis (or alleged basis) thereof, and (ii) if any Senior Loan Liabilities are then outstanding, in the event any proceeds of any such action, enforcement or settlement (the "*Mezz Guaranty Claim Proceeds*") are obtained, such Mezz Guaranty Claim Proceeds shall be promptly turned over to Senior Lender to be held in trust by Senior Lender in the event Senior Lender notifies Mezzanine Lender within sixty (60) days of receipt of Mezzanine Lender's notice of its intent to commence any action or otherwise pursue or settle any Guaranty Claim that any of the events or circumstances set forth in any of clauses (A), (B), (C) or (D) below are applicable: (A) Senior Lender is simultaneously exercising any rights or remedies that it may have against such Guarantor under any Senior Guaranty granted to Senior Lender as additional collateral to secure the obligations under the Senior Loan Documents (including without limitation the Senior Loan Guaranty), or (B) Senior Lender has a claim against such Guarantor that is based on the same acts, omissions, facts or circumstances giving rise to the related Guaranty Claim, and Senior Lender commences litigation or other action on such claim within sixty (60) days of such notice to Mezzanine Lender, or (C) Senior Lender has a claim (of any nature) against such Guarantor, and Senior Lender commences litigation or other action on such claim within sixty (60) days of such notice to Mezzanine Lender, if, with respect to this clause (C) only, payment by Guarantor of the Mezz Guaranty Claim Proceeds would (based on the most recent financial statements provided by Guarantor, and any other information regarding Guarantor reasonably relied upon by Senior Lender, including, without limitation, any proposed asset sales and/or distributions to investors, and assuming that no additional capital contributions or other additional funds shall be provided to Guarantor by any Person) result in Guarantor failing to meet the net worth and/or liquidity tests set forth in any Senior Guaranty (including, without limitation, any of the financial tests set forth in Section 6(b) of the Senior Guaranty) or (based on the foregoing information and assumptions) could reasonably be expected to so result prior to Senior Lender's realization on Senior Lender's claim, or (D) Guarantor has not been released of all of its guaranteed obligations under the Senior Guaranty in accordance with the terms and provisions thereof (regardless of whether Senior Lender then has a claim against such Guarantor), then if payment by Guarantor of the Mezz Guaranty Claim Proceeds would (based on the most recent financial statements provided by Guarantor, and any other information regarding Guarantor reasonably relied upon by Senior Lender, including, without limitation, any proposed asset sales and/or distributions to investors, and assuming that no additional capital contributions or other additional funds shall be provided

to Guarantor by any Person) result in Guarantor failing to meet the net worth and/or liquidity tests set forth in any Senior Guaranty (including, without limitation, any of the financial tests set forth in Section 6(b) of the Senior Guaranty) or (based on the foregoing information and assumptions) could reasonably be expected to so result prior to such time as Guarantor has been released of all of its obligations under the Senior Guaranty in accordance with the terms and provisions thereof. Senior Lender shall hold such Mezz Guaranty Claim Proceeds in trust for Mezzanine Lender until (I) in the event that any of the cases described in clauses (A), (B) and (C) is applicable, such time as Senior Lender's claim is resolved by a final, non-appealable judgment or by a final settlement, and, if such claim is not resolved in Senior Lender's favor, or if and to the extent Senior Lender actually receives payment on account of its claim from Guarantor, then Senior Lender shall return such proceeds to Mezzanine Lender to be applied as Mezzanine Lender deems appropriate in its discretion (provided, that if such claim is resolved in Senior Lender's favor and if and to the extent Senior Lender is unable to recover payment of such claim from Guarantor or if the proceeds so recovered are not sufficient to satisfy in full Senior Lender's claim, Senior Lender shall have the right to apply such proceeds to the Senior Loan Liabilities in its sole discretion until such claim is satisfied in full, and thereafter Senior Lender shall remit any remaining proceeds to Mezzanine Lender), (II) in the event the case described in clause (D) is applicable, until such time as Guarantor has been released of all of its obligations under the Senior Guaranty in accordance with the terms and provisions thereof, and (III) in the event none of the cases described in clauses (A), (B), (C) or (D) is applicable (or with respect to the cases described in clauses (B) or (C), Senior Lender fails to commence litigation or other action on such claim in the time periods provided therein), then Senior Lender shall return such proceeds to Mezzanine Lender to be applied as Mezzanine Lender deems appropriate in its discretion (provided that if at such time any of the events or circumstances set forth in any of clauses (A), (B), (C) or (D) above are applicable, then Senior Lender shall continue to hold such Mezz Guaranty Claim Proceeds in accordance with the provisions of clause (I) above of this sentence). Any right of payment of Mezzanine Lender under a Guaranty Claim shall be subject and subordinate as provided in this Section 5(c) in all respects to the rights and claims of Senior Lender against such Guarantor.

(d)     In the event Mezzanine Lender (or its designee or nominee) or any purchaser that is a Qualified Transferee obtains title to the Separate Collateral pursuant to and in accordance with Section 5(a), Senior Lender hereby acknowledges and agrees that (i) any such transfer shall not constitute a breach or default under the Senior Loan Documents, and (ii) any transfer or assumption fee in the Senior Loan Agreement shall be waived in connection with such Transfer; provided, however, that all reasonable, out-of-pocket expenses incurred by Senior Lender in connection with any such Transfer shall be paid by Mezzanine Lender and/or any such Qualified Transferee.

(e)     To the extent that Mezzanine Lender or any Qualified Transferee acquires the Equity Collateral in accordance with the provisions and conditions of this Agreement, Mezzanine Lender or such Qualified Transferee shall acquire the same subject to the Senior Loan and the terms, conditions and provisions of the Senior Loan Documents for the balance of the term thereof, which shall not be accelerated by Senior Lender solely due to such acquisition

and shall remain in full force and effect. Concurrently with, and as a condition to, such acquisition, Mezzanine Lender or such Qualified Transferee shall cause Borrower to reaffirm in writing, subject to such exculpatory provisions as shall be set forth in the Senior Loan Documents, all of the terms, conditions and provisions of the Senior Loan Documents on Borrower's part to be performed. For the avoidance of doubt, the parties acknowledge and agree that nothing contained herein shall require the cure of any default or Event of Default under the Senior Loan as a condition precedent to the exercise of any remedies by Mezzanine Lender under the Mezzanine Loan, including the commencement and completion of a foreclosure of against the Equity Collateral; provided, however, that nothing in this Section 5(e) is intended as (1) a waiver of or by Senior Lender of any such Event of Default or of any rights or remedies Senior Lender may have as a result of such Event of Default or otherwise under the Senior Loan Documents at law or in equity or (2) any agreement on the part of Senior Lender to extend the term of the Senior Loan or otherwise modify any Senior Loan Documents in any respect. Notwithstanding the foregoing, in the event that, as of the date of Transfer of the Equity Collateral pursuant to the provisions of this Section 5 to Mezzanine Lender or a Qualified Transferee, a non-monetary default shall remain uncured under the Senior Loan that was not susceptible to cure without foreclosure of the Equity Collateral, the transferee of such Equity Collateral shall have the right, during the Permitted Cure Period (as hereinafter defined), to cure such non-monetary default under the Senior Loan, so long as (A) following the occurrence of such non-monetary default, Mezzanine Lender shall have continuously and diligently pursued foreclosure of the Equity Collateral in accordance with the requirements of Section 11(a), and to the extent any aspect of such default was susceptible of cure or preparation for cure prior to the date of acquisition of the Equity Collateral, Mezzanine Lender shall have continuously and diligently pursued such cure or preparation for cure, (B) such transferee is continuously and diligently pursuing a cure of such non-monetary default, (C) such transferee shall reimburse Senior Lender for any costs or expenses (including, without limitation, Protective Advances and interest thereon) incurred by it as a result of such non-monetary default, (D) such default is not caused by a Proceeding of Borrower and no Proceeding of Borrower shall exist, and (E) during the period in which such transferee is pursuing such cure in accordance with this Section 5(e), there is no material impairment to the value, use or operation of the Premises or to Senior Lender's Lien on any of the collateral for the Senior Loan, in each case as determined by Senior Lender in good faith. The "*Permitted Cure Period*" shall mean, with respect to any non-monetary default, the period that commences on the date of Transfer of title to the Equity Collateral to Mezzanine Lender or a Qualified Transferee in accordance with the provisions of Section 5(a) (the "*Transfer Date*") and ends on the earliest of (i) the earliest practical date on which a cure of such non-monetary default can be effected, and (ii) the number of days after the Transfer Date that is equal to the number of days provided for a cure of such non-monetary default in the Senior Loan Agreement; provided that such number of days shall commence on the Transfer Date (and shall not require notice in order to commence). Notwithstanding anything to the contrary contained herein or in the Senior Loan Documents, the transferee of the Equity Collateral shall have no obligation to cure, and Senior Lender shall waive, any non-monetary default under the Senior Loan which (X) remains uncured as of the date of the Transfer of the Equity Collateral, and (Y) is not susceptible of being cured by such transferee; provided that (I) there is no material impairment to the value, use or operation of the Premises or to Senior Lender's Lien on any of the collateral for the Senior Loan, in each case as determined by Senior Lender in good faith, (II) such default is not caused by, and does not consist of a Proceeding of

Borrower and (III) such transferee shall reimburse Senior Lender for any costs or expenses (including, without limitation, Protective Advances and interest thereon) incurred by it as a result of such non-monetary default.

(f)     In the event Mezzanine Lender or any purchaser that is a Qualified Transferee obtains title to the Equity Collateral pursuant to and in accordance with this Section 5, Senior Lender hereby agrees that it will use commercially reasonable efforts to cooperate with Mezzanine Lender or such Qualified Transferee to effect the amendment of the Senior Loan Documents to make substantively consistent changes to the existing permitted Affiliate transfer provisions contained therein to reflect the organizational structure of Mezzanine Lender or such Qualified Transferee, as applicable, and such Person's Affiliates in lieu of that of Borrower and its Affiliates, and to refer thereafter to Mezzanine Lender or such Qualified Transferee, as applicable, and such Person's respective Affiliates instead of Borrower or its Affiliates; provided, that such amendments shall provide substantively the same protections to Senior Lender as the existing provisions of the Senior Loan Agreement.

(g)     Nothing contained in Section 4(a) or this Section 5 is intended (i) to limit any Loan Pledgee's right under its financing documents with Mezzanine Lender to foreclose against Mezzanine Lender; provided that such Loan Pledgee complies with the applicable provisions of Section 15, or (ii) if any such Loan Pledgee has foreclosed under its financing documents as aforesaid, to limit such Loan Pledgee's right to foreclose against Mezzanine Borrower's interest in the Separate Collateral; provided that such Loan Pledgee complies with the applicable provisions of Section 4 and this Section 5.  For the avoidance of doubt a Loan Pledgee, in the event that a Loan Pledgee becomes Mezzanine Lender, must comply with the provisions of this Section 5 regarding Acceptable New Guarantors.

**6.     Notice of Rating Confirmation.**  Mezzanine Lender shall notify Senior Lender promptly of any intended action relating to the Mezzanine Loan which would require Rating Agency Confirmation pursuant to this Agreement and shall cooperate with Senior Lender in obtaining such confirmation.  Senior Lender shall notify Mezzanine Lender promptly of any intended action relating to the Senior Loan which would require Rating Agency Confirmation pursuant to this Agreement and Mezzanine Lender shall cooperate with Senior Lender in obtaining such confirmation.  The party whose actions necessitate or require Rating Agency Confirmation shall pay all fees and expenses of the Rating Agencies in connection with such request.

**7.     Modifications, Amendments, Etc.**

(a)     Senior Lender shall have the right without the consent of Mezzanine Lender in each instance to enter into any amendment, deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver (collectively, a "***Senior Loan Modification***") of the Senior Loan or the Senior Loan Documents provided that no such Senior Loan Modification shall (i) increase the interest rate or principal amount (except for increases in principal to cover Protective Advances and the capitalization of interest) of the Senior Loan, (ii) increase in any other material respect any monetary obligations of Borrower under the Senior

Loan Documents, (iii) extend or shorten the scheduled maturity date of the Senior Loan (except that Senior Lender may permit Borrower to exercise any extension options in accordance with the terms and provisions of the Senior Loan Documents), (iv) convert or exchange the Senior Loan into or for any equity interest or any other indebtedness or subordinate any of the Senior Loan to any indebtedness, (v) waive, amend or modify the provisions limiting Transfers of direct or indirect interests in the Borrower or the Premises to the extent such waiver, amendment or modification would result in an Event of Default under the Mezzanine Loan Documents, (vi) materially waive, modify or amend the terms and provisions of the Senior Loan Cash Management Agreement or any of the other Senior Loan Documents with respect to the manner, timing, priority, amounts, conditions for release or methods of the application of payments or reserves under the Senior Loan Documents or impose new reserve requirements, (vii) cross-default the Senior Loan with any other indebtedness, (viii) modify or amend the Senior Loan Cash Management Agreement, (ix) obtain any direct or indirect equity interest, contingent interest, additional interest or so-called "kicker" measured on the basis of the cash flow or appreciation of the Premises, (or other similar equity participation), (x) extend the period during which defeasance or voluntary prepayments are prohibited or during which prepayments require the payment of a prepayment fee or premium or yield maintenance charge or increase the amount of or impose any new prepayment fee, premium or yield maintenance charge, (xi) release the lien on all or any material portion of the Premises or the Leases and Rents (each as defined in the Senior Loan Documents) or any other material portion of the collateral originally granted under the Senior Loan Documents (except as may be required or permitted in accordance with the terms of the Senior Loan Documents as of the date hereof in exchange for prepayment in full in cash of the Senior Loan) (it being understood that nothing herein shall prohibit or be construed to prohibit the release of any guarantor under any Senior Guaranty delivered with respect to the Senior Loan pursuant to and in accordance with the terms of the Senior Loan Agreement and otherwise permitted without the consent of Mezzanine Lender pursuant to clause (xvii) hereof), (xii) impose any financial covenants on Borrower or Guarantor (or if such covenants exist, impose more restrictive financial covenants on Borrower or Guarantor), (xiii) modify, amend or add any default provision, including modifying or amending the definitions of "Default" and "Event of Default", or delete or shorten any notice, cure or grace periods available to Borrower, (xiv) waive or materially modify or amend any material insurance requirements (including any deductibles, limits, qualifications of insurers, terrorism or environmental insurance requirements), or any material casualty or condemnation provisions, (xv) impose any new or additional fees on Borrower not provided for in the Senior Loan Documents in effect on the date hereof, (xvi) intentionally omitted, (xvii) release in any material respect any guarantor under any Senior Guaranty unless, in the case of the Senior Recourse Carve-out Guaranty, replaced with an Acceptable New Guarantor in accordance herewith, or modify, amend or waive any obligation or liability of the Guarantor under the Senior Loan, (xviii) change the bond requirements of any defeasance to make them more onerous on the Borrower, in each case, except as provided in the Senior Loan Documents, (xix) modify or amend the definitions "Cash Trap Period", "Debt Service", "Debt Service Coverage Ratio", "Monthly Debt Service Payment Amount", "Net Operating Income", "Monthly Current Mezzanine Debt Service Payment", "Monthly New Mezzanine Debt Service Payment", "Open Prepayment Date", "Permitted Transfers" or "Yield Maintenance Premium", and any of the terms used within such definitions or the covenants relating thereto, in effect on the date hereof or (xx) spread the lien of the Mortgage to encumber additional real property, or otherwise accept a grant of lien on or a security interest in any

collateral or any property of Borrower or any other Person not originally granted or contemplated to be granted under the Senior Loan Documents (except to the extent expressly contemplated by the Senior Loan Documents); provided, however, that after the later of (I) expiration of the applicable Monetary Cure Period or Non-Monetary Cure Period, and (II) the date that is thirty (30) days after Mezzanine Lender has been given notice of a Purchase Option Event, as applicable, Senior Lender shall not be obligated to obtain Mezzanine Lender's consent to a Senior Loan Modification in the case of a work-out or other surrender, extension, compromise, release, renewal, or indulgence relating to the Senior Loan during the existence of a Continuing Senior Loan Event of Default, except that under no circumstance shall modifications as described in clause (i) (with respect to increases in principal amount only), clause (iii) (with respect to shortening only), clause (v) (to the extent such modification would cause the exercise of remedies and realization upon the Equity Collateral by Mezzanine Lender or a Loan Pledgee in accordance with the terms hereof to constitute an Event of Default under the Senior Loan Documents) or clause (x) be made without the written consent of Mezzanine Lender, provided further, that to the extent Senior Lender consummates a Senior Loan Modification in accordance with the provisions of this Section 7(a), then such Senior Loan Modification shall not be deemed a violation of the Mezzanine Loan Documents (including, without limitation Section 5.37 thereof), and (ii) Mezzanine Lender shall be deemed to have consented to such Senior Loan Modification (and shall consent to such Senior Loan Modification for the benefit of the Mezzanine Borrower and promptly notify Mezzanine Borrower in writing of the same). In addition and notwithstanding the foregoing provisions of this Section 7, neither (A) any amounts funded by the Senior Lender under the Senior Loan Documents as a result of the making of any Protective Advances or other advances by the Senior Lender, nor (B) interest accruals or accretions and any compounding thereof (including default interest), shall be deemed to contravene this Section 7(a).

(b)     Mezzanine Lender shall have the right without the consent of Senior Lender in each instance to enter into any amendment, deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver (collectively, a "*Mezzanine Loan Modification*") of the Mezzanine Loan or the Mezzanine Loan Documents provided that no such Mezzanine Loan Modification shall (i) increase the interest rate or principal amount (except for increases in principal to cover Protective Advances) of the Mezzanine Loan, (ii) increase in any other material respect any monetary obligations of Mezzanine Borrower under the Mezzanine Loan Documents, (iii) extend or shorten the scheduled maturity date of the Mezzanine Loan (except that Mezzanine Lender may permit Mezzanine Borrower to exercise any extension options in accordance with the terms and provisions of the Mezzanine Loan Documents), (iv) convert or exchange the Mezzanine Loan into or for any equity interest or any other indebtedness, (v) provide for any additional contingent interest, additional interest or so-called "kicker" measured on the basis of the cash flow or appreciation of the Premises except in compliance with the Kicker Conditions, (vi) cross-default the Mezzanine Loan with any other indebtedness, (vii) accept a grant of any lien on or security interest in any collateral or property of Mezzanine Borrower or any other Person not originally granted or contemplated to be granted under the Mezzanine Loan Documents, unless (A) such collateral or property is owned by a Person other than Mezzanine Borrower or any Senior Guarantor or affiliate thereof and is not collateral for the Senior Loan and (B) the consent of Senior Lender is obtained if such consent is

required pursuant to the Senior Loan Documents, (viii) spread the lien and security interest of the Pledge Agreement to encumber additional collateral, (ix) amend or modify the provisions in the Mezzanine Loan Documents limiting transfers or encumbrances of interests in Borrower, Mezzanine Borrower or the Premises, (x) impose any financial covenants on Mezzanine Borrower (or if such covenants exist, impose more restrictive financial covenants on Mezzanine Borrower), (xi) modify, amend or add any default provision, including the definitions of "Default" and "Event of Default", or delete or shorten any notice, cure or grace periods available to Mezzanine Borrower or (xii) impose any new or additional fees on Mezzanine Borrower that are not provided for in the Mezzanine Loan Documents in effect on the date hereof, (xiii) modify or amend the definitions "Debt Service", "Debt Service Coverage Ratio", "Monthly Debt Service Payment Amount" or "Net Operating Income", and any of the terms used within such definitions or the covenants relating thereto, in effect on the date hereof or (xiv) modify or amend any obligation or liability of the Guarantor under the Mezzanine Loan in a manner to increase or expand the scope or amount thereof.  Notwithstanding anything to the contrary contained herein, if an Event of Default exists under the Mezzanine Loan Documents, Mezzanine Lender shall be permitted to modify or amend the Mezzanine Loan Documents in connection with a work-out or other surrender, compromise, release, extension, renewal or modification of the Mezzanine Loan without the Senior Lender's consent except that under no conditions shall clause (i), with respect to increases in principal amounts only, clause (iii) (with respect to shortening the maturity only), clause (iv) or clause (v) (unless the Kicker Conditions have been satisfied) be modified without the written consent of the Senior Lender.  In addition and notwithstanding the foregoing provisions of this Section 7(b), neither (A) the making of any Protective Advances or other advances by the Mezzanine Lender, nor (B) interest accruals or accretions and any compounding thereof (including default interest) shall be deemed to contravene this Section 7(b).

(c)     Senior Lender shall deliver to Mezzanine Lender copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one or more of the Senior Loan Documents (including, without limitation, any side letters, waivers or consents entered into, executed or delivered by Senior Lender) within a reasonable time after any of such applicable instruments have been executed by Senior Lender.

(d)     Mezzanine Lender shall deliver to Senior Lender copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one or more of the Mezzanine Loan Documents (including, without limitation, any side letters, waivers or consents entered into, executed or delivered by Mezzanine Lender) within a reasonable time after any of such applicable instruments have been executed by Mezzanine Lender.

8.     **Subordination of Mezzanine Loan and Mezzanine Loan Documents.**

(a)     Except as otherwise expressly provided herein, Mezzanine Lender hereby subordinates and makes junior the Mezzanine Loan, the Mezzanine Loan Documents and the liens and security interests created thereby, and all rights, remedies, terms and covenants

contained therein to (i) the Senior Loan, (ii) the liens and security interests created by the Senior Loan Documents and (iii) all of the terms, covenants, conditions, rights and remedies contained in the Senior Loan Documents, and no amendments, extensions, consolidations, supplements, replacements, restatements or modifications to the Senior Loan Documents or waivers of any provisions thereof shall affect the subordination thereof as set forth in this Section 8(a). Mezzanine Lender hereby acknowledges and agrees that the Mezzanine Loan is not secured by a lien on the Premises or any of the other collateral securing the Senior Loan or any other assets of the Borrower.

(b)     Except with respect to the Separate Collateral (but subject in all events to the provisions of Section 5(c)), every document and instrument included within the Mezzanine Loan Documents shall be subject and subordinate to each and every document and instrument included within the Senior Loan Documents and all extensions, modifications, consolidations, supplements, amendments, replacements and restatements of and/or to the Senior Loan Documents to the extent such extensions, modifications, consolidations, supplements, amendments, replacements and restatements are permitted by the terms hereof.

(c)     Subject to the provisions of Section 5(c), this Agreement shall not be construed as subordinating and shall not subordinate or impair Mezzanine Lender's first lien priority right, estate and interest in and to the Separate Collateral and Senior Lender hereby acknowledges and agrees that Senior Lender does not have and shall not hereafter acquire, any lien on, or any other interest whatsoever in, the Separate Collateral, or any part thereof, and that the exercise of remedies and realization upon the Separate Collateral by Mezzanine Lender or a Loan Pledgee and the application of proceeds therefrom as Mezzanine Lender deems appropriate in its sole discretion to the extent permitted hereunder and in accordance with the terms and provisions of this Agreement shall not constitute a default or an Event of Default under the Senior Loan Documents.

9.      **Payment Subordination.**

(a)     Except (i) as otherwise expressly provided in this Agreement and (ii) in connection with the exercise by Mezzanine Lender of its rights and remedies with respect to the Separate Collateral in accordance with the terms of this Agreement and the application of proceeds therefrom as Mezzanine Lender deems appropriate in its sole discretion, all of Mezzanine Lender's rights to payment of the Mezzanine Loan and the obligations evidenced by the Mezzanine Loan Documents are hereby subordinated to all of the Senior Loan Liabilities and all of Senior Lender's rights to payment by Borrower of the Senior Loan and the obligations secured by the Senior Loan Documents, and Mezzanine Lender shall not accept or receive payments (including, without limitation, whether in cash or other property and whether received directly, indirectly or by set-off, counterclaim or otherwise) from Borrower and/or from the Premises prior to the date that all Senior Loan Liabilities have been paid in full. If a Proceeding shall have occurred and has not been dismissed or an Event of Default shall then exist under the Senior Loan, Senior Lender shall be entitled to receive payment and performance in full of all amounts due or to become due to Senior Lender under the Senior Loan Documents before

Mezzanine Lender is entitled to receive any payment on account of the Mezzanine Loan (other than payments with respect to the Separate Collateral, including the proceeds of any enforcement, sale or liquidation of any Separate Collateral conducted in accordance with the terms of this Agreement). All payments, prepayments or distributions upon or with respect to the Mezzanine Loan which are received by Mezzanine Lender contrary to the provisions of this Agreement or any of the Senior Loan Documents shall be received and held in trust by the Mezzanine Lender for the benefit of Senior Lender and shall be paid over to Senior Lender in the same form as so received (with any necessary endorsement) to be applied (in the case of cash) to, or held as collateral (in the case of non-cash property or securities) for, the payment or performance of the Senior Loan in accordance with the terms of the Senior Loan Documents. Nothing contained herein shall prohibit the Mezzanine Lender from making Protective Advances (and adding the amount thereof to the principal balance of the Mezzanine Loan) notwithstanding the existence of a default under the Senior Loan at such time.

(b)     Notwithstanding anything to the contrary contained in this Agreement, including, without limitation, Section 9(a) (but subject in all events to the provisions of Section 5(c)):

(i)     provided that no Event of Default shall then exist under the Senior Loan Documents and provided that the stated maturity date of the Senior Loan has not occurred and provided further that no Proceeding shall have occurred, Mezzanine Lender may accept and retain payments and prepayments of the Mezzanine Loan, provided that concurrently with such payment and/or prepayment there is a pro rata payment or prepayment of the Senior Loan (together with any other amounts payable to Senior Lender pursuant to the Senior Loan Documents in connection with such payment or prepayment of the Senior Loan) and provided further that such payment or prepayment does not otherwise violate the terms of the Senior Loan Documents or this Agreement (together with any Yield Maintenance Premium, as such term is defined in the Mezzanine Loan Agreement) of any amounts due and payable from time to time (including, without limitation, payments to cure a default under the Mezzanine Loan) from Mezzanine Borrower out of its own funds and out of funds of any Affiliate contributed to Mezzanine Borrower, which Mezzanine Borrower is obligated to pay Mezzanine Lender in accordance with the terms and conditions of the Mezzanine Loan Documents and Mezzanine Lender shall have no obligation to pay over to Senior Lender any such amounts;

(ii)     If funds are deposited into Mezzanine Lender's account for the Mezzanine Loan, or otherwise paid to Mezzanine Lender, Senior Lender agrees that, absent clear evidence of error, such amounts shall be deemed to have been properly paid to Mezzanine Lender and may be accepted and retained by Mezzanine Lender; provided that such funds were not deposited or otherwise paid in violation of any provision of the Senior Loan Documents or this Agreement; and

(iii)     Mezzanine Lender may accept and retain amounts received in connection with the exercise of its rights and remedies with respect to the Separate Collateral in accordance with the terms of this Agreement notwithstanding the existence of an Event of Default under the Senior Loan but subject to Section 5(c).

(c)    In the event of a casualty to the buildings or improvements constructed on any portion of the Premises or a condemnation or taking under a power of eminent domain of all or any portion of the Premises, Senior Lender shall have a first and prior interest in and to any payments, awards, proceeds, distributions, or consideration arising from any such event (the "*Award*"). If the amount of the Award is in excess of all amounts owed to Senior Lender under the Senior Loan Documents, however, and either the Senior Loan has been paid in full or Borrower is entitled to a remittance of same under the Senior Loan Documents other than to restore the Premises, such excess Award or portion to be so remitted to Borrower shall, to the extent permitted in the Senior Loan Documents, be paid to or at the direction of Mezzanine Lender, unless other Persons have claimed the right to such awards or proceeds, in which case Senior Lender shall only be required to provide notice to Mezzanine Lender of such excess Award and of any other claims thereto. In the event of any competing claims for any such excess Award, Senior Lender shall continue to hold such excess Award until Senior Lender receives an agreement signed by all Persons making a claim to the excess Award or a final order of a court of competent jurisdiction directing Senior Lender as to how and to which Person(s) the excess Award is to be distributed. Notwithstanding the foregoing, in the event of a casualty or condemnation, Senior Lender shall release the Award from any such event to the Borrower if and to the extent required by the terms and conditions of the Senior Loan Documents in order to repair and restore the Premises in accordance with the terms and provisions of the Senior Loan Documents. Any portion of the Award made available to the Borrower for the repair or restoration of the Premises shall not be subject to attachment by Mezzanine Lender. Upon Mezzanine Lender's written request, Senior Lender shall advise Mezzanine Lender of the status of the adjustment or the settlement of a claim.

## 10.    **Rights of Subrogation; Bankruptcy.**

(a)    Each of Mezzanine Lender and Senior Lender hereby waives any requirement for marshaling of assets thereby in connection with any foreclosure of any security interest or any other realization upon collateral in respect of the Senior Loan Documents or the Mezzanine Loan Documents, as applicable, or any exercise of any rights of set-off or otherwise. Each of Mezzanine Lender and Senior Lender assumes all responsibility for keeping itself informed as to the condition (financial or otherwise) of Borrower, Mezzanine Borrower, the condition of the Premises and all other collateral and other circumstances and, except for notices expressly required by this Agreement, neither Senior Lender nor Mezzanine Lender shall have any duty whatsoever to obtain, advise or deliver information or documents to the other relative to such condition, business, assets and/or operations. Mezzanine Lender agrees that Senior Lender owes no fiduciary duty to Mezzanine Lender in connection with the administration of the Senior Loan and the Senior Loan Documents and Mezzanine Lender agrees not to assert any such claim. Senior Lender agrees that Mezzanine Lender owes no fiduciary duty to Senior Lender in connection with the administration of the Mezzanine Loan and the Mezzanine Loan Documents and Senior Lender agrees not to assert any such claim.

(b)    No payment or distribution to Senior Lender pursuant to the provisions of this Agreement and no Protective Advance by Mezzanine Lender shall entitle Mezzanine Lender to

exercise any right of subrogation in respect thereof prior to the payment in full of the Senior Loan Liabilities, and Mezzanine Lender agrees that, except with respect to the enforcement of its remedies under the Mezzanine Loan Documents permitted hereunder, prior to the satisfaction of all Senior Loan Liabilities it shall not acquire, by subrogation or otherwise, any lien, estate, right or other interest in any portion of the Premises or any other collateral now securing the Senior Loan or the proceeds therefrom that is or may be prior to, or of equal priority to, any of the Senior Loan Documents or the liens, rights, estates and interests created thereby.

(c)      Subject to Section 29 of this Agreement, the provisions of this Agreement shall be applicable both before and after the commencement, whether voluntary or involuntary, of any case, proceeding or other action against Borrower or any other member of the Borrower Group under any existing or future law of any jurisdiction relating to bankruptcy, insolvency, reorganization or relief of debtors (a "*Proceeding*"). For as long as the Senior Loan shall remain outstanding, Mezzanine Lender shall not, and shall not solicit any Person or entity to, and shall not direct or cause Mezzanine Borrower to direct or cause either the Borrower or any Person or entity which directly or indirectly controls Borrower or is otherwise Affiliated with Borrower (collectively, the "***Borrower Group***") to: (i) commence any Proceeding; (ii) institute proceedings to have Borrower adjudicated a bankrupt or insolvent; (iii) consent to, or acquiesce in, the institution of bankruptcy or insolvency proceedings against Borrower; (iv) file a petition or consent to the filing of a petition seeking reorganization, arrangement, adjustment, winding-up, dissolution, composition, liquidation or other relief by or on behalf of Borrower; (v) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for Borrower, the Premises (or any portion thereof) or any other collateral securing the Senior Loan (or any portion thereof); (vi) make an assignment for the benefit of any creditor of Borrower; (vii) seek to consolidate the Premises or any other assets of the Borrower with the assets of the Mezzanine Borrower or any member of the Borrower Group in any proceeding relating to bankruptcy, insolvency, reorganization or relief of debtors; or (viii) take any action in furtherance of any of the foregoing. The terms and provisions of this Section 10(c) apply to Mezzanine Lender solely in its capacity as Mezzanine Lender.  If Mezzanine Lender (A) commences an Equity Collateral Enforcement Action, and pursuant to such Equity Collateral Enforcement Action, Mezzanine Lender takes title to the Equity Collateral of Mezzanine Borrower, or (B) exercises voting power to direct or cause the direction of the management or policies of the Equity Collateral pursuant to the rights granted in the Mezzanine Loan Documents, from and after the date title to such Equity Collateral is vested in Mezzanine Lender, or the date Mezzanine Lender exercises such voting power, as applicable, Mezzanine Lender shall be bound by the terms and provisions of the respective organizational documents of Borrower and Mezzanine Borrower regarding bankruptcy and all matters requiring the vote of the independent directors/managers/members of Mezzanine Borrower and not by the terms of this Section 10(c).

(d)      If Mezzanine Lender is deemed to be a creditor of Borrower  in any Proceeding (i) Mezzanine Lender hereby agrees that it shall not make any election, give any consent, commence any action or file any motion, claim, obligation, notice or application or take any other action in any Proceeding without the prior written consent of Senior Lender,  (ii) Senior

Lender may vote in any such Proceeding any and all claims of Mezzanine Lender against Borrower, and Mezzanine Lender hereby appoints the Senior Lender as its agent, and grants to the Senior Lender an irrevocable power of attorney coupled with an interest, and its proxy, for the purpose of exercising any and all rights and taking any and all actions available to the Mezzanine Lender in connection with any case by or against the Borrower in any Proceeding, including without limitation, the right to file and/or prosecute any claims, to vote to accept or reject a plan, to make any election under Section 1111(b) of the Bankruptcy Code; and (iii) Mezzanine Lender shall not challenge the validity or amount of any claim against Borrower submitted in such Proceeding by Senior Lender in good faith or any valuations of the Premises or other Senior Loan collateral submitted by Senior Lender in good faith, in such Proceeding or take any other action in such Proceeding, which is adverse to Senior Lender's enforcement of its claim or receipt of adequate protection (as that term is defined in the Bankruptcy Code).

(e)    To the extent any payment under the Senior Loan Documents (whether by or on behalf of Borrower, as proceeds of security or enforcement of any right of setoff or otherwise) is declared to be fraudulent or preferential, set aside or required to be paid to a trustee, receiver or other similar party under any bankruptcy, insolvency, receivership or similar law, then if such payment is recovered by, or paid over to, such trustee, receiver or other similar party, the Senior Loan or part thereof originally intended to be satisfied shall for all purposes of this Agreement be deemed to be reinstated and outstanding as if such payment had not occurred.

(f)    The terms and provisions of Sections 10(c) and 11(d) apply to Mezzanine Lender solely in its capacity as a Mezzanine Lender; upon any foreclosure or other realization upon the Equity Collateral, the provisions of the Senior Loan Documents prohibiting a Proceeding by or against Borrower, and all provisions of the organizational documents of Borrower regarding bankruptcy and all matters requiring the vote of independent directors or independent managers of Borrower, shall continue to remain applicable from and after any such foreclosure or other realization with respect to such Equity Collateral.

## 11.    **Rights of Cure.**

(a)    Prior to Senior Lender commencing any Enforcement Action under the Senior Loan Documents, Senior Lender shall provide written notice of the default which would permit the Senior Lender to commence such Enforcement Action to Mezzanine Lender and any Loan Pledgee entitled to notice thereof pursuant to Section 15 of this Agreement, whether or not Senior Lender is obligated to give notice thereof to Borrower (each, a "***Senior Loan Default Notice***") and shall permit Mezzanine Lender an opportunity to cure such default in accordance with the provisions of this Section 11(a); provided that notwithstanding anything to the contrary set forth herein, in the event Borrower fails to repay the Senior Loan in full on the scheduled maturity date thereof, then Mezzanine Lender's sole right shall be to purchase the Senior Loan pursuant to the terms, and subject to the conditions, set forth in Section 13(a) below. In the event Senior Lender has delivered a Senior Loan Default Notice that has not been cured by Mezzanine Lender pursuant to this Section 11, Senior Lender shall provide Mezzanine Lender with copies of any and all material notices relating to such Event of Default, and otherwise upon request

keep Mezzanine Lender reasonably apprised as to the current status of any Enforcement Action. If the default is a monetary default relating to a liquidated sum of money, Mezzanine Lender shall have until five (5) Business Days after the later of (i) the receipt (or deemed receipt) by Mezzanine Lender of the Senior Loan Default Notice and (ii) the expiration of Borrower's cure provision, if any, (a "**_Monetary Cure Period_**") to cure such monetary default; *provided, however*, in the event it elects to cure any such monetary default, Mezzanine Lender shall (x) pay, defend and hold harmless Senior Lender for all actual cost, expenses, losses, liabilities, obligations, damages, penalties, costs, and disbursements arising under the pooling and servicing agreement for the Senior Loan, to the extent imposed on, incurred by or asserted against Senior Lender due to or arising from such Monetary Cure Period and (y) without duplication of the foregoing, reimburse the Senior Lender for any interest charged by Senior Lender on any required (pursuant to applicable pooling and servicing agreement) advances for monthly payments of principal and/or interest on the Senior Loan and/or on any Protective Advances.  Mezzanine Lender shall not have the right to cure as hereinabove set forth with respect to monthly scheduled debt service payments on the Senior Loan for a period of more than four (4) consecutive months or more than twelve (12) months in the aggregate during the term of the Senior Loan unless Mezzanine Lender has commenced its foreclosure against the Separate Collateral during such period and is continuing to diligently pursue its rights against the Separate Collateral.  Notwithstanding the foregoing, Mezzanine Lender shall not be required, in order to effect a cure hereunder to pay any interest at the Default Rate or late charges under the Senior Loan Documents, and no interest at the Default Rate or late charges shall accrue against Mezzanine Lender prior to expiration of the Monetary Cure Period, with respect to any cure of monetary defaults by the Mezzanine Lender, or prior to the expiration of the Non-Monetary Cure Period, with respect to any cure of non-monetary defaults by the Mezzanine Lender.   If the default is of a non-monetary nature, Mezzanine Lender shall have until the later of (A) thirty (30) days after the receipt (or deemed receipt) by Mezzanine Lender of the Senior Loan Default Notice and (B) the expiration of Borrower's cure period, if any, under the Senior Loan Documents to cure such non-monetary default, if any (a "**_Non-Monetary Cure Period_**"); *provided, however*, if such non-monetary default identified in a Senior Loan Default Notice is susceptible of cure but cannot reasonably be cured within the Non-Monetary Cure Period and if curative action was commenced within the applicable cure period and is being continuously and diligently pursued by Mezzanine Lender (or with respect to a non-monetary default that is not susceptible of cure without the foreclosure of its Equity Collateral, if Mezzanine Lender shall be diligently and continuously pursuing the foreclosure of the Equity Collateral) and the other conditions in this <u>Section 11</u> are satisfied, Mezzanine Lender shall be given an additional period of time as is reasonably necessary for Mezzanine Lender in the exercise of due diligence to cure such non-monetary default (or to foreclose on the Equity Collateral if the non-monetary default is not susceptible of cure without the foreclosure of the Equity Collateral) for so long as (i) Borrower or Mezzanine Lender makes or causes to be made timely payment of Borrower's regularly scheduled monthly principal (if any) and/or interest payments under the Senior Loan and any other amounts due under the Senior Loan Documents as and when the same are due thereunder (*i.e.*, without additional cure or grace periods), (ii) such default is not caused by a bankruptcy, insolvency or assignment for the benefit of creditors of Borrower and (iii) during such non-monetary cure period, there is no material impairment to the value, use or operation of the Premises or of Senior Lender's lien on any of the collateral for the Senior Loan, in each case as determined by Senior Lender in its good faith discretion.  Any non-monetary and/or additional cure period granted to the Mezzanine Lender

hereunder shall automatically terminate upon the commencement of a Proceeding of the Borrower which, in the case of an involuntary Proceeding, is not dismissed within ninety (90) days of filing thereof.

(b)     So long as no Continuing Senior Loan Event of Default shall have occurred and be continuing under the Senior Loan Documents, all funds held and applied pursuant to the Senior Loan Cash Management Agreement and Senior Loan Agreement shall continue to be applied pursuant thereto and shall not be applied by Senior Lender to prepay the outstanding principal balance of the Senior Loan.

**12.     No Actions; Restrictive Provisions.**    Senior Lender consents to Mezzanine Lender's right, pursuant to and as more particularly set forth in the Mezzanine Loan Documents, under certain circumstances, to cause the termination of the Property Manager.  In the event both Mezzanine Lender and Senior Lender shall have such rights at any time, and Senior Lender shall fail to exercise such rights, Mezzanine Lender may exercise such rights; provided such exercise may be superseded by any subsequent exercise of such rights by Senior Lender pursuant to the Senior Loan Documents.  Upon the occurrence of any event which would entitle Mezzanine Lender to cause the termination of the Property Manager pursuant to the Mezzanine Loan Documents, Mezzanine Lender shall have the right to select, or cause the selection, of a replacement property manager (including any asset manager) or leasing agent for the Premises, which replacement manager, asset manager and/or leasing agent shall either (a) be subject to Senior Lender's reasonable approval and, if any Certificates are then outstanding, be subject to a Rating Agency Confirmation or (b) be a Qualified Manager.  Notwithstanding anything in this Section 12 to the contrary, if a Continuing Senior Loan Event of Default under the Senior Loan then exists or any other event shall have occurred pursuant to which Senior Lender has the right to select any replacement manager, asset manager and/or leasing agent pursuant to the Senior Loan Documents, Senior Lender shall have the sole right to select any replacement manager, asset manager and/or leasing agent, whether or not a new manager or agent was retained by Mezzanine Lender; provided that so long as no Continuing Senior Loan Event of Default exists, any such replacement manager and/or asset manager shall be a Qualified Manager.

**13.     Right to Purchase Senior Loan.**

(a)     If (1) Borrower has become a debtor in any Proceeding, (2) the Senior Loan has been accelerated, (3) any Enforcement Action has been commenced, (4) any Senior Loan Event of Default, which is either a monetary Event of Default or a material non-monetary Event of Default, is continuing for a period of at least sixty (60) days exists, or (5) the Senior Loan is a "specially serviced mortgage loan" under the applicable pooling and servicing agreement or trust and servicing agreement (each of the foregoing, a "*Purchase Option Event*"), Senior Lender shall provide prompt written notice thereof to Mezzanine Lender and upon ten (10) Business Days prior written notice to Senior Lender (the "*Purchase Notice*"), Mezzanine Lender shall have the right to purchase, in whole but not in part, the Senior Loan for a price equal to the sum of (without duplication) (i) the outstanding principal balance thereof, together with all accrued interest, and other amounts due thereon, (ii) any Protective Advances, monthly advances of principal and interest or "servicing advances" made by Senior Lender or the Senior Loan servicer

and any interest charged by Senior Lender on any advances for monthly payments of principal and/or interest on the Senior Loan and/or on any Protective Advances), (iii) any workout fee or liquidation fee, or any other fee required to be paid under any applicable pooling and servicing agreement, (iv) post-petition interest and (v) all reasonable costs and expenses (including special servicing fees and reasonable legal fees and expenses) actually incurred by Senior Lender or any servicer in enforcing the terms of the Senior Loan Documents, any fees and expenses payable or reimbursable to any servicer, trustee, fiscal agent or special servicer including, without limitation, interest on any advances made by any of them and any workout, securitization, liquidation, special servicing or similar fees paid or payable to any of them, but specifically excluding (x) any prepayment fees or premiums, yield or spread maintenance premiums or fees, late charges, liquidated damages amount, default interest (other than interest on advances as set forth in clause (ii) above) and/or exit fees and (y) notwithstanding, clause (iii) above, in the event that Mezzanine Lender purchases the Senior Loan within ninety (90) days of the date it receives notice of the applicable Purchase Option Event, any workout or liquidation fees (collectively, the "*Loan Purchase Price*").  Concurrently with payment to the Senior Lender of the Loan Purchase Price, Senior Lender shall deliver or cause to be delivered to Mezzanine Lender all Senior Loan Documents held by or on behalf of Senior Lender and all amounts then held in any reserve or escrow account controlled by or held on account of the Senior Lender and will execute in favor of Mezzanine Lender or its designee assignment documentation, in form and substance reasonably acceptable to Mezzanine Lender, at the sole cost and expense of Mezzanine Lender, to assign the Senior Loan and its rights under the Senior Loan Documents (without recourse, representations or warranties except for representations as to the outstanding balance of the Senior Loan, the amounts held in reserves and escrows held under the Senior Loan, the power and authority of the Senior Lender to enter into the applicable assignment documentation, as to Senior Lender's ownership and not having assigned, transferred, participated or encumbered its rights in the Senior Loan other than with respect to any participation, encumbrance or other action which will be satisfied or released as of the transfer).  The right of Mezzanine Lender to purchase the Senior Loan shall automatically terminate (I) upon a transfer of the Premises by foreclosure sale, sale by power of sale or delivery of a deed in lieu of foreclosure and acceptance thereof by Senior Lender, (II) with respect to a specific Purchase Option Event, if such Purchase Option Event ceases to exist or (III) if Mezzanine Lender fails to close on the purchase of the Senior Loan within sixty (60) days of providing the Purchase Notice to Senior Lender; provided, however, that (A) with respect to clause (I), in no event shall Mezzanine Lender have less than thirty (30) days to deliver a Purchase Notice following receipt of notice by Senior Lender of the occurrence of a Purchase Option Event and (B) without limiting the foregoing provisions of clause (A) of this Section 13(a), Senior Lender shall give Mezzanine Lender at least fifteen (15) Business Days written notice prior to accepting a deed-in-lieu of foreclosure (or similar consensual transfer agreement) with respect to the Premises. To the extent Senior Lender accepts a conveyance of the Premises in lieu of foreclosure in compliance with this Section 13, then (i) such Transfer shall not be deemed a violation of the Mezzanine Loan Documents (including, without limitation Section 5.16 thereof), (ii) Mezzanine Lender shall be deemed to have consented to such deed in lieu or consensual foreclosure (and shall consent to such deed in lieu or other consensual foreclosure for the benefit of the Mezzanine Borrower and shall promptly notify Mezzanine Borrower in writing of the same) and (iii) such deed in lieu or consensual foreclosure shall not trigger liability under the Mezzanine Guaranty. Notwithstanding the foregoing, the ten (10) Business Day period following delivery of the Purchase Notice during

which Mezzanine Lender is required to consummate such purchase may be extended for any number of days specified by Mezzanine Lender, but in any event not more than an additional thirty (30) days, upon written notice thereof to Senior Lender and payment to the Senior Lender of a non-refundable cash deposit in an amount equal to 7.5% of the Loan Purchase Price.

(b)    Mezzanine Lender covenants not to enter into any agreement with the Borrower or any Affiliate thereof to purchase the Senior Loan pursuant to subsection (a) above or in connection with any refinancing of the Senior Loan in any manner designed to avoid or circumvent the provisions of the Senior Loan Documents which require the payment of a prepayment fee, exit fee, late charge, default interest, liquidated damages amount or yield maintenance premium or charge in connection with a prepayment of the Senior Loan by the Borrower.

14.    **Additional Understandings**.  For as long as the Mezzanine Loan remains outstanding.

(a)    Cooperation. At the request of Senior Lender, prior to the securitization of the Senior Loan, Mezzanine Lender shall use commercially reasonable efforts, to satisfy, and to cooperate with Senior Lender in attempting to cause Borrower and Mezzanine Borrower to satisfy, the market standards to which Senior Lender customarily adheres or which may be reasonably required in the marketplace or by the Rating Agencies in connection with the Securitization of the Senior Loan, including entering into (or consenting to, as applicable) any modifications to this Agreement or the Senior Loan Documents or Mezzanine Loan Documents, or the organizational documents of Borrower or Mezzanine Borrower and to cooperate with Senior Lender in attempting to cause Borrower and Mezzanine Borrower to execute such modifications to the Senior Loan Documents and Mezzanine Loan Documents or the organizational documents of Borrower or Mezzanine Borrower, in any such case, as may be reasonably requested by the Rating Agencies to effect the Securitization; provided, however, Mezzanine Lender shall not be required to modify or amend this Agreement or any Senior Loan Documents or Mezzanine Loan Documents or organizational documents (or consent to such modification of the Senior Loan Documents or any organizational documents), if such modification or amendment would materially increase or in any manner decrease Mezzanine Borrower's obligations under the Mezzanine Loan Documents or materially decrease Mezzanine Lender's rights, remedies or protections thereunder or hereunder. In connection with any securitization, upon Senior Lender's written request, Mezzanine Lender agrees to provide for inclusion in any disclosure document relating to the related securitization such non-confidential and nonproprietary information concerning Mezzanine Lender as the Senior Lender reasonably determines to be necessary or appropriate. Mezzanine Lender agrees that if the Senior Loan is to be included as an asset of the Securitization, subject to the limits contained in this Section 14(a), Mezzanine Lender shall at Senior Lender's request, and at Senior Lender's expense, reasonably cooperate with the requests of each Rating Agency and Senior Lender in connection with the securitization.

(b)    Budget Approval. If the Mezzanine Loan Documents contain any provision or requirement that Mezzanine Lender's consent or approval be obtained with respect to the Annual

Budget, to the extent that such consent or approval is also required by Senior Lender under the Senior Loan Documents, Mezzanine Lender hereby agrees that it shall first advise Senior Lender of whether Mezzanine Lender objects, along with its suggestions for changes, to the requested consent or approval within five (5) Business Days after its receipt of such Annual Budget in accordance with the Mezzanine Loan Documents. Senior Lender shall consult with Mezzanine Lender with respect to any such consent or approval right of Mezzanine Lender, but such consultation shall not be binding on Senior Lender.    The Mezzanine Lender shall not unreasonably withhold consent to any changes in the budget requested by the Senior Lender.

(c)    <u>Leasing and Alterations</u>.  If the Mezzanine Loan Documents contain any provision or requirement that Mezzanine Lender's consent or approval be obtained for any act or determination by Borrower or Mezzanine Borrower in connection with the leasing of the Premises or alterations to the Premises, to the extent that such consent or approval is also required by the Senior Lender under the Senior Loan Documents, the Mezzanine Lender hereby agrees that it shall first advise the Senior Lender of whether the Mezzanine Lender objects to the requested consent or approval within five (5) Business Days after its receipt of both (i) a written request for a consent or approval from Mezzanine Borrower and (ii) delivery of all materials reasonably requested by Mezzanine Lender required to make any such decision.  The Senior Lender shall consult with the Mezzanine Lender with respect to any such consent or approval right of the Mezzanine Lender but such consultation shall not be binding on Senior Lender. The Mezzanine Lender shall not unreasonably withhold its consent to such lease or alteration if Senior Lender approves such lease or alteration, provided, (x) with respect to a lease, the lease is on market terms, and (y) with respect to an alteration, the alteration is (i) necessary to maintain the Premises in good order and repair as required by the Senior Loan Documents, or (ii) is in connection with any lease approved or deemed approved in accordance with the Senior Loan Documents and the Mezzanine Loan Documents.

(d)    <u>Loan Components/Prepayment</u>.  Mezzanine Lender hereby acknowledges and agrees that, notwithstanding anything to the contrary contained herein, at any time prior to a Secondary Market Transaction of the Senior Loan, Senior Lender may divide the Senior Loan into components, create additional components of the Senior Loan, and determine or change the balances, amortization and interest rates of the components of the Senior Loan, in each case without the consent of Mezzanine Lender; <u>provided</u> that the initial weighted average interest rate, monthly amortization in the aggregate among the components of the Senior Loan and the aggregate principal balance of the Senior Loan shall remain the same, except for any rate creep that may occur as a result of the application of payments among the components of the Senior Loan.

(e)    <u>Additional Mezzanine Loan</u>.  Senior Lender agrees that it may not convert any portion of the Senior Loan into an additional mezzanine loan pursuant to Section 9.4 of the Senior Loan Agreement without the prior written consent of Mezzanine Lender, which consent may be granted or withheld in Mezzanine Lender's sole discretion.

(f)      Cash Management.  Senior Lender shall use commercially reasonable efforts to enforce and comply with the provisions of Section 3.10 of the Senior Loan agreement and to cause the distribution of funds in accordance with such section.

15.     **Financing of Mezzanine Loan.**

Notwithstanding any other provision hereof to the contrary, Senior Lender consents to Mezzanine Lender's sale in connection with a repurchase agreement facility or pledge (a "**Pledge**") of the Mezzanine Loan and of the Separate Collateral to any entity which has extended a credit facility including, without limitation, credit in the form of a repurchase agreement facility, to Mezzanine Lender that is a Qualified Transferee or a financial institution whose long-term unsecured debt is rated at least "A" (or the equivalent) or better by each Rating Agency (other than Morningstar) and is not Borrower or an Affiliate of Borrower (a "**Loan Pledgee**"), on the terms and conditions set forth in this Section 15. It is also agreed that the sale by Mezzanine Lender of the Mezzanine Loan to a Qualified Transferee and the simultaneous agreement by Mezzanine Lender to repurchase the Mezzanine Loan under an arrangement documented as a repurchase agreement shall qualify as a Pledge, provided that all applicable terms and conditions of this subsection (a) are complied with; further provided that a Loan Pledgee which is not a Qualified Transferee may not take title to the Equity Collateral except in accordance with Section 5(a). Upon written notice by Mezzanine Lender to Senior Lender that a Pledge has been effected, Senior Lender agrees to acknowledge receipt of such notice and thereafter agrees:  (i) to give such Loan Pledgee written notice of any default by Mezzanine Lender under this Agreement of which default Senior Lender has actual knowledge; (ii) to allow Loan Pledgee a period of ten (10) days (in respect of a monetary default) and a period of thirty (30) days (in respect of a non-monetary default) to cure a default by Mezzanine Lender in respect of its obligations to Senior Lender hereunder, but such Loan Pledge shall not be obligated to cure any such default; (iii) that no amendment, modification which adversely affects the rights or obligations of Mezzanine Lender, and no waiver or termination of this Agreement, shall be effective against such Loan Pledgee without the written consent of such Loan Pledgee, which consent shall not be unreasonably withheld; provided, that the consent of such Loan Pledgee shall not be required unless Mezzanine Lender's consent was required pursuant to the terms of this Agreement to each such modification, waiver or termination; (iv) that Senior Lender shall give to such Loan Pledgee a copy of any Senior Loan Default Notice simultaneously with the giving of same to the Mezzanine Lender and accept any cure thereof by such Loan Pledgee made in accordance with the provisions of Section 11 of this Agreement as if such cure were made by the Mezzanine Lender; (v) that Senior Lender shall deliver to such Loan Pledgee such estoppel certificate(s) as such Loan Pledgee shall reasonably request; provided, however, that any such estoppel certificate(s) shall be in the form contemplated by Section 18; and (vi) that, upon written notice (a "**Redirection Notice**") to Senior Lender by such Loan Pledgee that Mezzanine Lender is in default, beyond applicable cure periods, under Mezzanine Lender's obligations to such Loan Pledgee pursuant to the applicable credit agreement between Mezzanine Lender and such Loan Pledgee (which notice need not be joined in or confirmed by Mezzanine Lender), and until such Redirection Notice is withdrawn or rescinded by such Loan Pledgee, Senior Lender shall remit to such Loan Pledgee and not to Mezzanine Lender, any payments that Senior Lender

would otherwise be obligated to pay to Mezzanine Lender from time to time pursuant to this Agreement, any Senior Loan Document, any Mezzanine Loan Document or any other agreement between Senior Lender and Mezzanine Lender that relates to the Senior Loan or the Mezzanine Loan. Mezzanine Lender hereby unconditionally and absolutely releases Senior Lender from any liability to Mezzanine Lender on account of Senior Lender's compliance with any Redirection Notice reasonably believed by Senior Lender to have been delivered by Mezzanine Lender's Loan Pledgee. A Loan Pledgee shall be permitted to fully exercise its rights and remedies against Mezzanine Lender, and realize on any and all collateral granted by Mezzanine Lender to such Loan Pledgee (and accept an assignment in lieu of foreclosure as to such collateral), in accordance with applicable law. In such event, the Senior Lender shall recognize such Loan Pledgee (and any transferee which is also a Qualified Transferee at any foreclosure or similar sale held by such Loan Pledgee or any transfer in lieu of such foreclosure), and its successors and assigns, as the successor to Mezzanine Lender's rights, remedies and obligations under this Agreement and the Mezzanine Loan Documents and any such Loan Pledgee or Qualified Transferee shall assume in writing the obligations of the Mezzanine Lender hereunder accruing from and after such Transfer and agrees to be bound by the terms and provisions hereof. The rights of a Loan Pledgee under this <u>Section 15</u> shall remain effective unless and until such Loan Pledgee shall have notified the Senior Lender in writing that its interest in the Mezzanine Loan has terminated.

16.    **<u>Obligations Hereunder Not Affected.</u>**

(a)    All rights, interests, agreements and obligations of Senior Lender and Mezzanine Lender under this Agreement shall remain in full force and effect irrespective of:

(i)    any lack of validity or enforceability of any of the Senior Loan Documents or any of the Mezzanine Loan Documents or any other agreement or instrument relating thereto;

(ii)    any taking, exchange, release or non-perfection of any other collateral, or any taking, release, amendment or waiver of or consent to or departure from any guaranty, for all or any portion of the Senior Loan or the Mezzanine Loan;

(iii)    any manner of application of collateral, or proceeds thereof, to all or any portion of the Senior Loan or the Mezzanine Loan, or any manner of sale or other disposition of any collateral for all or any portion of the Senior Loan or the Mezzanine Loan or any other assets of Borrower or Mezzanine Borrower or any other Affiliates of Borrower;

(iv)    any change, restructuring or termination of the organizational structure or existence of Borrower or Mezzanine Borrower or any other Affiliates of Borrower; or

(v)    any other circumstance which might otherwise constitute a defense available to, or a discharge of, Borrower, Mezzanine Borrower or a subordinated creditor or a senior lender subject to the terms hereof.

(b)    This Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of all or any portion of the Senior Loan or the Mezzanine Loan is rescinded or must otherwise be returned by Senior Lender or Mezzanine Lender upon the insolvency, bankruptcy or reorganization of Borrower or Mezzanine Borrower or otherwise, all as though such payment had not been made.

17.    **Notices**.  All notices, demands, requests, consents, approvals or other communications required, permitted, or desired to be given hereunder (any of the foregoing, a "**Notice**") shall be in writing sent by registered or certified mail, postage prepaid, return receipt requested, or delivered by hand or reputable overnight courier addressed to the party to be so notified at its address hereinafter set forth, or to such other address as such party may hereafter specify to each other party hereto in accordance with the provisions of this Section 17.  Any such Notice shall be deemed to have been received: (a) three (3) Business Days after the date mailed, (b) on the date of delivery by hand if delivered during business hours on a Business Day (otherwise on the next Business Day) and (c) on the next Business Day if sent by an overnight commercial courier, in each case addressed to the parties as follows:

> To Senior Lender:
>
> Natixis, New York Branch,
> 1251 Avenue of the Americas, 36th Floor
> New York, New York 10020
> Attention: Real Estate Administration
>
> with a copy to:
>
> Haynes and Boone, LLP
> 30 Rockefeller Plaza, 26th Floor
> New York, New York 10112
> Attention: Walter Schleimer, Esq. (NMWH)
>
> To Mezzanine Lender:
>
> Natixis, New York Branch,
> 1251 Avenue of the Americas, 36th Floor
> New York, New York 10020
> Attention: Real Estate Administration
>
> with a copy to:
>
> Haynes and Boone, LLP
> 30 Rockefeller Plaza, 26th Floor
> New York, New York 10112
> Attention: Walter Schleimer, Esq. (NMWH)

18.    **Estoppel.**

(a)    Mezzanine Lender shall, within ten (10) days following a request from Senior Lender, provide Senior Lender with a written statement setting forth the then current outstanding principal balance of the Mezzanine Loan, the aggregate accrued and unpaid interest under the Mezzanine Loan, and stating whether to Mezzanine Lender's knowledge any default or Event of Default exists under the Mezzanine Loan or this Agreement.

(b)    Senior Lender shall, within ten (10) days following a request from Mezzanine Lender, provide Mezzanine Lender with a written statement setting forth the then current outstanding principal balance of the Senior Loan, the aggregate accrued and unpaid interest under the Senior Loan, and stating whether to Senior Lender's knowledge any default or Event of Default exists under the Senior Loan or this Agreement.

(c)    Any statement provided pursuant to this <u>Section 18</u> may be relied upon by any Loan Pledgee, prospective investor in, purchaser, assignee or transferee of the Senior Loan or the Mezzanine Loan (or any interest therein), but may not be relied upon by Borrower, Mezzanine Borrower or any guarantor of the Senior Loan or the Mezzanine Loan

19.    **Further Assurances**.  So long as all or any portion of the Senior Loan and the Mezzanine Loan remains unpaid and the Senior Mortgage encumbers the Premises, Mezzanine Lender and Senior Lender will each execute, acknowledge and deliver in recordable form and upon demand of the other, any other instruments or agreements reasonably required in order to carry out the provisions of this Agreement or to effectuate the intent and purposes hereof.

20.    **No Third Party Beneficiaries; No Modification**.  The parties hereto do not intend the benefits of this Agreement to inure to Borrower, Mezzanine Borrower or any other Person that is not a party to this Agreement other than a Loan Pledgee.  This Agreement may not be changed or terminated orally, but only by an agreement in writing signed by the party against whom enforcement of any change is sought.  If any Certificates are outstanding, this Agreement shall not be amended in any manner that is materially adverse to Senior Lender unless a Rating Agency Confirmation has been obtained with respect to such amendment. Neither Senior Lender nor Mezzanine Lender may provide a copy of this Agreement, or disclose the contents hereof, to Borrower, Mezzanine Borrower, Guarantor, or any Affiliate of Borrower or Mezzanine Borrower or Guarantor.

21.    **Successors and Assigns**.  This Agreement shall bind all successors and permitted assigns of Mezzanine Lender and Senior Lender and shall inure to the benefit of all successors and permitted assigns of Senior Lender and Mezzanine Lender.

22.    **Counterpart Originals**.  This Agreement may be executed in counterpart originals, each of which shall constitute an original, and all of which together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page of this Agreement by

facsimile or electronic image scan transmission (such as a "pdf" file) will be effective as delivery of an original manually-executed counterpart of this Agreement.

**23.    Legal Construction**.   In all respects, including, without limitation, matters of construction and performance of this Agreement and the obligations arising hereunder, this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York applicable to agreements intended to be wholly performed within the State of New York.

**24.    No Waiver; Remedies**.  No failure on the part of the Senior Lender or Mezzanine Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

**25.    No Joint Venture**.   Nothing provided herein is intended to create a joint venture, partnership, tenancy-in-common or joint tenancy relationship between or among any of the parties hereto.

**26.    Captions**.  The captions in this Agreement are inserted only as a matter of convenience and for reference, and are not and shall not be deemed to be a part hereof.

**27.    Conflicts**.  In the event of any conflict, ambiguity or inconsistency between the terms and conditions of this Agreement and the terms and conditions of any of the Senior Loan Documents or the Mezzanine Loan Documents, the terms and conditions of this Agreement shall control.

**28.    No Release**.  Nothing herein contained shall operate to release Borrower from (a) its obligation to keep and perform all of the terms, conditions, obligations, covenants and agreements contained in the Senior Loan Documents or (b) any liability of Borrower under the Senior Loan Documents or to release Mezzanine Borrower from (i) its obligation to keep and perform all of the terms, conditions, obligations, covenants and agreements contained in the Mezzanine Loan Documents or (ii) any liability of Mezzanine Borrower under the Mezzanine Loan Documents.

**29.    Continuing Agreement**.  This Agreement is a continuing agreement and shall remain in full force and effect until the earliest of  (a) payment in full in cash of the Senior Loan, (b) subject to the rights of Mezzanine Lender under Sections 5(e) and 13(a), Transfer of the Premises by foreclosure of the Senior Mortgage or the exercise of the power of sale contained therein or Senior Lender's acceptance of a deed-in-lieu of foreclosure, (c) Transfer of title to the Mezzanine Lender of all of the Equity Collateral in accordance with Section 5 or (d) payment in full of the Mezzanine Loan; provided, however, that (i) any rights or remedies of any party hereto arising out of any breach of any provision hereof occurring prior to the date of termination of this Agreement shall survive such termination, and (ii) if at any time any payment in full of the Senior Loan or Mezzanine Loan is rescinded in whole or in part or must be otherwise restored or returned in whole or in part upon the insolvency, bankruptcy or reorganization of Borrower or Mezzanine Borrower, as applicable, or otherwise, then, upon the restoration or return of any portion of such payment in full, Senior Lender's or Mezzanine Lender's, as

applicable, rights and obligations hereunder shall be reinstated as though such payment in full (or portion thereof so restored or returned, as the case may be) had not been made at such time. Notwithstanding the foregoing provisions of this <u>Section 29</u>, in the event the Senior Loan or Mezzanine Loan is repaid in full in cash or otherwise retired, cancelled or terminated, the holder of such repaid, retired, cancelled or terminated Senior Loan or Mezzanine Loan shall have no further rights or obligations under this Agreement, except those rights and obligations that expressly survive the expiration or termination of this Agreement.   The provisions of this <u>Section 29</u> shall survive the expiration and termination of this Agreement with respect to any party hereto.

**30.**    **Severability**.  In the event that any provision of this Agreement or the application hereof to any party hereto shall, to any extent, be invalid or unenforceable under any applicable statute, regulation, or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform to such statute, regulation or rule of law, and the remainder of this Agreement and the application of any such invalid or unenforceable provisions to parties, jurisdictions or circumstances other than to whom or to which it is held invalid or unenforceable, shall not be affected thereby nor shall same affect the validity or enforceability of any other provision of this Agreement.  Furthermore, the parties shall in good faith endeavor to replace any provision held to be invalid or unenforceable with a valid and enforceable provision that closely resembles, and that has the same economic effect as, the provision held to be invalid or unenforceable.

**31.**    **Expenses.**

(a)    To the extent not paid by Borrower or out of or from any collateral securing the Senior Loan which is realized by Senior Lender, Mezzanine Lender agrees upon demand to pay to Senior Lender the amount of any and all reasonable expenses, including, without limitation, the reasonable fees and expenses of its counsel and of any experts or agents, which Senior Lender may incur in connection with the (i) exercise or enforcement of any of the rights of Senior Lender against Mezzanine Lender hereunder to the extent that Senior Lender is the prevailing party in any dispute with respect thereto or (ii) failure by Mezzanine Lender to perform or observe any of the provisions hereof.

(b)    To the extent not paid by Mezzanine Borrower out of or from any collateral securing the Mezzanine Loan which is realized by Mezzanine Lender, Senior Lender agrees upon demand to pay to Mezzanine Lender the amount of any and all reasonable expenses, including, without limitation, the reasonable fees and expenses of its counsel and of any experts or agents, which Mezzanine Lender may incur in connection with the (i) exercise or enforcement of any of the rights of Mezzanine Lender against Senior Lender hereunder to the extent that Mezzanine Lender is the prevailing party in any dispute with respect thereto or (ii) failure by Senior Lender to perform or observe any of the provisions hereof.

**32.**    **Injunction**.  Senior Lender and Mezzanine Lender each acknowledges (and waives any defense based on a claim) that monetary damages are not an adequate remedy to redress a breach by the other hereunder and that a breach by either Senior Lender or Mezzanine Lender hereunder

would cause irreparable harm to the other.  Accordingly, each of Senior Lender and Mezzanine Lender agrees that upon a breach of this Agreement by the other, the remedies of injunction, declaratory judgment and specific performance shall be available to such non-breaching party.

33.    **Mutual Disclaimer.**

(a)     Each of Senior Lender and Mezzanine Lender is a sophisticated lender and/or investor in real estate and its decision to enter into the Senior Loan and the Mezzanine Loan is based upon its own independent expert evaluation of the terms, covenants, conditions and provisions of, respectively, the Senior Loan Documents and the Mezzanine Loan Documents and such other matters, materials and market conditions and criteria which each of Senior Lender and Mezzanine Lender deem relevant.  Neither Senior Lender nor Mezzanine Lender has relied in entering into this Agreement, and in the case of Senior Lender, the Senior Loan and the Senior Loan Documents, and in the case of Mezzanine Lender, the Mezzanine Loan or the Mezzanine Loan Documents, upon any oral or written information, representation, warranty or covenant from the other, or any of the other's representatives, employees, Affiliates or agents, other than the representations and warranties of the other party contained herein.  Each of Senior Lender and Mezzanine Lender further acknowledges for itself that no employee, agent or representative of the other has been authorized to make, and that neither Senior Lender nor Mezzanine Lender has relied upon, any statements, representations, warranties or covenants other than those specifically contained in this Agreement.  Without limiting the foregoing, each of Senior Lender and Mezzanine Lender acknowledges that the other has made no representations or warranties (other than those specifically contained in this Agreement) as to the Senior Loan or the Mezzanine Loan or the Premises (including, without limitation, the cash flow of the Premises, the value, marketability, condition or future performance thereof, the existence, status, adequacy or sufficiency of the leases, the tenancies or occupancies of the Premises, or the sufficiency of the cash flow of the Premises, to pay all amounts which may become due from time to time pursuant to the Senior Loan or the Mezzanine Loan).

(b)     Each of Senior Lender and Mezzanine Lender acknowledges that the Senior Loan and the Senior Loan Documents, and the Mezzanine Loan and the Mezzanine Loan Documents, respectively, are distinct, separate transactions and loans, separate and apart from each other.  Each of Senior Lender and Mezzanine Lender acknowledges and agrees that the other party is a distinct lender and/or investor with distinct and separate loans with various rights and remedies with respect to the Premises and the Separate Collateral, respectively, which are not in all respects aligned.

34.    **Venue**.  Any legal suit, action, proceeding or counterclaim arising out of or relating to this Agreement or the transactions contemplated hereunder, or recognition or enforcement of any judgment may be instituted in any federal or state court in New York, county of New York, and each of Senior Lender and Mezzanine Lender waives any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding, and Senior Lender and Mezzanine Lender each hereby irrevocably submits to the non-exclusive jurisdiction of any such court in any suit, action or proceeding.

**35.** **NO TRIAL BY JURY**. EACH OF THE PARTIES HERETO, TO THE FULLEST EXTENT THAT THEY MAY LAWFULLY DO SO, HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY PARTY HERETO WITH RESPECT TO THIS AGREEMENT OR THE MATTERS COVERED HEREBY. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH PARTY HERETO, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH PARTY HERETO IS HEREBY RESPECTIVELY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY EACH PARTY HERETO.

**36.** **Affiliated Mezzanine Lender.** In the event that, notwithstanding any prohibitions thereon contained in this Agreement, at any time the Mezzanine Loan is held by any Person who owns, directly or indirectly, more than ten percent (10%) of the legal or beneficial interests in Borrower or Mezzanine Borrower or has the power, directly or indirectly, to direct or cause the direction of the management or policies of Borrower or Mezzanine Borrower, then notwithstanding anything to the contrary contained in this Agreement, such Person shall not be entitled to the benefit of, or to exercise or enforce, any of the rights granted Mezzanine Lender under this Agreement.

**37.** **EU Bail-In Rule Provisions.** Notwithstanding anything to the contrary in this Agreement or in any other agreement, arrangement or understanding among the parties hereto, each party hereto acknowledges that any liability of any EEA Financial Institution arising under this Agreement, except to the extent such liability is excluded under the Bail-In Legislation from the scope of any Bail-In Action, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

   (a)   the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

   (b)   the effects of any Bail-in Action on any such liability, including, if applicable:

      (i)   a reduction in full or in part or cancellation of any such liability including without limitation a reduction in any accrued or unpaid interest in respect of such liability;
      (ii)  a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement; or
      (iii) the variation of the terms of this Agreement to give effect to the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

**IN WITNESS WHEREOF**, Senior Lender and Mezzanine Lender have executed this Agreement as of the date and year first set forth above.

**SENIOR LENDER:**

**NATIXIS, NEW YORK BRANCH**

By: _____

Name:   Andrew B. Levine
Title:   Managing Director

By: _____

Name:  Timothy R. Bachman
Title:  Director


**MEZZANINE LENDER:**

**NATIXIS, NEW YORK BRANCH**

By: _____

Name:   Andrew B. Levine
Title:   Managing Director

By: _____

Name:
Title:  Timothy R. Bachman
Director

ICA

## EXHIBIT A

Real Property Legal Description

The land referred to herein is situated in the State of California, County of Los Angeles,   and
described as follows:

PARCEL 1: PORTION OF APN: 6171-001-054

THOSE PORTIONS OF THE MODJESKA PARK, IN THE CITY OF LYNWOOD, COUNTY OF LOS
ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143
INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY,
DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWESTERLY CORNER OF LOT 17 IN BLOCK 15 OF SAID MODJESKA
PARK; THENCE NORTH 17° 59' 30" EAST ALONG THE WESTERLY LINE OF SAID BLOCK 362.90
FEET TO THE NORTHWESTERLY CORNER OF SAID BLOCK 15; THENCE NORTH 16° 19' 15" EAST
50.86 FEET TO THE SOUTHWESTERLY CORNER OF LOT 10 IN BLOCK 18 OF SAID MODJESKA
PARK; THENCE NORTH 5° 47' 00" EAST ALONG THE WESTERLY LINE OF SAID BLOCK 18, A
DISTANCE OF 230.13 FEET TO THE SOUTHERLY LINE OF IMPERIAL HIGHWAY 100 FEET;
THENCE EASTERLY ALONG SAID HIGHWAY, SOUTH 84° 13' 00" EAST, 830.37 FEET TO THE
BEGINNING OF A TANGENT CURVE CONCAVE NORTHERLY AND HAVING A RADIUS OF 697.35
FEET; THENCE ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 5° 44' 21", AN ARC
LENGTH OF 69.85 FEET TO THE WESTERLY LINE OF PEACH STREET; THENCE SOUTHERLY
ALONG SAID WESTERLY LINE OF PEACH STREET, SOUTH 14° 37' 33" EAST, 14.39 FEET; THENCE
SOUTH 5° 45' 40" WEST, 89.52 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE
WESTERLY AND HAVING A RADIUS OF 583.89 FEET; THENCE ALONG SAID CURVE THROUGH A
CENTRAL ANGLE OF 12° 13' 10", AN ARC LENGTH OF 124.53 FEET; THENCE SOUTH 17° 58' 50"
WEST, 6.92 FEET TO A POINT ON THE SOUTHERLY LINE OF BLOCK 18 IN SAID MODJESKA PARK;
THENCE SOUTH 26° 03' 45" WEST 53.29 FEET TO THE NORTHEAST CORNER OF LOT 1 IN BLOCK
17 OF SAID MODJESKA PARK; THENCE SOUTH 17° 58' 50" WEST 111.30 FEET TO THE
SOUTHEASTERLY CORNER OF LOT 3 IN BLOCK 17 OF SAID MODJESKA PARK; THENCE NORTH
72° 04' 03" WEST ALONG THE SOUTHERLY LINE OF SAID LOT, 130.64 FEET TO THE
NORTHEASTERLY CORNER OF LOT 46 IN BLOCK 17; THENCE SOUTH 17° 57' 05" WEST ALONG
THE EASTERLY LINE OF LOTS 46, 45, 44, 43, 42 AND 41, IN SAID BLOCK 17, 15094 FEET TO THE
SOUTHEASTERLY CORNER OF SAID LOT 41; THENCE NORTH 72° 04' 32" WEST ALONG THE
SOUTHERLY LINE OF SAID LOT 41 AND ITS WESTERLY PROLONGATION 170.59 FEET TO THE
EASTERLY LINE OF BLOCK 16 OF SAID MODJESKA PARK; THENCE SOUTH 17° 55' 20" WEST
ALONG SAID EASTERLY LINE, 234.84 FEET TO THE SOUTHEASTERLY CORNER OF LOT 16 IN
SAID BLOCK 16; THENCE NORTH 72° 01'41" WEST ALONG THE SOUTHERLY LINE OF SAID LOT,
130.15 FEET TO THE SOUTHWESTERLY CORNER OF SAID LOT; THENCE NORTH 17° 56' 17" EAST
ALONG THE WESTERLY LINE OF LOTS 16, 15, 14 AND 13 IN SAID BLOCK 16, A DISTANCE OF
99.98 FEET TO THE SOUTHEASTERLY CORNER OF LOT 30 IN SAID BLOCK 16; THENCE NORTH
72° 01' 43" WEST ALONG THE SOUTHERLY LINE OF SAID LOT AND ITS WESTERLY
PROLONGATION, 170.13 FEET TO THE EASTERLY LINE OF SAID BLOCK 15; THENCE SOUTH 17°
57' 15" WEST 196.60 FEET AND NORTH 62° 29'70' WEST, 263.86 FEET ALONG THE BOUNDARY
LINES OF SAID BLOCK 15 AND TO THE POINT OF BEGINNING.

EXCEPT LOTS 53 AND 54 INCLUSIVE, IN BLOCK 18 OF SAID MODJESKA PARK.

ALSO EXCEPT THEREFROM THOSE PORTIONS INCLUDED WITHIN THE LINES OF GRAPE STREET, APRICOT STREET AND BEECHWOOD AVENUE AS SHOWN ON THE MAP OF SAID MODJESKA PARK.

ALSO EXCEPT THEREFROM THAT PORTION THEREOF LYING WITHIN SAID BLOCK 17.

ALSO EXCEPT ALL CRUDE OIL, PETROLEUM, MINERALS AND KINDRED SUBSTANCES LYING BELOW A DEPTH OF 500 FEET FROM THE SURFACE THEREOF, BUT WITHOUT RIGHT OF SURFACE ENTRY, AS RESERVED BY HAROLD L. BABB AND SADIE M. BABB, BY DEED RECORDED JUNE 1, 1971, IN BOOK D-5074 PAGE 5, OFFICIAL RECORDS, AS TO LOT 11, BLOCK 18 OF SAID TRACT, AND RESERVED BY CARL A. NORDBAK, ET AL., BY DEED RECORDED JUNE 1, 1971, IN BOOK D-5074 PAGE 112, OFFICIAL RECORDS, AS TO LOTS 59, 60 AND THE EAST 15 FEET OF LOT 61, IN SAID BLOCK 18, AND RESERVED BY WILLIE G. MEANY, AN UNMARRIED WOMAN, BY DEED RECORDED JUNE 1, 1971, IN BOOK D-5074 PAGE 79, OFFICIAL RECORDS, AS TO LOTS 69 AND 70, IN BLOCK 18 OF SAID TRACT.

ALSO EXCEPT ALL CRUDE OIL, PETROLEUM, MINERALS AND KINDRED SUBSTANCES IN AND UNDER LOTS 23 AND 24 AND THE WESTERLY 7 FEE OF LOT 25, ALL IN BLOCK 18 OF SAID TRACT, LYING BELOW A DEPTH OF 300 FEET FROM THE SURFACE THEREOF, BUT WITHOUT RIGHT OF SURFACE ENTRY, AS RESERVED BY DELORES JUNE RATZLAFF SMITH, ET AL., BY DEED RECORDED JUNE 1, 1971, IN BOOK D-5074 PAGE 83, OF OFFICIAL RECORDS.

PARCEL 2: PORTION OF APN: 6171-001-054

THOSE PORTIONS OF BEECHWOOD AVENUE AND GRAPE STREET IN MODJESKA PARK, AS VACATED BY RESOLUTION NO. 71-34, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, A CERTIFIED COPY THEREOF BEING RECORDED MAY 20, 1971 AS INSTRUMENT NO. 3445, IN BOOK D-5063 PAGE 937, OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCELS 1 AND 2 ARE ALSO DESCRIBED AS FOLLOWS:

THOSE PORTIONS OF THE MODJESKA PARK, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWESTERLY CORNER OF LOT 17 IN BLOCK 15 OF SAID MODJESKA PARK; THENCE NORTH 18° 01' 23" EAST ALONG THE WESTERLY LINE OF SAID BLOCK 352.97 FEET TO THE NORTHWESTERLY CORNER OF SAID BLOCK 15; THENCE NORTH 16° 23' 16" EAST 50.87 FEET TO THE SOUTHWESTERLY CORNER OF LOT 10 IN BLOCK 18 OF SAID MODJESKA PARK; THENCE NORTH 5° 48' 32" EAST ALONG THE WESTERLY LINE OF SAID BLOCK 18, A DISTANCE OF 230.02 FEET TO THE SOUTHERLY LINE OF IMPERIAL HIGHWAY 100 FEET WIDE; THENCE EASTERLY ALONG SAID HIGHWAY, SOUTH 84° 12' 05" EAST, 630.08 FEET TO THE NORTHWESTERLY LINE OF LOT 54 OF SAID MODJESKA PARK; THENCE SOUTH 05° 46' 54" WEST 99.95 FEET TO THE SOUTHWESTERLY CORNER OF LOT 54; THENCE SOUTH 84° 12' 24" EAST 50.01 FEET TO THE SOUTHEASTERLY CORNER OF LOT 53 OF SAID MODJESKA PARK; THENCE NORTHERLY ALONG THE EASTERLY LINE OF SAID LOT 53 NORTH 05° 46' 54" EAST 99.95 FEET TO SAID SOUTHERLY LINE IMPERIAL HIGHWAY 100 FEET WIDE; THENCE EASTERLY ALONG SAID SOUTHERLY LINE SOUTH 84° 12' 05" EAST 150.27 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE NORTHERLY AND HAVING A RADIUS OF 697.35 FEET; THENCE ALONG SAID

CURVE THROUGH A CENTRAL ANGLE OF 5° 43' 54" AN ARC LENGTH OF 69.76 FEET TO THE WESTERLY LINE OF PEACH STREET; THENCE SOUTHERLY ALONG SAID WESTERLY LINE OF PEACH STREET, SOUTH 15° 03' 26" EAST, 14.39 FEET; THENCE SOUTH 5° 46' 23" WEST, 89.52 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE WESTERLY AND HAVING A RADIUS OF 583.89 FEET; THENCE ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 12° 13' 22", AN ARC LENGTH OF 124.56 FEET; THENCE SOUTH 17° 59' 45" WEST, 6.88 FEET TO A POINT ON THE SOUTHERLY LINE OF BLOCK 18 IN SAID MODJESKA PARK; THENCE SOUTH 26° 05' 00" WEST 53.31 FEET TO THE NORTHEAST CORNER OF LOT 1 IN BLOCK 17 OF SAID MODJESKA PARK; THENCE SOUTH 17° 59' 45" WEST 111.29 FEET TO THE SOUTHEASTERLY CORNER OF LOT 3 IN BLOCK 17 OF SAID MODJESKA PARK; THENCE NORTH 72° 03' 58" WEST ALONG THE SOUTHERLY LINE OF SAID LOT, 130.66 FEET TO THE NORTHEASTERLY CORNER OF LOT 46 IN BLOCK 17; THENCE SOUTH 17° 58' 08" WEST ALONG THE EASTERLY LINE OF LOTS 46, 45, 44, 43, 42 AND 41 IN SAID BLOCK 17, 150.07 FEET TO THE SOUTHEASTERLY CORNER OF SAID LOT 41; THENCE NORTH 72° 03' 10" WEST ALONG THE SOUTHERLY LINE OF SAID LOT 41 AND ITS WESTERLY PROLONGATION 170.60 FEET TO THE EASTERLY LINE OF BLOCK 16 OF SAID MODJESKA PARK; THENCE SOUTH 17° 56' 15" WEST ALONG SAID EASTERLY LINE, 234.89 FEET TO THE SOUTHEASTERLY CORNER OF LOT 16 IN SAID BLOCK 16; THENCE NORTH 72° 00' 18" WEST ALONG THE SOUTHERLY LINE OF SAID LOT, 130.16 FEET TO THE SOUTHWESTERLY CORNER OF SAID LOT; THENCE NORTH 17° 57' 20" EAST ALONG THE WESTERLY LINE OF LOTS 16, 15, 14 AND 13 IN SAID BLOCK 16, A DISTANCE OF 99.99 FEET TO THE SOUTHEASTERLY CORNER OF LOT 30 IN SAID BLOCK 16; THENCE NORTH 72° 01' 04" WEST ALONG THE SOUTHERLY LINE OF SAID LOT AND ITS WESTERLY PROLONGATION, 170.13 FEET TO THE EASTERLY LINE OF SAID BLOCK 15; THENCE SOUTH 17° 58' 39" WEST 196.61 FEET AND NORTH 62° 27' 15" WEST, 264.09 FEET ALONG THE BOUNDARY LINES OF SAID BLOCK 15 AND TO THE POINT OF BEGINNING.

EXCEPT THEREFROM THOSE PORTIONS INCLUDED WITHIN THE LINES OF APRICOT STREET AND BEECHWOOD AVENUE AS SAID STREETS ARE SHOWN ON MAP RECORDED IN BOOK 102 PAGE 32 OF RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

ALSO EXCEPT THEREFROM THAT PORTION THEREOF LYING WITHIN SAID BLOCK 17.

ALSO EXCEPT THEREFROM THAT PORTION LYING WITHIN LOTS 44 TO 52 INCLUSIVE OF SAID BLOCK 18.

PARCEL 3: PORTION OF APN: 6171-001-054

THOSE PORTIONS OF BEECHWOOD AVENUE AND APRICOT STREET IN MODJESKA PARK, AS VACATED BY RESOLUTION NO. 99.108 OF THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, A CERTIFIED COPY THEREOF BEING RECORDED ON AUGUST 24, 1999 AS INSTRUMENT NO. 99-1593013 AND VACATED BY RESOLUTION NO. 99.108, RECORDED NOVEMBER 14, 2001 AS INSTRUMENT NO. 01-2173406 OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY', DESCRIBED AS FOLLOWS:

THOSE PORTIONS OF APRICOT STREET SOUTH OF BEECHWOOD AVENUE AND BEECHWOOD AVENUE BETWEEN APRICOT STREET AND PEACH STREET OF MODJESKA PARK TRACT, IN THE CITY OF LYN WOOD COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, MAP BOOK 9 PAGES 142 AND 143 OF MAPS, IN THE OFFICE OF THE LOS ANGELES COUNTY RECORDER, MORE CLOSELY DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST NORTHEASTERLY CORNER OF LOT 1, BLOCK 17 OF SAID TRACT; THENCE NORTH 84° 13' WEST 266 FEET ALONG THE NORTHERLY LINE OF SAID LOT 1 AND LOT

48, BEING THE SOUTHERLY RIGHT-OF-WAY LINE OF BEECH WOOD AVENUE, TO THE NORTHWESTERLY CORNER OF LOT 48; THENCE SOUTH 17° 59' WEST 205 FEET ALONG THE EASTERLY RIGHT-OF-WAY LINE OF APRICOT STREET TO THE SOUTHWESTERLY CORNER OF LOT 41; THENCE NORTH 72° 01' WEST 40 FEET TO A POINT ON THE WESTERLY RIGHT-OF-WAY LINE OF APRICOT STREET; THENCE ALONG SAID LINE NORTH 17° 59' EAST TO A POINT LOCATED ON THE SOUTHERLY LINE OF LOT 28, BLOCK 18 OF SAID TRACT, SAID POINT BEING 5.64 FEET WEST OF THE SOUTHEASTERLY CORNER OF LOT 28; THENCE ALONG THE NORTHERLY LINE OF BEECHWOOD AVENUE SOUTH 84° 13' EAST 316.02 FEET TO A POINT ON THE SOUTHERLY LINE OF LOT 41 OF SAID TRACT, SAID POINT BING 10.38 FEET FROM THE SOUTHWESTERLY CORNER OF SAID LOT; THENCE SOUTHWESTERLY IN A DIRECT LINE TO THE NORTHEASTERLY CORNER OF LOT 1 OF SAID TRACT BEING THE POINT OF BEGINNING.

PARCEL 4: PORTION OF APN: 6171-001-054

LOTS 53 AND 54, BLOCK 18 OF MODJESKA PARK, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 5: PORTION OF APN: 6171-001-052

LOTS 28 AND 29, IN BLOCK 16, CF MODJESKA PARK, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT ALL OIL, GAS, PETROLEUM AND OTHER MINERAL OR HYDROCARBON SUBSTANCES IN AND UNDER OR WHICH MAY BE PRODUCED FROM SAID LAND, TOGETHER WITH THE RIGHT TO USE THAT PORTION ONLY OF SAID LAND WHICH UNDERLIES A PLANE PARALLEL WITH AND 500 FEE BELOW THE PRESENT SURFACE OF SAID LAND, FOR THE PURPOSE OF PROSPECTING FOR DEVELOPING AND/OR EXTRACTING SAID OIL, GAS, PETROLEUM AND OTHER MINERAL OR HYDROCARBON SUBSTANCES FROM SAID LAND BY MEANS OF WELLS DRILLED INTO SAID SUBSURFACE OF SAID LAND FROM DRILL SITES LOCATED ON OTHER LAND, IT BEING EXPRESSLY UNDERSTOOD AND AGREED THAT EDISON SECURITIES COMPANY, ITS SUCCESSORS AND ASSIGNS, SHALL HAVE NO RIGHT TO ENTER UPON THE SURFACE OF SAID LAND, OR TO USE SAID LAND OR ANY PORTION THEREOF TO SAID DEPTH OF 500 FEET FOR ANY PURPOSE WHATSOEVER, AS RESERVED BY EDISON SECURITIES COMPANY, A CORPORATION, IN DEED RECORDED DECEMBER 16, 1958 AS INSTRUMENT NO. 4046 OFFICIAL RECORDS.

PARCEL 6: REMAINDER OF APN: 6171-001-052

THE NORTHERLY 13 FEET OF LOT 27 OF BLOCK 16 OF "MODJESKA PARK", IN THE RANCHO SAN ANTONIO, IN THE CITY OF LYNWOOD, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM, ALL OIL, GAS, PETROLEUM AND OTHER MINERAL OR HYDROCARBON SUBSTANCES IN AND UNDER, OR WHICH MAY BE PRODUCED FROM SAID LAND, TOGETHER WITH THE RIGHT TO USE THAT PORTION ONLY OF SAID LAND WHICH UNDERLIES A PLANE PARALLEL WITH AND 500 FEET BELOW THE PRESENT SURFACE OF SAID LAND, FOR THE PURPOSE OF PROSPECTING FOR DEVELOPING AND/OR EXTRACTING SAID OIL GAS, PETROLEUM AND OTHER MINERAL AND HYDROCARBON SUBSTANCES FROM SAID LAND, BY MEANS OF WELLS DRILLED INTO SAID SUBSURFACE OF SAID LAND FROM DRILL SITES LOCATED ON OTHER LAND, IT BEING EXPRESSLY UNDERSTOOD AND AGREED THAT SAID

EDISON SECURITIES COMPANY, ITS SUCCESSORS AND ASSIGNS, SHALL HAVE NO RIGHT TO ENTER UPON THE SURFACE OF SAID LAND, OR TO USE SAID LAND OR ANY PORTION THEREOF, TO SAID DEPTH OF 500 FEET, FOR ANY PURPOSE WHATSOEVER, AS RESERVED IN DEED FROM EDISON SECURITIES COMPANY, RECORDED SEPTEMBER 5, 1956 AS INSTRUMENT NO. 18, IN BOOK 52213 PAGE 275, OFFICIAL RECORDS.

PARCEL 7: PORTION OF APN: 6171-001-054

THE EASTERLY 20.00 FEET OF THAT PORTION OF GRAPE STREET VACATED BY RESOLUTION NO. 2002.050 OF THE CITY COUNCIL OF THE CITY OF LYNWOOD, RECORDED APRIL 30, 2002 AS INSTRUMENT NO. 02- 995125, LYING SOUTHERLY OF THE WESTERLY PROLONGATION OF THE NORTHERLY LINE OF LOT 29 AND LYING NORTHERLY OF THE WESTERLY PROLONGATION OF A LINE PARALLEL WITH AND 13.00 FEET SOUTHERLY OF THE NORTHERLY LINE OF LOT 27, ALL IN BLOCK 16 OF MODJESKA PARK, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 8: APN: 6171-001-056 AND 6171-007-57

LOTS 1 THROUGH 48 INCLUSIVE OF BLOCK 17 OF MODJESKA PARK, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT ALL GAS, OIL AND OTHER HYDROCARBON SUBSTANCES IN, UNDER AND/OR THAT MAY BE PRODUCED FROM A DEPTH OF 500 FEET BELOW THE SURFACE OF SAID LAND BUT WITHOUT ANY USE OF OR RIGHT IN OR TO ANY PORTION OF THE SURFACE THEREOF, TO A DEPTH OF 500 FEET, AS RESERVED BY HELMER J. RONNING AND ADAH J. RONNING, HIS WIFE, AS JOINT TENANTS, THEIR HEIRS, SUCCESSORS AND ASSIGNS, IN DEED RECORDED NOVEMBER 4, 1959 AS INSTRUMENT NO. 622, IN BOOK D - 563 PAGE 872 OFFICIAL RECORDS.

ALSO EXCEPT THEREFROM, ALL OIL, OIL RIGHTS, MINERALS, MINERAL RIGHTS, NATURAL GAS, NATURAL GAS RIGHTS, AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN THAT MAY BE WITHIN OR UNDER THE HEREIN CONVEYED PARCEL OF LAND, AND THE RIGHTS THERETO, TOGETHER WITH CERTAIN OTHER CONDITIONS, AS EXCEPTED IN THE DEED (STATE PARCEL 62085), TO THE STATE OF CALIFORNIA RECORDED NOVEMBER 26, 1971 AS INSTRUMENT NO. 931, IN BOOK D 5269 PAGE 230 OFFICIAL RECORDS.

ALSO EXCEPT THEREFROM, ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES LYING BELOW A DEPTH OF 500 FEET FROM THE SURFACE OF SAID LAND WITHOUT THE RIGHT OF SURFACE ENTRY, AS RESERVED IN THE DEED RECORDED JUNE 21, 1978 AS INSTRUMENT NO. 78-671620, OFFICIAL RECORDS.

PARCEL 9: PORTION OF APN: 6171-001-056 AND PORTION OF APN: 6171-001-057

THAT PORTION OF APRICOT STREET, AS DEDICATED BY THE MAP OF MODJESKA PARK, IN THE CITY OF LYNWOOD COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 OF MAPS, VACATED BY RESOLUTION NO. 2001.124, RECORDED NOVEMBER 14, 2001 AS INSTRUMENT NO. 01-2173405, OFFICIAL RECORDS, DESCRIBED IN SAID RESOLUTION AS BEING BOUNDED TO THE SOUTH BY THE NORTHERLY RIGHT OF WAY LINE OF FERNWOOD AVENUE, AND TO THE NORTH BY THE EXTENSION OF THE SOUTHERLY LINE OF LOT 41 OF MODJESKA PARK TRACT.

PARCEL 10: PORTION OF APN: 6171-001-057

THE WESTERLY HALF OF THAT PORTION OF PEACH STREET, AS DEDICATED BY THE MAP OF MODJESKA PARK, EN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 OF MAPS, VACATED BY RESOLUTION NO. 2002 023, RECORDED MARCH 6, 2002 AS INSTRUMENT NO. 02-536754 OFFICIAL RECORDS, SAID VACATED PORTION OF PEACH STREET DESCRIBED AS:

PEACH STREET, AS SHOWN ON MAP OF MODJESKA PARK TRACT, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, AND TRACT NO. 2551, AS PER MAP RECORDED IN BOOK 24 PAGES 78 AND 79 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER, DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE EASTERLY LINE OF PEACH STREET, 40 FEET WIDE, WITH THE SOUTHERLY LINE OF BEECHWOOD AVENUE, 50 FEET WIDE, BEING THE NORTHWEST CORNER OF LOT 249 OF SAID TRACT NO. 2551; THENCE NORTH 84° 12' 40" WEST 40.93 FEET MORE OR LESS, TO THE INTERSECTION OF THE WESTERLY LINE OF PEACH STREET, 40 FEET WIDE, WITH SAID SOUTHERLY LINE OF BEECHWOOD AVENUE, BEING THE NORTHEAST CORNER OF LOT 1 OF BLOCK 17 OF SAID MODJESKA PARK TRACT; THENCE ALONG SAID WESTERLY LINE OF PEACH STREET AND THE EASTERLY LINE OF LOTS 1 AND 12 INCLUSIVE, OF SAID BLOCK 17 OF SAID MODJESKA PARK TRACT, SOUTH 17° 59' 45" WEST 327.58 FEET TO THE WESTERLY PROLONGATION OF THE CENTERLINE OF SANBORN AVENUE, 40 FEET WIDE; THENCE ALONG LAST MENTIONED WESTERLY PROLONGATION SOUTH 84° 10' 55" EAST, 40.92 FEET TO SAID EASTERLY LINE OF PEACH STREET; THENCE ALONG SAID EASTERLY LINE OF SAID PEACH STREET AND THE WESTERLY LINES OF LOTS 249 AND 250 OF SAID TRACT NO. 2551, NORTH 17° 49' 45" EAST 327.51 FEET TO THE POINT OF BEGINNING.

PARCEL 11: APN: 6171-001-056 AND PORTION OF 6171-001-055

LOTS 17, 18 AND 19, IN BLOCK 16 OF MODJESKA PARK, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 OF MAPS, IN THE OFFICE OF THE COUNTY' RECORDER OF SAID COUNTY.

EXCEPT THEREFROM, ALL OIL, OIL RIGHTS, MINERALS, MINERAL RIGHTS, NATURAL GAS, NATURAL GAS RIGHTS, AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN THAT MAY BE WITHIN OR UNDER THE HEREIN CONVEYED PARCEL OF LAND, AND THE RIGHTS THERETO, TOGETHER WITH CERTAIN OTHER CONDITIONS, AS EXCEPTED IN THE DEED (STATE PARCEL 62083-1), TO THE STATE OF CALIFORNIA RECORDED MAY 14, 1974 AS INSTRUMENT NO. 958, IN BOOK  D-6270 PAGE 472 OF OFFICIAL RECORDS.

PARCEL 12: PORTION OF APN: 6171-001-054

THAT PORTION OF THE WEST ONE-HALF OF GRAPE STREET, VACATED BY RESOLUTION NO. 2002.050. OF THE CITY COUNCIL OF THE CITY OF LYNWOOD RECORDED APRIL 30, 2002 AS INSTRUMENT NO. 02995125 OF OFFICIAL RECORDS.

SAID VACATED GRAPE STREET DESCRIBED AS:

THAT PORTION OF GRAPE STREET LOCATED IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, BOUNDED TO THE NORTH BY THE EXTENSION OF THE SOUTHERLY LINE OF LOT 30, BLOCK 16, TO THE WEST BY THE EASTERLY LINE OF LOTS 10

THROUGH 16 INCLUSIVE, TO THE SOUTH BY THE NORTHERLY RIGHT OF WAY LINE OF FERNWOOD AVENUE, AND TO THE EAST BY THE WESTERLY LINE OF LOTS 26 THROUGH 29 INCLUSIVE, AS SHOWN ON MAPS OF MODJESKA PARK TRACT, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 13: APN: 6171-001-046, PORTION OF APN: 6171-001-055, PORTION OF APN: 6171-007-052

THAT PORTION OF FERN WOOD AVENUE, AS DEDICATED BY THE MAP OF MODJESKA PARK, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 OF MAPS, VACATED BY RESOLUTION NO. 2002.050, RECORDED APRIL 30, 2002 AS INSTRUMENT NO. 02995125 OFFICIAL RECORDS, LYING NORTHWESTERLY OF THE SOUTHWESTERLY PROLONGATION OF THE SOUTHEASTERLY LINE OF PEACH STREET AS SHOWN ON THE MAP OF SAID MODJESKA TRACT.

EXCEPT THEREFROM THAT PORTION OF THE NORTHERLY HALF OF SAID FERNWOOD AVENUE THAT WOULD PASS WITH A LEGAL CONVEYANCE OF LOTS 20, 21, 22, 23, 24, 25 AND 26, IN BLOCK 16, OF SAID MODJESKA PARK.

PARCEL 14: APN: 6171-010-002

THAT PORTION OF RANCHO SAN ANTONIO, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, DESCRIBED AS THOSE CERTAIN STRIPS OF LAND 100.00 FEET WIDE, DESCRIBED IN DEEDS TO LOS ANGELES INTER-URBAN RAILWAY COMPANY, RECORDED IN BOOK 2509 PAGE 240 OF DEEDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, AS ACQUIRED BY THE STATE OF CALIFORNIA BY FINAL ORDER OF CONDEMNATION (STATE PARCEL 58202), RECORDED DECEMBER 6, 1990 AS INSTRUMENT NO. 90-2019955 OF OFFICIAL RECORDS IN SAID OFFICE, BOUNDED AS FOLLOWS:

ON THE WEST BY THE EASTERLY LINE OF STATE STREET 105.00 FEET WIDE; FORMERLY LONG BEACH BOULEVARD, AS DESCRIBED IN DEED RECORDED IN BOOK 2773 PAGE 311 OF DEEDS, IN SAID OFFICE AND SEGMENT 14 OF THE HIGHWAY RIGHT OF WAY RELINQUISHED TO THE CITY OF LYNWOOD BY RESOLUTION OF THE CALIFORNIA HIGHWAY COMMISSION, A CERTIFIED COPY OF WHICH RESOLUTION IS RECORDED APRIL 25, 1996 AS DOCUMENT NO. 96-650665 OF OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, AND AS SHOWN ON MAP RECORDED MARCH 6, 1995, IN SPATE HIGHWAY MAP BOOK 19 PAGES 54 AND 55, IN SAID OFFICE; ON THE NORTHEAST BY THE NORTHEASTERLY LINE OF SAID 100 FOOT STRIP; ON THE SOUTHWEST AND THE SOUTH BY THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT ON SAID EASTERLY LINE OF STATE STREET, FORMERLY LONG BEACH BOULEVARD, DISTANT SOUTH 18° 00' 3211 WEST, 44.42 FEET FROM THE INTERSECTION OF SAID EASTERLY LINE OF STATE STREET WITH THE NORTHEASTERLY LINE OF SAID 100.00 FOOT STRIP; THENCE SOUTH 62° 00' 06" EAST 432.77 FEET; THENCE SOUTH 64° 13' 52" EAST, 986.02 FEET; THENCE SOUTH 79° 10' 45" EAST TO THE SAID NORTHEASTERLY LINE OF THE 100.00 FOOT STRIP AND END OF THE HEREIN DESCRIBED LINE.

PARCEL 15: PORTION OF APN: 6171-006-035

LOTS 450, 451, 452 AND 453 OF TRACT NO. 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78, 79 AND 80 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 16: PORTION OF APN: 6171-006-037 AND UNASSIGNED APN FOR WEST HALF OF
PEACH STREET

THAT PORTION OF PEACH STREET BOUNDED BY THE NORTHERLY RIGHT OF WAY LINE OF
FERNWOOD AVENUE (VACATED) AND THE ELONGATION OF THE CENTERLINE OF SANBORN
AVENUE, 40 FEET WIDE; AS SHOWN ON TRACT NO. 2551, IN THE CITY OF LYNWOOD, COUNTY
OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78, 79
AND 80 OF INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY,
AS VACATED BY RESOLUTION NO. 2003.064, OF THE CITY' COUNCIL OF THE CITY OF
LYNWOOD, RECORDED MAY 1, 2003 AS INSTRUMENT NO. 03-1251383 OF OFFICIAL RECORDS.

EXCEPT THE EASTERLY ONE-HALF OF SAID PEACH STREET, LYING NORTHERLY OF THE
WESTERLY PROLONGATION OF THE SOUTHERLY LINE OF LOT 449 OF SAID TRACT NO. 2551 AND
SOUTHERLY OF THE WESTERLY PROLONGATION OF THE CENTER LINE OF SAID SANBORN
AVENUE.

PARCEL 17: PORTION OF APN: 6171-006-038

THAT PORTION OF FERN WOOD AVENUE, AS DEDICATED BY THE MAP OF MODJESKA TRACT,
IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP
RECORDED IN BOOK 9 PAGES 142 AND 143 OF MAPS, AND TRACT NO. 2551, AS PER MAP
RECORDED IN BOOK 24 PAGES 78 TO 80 INCLUSIVE OF MAPS, VACATED BY RESOLUTION NO.
2002.050, RECORDED APRIL 30, 2002 AS INSTRUMENT NO. 02-995125, OF OFFICIAL RECORDS,
BOUNDED ON THE WEST BY THE SOUTHWESTERLY PROLONGATION OF THE SOUTHEASTERLY
LINE OF PEACH STREET AS SHOWN ON THE MAP OF SAID MODJESKA TRACT THAT WOULD
PASS WITH A LEGAL CONVEYANCE OF LOT 453 OF SAID TRACT NO. 2551.

PARCEL 18: PORTION OF APN: 6171-006-037

THAT PORTION OF CHESTER STREET 50 FEET WIDE, AS DEDICATED BY THE MAP OF TRACT
NO. 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS
PER MAP RECORDED IN BOOK 24 PAGES 78, 79 AND 80 OF MAPS, AS VACATED BY RESOLUTION
NO. 2003.180, RECORDED OCTOBER 6, 2003 AS INSTRUMENT NO. 03-2974163 OF OFFICIAL
RECORDS.

SAID CHESTER STREET DESCRIBED ON SAID VACATION AS BEING BOUNDED BY THE
SOUTHEASTERLY EXTENSION OF THE SOUTHERLY PROPERTY LINE OF LOT 439 AND THE
NORTHERLY RIGHT OF WAY LINE OF FERNWOOD AVENUE (VACATED), AS SHOWN ON TRACT
NO. 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS
PER MAP RECORDED IN BOOK 24 PAGES 78, 79 AND 80 INCLUSIVE OF MAPS, IN THE OFFICE OF
THE COUNTY RECORDER OF SAID COUNTY, THAT WOULD PASS WITH A LEGAL CONVEYANCE
OF PARCEL 15 SHOWN ABOVE.

PARCEL 19: APN: 6171-004-017, 022, PORTION OF APN: 6171-004-032; PORTION OF
APN: 6171-006-037, APN: 6171-003-035, 6171-003-039

THAT PORTION OF TRACT NO. 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES,
STATE OF CALIFORNIA. AS PER MAP RECORDED IN BOOK 24 PAGES 78, 79 AND 80 INCLUSIVE OF
MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, TOGETHER WITH THOSE

PORTIONS OF SANBORN AVENUE, PEACH STREET, COURT STREET, CHESTER STREET, PLAZA STREET, LONG BEACH BOULEVARD AND THE UNNAMED ALLEY LYING WITHIN SAID TRACT, ALL MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE CENTERLINE INTERSECTION OF LONG BEACH BOULEVARD ORIGINALLY 80 FEET WIDE, WITH THE CENTERLINE OF BEECHWOOD AVENUE, 50 FEET WIDE, AS SHOWN ON SAID MAP; THENCE SOUTH 14° 36' 19" EAST ALONG SAID CENTERLINE OF LONG BEACH BOULEVARD 715.17 FEET; THENCE SOUTH 75° 23' 41" WEST AT RIGHT ANGLES TO SAID CENTERLINE 65.00 FEET TO A POINT OF INTERSECTION IN THE NORTHERLY LINE OF LOT 312 IN SAID TRACT, WITH THE NORTHWESTERLY LINE OF THAT PARTICULAR PARCEL OF LAND ACQUIRED BY THE STATE OF CALIFORNIA PER DEED RECORDED JUNE 20, 1986 AS INSTRUMENT NO. 86-771435, FOR THE PROPOSED "CENTURY FREEWAY" AND SHOWN ON A STATE OF CALIFORNIA DIVISION OF HIGHWAYS RIGHT-OF-WAY MAP NO. F1150-6; THENCE SOUTH 02° 00' 07" WEST ALONG SAID NORTHWESTERLY LINE 26.09 FEET TO A POINT IN THE NORTHERLY LINE OF LOT 311 IN SAID TRACT; THENCE SOUTH 75° 23' 53" WEST ALONG SAID LAST MENTIONED NORTHERLY LINE, THE NORTHERLY LINE OF LOT 338 IN SAID TRACT AND THE WESTERLY PROLONGATION THEREOF, 203.56 FEET TO A POINT IN THE CENTERLINE OF PLAZA STREET, 40 FEET WIDE, AS SHOWN ON SAID TRACT; THENCE NORTH 14° 351 48" WEST ALONG SAID CENTERLINE 130.00 FEET; THENCE SOUTH 75° 23' 41" WEST, AT RIGHT ANGLES TO SAID CENTERLINE OF LONG BEACH BOULEVARD, 20.00 FEET TO A POINT IN THE EASTERLY LINE OF LOT 413 IN SAID TRACT; THENCE NORTH 14° 35' 48" ALONG SAID EASTERLY LINE, 21.81 FEET TO THE MOST NORTHERLY CORNER OF SAID LOT 413; THENCE SOUTH 28° 51' 11" WEST ALONG THE WESTERLY LINE OF SAID LOT 413, A DISTANCE OF 30.01 FEET; THENCE LEAVING SAID WESTERLY LINE SOUTH 75° 23' 41" WEST AT RIGHT ANGLES TO SAID CENTERLINE OF LONG BEACH BOULEVARD, 34.44 FEET TO A POINT IN THE CENTERLINE OF COURT STREET 50 FEET WIDE AS SHOWN ON SAID TRACT; THENCE SOUTH 28° 51' 11" WEST, ALONG SAID CENTERLINE 94.03 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE NORTHWESTERLY AND HAVING A RADIUS OF 519.71 FEET; THENCE SOUTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 08° 41' 10" AN ARC LENGTH OF 78.79 FEET NORTH 52° 27' 02" WEST ALONG A RADIAL LINE TO SAID CURVE, 25.00 FEET TO THE MOST EASTERLY CORNER OF LOT 424 OF SAID TRACT; THENCE NORTH 52° 24' 33" WEST ALONG THE NORTHEASTERLY LINE OF SAID LOT, 100,03 FEET TO THE NORTHERLY CORNER THEREOF, SAID NORTHERLY CORNER ALSO BEING IN THE SOUTHEASTERLY LINE OF LOT B, 18,5 FEET WIDE, AS SHOWN ON SAID TRACT; THENCE NORTH 53° 12' 47" WEST 43.48 FEET TO A POINT IN WE CURVED CENTERLINE OF CHESTER STREET, 50 FEET WIDE, AS SHOWN ON SAID TRACT, SAID CURVE HAVING A RADIUS OF 351.21 FEET, WITH A RADIAL LINE TO SAID POINT BEING SOUTH 52° 22' 05" EAST; THENCE NORTHEASTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 08° 46' 07", AN ARC LENGTH OF 53.75 FEET TO A POINT OF TANGENCY IN SAID CENTERLINE, SAID POINT ALSO BEING THE INTERSECTION WITH THE SOUTHEASTERLY PROLONGATION OF THE NORTHEASTERLY LINE OF LOT 439 IN SAID TRACT; THENCE NORTH 61° 08' 12" WEST ALONG SAID NORTHEASTERLY LINE AND SAID PROLONGATION THEREOF, 168.09 FEET TO AN ANGLE POINT THEREIN; THENCE 84° 10' 24" WEST ALONG THE MOST NORTHERLY LINE THEREOF 67.21 FEET TO THE MOST WESTERLY CORNER THEREOF, ALSO BEING THE SOUTHEAST CORNER OF LOT 447 IN SAID TRACT; THENCE NORTH 05° 49' 36" EAST ALONG THE EASTERLY LINE OF SAID LOT 447 AND THE NORTHERLY PROLONGATION THEREOF, 170.00 FEET TO A POINT IN THE CENTERLINE OF SANBORN AVENUE, 40 FEET WIDE, AS SHOWN ON SAID MAP; THENCE NORTH 84° 10' 24" WEST ALONG SAID CENTERLINE, 166.15 FEET TO THE INTERSECTION WITH THE CENTERLINE OF PEACH STREET, 40 FEET WIDE AS SHOWN ON SAID MAP; THENCE NORTH 17° 59' 42" EAST ALONG SAID LAST MENTIONED CENTERLINE, 353,12 FEET TO THE INTERSECTION WITH SAID CENTERLINE OF BEECHWOOD AVENUE; THENCE SOUTH 84° 12' 40" EAST ALONG SAID LAST MENTIONED CENTERLINE, 261.79 FEET TO AN ANGLE POINT THEREIN; THENCE NORTH 75° 25' 12" EAST ALONG SAID

CENTERLINE, 383.75 FEET TO THE POINT OF BEGINNING.

EXCEPT THEREFROM, THOSE PORTIONS OF COURT STREET AND PLAZA STREET THAT WOULD PASS WITH THE CONVEYANCE OF LOT 413 OF SAID TRACT NO. 2551.

ALSO EXCEPT FROM PORTIONS OF LOTS 226 TO 228, ALL OIL, GAS AND OTHER MINERAL RIGHTS IN AND UNDER SAID PROPERTY, TOGETHER WITH THE EXCLUSIVE RIGHT TO USE SUCH PORTION OF SAID PROPERTY LYING MORE THAN 500 FEET BELOW THE SURFACE THEREOF FOR THE EXTRACTION OF OIL, GAS AND MINERALS FROM SAID PROPERTY OR PROPERTY IN THE VICINITY THEREOF; HOWEVER, WITH NO RIGHT OF SURFACE ENTRY WHATSOEVER, AS RESERVED AND EXCEPTED IN DEED RECORDED NOVEMBER 21, 1962 AS INSTRUMENT NO. 2511, IN BOOK D-1830 PAGE 16, OFFICIAL RECORDS.

ALSO EXCEPT FROM PORTIONS OF LOTS 229 TO 233, ALL OIL, GAS, HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND OR PRODUCED AND SAVED THEREFROM, WITHOUT ANY RIGHTS IN THE GRANTOR TO THE USE OF THE SURFACE AND THE SUBSURFACE AREAS OF SAID LAND TO A DEPTH OF 500 FEET FOR ANY PURPOSE TO PRODUCE, PROSPECT FOR AND DEVELOP ANY OF SUCH SUBSTANCES; AND ALSO SPECIFICALLY RESERVING UNTO THE GRANTOR THEREIN, RIGHTS OF WAY AND EASEMENTS IN AND THROUGH THE SUBSURFACE STRATA OF SAID LAND LYING BELOW A PLANE 500 FEET BELOW THE PRESENT SURFACE OF SAID LAND FOR THE PURPOSE OF DRILLING, PROSPECTING FOR AND DEVELOPING OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS LYING IN AND UNDER, AND THE PRODUCING INTERVALS OF WHICH ARE IN LANDS OTHER THAN THE LAND ABOVE DESCRIBED AND FROM THE SURFACE OF LANDS OTHER THAN THE LAND ABOVE DESCRIBED, AS RESERVED BY JACKSON O. LAW, JR., IN DEED RECORDED DECEMBER 11, 1972 AS INSTRUMENT NO. 63, OFFICIAL RECORDS.

ALSO EXCEPT FROM PORTIONS OF LOTS 234 AND 235, ALL OIL, GAS, HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND OR PRODUCED AND SAVED THEREFROM, WITHOUT ANY RIGHTS IN THE (DEFENDANT OR GRANTOR) TO THE USE OF THE SURFACE AND THE SUBSURFACE AREA OF SAID LAND TO A DEPTH OF 500 FEET FOR ANY PURPOSE TO PRODUCE, PROSPECT FOR AND DEVELOP ANY SUCH SUBSTANCES; AND ALSO SPECIFICALLY RESERVING UNTO THE (DEFENDANT DR GRANTOR) THEREIN, RIGHTS OF WAY AND EASEMENTS IN AND THROUGH THE SUBSURFACE STRATA OF SAID LAND LYING BELOW A PLANE 500 FEET BELOW THE SURFACE OF SAID LAND FOR THE PURPOSE OF DRILLING, PROSPECTING FOR AND DEVELOPING OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS LYING IN AND UNDER, AND THE PRODUCING INTERVALS OF WHICH ARE IN LANDS OTHER THAN THE LAND ABOVE DESCRIBED AND FROM THE SURFACE OF LANDS OTHER THAN THE LAND ABOVE DESCRIBED, EXCEPTED BY B. DEAN CLANTON, AS HIS SEPARATE PROPERTY, IN DEED RECORDED NOVEMBER 15, 1972 AS INSTRUMENT NO. 73, OFFICIAL RECORDS.

ALSO EXCEPT FROM LOTS 246, ALL OIL, GAS, HYDROCARBON SUBSTANCES AND MINERALS OF EVERY KIND AND CHARACTER LYING MORE THAN 500 FEET BELOW THE SURFACE OF SAID LAND, TOGETHER WITH THE RIGHT TO DRILL INTO, THROUGH, AND TO USE AND OCCUPY ALL PARTS OF SAID LAND LYING MORE THAN 500 FEET BELOW THE SURFACE THEREOF FOR ANY AND ALL PURPOSES INCIDENTAL TO THE EXPLORATION FOR AND PRODUCTION OF OIL, GAS, HYDROCARBON SUBSTANCES OR MINERALS FROM SAID LAND OR OTHER LANDS BUT WITHOUT, HOWEVER, ANY RIGHT TO USE EITHER THE SURFACE OF SAID LAND OR ANY PORTION OF SAID LAND WITHIN 500 FEET OF THE SURFACE FOR ANY PURPOSE OR

PURPOSES WHATSOEVER, IN DEED RECORDED JANUARY 5, 1978 AS INSTRUMENT NO. 78-11639, OFFICIAL RECORDS.

ALSO EXCEPT FROM LOTS 249, ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES IN UPON OR UNDERLYING SAID LAND WITHOUT THE RIGHT OF ENTRY ABOVE THE DEPTH OF 100 FEET BELOW THE SURFACE OF SAID LAND, AS RESERVED BY ALICE M. WILLIS, A MARRIED WOMAN WHO ACQUIRED TITLE AS ALICE M. MATYSHAK, A WIDOW AND HAROLD L. WILLIS, HER HUSBAND, RECORDED MAY 5, 1959 AS INSTRUMENT NO. 1535, IN BOOK D-455 PAGE 928 OF OFFICIAL RECORDS.

ALSO EXCEPT FROM LOT 253, ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES LYING BELOW A VERTICAL DEPTH OF 500 FEET FROM THE SURFACE OF SAID LAND WITHOUT THE RIGHT OF SURFACE ENTRY THEREOF, IN DEED RECORDED DECEMBER 22, 1977 AS INSTRUMENT NO. 77-1411432, OFFICIAL RECORDS.

ALSO EXCEPT FROM SAID LOT 321 THEREFROM, ALL OIL, GAS, HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND OR PRODUCED AND SAVED THEREFROM WITHOUT ANY RIGHTS IN AND TO THE USE OF THE SURFACE AND THE SUBSURFACE AREAS OF SAID LAND TO A DEPTH OF 500 FEET FOR ANY PURPOSE TO PRODUCE PROSPECT FOR AND DEVELOP ANY OF SUCH SUBSTANCES AND ALSO SPECIFICALLY RESERVING THE HEREIN RIGHTS OF WAY AND EASEMENTS IN AND THROUGH THE SUBSURFACE STRATA OF SAID LAND LYING BELOW A PLANE 500 FEET BELOW THE SURFACE OF SAID LAND, FOR THE PURPOSE OF DRILLING, PROSPECTING FOR AND DEVELOPING OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS LYING IN AND UNDER, AND THE PRODUCING INTERVALS OF WHICH ARE IN LANDS OTHER THAN THE LAND ABOVE DESCRIBED AND FROM THE SURFACE OF LANDS OTHER THAN THE LAND ABOVE DESCRIBED, AS PROVIDED IN THE DEED RECORDED APRIL 10, 1974 AS INSTRUMENT NO. 11, OFFICIAL RECORDS.

ALSO EXCEPT FROM LOT 133, ALL OIL, GAS, HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND OR PRODUCED AND SAVED THEREFROM WITHOUT ANY RIGHTS IN THE GRANTOR TO THE USE OF THE SURFACE AND THE SUBSURFACE AREAS OF SAID LAND TO A DEPTH OF 500 FEET FOR ANY PURPOSE TO PRODUCE, PROSPECT FOR AND DEVELOP ANY OF SUCH SUBSTANCES; AND ALSO SPECIFICALLY RESERVING UNTO THE GRANTOR THEREIN, RIGHTS OF WAY AND EASEMENTS IN AND THROUGH THE SUBSURFACE STRATA OF SAID LAND LYING BELOW A PLANE 500 FEET BELOW THE SURFACE OF SAID LAND FOR THE PURPOSE OF DRILLING, PROSPECTING FOR AND DEVELOPING OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS LYING IN AND UNDER, AND THE PRODUCING INTERVALS OF WHICH ARE IN LANDS OTHER THAN THE LAND ABOVE DESCRIBED AND FROM THE SURFACE OF LANDS OTHER THAN THE LAND ABOVE DESCRIBED, AS RESERVED BY JACKSON O. LAW, JR., RECORDED DECEMBER 11, 1972 AS INSTRUMENT NO. 63, OFFICIAL RECORDS.

ALSO EXCEPT THAT PORTION THEREOF LYING BELOW A DEPTH OF 500 FEET, MEASURED VERTICALLY, FROM THE CONTOUR OF THE SURFACE OF SAID PROPERTY HOWEVER, GRANTOR, OR ITS SUCCESSORS AND ASSIGNS, SHALL NOT HAVE THE RIGHT FOR ANY PURPOSE WHOSOEVER TO ENTER UPON INTO OR THROUGH THE SURFACE OF SAID PROPERTY OR ANY PART THEREOF LYING BETWEEN SAID SURFACE AND 500 FEET BELOW THE SURFACE, AS RESERVED IN DEED RECORDED DECEMBER 15, 1986 AS INSTRUMENT NO. 86-1733235, OFFICIAL RECORDS.

EXCEPT THEREFROM ALL OIL, OIL RIGHTS, MINERALS, MINERAL RIGHTS, NATURAL GAS, NATURAL GAS RIGHTS, AND OTHER HYDROCARBON BY WHATSOEVER NAME KNOWN THAT MAY BE WITHIN OR UNDER THE PARCEL OF LAND HEREIN ABOVE DESCRIBED, TOGETHER WITH THE PERPETUAL RIGHT OF DRILLING, MINING, EXPLORING, AND OPERATING THEREFORE AND REMOVING THE SAME FROM SAID LAND OR ANY OTHER LAND, INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL AND MINE FROM LANDS OTHER THAT THOSE HEREINABOVE DESCRIBED, OIL OR GAS WELLS, TUNNELS, AND SHAFTS INTO, THROUGH OR ACROSS THE SUBSURFACE OF THE LAND HEREINABOVE DESCRIBED, AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS, TUNNELS AND SHAFTS UNDER AND BENEATH OR BEYOND THE EXTERIOR LINES THEREOF, AND TO REDRILL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE ANY SUCH WELLS OR MINES, WITHOUT, HOWEVER, THE RIGHT TO DRILL, MINE, EXPLORE AND OPERATE THROUGH THE SURFACE OR THE UPPER 100 FEET
OF THE SUBSURFACE OF THE LAND HEREINABOVE DESCRIBED OR OTHERWISE IN SUCH MANNER AS TO ENDANGER THE SAFETY OF ANY HIGHWAY THAT MAY BE CONSTRUCTED ON SAID LANDS, AS RESERVED BY MARTHA L. FUHRMAN, A WIDOW, IN DEED RECORDED AUGUST 17, 1973 AS INSTRUMENT NO. 1068, OFFICIAL RECORDS.

PARCEL 20: PORTION OF APN: 6171-004-032

LOT 413, TRACT 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78 TO 80 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 21: PORTION OF APN: 6171-006-037

LOT 449 OF TRACT NO. 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78 TO 80 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM THE SOUTHERLY 55 FEET, MEASURED ALONG THE EASTERLY LINE OF SAID LOT.

PARCEL 22: PORTION OF APN: 6171-006-037

LOT 447 OF TRACT NO. 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78 TO 80 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 23: PORTION OF APN: 6171-006-037

THE NORTH 95 FEET OF LOT 448 OF TRACT NO. 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78 TO 80 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 24: PORTION OF APN: 6171-006-037

THE SOUTH 55 FEET OF LOTS 448 AND 449 OF TRACT NO. 2551, IN THE CITY OF LYNWOOD, COUNTY' OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78, 79 AND 80 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 25: PORTION OF APN: 6171-006-037

LOTS 424 THROUGH 427 INCLUSIVE OF TRACT NO. 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78 TO 80 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 26: PORTION OF APN: 6171-006-037

LOT B OF TRACT NO, 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78 TO 80 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM, THAT PORTION LYING NORTHEASTERLY OF THE NORTHWESTERLY PROLONGATION OF THE NORTHEASTERLY LINE OF LOT 424 OF SAID TRACT NO, 2551.

ALSO EXCEPT THEREFROM THAT PORTION THEREOF LYING BELOW A DEPTH OF 500 FEET MEASURED VERTICALLY, FROM THE CONTOUR OF THE SURFACE OF SAID PROPERTY; HOWEVER, GRANTOR, OR ITS SUCCESSORS AND ASSIGNS, SHALL NOT HAVE THE RIGHT FOR ANY PURPOSE WHATSOEVER TO ENTER UPON INTO OR THROUGH THE SURFACE OF SAID PROPERTY, OR ANY PART THEREOF LYING BETWEEN SAID SURFACE AND 500 FEET BELOW SAID SURFACE, AS RESERVED BY SOUTHERN PACIFIC TRANSPORTATION COMPANY, A DELAWARE CORPORATION SUCCESSOR BY MERGER TO SOUTHERN PACIFIC COMPANY, A DELAWARE CORPORATION WHICH ACQUIRED TITLE AS PACIFIC ELECTRIC RAILWAY CO., IN DEED RECORDED DECEMBER 15, 1986 AS INSTRUMENT NO. 86-1733235, OFFICIAL RECORDS.

PARCEL 27: PORTION OF APN: 6171-006-037

LOTS 434 THROUGH 439 INCLUSIVE, OF TRACT 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78, 79 AND 80 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY'.

EXCEPT THEREFROM THAT PORTION OF LOTS 436, 437 AND 438 OF SAID TRACT 2551. QUITCLAIMED TO THE CITY OF LYNWOOD BY DEED RECORDED FEBRUARY 27, 2007 AS INSTRUMENT NO. 07-0424849, OF OFFICIAL RECORDS.

PARCEL 28: PORTION OF APN: 6171-006-037

THE EASTERLY ONE-HALF OF THAT PORTION OF PEACH STREET (VACATED) BOUNDED SOUTHERLY BY THE WESTERLY PROLONGATION OF THE SOUTHERLY LINE OF LOT 449 OF SAID TRACT NO. 2551, AND NORTHERLY BY THE ELONGATION OF THE CENTERLINE OF SANBORN AVENUE, 40 FEET WIDE; TOGETHER WITH THE SOUTHERLY HALF OF SANBORN AVENUE BOUNDED BY THE EASTERLY RIGHT OF WAY LINE OF SAID PEACH STREET AND THE ELONGATION OF THE EASTERLY LINE OF LOT 447, AS SHOWN ON TRACT NO. 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78 TO SO INCLUSIVE OF MAPS, IN THE OFFICE OF THE LOS ANGELES COUNTY RECORDER, AS VACATED BY RESOLUTION ND. 2003-064, OF THE CITY COUNCIL OF THE CITY OF LYNWOOD, RECORDED MAY 1, 2003 AS INSTRUMENT NO. 03-1251383, OF OFFICIAL RECORDS.

PARCEL 29: PORTION OF APN: 6171-006-037

THAT PORTION OF CHESTER STREET BOUNDED BY THE EASTERLY PROPERTY LINE OF LOT 439, THE SOUTHEASTERLY EXTENSION OF THE SOUTHERLY PROPERTY LINE OF LOT 439, THE CENTERLINE OF CHESTER STREET (50 FEET WIDE), AND THE SOUTHEASTERLY EXTENSION OF THE NORTHERLY PROPERTY LINE OF LOT 439, AS SHOWN ON TRACT NO. 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78 TO 80 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, AS VACATED BY RESOLUTION NO. 2003-076, CITY COUNCIL OF THE CITY OF LYNWOOD, RECORDED MAY 29, 2003 AS INSTRUMENT NO. 03-1533727, OF OFFICIAL RECORDS.

PARCEL 30: PORTION OF APN: 6171-004-032

THAT PORTION OF COURT STREET AND PLAZA STREET BOUNDED BY THE NORTHWESTERLY EXTENSION OF THE NORTHERLY RIGHT OF WAY LINE OF MULFORD AVENUE (40 FEET WIDE), THE CENTERLINE OF COURT STREET (50 FEET WIDE AND PARTIALLY VACATED) FROM MULFORD AVENUE TO THE CENTERLINE OF PLAZA STREET (40 FEET WIDE AND PARTIALLY VACATED), THE CENTERLINE OF PLAZA STREET FROM COURT STREET TO THE SOUTHWESTERLY EXTENSION OF THE SOUTHERLY PROPERTY LINE OF LOT 337, THE EASTERLY PROPERTY' LINE OF 413, AND THE WESTERLY PROPERTY LINE OF LOT 413, AS SHOWN ON TRACT NO, 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78 TO 80 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, AS VACATED BY RESOLUTION NO. 2003-076, CITY COUNCIL, CITY OF LYNWOOD, RECORDED MAY 29, 2003 AS INSTRUMENT NO. 03-1533727, OF OFFICIAL RECORDS.

PARCEL 31: PORTION OF APN: 6171-006-038

THAT PORTION OF FERN WOOD AVENUE, AS DEDICATED BY THE MAP OF MODJESKA TRACT, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 9 PAGES 142 AND 143 OF MAPS, AND TRACT NO, 2551, AS PER MAP RECORDED IN BOOK 24 PAGES 78 TO 80 INCLUSIVE OF MAPS, VACATED BY RESOLUTION NO. 2002.050, RECORDED APRIL 30, 2002 AS INSTRUMENT NO. 02-995125 OF OFFICIAL RECORDS, THAT WOULD PASS WITH A LEGAL CONVEYANCE OF PARCELS 26, 27 AND 32 SHOWN HEREIN.

PARCEL 32: PORTION OF APN: 6171-006-035

THAT PORTION OF CHESTER STREET, 50 FEET WIDE, AS DEDICATED BY THE MAP OF TRACT NO. 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78, 79 AND 80 OF MAPS, AS VACATED BY RESOLUTION NO. 2003.180, RECORDED OCTOBER 6, 2003 AS INSTRUMENT NO. 03-2974163 OF OFFICIAL RECORDS, SAID CHESTER DESCRIBED ON SAID VACATION AS BEING BOUNDED BY THE SOUTHEASTERLY EXTENSION OF THE SOUTHERLY PROPERTY LINE OF LOT 439 AND THE NORTHERLY RIGHT OF WAY LINE OF FERNWOOD AVENUE (VACATED), AS SHOWN ON TRACT NO, 2551, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 24 PAGES 78 TO 80 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM THAT PORTION THEREOF THAT WOULD PASS WITH A LEGAL CONVEYANCE OF LOT 453 OF SAID TRACT NO. 2551.

SAID PARCELS 1 THROUGH 32 INCLUSIVE ARE ALSO KNOWN AS PARCELS 1 THROUGH 5 INCLUSIVE OF PARCEL MAP NO. 26625, IN THE CITY OF LYNWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP FILED IN <u>BOOK 356 PAGES 38</u> TO 69 INCLUSIVE OF PARCEL MAPS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 33:

A NON-EXCLUSIVE RECIPROCAL ACCESS INGRESS AND EGRESS EASEMENT, SUBJECT TO ALL THE TERMS, PROVISIONS, AND CONDITIONS THEREIN CONTAINED, IN THAT CERTAIN EASEMENT AGREEMENT RECORDED AUGUST 22, 1991 AS INSTRUMENT <u>NO. 91-1323309</u>, OF OFFICIAL RECORDS.

## EXHIBIT B

### Senior Loan Documents

(All documents are dated as of June 16, 2016, unless otherwise indicated.)

1.      Promissory Note by Plamex Investment, LLC, a Delaware limited liability company ("***Borrower***"), for the benefit of Natixis, New York Branch, a direct branch of Natixis S.A., a société anonyme à conseil d'administration (public limited company) organized and existing under the laws of France (together with its successors and assigns, "***Lender***")

2.      Replacement Promissory Note A-1 by Borrower for the benefit of Lender;

3.      Replacement Promissory Note A-2 by Borrower for the benefit of Lender;

4.      Replacement Promissory Note A-3 by Borrower for the benefit of Lender;

5.      Replacement Promissory Note A-4 by Borrower for the benefit of Lender;

6.      Replacement Promissory Note A-5 by Borrower for the benefit of Lender;

7.      Replacement Promissory Note A-6 by Borrower for the benefit of Lender;

8.      Loan Agreement between Borrower and Lender;

9.      Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing by Borrower to Stewart Title of California, Inc., a California corporation, for the benefit of Lender;

10.     Assignment of Leases and Rents by Borrower for the benefit of Lender;

11.     Guaranty of Recourse Obligations by Min Chae, a natural person, and Donald Chae, a natural person (collectively, "***Guarantor***");

12.     Note Splitter and Loan Document Modification Agreement between Borrower, Lender and Guarantor;

13.     Performance and Completion Guaranty by Guarantor for the benefit of Lender;

14.     Deposit Account Control Agreement (Wells Fargo Bank, National Association) between Borrower, Lender and Wells Fargo, National Association;

15.     Deposit Account Agreement (PNC Bank) between Borrower, Lender and PNC Bank, National Association;

16.     Assignment and Subordination of Management Agreement by Borrower and Greenland Property Management, LLC, a California limited liability company;

17.     Assignment of Agreements, Licenses, Permits and Contracts by Borrower for the benefit of Lender;

18.     Title Escrow Instruction Letter with Proforma Title Policy;

19.     Post-Closing Agreement by Borrower; and

20.     UCC-1 Financing Statements (County and State), reflecting Borrower as the debtor and Lender as the secured party.

**EXHIBIT C**

Mezzanine Loan Documents

(All documents are dated as of June 16, 2016, unless otherwise indicated)

1.      Mezzanine Loan Agreement between 3100 E. Imperial Investment, LLC, a Delaware limited liability company ("*Mezzanine Borrower*") and Natixis, New York Branch, a direct branch of Natixis S.A., a société anonyme à conseil d'administration (public limited company) organized and existing under the laws of France (together with its successors and assigns, "*Mezzanine Lender*");

2.      Promissory Note by Mezzanine Borrower for the benefit of Mezzanine Lender;

3.      Pledge and Security Agreement by Mezzanine Borrower for the benefit of Mezzanine Lender;

4.      Agreement and Acknowledgment of Pledge by Owner, by Mezzanine Borrower and 3100 E. Imperial Investment, LLC, a Delaware limited liability company, for the benefit of Mezzanine Lender.

5.      Subordination of Management Agreement between Mezzanine Borrower and Greenland Property Management, LLC, a California limited liability company, for the benefit of Mezzanine Lender;

6.      Guaranty of Recourse Obligations by Min Chae, a natural person, and Donald Chae, a natural person (collectively, "*Mezzanine Guarantor*"), for the benefit of Mezzanine Lender;

7.      Performance and Completion Guaranty by Mezzanine Guarantor for the benefit of Mezzanine Lender;

8.      Title Escrow Instruction Letter with Proforma Title Policy;

9.      Post-Closing Agreement by Mezzanine Borrower for the benefit of Mezzanine Lender; and

10.     UCC-1 Financing Statement, reflecting Mezzanine Borrower as the debtor and Mezzanine Lender as the secured party.

## EXHIBIT D

### Permitted Fund Managers

Alliance Bernstein
AREA Global Real Estate
Apollo Real Estate Advisors, L.P.
Blackrock, Inc.
The Blackstone Group International, Ltd.
CBRE Global Investors / CBRE Capital Partners
Clarion Partners
Five Mile Capital Partners
Fortress Investment Group, LLC
GEM Realty Capital
Investcorp International
iStar Financial Inc.
Lend Lease Real Estate Investments, Inc.
Lonestar Opportunity Fund
Principal Life / Principal Real Estate Investors
Rockpoint Group
Square Mile Capital Management
Walton Street Capital LLC
Westbrook Partners
DLJ Real Estate Capital Partners
Colony Capital, Inc.
Praedium Group
Starwood Financial Trust
Prime Financial
Cerberus Capital Management
Centerbridge Capital Partners
Oaktree Capital Partners
The Carlyle Group
Normandy Real Estate Partners
Guggenheim Partners
H/2 Capital Partners
Goldman Sachs Real Estate Mezzanine Partners
Rialto Capital Management, LLC
Waterfall Asset Management

<u>ASSIGNMENT AND ASSUMPTION AGREEMENT</u>
<u>(INTERCREDITOR AGREEMENT)</u>

| | |
|---|---|
| **Senior Lender**<br>**("Senior Lender"):** | SG COMMERCIAL MORTGAGE<br>SECURITIES TRUST 2016-C5<br>Trustee / Wilmington Trust, National Association<br>c/o Wells Fargo Bank, National Association, as Master Servicer<br>MAC D1086 120, 550 South Tryon Street, 14th Floor<br>Charlotte, North Carolina  28202 |
| **Seller of Note**<br>**("Seller"):** | Natixis Real Estate Capital LLC<br>9 West 57th Street<br>New York, New York 10019 |
| **Purchaser of Note**<br>**("Purchaser"):** | Waterfall Olympic Master Fund Grantor Trust, Series III<br>c/o Waterfall Asset Management, LLC<br>1140 Avenue of the Americas, 7th floor<br>New York, New York 10036 |
| **Re:** | Re: 3100 E. Imperial Highway Lynwood, California 90262,<br>Mezzanine Loan. |

Reference is made to (i) That certain mezzanine loan made by Natixis, New York Branch, a direct branch of Natixis S.A., a société anonyme à conseil d'administration (public limited company) organized and existing under the laws of France ("Natixis"), as predecessor in interest to Seller, to 3100 E. Imperial Investment, LLC, a Delaware limited liability company, on June 16, 2016 (the "Loan"), and (ii) that certain Intercreditor Agreement dated June 16, 2016, by Natixis, as predecessor in interest to Senior Lender, as senior lender, and Natixis, as predecessor in interest to Seller, as mezzanine lender (the "Intercreditor Agreement").  All terms used but not defined shall have the meanings set forth in the Intercreditor Agreement.

In connection with the sale of the Loan by Seller to Purchaser, effective as of August 12, 2016, Purchaser hereby (i) assumes all the obligations of Seller under the Intercreditor Agreement arising from and after the date hereof, (ii) agrees to be bound by the terms and provisions of the Intercreditor Agreement, and (iii) remakes each of the representations and warranties contained in the Intercreditor Agreement with respect to Purchaser's authority as if Purchaser was the "Seller," under the Intercreditor Agreement for the benefit of Senior Lender (provided, that notwithstanding the foregoing, in the case of the representations in Section 3(a)(i) of the Intercreditor, (x) such representations relating to the Mezzanine Loan Documents are limited to the knowledge of Purchaser, (y) for purposes of remaking such representations and warranties, Exhibit B to the Intercreditor Agreement is hereby supplemented by adding the documents listed on <u>Schedule 1</u> attached hereto), and (z) Purchaser does not make any representations regarding the existence of any default).

PURCHASER:

**WATERFALL OLYMPIC MASTER FUND
GRANTOR TRUST SERIES III**,
a Delaware statutory trust


By: Waterfall Asset Management, LLC, as Trust's
Agent

By:
Name:          **Thomas Capasse**
Title:          **Authorized Person**

<u>Schedule 1</u>
(Supplement to Exhibit B)

Agreement for Omnibus Amendment, dated as of August 12, 2016, between 3100 E. Imperial
Investment, LLC, a Delaware limited liability company and NATIXIS Real Estate Capital LLC

**Exhibit 10**

## <u>DEPOSIT ACCOUNT AGREEMENT</u>

This **DEPOSIT ACCOUNT AGREEMENT** (this "*Agreement*"), is made as of June 16, 2016, by and among **PNC BANK, NATIONAL ASSOCIATION**, having an address at 620 Liberty Avenue, Two PNC Plaza, Pittsburgh, Pennsylvania 15219 (the "*Deposit Bank*"), **PLAMEX INVESTMENT, LLC**, a Delaware limited liability company, having an address at 3100 East Imperial Highway, Lynwood, California 90262 ("*Borrower*"), and **NATIXIS, NEW YORK BRANCH**, a direct branch of Natixis S.A., a société anonyme à conseil d'administration (public limited company) organized and existing under the laws of France, having an address at 1251 Avenue of the Americas, New York, New York 10020 (together with its successors and assigns, "*Lender*").

<u>R E C I T A L S</u>:

WHEREAS, pursuant to that certain Loan Agreement, dated as of the date hereof (as amended, modified, supplemented, restated or replaced from time to time, the "*Loan Agreement*"), between Lender and Borrower, Lender has agreed to provide financing to Borrower secured by a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of the date hereof (the "*Security Instrument*"), on certain real property owned by Borrower and known as Plaza Mexico in Lynwood, California (the "*Property*") (capitalized terms used herein and not herein defined shall have the meanings assigned to such terms in the Loan Agreement); and

WHEREAS, Borrower and GREENLAND PROPERTY MANAGEMENT, LLC, a California limited liability company (the "*Manager*") are parties to a management agreement with respect to the Property pursuant to which the Manager has agreed to manage the Property; and

WHEREAS, the Loan Agreement provides that all Rents shall be sent directly to one or more financial institutions acceptable to Lender for deposit into an account designated and established by Lender or its designee; and

WHEREAS, pursuant to an agreement (the "*Clearing Account Agreement*") between Borrower, Lender and the bank listed on **<u>Schedule 1</u>** (the "*Clearing Bank*") with respect to the bank account identified on **<u>Schedule 1</u>** (the "*Clearing Account*"), the Clearing Bank will receive and process deposits presented by or on behalf of Borrower, the Manager or any of their respective agents and will transfer by wire transfer amounts constituting available funds on deposit in the Clearing Account to the Deposit Account (as defined below); and

WHEREAS, Lender and Borrower desire to retain the Deposit Bank to provide the services described herein.

NOW THEREFORE, in consideration of the mutual promises contained herein and for other good and valuable consideration the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## 1.    <u>Duties of the Deposit Bank and Lender.</u>

(a)    Lender shall establish and maintain at the Deposit Bank a "deposit account" as defined in Section 9-102(a)(29) of the UCC (the "***Deposit Account***") which shall be an Eligible Account (as defined below) entitled as follows:

| | |
|---|---|
| Name: | Plamex Investment, LLC for the benefit of Natixis, New York Branch, as secured party – Deposit Account |
| Account No.: | 1029065216 |
| ABA: No.: | 043000096 |

The Deposit Bank shall deposit into the Deposit Account the Rents for the Property and any other amounts transferred to the Deposit Bank pursuant to the Clearing Account Agreement. The Deposit Bank shall hold amounts deposited in the Deposit Account for Lender and shall not commingle such amounts with any other amounts held on behalf of Lender or any other Person. The Deposit Account shall be under the sole dominion and control of Lender (which may be exercised through its designee) and Lender (and its designee) shall have the sole right to make withdrawals from the Deposit Account and to exercise all rights with respect to the amounts deposited from time to time in the Deposit Account; *provided, however,* that so long as no Event of Default shall exist under the Loan Agreement, Lender shall direct its designee or the Deposit Bank to make disbursements out of the Deposit Account (and the Subaccounts therein), from time to time, in accordance with the Loan Agreement and this Agreement, and for the purposes set forth therein and herein.

(b)    The Deposit Bank shall maintain on a ledger entry basis the following subaccounts (collectively, the "***Subaccounts***") entitled: (i) "Tax and Insurance Subaccount"; (ii) "Cash Management Fee Subaccount"; (iii) "Monthly Debt Service Subaccount"; (iv) "Operating Expense Subaccount"; (v) "Capital Reserve Subaccount"; (vi) "Rollover Reserve Subaccount"; (vii) "Required Repairs Subaccount"; (viii) "Casualty/Condemnation Subaccount"; (ix) "Security Deposit Subaccount"; (x) "Borrower's Subaccount"; (xi) "Cash Collateral Reserve Subaccount", (xii) "Food 4 Less Cash Trap Reserve Subaccount"; (xiii) "Free Rent Reserve Subaccount"; (xiv) "Planet Fitness TI/LC Reserve Subaccount"; (xv) "Food 4 Less CAM Reserve Subaccount"; (xvi) "La Curacao CAM Reserve Subaccount"; (xvii) "Litigation Reserve Subaccount"; (xviii) "Proposed Construction Subaccount"; and (xix) "Earthquake Insurance Reserve Subaccount".

(c)    On each Payment Date, Lender or its designee shall direct the Deposit Bank to disburse amounts received during the most recent Receipts Period from the Deposit Account pursuant to disbursement instructions ("***Disbursement Instructions***").  Items deposited with the Deposit Bank which are returned for insufficient or uncollected funds will be re-deposited the first time.  Items returned unpaid the second time for whatever reason shall be debited to the Deposit Account under advice and returned to Borrower.  Borrower shall be liable to the Deposit Bank for the amount of any exchange or collection charges incurred by the Deposit Bank. Return item fees will be charged directly to the Deposit Account.  The Deposit Bank shall make available a monthly report to Borrower and Lender, which monthly report shall specify the amount deposited into the Deposit Account with respect to the Property for the previous month. Notwithstanding the provisions of this <u>Section 1(c)</u> to the contrary, Deposit Bank shall follow its

NY:1795949.5

customary procedures for (i) the receipt and processing of deposits, (ii) the availability of reports and copies relating to the Subaccounts, (iii) the actions to be taken for items returned, and (iv) determining whether or not to honor any checks, drafts or other payment requests drawn on or with respect to the Deposit Account.  Any electronic fund transfers (wire, automated clearing house, etc.) to or from the Deposit Account will be subject to the terms and conditions of Deposit Bank's standard agreements for such services, as in effect and as amended from time to time.  The term "***Receipts Period***" means the period from and including the prior Payment Date through and including the Business Day prior to the Payment Date on which the disbursement is made; provided, however, for the first Payment Date, the Receipts Period shall be the period from the date hereof through and including the Business Day prior to the first Payment Date.  If no Disbursement Instructions are received on or prior to such Payment Date, the Deposit Bank shall disburse amounts from the Deposit Account pursuant to the Disbursement Instructions received from Lender or its designee with respect to the preceding Receipts Period.  As used herein the term "***Payment Date***" means the fifth (5th) day of each calendar month or, if the fifth (5th) day of any calendar month is not a Business Day, then the Payment Date for such month shall be the immediately preceding Business Day.

(d)    So long as no Event of Default under the Loan Documents has occurred and is continuing, Lender or its designee shall instruct the Deposit Bank to invest amounts held in the Deposit Account in Permitted Investments (as defined below) as Lender shall determine in Lender's discretion.  All funds in the Deposit Account or any Subaccount that are invested in a Permitted Investment are deemed to be held in such Deposit Account or Subaccount for all purposes of this Agreement and the other Loan Documents.  The maturities of the Permitted Investments on deposit in the Deposit Account or any Subaccount shall, to the extent such dates are ascertainable, be selected and coordinated to become due not later than the day before any disbursements from the Subaccounts must be made.  All Permitted Investments shall be held in the name and be under the sole dominion and control of Lender or its designee.  Deposit Bank and Lender shall have no liability for any loss in investments of funds in the Deposit Account or Subaccount that are invested in Permitted Investments.  Borrower shall include all such earnings and losses on the Deposit Account or any Subaccount as income or losses, as the case may be, of Borrower for federal and applicable state tax purposes.

(e)    "***Eligible Account***" shall mean either (i) an account maintained with a depository institution or trust company, the short term unsecured debt obligations or commercial paper of which are rated at least A-1 (or equivalent) by each Rating Agency in the case of accounts in which funds are held for thirty (30) days or less (or, in the case of accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least A (or equivalent) by each Rating Agency) or (ii) a segregated trust account maintained with the trust department of a federal or state chartered depository institution or trust company acting in its fiduciary capacity which institution or trust company is subject to regulations similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and is subject to federal and state authority.

(f)    "***Permitted Investments***" shall mean any one or more of the following obligations or securities payable on demand or having a scheduled maturity on or before the Business Day preceding the date upon which such funds are required to be drawn, and having at all times the required ratings, if any, provided for in this definition: any Money Market Fund (the "***Fund***") so

long as the Fund is rated "AAA M" or "AAA M-G" by each Rating Agency (or, if not rated by any Rating Agency other than Standard & Poor's Ratings Group, otherwise acceptable to such Rating Agency or Agencies, as applicable, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the then current ratings assigned to any Securities).

       2.    **Fees.**  Borrower hereby agrees to pay the fees and expenses of the Deposit Bank and any successor thereto, for performing the services described herein.

       3.    **Termination.**  The Deposit Bank may resign from its obligations under this Agreement at any time after thirty (30) days' prior written notice to the other parties hereto, but in no event shall the Deposit Bank be released of its obligations hereunder unless and until a substitute bank has been designated and assumed the obligations hereunder.  Lender shall designate a substitute Deposit Bank, in its sole discretion, promptly after receipt of notice of resignation by the Deposit Bank and shall take all reasonable actions necessary to cause such designated successors promptly to assume the obligations of the Deposit Bank hereunder. Lender may terminate this Agreement at any time after thirty (30) days' prior written notice to the other parties hereto.  Borrower has no right to terminate this Agreement or close the Deposit account established hereunder.  Notwithstanding anything to the contrary contained in the foregoing, Deposit Bank may resign from this Agreement immediately upon written notice to Lender and Borrower in the event Deposit Bank has a commercially reasonable belief that fraud or other illegal activity has occurred in connection with the Deposit Account or this Agreement.

       4.    **Set-off.**  The Deposit Bank and Borrower acknowledge and agree that the Deposit Account and the Subaccounts maintained hereunder are subject to the sole dominion, control and discretion of Lender, its authorized agents or designees and Borrower shall have no right to close, and no right of withdrawal with respect to, any such account except with the prior written consent of Lender.  The Deposit Bank waives any right to offset any claim against Borrower which it might have against any account maintained hereunder, provided, however, that the Deposit Bank may charge or set off against the Deposit Account for (i) any of Deposit Bank's charges, fees and expenses provided for herein for which Borrower is responsible that have not been paid or satisfied after written demand from Deposit Bank, (ii) all items deposited in and credited to the Deposit Account and subsequently returned unpaid or with respect to which Deposit Bank fails to receive final settlement, (iii) all charges and obligations and liabilities arising out of any cash management services provided by Deposit Bank under this Agreement, including, but not limited to, Automated Clearing House transactions that have not been paid or satisfied after written demand from Deposit Bank, and (iv) any amounts deposited in the Deposit Account in error or as necessary to correct processing errors.  If there are insufficient collected funds in the Deposit Account to cover the amount of any returned check or other adjustment or correction to be debited thereto, Borrower shall repay Deposit Bank the amount of such debit immediately upon demand.

       5.    **Matters Concerning Borrower and Manager.**

       (a)    Borrower and the Manager hereby agree to deposit with the Clearing Bank within one Business Day of receipt, all Rents received by Borrower or the Manager, respectively, with respect to the Property.  Borrower hereby pledges, transfers and assigns to Lender, and grants to

NY:1795949.5

Lender, as additional security for the Debt, a continuing perfected security interest in and to, and a general first lien upon, (i) the Deposit Account, the Clearing Account and all of Borrower's right, title and interest in and to all cash, property or rights transferred to or deposited in the Deposit Account or the Clearing Account from time to time by Borrower or on behalf of Borrower in accordance with the provisions of this Agreement, (ii) all earnings, investments and securities held in the Deposit Account or the Clearing Account in accordance with this Agreement or the Clearing Account Agreement, as the case may be, and (iii) any and all proceeds of the foregoing.  Borrower further agrees to execute, acknowledge, deliver, file or do, at its sole cost and expense, all other acts, assignments, notices, agreements or other instruments as Lender may reasonably require in order to effectuate, assure, convey, secure, assign, transfer and convey unto Lender any of the rights granted by this Section 5(a).

(b)      Borrower shall have the right to access information regarding the Deposit Account through PNC's Pinacle Web internet product.

**6.      Certain Matters Regarding Lender.**

(a)      The parties agree that the Deposit Bank shall pay over to Lender all amounts deposited in the Deposit Account or any Subaccount maintained hereunder on demand, without notice to Borrower, *provided, however*, that in making such demand, Lender certifies, in a writing, signed by Lender or an authorized agent thereof, that an Event of Default has occurred and is continuing.

(b)      Upon the request of Lender, Lender shall be entitled to receive copies of all reports, advices, statements and other information supplied hereunder as Lender shall reasonably request.

**7.      Indemnification.**  The Deposit Bank shall not be liable for any claims, suits, actions, costs, damages, liabilities or expenses or for any interruption of services, or incidental, consequential, special or punitive damages ("***Liabilities***") in connection with the subject matter of this Agreement other than Liabilities caused by the gross negligence or willful misconduct of the Deposit Bank.  Borrower hereby agrees to indemnify and hold harmless the Deposit Bank and its Affiliates and the directors, officers, employees and agents of any of them, and the respective successors and assigns of the Deposit Bank from and against any and all Liabilities (including without limitation, reasonable attorneys' fees and disbursements) arising from or in connection with any acts or omissions taken by the Deposit Bank or any Affiliate or any director, officer, employee or agent of any of them in connection with this Agreement, other than those Liabilities caused by the gross negligence or willful misconduct of the Deposit Bank or such indemnified party.  Lender hereby agrees to indemnify and hold harmless the Deposit Bank and its Affiliates and the directors, officers, employees and agents of any of them, and the respective successors and assigns of the Deposit Bank from and against any and all Liabilities arising from or in connection with the Deposit Bank complying with the written instructions of Lender or its designee pursuant to this Agreement, other than those Liabilities caused by the gross negligence or willful misconduct of the Deposit Bank or such indemnified party.  Borrower hereby agrees not to assert any claims, suits or actions against Deposit Bank or its Affiliates or the directors, officers, employees and agents of any of them, or the respective successors and assigns of the Deposit Bank, arising from Deposit Bank complying with the written instructions of the Lender

NY:1795949.5

or its designee pursuant to this Agreement, other than those claims, suits or actions arising from the gross negligence or willful misconduct of the Deposit Bank.  This <u>Section 7</u> shall survive termination of this Agreement.

**8.    <u>Successors and Assigns; Assignments.</u>**  This Agreement shall bind and inure to the benefit of and be enforceable by the Deposit Bank, Borrower and Lender and their respective successors and assigns.  Lender shall have the right to assign or transfer its rights under this Agreement without limitation.  Any assignee or transferee shall be entitled to all the benefits afforded Lender under this Agreement; *provided, however*, that such assignee or transferee shall have delivered to the other parties hereto written confirmation that such assignee or transferee agrees to be bound by the terms of this Agreement and is also the assignee or transferee of the Loan Agreement, the Note and the Security Instrument.  The Deposit Bank shall have the right to assign or transfer its rights and obligations hereunder only in connection with a termination, as set forth in <u>Section 3</u> hereof, or with the prior consent of Lender.  Borrower shall have the right to assign and transfer its rights and obligations hereunder only with the prior consent of Lender or as may be otherwise permitted under the Loan Documents.

**9.    <u>Amendments.</u>**  This Agreement may be amended from time to time in writing by all parties hereto.

**10.    <u>Notices.</u>**  Notices to the Deposit Bank should be sent to: PNC Bank, National Association, 500 First Avenue, Pittsburgh, Pennsylvania 15219, Attention: Thomas Boyce (Telecopy (866) 830-1520); notices to Borrower should be sent to the address first above written or by telecopy to (310) 631-6999, Attention: Min Chae and/or Donald Chae; and notices to Lender should be sent to the address first above written or by telecopy to (212) 891-5777, Attention: Real Estate Administration (Khaled Mohiuddin); or, in each case, to such other address as shall be designated in writing by the respective party to the other parties hereto.  Unless otherwise expressly provided herein, all such notices, to be effective, shall be in writing (including by facsimile), and shall be deemed to have been duly given or made (a) when delivered by hand or by nationally recognized overnight carrier, (b) upon receipt after being deposited in the mail, certified mail and postage prepaid or (c) in the case of facsimile notice, when sent and electronically confirmed, addressed as set forth above.

**11.    <u>Governing Law and Venue.</u>  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES APPLIED IN NEW YORK).   ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST DEPOSIT BANK, LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND THE DEPOSIT BANK AND BORROWER WAIVE ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND THE DEPOSIT BANK AND BORROWER HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.**

**12.    <u>Certain Matters Affecting the Deposit Bank.</u>**  The Deposit Bank may rely and shall be protected in acting or refraining from acting upon any notice (including but not limited

NY:1795949.5

to electronically confirmed facsimiles of such notice) believed by it to be genuine and to have been signed or presented by the proper party or parties.  The duties and obligations of the Deposit Bank shall be determined solely by the express provisions of this Agreement.  The Deposit Bank shall not be liable except for the performance of such party's duties and obligations as are specifically set forth in this Agreement, and except as set forth in <u>Section 7</u> hereof, no implied covenants or obligations shall be read into this Agreement against the Deposit Bank.  This <u>Section 12</u> shall survive termination of this Agreement.

      **13.**    **<u>Right to Place Hold; Interpleader.</u>**  If at any time: (a) Deposit Bank, in good faith, is in doubt as to the action it should take under this Agreement, or (b) Borrower becomes subject to a voluntary or involuntary bankruptcy, reorganization, receivership or similar proceeding, or (c) Deposit Bank is served with legal process which it in good faith believes prohibits the disbursement of the funds deposited in the Deposit Account then Deposit Bank shall have the right (i) to place a hold on the funds the Deposit Account until such time as it receives an appropriate court order or other assurance satisfactory to it as to the disposition of the funds in the Deposit Account, or (ii) to commence, at Borrower's expense, an interpleader action in any competent Federal or State Court located in the State of New York, and otherwise to take no further action except in accordance with joint written instructions from Borrower and Lender or in accordance with the final order of a competent court, served on Deposit Bank.

      **14.**    **<u>Jurisdiction of Deposit Bank.</u>**  New York shall be deemed to be the Deposit Bank's "jurisdiction" (within the meaning of Section 9-304 of the UCC in effect in the State of New York), and the Deposit Account and the Subaccounts shall be governed by the law of the State of New York.

      **15.**    **<u>Counterparts</u>**.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument.  Signature pages may be detached from the counterparts and attached to a single copy of this Agreement to physically form one document.

[The Remainder of the Page is Intentionally Blank]

NY:1795949.5

IN WITNESS WHEREOF, the parties hereto have executed this Agreement in several counterparts (each of which shall be deemed an original) as from the date first above written.

DEPOSIT BANK:

PNC BANK, NATIONAL ASSOCIATION

By: _____

Name: _____

Title: _____

Peggy Kiely
Assistant Vice President

[Signatures continue on the following page.]

Plaza Mexico
Signature Page to DAA

BORROWER:

**PLAMEX INVESTMENT, LLC,**
a Delaware limited liability company

By:    3100 E. Imperial Investment, LLC,
        a Delaware limited liability company

        By:  Placo Investment, LLC,
           a  Delaware limited liability company

        By:_____
           Name: Donald Chae
           Title:   Manager

[Signatures continue on the following page.]

LENDER:

NATIXIS, NEW YORK BRANCH,
a direct branch of Natixis S.A., a société anonyme à
conseil d'administration (public limited company)
organized and existing under the laws of France

By: _____

    Name: Andrew Levine

    Title:   Director

By: _____

    Name: Timothy Bachman

    Title:   Director

[Signatures continue on the following page.]

The Manager hereby agrees to the
provisions of <u>Section 5</u> hereof:

MANAGER:

**GREENLAND PROPERTY MANAGEMENT, LLC,**
a California limited liability company

By: _____

    Name: Donald Chae
    Title: Manager

## <u>SCHEDULE 1</u>
[CLEARING BANK & CLEARING ACCOUNT INFORMATION]

Wells Fargo Bank, National Association
ABA#: 121-000-248
Account #: 4003131414
Account Name:  Plamex Investment, LLC fbo Natixis, New York Branch (DACA)

**Exhibit 11**



# DEPOSIT ACCOUNT CONTROL AGREEMENT

## (Hard Lockbox)

This **Deposit Account Control Agreement** (the "Agreement") is made as of June 16, 2016, by and among **Plamex Investment, LLC**, a Delaware limited liability company ("Borrower"), **Natixis, New York Branch**, a direct branch of Natixis S.A., a société anonyme à conseil d'administration (public limited company) organized and existing under the laws of France ("Lender") and **Wells Fargo Bank, National Association** ("Bank"), and sets forth the rights and obligations of the parties with respect to the DACA Account (defined below).

1.    **Establishment of Account.**

a.    Borrower and Bank acknowledge and confirm that Borrower has, in accordance with the terms of the Loan Agreement of even date herewith between Borrower and Lender (the "Loan Agreement") established with Bank an account or accounts with account number(s) as set forth below (individually or collectively, the "DACA Account"), and that the DACA Account is subject to lockbox services provided by Bank in accordance with Section 7 of this Agreement and Bank's standard lockbox policies and procedures.

b.    The DACA Account shall be in the name of Borrower for the benefit of Lender (or in such other name as Lender may direct in writing and agreed to by Bank).

c.    Each account designated as a DACA Account includes, for purposes of this Agreement, and without the necessity of separately listing subaccount numbers, all subaccounts presently existing or hereafter established for deposit reporting purposes and integrated with the DACA Account by an arrangement in which deposits made through subaccounts are posted only to the DACA Account.

d.    The DACA Account (Account No. 4003131414) (ABA #121-000-248) shall at all times have a minimum balance of $5,000 (the "Minimum Balance").

e.    The DACA Account is an Eligible Account.  As used herein, (i) "Eligible Account" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (i) an account or accounts maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (ii) a segregated trust account or accounts maintained with a federal or state chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a state chartered depository institution or trust company is subject to regulations substantially similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and state authority.  An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument and (ii) "Eligible Institution" shall mean a depository institution or trust company insured

by the Federal Deposit Insurance Corporation the short term unsecured debt obligations or commercial paper of which are rated at least "A-1" by Standard & Poor's Ratings Group ("S&P"), "P-1" by Moody's Investors Service, Inc. ("Moody's"), and "F-1+" by Fitch, Inc. ("Fitch") in the case of accounts in which funds are held for thirty (30) days or less or, in the case of Letters of Credit or accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least "A-" by Fitch and S&P and "A2" by Moody's.

2.    **Lender's Interest in DACA Account.**  Borrower represents that it has granted, or intends to grant, a security interest in the DACA Account to Lender.  Borrower hereby confirms the security interest granted, or to be granted, by Borrower to Lender in all of Borrower's right, title and interest in and to the DACA Account and all sums now or hereafter on deposit in or payable or withdrawable from the DACA Account (the "DACA Account Funds"), which includes, if applicable, all financial assets, security entitlements, investment property, and other property and the proceeds thereof now or at any time hereafter held in the DACA Account).  Lender hereby appoints Bank as agent for Lender solely for the purpose of perfecting the security interest of Lender in the DACA Account and the DACA Account Funds.

3.    **Lender Control.**  Except as otherwise provided in this Agreement, Borrower agrees that the DACA Account and the DACA Account Funds are subject to the sole dominion, control and discretion of Lender.  Bank, Lender and Borrower each agrees that Bank will comply with instructions given to Bank by Lender directing disposition of funds in the DACA Account (collectively "Disposition Instructions") without further consent by Borrower or any other person.  Except as otherwise required by law, Bank will not agree with any third party to comply with instructions for disposition of funds in the DACA Account.

4.    **No Access to DACA Account.**  Borrower acknowledges and agrees that (a) subject to the terms hereof, neither Borrower nor any other person claiming on behalf of, or through, Borrower shall have any right, title or interest, whether express or implied, in the DACA Account or to withdraw or make use of any amounts from the DACA Account, and (b) unless required by applicable law, Borrower shall not be entitled to any interest on amounts held in the DACA Account.

5.    **Disbursements from DACA Account.**

a.    Unless otherwise instructed by Lender in writing in accordance with Section 3 above, Bank will transfer the full amount of the collected and available balance in the DACA Account (after deduction of the Minimum Balance and other amounts permitted under Section 6 hereof), on each Business Day by wire transfer (or other means in Bank's sole discretion) of immediately available funds to such account specified by Lender in writing.

"Business Day" means any day on which Bank is open to conduct its regular banking business, other than a Saturday, Sunday or public holiday.

b.      Unless Bank separately agrees in writing to the contrary, Bank will have no obligation to disburse funds or assets under this Agreement other than by automatic standing wire. Any disposition of funds or assets which Bank makes pursuant to this Agreement is subject to Bank's standard policies, procedures and documentation governing the type of disposition made; provided, however, that in no circumstances will any such disposition require Borrower's consent. Furthermore, Bank will have a reasonable opportunity to act upon any instructions (including Disposition Instructions) provided pursuant to this Agreement.

c.      Funds available for disbursement from the DACA Account in accordance with this Section 5 shall not include any rents or additional rents which are paid for more than one month in advance, which shall be retained in the DACA Account and not released without Lender's written consent until payment thereof is due under the applicable lease or agreement. Lender and Borrower agree to notify Bank in writing as to the amount of any such rents and/or additional rents that should be retained in the DACA Account and the date such funds may be disbursed from the DACA Account in such manner as to afford Bank a reasonable opportunity to act upon such notice.

6.      **Partial Subordination of Bank's Rights.**    Bank hereby subordinates to the security interest of Lender in the DACA Account (i) any security interest which Bank may have or acquire in the DACA Account, and (ii) any right which Bank may have or acquire to set off or otherwise apply any DACA Account Funds against the payment of any indebtedness from time to time owing to Bank from Borrower; provided, however, that, Bank retains the right to set off against and to charge the DACA Account for (A) any Bank Fees (as defined in Section 9), (B) all items deposited in and credited to such account and subsequently returned unpaid or with respect to which Bank fails to receive final settlement and (C) all items deposited in and credited to such account in error. If amounts in the DACA Account are insufficient to fully reimburse Bank for such amounts, Borrower agrees to pay such deficiency to Bank in immediately available funds, without setoff or counterclaim, within five (5) calendar days after demand of Bank.

7.      **Bank Obligations with respect to DACA Account.**

a.      To the extent items deposited to a DACA Account have been received in one or more post office lockboxes maintained for Borrower by Bank (each a "Lockbox") and processed by Bank for deposit, Borrower acknowledges that Borrower has granted Lender a security interest in all such items (the "Remittances"). Until all sums due Lender pursuant to the Loan Agreement have been paid in fill, Lender alone will have the right and ability to so instruct Bank regarding the receipt, processing or deposit of Remittances. Borrower and Lender acknowledge and agree that Bank's operation of each Lockbox, and the receipt, retrieval, processing and deposit of Remittances, will at all times be governed by Bank's Master Agreement for Treasury Management Services and the relevant lockbox service description, and by Bank's procedures set forth on Exhibit A attached hereto.

b.      The parties agree that items deposited in the DACA Account shall be deemed to bear the valid and legally binding endorsement of the payee and to comply with all of Bank's requirements for the supplying of missing endorsements, now or

hereafter in effect.  As between Borrower and Lender, any deposit made by or on behalf of Borrower into the DACA Account shall be deemed deposited into the DACA Account when the funds in respect of such deposit shall become collected funds.

c.      Any item deposited by or on behalf of Borrower in the DACA Account which is returned for insufficient or uncollected funds will be re-deposited by Bank one time.

8.      **Balance Reports and Bank Statements.**  Borrower agrees that it shall, at its sole cost and expense, make available to Lender information directly related to the DACA Account, including granting Lender online access to Borrower's treasury reporting with Bank (if any).  Bank will, at the telephone or written request of Lender, provide Lender such information by a transmission method determined by Bank, in Bank's sole discretion, which may include granting Lender online access to Borrower's treasury reporting (if any), and Borrower consents to the provision of such information to Lender.

9.      **Bank Fees.**  Borrower agrees to pay all Bank's fees and charges for the maintenance and administration of the DACA Account and for the treasury management and other account services provided with respect to the DACA Account and any Lockboxes (collectively, the "Bank Fees"), including, but not limited to, the fees for (a) treasury reporting (including online access thereto) provided on the DACA Account, (b) funds transfer services received with respect to the DACA Account, (c) lockbox processing services, (d) funds advanced to cover overdrafts in the DACA Account (but without Bank being in any way obligated to make any such advances), (e) duplicate bank statements, (f) any treasury management service(s) that may be required to block the DACA Account as contemplated hereunder, and (g) the Acceptance Fee, as described in Exhibit B, attached hereto, in each case, to the extent applicable.  The Bank Fees will be paid by Bank debiting one or more of the DACA Account on the Business Day that the Bank Fees are due, without notice to Lender or Borrower.  If there are not sufficient funds in the DACA Account to cover fully the Bank Fees on the Business Day Bank attempts to debit them from the DACA Account, such shortfall or the amount of such Bank Fees will be paid by Borrower to Bank, without setoff or counterclaim, within five (5) calendar days after demand from Bank.

10.     **Account Documentation.**  Except as specifically provided in this Agreement, Lender and Borrower agree that the DACA Account will be subject to, and Bank's operation of the DACA Account will be in accordance with, the terms of Bank's applicable deposit account agreement and other related service documentation governing the DACA Account (the "Account Documentation").  Borrower agrees, upon Bank's request, to promptly execute and deliver the Account Documentation to Bank.  For the avoidance of doubt, the parties hereto acknowledge and agree that pursuant to the Account Documentation, the DACA Account may be subject to Bank's sweep product services. The parties agree that, in the event of a conflict between this Agreement and the Account Documentation with respect to the DACA Account, this Agreement shall control.

11.  **Legal Compliance.**

   a.   If Bank at any time receives notice of the commencement of a bankruptcy case or other insolvency or liquidation proceeding by or against Borrower, Bank will continue to comply with its obligations under this Agreement, except to the extent that any action required of Bank under this Agreement is prohibited under applicable bankruptcy laws or regulations or is stayed pursuant to the automatic stay imposed under the United States Bankruptcy Code or by order of any court or agency.

   b.   Bank will comply with any legal process, legal notice or court order it receives in relation to the DACA Account if Bank determines in its sole discretion that the legal process, legal notice or court order is legally binding on it.

   c.   If at any time Bank, in good faith, is in doubt as to the action it should take under this Agreement, Bank shall have the right (i) to commence an interpleader in the United States District Court in the State of New York, and/or (ii) to take no further action, except, in each case, in accordance with joint instructions from Lender and Borrower or in accordance with the final order of the court in such action.

12.  **Indemnification.**   Borrower will indemnify, defend and hold harmless Bank and its officers, directors, employees, and agents (collectively, the "Indemnified Parties") from and against any and all claims, demands, losses, liabilities, damages, costs and expenses (including reasonable attorneys' fees) (collectively "Losses and Liabilities") Bank may suffer or incur as a result of or in connection with (a) Bank complying with any binding legal process, legal notice or court order referred to in the immediately preceding Section of this Agreement, (b) Bank following any instruction or request of Lender, including but not limited to any Disposition Instructions, or (c) Bank complying with its obligations under this Agreement, except, in each case, to the extent such Losses and Liabilities are directly caused by Bank's gross negligence or willful misconduct.

13.  **Termination.**   This Agreement may be terminated by Lender or Bank at any time by either of them giving thirty (30) calendar days prior written notice of such termination to the other parties to this Agreement at their contact addresses specified after their signatures to this Agreement; provided, however, that this Agreement may be terminated (i) immediately upon prior written notice from Bank to Borrower and Lender (x) should Borrower or Lender fail to make any payment when due to Bank from Borrower or Lender under the terms of this Agreement or (y) should Bank close the DACA Account pursuant to applicable law, regulation or policy, or (ii) immediately upon prior written notice from Lender to Bank on termination or release of Lender's security interest in the DACA Account; provided that any notice from Lender under clause (ii) of this sentence must contain Lender's acknowledgement of the termination or release of its security interest in the DACA Account.  Borrower's payment obligations hereunder, as well as the indemnifications made, and the limitations on the liability of Bank accepted by Borrower and Lender under this Agreement will continue after the termination of this Agreement with respect to all the circumstances to which they are applicable, existing or occurring before such termination, and any liability of any party to this Agreement, as determined under the provisions of this Agreement, with respect to acts or omissions of such party

prior to such termination will also survive such termination.  Upon any termination of this Agreement, Bank will transfer all collected and available balances (less any deductions permitted under <u>Section 6</u> hereof) in the DACA Account on the date of such termination in accordance with Lender's written instructions.

14.    **<u>Modifications, Amendments, and Waivers.</u>**  This Agreement may not be modified or amended, or any provision thereof waived, except in a writing signed by all the parties to this Agreement.

15.    **<u>Notices.</u>**  All notices from one party to another must be in writing, must be delivered to Borrower, Lender and/or Bank at their contact addresses specified after their signatures to this Agreement, or any other address of any party communicated to the other parties in writing, and will be effective on receipt.  Any notice sent by a party to this Agreement to another party must also be sent to all other parties to this Agreement.  Bank is authorized by Borrower and Lender to act on any instructions or notices received by Bank if (a) such instructions or notices purport to be made in the name of Lender, (b) Bank reasonably believes that they are so made, and (c) they do not conflict with the terms of this Agreement as such terms may be amended from time to time, unless such conflicting instructions or notices are supported by a court order.

16.    **<u>Successors and Assigns.</u>**  Neither Borrower nor Lender may assign or transfer its rights or obligations under this Agreement to any person or entity without the prior written consent of Bank, which consent will not be unreasonably withheld or delayed. Notwithstanding the foregoing, Lender may transfer its rights and duties under this Agreement to (i) a transferee to which, by contract or operation of law, Lender transfers substantially all of its rights and duties under the financing or other arrangements between Lender and Borrower, or (ii) if Lender is acting as a representative in whose favor a security interest is created or provided for, a transferee that is a successor representative; provided, that, in any case, as between Bank and Lender, Lender will not be released from its obligations under this Agreement unless and until Bank receives any such transferee's binding written agreement to assume all of Lender's obligations hereunder.  Bank may not assign or transfer its rights or obligations under this Agreement to any person or entity without the prior written consent of Lender, which consent will not be unreasonably withheld or delayed; provided, however, that no such consent will be required if such assignment or transfer takes place as part of a merger, acquisition or corporate reorganization affecting Bank.

17.    **<u>Governing Law.</u>**  This Agreement will be governed by and be construed in accordance with the laws of the State of New York, without regard to conflict of laws principles. This state will also be deemed to be Bank's jurisdiction, for purposes of Article 9 of the Uniform Commercial Code as it applies to this Agreement.

18.    **<u>Severability.</u>**  To the extent that the terms of this Agreement are inconsistent with, or prohibited or unenforceable under, any applicable law or regulation, they will be deemed ineffective only to the extent of such prohibition or unenforceability, and will be deemed modified and applied in a manner consistent with such law or regulation.  Any provision of this Agreement which is deemed unenforceable or invalid in any jurisdiction will not affect the enforceability or validity of the remaining provisions of this Agreement or the same provision in any other jurisdiction.

19. **Counterparts.** This Agreement may be executed in any number of counterparts each of which will be an original with the same effect as if the signatures were on the same instrument. Delivery of an executed counterpart of a signature page of this Agreement by telecopier or electronic image scan transmission (such as a "pdf" file) will be effective as delivery of a manually executed counterpart of the Agreement.

20. **Entire Agreement.** This Agreement, together with the Account Documentation, contains the entire and only agreement among all the parties to this Agreement and between Bank and Borrower, on the one hand, and Bank and Lender, on the other hand, with respect to (a) the interest of Lender in the DACA Account and DACA Account Funds, and (b) Bank's obligations to Lender in connection with the DACA Account and DACA Account Funds.

21. **Waiver of Jury Trial.** To the extent permitted by law, the parties hereto hereby waive all rights to a trial by jury in any action or proceeding relating to the DACA Account or this Agreement.

22. **Certain Matters Affecting Bank.**

    a. Bank may rely and shall be protected in acting or refraining from acting upon any notice, request, consent, order, certificate, report, opinion or document (including, but not limited to, electronically confirmed facsimiles thereof) believed by it to be genuine and to have been signed or presented by the proper party or parties. Bank shall have no obligation to review or confirm that actions taken pursuant to the foregoing in accordance with this Agreement comply with any other agreement or document to which it is not a party.

    b. The duties and obligations of Bank set forth in this Agreement shall be determined solely by the express provisions of this Agreement. Bank shall not be liable except for the performance of its duties and obligations as are specifically set forth herein. No implied covenants or obligations shall be read into this Agreement against Bank. Bank makes no express or implied representations or warranties with respect to its obligations under this Agreement, except for those expressly set forth herein.

    c. Bank will not be liable to Borrower, Lender or any other person for any Losses and Liabilities caused by (i) circumstances beyond Bank's reasonable control (including, without limitation, computer malfunctions, interruptions of communication facilities, labor difficulties, acts of God, wars, or terrorist attacks) or (ii) any other circumstances, except, in each case, to the extent that such Losses and Liabilities are directly caused by Bank's gross negligence or willful misconduct.

    d. **IN NO EVENT WILL BANK BE LIABLE FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, WHETHER OR NOT THE LIKELIHOOD OF SUCH DAMAGES WAS KNOWN TO BANK, AND REGARDLESS OF THE FORM OF THE CLAIM OR ACTION, OR THE LEGAL THEORY ON WHICH IT IS BASED.**

e.      Any action against Bank by Borrower or Lender under or related to this Agreement must be brought within twelve (12) months after the cause of action accrues

[SIGNATURE PAGES FOLLOW]

This Agreement has been signed by the duly authorized officers or representatives of Borrower, Lender and Bank on the date first written above.

**DACA Account Number(s):**        <u>**As set forth in Section 1(d) of this Agreement**</u>


**BORROWER:**

**PLAMEX INVESTMENT, LLC,**
**a Delaware limited liability company,**
**as Borrower**

By:    3100 E. Imperial Investment, LLC,
       a Delaware limited liability company

       By: Placo Investment, LLC,
           a Delaware limited liability company
       By: _____
           Name: Donald Chae
           Title:  Manager

TIN: <u>45-2918817</u>

**Address for Notices:**

<u>3100 E. Imperial Highway</u>
<u>Lynwood, CA 90262</u>
<u>Attn: Donald Chae</u>

[SIGNATURES CONTINUE ON NEXT PAGE]

**NATIXIS, NEW YORK BRANCH,**
**a direct branch of Natixis S.A., a société**
**anonyme à conseil d'administration (public**
**limited company) organized and existing under**
**the laws of France,**
**as Lender:**

By: _____
    Name: Andrew Levine
    Title:  Managing Director

By: _____
    Name: Timothy Bachman
    Title:  Director

**Address for Notices:**

1251 Avenue of the Americas
New York, New York 10020
Attention:  Real Estate Administration

[SIGNATURES CONTINUE ON NEXT PAGE]

*[Signature Page to DACA (Hard) – Plaza Mexico]*

**WELLS FARGO BANK, NATIONAL ASSOCIATION, as Bank**

By: _____

    Name:  James Caswell
    Title:   Assistant Vice President

**Address for Notices:**

1901 Harrison Street, 2nd Floor
Oakland, CA  94612
Attn:  CMS Cash Management
Fax No.:  (866) 359-5954

*[Signature Page to DACA (Hard) – Plaza Mexico]*

# EXHIBIT A

## Lockbox Procedures

(Capitalized terms used in this <u>Exhibit A</u> have the same meaning stated in the Agreement to which this <u>Exhibit A</u> is attached.)

1.   **Inspections of Items.**  Items to be deposited in the DACA Account will be inspected and handled as follows:

   a.   <u>Payees</u>.  An item not bearing an acceptable payee designation, as set forth in the specifications, or a reasonable variation thereof, will not be deposited in the DACA Account.  If a necessary endorsement of a payee other than Borrower is missing, the item will not be deposited into the DACA Account.

   b.   <u>Dates</u>.  An item will be deposited into the DACA Account whether it is stale-dated, post dated or does not bear a date.

   c.   <u>Amounts</u>.  If the written and numeric amounts of an item differ, the written amount shall control over the numeric amount unless the written amount is ambiguous.  If the amount of an item cannot be determined from application of the preceding sentence, or if the amount is missing altogether, the item will not be deposited into the DACA Account.

   d.   <u>Drawer's Signatures</u>.  For an item in which the drawer's signature is missing, Bank will deposit it into the DACA Account and affix a stamp requesting the drawee bank or other payor to contact the drawer for authority to pay the item.

   e.   <u>Alterations</u>.  An item which appears to Bank to have been materially altered will not be deposited into the DACA Account; provided, however, Bank shall have no liability to Borrower or Lender for depositing any such item.

   f.   <u>Other Language</u>.  Bank will not examine the front and backsides of items to detect handwritten or typed "paid in full" or similar language.  Such items will be deposited into the DACA Account and Bank shall have no liability to Borrower or Lender for depositing such items.

   g.   <u>International Payments</u>.  An item denominated in foreign currency and drawn on a foreign bank will not be deposited into the DACA Account but will be submitted for collection only.  An appropriate advice will be forwarded to Borrower.  Bank shall not be responsible for fluctuation in exchange rates.

2.   **Processing Procedures.**  Items found acceptable for deposit under <u>Section 1</u> above will be accepted for deposit into the DACA Account.  Upon request by Borrower, Bank will send to Borrower documentation in accordance with Bank's customary and standard practices for maintenance of a DACA Account.

3.   **Microfilm.**  All deposited items will be microfilmed in processing sequence for reference purposes.  Bank will retain such microfilm for at least two years and will provide

photocopies of deposited items to Borrower within said time upon request and payment of Bank's retrieval and photocopying charges.

**EXHIBIT B**

**ACCEPTANCE FEE NOTICE**

Acceptance Fee  .............................................$1,000.00


This one-time fee is <u>payable upon closing</u> and includes the review of this Agreement and supporting documentation.  Bank may debit the Acceptance Fee from the DACA Account on the Business Day that the Bank Fees are due, without notice to Lender or Borrower.  If there are not sufficient funds in the DACA Account to cover fully the Acceptance Fee on the Business Day Bank attempts to debit such fee from the DACA Account, such shortfall or the amount of such fee will be paid by Borrower to Bank, without setoff or counterclaim, within five (5) calendar days after demand from Bank.

NY:1798218.4

**Exhibit 12**

**Plamex Investment, LLC**
**13-Week Cash Flow Projection**

| | | | | | | | WEEK ENDING | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week ending========> | 4/23/2021 | 4/30/2021 | 5/7/2021 | 5/14/2021 | 5/21/2021 | 5/28/2021 | 6/4/2021 | 6/11/2021 | 6/18/2021 | 6/25/2021 | 7/2/2021 | 7/9/2021 | 7/16/2021 |
| **BEGINNING CASH BALANCE** | $ - | $ 139,706.17 | $ 103,170.32 | $ 827,596.65 | $ 623,311.34 | $ 587,679.51 | $ 594,349.66 | $ 1,285,766.50 | $ 1,246,503.66 | $ 1,137,601.48 | $ 1,136,965.00 | $ 1,824,439.30 | 1,823,580.90 |
| **RECEIPTS:** | | | | | | | | | | | | | |
| New bank account opened: | 140,000.00 | | | | | | | | | | | | |
| Funding from affiliates | | | | | | | | | | | | | |
| *Collections:* | | | | | | | | | | | | | |
| Rent - Retail | | | 635,752.48 | | | | 636,419.65 | | | | 636,667.95 | | |
| Rent - Storage | | | 1,235.00 | | | | 1,235.00 | | | | 1,235.00 | | |
| Rent Abatements and Concessions | | | | | | | | | | | | | |
| Rent Discount-COVID 19 | | | | | | | | | | | | | |
| **Net Rental Income** | - | - | 636,987.48 | - | - | - | 637,654.65 | - | - | - | 637,902.95 | - | - |
| *Recoverable Expenses:* | | | | | | | | | | | | | |
| CAM Reimbursements | | | 136,083.84 | | | | 136,083.84 | | | | 136,083.84 | | |
| CAM Reconciliation | | | - | | | | - | | | | - | | |
| Property Tax Reimbursements | | | 21,174.69 | | | | 21,174.69 | | | | 21,174.69 | | |
| Insurance Reimbursements | | | 7,370.95 | | | | 7,370.95 | | | | 7,370.95 | | |
| Grease Cleaning Reimbursements | | | 114.89 | | | | 114.89 | | | | 114.89 | | |
| Pest Control Reimbursements | | | 127.30 | | | | 127.30 | | | | 127.30 | | |
| Sundry Income | | | | | | | | | | | | | |
| **Total Recoverable Expenses** | - | - | 164,871.66 | - | - | - | 164,871.66 | - | - | - | 164,871.66 | - | - |
| *Other Tenant Related Income* | | | | | | | | | | | | | |
| Advertising & Promotion | | | 9,987.91 | | | | 9,987.91 | | | | 9,987.91 | | |
| Merchant Association Fees | | | 598.00 | | | | 598.00 | | | | 598.00 | | |
| Tenant Ads Signage Income | | | 585.00 | | | | 585.00 | | | | 585.00 | | |
| Advertising Signage-I 105 | | | | | | 10,280.00 | | | | | | | |
| Forfeited Deposits | | | | | | | | | | | | | |
| Assignment Fee | | | | | | | | | | | | | |
| **Other Tenant Related Income** | - | - | 11,170.91 | - | - | 10,280.00 | 11,170.91 | - | - | - | 11,170.91 | - | - |
| *Other Income:* | | | | | | | | | | | | | |
| Wireless Tower Income | | 160.00 | | | | | 160.00 | | | | 160.00 | | |
| Advertisement Income | | | | | | | | | | | | | |
| **Total Other Income** | - | 160.00 | - | - | - | - | 160.00 | - | - | - | 160.00 | - | - |
| **Total Collections** | - | 160.00 | 813,030.05 | - | - | 10,280.00 | 813,857.22 | - | - | - | 814,105.52 | - | - |
| *Total Receipts* | 140,000.00 | 160.00 | 813,030.05 | - | - | 10,280.00 | 813,857.22 | - | - | - | 814,105.52 | - | - |
| **DISBURSEMENTS:** | | | | | | | | | | | | | |
| *Direct expenses:* | | | | | | | | | | | | | |
| Security Service | | 33,086.00 | 45.00 | 35,338.00 | | | 33,086.00 | 45.00 | 35,338.00 | | 33,086.00 | 45.00 | 35,338.00 |
| Parking Lot Maintenance | | | 1,600.00 | | | | 1,600.00 | | | | 1,600.00 | | |
| Sweeping Service | | | | 3,499.00 | | | | | 3,499.00 | | | | 3,499.00 |
| Steam Cleaning | | | | 3,000.00 | | | | | 3,000.00 | | | | 3,000.00 |
| Landscape Exterior Service | | | 2,000.00 | | | | 2,000.00 | | | | 2,000.00 | | |
| Pest Control | | 660.00 | 226.00 | | | 660.00 | 226.00 | 250.00 | | | 886.00 | | |
| Fountain R&M | | 1,300.00 | | | | 1,300.00 | 1,300.00 | | | | | | |
| Monument Signage | | 107.20 | 500.00 | 179.49 | | | 107.20 | 500.00 | 179.49 | | 607.20 | | 179.49 |
| Equipment Rental | | | 103.63 | | | | 103.63 | | | | 103.63 | | |
| Center Maintenance Payroll | | | 7,000.00 | | | | 7,000.00 | | | | 7,000.00 | | |
| Signage | | | 431.25 | 60.08 | | | 431.25 | | 60.08 | | 431.25 | | 60.08 |
| Janitorial | | | | 52,985.00 | | | | | 52,985.00 | | | | 52,985.00 |
| Building Repairs & Maintenance | | 200.00 | | | | 200.00 | 200.00 | | | | | | |
| Painting Exterior | | 800.00 | | | | 800.00 | 800.00 | | | | | | |
| Elevator - Contract | | | 6,416.55 | | | | 6,416.55 | | | | 6,416.55 | | |
| HVAC - Contract | | | 200.00 | | | | 1,655.00 | | | | 200.00 | | |
| HVAC - R&M | | | | | | | | | | | | | |
| Restroom R&M | | 200.00 | | | | | 200.00 | | | | | | |
| Plumbing R&M | | | | | | | | | | | | | |
| Fire Alarm & Sprinkler Monitor | | | | | | | | | | | 1,350.00 | | |
| Fire Alarm & Sprinkler Phone | | 299.85 | 290.11 | 109.06 | | | 299.85 | 290.11 | 109.06 | 299.85 | 1,040.11 | 109.06 | |
| Telephone | | | | | | | | | | | 278.64 | | |
| Electrical Parking Lot | | | | 2,372.07 | | | 2,372.07 | | | | | | 2,372.07 |
| Electrical Pylon Sign | | | | 3,755.32 | | | 3,755.32 | | | | | | 3,755.32 |

**Plamex Investment, LLC**
**13-Week Cash Flow Projection**

| | | | | | | | WEEK ENDING | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week ending========> | 4/23/2021 | 4/30/2021 | 5/7/2021 | 5/14/2021 | 5/21/2021 | 5/28/2021 | 6/4/2021 | 6/11/2021 | 6/18/2021 | 6/25/2021 | 7/2/2021 | 7/9/2021 | 7/16/2021 |
| Electrical Canopy Lights | | | | 4,709.26 | | | | 4,709.26 | | | | | 4,709.26 |
| Electrical House Meter | | | | 21,230.24 | | | | 21,230.24 | | | | | 21,230.24 |
| Gas | | | 600.00 | | | | | 600.00 | | | | 600.00 | |
| Water - House Meter | | | | 12,961.53 | | | | | | | | | 12,961.53 |
| Water - Landscape | | | | 5,874.67 | | | | | | | | | 5,874.67 |
| Water - Fire/Life/Safety | | | | | | | | | 2,230.10 | | | | |
| Trash Tenants | | | 19,166.62 | | | | 19,166.62 | | | | 19,166.62 | | |
| Advertisement & Promotions | 293.83 | | 104.34 | 350.00 | 293.83 | | | 454.34 | | 293.83 | | 104.34 | 350.00 |
| Insurance Fire | | | 13,277.26 | | | | 13,277.26 | | | | 13,277.26 | | |
| Property Tax | | | | | | | | | | | | | |
| Management Fees | | | 36,000.00 | | | | 36,000.00 | | | | 36,000.00 | | |
| Merchant Assoc Fees | | | | | | | | | | | | | |
| License, Permits, Fees | | | | | | | | | | | | | |
| Music & Entertainment | | | | | | | | | | | | | |
| *Post-Petition Utility Deposits* | | | | 85,000.00 | | | | | | | | | |
| **Sub-total** | **293.83** | **36,653.05** | **87,915.76** | **196,130.72** | **35,631.83** | **3,567.05** | **121,752.42** | **33,704.78** | **97,112.18** | **593.68** | **125,943.26** | **858.40** | **146,314.66** |
| **General & Admin Expenses** | | | | | | | | | | | | | |
| Phone Local/LD/mobile | | | 377.08 | | | | 377.08 | | | | 377.08 | | |
| Internet | | 42.80 | | | | 42.80 | | | | 42.80 | | | |
| Internet Hotspot Service-Signage | | | | | | | | | | | | | |
| Repairs & Maintenance | | | 174.00 | | | | 174.00 | | | | 174.00 | | |
| Electricity | | | | 5,558.06 | | | | 5,558.06 | | | | | 5,558.06 |
| Water & Sewer | | | | 2,378.07 | | | | | | | | | 2,378.07 |
| Office Supplies | | | | | | | | | | | | | |
| Printing | | | | | | | | | | | | | |
| Equipment Rental & Maint. | | | 136.88 | | | | 136.88 | | | | 136.88 | | |
| Equipment < $300 | | | | | | | | | | | | | |
| Bank & card charges | | | | 218.46 | | | | | | | | | |
| LLC Fees | | | | | | | | | 11,790.00 | | | | |
| Permits and Licenses | | | | | | | | | | | | | |
| **Sub-total** | **-** | **42.80** | **687.96** | **8,154.59** | **-** | **42.80** | **687.96** | **5,558.06** | **11,790.00** | **42.80** | **687.96** | **-** | **7,936.13** |
| *Total Disbursements* | *293.83* | *36,695.85* | *88,603.72* | *204,285.31* | *35,631.83* | *3,609.85* | *122,440.38* | *39,262.84* | *108,902.18* | *636.48* | *126,631.22* | *858.40* | *154,250.79* |
| Net Change in Cash Position | *139,706.17* | *(36,535.85)* | *724,426.33* | *(204,285.31)* | *(35,631.83)* | *6,670.15* | *691,416.84* | *(39,262.84)* | *(108,902.18)* | *(636.48)* | *687,474.30* | *(858.40)* | *(154,250.79)* |
| **ENDING CASH POSITION** | $ 139,706.17 | $ 103,170.32 | $ 827,596.65 | $ 623,311.34 | $ 587,679.51 | $ 594,349.66 | $ 1,285,766.50 | $ 1,246,503.66 | $ 1,137,601.48 | $ 1,136,965.00 | $ 1,824,439.30 | $ 1,823,580.90 | $ 1,669,330.11 |

**Exhibit 13**

RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: RB@LNBYB.com, MYK@LNBYB.COM; JYO@LNBYB.com

Proposed Attorneys for Chapter 11 Debtor
and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No. 8:21-bk-10958-ES |
| | |
| PLAMEX INVESTMENT, LLC, | Chapter 11 |
| | |
|     Debtor and | **INTERIM ORDER GRANTING DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN INTERIM ORDER, PENDING A FINAL HEARING, AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL** |
|     Debtor in Possession. | |
| | Date:    April 16, 2021 |
| | Time:    10:00 a.m. |
| | Place:   Courtroom 5A |
| |            Via Zoom.Gov |

1

A hearing was held on April 16, 2021 at 10:00 a.m., before the Honorable Erithe A. Smith, United States Bankruptcy Judge for the Central District of California, Santa Ana Division, in Courtroom "5A" located at 411 West Fourth St., Santa Ana, California 92701, to consider the motion (the "Motion") filed by Plamex Investment, LLC, a Delaware limited liability company and the debtor and debtor-in-possession in the above-captioned Chapter 11 bankruptcy case ("Plamex"), for the entry of an order authorizing Plamex to use cash collateral in accordance with its operating budget for the period through and including July 16, 2021 (the "Budget"), a copy of which is attached as Exhibit "12" to the Declaration of Donald Chae filed concurrently with the Motion.  Appearances at the hearing on the Motion were made as noted on the record of the Court.

The Court, having considered the Motion and all papers filed by Plamex in support of the Motion, having considered the oral arguments, statements and representations of counsel made at the hearing on the Motion and all matters of record in the Chapter 11 cases of Plamex and 3100 Investment, LLC, proper notice of the Motion and the hearing on the Motion having been provided, having received no opposition to the Motion, finding that the relief requested in the Motion is necessary to avoid immediate and irreparable harm, and other good cause appearing therefor,

IT IS HEREBY ORDERED AS FOLLOWS:

A.     The Motion is granted on an interim basis, pending a final hearing.

B.     Plamex is authorized to use cash collateral on an interim basis, pending a final hearing, to (i) pay all of the expenses set forth in the Budget, with authority to deviate from the line items contained in the Budget by not more than 20%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s) and (ii) pay all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court.

C.     As adequate protection on account of Plamex's use of cash collateral to the holders of Replacement Promissory Note A-1 for $28,000,000, Replacement Promissory Note A-

2 for $20,000,000, Replacement Promissory Note A-3 for $20,000,000, Replacement Promissory Note A-4 for $20,000,000, Replacement Promissory Note A-5 for $10,000,000, and Replacement Promissory Note A-6 for $8,000,000 (collectively, the "Notes"), of which CWCapital Asset Management, LLC is the servicer ("Servicer") of all of the Notes, including the A-2 and A-3 Notes which are held by Wells Fargo Bank, National Association, as Trustee for Morgan Stanley Capital I Trust 2016-UBS11, Commercial Mortgage-Pass Through Certificates, Series 2016-UBS11 (the "Trust"), these holders are granted a valid, enforceable, non-avoidable and fully perfected replacement liens on, and security interests in, Plamex's cash and other post-petition assets, to the extent of any diminution in value of these holders' respective interests in Plamex's pre-petition collateral, and to the same extent, validity, scope and priority of their respective pre-petition liens.

D.       A final hearing to consider the entry of a final order granting the relief requested in the Motion will be held on _____, 2019 at _____.m.

E.       Any opposition to the entry of a final order granting the relief requested in the Motion must be filed with the Court and served upon counsel for Plamex by 5:00 p.m. (Pacific time) on _____, 2021.

F.       Any reply to any opposition to the entry of a final order granting the relief requested in the Motion must be filed with the Court and served upon counsel for the opposing party by 5:00 p.m. (Pacific time) on _____, 2021.

IT IS SO ORDERED.

###