PETER C. ANDERSON
United States Trustee
Nancy S. Goldenberg (Bar No. 167544)
Attorney for the U.S. Trustee
Ronald Reagan Federal Building & U.S. Courthouse
411 West Fourth Street, Suite 7160
Santa Ana, CA  92701-8000
Telephone: (714) 338-3400
Facsimile: (714) 338-3421
Email: Nancy.Goldenberg@usdoj.gov

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SANTA ANA DIVISION

In re:

**PLAMEX INVESTMENT, LLC,**
a Delaware limited liability company,

      Debtor and Debtors in Possession.

_____

In re:

**3100 E. IMPERIAL INVESTMENT, LLC**,
a Delaware limited liability company,

      Debtor and Debtors in Possession.

_____

[ x]  Affects both Debtors

[ ]  Affects Plamex Investment, LLC only

[ ]  Affects 3100 E. Imperial Investment,
    LLC Only

LEAD CASE NO. 21-bk-10958-ES

Jointly Administered With:

CASE NO. 21-bk-10957-ES

CHAPTER 11

NOTICE OF APPLICABILITY OF LARGE-CASE UNITED STATES TRUSTEE FEE GUIDELINES

**TO THE HONORABLE ERITHE SMITH, DEBTOR, DEBTOR'S ATTORNEY, AND PARTIES IN INTEREST:**

Peter C. Anderson, the United States Trustee for Region 16 ("U.S. Trustee"), gives notice to all parties in this case as follows:

1. As required by 28 U.S.C. § 586(a)(3)(A), the United States Trustee Program has adopted Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses ("Fee Applications") filed under 11 U.S.C. § 330 (the "U.S. Trustee Guidelines"). The U.S. Trustee Guidelines are intended to promote consistency and predictability in bankruptcy cases by directing United States Trustees to exercise their discretion in a uniform manner when determining whether to object to professional fees. In particular, the U.S. Trustee Guidelines: (1) direct the U.S. Trustee to object to fees and expenses in specified circumstances; (2) direct the U.S. Trustee to request certain statements and disclosures in order to aid the review of Fee Applications; and (3) in some circumstances, direct the U.S. Trustee to seek entry of certain procedural orders.

2. There are different U.S. Trustee Guidelines in effect depending on case size, case chapter, and type of professional. As of November 1, 2013, United States Trustees will apply specialized U.S. Trustee Guidelines for Fee Applications filed by attorneys in Chapter 11 cases with $50 million or more in assets and $50 million or more in liabilities (aggregated for jointly administered cases and excluding single asset real estate cases as defined in 11 U.S.C. § 101(51B)), a copy of which is attached to this Notice (the "Appendix B Guidelines"). The Appendix B Guidelines are also set forth in 28 C.F.R. Part 58, Appendix B, and are posted on the internet at http://www.justice.gov/ust/eo/rules_regulations/guidelines/index.htm. The U.S. Trustee will continue to apply the U.S. Trustee Guidelines set forth in 28 C.F.R. Part 58, Appendix A (the "Appendix A Guidelines") for the review of Fee Applications filed under Section 330 in (1) larger Chapter 11 cases by those seeking compensation who are not attorneys, (2) all Chapter 11 cases below the larger case threshold, and (3) cases under other chapters of the Bankruptcy Code.

3. Among other provisions, the Appendix B Guidelines direct the U.S. Trustee to request that attorneys file disclosures and adopt practices that will better enable the U.S. Trustee, the Court, and other parties to ascertain whether those attorneys have met their evidentiary burden

of establishing their entitlement to fees under Section 330. Standardized disclosures to be filed by attorneys along with their Fee Applications in order to substantiate the statutory requirement that the requested fees are "comparable" to the fees charged to non-bankruptcy clients;

● The maintenance of budget and staffing plans, which should be agreed upon by the attorney and client and filed along with the Fee Application, in order to promote transparency and client accountability in the billing process;

● The use of electronic billing data and standardized project codes in the billing records submitted with the Fee Application, in order to facilitate a more efficient review of fees by the court, the U.S. Trustee, and parties in interest;

● Supplemental statements by both the attorney and the client regarding the circumstances of the attorney's selection and the principal terms of the engagement, in order to provide meaningful context for the billing rates requested; and

● Disclosures regarding any increases during the case from the billing rates recited in the attorney's retention application, in order that the reasonableness and justification (if any) for such increases may be investigated in a timely manner.

4. Based on the records maintained in the above-captioned cases, these cases involve more than $50 million in assets and $50 million in liabilities and are not single asset real estate cases. As a result, the U.S. Trustee will review attorney Fee Applications in this case in accordance with the Appendix B Guidelines.

5. The U.S. Trustee has consulted with Juliet Oh, Esq. of Levene, Neale, Bender, Yoo & Brill LLP, counsel for the Debtor, regarding the Appendix B Guidelines. This firm has represented that it intends to comply with the U.S. Trustee's Appendix B Guidelines. It is anticipated that any and all other professionals retained in the case will comply with the U.S. Trustee Guidelines.

Respectfully Submitted,
UNITED STATES TRUSTEE FOR REGION 16

Dated:  June 8, 2021

*/s/ Nancy S. Goldenberg*
Nancy S. Goldenberg
Attorney for the U.S. Trustee

not associated with the information collection; (c) for reasons other than to provide information or keep records for the Government; or (d) as part of customary and usual business or private practices.

We will summarize written responses to this notice and address them in our submission for OMB approval. As a result of your comments, we will make any necessary adjustments to the burden in our submission to OMB.

*Public Availability of Comments:* Before including your address, phone number, email address, or other personal identifying information in your comment, you should be aware that your entire comment—including your personal identifying information—may be made publicly available at any time. While you can ask us in your comment to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so.

Dated: June 6, 2013.

**Deanna Meyer-Pietruszka,**
*Chief, Office of Policy, Regulations, and Analysis.*

[FR Doc. 2013–14093 Filed 6–14–13; 8:45 am]

**BILLING CODE 4810–MR–P**

---

## INTERNATIONAL TRADE COMMISSION

**[USITC SE–13–014]**

### Sunshine Act Meeting

**AGENCY HOLDING THE MEETING:** United States International Trade Commission.

**TIME AND DATE:** June 20, 2013 at 2:00 p.m.

**PLACE:** Room 101, 500 E Street SW., Washington, DC 20436, Telephone: (202) 205–2000.

**STATUS:** Open to the public.

**MATTERS TO BE CONSIDERED:**

1. Agendas for future meetings: None
2. Minutes
3. Ratification List
4. Vote in Inv. Nos. 731–TA–1202 and 1203 (Final)(Xanthan Gum from Austria and China). The Commission is currently scheduled to transmit its determinations and Commissioners' opinions to the Secretary of Commerce on or before July 2, 2013.
5. Outstanding action jackets: none

In accordance with Commission policy, subject matter listed above, not disposed of at the scheduled meeting, may be carried over to the agenda of the following meeting.

Issued: June 12, 2013.

By order of the Commission.

**William R. Bishop,**
*Supervisory Hearings and Information Officer.*

[FR Doc. 2013–14432 Filed 6–13–13; 11:15 am]

**BILLING CODE 7020–02–P**

---

## DEPARTMENT OF JUSTICE

### Appendix B Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under United States Code by Attorneys in Larger Chapter 11 Cases

**AGENCY:** Executive Office for United States Trustees, Justice.

**ACTION:** Notice of internal procedural guidelines.

**SUMMARY:** In 1996, in accordance with Congress's mandate in 28 U.S.C. 586(a)(3)(A), the United States Trustee Program ("USTP") established Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses filed under 11 U.S.C. 330. *See* 28 CFR Part 58, Appendix A ("Appendix A guidelines"). The USTP has drafted additional guidelines for reviewing applications for compensation and reimbursement of expenses filed by attorneys in larger chapter 11 cases with $50 million or more in assets and $50 million or more in liabilities, aggregated for jointly administered cases. Single asset real estate cases, as defined in 11 U.S.C. 101(51B), filed under chapter 11 are excluded from these guidelines.

These guidelines that apply to the USTP's review of applications for compensation filed by attorneys in larger chapter 11 cases will be published in the **Federal Register** and entitled Appendix B—Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. 330 by Attorneys in Larger Chapter 11 Cases ("Appendix B guidelines"). Until the USTP adopts other superseding guidelines, the Appendix A guidelines will continue in effect for the USTP's review of applications filed under section 330 in: (1) Larger chapter 11 cases by those professionals seeking compensation who are not attorneys; (2) all chapter 11 cases with less than $50 million in assets and $50 million in liabilities, aggregated for jointly administered cases; (3) all chapter 11 single asset real estate cases; and (4) all cases under other chapters of the Bankruptcy Code.

The USTP will continue to review and update these guidelines, as appropriate.

**DATES:** *Effective Date:* November 1, 2013.

**FOR FURTHER INFORMATION CONTACT:** Nan Roberts Eitel, Associate General Counsel for Chapter 11 Practice, Executive Office for United States Trustees, 441 G St. NW., Suite 6150, Washington, DC 20530.

**SUPPLEMENTARY INFORMATION:** The authority for these guidelines is 28 U.S.C. 586(a)(3)(A), which provides that United States Trustees may review "in accordance with procedural guidelines adopted by the Executive Office of the United States Trustee (which guidelines shall be applied uniformly by the United States Trustee except when circumstances warrant different treatment) applications filed for compensation and reimbursement under section 330 of title 11 . . . ." *Id.* The guidelines are to be applied by the USTP; however, they are not exclusive and do not limit the United States Trustee's discretion to object to or comment on a particular application.

Because the Appendix B guidelines, like the Appendix A guidelines, constitute procedural guidelines that apply to the USTP's review of fee applications, they are not subject to the Administrative Procedure Act's formal notice and comment provisions. Nonetheless, to engage the bankruptcy community, the USTP followed an extensive notice and comment-like process by reaching out to various bankruptcy judges and the National Bankruptcy Conference before drafting the Appendix B guidelines, posting a draft of the Appendix B guidelines to its public Web site for public comment, holding a public meeting, and posting a revised draft of the Appendix B guidelines responding to the comments to its public Web site for further public comment before finalizing.

### Table of Contents

I. Appendix B—Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. 330 by Attorneys in Larger Chapter 11 Cases
II. Exhibit A: Customary and Comparable Compensation Disclosures With Fee Applications
III. Exhibit B: Summary of Professionals Included in This Fee Application
IV. Exhibit C: Budget and Staffing Plan
V. Exhibit D: Summary of Compensation Requested by Project Category
VI. Exhibit E: Summary Cover Sheet of Fee Application
VII. Exhibit F: Analysis of Comments Received and Summary of Significant Changes in Response to Comments

## Appendix B—Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. 330 by Attorneys in Larger Chapter 11 Cases

### A. General Information

1. United States Trustees may review ''in accordance with procedural guidelines adopted by the Executive Office of the United States Trustee (which guidelines shall be applied uniformly by the United States trustee except when circumstances warrant different treatment), applications filed for compensation and reimbursement under section 330 of title 11 . . . .'' 28 U.S.C. 586(a)(3)(A)(i). United States Trustees may also file ''with the court comments with respect to such application and, if the United States Trustee considers it to be appropriate, objections to such application.'' *Id.* The Executive Office for United States Trustees (''Executive Office'') adopted procedural guidelines, which apply to all cases commenced on or after October 22, 1994. *See* 28 CFR Part 58, Appendix A.

2. Because the circumstances in larger chapter 11 cases warrant different treatment, the Executive Office adopted these Appendix B guidelines (''Guidelines'') to apply only when United States Trustees review applications for compensation filed by attorneys employed under sections 327 or 1103 of the United States Bankruptcy Code, 11 U.S.C. 101, *et seq.* (''Code''), in chapter 11 cases where the debtor's petition lists $50 million or more in assets and $50 million or more in liabilities, aggregated for jointly administered cases and excluding single asset real estate cases as defined in 11 U.S.C. 101(51B) (''threshold'').

3. The United States Trustees will use these Guidelines to review applications for compensation filed by attorneys employed under sections 327 or 1103 of the Code in all chapter 11 cases that meet the threshold and that are filed on or after October 1, 2013. The Guidelines generally will not apply to counsel retained as an ordinary course professional pursuant to appropriate court order or local rule (''ordinary course professional''), unless the professional is required to file a fee application under such court order or local rule.

4. The Guidelines express the USTP's policy positions, and the USTP will use these Guidelines in the absence of controlling law or rules in the jurisdiction. Thus, the Guidelines do not supersede local rules, court orders, or other controlling authority. However, these Guidelines do not limit the

USTP's ability to seek changes in controlling laws or rules through litigation, appeals, and other actions.

5. Only the court has authority to award compensation and reimbursement under section 330 of the Code. The Guidelines focus on the disclosure of information relevant to the court's award of compensation and reimbursement of expenses under section 330 of the Code. The Guidelines reflect standards and procedures in section 330 of the Code and Bankruptcy Rule 2016. Applications containing the information requested in these Guidelines will assist review by the court, the parties, and the United States Trustee.

6. Because the review of fee applications under section 330 of the Code is inextricably intertwined with the terms and conditions of employment approved by the court when the applicant is retained, these Guidelines also address disclosure of certain information in applications for retention filed under sections 327 and 1103 of the Code.

7. Nothing in the Guidelines should be construed:

a. To limit the United States Trustee's discretion to request additional information necessary for the review of a particular fee application or to refer any information provided to the United States Trustee to any law enforcement authority of the United States or a state.

b. To limit the United States Trustee's discretion to determine whether to file comments or objections to fee applications.

c. To create any private right of action on the part of any person enforceable against the United States Trustee or the United States.

### B. United States Trustee's Goals and Considerations In Reviewing and Commenting On Fee Applications

1. *Goals:* In determining whether to object to or comment on fee applications, the United States Trustee will be guided by the following goals. These goals, however, are not exclusive and in no way limit the discretion of the United States Trustee to object or comment. In applying the Guidelines, the United States Trustee seeks:

a. To ensure that bankruptcy professionals are subject to the same client-driven market forces, scrutiny, and accountability as professionals in non-bankruptcy engagements.

b. To ensure adherence to the requirements of section 330 of the Code so that all professional compensation is reasonable and necessary, particularly as compared to the market measured both by the applicant's own billing

practices for bankruptcy and non-bankruptcy engagements and by those of other comparable professionals.

c. To increase disclosure and transparency in the billing practices of professionals seeking compensation from the estate.

d. To increase client and constituent accountability for overseeing the fees and billing practices of their own professionals who are being paid by the estate.

e. To encourage the adoption of budgets and staffing plans developed between the client and the applicant to bring discipline, predictability, and client involvement and accountability to the compensation process.

f. To decrease the administrative burden and increase the efficiency of review of fee applications.

g. To assure that, even in the absence of an objection, the burden of proof to establish that fees and expenses are reasonable and necessary remains on the applicant seeking compensation and reimbursement.

h. To increase public confidence in the integrity and soundness of the bankruptcy compensation process.

2. *Considerations on fees:* The Guidelines are intended to elicit information that will aid the United States Trustee, the parties, and the court in determining whether the fees and expenses sought in a fee application are reasonable and necessary as required by section 330 of the Code. In applying section 330 to the review of fee applications, the United States Trustee will consider the following:

a. *Section 330 factors:* The factors expressly set forth in section 330 of the Code, including:

i. The time spent.

ii. The rates charged.

iii. Whether the services were necessary to the administration of, or beneficial towards the completion of, the case at the time they were rendered.

iv. Whether services were performed within a reasonable time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed.

v. The demonstrated skill and experience in bankruptcy of the applicant's professionals.

vi. Whether compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under title 11.

The United States Trustee may object to the extent that the applicant fails to provide sufficient information to satisfy its burden under section 330.

b. *Comparable services standard:* Whether the applicant provided

sufficient information in the application to establish that the compensation sought is reasonable as compared to the market measured by the billing practices of the applicant and its peers for bankruptcy and non-bankruptcy engagements. The United States Trustee will ordinarily object to fees that are above the market rate for comparable services. Exhibit A is a model form that may be useful in providing this information.[1]

c. *Staffing inefficiencies:* Whether there was duplication of effort or services, or whether the seniority or skill level of the applicant's professional was commensurate with the complexity, importance, and nature of the issue or task. The United States Trustee may object if any duplication is unjustified or unjustifiable, including if multiple professionals unnecessarily attend hearings or meetings. The United States Trustee may also object if the skill level of the professional rendering a particular service is not commensurate with the task. The United States Trustee encourages applicants to consider how to assign and staff more routine and "commoditized" work, such as avoidance actions and claims objections, and to consider whether lower cost co-counsel should be retained for discrete types of work, while being careful to avoid duplication, overlap, and inefficiencies. Factors the USTP will consider in determining whether to object to the retention or compensation of co-counsel are described more specifically in ¶ F. Nothing in the Guidelines should be construed as precluding the retention and payment of "ordinary course professionals," subject to appropriate motions and orders in a particular case. Nothing in the guidelines should be construed as precluding the retention of special counsel under section 327(e) or local counsel under section 327(a).

d. *Rate increases:*[2] Whether the application contains rates higher than those disclosed and approved on the application for retention or any supplemental application for retention or agreed to with the client. Exhibit B

is a model form that may be useful in providing this information. The United States Trustee may object if the applicant fails to justify any rate increases as reasonable. Boilerplate language in the retention application filed under section 327 of the Code is insufficient.

e. *Transitory professionals:* Whether any of the applicant's professionals billed only a few hours to the matter with insufficient evidence of benefit to the estate. The United States Trustee may object if the applicant fails to justify the necessity or benefit of these professionals' services.

f. *Routine billing activities:* Whether an applicant billed for routine billing activities that typically are not compensable outside of bankruptcy. Most are not compensable because professionals do not charge a client for preparing invoices, even if detailed. *Reasonable* charges for preparing interim and final fee applications, however, are compensable, because the preparation of a fee application is not required for lawyers practicing in areas other than bankruptcy as a condition to getting paid. Activities that the United States Trustee may object to as non-compensable include but are not limited to:

i. Excessive redaction of bills or invoices for privileged or confidential information. Professionals and paraprofessionals whose compensation will be paid by the bankruptcy estate know at the inception that their billing records must be publicly filed and should draft time entries and prepare invoices to both minimize redactions and avoid vague descriptions. The time spent for redactions should be reasonably proportional to the overall fees sought.

ii. Reviewing or revising time records.

iii. Preparing, reviewing, or revising invoices.

iv. Preparing, reviewing, or revising monthly fee statements, notices or other informal interim compensation requests to the extent duplicative of the preparation of the related interim or final fee application filed with the court under section 330 of the Code (or vice versa).

v. Preparing the final fee application to the extent duplicative of the preparation of interim fee applications.

g. *Contesting or litigating fee objections:* Whether the fee application seeks compensation for time spent explaining or defending monthly invoices or fee applications that would normally not be compensable outside of bankruptcy. Most are not compensable because professionals typically do not charge clients for time spent explaining

or defending a bill. The USTP's position is that awarding compensation for matters related to a fee application after its initial preparation is generally inappropriate, unless those activities fall within a judicial exception applicable within the district (such as litigating an objection to the application where the applicant substantially prevails). Thus, the United States Trustee may object to time spent explaining the fees, negotiating objections, and litigating contested fee matters that are properly characterized as work that is for the benefit of the professional and not the estate.

h. *Block billing or lumping:* Whether the entries in the application are recorded in increments of .1 of an hour and whether discrete tasks are recorded separately. The United States Trustee will object to block billing or lumping. Each timekeeper, however, may record one daily entry that combines tasks for a particular project that total a de minimis amount of time if those tasks do not exceed .5 hours on that day.

i. *Vague or repetitive entries:* Whether the application contains sufficient information to identify the purpose of the work or the benefit to the estate. The United States Trustee may object to vague or repetitive entries that are otherwise unjustified. Phrases like "attention to" or "review file," without greater specificity or more detail, are generally insufficient.

j. *Overhead:* Whether the application includes activities that should be considered part of the applicant's overhead and not billed to the estate. Tasks that the United States Trustee may object to as overhead include clerical tasks and word processing. The United States Trustee may also object to fees for summer clerks or summer associates, which are more properly the firm's overhead for recruiting and training.

k. *Non-working travel:* Whether the application includes time billed for non-working travel at the full rate. The United States Trustee may object if the applicant seeks compensation at a professional's full rate for time spent traveling without actively working on the bankruptcy case or while working on other unrelated matters.

l. *Geographic variations in rates:* Whether the applicant increased the hourly rates of its professionals and paraprofessionals based solely on the geographic location of the bankruptcy case. The United States Trustee will not object to "non-forum" rates of professionals when the "non-forum" rates are based on the reasonable rates where the professionals maintain their primary office, even if the locally

---

[1] The model forms included as exhibits to the Guidelines are templates offered as guidance to facilitate preparation and review of requested information.

[2] "Rate increases" as used in the Guidelines exclude annual "step increases" historically awarded by the firm in the ordinary course to attorneys throughout the firm due to advancing seniority and promotion. Applicants should not characterize actual rate increases that are unrelated to an attorney's advancing seniority and promotion as "step increases" in an effort to thwart meaningful disclosure or billing discipline. If a firm does not distinguish between "step increases" and other types of rate increases, it should disclose and explain all rate increases as requested.

prevailing rates where the case is pending are lower (*i.e.,* a professional may bill the same reasonable rate in any forum). Conversely, the United States Trustee will object if professionals increase their rates based on the forum where the case is pending when they bill lower rates where they maintain their primary offices.

m. *Budgets and staffing plans:* Whether the fee application sufficiently explains: (i) Any substantial increase (e.g., 10% or more) in the amount requested in the fee application as compared to any client-approved budget; and (ii) any increase in the number of professionals and paraprofessionals billing to the matter during the application period as compared to any client-approved staffing plan. The United States Trustee ordinarily will seek the use of fee and expense budgets and staffing plans, either with the consent of the parties or by court order as soon as feasible after the commencement of the case, as described more specifically in ¶ E. In reviewing the fee application, the United States Trustee will consider any budget and staffing plan filed retrospectively with the application. Exhibit C is a model budget (Exhibit C–1) and staffing plan (Exhibit C–2), and Exhibit D–1 is a model form that may be useful in reporting fees sought in comparison to client-approved budgets.

n. *Verified and other statements:* Whether the client has provided a verified statement with the applicant's retention application regarding its budgeting, review, and approval process for fees and expenses, and whether the applicant has made similar representations and disclosures in the retention application and fee application.

3. *Considerations on expenses:* In applying section 330 to the review of applications for reimbursement of reasonable, actual, and necessary expenses, the United States Trustee will consider the following:

a. *Proration:* Whether the applicant has prorated shared expenses where appropriate between the estate and other cases and has adequately explained the basis for any such proration. For example, applicants should prorate travel expenses that are applicable to more than one case.

b. *Reasonable:* Whether the expense is reasonable and necessary. For example, travel should be in coach class. First class and other above standard travel or accommodations will normally be objectionable.

c. *Customary:* Whether the requested expenses are customarily charged to the applicant's non-bankruptcy clients and by other comparable professionals. The United States Trustee will ordinarily object to expenses that are not customary, absent a specific and adequate justification.

d. *Actual:* Whether the expenses incurred or paid by the applicant reflect the actual cost of such expenses to the applicant and whether any mark-up is justified. Mark-ups will ordinarily be objectionable.

e. *Overhead:* Whether the expenses are or should be non-reimbursable overhead costs incident to the operation of the applicant's office and not particularly attributable to an individual client or case. Without limitation, the United States Trustee will ordinarily consider the following expenses to be overhead: Word processing, proofreading, secretarial and other clerical services, rent, utilities, office equipment and furnishings, insurance, taxes, telephone charges (other than actual charges for multi-party conference calls incurred by counsel in connection with the case), and library and publication charges.

f. *Local rule or order:* Whether the applicant has adhered to allowable rates or charges for expenses as may be fixed by any local rule or order of the court. Expenses that are not allowable will normally be objectionable.

g. *Unusual:* Whether unusual expenses are supported by detailed explanations and allocated, where practicable, to specific projects. The United States Trustee may object if unusual expenses are unsupported or unjustified.

h. *Receipts:* Whether receipts for larger or unusual expenses are available for review upon request.

## C. Contents and Format of Applications for Compensation and Reimbursement Of Expenses

1. *General:* All applications should include sufficient detail to demonstrate compliance with the standards of 11 U.S.C. 330. The fee application should also contain sufficient information about the case and the applicant so that the court, the parties, and the United States Trustee can review it without searching for relevant information in other documents. The information sought below will facilitate review of the application and should be provided in every fee application.

2. *Information to be provided about the applicant and the scope of the application:*

a. Name of applicant.
b. Name of client.
c. Petition date.
d. Retention date.

e. Date of order approving employment.
f. Time period covered by application.
g. Terms and conditions of employment and compensation, including source of compensation, existence of and terms controlling any retainer, and any budgetary or other limitations on fees.
h. Whether the application is interim under section 331 or final under section 330.
i. The date and terms of any order allowing filing of interim applications more frequently than every 120 days, if applicable.
j. Whether the applicant seeks compensation under a provision of the Code other than section 330.
k. For each professional and paraprofessional who billed on the matter during the application period:
i. Name.
ii. Title or position.
iii. Primary department, group, or section.
iv. Date of first admission to the bar, if applicable.
v. Total fees billed included in application.
vi. Total hours billed included in application.
vii. Current hourly rate contained in this application.
viii. Hourly rate contained in the first interim application.
ix. The number of rate increases since the inception of the case.
Exhibit B is a model form that may be useful in providing the information requested in ¶ C.2.k.
l. If the applicant has increased rates during the case, the application should disclose the effect of the rate increases. For comparison purposes, the applicant should calculate and disclose the total compensation sought in the fee application using the rates originally disclosed in the retention application. Exhibit E is a model form that may be useful in providing the requested calculation.

3. *Information to be provided about customary and comparable compensation:*

a. The blended hourly rate either billed or collected during the preceding year for the applicant's timekeepers.

i. The application should disclose the blended hourly rate for the aggregate of either:

(a) All of the applicant's domestic timekeepers; or

(b) All timekeepers in each of the applicant's domestic offices in which timekeepers collectively billed at least 10% of the hours to the bankruptcy case during the application period.

ii. The application should also segregate the timekeepers in ¶ C.3.a.i. by the various categories of professionals and paraprofessionals maintained by the applicant (e.g., partner, counsel, sr. counsel, associate, etc.), and disclose the blended hourly rate for each category of timekeeper.

iii. To calculate the blended hourly rate billed, divide the dollar value of hours billed by the number of hours billed (regardless of when the work was performed) for the relevant timekeepers during the applicable time period. To calculate the blended hourly rate collected, divide the revenue collected by the number of hours billed for the relevant timekeepers during the applicable time period.

iv. In calculating the blended hourly rate:

(a) Full service law firms should generally exclude all bankruptcy engagements or all data from timekeepers practicing primarily in a bankruptcy group or section.

(b) Law firms that practice exclusively or primarily in bankruptcy should exclude all estate-billed bankruptcy engagements.

(c) The applicant may exclude:

(1) Pro bono engagements.

(2) Other engagements for clients who are employees or charitable organizations that are billed at materially discounted rates.

(d) The applicant should include discounted or alternative fee arrangements, other than those engagements in ¶ C.3.a.iv.(c). For any fee arrangements not billed by the hour to the client but for which the applicant tracks hours and revenue by hours worked, the applicant should include this information in the calculation. If the applicant's calculation includes any fee arrangements not billed by the hour, the applicant should concisely explain the methodology it used to calculate the blended hourly rates.

v. The "preceding year" can be either the applicant's prior completed fiscal year or a rolling 12 month year.

b. The blended hourly rate billed to the bankruptcy case during the application period for all of the applicant's timekeepers.

i. The application should disclose the blended hourly rate billed in the aggregate for all timekeepers who billed to the matter.

ii. The application should also segregate the timekeepers by the various categories of professionals and paraprofessionals maintained by the applicant (e.g., partner, counsel, sr. counsel, associate, etc.), and disclose the blended hourly rate billed for each category of timekeeper.

iii. To calculate the blended hourly rate billed, divide the dollar value of hours billed by the number of hours billed (regardless of when the work was performed) for the relevant timekeepers during the application period.

Exhibit A is a model form that may be useful in providing this information.

c. Applicants can propose detailed and specific disclosures, other than those requested at ¶ C.3.a.–b., that are tailored to the applicant's circumstances and ability to gather and organize internal information, but the United States Trustee may object to the adequacy of the disclosure if it is insufficient to enable the United States Trustee to evaluate whether the requested compensation is comparable and customary.

4. *"Safe harbor":* An applicant's disclosure of blended hourly rates in accordance with ¶ C.3.a.–b. will provide a limited "safe harbor" from additional requests from the United States Trustee for information about customary and comparable compensation under section 330(a)(3)(F) of the Code. This "safe harbor" is without prejudice to the United States Trustee's ability to seek additional information based upon the particular facts and circumstances of the case, to file an objection, or to offer evidence on comparable compensation from other sources.

5. *Statement from the applicant:* The applicant should answer the questions below in the fee application. Many questions require only a yes or no answer. The applicant, however, is free to provide additional information if it chooses to explain or clarify its answers.

a. Did you agree to any variations from, or alternatives to, your standard or customary billing rates, fees or terms for services pertaining to this engagement that were provided during the application period? If so, please explain.

b. If the fees sought in this fee application as compared to the fees budgeted for the time period covered by this fee application are higher by 10% or more, did you discuss the reasons for the variation with the client?

c. Have any of the professionals included in this fee application varied their hourly rate based on the geographic location of the bankruptcy case?

d. Does the fee application include time or fees related to reviewing or revising time records or preparing, reviewing, or revising invoices? (This is limited to work involved in preparing and editing billing records that would not be compensable outside of bankruptcy and does not include reasonable fees for preparing a fee application.). If so, please quantify by hours and fees.

e. Does this fee application include time or fees for reviewing time records to redact any privileged or other confidential information? If so, please quantify by hours and fees.

f. If the fee application includes any rate increases since retention:

i. Did your client review and approve those rate increases in advance?

ii. Did your client agree when retaining the law firm to accept all future rate increases? If not, did you inform your client that they need not agree to modified rates or terms in order to have you continue the representation, consistent with ABA Formal Ethics Opinion 11–458?

6. *Information about budget and staffing plans:* If the applicant consents to, or the court directs, the use of budgets and staffing plans, as described more generally in ¶ E, the applicant should attach the client-approved budget and client-approved staffing plan to the fee application for the time period covered by the fee application. Both original and any amended budgets and staffing plans should be included.

a. The budget and staffing plan for the fee application period should be filed when the fee application is filed, not when the client and the applicant agree on the budget and staffing plan. For example, the budget disclosed with each interim fee application should relate to work already performed and reflected in that application. Thus, if the client approved four, 30-day budgets that collectively covered a 120-day interim application period, then these four budgets should be attached.

b. Budgets may be redacted as necessary to protect privileged and confidential information, and such redactions may be compensable if the disclosure of the privileged or confidential information cannot otherwise be avoided through careful drafting. But the time spent for redactions should be reasonably proportional to the overall fees sought. Redactions may be unnecessary if the applicant uses the model budget in Exhibit C–1, which budgets total hours and fees by project category, *see* ¶ C.8., and without descriptive entries.

c. The fee application should also include a summary of fees and hours budgeted compared to fees and hours billed for each project category. Exhibit D–1 is a model form that may be useful in reporting fees sought in comparison to the budget.

d. The applicant should provide an explanation if the fees sought in the fee application exceed the budget during the application period by 10% or more.

e. The applicants should provide an explanation if fees are sought in the fee application for a greater number of professionals than identified in the staffing plan.

*7. Information about prior interim applications:*

a. With respect to each prior interim application, counsel should provide the following information:

i. Date(s) filed and period covered.

ii. Fees and expenses requested.

iii. Fees and expenses approved.

iv. Approved fees and expenses paid.

v. Approved fees and expenses remaining unpaid.

vi. Date(s) of previous order(s) on interim compensation or reimbursement of expenses.

b. Counsel should provide the following information on a cumulative basis since case inception:

i. Fees and expenses requested.

ii. Fees and expenses approved.

iii. Approved fees and expenses paid.

iv. Approved fees and expenses remaining unpaid.

v. Fees and expenses disallowed or withdrawn.

*8. Project categories for billing records:* To facilitate effective review of the application, all time and service entries should be arranged by project categories.

a. Only one category should be used for a given activity. Professionals should make their best effort to be consistent in their use of categories, whether within a particular firm or by different firms working on the same case. It would be appropriate for all professionals to discuss the categories in advance and agree generally on how activities will be categorized.

b. The project categories set forth below should be used to the extent applicable. The following list of project categories is not exclusive, and applicants are encouraged to consult with the United States Trustee regarding the need to formulate case-specific project billing with respect to a particular case.

i. Asset Analysis and Recovery: Identification and review of potential assets including causes of action and non-litigation recoveries.

ii. Asset Disposition: Sales, leases (section 365 matters), abandonment and related transaction work related to asset disposition.

iii. Assumption and Rejection of Leases and Contracts: Analysis of leases and executory contracts and preparation of motions specifically to assume or reject.

iv. Avoidance Action Analysis: Review of potential avoiding actions under Sections 544–549 of the Code to determine whether adversary proceedings are warranted.

v. Budgeting (Case): Preparation, negotiation, and amendment to budgets for applicant.

vi. Business Operations: Issues related to debtor-in-possession operating in chapter 11 such as employee, vendor, tenant issues and other similar problems.

vii. Case Administration: Coordination and compliance activities not specifically covered by another category.

viii. Claims Administration and Objections: Specific claim inquiries; bar date motions; analyses, objections and allowances of claims.

ix. Corporate Governance and Board Matters: Preparation for and attendance at Board of Directors meetings; analysis and advice regarding corporate governance issues, including trustee, examiner, and CRO issues; review and preparation of corporate documents (e.g., articles and bylaws, etc.).

x. Employee Benefits and Pensions: Review and preparation related to employee and retiree benefit issues, including compensation, bonuses, severance, insurance benefits, and 401K, pensions, or other retirement plans.

xi. Employment and Fee Applications: Preparation of employment and fee applications for self or others; motions to establish interim procedures.

xii. Employment and Fee Application Objections: Review of and objections to the employment and fee applications of others.

xiii. Financing and Cash Collateral: Matters under sections 361, 363 and 364 including cash collateral and secured claims; loan document analysis.

xiv. Litigation: Contested Matters and Adversary Proceedings (not otherwise within a specific project category), each identified separately by caption and adversary number, or title of motion or application and docket number, and using the Uniform Task Based Management System ("UTBMS") Litigation Task Code Set.[3]

xv. Meetings and Communications with Creditors: Preparation for and attendance at section 341(a) meeting and any other meetings with creditors and creditors' committees.

xvi. Non-Working Travel: Non-working travel where the court reimburses at less than full hourly rates.

xvii. Plan and Disclosure Statement: Formulation, presentation and confirmation; compliance with the plan confirmation order, related orders and rules; disbursement and case closing activities, except those related to the allowance and objections to allowance of claims.

xviii. Real Estate: Review and analysis of real estate-related matters, including purchase agreements and lease provisions (e.g., common area maintenance clauses).

xix. Relief from Stay and Adequate Protection: Matters relating to termination or continuation of automatic stay under 11 U.S.C. 362 and motions for adequate protection under 11 U.S.C. 361.

xx. Reporting: Statement of financial affairs, schedules, monthly operating reports, and any other accounting or reporting activities; contacts with the United States Trustee not included in other categories.

xxi. Tax: Analysis of tax issues and preparation of federal and state tax returns.

xxii. Valuation: Appraise or review appraisals of assets.

c. The applicant should provide a brief narrative summary of the following information for each project category:

i. A description of the project, its necessity and benefit to the estate, and its status, including all pending litigation for which compensation and reimbursement are requested.

ii. The identity of each person providing services on the project.

iii. A statement of the number of hours spent and the amount of compensation requested for each professional and paraprofessional on the project.

*9. Time and service entries within each project category:*

a. Time and service entries should be reported in chronological order within each project category.

b. Each time or service entry should include:

i. The timekeeper's name.

ii. Time spent on task.

iii. Hourly rate.

iv. Fees sought for each entry.

v. Description of task or service.

c. Time should be recorded contemporaneously in increments of no more than one tenth (.1) of an hour. A disproportionate number of entries billed in half- or whole-hour increments may indicate that actions are being lumped or not accurately billed.

d. Services should be described in detail and not combined or "lumped" together, with each service showing a separate time entry. Each timekeeper, however, may record one daily entry that combines tasks for a particular project that total a de minimis amount of time if those tasks do not exceed .5 hours on that day.

---

[3] See UTBMS.com for information on uniform task codes commonly used in legal billing.

e. Entries should give sufficient detail about the work, identifying the subject matter of the communication, hearing, or task and any recipients or participants.

f. If more than one professional attends a hearing or conference, the applicant should explain the need for multiple attendees.

10. *Electronic billing records:* The billing records (detailed time and service entries) substantiating the application should be provided in an open and searchable electronic data format: (i) With the application to the court, the debtor-in-possession (or trustee), official committees, the United States Trustee, and the fee review committee, fee examiner, and fee auditor; and (ii) upon request, to any other party in interest.[4] The applicant may provide the electronic data in the manner in which it maintains it. An applicant that does not maintain billing data electronically is encouraged to consult with the United States Trustee about providing paper copies of such information. The applicant's submission of electronic data does not relieve the applicant of its obligations under the Code, local rules, and any applicable compensation or case management orders, including providing paper copies if required.

11. *Case status:* The following information should be provided to the extent possible:

a. A brief summary of the case, discussing key steps completed and key steps remaining until the case can be closed.

b. The amount of cash on hand or on deposit, the amount and nature of accrued unpaid administrative expenses, and the amount of unencumbered funds in the estate.

c. Any material changes in the status of the case that occur after the filing of the fee application should be raised at the hearing on the application or, if a hearing is not required, prior to the expiration of the time period for objection.

12. *Expense Categories:* To facilitate effective review of the application, all expense entries should be arranged by expense categories.

a. The expense categories set forth below should be used to the extent applicable:
i. Copies.
ii. Outside Printing.
iii. Telephone.
iv. Facsimile.
v. Online Research.

vi. Delivery Services/Couriers.
vii. Postage.
viii. Local Travel.
ix. Out-of-town Travel:
(a) Transportation.
(b) Hotel.
(c) Meals.
(d) Ground Transportation.
(e) Other (please specify).
x. Meals (local).
xi. Court Fees.
xii. Subpoena Fees.
xiii. Witness Fees.
xiv. Deposition Transcripts.
xv. Trial Transcripts.
xvi. Trial Exhibits.
xvii. Litigation Support Vendors.
xviii. Experts.
xix. Investigators.
xx. Arbitrators/Mediators.
xxi. Other (please specify).

b. Although certain expense categories may appear in the category list, the United States Trustee may still object to the inclusion of any expenses that should properly be deemed an applicant's overhead. *See* ¶ B.3.e.

c. Unusual items require more detailed explanations and should be allocated, where practicable, to specific projects.

13. *Contents of application for reimbursement of reasonable, actual, and necessary expenses:* Any expense for which reimbursement is sought must be reasonable, actual, and necessary, and must be of the kind customarily billed to non-bankruptcy clients.

a. Expenses should be reported in chronological order within each expense category.

b. Each expense should include the following information:
i. Amount.
ii. Description and pertinent detail (e.g., copy costs, messengers, computer research, type of travel, type of fare, rate, destination, etc.).
iii. Date incurred.
iv. Who incurred the expense, if relevant.
v. Reason for expense.

14. *Summaries:*
a. All applications should contain a summary cover sheet that provides the information below. Exhibit E is a model form that may be useful in transmitting this information.
i. Name of applicant.
ii. Name of client.
iii. Time period covered by this application.
iv. Total compensation sought this period.
v. Total expenses sought this period.
vi. Petition date.
vii. Retention date.
viii. Date of order approving employment.

ix. Total compensation approved by interim order to date.
x. Total expenses approved by interim order to date.
xi. Total allowed compensation paid to date.
xii. Total allowed expenses paid to date.
xiii. Blended rate in this application for all attorneys.
xiv. Blended rate in this application for all timekeepers. *See* Exhibit A.
xv. Compensation sought in this application already paid pursuant to a monthly compensation order but not yet allowed.
xvi. Expenses sought in this application already paid pursuant to a monthly compensation order but not yet allowed.
xvii. Number of professionals included in this application.
xviii. If applicable, the number of professionals included in this application not included in a staffing plan approved by the client.
xix. If applicable, difference between fees budgeted and compensation sought for this period.
xx. Number of professionals billing fewer than 15 hours to the case during this period.
xxi. If the applicant has increased rates during the case, the application should disclose the effect of the rate increases. For comparison purposes, the applicant should calculate and disclose the total compensation sought in the application using the rates originally disclosed in the retention application.

b. All applications should summarize fees and hours by project category and expenses by expense category. Exhibit D–1 (fees) and Exhibit D–2 (expenses) are model forms that may be useful in providing this information.

c. All applications should summarize professionals (preferably in alphabetical order) included in the fee application by the professional's name, title, primary practice group, date of first admission, fees, hours, rates, and number of rate increases. Exhibit B is a model form that may be useful in providing this and other information.

**D. Applications For Employment**

1. *Statement from the applicant.* The applicant should answer the questions below in all applications for employment filed under sections 327 or 1103 of the Code. Most questions require only a yes or no answer. The applicant, however, is free to provide additional information if it chooses to explain or clarify its answers.

a. Did you agree to any variations from, or alternatives to, your standard or customary billing arrangements for this engagement?

---

[4] See *www.LEDES.org* for information regarding open electronic data formats commonly used in legal e-billing.

b. Do any of the professionals included in this engagement vary their rate based on the geographic location of the bankruptcy case?

c. If you represented the client in the 12 months prepetition, disclose your billing rates and material financial terms for the prepetition engagement, including any adjustments during the 12 months prepetition. If your billing rates and material financial terms have changed postpetition, explain the difference and the reasons for the difference.

d. Has your client approved your prospective budget and staffing plan, and, if so, for what budget period?

2. *Verified statement from the client:* [5] The client should provide a verified statement with all applications for employment filed under sections 327 and 1103 of the Code that addresses the following:

a. The identity and position of the person making the verification. The person ordinarily will be the general counsel of the debtor or another officer responsible for supervising outside counsel and monitoring and controlling legal costs.

b. The steps taken by the client to ensure that the applicant's billing rates and material terms for the engagement are comparable to the applicant's billing rates and terms for other non-bankruptcy engagements and to the billing rates and terms of other comparably skilled professionals.

c. The number of firms the client interviewed.

d. If the billing rates are not comparable to the applicant's billing rates for other non-bankruptcy engagements and to the billing rates of other comparably skilled professionals, the circumstances warranting the retention of that firm.

e. The procedures the client has established to supervise the applicant's fees and expenses and to manage costs. If the procedures for the budgeting, review and approval of fees and expenses differ from those the client regularly employs in non-bankruptcy cases to supervise outside counsel, explain how and why. In addition, describe any efforts to negotiate rates, including rates for routine matters, or in the alternative to delegate such matters to less expensive counsel.

f. The client verification should be appropriately detailed and should not be a routine form prepared by the client's bankruptcy counsel.

[5] A verified statement is either a declaration executed in accordance with 28 U.S.C. 1746 or an affidavit conforming to the laws of the jurisdiction where executed.

## E. Budgets and Staffing Plans, In General

1. In a larger chapter 11 case that meets the threshold, the United States Trustee ordinarily will seek the use of fee and expense budgets and staffing plans, either with the consent of the parties or by court order as soon as feasible after the commencement of the case. As set forth in ¶ B.2.m above, the United States Trustee will consider fee applications in the context of budgets and staffing plans used in the case, and the professionals are urged to consult with the United States Trustee whether they anticipate delays in formulating budgets. The United States Trustee will also consider whether the client has approved the applicant's budget and staffing plan when reviewing applications for employment. *See* ¶ D.1.d. Exhibit C contains a model budget (Exhibit C–1) and staffing plan (Exhibit C–2).

2. Budgets and staffing plans should be agreed to between the professional and its client.

3. Budgets can and should be amended as necessary to reflect changed circumstances or unanticipated developments.

4. The appropriate budget period should be decided between the professional and its client. For example, the budget could be provided for the next month, the next 120-day interim application period, or for any other time period as agreed.

5. The staffing plan should use the same planning period as the budget.

6. In the staffing plan, the number of professionals expected to work on the matter during the budget period may be disclosed either by category of timekeeper (*e.g.,* 25 associates) or by years of experience (*e.g.,* 15 lawyers with 8–14 years of experience).

7. Except as provided in ¶ E.8. below, any disclosure of the budget and staffing plan to the United States Trustee and other parties will be retrospective only in conjunction with the fee application. *See* ¶ C.6. above.

8. Absent the parties' consent, the United States Trustee may seek a court order expressly authorizing the exchange of budgets by counsel for the debtor-in-possession and the official committees once they are approved by their respective clients or whenever amended. These budgets may be provided subject to an appropriate confidentiality agreement and redacted to protect privileged or confidential information. Such redactions may be compensable if the disclosure of the privileged or confidential information cannot otherwise be avoided through

careful drafting. But the time spent for redactions should be reasonably proportional to the overall fees sought. The confidential and prospective exchange of budgets between these fiduciaries concerns the administration of the case and potentially avoids duplication, consistent with the requirements of section 1103 of the Code.

## F. Retention and Compensation of Co-Counsel

1. *Scope of retention:*

a. Where a debtor retains multiple section 327(a) bankruptcy counsel, the retention applications should clearly specify which firm is acting as lead counsel and should clearly delineate the areas of secondary counsel's responsibility. In general, it should be presumed that all bankruptcy matters in the case will be handled by the lead counsel unless the retention application specifically assigns them to secondary counsel.

b. The retention application should not contain an indeterminate or open-ended description of secondary counsel's duties. In particular, retention orders should not contain language permitting secondary counsel to perform additional, unspecified services at the discretion of the debtor or the lead counsel.

c. When a new matter within the authorized scope of secondary counsel's engagement is assigned by the lead counsel to secondary counsel, secondary counsel need not file a supplemental retention application and obtain an amended order. Rather, secondary counsel should file a supplemental declaration in accordance with Bankruptcy Rule 2014, and provide notice of the filing sufficient to afford parties in interest an opportunity to object. Nevertheless, if the matter does not fall within the authorized scope of the engagement, secondary counsel should file a supplemental retention application and obtain an amended order to expand the scope of the engagement to include that matter.

d. Except to the extent that such work is directly relevant to its assigned duties, secondary counsel should not perform or be compensated for general case administration duties, such as preparing agenda letters, monitoring dockets, reviewing pleadings, or attending hearings at which it does not directly participate.

e. The retention application should clearly identify to whom the proposed secondary counsel will report. In most cases, secondary counsel should report directly to the management of the debtor.

2. *Necessity for retention:*

a. Applications to retain secondary counsel should contain sufficient facts to support any contention that employment of an additional law firm will benefit the estate. Secondary counsel may be either "efficiency counsel" or "conflicts counsel." Efficiency counsel is secondary counsel employed to handle more routine and "commoditized" work, such as claims objections and avoidance actions, at lower cost to the estate than lead bankruptcy counsel. Conflicts counsel is secondary counsel employed when lead bankruptcy counsel is subject to a limited, not pervasive, conflict of interest that prevents it from performing some small part of its duties.

b. In the case of efficiency counsel, the retention application should include, at a minimum, a comparison of the billing rates of the lead counsel and secondary counsel and a projection of the total cost savings to the estate that would result from employing secondary counsel. The retention application should also identify any other factors that would weigh for or against retaining secondary counsel, including any significant differences in associated travel costs.

c. In the case of conflicts counsel, the retention application should set forth with specificity the nature of the lead counsel's conflict, including the identity of any relevant party whom the lead counsel has represented, a description of the nature of that representation, and the terms of any waivers or covenants that affect the lead counsel's ability to take action adverse to that party. The application should also set forth any procedures that the debtor proposes to adopt in response to that conflict, including any ethical walls to which the lead counsel will be subject.

3. *Lead counsel's conflicts:*

a. In most cases, applications for the retention of conflicts counsel are filed because either the debtor is aware at the outset that its proposed lead counsel is subject to a conflict of interest that prevents it from performing some part of its duties, or in response to an objection to retention filed by the United States Trustee or other party. The United States Trustee should carefully review the proposed conflicts counsel's retention to assure that the lead counsel's conflicts are not so pervasive as to give rise to an objection to the lead counsel's retention rather than the appointment of secondary counsel.

b. As in any case, the United States Trustee should review the lead counsel's conflicts based on the particular facts and circumstances of the case, including the specific terms of the proposed conflicts counsel's retention. The following are circumstances that may indicate that the retention of conflicts counsel is inappropriate and should weigh in favor of an objection to the retention application of the lead counsel:

i. The responsibilities of conflicts counsel are not confined to discrete legal matters.

ii. The conflicts counsel will be used to handle matters that are inseparable from the major reorganization activities of the case (e.g., negotiation of major plan provisions).

iii. The conflicts counsel will act under the direct supervision of, and at the direction of, the lead counsel.

iv. The conflicts counsel's role will include filing or advocating pleadings that have been drafted by lead counsel.

v. The conflicts counsel has been retained to litigate matters in which the lead counsel has represented the debtor in settlement negotiations.

vi. The debtor will not (or cannot) create an ethical wall to screen the lead counsel from the work of the conflicts counsel.

c. One recent trend has been for law firms to obtain limited conflicts waivers that permit them to engage in settlement negotiations against certain entities, but which require them to assign the matter to conflicts counsel in the event that the dispute is litigated in court. Such arrangements are generally objectionable, and the United States Trustee retains discretion whether to object in a particular situation. Negotiation without the ability to litigate against a party usually will render a lawyer disqualified from the matter, and such disqualification cannot be cured by retention of conflicts counsel to handle the litigation.

4. *Billing and fee matters:* The United States Trustee should encourage both lead and secondary counsel to submit their billing records in a format that will enable the United States Trustee and other interested parties to easily identify any duplication or overlap in their work. Matters for which secondary counsel is primarily responsible should be assigned a separate billing code, and fee statements should clearly reflect both the amount of time that lead counsel or other professionals have spent on the matter assigned to secondary counsel, as well as the amount of time that secondary counsel has spent on matters outside its primary responsibility.

5. *Non-compensable services:* The United States Trustee should monitor the fees of both lead counsel and secondary counsel for services that are unnecessary, duplicative, or that do not benefit the estate, and should advise counsel in advance that the United States Trustee will object to any such fees. Among other examples, the United States Trustee should object to fees for the following:

a. Excessive time bringing secondary counsel "up to speed" on the case, including time spent reviewing background materials that are not germane to secondary counsel's areas of responsibility;

b. "Shadowing" of secondary counsel by lead counsel (or vice versa);

c. Unnecessary attendance of attorneys from both lead and secondary counsel at court hearings and conferences, and other meetings;

d. Reviewing, editing, or revising the work product of the other counsel; or

e. Unnecessary duplication of case administration tasks, such as monitoring the docket, reviewing pleadings, or preparing hearing agenda letters.

**G. Special Fee Review Entities**

1. *Generally:* In a larger chapter 11 case where a significant number of professionals will be retained and the normal fee application and review process would be especially burdensome, the United States Trustee ordinarily will seek the court's appointment of a special fee review entity, such as a fee review committee or an independent fee examiner. Such an entity can assist the court and parties in reviewing fee applications and can bring consistency, predictability, and transparency to the process. Although whether a fee review entity is appointed is ultimately the court's decision, the United States Trustee will follow these Guidelines in connection with fee review entities, subject to the court's directions and orders.

2. *Timing:* The United States Trustee ordinarily will seek the appointment of a fee review entity as soon as practicable after the order for relief.

3. *Purpose:* A fee review entity's primary purpose is to ensure that professional fees and expenses paid by the estate are reasonable, actual, and necessary, as required by section 330 of the Code. Thus, a fee review entity should monitor, review, and where appropriate, object to interim and final applications for fees and expenses filed by professionals who seek compensation from the estate. If a case has a monthly compensation order permitting the payment of fees and expenses before approval of interim or final applications, the fee review entity should also monitor, review, and where appropriate, object to monthly invoices submitted for payment. The fee review entity can also establish other measures

to assist the court and the professionals in complying with the Code, the Federal Rules of Bankruptcy Procedure, local rules or general orders, the Guidelines, and other controlling law within the jurisdiction. In the absence of local rules or general orders and other controlling law within the jurisdiction, a fee review entity should monitor, review, and where appropriate, object to interim and final fee applications under section 330 in accordance with these Guidelines.

4. *Models:* A fee review entity can take one of several forms. The determination of the appropriate form for a particular case will be the product of consultation among the United States Trustee, the debtor, and any official committee, but it is ultimately the court's decision. There are several possible models, including a fee review committee, a fee review committee with an independent member, and an independent fee examiner.

a. *Fee review committee:* The court could appoint a Fee Review Committee, which should ordinarily consist of representatives of the debtor-in-possession, the unsecured creditors committee, any other official committee, and the United States Trustee. The representatives of the debtor-in-possession and the official committee(s) should not be retained professionals whose fees and expenses will be subject to review by the Fee Review Committee. One member of the Fee Review Committee should be designated as chairman, but that person's function should be administrative. The chairman should serve as a point of contact for any professionals retained by the Fee Review Committee. Each member should have one vote, and decisions should be reached by majority vote. The order appointing the Fee Review Committee or any protocol developed by the members may address other administrative issues, including the resolution of any tie vote.

b. *Fee review committee with independent member:* The court could appoint a Fee Review Committee, as described above, and add an ''Independent Member'' as chairman. The Independent Member should be an experienced person not otherwise involved in the case as a party in interest or as a representative of a party in interest. The Independent Member will perform administrative functions and serve as the primary contact for any professionals retained by the Fee Review Committee. In addition, the Independent Member will be an active participant in the substantive discussions of the Fee Review Committee and will, in consultation with the committee, meet and otherwise communicate with professionals whose compensation is subject to the committee's review. Each member, including the Independent Member, should have a vote, and decisions should be reached by majority vote. In the event of a tie vote, the Independent Member's vote should be determinative. The United States Trustee will, at the court's request, solicit suggestions from parties in interest for appointment as the Independent Member and submit several names to the court for consideration.

c. *Independent fee examiner:* The court may appoint a single person to serve as an Independent Fee Examiner for the case. The Fee Examiner should be an experienced person not otherwise involved in the case as a party in interest or a representative of a party in interest. The order appointing the Fee Examiner should fully describe the Fee Examiner's duties and reporting obligations.

5. *Retention of professionals:* A fee review entity should be authorized, subject to court approval, to retain professionals, including but not limited to attorneys and fee auditors, to assist in discharging its duties. The United States Trustee, however, may not participate in or vote on the hiring of professionals for the fee review entity, although the United States Trustee may suggest persons who should serve as Independent Members or Independent Fee Examiners.

6. *Compensation:* The Fee Review Committee's professionals, the Independent Member, and the Independent Fee Examiner should be compensated in accordance with the fee procedures established in the case and should file interim and final fee applications for consideration under the reasonableness standards set forth in 11 U.S.C. § 330(a). Compensation under a flat fee arrangement may be appropriate in certain cases but only if subject to reasonableness review under section 330.

7. *Rights of a party in interest:* A fee review entity should have the rights of a party in interest in connection with fee issues, and should be authorized to negotiate fee disputes with retained professionals, to object to fee applications both interim and final, to object to monthly invoices if a case is governed by a monthly compensation order, and to undertake discovery in connection with contested fee matters.

8. *Budgets:* If the court directs that budgets be adopted by retained professionals, a fee review entity should establish guidelines and requirements for the preparation and submission of fee and expense budgets by the retained professionals. A fee review entity should also consider whether case-specific project billing codes should be developed to facilitate preparation and review of fee applications.

9. *Dispute resolution:* A fee review entity should establish procedures to resolve fee disputes with retained professionals, while retaining the right to file and prosecute objections if disputes cannot be resolved.

10. *Exculpation and indemnification:* The order appointing a fee review entity should contain appropriate provisions exculpating and indemnifying Fee Review Committee members, the Independent Member, or the Fee Examiner from any liability arising out of their service.

**Clifford J. White III,**
*Director, Executive Office for United States Trustees.*

EXHIBIT A—CUSTOMARY AND COMPARABLE COMPENSATION DISCLOSURES WITH FEE APPLICATIONS

[*See* Guidelines ¶C.3. for definitions of terms used in this Exhibit]

| Category of timekeeper (using categories already maintained by the firm) | Blended hourly rate | |
|---|---|---|
| | Billed or collected firm or offices for preceding year, excluding bankruptcy | Billed in this fee application |
| Sr./Equity Partner/Shareholder | | |
| Jr./Non-equity/Income Partner | | |
| Counsel | | |

EXHIBIT A—CUSTOMARY AND COMPARABLE COMPENSATION DISCLOSURES WITH FEE APPLICATIONS—Continued

[*See* Guidelines ¶ C.3. for definitions of terms used in this Exhibit]

| Category of timekeeper (using categories already maintained by the firm) | Blended hourly rate | |
|---|---|---|
| | Billed or collected firm or offices for preceding year, excluding bankruptcy | Billed in this fee application |
| Sr. Associate (7 or more years since first admission) | | |
| Associate (4–6 years since first admission) | | |
| Jr. Associate (1–3 years since first admission) | | |
| Staff Attorney | | |
| Contract Attorney | | |
| Paralegal | | |
| Other (please define) | | |
| All timekeepers aggregated | | |

Case Name and Number: _____
Applicant's Name: _____
Date of Application: _____
Interim or Final: _____

**Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 by Attorneys in Larger Chapter 11 Cases**

EXHIBIT B—SUMMARY OF TIMEKEEPERS INCLUDED IN THIS FEE APPLICATION

| Name | TITLE OR POSITION | Department, group, or section | Date of first admission[1] | Fees billed in this application | Hours billed in this application | Hourly rate billed | | Number of rate increases since case inception |
|---|---|---|---|---|---|---|---|---|
| | | | | | | In this application | In first interim application | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

[1] If applicable.

Case Name and Number: _____
Applicant's Name: _____
Date of Application: _____
Interim or Final: _____

**Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 by Attorneys in Larger Chapter 11 Cases**

If the parties consent or the court so directs, a budget approved by the client in advance should generally be attached to each interim and final fee application filed by the applicant. If the fees sought in the fee application vary by more than 10% from the budget, the fee application should explain the variance. *See* Guidelines ¶ C.8. for project category information.

EXHIBIT C–1—BUDGET

| Project category | Estimated hours | Estimated fees |
|---|---|---|
| Asset Analysis and Recovery | | |
| Asset Disposition | | |

### EXHIBIT C–1—BUDGET—Continued

| Project category | Estimated hours | Estimated fees |
|---|---|---|
| Assumption and Rejection of Leases and Contracts | | |
| Avoidance Action Analysis | | |
| Budgeting (Case) | | |
| Business Operations | | |
| Case Administration | | |
| Claims Administration and Objections | | |
| Corporate Governance and Board Matters | | |
| Employee Benefits and Pensions | | |
| Employment and Fee Applications | | |
| Employment and Fee Application Objections | | |
| Financing and Cash Collateral | | |
| Litigation: Contested Matters and Adversary Proceedings (not otherwise within a specific project category)—identify each separately by caption and adversary number, or title of motion or application and docket number | | |
| Meetings and Communications with Creditors | | |
| Non-Working Travel | | |
| Plan and Disclosure Statement | | |
| Real Estate | | |
| Relief from Stay and Adequate Protection | | |
| Reporting | | |
| Tax | | |
| Valuation | | |
| Total | | |

Case Name and Number: _____

Applicant's Name: _____

Date of Application: _____

Interim or Final: _____

**Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 by Attorneys in Larger Chapter 11 Cases**

If the parties consent or the court so directs, a staffing plan approved by the client in advance should generally be attached to each interim and final fee application filed by the applicant. If the fees are sought in the fee application for a greater number of professionals than identified in the staffing plan, the fee application should explain the variance.

### EXHIBIT C–2—STAFFING PLAN

| Category of timekeeper [1] (using categories maintained by the firm) | Number of timekeepers expected to work on the matter during the budget period | Average hourly rate |
|---|---|---|
| Sr./Equity Partner/Shareholder | | |
| Jr./Non-equity/Income Partner | | |
| Counsel | | |
| Sr. Associate (7 or more years since first admission) | | |
| Associate (4–6 years since first admission) | | |
| Jr. Associate (1–3 years since first admission) | | |

### EXHIBIT C–2—STAFFING PLAN—Continued

| Category of timekeeper [1] (using categories maintained by the firm) | Number of timekeepers expected to work on the matter during the budget period | Average hourly rate |
|---|---|---|
| Staff Attorney | | |
| Contract Attorney | | |
| Paralegal | | |
| Other (please define) | | |

[1] As an alternative, firms can identify attorney timekeepers by years of experience rather than category of attorney timekeeper: 0–3, 4–7, 8–14, and 15+. Non-attorney timekeepers, such as paralegals, should still be identified by category.

Case Name and Number: _____
Applicant's Name: _____
Date of Application: _____
Interim or Final: _____

**Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 by Attorneys in Larger Chapter 11 Cases**

### EXHIBIT D–1—SUMMARY OF COMPENSATION REQUESTED BY PROJECT CATEGORY

[*See* Guidelines ¶C.8. for project category information.]

| Project category | Hours budgeted [1] | Fees budgeted [1] | Hours billed | Fees sought |
|---|---|---|---|---|
| Asset Analysis and Recovery | | | | |
| Asset Disposition | | | | |
| Assumption and Rejection of Leases and Contracts | | | | |
| Avoidance Action Analysis | | | | |
| Budgeting (Case) | | | | |
| Business Operations | | | | |
| Case Administration | | | | |
| Claims Administration and Objections | | | | |
| Corporate Governance and Board Matters | | | | |
| Employee Benefits and Pensions | | | | |
| Employment and Fee Applications | | | | |
| Employment and Fee Application Objections | | | | |
| Financing and Cash Collateral | | | | |
| Litigation: Contested Matters and Adversary Proceedings (not otherwise within a specific project category)—identify each separately by caption and adversary number, or title of motion or application and docket number | | | | |
| Meetings and Communications with Creditors | | | | |
| Non-Working Travel | | | | |
| Plan and Disclosure Statement | | | | |
| Real Estate | | | | |
| Relief from Stay and Adequate Protection | | | | |
| Reporting | | | | |
| Tax | | | | |
| Valuation | | | | |

### EXHIBIT D–1—SUMMARY OF COMPENSATION REQUESTED BY PROJECT CATEGORY—Continued

[*See* Guidelines ¶C.8. for project category information.]

| Project category | Hours budgeted [1] | Fees budgeted [1] | Hours billed | Fees sought |
|---|---|---|---|---|
| TOTAL | | | | |

[1] If applicable.

Case Name and Number: _____
Applicant's Name: _____
Date of Application: _____
Interim or Final: _____

**Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 by Attorneys in Larger Chapter 11 Cases**

### EXHIBIT D–2—SUMMARY OF EXPENSE REIMBURSEMENT REQUESTED BY CATEGORY

[*See* Guidelines ¶C.12. for expense category information]

| Category | Amount |
|---|---|
| Copies | |
| Outside Printing | |
| Telephone | |
| Facsimile | |
| Online Research | |
| Delivery Services/ Couriers | |
| Postage | |

### EXHIBIT D–2—SUMMARY OF EXPENSE REIMBURSEMENT REQUESTED BY CATEGORY—Continued

[*See* Guidelines ¶C.12. for expense category information]

| Category | Amount |
|---|---|
| Local Travel | |
| Out-of-Town Travel: (a) Transportation | |
| (b) Hotel | |
| (c) Meals | |
| (d) Ground Transportation | |
| (e) Other (please specify) | |
| Meals (local) | |
| Court Fees | |
| Subpoena Fees | |
| Witness Fees | |
| Deposition Transcripts | |

### EXHIBIT D–2—SUMMARY OF EXPENSE REIMBURSEMENT REQUESTED BY CATEGORY—Continued

[*See* Guidelines ¶C.12. for expense category information]

| Category | Amount |
|---|---|
| Trial Transcripts | |
| Trial Exhibits | |
| Litigation Support Vendors | |
| Experts | |
| Investigators | |
| Arbitrators/Mediators | |
| Other (please specify) | |

Case Name and Number: _____
Applicant's Name: _____
Date of Application: _____
Interim or Final: _____

**Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 by Attorneys in Larger Chapter 11 Cases**

### EXHIBIT E—SUMMARY COVER SHEET OF FEE APPLICATION

| | |
|---|---|
| Name of applicant | |
| Name of client | |
| Time period covered by this application | |
| Total compensation sought this period | |
| Total expenses sought this period | |
| Petition date | |
| Retention date | |
| Date of order approving employment | |
| Total compensation approved by interim order to date | |
| Total expenses approved by interim order to date | |
| Total allowed compensation paid to date | |
| Total allowed expenses paid to date | |
| Blended rate in this application for all attorneys | |

## EXHIBIT E—SUMMARY COVER SHEET OF FEE APPLICATION—Continued

| | |
|---|---|
| Blended rate in this application for all timekeepers | |
| Compensation sought in this application already paid pursuant to a monthly compensation order but not yet allowed | |
| Expenses sought in this application already paid pursuant to a monthly compensation order but not yet allowed | |
| Number of professionals included in this application | |
| If applicable, number of professionals in this application not included in staffing plan approved by client | |
| If applicable, difference between fees budgeted and compensation sought for this period | |
| Number of professionals billing fewer than 15 hours to the case during this period | |
| Are any rates higher than those approved or disclosed at retention? If yes, calculate and disclose the total compensation sought in this application using the rates originally disclosed in the retention application | |

Case Name and Number: _____

Applicant's Name: _____

Date of Application: _____

Interim or Final: _____

**Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 by Attorneys in Larger Chapter 11 Cases**

**Exhibit F**

**ANALYSIS OF COMMENTS RECEIVED AND SUMMARY OF SIGNIFICANT CHANGES IN RESPONSE TO COMMENTS**

**A. INTRODUCTION**

On November 4, 2011, the United States Trustee Program ("USTP") posted for public comment an initial draft of the Appendix B—Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed under 11 U.S.C. § 330 by Attorneys in Larger Chapter 11 Cases ("Appendix B guidelines'' or ''Guidelines''). The Appendix B guidelines reflect eight core principles:

1. Ensuring that fee review is subject to client-driven market forces, accountability, and scrutiny.

2. Ensuring adherence to the requirements of section 330 of the Bankruptcy Code so that all professional compensation is reasonable and necessary, particularly as compared to the market measured both by the professional's own billing practices for bankruptcy and non-bankruptcy engagements and by those of its peers.

3. Enhancing meaningful disclosure by professionals and transparency in billing practices.

4. Increasing client and constituent accountability for overseeing the fees and billing practices of their own professionals.

5. Encouraging the development of budgets and staffing plans to bring discipline, predictability, and client involvement and accountability to the compensation process.

6. Decreasing the administrative burden of review.

7. Maintaining the burden of proof on the fee applicant, and not the objecting party.

8. Increasing public confidence in the integrity and soundness of the bankruptcy compensation process.

The USTP received more than two dozen comment letters on the initial draft of the Appendix B guidelines posted on November 4, 2011. The USTP thereafter convened a public meeting regarding the Appendix B guidelines on June 4, 2012. Seven commenters appeared at the public meeting, and this discussion is reflected in the transcript of the public meeting.

The USTP reviewed the written and oral comments to the initial draft of the Appendix B guidelines, and on November 2, 2012, posted its analysis of those comments and a summary of the significant revisions incorporated in the second draft of the Appendix B guidelines. See ¶ B.2. below.[1] At the same time, the USTP also posted the second draft of the Appendix B guidelines for an additional and final comment period ending November 23, 2012.

The USTP received six comment letters on the second draft. After reviewing the comments to the second draft, the USTP finalized and issued the Appendix B guidelines. The USTP's analysis of the comments on the second draft and a summary of the significant revisions incorporated in the final Appendix B guidelines as issued follow the USTP's comment analysis on the initial draft. See ¶ C. below.[2]

All comments to the initial and second drafts of the Appendix B guidelines, as well as the transcript of the June 4, 2012, public meeting, are available for review on the USTP's website, at http://www.justice.gov/ust/eo/rules_regulations/guidelines/public_comments.htm. An analysis of the primary comments received on both drafts and a summary of the significant changes made in response to the comments follow.

**B. SUMMARY OF SIGNIFICANT CHANGES AND ANALYSIS OF COMMENTS RECEIVED AFTER POSTING INITIAL DRAFT GUIDELINES FOR COMMENT ON NOVEMBER 4, 2011**

**1. Summary of Significant Changes Following Posting of Initial Draft Appendix B _Guidelines for Comment on November 4, 2011_**

a. THRESHOLD FOR APPLICATION: The threshold for application has been revised to $50 million or more in assets **_and_** $50 million or more in liabilities, aggregated for jointly administered cases and excluding single asset real estate cases. Guidelines ¶ A.2.[3] The initial threshold was $50 million in assets and liabilities combined.

b. DISCLOSURES FOR CUSTOMARY AND COMPARABLE COMPENSATION AND CLIENT VERIFICATIONS: The disclosures that the USTP will request regarding customary and comparable compensation have been amended. Guidelines ¶ C.3. Instead of disclosing high, low and average rates, the revised Guidelines provide that applicants disclose blended billing rates in the aggregate and by category of professional. Guidelines ¶ C.3.a–b. Applicants have the flexibility to report

---

[1] Summary of Significant Changes and Analysis of Comments Received After Posting Initial Draft Guidelines for Comment on November 4, 2011.

[2] Summary of Significant Changes and Analysis of Comments Received After Posting Revised Draft Guidelines for Final Comment on November 2, 2012.

[3] All references are to the final Appendix B guidelines as issued.

their blended rate information for non-bankruptcy engagements based on either time billed or revenue collected either for the firm (domestic offices only) or offices in which timekeepers billed at least 10% of the hours to the bankruptcy case during the application period. Guidelines ¶ C.3.a.i. The revised Guidelines clarify that pro bono and materially discounted charitable or firm-employee engagements may be excluded from the non-bankruptcy blended rate computation. Guidelines ¶ C.3.a.iv.(c). Disclosure in accordance with ¶ C.3.a.-b. of the Guidelines will provide a limited "safe harbor" from additional requests from the United States Trustee for information about customary and comparable compensation under section 330(a)(3)(F) of the Bankruptcy Code, without prejudice to the United States Trustee's ability to seek additional information based upon the particular facts and circumstances of the case, to file an objection, or to offer evidence on comparable compensation from other sources. Guidelines ¶ C.4.

**c. BUDGETS AND STAFFING PLANS:** A budget and staffing plan will be used only with the consent of the professionals or if the United States Trustee obtains a court order. Guidelines ¶ E.1. The United States Trustee will ask that the counsel for the debtor-in-possession and official committees exchange their budgets once client-approved, Guidelines ¶ E.8., and that professionals provide budgets and staffing plans to the United States Trustee retrospectively with the fee application. Guidelines ¶¶ C.6.a., E.7.-8. Budgets may be redacted to protect privileged or confidential information. Guidelines ¶ C.6.b., E.8. The Guidelines clarify that the attorney and the client should decide the appropriate budget period, and that budgets may be amended as necessary to reflect changed circumstances or unanticipated developments. Guidelines ¶¶ E.3.-4.

**d. TASK CODES AND SUB-CATEGORY ACTIVITY CODES:** The 20 sub-category activity codes have been deleted. Instead, the USTP slightly modified the project categories in the existing Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses filed under 11 U.S.C. § 330, 28 C.F.R. Part 58, Appendix A ("Appendix A guidelines"). Guidelines ¶ C.8.b.; Exhibits C-1, D-1. First, the USTP added a "Budgeting" category to reflect the intention to seek the use of budgets for the applicant in most cases that satisfy the threshold. Second, to provide better transparency and accountability, the USTP extracted and separately categorized certain tasks that are

included in the broader Appendix A guidelines' project categories, all but one of which is included in the long-established Uniform Task Based Management System ("UTBMS") bankruptcy code set.[4] These tasks are: Assumption and Rejection of Leases and Contracts; Avoidance Action Analysis; Corporate Governance and Board Matters; Litigation; Non-Working Travel; Real Estate; and Reporting.

**e. CO-COUNSEL RETENTIONS AND STAFFING EFFICIENCIES:** Debtors and official committees are encouraged to use co-counsel arrangements to achieve better staffing and fee efficiencies. Guidelines ¶¶ B.2.c., F. These arrangements include using less expensive co-counsel for certain routine, commoditized, or discrete matters to avoid duplication, overlap, and inefficiencies.

**f. DEBTORS' ESTIMATE OF FEES INCURRED IN ORDINARY COURSE AND NOT BECAUSE OF BANKRUPTCY:** This requested disclosure has been deleted.

**g. REDACTIONS:** The USTP will not object to compensation for limited redactions to protect privileged or confidential information in the budget or the fee application, the disclosure of which could not be avoided through drafting. Guidelines ¶¶ B.2.f., C.6.b., E.8.

**h. CLIENT AGREEMENT TO RATE INCREASES:** The applicant's statement for the fee application adds an additional question: "Did your client agree when retaining the law firm to accept all future rate increases? If not, did you inform your client that they need not agree to modified rates or terms in order to have you continue the representation, consistent with ABA Formal Ethics Opinion 11-458?" Guidelines ¶ C.5.f. The client's verification at the time of the fee application has been deleted.

**2. Discussion of Initial Public Comments after Posting Initial Draft for Comment on *November 4, 2011 and the Public Meeting Held June 4, 2012***

As of October 19, 2012, the USTP had received 31 comments on the Appendix B guidelines. In addition, seven

---

[4] The UTMBS was developed in the mid-1990s by the Association of Corporate Counsel and the American Bar Association and is now under the jurisdiction of the non-profit LEDES Oversight Committee. *See www.LEDES.org.* Task-based billing, coded and aggregated by type of work performed, allows corporate clients to have "consistent enforcement" of their "outside counsel billing guidelines and alleviat[ed] some of the burden on bill reviewers. Time entry coding assists with reporting and facilitates comparison . . . ." *See www.utbms.com.*

commenters appeared at the public meeting held on June 4, 2012, and this discussion is reflected in the transcript of the public meeting. Many of the comments contained several sub-comments. The USTP appreciates the comments and has considered each comment carefully. The USTP's response to the most significant comments are discussed below, starting with the "General Comments" section and continuing with comments categorized by specific subject matter.

**a. GENERAL COMMENTS**

1) *Comment:* **Official committees, the U.S. Trustee, and the court already review fee applications. The Appendix A guidelines should not be updated because the current system works well and changes would not improve the administration of bankruptcy cases.**

*Response:* The existing Appendix A guidelines are adopted 16 years ago, and law firm billing practices and billing technology have evolved considerably since then. Better data and better technology permit comparisons that would have been difficult, if not impossible, two decades ago. In addition, while clients have substantially improved the way they manage and pay their counsel outside of bankruptcy, estate-paid bankruptcy engagements may not have been subject to comparable discipline. In its comment, the Managed Funds Association ("MFA"), an industry group that represents regular consumers of sophisticated legal services in both bankruptcy and non-bankruptcy engagements, asserted that "bankruptcy compensation has moved from the economy of administration standard to a premium standard by which bankruptcy professionals are effectively compensated at rates higher than those realized in comparable non-bankruptcy engagements. . . . In bankruptcy cases, we do not perceive the same cost control-driven constraints [that we see in non-bankruptcy engagements or bankruptcy engagements not subject to section 330] . . . ." MFA letter dated September 21, 2012, p. 2 ("MFA Letter"). Similarly, one academic took the view that the bankruptcy compensation process generally requires improvement, including better disclosures. *See generally* Professor Nancy B. Rapoport, Letters dated December 14, 2011, and May 1, 2012, and Public Meeting Tr., pp. 11-36. The Appendix B guidelines seek to remain current with contemporary law firm practice and improve the fee application process for all stakeholders.

*2) Comment:* **The Appendix B guidelines would benefit from a robust**

**and open rule-making process.** Similarly, the USTP should "convene a series of meetings with practitioners, judges, and debtors and creditors' committees . . . to discuss the USTP's concerns with the current fee process and hear and solicit views on the relevant issues from the participants." 119 law firms' letter dated January 30, 2012, p. 14 ("119 Law Firms' Initial Letter").

*Response:* The Appendix B guidelines are internal procedural guidelines that are not subject to the notice-and-comment process of the Administrative Procedure Act ("APA"). Nevertheless, recognizing the importance of the proposed Guidelines to the bankruptcy system, the USTP has solicited a great deal of public comment within a framework that exceeds APA requirements.

The USTP engaged in pre-drafting outreach to various bankruptcy judges and practitioners. In November 2011, the USTP posted on its website the initial draft Appendix B guidelines for public comment through the end of January 2012. The USTP posted the comments on its website as they were received and re-opened the comment period at the request of various commenters. The USTP convened a public meeting on June 4, 2012, and invited the public—and all commenters—to attend and to make presentations. The USTP made available on its website a transcript of the public meeting and advised interested parties that it would revise the Guidelines as necessary after consideration of the comments and post a second draft for an additional (third) comment period. The USTP also considered written submissions after the public meeting.

The USTP concludes that no changes are necessary to the process that the USTP employed to solicit public comment or to the Guidelines based on these comments.

**b. SCOPE OF THE APPENDIX B GUIDELINES**

3) *Comment:* **The threshold of $50 million in combined assets and liabilities is too low. In addition, certain types of cases, such as single asset real estate cases, should be excluded from the Appendix B guidelines.**

*Response:* The USTP reviewed available data before setting the initial threshold. A combined assets and liabilities standard was adopted based on the metric used in the American Bankruptcy Institute's chapter 11 fee study, *see* Stephen J. Lubben, *Corporate Reorganization and Professional Fees,*

82 AM. BANKR. L.J. 77, 105 (2008),[5] and it is the formula used by some courts, including one in the District of Delaware, when determining whether to appoint fee examiners. *See General Order Re: Fee Examiners in Chapter 11 Cases With Combined Assets and/or Liabilities in Excess of $100,000,000* (Bankr. D. Del. Dec. 16, 2009) (Sontchi, J.). The $50 million threshold appeared to apply to approximately 40% of all chapter 11 cases filed in the District of Delaware and 10% of all cases filed in the Southern District of New York. Virtually every other judicial district would have had approximately one or two cases a year at this level.

Although a few commenters offered suggestions on revising the threshold, there was no clear basis for those suggestions. For example, the NBC suggested raising the threshold from $50 million to $100 million but did not have a particular basis for its suggestion and acknowledged that, "[t]here is no precise answer here . . . ." Public Meeting Tr., p. 59.

The group of 118 law firms (previously 119) suggested a complex formula resulting in an even higher threshold. 118 law firms' supplemental letter dated April 16, 2012, p. 2 ("118 Law Firms' Supplemental Letter"). The suggested threshold would require all of the following:

• More than $250 million in assets.
• More than $50 million of unencumbered assets.
• More than $250 million of unsecured debt.
• At least 250 unsecured creditors (excluding present and former employees).
• More than $50 million of syndicated debt for borrowed money.

The petition does not collect asset, debt, and creditor information in the manner necessary to determine whether a particular case meets the threshold suggested by the commenters. Therefore, it is impossible to confirm without further information whether any chapter 11 cases that are currently pending in any judicial district or that have been filed since 2009, would meet that proposed threshold. Under the 118 law firms' proposal, debtors would need to provide in their first day filings the information necessary to answer these five questions or risk uncertainty and delay.

The USTP revised the threshold after evaluating additional data in light of the comments. Guidelines ¶ A.2. First, the threshold was increased to a

combination of at least $50 million in assets *and* $50 million in liabilities, based on the values shown on the petition. Second, the USTP agreed that single asset real estate cases should be excluded because they do not routinely entail the complexities of other large cases and revised the Guidelines to exclude them. Without controlling for single asset real estate cases, the USTP estimates that approximately one-half of the chapter 11 cases subject to the revised Guidelines would be filed outside of the District of Delaware and the Southern District of New York, in approximately two-thirds of the USTP's judicial districts.

4) *Comment:* **The Appendix B guidelines should apply to all estate compensated professionals.**

*Response:* The USTP is revisiting the fee guidelines in phases. Other considerations are relevant in evaluating the fee applications of financial advisors and other professionals, as well as attorneys in chapter 11 cases below the threshold in the Appendix B guidelines. Until the USTP promulgates new guidelines, the Appendix A guidelines remain in effect for the USTP's review of fee applications of other types of professionals in chapter 11 cases that meet the threshold, of professionals in all chapter 11 cases below the threshold, and of all professionals in cases not under chapter 11.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

**c. COMPARABLE COMPENSATION DISCLOSURES**

5) *Comment:* **The comparable billing disclosures proposed by the USTP are overly burdensome.**

*Response:* The necessity for comparable billing data arises from the Bankruptcy Code, which requires that courts determine "reasonable compensation" based on, among other factors, "customary compensation charged by comparably skilled practitioners in cases other than cases under title 11." 11 U.S.C. § 330. The USTP concurs that the disclosure of data for the necessary comparison to customary compensation outside of bankruptcy must strike the right balance between the parties' and the court's need for evidence and the professional's burden of providing it.

The National Bankruptcy Conference ("NBC") suggested modifications to the Appendix B guidelines intended to preserve the ability of reviewers to meaningfully evaluate fee applications while arguably lessening the burden on the applicants. In substance, the NBC proposed that applicants should be

---

[5] Professor Lubben used the sum of assets and liabilities as a measure of debtor size to select large cases for his analysis.

provided with a "menu" of three possible, alternative methods for demonstrating comparable compensation. These options are: (1) a certification that would compare the billing rates of certain of the attorneys assigned to the case with their billing rates in other engagements; (2) a certification comparing the blended rates of the firm or office as a whole to its overall billing rate in the past year; or (3) a client verification detailing the steps it took to ensure that it was being charged reasonable market rates. NBC's supplemental letter dated February 27, 2012, pp. 3-5. The NBC further proposed that firms satisfying any of the three alternatives should receive a limited "safe harbor" from a USTP objection on whether the firm has met its burden to disclose customary and comparable compensation information. *Id.*, pp. 2-3.

The USTP agrees that many of the NBC's suggestions have merit, subject to further modification. The NBC's menu of options could too easily be circumvented by uncorroborated and boilerplate certifications and therefore would not represent a substantial improvement on current practices. In addition, the MFA suggested that the comparability disclosure should be "more plainly and overtly referenced than capturing it in a blended rate as the NBC proposed." MFA Letter, p. 4.

Based on these comments, the USTP has revised the Appendix B guidelines regarding customary and comparable compensation, ¶ C.3., as follows:

a) The USTP adopted the NBC's "blended hourly rate" disclosures, with some modifications. *See* Guidelines ¶ C.3.

• Professionals should disclose blended rate information by category of timekeeper. The USTP modified the NBC's suggestion of a single, aggregate blended rate in order to ensure that staffing patterns, which may vary for different types of cases, do not mask differences in blended rates among professionals within the firm that have the same level of experience. If higher blended rates are charged by bankruptcy professionals as compared to similarly experienced professionals in other practice areas, then the applicant should explain why the bankruptcy rate is higher and how the rate satisfies the statutory standard. Disclosing the blended rate by category of professional also obviates the need for the NBC's suggested disclosure of staffing percentages for bankruptcy and other engagements, which the USTP understood would have been difficult for certain firms to calculate.

• To provide flexibility, blended hourly rate information may be disclosed on either an as-billed or as-collected basis. Blended hourly rates should be calculated as total dollar value of hours billed (or collected) divided by the number of hours.[6]

• To provide further flexibility, the USTP also adopted the NBC's suggestion that firms choose one of two alternative groups of timekeepers for the blended rate disclosures. Firms may calculate the blended rate based on all domestic timekeepers throughout the firm or, alternatively, on all timekeepers in only those domestic offices in which professionals collectively billed at least 10% of the hours to the matter during the relevant application period.

b) The USTP partially adopted the NBC's suggestion of a limited "safe harbor." An applicant that provides the disclosures in the Appendix B guidelines at ¶ C.3. will receive a limited "safe harbor" from additional requests from the United States Trustee for information about customary and comparable compensation under section 330(a)(3)(F) of the Bankruptcy Code. The United States Trustee, however, is not precluded by the "safe harbor" from seeking additional information based on the particular facts and circumstances of the case, filing an objection, or offering evidence on comparable compensation from other sources. Guidelines ¶ C.4.

c) The USTP also adopted the NBC's proposal that other meaningful and detailed evidence may satisfy the professional's disclosure obligations on comparable and customary compensation, which is consistent with the MFA's suggestion of an alternative flexible standard to avoid the Guidelines' obsolescence as billing practices evolve. Disclosures other than in compliance with the Guidelines at ¶ C.3. fall outside the scope of the "safe harbor," and the United States Trustee might object to the adequacy of those disclosures. Guidelines ¶ C.3.c.

6) ***Comment:*** **Given the prevalence of alternative fee arrangements and other variable terms of engagements outside of bankruptcy, including volume or repeat business discounts and other individually negotiated billing arrangements, the disclosures seek incomplete or inaccurate information and will not establish comparability. Similarly, *pro bono* or other types of engagements should be excluded.**

***Response:*** Several commenters expressed the view that the requested data on hourly rates actually billed

would not establish comparable data because it would not account for such things as volume discounts or other alternative fee arrangements. This conclusion ignores that applicants may choose to explain why a particular alternative fee arrangement would be an inaccurate point of comparison for bankruptcy engagements. Moreover, excluding these arrangements would circumvent comparability with the firm's bankruptcy fees as required by the Bankruptcy Code, because "[d]iscount arrangements . . . are regularly sought and given in non-bankruptcy engagements; therefore, we think that any safe harbor should measure the market by the effective discount provided in non-bankruptcy engagements." MFA Letter, p. 3.

The USTP concludes that no changes are necessary to the Guidelines based on these comments, except for one clarification: The USTP agrees that for all comparable billing rate disclosures, firms may exclude pro bono, charitable, or firm-employee engagements that were never contemplated to be billed at or near standard or full rates. Guidelines ¶ C.3.a.iv.(c).

7) ***Comment:*** **The increased disclosures of actual comparable billing data will force sophisticated practitioners and firms to withdraw from a bankruptcy practice because they would choose to leave bankruptcy practice before disclosing this data. This would result in decreased competition for estate-paid bankruptcy work.**

***Response:*** These comments suggest that estate-paid professionals may ignore the requirement in section 330 that an applicant establish that its compensation is comparable to compensation outside of bankruptcy. The USTP concludes that no changes are necessary to the Guidelines based on these comments.

8) ***Comment:*** **Some commenters stated that requiring disclosure of the lowest hourly rates billed seeks to re-impose the economy of administration standard rejected by Congress in the 1978 Bankruptcy Code. In contrast, other commenters stated that requiring the disclosure of high, average, and low hourly rates might "normalize" the market at the high range and therefore drive up estate costs.**

***Response:*** These comments are irreconcilable. The USTP does not seek to re-impose the economy of administration standard rejected by the 1978 Code any more than it seeks to foster premium compensation for bankruptcy. By emphasizing actual market forces, the revised Appendix B guidelines reinforce the legislative

---

[6] The USTP adopted NBC's calculation of "blended hourly rate," which was the same as the USTP's original formula for "average rate billed."

purpose of the 1978 Code as embodied in section 330—that comparable services are the standard by which to measure bankruptcy fees. "Comparable" does not mean "economy" or "premium" as the standard against which bankruptcy fees should be measured.

Nevertheless, the USTP agrees with the NBC's suggestion that the average (or blended) hourly billed rate is the most meaningful of the originally requested disclosures. Accordingly, the USTP revised the Appendix B guidelines to delete the request for any disclosure of low and high rates billed. The USTP retains the right to seek further information based on the facts and circumstances in a particular case or if an applicant does not choose to disclose billing information in compliance with the limited "safe harbor" option at ¶ C.4.

9) *Comment:* **Some commenters stated that the additional disclosures of actual comparable billing data will increase the cost of preparing fee applications and, therefore, chapter 11 bankruptcy cases. Other commenters stated that it is logistically impossible for even the most sophisticated law firms to generate low, high, and average billed rates by attorney or other comparable billing data sought in the Appendix B guidelines.**

*Response:* Sophisticated law firms maintain and study copious amounts of data and metrics for various purposes, including managing their own profitability, determining partner compensation, and meeting client expectations. As the co-chairman of the NBC stated at the public meeting, "firm billing systems are just huge databases. . . . [W]hen a firm wants to do a bill, it extracts data from the database, and when it wants to do financial reporting statistics, it extracts data from the database." Public Meeting Tr., pp. 71–73. A law firm that maintains that it is impossible to provide this information may explain in the fee application and attest in its statement why it is unable to do so.

The evidence is overwhelming that law firms routinely obtain and review billing data in setting their rates outside of bankruptcy. For example, many firms provide internal billing and other financial data that is made available to participating firms in a variety of surveys, including the Citi Private Bank Law Watch Annual Survey of Law Firm Financial Performance, PriceWaterhouseCoopers BRASS Survey (billing rate and associate salary survey), the Thomson Reuters Peer Monitor data, Hildebrandt International surveys, and various Altman Weil Surveys. In

addition, firms (including many that commented on the Guidelines) routinely disclose aggregate billing rate information to periodicals for publication, including the National Law Journal ("NLJ") 250 Annual Billing Rate survey, which provides low, high, and average rates by timekeeper class for a number of firms and includes far more detailed information than the information requested in the Appendix B guidelines.

Although there will be some additional work for the professionals in preparing fee applications with these disclosures, the financial data to be disclosed will come from the professionals' accounting and finance staff. Moreover, as explained above, the USTP revised the Guidelines to no longer require disclosure of low and high rates. The USTP concludes that no further changes are necessary to the Guidelines based on these comments.

10) *Comment:* **A firm's actual billing data is attorney-client privileged, confidential, and proprietary. Alternatively, the USTP should seek comparable billing data from outside proprietary sources, such as CitiBank, Hildebrand, and Hoffman Alvery.**

*Response:* The proposed disclosure of blended billing rates in the Appendix B guidelines does not require the disclosure of attorney-client privileged information. The disclosure is not a **COMMUNICATION** with a client and does not identify particular clients.

Moreover, the broad dissemination of a firm's billing information to third parties, as discussed in the prior response, is inconsistent with the contentions that the information is legally privileged and that clients consistently maintain such information as proprietary. For example, the CT Tymetrix and Corporate Executive Board Real Rate Report 2012 analyzes actual invoice data provided by clients. The 2012 report reviewed $7.6 billion in law firm billings generated from 2007 through 2011 by more than 4,000 law firms and roughly 120,000 timekeepers. Although the Real Rate Report does not disclose rates of particular firms or attorneys, it is generated from the billing data firms send to their clients.

To the extent that commenters suggest that the USTP obtain comparable billing data from outside survey sources, these are generally unavailable to the USTP (and the court as the arbiter). For example, CitiBank and PWC BRASS surveys are only available to those who participate and for a fee. In addition, comparability under section 330 requires consideration of fees charged by comparably skilled practitioners within the firm for other types of

engagements as well as fees charged by other firms providing similar services. These surveys address comparability with other firms, not within the firm.

Some commenters state that their billing rates are proprietary business information and that their business will be harmed if they disclose them, presumably because disclosure would allow law firms to bid for work against each other more effectively. Other commenters appear concerned that if their rate structures are transparent to their clients, those clients may be better positioned to negotiate fees. The commenters, however, do not explain why their pecuniary interest in preventing transparency in billing practices should outweigh the need to produce evidence that satisfies the Bankruptcy Code's comparable services requirement.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

11) *Comment:* **The Appendix B guidelines should only obtain comparability data from domestic practitioners because international billing practices vary widely.**

*Response:* The USTP agrees and has revised the Guidelines to clarify that comparability data should be reported for U.S. professionals only. Guidelines ¶ C.3.a.i.

## d. BUDGETS AND STAFFING PLANS

12) *Comment:* **Budgets and staffing guidelines are unduly burdensome.**

*Response:* The requested budgets are a summary with little detail. Presumably attorneys in complex chapter 11 cases—at least once the critical early days of a case have passed—make some effort to plan next steps, to strategize on ultimate outcome, and to assign tasks accordingly, taking into account their experience in other complex cases.

Moreover, requesting budgets and staffing plans in bankruptcy cases is consistent with practices employed by clients outside of bankruptcy to manage legal costs. The USTP budget and staffing templates are modeled after the Association of Corporate Counsel's ("ACC") Sample Case Budget Template.[7] The ACC is a global bar association for in-house counsel with 29,000 members employed by over 10,000 organizations. The extensive resources provided by ACC to its members on legal project management, including budgeting and staffing,

---

[7] See http://www.acc.com/legalresources/ resource.cfm?show=743131; see also http:// www.acc.com/ValueChallenge/resources/ avcresources.cfm?rs_vc=365.

strongly suggest that budgeting and staffing plans are mainstream and common features of legal engagements across a wide spectrum of businesses.

The USTP slightly modified the ACC template. *See* Exhibit C. First, the USTP separated the budget template from the staffing template. Second, the USTP budget template at Exhibit C uses the modified project categories in ¶ C.8.b. of the Guidelines, as described more fully in the response to Comment 18 below. Third, in the revised Appendix B guidelines, the USTP further simplified the staffing plan to reduce the perceived burden. Rather than asking for identification of each professional proposed to work on the engagement, the revised USTP template requests the number of professionals by category of timekeeper (*e.g.,* 10 partners, 30 associates, *etc.*) or experience level, as well as their average hourly rates (billed or collected). Unlike the ACC template, however, the USTP revised staffing plan does not ask for this information for each project category.

13) ***Comment:* Public disclosure of budgets with interim fee applications will reveal confidential strategy information and give adversaries advantages.**

***Response:*** The USTP addressed this concern in the initial draft of the Appendix B guidelines in two ways. First, the budgets and staffing plans are to be publicly disclosed retrospectively with the fee application and for the same time period covered by the fee application. Guidelines ¶¶ C.6., E.7.-8. Second, the budget template is a summary chart of aggregate hours and fees by project code, without the detail of the budget that the professional provided to its client prospectively at the beginning of the fee application period. Exhibit C-1. While the budget submitted with the fee application will retrospectively summarize the fees estimated to be required during that period, the fee application itself and invoices contain the detailed information about what was actually done during the period.

Nevertheless, to further address this concern, the USTP revised the Guidelines to provide that budgets and invoices may be redacted as necessary, and such redactions may be compensable if necessary to protect privileged or confidential information that must be disclosed. Guidelines ¶¶ C.6.b., E.8. But the time spent for redactions should be reasonably proportional to the overall fees sought. Redactions, particularly to address issues of litigation strategy, may be unnecessary if the applicant uses the model budget in Exhibit C, which

budgets total hours and fees by project category without descriptive entries.

The USTP also revised the Guidelines to provide for one prospective disclosure of the budget on a confidential basis: between counsel for the debtor-in-possession and official committees once the budgets have been approved by their respective clients or whenever they are amended. Guidelines ¶ E.8. As the NBC commented, there are at least two "set[s] of professionals compensated out of the estate . . . looking out for the estate's interests." NBC letter dated January 30, 2012, p. 2. Official committees routinely receive confidential or other sensitive information during the case that they are precluded from sharing. In addition to providing the budgets under appropriate confidentiality agreements, the debtor and committees may redact the budgets to address privilege or confidentiality concerns. Guidelines ¶¶ C.6.b., E.8. The confidential and prospective exchange of budgets between these fiduciaries facilitates communication, avoids duplication of effort, and promotes efficiency in the administration of the bankruptcy case, consistent with the requirements of section 1103 of the Bankruptcy Code.

14) ***Comment:* Budgets are ineffective and provide little, if any, benefit to the estate because bankruptcy is just too unpredictable to budget.**

***Response:*** Budgets are a planning tool for disciplined and deliberative case management that business clients routinely expect of their professionals outside of bankruptcy. The pervasiveness of this practice supports the conclusion that budgets are effective to focus the scope of the engagement and the efficiency in staffing.

Moreover, the concern about the alleged unpredictability of bankruptcy engagements in particular is overstated. All budgets—whether for a bankruptcy case, a litigation matter, a chapter 13 debtor, a law firm, a business, or the government—are an informed estimate of expectations, identifying that which is predictable based on historical experience and that which is truly volatile and beyond the budgeter's control.

Indeed, budgets for professional fees are already a regular feature of chapter 11 cases. Secured lenders typically require debtors and their counsel to prepare budgets as a condition to the estate's use of cash collateral. Similarly, parties in the case, including the debtor and official committees, often insist that examiners prepare and file budgets and work plans.

The USTP concludes that no changes are necessary to the budget and staffing guidelines based on these comments.

15) ***Comment:* Budgets should not be mandatory.**

***Response:*** Only the courts can award compensation and determine what requirements professionals must satisfy consistent with section 330 to be paid from the estate. The Appendix B guidelines are internal procedural guidelines that the USTP will follow "in the absence of controlling law or rules in the jurisdiction" in reviewing applications for compensation and determining whether to comment or object. Guidelines ¶ A.4. In some instances, the Guidelines reflect disclosures, standards, or procedures that the United States Trustee may consider presumptively reasonable or presumptively unreasonable when deciding whether to object to fee applications.

After considering these comments, the USTP revised the Guidelines to clarify that, although budgets are not mandatory, the parties may agree to the budgets or the court may require them. Guidelines ¶¶ C.6., E.1. If the parties do not consent, the United States Trustee generally will move the court to require budgets of estate-paid attorneys in larger chapter 11 cases consistent with the Guidelines.

16) ***Comment:* Budgets should be non-binding and should be able to be amended.**

***Response:*** The USTP agrees. The revised Appendix B guidelines provide that "[b]udgets can and should be amended as necessary to reflect changed circumstances or unanticipated developments." Guidelines ¶ E.3. Similarly, the Guidelines request an explanation if the fees sought in the application exceed the budget during the application period by at least 10%, and whether the applicant has discussed the variance with the client. Guidelines ¶¶ C.2.l., C.5.b.; Exhibit C.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

17) ***Comment:* Time spent preparing budgets and staffing plans should be compensable.**

***Response:*** The USTP agrees. For this reason, the Appendix B guidelines, both as originally proposed and as revised, include a suggested project category for "budgeting." Guidelines ¶ C.8.b.; Exhibits C-1, D-1.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

## e. PROJECT CODES AND CATEGORIES

18) **Comment: The project categories and sub-categories create 480 possible coding combinations, which is unworkable and unduly complicated without a corresponding benefit.**

**Response:** The Appendix A guidelines contain suggested project codes that professionals have used for years to categorize their time in fee applications. To further assist the court and parties in reviewing fee applications, the USTP had proposed additional disclosures in the initial draft of the Appendix B guidelines in the form of sub-categories for the project codes, substantially comparable to the UTBMS activity codes used with task codes in legal billing.

Based on these comments to streamline project coding, the USTP revised the Appendix B guidelines to eliminate the proposed sub-categories. The Appendix B guidelines will continue to use the project categories from the Appendix A guidelines with slight modifications. First, the USTP added a ''Budgeting'' category to reflect the intention to seek the use of budgets for the applicant in most cases that satisfy the threshold. Second, to provide better transparency and accountability, the USTP extracted and separately categorized certain tasks that are included in the broader Appendix A project categories.[8] *See* Guidelines ¶ C.8.b. All but one of these tasks (''Reporting'') is included in the long-established UTBMS bankruptcy code set.

Based on these revisions to the project categories, the USTP conformed other requested disclosures that incorporate the modified project categories, such as the budgets and the reconciliation of fee applications to budgets. *See* Exhibits C-1, D-1.

The USTP retains discretion not to seek coding or to seek case-specific coding if the standard template does not meet the needs of a particular case.

## f. CO-COUNSEL AND STAFFING EFFICIENCIES

19) **Comment: The USTP should encourage the use of co-counsel for more routine or ''commoditized'' work, such as preference actions and claims objections, to bring efficiencies to the bankruptcy estate.**

---

[8] ''Reporting'' was extracted from the existing ''Case Administration'' category. ''Assumption and Rejection of Leases and Contracts'' was extracted from ''Asset Disposition.'' ''Avoidance Action Analysis'' was extracted from ''Litigation.'' ''Corporate Governance and Board Matters,'' ''Real Estate'' and ''Non-working Travel'' span across a number of the existing Appendix A project categories.

**Response:** This suggestion was raised by several commenters, including the NBC, Professor Lubben, and Togut, Segal & Segal. It is also similar to the local counsel requirement in the District of Delaware. The USTP agrees that applicants should consider how to assign and staff more routine and ''commoditized'' work, and whether lower cost co-counsel should be retained for discrete types of work, provided that the use of multiple section 327(a) bankruptcy counsel must not mask disqualifying conflicts and connections, and co-counsel must avoid duplication of services.

The USTP revised the Appendix B guidelines to provide that retention applications should clearly specify lead counsel and clearly delineate secondary counsel's responsibility. *See* Guidelines ¶ F. In general, all bankruptcy matters should presumptively be handled by lead counsel unless the retention application specifically assigns them to secondary counsel. The retention application should not contain indeterminate or open-ended duties for secondary counsel, and retention of secondary counsel must benefit the estate.

The USTP will carefully review the proposed co-counsel retention to ensure that the lead counsel does not have a pervasive conflict requiring disqualification that the retention of secondary counsel is designed to conceal or ignore. The USTP will also monitor the fees of both lead and secondary counsel for services that are unnecessary, duplicative, or not beneficial to the estate.

At the public meeting, one commenter suggested that the USTP should also include a proposed form of order for the retention of co-counsel. Public Meeting Tr., pp. 99-100. In developing a proposed form of order, the USTP will benefit from experience with these Guidelines and declines to address a specific form of order at this time.

## g. ELECTRONIC DATA

20) **Comment: Submitting electronic billing records creates confidentiality concerns.**

**Response:** Fee applications with detailed invoices are routinely filed and served on parties in a particular case through the courts' Case Management/Electronic Case Filing (CM/ECF) system. In addition, once filed this information is available to the general public through the courts' Public Access to Court Electronic Records (PACER) system. There should be no confidentiality concern in providing the same data in a format that can be queried and sorted.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

21) **Comment: Submitting electronic data may require firms to revamp their billing software.**

**Response:** The USTP suggested using LEDES standards because this is the universal standard adopted by law firms, clients, and e-billing vendors and because no particular software is required. *See www.LEDES.org.* Because it is an open standard, a firm can provide electronic data in the same format in which it maintains the data and does not need to modify its existing billing software.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

## h. APPLICATIONS FOR EMPLOYMENT AND RELATED VERIFICATIONS

22) **Comment: The USTP has no statutory authority to address compensation issues at the retention stage.**

**Response:** The USTP is statutorily required to adopt uniform guidelines for the review of professional compensation applications. 28 U.S.C. § 586(a)(3)(A). The review of fee applications under section 330 of the Bankruptcy Code is inextricably intertwined with the terms and conditions of the applicant's retention under section 327 or 1103. The NBC, among others, supports the view that a closer consideration of the terms of compensation at the outset of the case can lead to less controversy later and benefit both the professionals and the estate. *See* Public Meeting Tr., p. 74. The USTP's adoption of uniform guidelines governing the review of applications for retention under sections 327 and 1103 of the Bankruptcy Code on issues that are relevant to fee applications benefits professionals, the court, and parties in interest by providing predictability in enforcement and is consistent with the USTP's statutory mandate.

The NBC proposed adding a client verification at the retention stage. The USTP agrees and has modified the Appendix B guidelines to provide that clients supply a verified statement on retention. Guidelines ¶ D.2. This is in lieu of the previously requested client verification with the fee application. The proposed verification may explain the steps the client took to ensure compensation was comparable to the non-bankruptcy market, to control legal fees as it would outside of chapter 11, and to negotiate rates.

The USTP concludes that no other changes are necessary to the Guidelines based on these comments.

### i. FEE APPLICATIONS

23) **Comment: The USTP exceeds its statutory authority when it reviews and comments on interim fee applications filed under section 331. The USTP may only comment on final fee applications under section 330.**

**Response:** Consistent with its statutory duties, the USTP has commented on and objected to thousands of interim fee applications, and is unaware that any party has challenged the USTP's right to appear and be heard in that litigation. In addition to 28 U.S.C. § 586(a)(3), section 307 of the Bankruptcy Code gives the United States Trustee broad authority to raise, to be heard, and to appear on any issue in any case. Moreover, deferring all objections to the final fee application would seem unfair and unduly prejudicial to the professionals, in addition to being unduly burdensome to the USTP, the court, and other parties in interest.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

24) **Comment: The Appendix B guidelines fail to consider that for many debtors a significant portion of estate-paid work is for non-bankruptcy matters. Other practitioners stated that the Guidelines require debtors' attorneys to speculate about what legal fees the debtor would have incurred outside of bankruptcy, which will be costly and of no value.**

**Response:** The USTP originally included a disclosure to address the complaint that the public misunderstands professional fees in bankruptcy because some of the fees that the court must approve may not result from the bankruptcy filing. Thus, the fee application may include fees for matters for which the debtor routinely engaged counsel before the bankruptcy filing. The USTP did not anticipate that providing this data would be time-consuming or arduous because applicants could provide historical data. Nevertheless, the group of 119 law firms, representing a broad segment of the bankruptcy legal community and including many of the firms that are routinely involved in the larger cases meeting the threshold, stated that this disclosure "serves no useful purpose." 119 Law Firms' Initial Letter, p. 7. Based on this comment, the USTP eliminated the disclosure.

### j. COMPENSATION FOR PARTICULAR MATTERS

25) **Comment: Redaction of bills or invoices for privileged or confidential information should be compensable.**

**Response:** The USTP has re-evaluated its position in light of these comments. It is important that clients receive informative invoices that may contain privileged or confidential information. But professionals whose compensation will be paid by the bankruptcy estate know at the inception that their billing records must be publicly filed and should draft time entries and prepare invoices both to minimize redactions and to avoid vague descriptions. Therefore, the time for redacting invoices that are submitted under a monthly compensation order or filed with the fee application should be kept to a minimum and bear some reasonable relationship to the overall fees sought. Guidelines ¶ B.2.f.

26) **Comment: The Appendix B guidelines prohibit the use of transitory professionals and the attendance of multiple attorneys at meetings or hearings.**

**Response:** This comment is inaccurate. In these two instances, the Guidelines instruct the United States Trustee to seek an explanation of practices that could be evidence of billing abuses. Guidelines ¶¶ B.2.c., e. An adequate explanation will avert an objection on this guideline.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

27) **Comment: Precluding compensation for preparing monthly invoices is inappropriate.**

**Response:** The ability to bill monthly is an accommodation to professionals to enable them to avoid the delay incumbent in the interim fee application process. The professional's decision to avail itself of this opportunity should not cost the estate additional money. The United States Trustee may object if a professional seeks compensation for the preparation of monthly invoices that is duplicative of fees that the professional later seeks for the preparation of the fee application related to those invoices. Based on these comments, the USTP has revised the Appendix B guidelines to clarify its position. See Guidelines ¶ B.2.f.

28) **Comment: Attorneys should be entitled to compensation for litigating and negotiating objections to fee applications.**

**Response:** The Appendix B guidelines provide that "[r]easonable charges for preparing interim and final fee applications . . . are compensable," (¶ B.2.f.) (emphasis in original), because the preparation of a fee application is not required for lawyers practicing in areas other than bankruptcy as a condition to getting paid. But time spent beyond the initial preparation of the applications, including without limitation time spent explaining the fees, negotiating objections, and litigating contested fee matters, is properly characterized as work that is for the benefit of the professional, and not the estate. Such services are therefore not compensable under 11 U.S.C. § 330(a)(4)(ii) because they are neither reasonably likely to benefit the debtor's estate nor necessary to the administration of the bankruptcy case. This result is consistent with non-bankruptcy practice because law firms typically do not charge clients for time spent explaining or defending a bill. Thus, the USTP's position is that awarding compensation for fee application matters beyond the initial preparation of the application is inappropriate, unless those activities fall within an applicable and judicially recognized exception (such as litigating an objection to the application where the applicant substantially prevails).

The USTP has clarified its position in the Guidelines based on these comments. See Guidelines ¶ B.2.f.

29) **Comment: Attorneys should always be able to charge their highest rate, and are not bound by their lower "home forum" rate when the bankruptcy case is pending in a higher-priced market, for example, New York.**

**Response:** The Appendix B guidelines provide that the USTP will not object to attorneys charging their "home forum" rate regardless of where a case is pending. Guidelines ¶ B.2.l. This recognizes that a substantial component of a professional's billing rate is overhead attributable to the professional's home office, and does not penalize professionals (or their clients in their choice of professionals) solely because of the forum in which the case is pending.

By contrast, the group of 118 law firms (formerly 119) proposed that, if a lawyer from St. Louis, for example, traveled to New York for a bankruptcy case, the St. Louis lawyer should charge New York rates. 118 Law Firms' Supplemental Letter, p. 2. But the 118 law firms would not have the New York lawyer traveling to St. Louis charge St. Louis rates. This result is illogical because it is not based on the professional's overhead (or even the forum in which the case is pending). Additionally, travel costs are typically reimbursed by the estate, and allowing professionals to receive both a rate

higher than their home forum rate and reimbursement for travel costs is unreasonable.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

30) ***Comment:*** **Routine expenses, such as copies and long distance calls, should not require explanation. Similarly, referring to telephone charges as "overhead" might result in objection to long distance and conference charges currently allowed.**

***Response:*** Clients outside of bankruptcy increasingly refuse to reimburse expenses, even routine ones, that clients consider part of a firm's overhead. Thus, the Appendix B guidelines provide that the United States Trustee will ordinarily object to expenses not customarily charged by the applicant to its non-bankruptcy clients and by the applicant's peers in the market, as well as overhead expenses incident to the operation of the applicant's office. Guidelines ¶¶ B.3.c., e.

31) ***Comment:*** **Routine objection to summer associate time and non-working travel at full rate are not market-based.**

***Response:*** These commenters did not provide any support for the contention that sophisticated clients routinely pay for summer associate time or full rates for non-working travel. Indeed, the USTP understands that it has long been customary for firms to write off the time of their summer associates, which is more properly attributed to recruitment and training. And clients increasingly refuse to pay for first or second year associates working on their matters.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

32) ***Comment:*** **Fee enhancements should be based on agreements between counsel and clients, subject to court approval.**

***Response:*** A central principle of the Appendix B guidelines is that bankruptcy fees should be reasonable, fully disclosed, and consistent with market norms. For this reason, it is problematic when bankruptcy professionals seek to compel the estate, through their clients, to pay them a fee enhancement or a bonus that is not based on their contractual agreement and disclosed and approved at retention. An applicant's request for fees above the amounts it initially represented in its retention application remains subject to section 330 of the Bankruptcy Code, including the comparability requirements of section 330(a)(3)(F), and other applicable law. Therefore, fee enhancements should be

available only in extraordinary circumstances and solely to the extent that a professional outside of bankruptcy would be entitled to demand fees from the client in excess of a contractually agreed upon amount.

Upon further consideration, the USTP concludes that the issue of fee enhancements should, at this time, be addressed on a case-by-case basis and thus deleted the considerations pertaining to fee enhancements from the Guidelines.

### k. FEE REVIEW ENTITIES

33) ***Comment:*** **Fee examiners and fee committees are appropriate only if the court believes they will be helpful. Similarly, special fee review procedures should not be included in the Appendix B guidelines.**

***Response:*** The appointment of a fee examiner or a fee committee is a decision reserved to the judgment of the bankruptcy court. To enhance the transparency and integrity of the fee review process, the Guidelines simply offer several alternative models that the USTP may suggest in a particular case. Guidelines ¶ G.

The success of the fee examiner in the case of *In re General Motors Corp.,* No. 09–50026 (Bankr. S.D.N.Y. filed June 1, 2009), and of the fee committee in the case of *In re Lehman Brothers Holdings, Inc.,* No. 08–13555 (Bankr. S.D.N.Y. filed Sept. 15, 2008), has demonstrated that alternative fee review arrangements can have salutary effects. The fee examiner and fee committee have identified both discrete issues with the applications of certain professionals and global issues affecting compensation sought by many professionals. When possible, they have negotiated an acceptable resolution of those issues. When agreement could not be reached, they have presented the issues to the court in an organized manner that eased the burden of fee review on the court and others.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

34) ***Comment:*** **The costs of fee examiners should be borne by the federal government.**

***Response:*** Presumably the commenter intended that the USTP bear these costs. The Bankruptcy Code is premised on bankruptcy estates paying the costs of administration, including professional fees. *See, e.g.,* 11 U.S.C. §§ 330, 503(b), 507(a)(2); 28 U.S.C. § 1930. Fee examiners and fee committees are typically sought in cases that are administratively solvent and very complex to ease the burden of fee review on the court and parties in

interest. It is reasonable that the costs of administration of the estate include the cost of a fee examiner or a fee committee.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

### l. MISCELLANEOUS COMMENTS

35) ***Comment:*** **One commenter stated that firms should not have to disclose all rate increases under all circumstances. Rather, the commenter proposed that firms should only disclose annual rate increases exceeding 10% and should not have to disclose any "standard seniority step ups" regardless of amount or any annual increases of 10% or less.**

***Response:*** The cumulative cost to the estate of regular rate increases of, for instance, 10% per year over the life of a lengthy chapter 11 case is significant. This additional cost would be compounded by annual step increases as attorneys advance in seniority. At a minimum, law firms should disclose the additional cost being borne by the estate and its creditors as a result of increased rates so the parties, the court, and the United States Trustee can evaluate whether the requested compensation is reasonable, comparable, and customary.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

36) ***Comment:*** **The guideline on billing a disproportionate amount of time in .5 and 1.0 hour increments is not realistic.**

***Response:*** This is not a change from the existing Appendix A guidelines. Moreover, routinely billing in those increments can be suggestive of billing abuses and failure to carefully track an attorney's time.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

37) ***Comment:*** **The Appendix B guidelines lack consequences that would give professionals incentives to comply with them.**

***Response:*** The Guidelines are internal procedural guidelines that the USTP will follow in reviewing and commenting on fee applications in the absence of controlling law or rules in a jurisdiction. The Guidelines do not supersede local rules, court orders, or other controlling authority. Only the court has the authority to award compensation and reimbursement under section 330 of the Bankruptcy Code and to provide incentives for complying with the Guidelines. Guidelines ¶¶ A.1.-5.

The USTP concludes that no changes are necessary to the Guidelines based on this comment.

38) ***Comment:*** **Greater transparency in fee applications would reduce concerns and address allegations that professionals are overly compensated for unnecessary work and diverting value.**

*Response:* One of the USTP's stated goals has been to bring greater transparency to the compensation process in chapter 11 cases and to foster public confidence in the integrity of that process.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

## C. SUMMARY OF SIGNIFICANT CHANGES AND ANALYSIS OF COMMENTS RECEIVED AFTER POSTING REVISED DRAFT GUIDELINES FOR FINAL COMMENT ON NOVEMBER 2, 2012

1. Summary of Significant Changes Following Posting of Revised Draft Appendix B *Guidelines for Final Comment on November 2, 2012*

**a. DISCLOSURES OF CUSTOMARY AND COMPARABLE COMPENSATION:** Applicants should include a concise description of the methodology used to calculate hourly blended rates if the calculation includes any fee arrangements not billed by the hour. Guidelines ¶ C.3.a.iv.(d).

**b. BUDGETS:** Absent the parties' consent, the United States Trustee may seek a court order encouraging the prospective sharing of budgets by counsel for the debtors-in-possession and the official committees. Guidelines ¶ E.8.

**c. CO-COUNSEL RETENTION:** Guidance regarding the use of secondary counsel, either efficiency or conflicts co-counsel, has been clarified as follows:

**1)** When a new matter within the authorized scope of engagement for efficiency or conflicts co-counsel is assigned by lead counsel to that co-counsel, co-counsel need not file a supplemental retention application and obtain an amended order. Rather, co-counsel should file a supplemental declaration in accordance with Bankruptcy Rule 2014 and provide notice of the filing sufficient to afford parties in interest an opportunity to object. Nevertheless, if the matter does not fall within the authorized scope of engagement, co-counsel should file a supplemental retention application and obtain an amended order to expand the scope of the engagement to include that matter. Guidelines ¶ F.1.c.

**2)** The use of conflicts counsel to litigate a specific matter as to which lead counsel's involvement is limited to negotiation is generally objectionable, and the United States Trustee retains discretion whether to object in a particular situation. Negotiation without the ability to litigate against a party usually will render a lawyer disqualified from the matter, and such disqualification cannot be cured by retention of conflicts counsel to handle the litigation. Guidelines ¶ F.3.c.

**d. ORDINARY COURSE PROFESSIONALS:** The Guidelines will not apply to counsel retained and paid as an ordinary course professional pursuant to appropriate court order or local rule ("ordinary course professional"), unless the professional is required to file a fee application under such court order or local rule. Guidelines ¶ A.3.

**e. ELECTRONIC BILLING RECORDS:** The applicant should provide electronic billing data to the court, the debtor-in-possession (or trustee), official committees, the United States Trustee, and the fee review committee, examiner or auditor. Other parties in interest should receive the electronic billing data upon request. Guidelines ¶ C.10.

**f. APPLICATIONS FOR EMPLOYMENT AND RELATED VERIFICATIONS:** Applicants who represented the client in the 12 months prepetition should disclose in the application for employment specific and material information regarding their prepetition billing rates and financial terms to explain the reasons for any difference between prepetition and postpetition billing rates and terms. Guidelines ¶ D.1.c. In the verification provided by an applicant who also represented the client prepetition, the disclosure of the applicant's "effective rate" has been deleted, and instead, the applicant should disclose and explain any postpetition change in "billing rates and material financial terms." *Id.* The client verification has been revised to delete the undefined term "market rate" and instead to use terms expressly contained in the statute. Thus, the client should disclose the steps taken to ensure that the applicant's billing rates and terms are comparable to the applicant's billing rates and terms for other engagements and to those of other comparably skilled professionals. Guidelines ¶ D.2.b.-c.

**g. MONTHLY INVOICES:** The United States Trustee will not object to the extent that monthly invoices under a monthly compensation order effectively serve as interim fee applications and the applicant seeks no additional compensation for preparing the interim fee application because the time was expended on the related monthly invoices (or vice versa). Guidelines ¶ B.2.f.(iv).

**h. "FEES ON FEES":** The USTP's position on fees for contesting or litigating objections to applications for compensation has been amended. "Fees on fees" are generally inappropriate unless they fall within a judicial exception applicable within the district allowing such fees. The word "binding" has been deleted from the Guidelines. Guidelines ¶ B.2.g.

**i. STEP INCREASES:** The disclosure of rate increases and calculations of their effect may exclude annual "step increases" historically awarded in the ordinary course to attorneys throughout the firm due to advancing seniority and promotion, if the firm distinguishes between "step increases" and other types of rates increases. Nevertheless, applicants should not attempt to characterize actual rate increases that are unrelated to an attorney's advancing seniority and promotion as "step increases" in effort to thwart meaningful disclosure or billing discipline. If a firm does not distinguish between "step increases" and other types of rate increases, it should disclose and explain all rate increases. Guidelines ¶ B.2.d.

**j. OVERHEAD:** Actual charges for multi-party conference calls related to the case will be considered a reimbursable expense, not overhead. Guidelines ¶ B.3.e.

**k. EFFECTIVE DATE:** The effective date of the Guidelines has been changed from July 1, 2013 to November 1, 2013, to afford sufficient time for the courts to incorporate the Guidelines into local rules and practice and for the bankruptcy bar to become familiar with the new disclosure provisions.

**l. EXHIBITS:** The Guidelines have been revised to incorporate certain information that was previously included in exhibits and to renumber the remaining exhibits. The project categories and expense categories formerly at Exhibit E have been incorporated into the Guidelines at ¶ C.8. (project categories for billing records) and ¶ C.12. (expense categories). The "United States Trustee Considerations on the Retention and Compensation of Co-Counsel" formerly at Exhibit B have been incorporated into the Guidelines at ¶ F.

**2. Discussion of Public Comments after Posting Revised Draft for Final Comment on** *November 2, 2012*

The USTP received six comment letters in response to the USTP's posting of the revised draft of the Appendix B guidelines. Many of the comments contained several sub-parts. The USTP appreciates the comments and has considered each carefully. Those

comments that simply repeated earlier arguments against any reform or improvement of the fee review process were addressed in the preceding analysis of the initial draft, *see* ¶ B.2. above, and will not be revisited here. The USTP's responses to the most significant comments are discussed below, and the comments are categorized by the same subject matters used above in ¶ B to categorize comments on the initial draft.[9]

### a. GENERAL COMMENTS

N/A

### b. SCOPE OF THE APPENDIX B GUIDELINES

1) **Comment: Use of the Appendix B guidelines by the United States Trustee should be discretionary, rather than mandatory, in cases that meet the revised threshold.**

*Response:* Consistent with 28 U.S.C. § 586(a)(3)(A), the Appendix B guidelines are internal procedures that the United States Trustees will apply in reviewing applications for compensation filed by attorneys employed under section 327 or 1103 in chapter 11 cases that meet the threshold. The Guidelines provide transparency in the USTP's review of fee applications by providing notice of the USTP's policy positions in the absence of controlling law or rules in the jurisdiction. They also create greater efficiency in the review of the applications by the court, parties in interest, as well as the USTP, and provide uniformity and predictability in enforcement nationally. In administering any particular case, the United States Trustee may exercise discretion in applying the Guidelines based on the facts of that case. The exercise of such discretion in a specific case will not be routine or obviate the Guidelines in any particular district.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

### c. COMPARABLE COMPENSATION DISCLOSURES

2) **Comment: The disclosure of blended rates for comparable services should exclude rates from dissimilar areas of practice, such as insurance defense.**

*Response:* This comment misconstrues the statutory standard specified in section 330(a)(3)(F). That section expressly requires that reasonableness should be determined

"based on the customary compensation . . . in cases other than cases under this title [11]." 11 U.S.C. § 330(a)(3)(F). Thus, a disclosure of blended rates that takes into account the rates charged in non-bankruptcy matters simply reflects Congress's stated intent that bankruptcy practitioners be compensated on terms comparable to other areas of practice, and no worse and no better. *See* Guidelines ¶ C.3. The applicant retains the right, and is encouraged, to supplement its disclosure with additional information explaining the different rate structures of the various practice groups in the firm and their impact on the firm's blended rate.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

3) **Comment: The Appendix B guidelines permit bankruptcy boutiques to exclude estate-billed engagements from the blended rate computation for comparable services, but do not permit full-service law firms to do so. This exclusion should apply to all law firms.**

*Response:* This comment may misunderstand the Appendix B guidelines as they apply to full-service firms. Consistent with section 330(a)(3)(F), the blended rate computation for comparable services rendered by full-service firms is based on non-bankruptcy matters billed by the firm, but not matters arising in bankruptcy cases (whether estate or not). Guidelines ¶ C.3.a.iv.(a). Because bankruptcy boutiques often do not conduct a significant volume of work in non-bankruptcy matters, they are subject to a slightly different computation, which includes non-estate paid bankruptcy work (as the closest approximation to what those firms would likely bill outside of bankruptcy) while continuing to exclude estate-paid work. Guidelines ¶ C.3.a.iv.(b). There is no need to extend this specific exclusion to full-service firms because all bankruptcy-related work is already excluded from the blended rate computation for full-service firms.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

4) **Comment: The limited safe harbor on the disclosure of comparable billing data should be an absolute safe harbor from a United States Trustee objection or further disclosure.**

*Response:* The United States Trustee has a statutory duty to review and comment on applications for compensation as "appropriate." 28 U.S.C. § 586(a)(3)(A). Accordingly, the USTP cannot prospectively limit the United States Trustee's prosecutorial discretion or authority to remedy billing

abuses or insufficient disclosures. The limited safe harbor, however, is an effort to provide professionals with some comfort that making these types of disclosures will normally be sufficient to avoid the United States Trustee seeking further comparable billing information from the applicant. Guidelines ¶ C.4. Among other things, an absolute safe harbor would lead to the anomalous result where a party that fully disclosed that its bankruptcy rates are higher than its non-bankruptcy rates would be immune from an objection while admitting that it has violated the statutory standard for reasonable compensation.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

5) **Comment: The comparable billing data is proprietary, should be sought only from external sources, should be provided confidentially to the United States Trustee, and should only be obtained through discovery by the United States Trustee, not through proactive disclosure.**

*Response:* The suggestion that specific disclosures of customary and comparable compensation should be provided only upon request instead of proactively by the applicant improperly shifts the evidentiary burden under section 330 away from the applicant and onto the court, the United States Trustee, and other parties in interest. An applicant seeking to be paid by the bankruptcy estate under section 330 has an affirmative burden to prove that the compensation sought is reasonable, including by offering evidence sufficient to satisfy section 330(a)(3)(F). The court and other parties in interest, in addition to the United States Trustee, are entitled to information necessary to evaluate the reasonableness of an application for compensation. The statute and public interest requires transparency of the bankruptcy compensation process for the multiple stakeholders in the case. Finally, it is inefficient and uneconomical for the court and parties to have the United States Trustee propound identical discovery requests in every larger chapter 11 case when the United States Trustee will presumptively seek this information.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

6) **Comment: If an applicant includes a discounted or alternative arrangement in the blended hourly rate disclosures, the applicant should also explain its calculation methodology. Applicants should be required to disclose the specifics of any discount or**

other alternative billing arrangement in non-bankruptcy matters.

*Response:* The USTP agrees that a concise statement of methodology on how the applicant calculated the blended hourly rates would be helpful and would enable those reviewing the information to determine whether the disclosed data fully and accurately reflects the information necessary for the comparison contemplated by section 330. The Appendix B guidelines have been so amended. *See* Guidelines ¶ C.3.a.iv.(d). Because the effect of discounts and alternative billing arrangements should generally be reflected in the blended hourly rate, a requirement that applicants disclose the specifics of every discount would be unlikely to produce a benefit that would outweigh the burden of making such disclosures. If the blended hourly rate does not capture the effect of discounts and alternative billing, the explanation of how the rate was calculated should explain this and may lead to further inquiry by the United States Trustee. The USTP adopted a middle ground by seeking blended rates and explanations rather than other potentially useful and informative disclosures that are more burdensome.

7) ***Comment:*** **In its response to the comments to the Appendix B guidelines as initially posted November 4, 2011, the USTP stated that ''[a] law firm that maintains that it is impossible to provide'' information relevant to the blended rate disclosures ''may explain in the fee application and attest in its statement why it is unable to do so.''** *See* **Response to Comment 9 in ¶ B.2.c. above. A commentator replied that the standard should be changed from ''impossible'' to ''impracticable,'' and some applicants may not easily produce the requested disclosures because it is cost prohibitive to produce.**

*Response:* The USTP agrees that an impracticability standard is more appropriate. Nevertheless, as the USTP explained in its response to the prior comments, most law firms that are retained in the larger cases that meet the threshold should have the technology and resources necessary to provide this information. *See, e.g.,* Response to Comment 9 in ¶ B.2.c. above; Response to Comment 21 in ¶ B.2.g. above. Therefore, with rare exception, cost should not be a basis for asserting impracticality in providing the blended rate disclosures.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

**d. BUDGETS AND STAFFING PLANS**

8) ***Comment:*** **The sharing of budgets and staffing plans between debtors-in-possession and official committees should be voluntary.**

*Response:* The USTP encourages counsel for the debtors-in-possession and official committees to prospectively share their respective budgets once agreed to by their clients or amended, subject to an appropriate confidentiality agreement and redaction to protect privileged or confidential information. As the USTP previously explained in response to the comments to the Appendix B guidelines as originally posted November 4, 2011, the confidential and prospective exchange of budgets between these fiduciaries facilitates communication, potentially avoids duplication, and promotes efficiency in the administration of the bankruptcy case, consistent with the requirements of section 1103 of the Bankruptcy Code. *See* Response to Comment 13 in ¶ B.2.d. above. The USTP has clarified the Appendix B guidelines to provide that, in the absence of the parties' agreement, the United States Trustee may seek a court order expressly authorizing the prospective sharing of budgets by counsel for the debtors-in-possession and the official committees. Guidelines ¶ E.8.

9) ***Comment:*** **Budgets should not be required; they should only be encouraged. Moreover, even if not required, detailed budgets should not be sought in every case because they are unnecessary, costly, and burdensome and constrain the professionals' flexibility in handling the case. Other commenters said that the USTP-sought budgets would be redundant of cash collateral and debtor-in-possession (''DIP'') loan budgets already used in every case.**

*Response:* In its response to the comments to the Guidelines as originally posted November 4, 2011, the USTP highlighted that it had revised the Appendix B guidelines to provide that the United States Trustee will seek budgets and staffing plans only with the consent of the parties or by court order. *See* Response to Comment 15 in ¶ B.2.d. above. The USTP also fully addressed the concerns about the effectiveness and burden to applicants of providing budgets and staffing plans. *See* Response to Comments 12 and 14 in ¶ B.2.d. above. It is undisputed that clients frequently require budgets inside and outside of bankruptcy, and that secured lenders in bankruptcy cases typically require debtors and their counsel to prepare budgets as a

condition to the estate's use of cash collateral. The USTP believes that such sound practices ought to be followed as part of the fee review process. Moreover, the budgeting guidelines are not redundant of cash collateral and DIP loan budgets, which typically include a single line-item for professional fees, insofar as the guidelines include a reasonable amount of additional and relevant detail, such as a description of major areas of activity.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

10) ***Comment:*** **Budgets should not use the bankruptcy project or task codes.**

*Response:* As the USTP explained in its response to the comments to the Guidelines as originally posted November 4, 2011, budgets serve at least two important purposes: they help ensure that professional fees will be incurred in a more disciplined manner, and are a helpful tool to evaluate applications for compensation. *See* Response to Comments 12 and 14 in ¶ B.2.d. above. By using a common set of project and task codes, the Appendix B guidelines serve both of these purposes by ensuring that the budgeted and actual fees can be directly and transparently compared. *See* Exhibit D–1.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

11) ***Comment:*** **Budgets should not be sought during the first sixty days of a case.**

*Response:* The Appendix B guidelines do not impose an inflexible timetable for adopting a budget. Consistent with practices for submitting cash collateral and DIP loan budgets, the USTP's position is that budgets should be adopted earlier, rather than later.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

**e. PROJECT CODES AND CATEGORIES**

**N/A**

**f. CO-COUNSEL AND STAFFING EFFICIENCIES**

12) ***Comment:*** **No supplemental application for employment and corresponding order should be necessary when lead counsel transfers a matter to conflicts co-counsel.**

*Response:* The USTP has clarified the Appendix B guidelines to provide that when a new matter within the authorized scope of engagement for either efficiency or conflicts co-counsel is assigned by lead counsel to that co-counsel, co-counsel need not file a

supplemental retention application and obtain an amended order. Rather, co-counsel should file a supplemental declaration in accordance with Bankruptcy Rule 2014, and provide notice of the filing sufficient to afford parties in interest an opportunity to object. Nevertheless, if the matter does not fall within the authorized scope of engagement, co-counsel should file a supplemental retention application and obtain an amended order to expand the scope of the engagement to include that matter. Guidelines ¶ F.1.c.

13) ***Comment:*** **The Appendix B guidelines should not provide that the USTP will object to the use of conflicts counsel in situations in which lead counsel may negotiate, but not litigate, a particular matter.**

***Response:*** The USTP has revised the Appendix B guidelines to clarify that the use of conflicts counsel to litigate a specific matter as to which lead counsel's involvement is limited to negotiation is generally objectionable, and the United States Trustee retains discretion whether to object in a particular situation. Negotiation without the ability to litigate against a party usually will render a lawyer disqualified from the matter, and such disqualification cannot be cured by retention of conflicts counsel to handle the litigation. Guidelines ¶ F.3.c.

14) ***Comment:*** **The Appendix B guidelines should clarify that they do not limit the use of ordinary course professionals, local counsel, or special counsel.**

***Response:*** The USTP agrees and has amended the Appendix B guidelines accordingly. *See* Guidelines ¶ B.2.c.

15) ***Comment:*** **The Appendix B guidelines should not apply to ordinary course professionals or special counsel.**

***Response:*** The Appendix B guidelines have been clarified to provide that they do not preclude the use of counsel retained and paid as an ordinary course professional pursuant to appropriate court order or local rule. Guidelines ¶ B.2.c. The USTP acknowledges that ordinary course professionals are distinguishable from other counsel retained by the estate, including special counsel, because the court's order authorizing the retention or local rule governs whether and when they are required to file a fee application. Thus, the Appendix B guidelines have been further clarified to provide that generally they will not apply to an ordinary course professional, unless the professional is required to file a fee application under the court's order authorizing retention or local rule. Guidelines ¶ A.3.

## g. ELECTRONIC DATA

16) ***Comment:*** **Electronic records should be provided only to the debtor, official committees, and the United States Trustee.**

***Response:*** Section 330 provides for an open and public bankruptcy compensation process whereby all parties in interest and the court have access to relevant information necessary to evaluate whether the applicant has sustained its burden that the compensation sought to be paid from the estate is reasonable. Nevertheless, the USTP agrees that it is likely more efficient that, in the ordinary course, an applicant provide the billing data in an electronic format to the court, the United States Trustee and those parties in interest most likely to use the information electronically, provided that other parties in interest may obtain it upon request. Accordingly, the USTP has revised the Appendix B guidelines to provide that an applicant should provide electronic billing data to the court, the debtor in possession (or trustee), official committees, the United States Trustee, and the fee review committee, examiner, or auditor. Other parties in interest should receive the electronic billing data upon requesting it from the applicant. Guidelines ¶ C.10.

## h. APPLICATIONS FOR EMPLOYMENT AND RELATED VERIFICATIONS

17) ***Comment:*** **If an applicant has represented the client at any time during the 12 months prepetition, then it should disclose in the retention application the specifics of its billing arrangement, including discounted rates, write-down policies, or other material terms affecting the billing and compensation arrangement. Similarly, if the applicant has changed the terms of its billing arrangements with the client during the postpetition period, the applicant should explain why.**

***Response:*** The USTP agrees that these specific disclosures and explanations would be helpful and meaningful. The USTP has amended the Appendix B guidelines to provide that applicants who represented the client in the 12 months prepetition should disclose specific and material information regarding their prepetition billing rates and financial terms to explain the reasons for any difference between prepetition and postpetition billing rates and terms. Guidelines ¶ D.1.c.

18) ***Comment:*** **The applicant's disclosure with the application for employment currently asks whether the applicant is billing its client at the same**

"effective rate" as was in effect prepetition. This may cause confusion because alternative arrangements may not readily translate into hourly rates and elsewhere the Appendix B guidelines use the term blended hourly rate.

***Response:*** The USTP agrees and has amended the Appendix B guidelines to delete references to "effective rate." Instead, the applicant should disclose and explain any postpetition change in "billing rates and material financial terms." Guidelines ¶ D.1.c.

19) ***Comment:*** **The client verification with the application for employment should not verify that the engagement is at "market rate." Rather, the client should only verify that the rate and terms are proper under the circumstances because clients should be free to select the best counsel for the engagement.**

***Response:*** The Bankruptcy Code requires that the compensation for an estate-paid engagement be reasonable as compared to customary compensation for similarly skilled practitioners in cases other than under Title 11. That means a market rate. Nevertheless, the USTP has clarified the Appendix B guidelines to conform to the language of section 330. Guidelines ¶¶ D.2.b., d.

## i. FEE APPLICATIONS

N/A

## j. COMPENSATION FOR PARTICULAR MATTERS

20) ***Comment:*** **Compensation for preparing monthly invoices when a case has a monthly compensation order should be allowed if it is not duplicative of preparing interim fee applications. Conversely, compensation for preparing interim fee applications should be allowed if it is not duplicative of preparing monthly invoices.**

***Response:*** The USTP agrees and has revised the Appendix B guidelines to provide that the United States Trustee will not object to the extent that monthly invoices under a monthly compensation order effectively serve as the interim fee application and the applicant seeks no additional compensation for preparing the interim fee application because the time was expended on the related monthly invoices (or vice versa). Guidelines ¶ B.2.f.(iv).

21) ***Comment:*** **Applicants should be compensated for responding to inquiries and negotiating issues related to applications for compensation.**

***Response:*** The USTP disagrees. Applicants should and do have the incentive to prepare an unobjectionable

**Federal Register** / Vol. 78, No. 116 / Monday, June 17, 2013 / Notices    **36275**

application for compensation in the first instance. Reasonable and proportionate time for fee application preparation is compensable. Applicants should not be rewarded with additional compensation for responding to inquiries and objections that should have been avoided, particularly when the statutory standards are well-developed and the USTP guidelines are clear.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

22) ***Comment:*** **The Appendix B guidelines make an exception for objecting to "fees on fees" for activities that fall within a "judicially-recognized and binding exception (such as litigating an objection to the application where the applicant substantially prevails)." The use of the word "binding" suggests only authority by the applicable court of appeals on an issue would be considered binding, whereas the prevailing law in the lower courts would not.**

***Response:*** The USTP has clarified its position to provide that fees for contesting or litigating objections to applications for compensation are generally inappropriate unless they fall within a judicial exception applicable within the district allowing such fees. The term "binding" has been deleted from the exception. Guidelines ¶ B.2.g.

The USTP concludes that no other changes are necessary to the Guidelines based on these comments.

23) ***Comment:*** **The USTP standard that it will object to fees for responding to objections to fees unless the applicant substantially prevails on the objection should be the court's decision and is inconsistent with the Bankruptcy Code.**

***Response:*** This standard represents the litigating position of the USTP that applicants who pursue unmeritorious positions in defending their fees, and thereby waste the resources of the court and parties, should not be entitled to payment of fees. The USTP's position follows the bankruptcy court's decision in *In re Motors Liquidation Co.,* No. 09–50026, Bench Decision on Pending Fee Issues, at 2 (Bankr. S.D.N.Y. Nov. 23, 2010) (ECF No. 7896), which appropriately takes into account inherent litigation risks and the reasonableness of the applicant's arguments.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

24) ***Comment:*** **The Appendix B guidelines should not treat phone charges related to multi-party, case-specific conference calls as overhead and should instead consider them a reimbursable expense.**

***Response:*** The USTP agrees and has revised the Appendix B guidelines to provide that actual charges for multi-party conference calls related to the case will be considered a reimbursable expense, not overhead. Guidelines ¶ B.3.e.

## k. FEE REVIEW ENTITIES

25) ***Comment:*** **If the court appoints a fee committee, fee examiner, or other reviewer, the United States Trustee should defer all compensation and expense inquiries and objections to such reviewed to avoid subjecting the applicant to multiple and competing demands for information.**

***Response:*** The United States Trustee has an independent statutory duty to review and comment on applications for compensation. 28 U.S.C. § 586(a)(3)(A). That duty cannot be delegated. Nevertheless, the United States Trustee will not lightly deviate from positions taken by the fee committee, examiner or other reviewer.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

26) ***Comment:*** **The United States Trustee should use discretion and only seek a fee committee or examiner when circumstances dictate. Similarly, the appointment should be sought at the earliest stages of the case.**

***Response:*** The Appendix B guidelines already address these issues and provide that the United States Trustee will "ordinarily" seek appointment of a fee review entity. Guidelines ¶ G.1. The Guidelines acknowledge that the appointment is ultimately the court's decision. Similarly, the United States Trustee will ordinarily seek a fee committee, examiner or other review entity "as soon as practicable after the order for relief." Guidelines ¶ G.2.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

27) ***Comment:*** **The scope of fee review entities should be expanded to include active consultation with and oversight of the clients regarding the retention of professionals and the terms of those retentions, which should reflect market-driven considerations.**

***Response:*** The USTP strongly concurs that section 330(a)(3)(F) expresses Congress' intention that professional compensation in bankruptcy be market driven. Oversight of professionals retained on behalf of the estate must be limited to ensuring that they satisfy the requirements set by Congress in the Bankruptcy Code, including sections 327 and 330, without overreaching. Moreover, while the United States Trustee ordinarily will seek the appointment of a fee review entity as soon as practicable after the order for relief, it typically will not be in place when most applications for employment are filed early in the case. Consequently, the Appendix B guidelines are not being changed to give the fee review entities any additional express responsibilities.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

## l. MISCELLANEOUS COMMENTS

28) ***Comment:*** **One commenter suggested that the Appendix B guidelines "provide a useful template for any court that wishes to systematize a law firm's explanation of its fees and expenses" in larger chapter 11 cases, and that if the courts adopted these as local rules that "would create a single set of expectations for what belongs in fee applications in such cases." Prof. Rapoport Letter, dated November 6, 2012.**

***Response:*** The USTP agrees and will urge courts to incorporate the Appendix B guidelines into their local rules or general orders, as many have with the existing Appendix A guidelines. Uniformity and consistency in the USTP's review of fee applications will benefit the courts, the applicants, and the public, in addition to the USTP. Moreover, before the Guidelines go effective, the USTP will engage in a systematic training and outreach effort related to the Appendix B guidelines, including coordination and training with relevant professional associations.

The USTP concludes that no changes are necessary to the Guidelines based on these comments.

29) ***Comment:*** **The requested disclosures for rate increases should not include annual "step increases" related to the advancement of an attorney but should be limited only to increases of the overall rate structure.**

***Response:*** The USTP agrees. The USTP has revised the Appendix B guidelines to provide that the disclosure of rate increases and calculations of their effect may exclude annual "step increases" historically awarded in the ordinary course to attorneys throughout the firm due to advancing seniority and promotion, if the firm distinguishes between "step increases" and other types of rate increases. Guidelines ¶ B.2.d., n.2. Nevertheless, applicants should not attempt to characterize actual rate increases that are unrelated to an attorney's advancing seniority and promotion as "step increases" in effort

to thwart meaningful disclosure or billing discipline. If a firm does not distinguish between "step increases" and other types of rate increases, it should disclose and explain all rate increases.

June 12, 2013

Submitting on Behalf of the U.S. Trustees Office,

Jerri Murray,

*Department Clearance Officer for PRA, U.S. Department of Justice*

[FR Doc. 2013–14323 Filed 6–14–13; 8:45 am]

**BILLING CODE P**

# DEPARTMENT OF LABOR

## Office of the Secretary

## Agency Information Collection Activities; Submission for OMB Review; Comment Request; Regulations Containing Procedures for Handling of Retaliation Complaints

**ACTION:** Notice.

**SUMMARY:** The Department of Labor (DOL) is submitting the Occupational Safety and Health Administration (OSHA) sponsored information collection request (ICR) revision titled, "Regulations Containing Procedures for Handling of Retaliation Complaints," to the Office of Management and Budget (OMB) for review and approval for use in accordance with the Paperwork Reduction Act (PRA) of 1995 (44 U.S.C. 3501 et seq.).

**DATES:** Submit comments on or before July 17, 2013.

**ADDRESSES:** A copy of this ICR with applicable supporting documentation; including a description of the likely respondents, proposed frequency of response, and estimated total burden may be obtained free of charge from the RegInfo.gov Web site at *http:// www.reginfo.gov/public/do/ PRAViewICR?ref_nbr=201305-1218-001* (this link will only become active on the day following publication of this notice) or by contacting Michel Smyth by telephone at 202–693–4129 (this is not a toll-free number) or sending an email to *DOL_PRA_PUBLIC@dol.gov.*

Submit comments about this request to the Office of Information and Regulatory Affairs, Attn: OMB Desk Officer for DOL–OSHA, Office of Management and Budget, Room 10235, 725 17th Street NW., Washington, DC 20503, Fax: 202–395–6881 (this is not a toll-free number), email: *OIRA_submission@omb.eop.gov.*

**FOR FURTHER INFORMATION CONTACT:**
Michel Smyth by telephone at 202–693–4129 (this is not a toll-free number) or by email at *DOL_PRA_PUBLIC@dol.gov.*

**Authority:** 44 U.S.C. 3507(a)(1)(D).

**SUPPLEMENTARY INFORMATION:** The OSHA administers and enforces a number of provisions in various Federal laws and regulations prohibiting retaliatory action by an employer against an employee who is believed to have reported a possible violation of those laws or regulations, or who otherwise engages in an activity protected specified by an anti-retaliation provision. Any person may file a complaint alleging the employer violated these protection provisions with the OSHA for investigation. This ICR has been classified as a revision, because the OSHA is making Web-based and paper options available for filing complaints. For additional substantive information about this ICR, see the related notice published in the **Federal Register** on January 17, 2013 (78 FR 3918).

This information collection is subject to the PRA. A Federal agency generally cannot conduct or sponsor a collection of information, and the public is generally not required to respond to an information collection, unless it is approved by the OMB under the PRA and displays a currently valid OMB Control Number. In addition, notwithstanding any other provisions of law, no person shall generally be subject to penalty for failing to comply with a collection of information that does not display a valid Control Number. *See* 5 CFR 1320.5(a) and 1320.6. The DOL obtains OMB approval for this information collection under Control Number 1218–0236. The DOL notes that existing information collection requirements remain in effect while they undergo review. New information collection requirements would only take upon OMB approval.

Interested parties are encouraged to send comments to the OMB, Office of Information and Regulatory Affairs at the address shown in the **ADDRESSES** section within 30 days of publication of this notice in the **Federal Register**. In order to help ensure appropriate consideration, comments should mention OMB Control Number 1218–0236. The OMB is particularly interested in comments that:

• Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

• Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information,

including the validity of the methodology and assumptions used;

• Enhance the quality, utility, and clarity of the information to be collected; and

• Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g., permitting electronic submission of responses.

*Agency:* DOL–OSHA.

*Title of Collection:* Regulations Containing Procedures for Handling of Retaliation Complaints.

*OMB Control Number:* 1218–0236.

*Affected Public:* Individuals or Households.

*Total Estimated Number of Respondents:* 2,872.

*Total Estimated Number of Responses:* 2,872.

*Total Estimated Annual Burden Hours:* 2,872.

*Total Estimated Annual Other Costs Burden:* $0.

Dated: June 11, 2013.

**Michel Smyth,**

*Departmental Clearance Officer.*

[FR Doc. 2013–14248 Filed 6–14–13; 8:45 am]

**BILLING CODE 4510–26–P**

# NATIONAL AERONAUTICS AND SPACE ADMINISTRATION

[Notice: 13–065]

## NASA Advisory Council; Science Committee; Astrophysics Subcommittee; Meeting

**AGENCY:** National Aeronautics and Space Administration.

**ACTION:** Notice of meeting.

**SUMMARY:** In accordance with the Federal Advisory Committee Act, Public Law 92–462, as amended, the National Aeronautics and Space Administration (NASA) announces a meeting of the Astrophysics Subcommittee of the NASA Advisory Council (NAC). This Subcommittee reports to the Science Committee of the NAC. The meeting will be held for the purpose of soliciting, from the scientific community and other persons, scientific and technical information relevant to program planning.

**DATES:** Tuesday, July 16, 2013, 9:00 a.m. to 5:00 p.m., and Wednesday, July 17, 2013, 9:00 a.m. to 4:00 p.m., Local Time.

**ADDRESSES:** NASA Goddard Space Flight Center, Building 1, Rooms E100D

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
OFFICE OF THE U.S. TRUSTEE, 411 West 4th St., #7160 Santa Ana, CA  92701

A true and correct copy of the foregoing document entitled NOTICE OF APPLICABILITY OF LARGE-CASE
UNITED STATES TRUSTEE FEE GUIDELINES will be served in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General
orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **JUNE 9,
2021,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following
persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated

- Ron Bender     rb@lnbyb.com
- Amir Gamliel     amir-gamliel-9554@ecf.pacerpro.com,
  cmallahi@perkinscoie.com;DocketLA@perkinscoie.com
- Nancy S Goldenberg     nancy.goldenberg@usdoj.gov
- Monica Y Kim     myk@lnbyb.com, myk@ecf.inforuptcy.com
- Daniel A Lev     dlev@sulmeyerlaw.com, ccaldwell@sulmeyerlaw.com;dlev@ecf.inforuptcy.com
- Juliet Y Oh     jyo@lnbyb.com, jyo@lnbrb.com
- Robert E Opera     ropera@wghlawyers.com,
  jmartinez@wghlawyers.com;mweinberg@wghlawyers.com
- Ronald N Richards     ron@ronaldrichards.com, morani@ronaldrichards.com
- Jeffrey S Shinbrot     jeffrey@shinbrotfirm.com, sandra@shinbrotfirm.com
- United States Trustee (SA)     ustpregion16.sa.ecf@usdoj.gov

**2.  TO BE SERVED BY UNITED STATES MAIL:**  On **JUNE 9, 2021,** I will be served on the persons and/or entities at
the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a
sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here
constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed

**3.  TO BE SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION** OR
(state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **JUNE 9, 2021,**  I
served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in
writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a
declaration
that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is
filed.

| | | |
|---|---|---|
| JUNE 9, 2021 | TARI KING | /S/ TARI KING |
| DATE | PRINTED NAME | SIGNATURE |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                 **F 9013-3.1.PROOF.SERVICE**