RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email:  RB@LNBYB.COM; MYK@LNBYB.COM; JYO@LNBYB.COM

Attorneys for Chapter 11 Debtors and
Debtors-in-Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>PLAMEX INVESTMENT, LLC, a Delaware limited liability company,<br><br>    Debtor and Debtor in  Possession.<br>─────────────────────────────<br>In re:<br><br>3100 E. IMPERIAL INVESTMENT, LLC, a Delaware limited liability company,<br><br>    Debtor and Debtor in Possession.<br>─────────────────────────────<br><br>☒  Affects both Debtors<br><br>☐ Affects Plamex Investment, LLC only<br><br>☐  Affects 3100 E. Imperial Investment, LLC only | Lead Case No.: 8:21-bk-10958-ES<br><br>Jointly administered with 3100 E. Imperial Investment, LLC (8:21-bk-10957-ES)<br><br>Chapter 11 Cases<br><br>**APPLICATION OF DEBTORS AND DEBTORS IN POSSESSION TO JOINTLY EMPLOY NAI CAPITAL COMMERCIAL, INC. AS REAL ESTATE BROKER PURSUANT TO 11 U.S.C. §§ 327 AND 328; DECLARATION OF CHRIS JACKSON IN SUPPORT THEREOF**<br><br>[No Hearing Required – Local Bankruptcy Rule 2014-1(b)] |

Plamex Investment, LLC, a Delaware limited liability company ("Plamex"), and 3100 E. Imperial Investment, LLC, a Delaware limited liability company ("3100," and together with Plamex, the "Debtors"), the debtors and debtors-in-possession in the above-captioned, jointly administered chapter 11 bankruptcy cases, hereby submit this application (the "Application") for Court approval of their joint employment of NAI Capital Commercial, Inc. (the "NAI Capital") as their real estate broker upon the terms and conditions described below.  In support of this Application, the Debtors respectfully represent as follows:

**A.    Background.**

1.    The Debtors commenced their bankruptcy cases by filing Voluntary Petitions for relief under chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on April 14, 2021 (the "Petition Date").  Since the Petition Date, the Debtors have operated their businesses, managed their financial affairs, and operated their bankruptcy estates as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    On April 15, 2021, the Court entered orders approving the joint administration of the Debtors' bankruptcy cases, with the lead case being the bankruptcy case of Plamex, Case No. 8:21-bk-10958-ES.

3.    The two individuals who serve as the principals of the Debtors are Min Chae and Donald Chae, brothers who each have more than 30 years of experience in real estate investment, development, and management. The Chae brothers' specialty and expertise rest in creating vibrant and thriving cultural retail centers at previously under-performing locations, particularly in ethnically diverse areas. The "Plaza Mexico" is one such project and the crown jewel of the Chae brothers' real estate portfolio.

4.    Plamex is the fee simple owner of Plaza Mexico ("Plaza Mexico" or the "Property"), a 403,242 square-foot community shopping center offering specialty retail and dining located in Lynwood, California just north of the 105 freeway (approximately 20 minutes from LAX). For over 20 years, Plaza Mexico has been a community landmark in Southern California. The premise behind Plaza Mexico is to represent the rich Latino heritage of the community and create an

authentic Mexican cultural landscape through the incorporation of Mexican architecture, authentic building materials, notable monuments, and a forum to celebrate all Mexican fiestas. Currently, Plaza Mexico is occupied by tenants that include Food 4 Less, Rite Aid, Curacao, Chuck E. Cheese, and a wide variety of restaurants and retailers of clothing, electronics, shoes, toys, jewelry, and furniture. The Property also generates a modest revenue from advertising it sells on its LED tower, which overlooks the I-105 Freeway.

5.      Plamex is wholly-owned by its sole member, 3100.  In turn, 3100 is wholly owned by an entity called Placo Investment, LLC ("Placo"), and Placo is wholly-owned by ISLT Investment, LLC ("ISLT").  Neither Placo nor ISLT has filed its own bankruptcy case.

6.      The multi-layered organizational structure of the Debtors and their parent companies, as well as the terms of the limited liability agreements for the Debtors, as amended and restated ("LLC Agreements"), are the direct result of pre-petition structured finance and securitization transactions. As part of these transactions, the secured lenders and the preferred equity holder forced an elaborate corporate structure in part to create bankruptcy-remote entities, which are otherwise known as "special purpose" entities or vehicles, to attempt to isolate and deter bankruptcy filings by these entities. The Debtors contend that such terms are unenforceable "*ipso facto*" clauses which are void as a matter of law and public policy.

7.      The Debtors' bankruptcy filings were the results of two primary factors: (i) substantial loss of rent revenue from Plamex's tenants due to the COVID-19 pandemic which caused the Debtors to default on their obligations to their secured lenders, and (ii) efforts by the secured lenders to foreclose on their collateral, including a foreclosure sale on the membership interests held by 3100 in Plamex, which was scheduled by 3100's secured lenders for April 15, 2021 at 10:00 a.m. (EST).

8.      More specifically, Plaza Mexico has not been immune to the financial effects of the COVID-19 pandemic.  Due to government-imposed stay-at-home orders and related restrictions which started in March of 2020, Plaza Mexico's tenants were required to close and/or experienced a drastic loss of business, sales and income.  Many of the tenants have not paid full or any rents to

Plamex, which, in turn, resulted in a default by the Debtors to their secured lenders.  The Debtors and their parent companies were in the process of re-financing at the time the pandemic hit, which halted the process. Recently, as California has started to ease restrictions, rent collections at Plaza Mexico have been brought almost back to pre-pandemic levels.  There is an increase in foot traffic, and tenants are starting to pay rents timely.  However, despite these positive movements, the secured lenders who provided mezzanine loans to 3100 were unwilling to stop their April 15, 2021 foreclosure sale.  As a result, the Debtors had no choice but to file their bankruptcy petitions to preserve their assets for the benefit of all constituencies.

**B.** **Decision to Employ a Real Estate Broker and Summary of Key Terms of Employment.**

9.    The Debtors have made the decision that the best interests of their estates are served by their employment of a highly qualified real estate broker to assist the Debtors either to sell Plaza Mexico for the most money possible or to find an investment partner to team up with the Debtors either in connection with a sale process or a reorganization process.

10.    The Debtors interviewed and consulted with a number of qualified real estate brokers and decided that NAI Capital is the ideal broker for them.  NAI Capital has approximately 223 brokers working in 13 offices throughout Southern California, and NAI Capital has an extremely strong presence in Southern California yet is part of a worldwide network that provides NAI Capital with access to prospective buyers and investors worldwide.  The Debtors seek to employ NAI Capital as their real estate broker in accordance with the listing agreement (the "Listing Agreement") attached as Exhibit "1" to the annexed Declaration of Chris Jackson (the "Jackson Declaration").

11.    The Debtors seek to employ NAI Capital as their real estate broker to render, among others, the following types of professional services:

a.    Identifying potential buyers and investors using NAI Capital's worldwide network;

b.    Assisting the Debtors to expeditiously formulate and implement a strategy

for soliciting interest from potential buyers and investors, including by developing and implementing procedures and a timetable for marketing the Property for sale or investment;

c.      Introducing the Debtors to potential buyers and investors and coordinating due diligence investigations;

d.      Assisting the Debtors to evaluate proposals from interested parties, formulating negotiation strategies, and assisting in negotiations and closing of a sale or investment; and

e.      Participating in hearings before the Bankruptcy Court with respect to the matters upon which NAI Capiutal has provided services or advice, including, as relevant, providing testimony.

12.    The Debtors expect that NAI Capital will work closely in concert with the Debtors' bankruptcy counsel with respect to all of the foregoing.

13.    The NAI Capital team of brokers that will be representing the Debtors will be comprised of Chris Jackson (the co-CEO of NAI Capital) along with Philip Attalla, Executive Managing Director; Todd Lorber, Executive Vice President; David M. Shabby III, Senior Associate; and Grant Bullen, Senior Associate.   Their respective professional resumes are collectively attached as Exhibit "2" to the Jackson Declaration.

14.    NAI Capital has not received any retainer for this engagement and has not been paid any money by the Debtors at any time.

15.    The Listing Agreement is for a term of approximately six months, ending on November 30, 2021 (see Section 1.3 of the Listing Agreement).

16.    This is an exclusive Listing Agreement where NAI Capital will serve as the Debtors' sole and exclusive agent (see section 2.1 of the Listing Agreement).

17.    In the event of a transaction closing, NAI Capital shall be entitled to receive a commission (see section 5 of the Listing Agreement) in accordance with the Schedule of Commissions contained in Exhibit A to the Listing Agreement.  NAI Capital shall be entitled to a

commission of 1% of the sale price unless the consummated transaction is with any of the "Excluded Persons" contained in Exhibit C to the Listing Agreement in which case NAI Capital shall be entitled to a commission of 0.25% of the sale price. For confidentiality reasons, Exhibit C is not included in the attachment to the Jackson Declaration.

18.     Solely in order to save the expense of preparing a fee application, the Debtors are requesting that their employment of NAI Capital be pursuant to 11 U.S.C. § 328 and provide for NAI Capital to be paid its commission in connection with the closing of any transaction without the need for a fee application or further Court order. If the Court concludes otherwise, then of course the Debtors and NAI Capital will comply with the desires of the Court.

19.     Notwithstanding the foregoing request, no transaction involving any buyer or investor will proceed to a closing unless approved in advance by the Court.

20.     Pursuant to 11 U.S.C. § 328(a), notwithstanding the terms and conditions of the Broker's employment, "the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions."

21.     Other than the Listing Agreement and the terms of engagement set forth in this Application, there is no agreement between the Debtors and NAI Capital regarding the Debtors' employment of NAI Capital in connection with the Debtors' chapter 11 cases.

**III.     NAI CAPITAL IS DISINTERESTED AND DOES NOT HOLD ANY INTEREST ADVERSE TO THESE ESTATES**

22.     NAI Capital is not a creditor, an equity security holder or an insider of the Debtors.

23.     NAI Capital is not and was not an investment banker for any outstanding security of the Debtors. NAI Capital has not been within three years before the Petition Date an investment banker for a security of the Debtors, or an attorney for such an investment banker in connection with the offer, sale or issuance of any security of the Debtors.

24.     NAI Capital is not now nor was within two years before the Petition Date, a director, officer or employee of the Debtors or of any investment banker for any security of the Debtors.

25.     To the best of the Debtors' knowledge and based upon the Jackson Declaration, NAI Capital does not hold or represent any interest materially adverse to the interest of the Debtors' estates or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors or an investment banker for any security of the Debtors, or for any other reason. For disclosure purposes only, NAI Capital is also being retained by "The Source Hotel, LLC" ("Source Hotel"), which is an affiliate of the Debtors in its own chapter 11 bankruptcy case pending before this Court (bearing case number 8:21-bk-10525-ES). However, NAI Capital's proposed employment as the real estate broker for Source Hotel is subject to a separate listing agreement that is part of an entirely separate employment application filed in the Source Hotel chapter 11 bankruptcy case that relates to an entirely different property and is not tied to or linked in any way to the Debtors' proposed employment of NAI Capital in the Debtors' chapter 11 cases. Also for disclosure purposes only, NAI Capital has also been retained by The Source at Beach, LLC and The Source Office, LLC (affiliated entities which are not in bankruptcy) with respect to the balance of the Source property.

26.     To the best of the Debtors' knowledge and based upon the Jackson Declaration, NAI Capital does not hold or represent any interest materially adverse to the Debtors or the Debtors' estates, and NAI Capital is a "disinterested person" as that term is defined in Section 101(14) of the Bankruptcy Code. Also, to the best of the Debtors' knowledge, other than as set forth herein and in the Jackson Declaration, NAI Capital has no prior connection with the Debtors, any creditors of the Debtors or their estates, or any other party in interest in these cases, or their respective attorneys or accountants, the United States Trustee or any person employed by the United States Trustee.

27.     On January 31, 2020, NAI Capital, Inc. ("NCI") (which is not the broker the Debtors are seeking to employ herein) filed a voluntary petition under chapter 11 of the

bankruptcy code in the Central District of California, San Fernando Valley Division, as Case Number 1:20-bk-10256-DS.  At the time of its bankruptcy filing, NCI was a privately held, full service commercial real estate brokerage firm headquartered in Encino, California.  The primary financial problem facing the company was ongoing litigation between the three primary shareholders of NCI.  On August 28, 2020, the Court entered an order approving a sale of certain assets that constituted the operating business portion of the bankruptcy estate to a newly formed corporation owned by a group of NCI's real estate brokers.  That newly formed corporation is what constitutes NAI Capital and is the broker the Debtors are seeking to employ herein.  That asset sale closed on September 30, 2020.  None of the three primary shareholders of NCI referenced above are involved with NAI Capital.  The only remaining financial connection between NAI Capital and the NCI bankruptcy estate is that, as part of the consideration for NAI Capital's purchase of NCI's operating business, NAI Capital owes the NCI bankruptcy estate the remaining balance of a $250,000 promissory note, and NAI Capital is required to pay to the NCI bankruptcy estate for the next approximately 2.5 years 3% of the net commissions earned by NAI Capital after deducting costs of sale and payment of brokers' commissions.  The Debtors' bankruptcy counsel, Levene, Neale, Bender, Yoo & Brill L.L.P. ("LNBYB"), filed NCI's chapter 11 bankruptcy case and served as NCI's bankruptcy counsel throughout its chapter 11 bankruptcy case.  NCI's chapter 11 bankruptcy case remains open (although no longer an operating business), and LNBYB continues to serve as bankruptcy counsel to that chapter 11 entity.  LNBYB is not serving as counsel to NAI Capital (i.e., the broker the Debtors are seeking to employ herein), and LNBYB has never served as counsel to NAI Capital.  The Debtors are simply providing this information as a matter of disclosure.

WHEREFORE, the Debtors respectfully submit that their employment of NAI Capital is in the best interests of the Debtors' bankruptcy estates, and Debtors request that they be authorized to employ NAI Capital as their real estate broker in accordance with the terms and conditions set forth above and in the Listing Agreement.

Dated:  June 11, 2021


PLAMEX INVESTMENT, LLC and
3100 E. IMPERIAL INVESTMENT, LLC


_____
Name:  Luis Valenzuela
Title:    Executive Vice President of M+D Properties,
           Manager of Debtors



                                    LEVENE, NEALE, BENDER, YOO
                                    & BRILL L.L.P.


                          By:_____
                                    Ron Bender
                                    Monica Y. Kim
                                    Juliet Y. Oh
                                    Counsel for Chapter 11 Debtors
                                    and Debtors in Possession

Dated:  June 11, 2021

PLAMEX INVESTMENT, LLC and
3100 E. IMPERIAL INVESTMENT, LLC

_____
Name:  Luis Valenzuela
Title:  Executive Vice President of M+D Properties,
        Manager of Debtors

                                    LEVENE, NEALE, BENDER, YOO
                                    & BRILL L.L.P.

                                    By:___*/s/ Ron Bender*_____
                                          Ron Bender
                                          Monica Y. Kim
                                          Juliet Y. Oh
                                          Counsel for Chapter 11 Debtors
                                          and Debtors in Possession

## DECLARATION OF CHRIS JACKSON

I, Chris Jackson, hereby declare as follows:

1.      I am the co-Chief Executive Officer of NAI Capital Commercial, Inc. (the "NAI Capital").

2.      I have personal knowledge of the facts stated herein, except where stated upon information and belief, and, as to such statements, I believe them to be true. I make this Declaration in support of the application of Plamex Investment, LLC, a Delaware limited liability company ("Plamex"), and 3100 E. Imperial Investment, LLC, a Delaware limited liability company ("3100," and together with Plamex, the "Debtors"), the debtors and debtors-in-possession in the above-captioned, jointly administered chapter 11 bankruptcy cases, for Court approval of their joint employment of NAI Capital as their real estate broker (the "Application"). Unless the context indicates otherwise, capitalized terms herein shall have the meanings as defined in the Application.

3.      I have reviewed the Application, and I believe that all of the contents of the Application are accurate.  I understand the facts of the Debtors' chapter 11 bankruptcy cases as they have been presented to me, and I believe that NAI Capital is well qualified to serve as the Debtors' real estate broker.  My team and I have already conducted significant due diligence of Plaza Mexico.

4.      NAI Capital will work with the Debtors to assist the Debtors either to sell Plaza Mexico for the most money possible or to find an investment partner to team up with the Debtors either in connection with a sale process or a reorganization process.

5.       NAI Capital has approximately 223 brokers working in 13 offices throughout Southern California, and NAI Capital has an extremely strong presence in Southern California yet is part of a worldwide network that provides NAI Capital with access to prospective buyers and investors worldwide.  Subject to the approval of the Court and of the Application, the Debtors and NAI Capital have entered into the listing agreement (the "Listing Agreement") attached hereto as Exhibit "1".

6.      As the real estate broker to the Debtors, NAI Capital expects to render, among others, the following types of professional services:

  a.  Identifying potential buyers and investors using NAI Capital's worldwide network;

  b.  Assisting the Debtors to expeditiously formulate and implement a strategy for soliciting interest from potential buyers and investors, including by developing and implementing procedures and a timetable for marketing the Property for sale or investment;

  c.  Introducing the Debtors to potential buyers and investors and coordinating due diligence investigations;

  d.  Assisting the Debtors to evaluate proposals from interested parties, formulating negotiation strategies, and assisting in negotiations and closing of a sale or investment; and

  e.  Participating in hearings before the Bankruptcy Court with respect to the matters upon which NAI Capiutal has provided services or advice, including, as relevant, providing testimony.

7.      NAI Capital will work in close concert with the Debtors' bankruptcy counsel with respect to all of the foregoing.

8.      The NAI Capital team of brokers that will be representing the Debtors will be comprised of me along with Philip Attalla, Executive Managing Director; Todd Lorber, Executive Vice President; David M. Shabby III, Senior Associate; and Grant Bullen, Senior Associate.  All of our respective professional resumes are collectively attached hereto as Exhibit "2".

9.      NAI Capital has not received any retainer for this engagement and has not been paid any money by the Debtors at any time.

10.     The Listing Agreement is for a term of approximately six months, ending on November 30, 2021 (see Section 1.3 of the Listing Agreement).

11. This is an exclusive Listing Agreement where NAI Capital will serve as the Debtors' sole and exclusive agent (see section 2.1 of the Listing Agreement).

12. In the event of a transaction closing, NAI Capital shall be entitled to receive a commission (see section 5 of the Listing Agreement) in accordance with the Schedule of Commissions contained in Exhibit A to the Listing Agreement. NAI Capital shall be entitled to a commission of 1% of the sale price unless the consummated transaction is with any of the "Excluded Persons" contained in Exhibit C to the Listing Agreement in which case NAI Capital shall be entitled to a commission of 0.25% of the sale price. For confidentiality reasons, I have not included Exhibit C herein.

13. Other than the Listing Agreement and the terms of engagement set forth in the Application, there is no agreement between the Debtors and NAI Capital regarding the Debtors' employment of NAI Capital in connection with these chapter 11 cases.

14. NAI Capital is not a creditor, an equity security holder or an insider of the Debtors.

15. NAI Capital is not and was not an investment banker for any outstanding security of the Debtors. NAI Capital has not been within three years before the Petition Date an investment banker for a security of the Debtors, or an attorney for such an investment banker in connection with the offer, sale or issuance of any security of the Debtors.

16. NAI Capital is not now nor was within two years before the Petition Date, a director, officer or employee of the Debtors or of any investment banker for any security of the Debtors.

17. To the best of my knowledge, NAI Capital does not hold or represent any interest materially adverse to the interest of the Debtors' estates or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors or an investment banker for any security of the Debtors, or for any other reason.

18. For disclosure purposes only, NAI Capital is also being retained by "The Source Hotel, LLC" ("Source Hotel"), which I understand is an affiliate of the Debtors in its own chapter 11 bankruptcy case pending before this Court (bearing case number 8:21-bk-10525-ES).

However, NAI Capital's proposed employment as the real estate broker for Source Hotel is subject to a separate listing agreement that is part of an entirely separate employment application filed in the Source Hotel chapter 11 bankruptcy case that relates to an entirely different property and is not tied to or linked in any way to the Debtors' proposed employment of NAI Capital in the Debtors' chapter 11 cases. Also for disclosure purposes only, NAI Capital has also been retained by The Source at Beach, LLC and The Source Office, LLC (affiliated entities that are not in bankruptcy) with respect to the balance of the Source property.

19.     To the best of my knowledge, NAI Capital does not hold or represent any interest materially adverse to the Debtors or the Debtors' estates, and NAI Capital is a "disinterested person" as that term is defined in Section 101(14) of the Bankruptcy Code. Also, to the best of my knowledge, other than as set forth herein, NAI Capital has no prior connection with the Debtors, any creditors of the Debtors or their estates, or any other party in interest in these cases, or their respective attorneys or accountants, the United States Trustee or any person employed by the United States Trustee.

20.     On January 31, 2020, NAI Capital, Inc. ("NCI") (which is not the broker the Debtors are seeking to employ herein) filed a voluntary petition under chapter 11 of the bankruptcy code in the Central District of California, San Fernando Valley Division, as Case Number 1:20-bk-10256-DS. At the time of its bankruptcy filing, NCI was a privately held, full service commercial real estate brokerage firm headquartered in Encino, California. The primary financial problem facing the company was ongoing litigation between the three primary shareholders of NCI. On August 28, 2020, the Court entered an order approving a sale of certain assets that constituted the operating business portion of the bankruptcy estate to a newly formed corporation owned by a group of NCI's real estate brokers led primarily by me. That newly formed corporation is what constitutes NAI Capital and is the broker the Debtors are seeking to employ herein. That asset sale closed on September 30, 2020. None of the three primary shareholders of NCI referenced above are involved with NAI Capital. The only remaining financial connection between NAI Capital and the NCI bankruptcy estate is that, as part of the

consideration for NAI Capital's purchase of NCI's operating business, NAI Capital owes the NCI bankruptcy estate the remaining balance of a $250,000 promissory note, and NAI Capital is required to pay to the NCI bankruptcy estate for the next approximately 2.5 years 3% of the net commissions earned by NAI Capital after deducting costs of sale and payment of brokers' commissions.   The Debtors' bankruptcy counsel, Levene, Neale, Bender, Yoo & Brill L.L.P. ("LNBYB"), filed NCI's chapter 11 bankruptcy case and served as NCI's bankruptcy counsel throughout its chapter 11 bankruptcy case.   NCI's chapter 11 bankruptcy case remains open (although no longer an operating business), and LNBYB continues to serve as bankruptcy counsel to that chapter 11 entity.   LNBYB is not serving as counsel to NAI Capital (i.e., the broker the Debtors are seeking to employ herein), and LNBYB has never served as counsel to NAI Capital.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed on June 11, 2021, at Los Angeles, California.

CHRIS JACKSON

# EXHIBIT "1"

## [LISTING AGREEMENT]



## EXCLUSIVE RIGHT TO REPRESENT OWNER
## FOR SALE ~~OR LEASE~~ OF REAL PROPERTY
(Non-Residential)

**1. BASIC PROVISIONS ("BASIC PROVISIONS").**

    **1.1** **Parties:** This agency Agreement ("Agreement"), dated for reference purposes only April 23, 2021, is made by and between Plamex Investment, LLC and M+D Properties, whose address is 6988 Beach Boulevard Suite B-215, Buena Park, CA 90621, ("Owner"), and NAI Capital Commercial, Inc., a California corporation, whose address is 970 W. 190th Street, Suite 100, Torrance CA 90502, telephone number (310) 878-6900, Fax No. (310) 878-6901, ("Agent").

    **1.2** **Property/Premises:** The real property, or a portion thereof, which is the subject of this Agreement is commonly known as (street, address, city, state, zip) SWC of Long Beach Blvd. and Imperial Highway, Lynwood, CA, identified as "Plaza Mexico", located in the County of Los Angeles, and generally described as (describe briefly the nature of the property): Approximately 415,424 square feet of gross leasable retail space located on approximately 31.54 acres acres of land. The corresponding APN numbers are: 6171-001-040, 046, 052, 054, 055; 6171-003-039; 6171-004-017, 032; 6171-006-035, 037, 038; 6171-007-052, 056, 057; 6171-010-002 (See Exhibit B). ("Property"). (See also Paragraph 3).

    **1.3** **Term of Agreement:** The term of this Agreement shall commence on May 25, 2021, 2021 and expire at 5:00 p.m. on November 30, 2021, except as it may be extended ("Term"). (See also paragraph 4)

    **1.4** **Transaction:** The nature of the transaction concerning the Property for which Agent is employed ("Transaction") is (check the appropriate box(es)):

    (a) _X_  A sale for the following sale price and terms: To be sold at a price approved by the United States Bankruptcy Court and Subject to Overbid and other additional standard terms reasonably similar to those contained in the "STANDARD OFFER, AGREEMENT AND ESCROW INSTRUCTIONS FOR THE PURCHASE OF REAL ESTATE" published by the AIR Commercial Real Estate Association ("AIR"), or for such other price and terms agreeable to Owner;

**2. EXCLUSIVE EMPLOYMENT AND RIGHTS.**



    **2.1** Owner hereby employs Agent as Owner's sole and exclusive agent to represent Owner in the Transaction and to find buyers or lessees/tenants ("lessees"), as the case may be, for the Property or any portion thereof. Agent shall use reasonably diligent efforts to find such buyers or ~~lessees and~~ Owner agrees to and willfully cooperate with Agent in connection with Agent's discharge of its duties arising from this Agreement. All negotiations and discussions for a Transaction shall be conducted by Agent on behalf of Owner. Owner shall promptly disclose and refer to Agent all written or oral inquiries or contacts received by Owner from any source regarding the Property and any possible Transaction.

    **2.2** Owner authorizes Agent to:

      (a) Place advertising signs on the Property;

      (b) Place a lock box on the Property if vacant;

      (c) Distribute information regarding the Property to participants in THE MULTIPLE ("MULTIPLE") of the AIR and/or any other appropriate local commercial multiple listing service, to other brokers, and to potential buyers or lessees of the Property. Owner shall identify as "confidential" any information provided to Agent that Owner considers confidential and does not want disclosed. All other information provided by Owner may be disclosed as Agent may deem appropriate or necessary. After consummation of a Transaction, Agent may publicize the terms of such Transaction.

Owner       Agent

2.3    Agent shall comply with the Rules of Professional Conduct of the AIR, if a member or if not, the Rules of Professional Conduct of the Society of Industrial and Office Realtors, and shall submit the Property to the MULTIPLE. Agent shall cooperate with participants in the MULTIPLE and may, at Agent's election, cooperate with other real estate brokers (collectively **"Cooperating Broker"**).

2.5    Owner agrees that Agent may, during the ordinary and normal course of marketing the Property, respond to inquiries on the Property by showing and providing information on the Property, as well as on other competing properties, to prospective buyers and lessees and that such activities may result in the payment of a commission to Agent by a third party. Owner understands that Agent may also represent other lessors/sellers with competing properties.

**3.    PROPERTY.**

3.1    The term "Property" shall include all of the following which are currently located on the Property and owned by Owner: permanent improvements, electrical distribution systems (power panels, buss ducting, conduits, disconnects, lighting fixtures, etc.), telephone distribution systems (lines, jacks and connections), space heaters, air conditioning equipment, air lines, carpets, window coverings, wall coverings, partitions, doors, suspended ceilings, built-ins such as cabinets, and _ (if there are no additional items write "NONE"). If the Transaction is a sale, the term "Property" shall additionally include, to the extent owned by Owner, oil and mineral rights, leases and other agreements which will continue in effect after Owner's transfer of title to the Property.

3.2    Within five business days after the commencement of the Term hereof, Owner shall provide Agent with the following:

    (a)    A duly completed and fully executed Property Information Sheet on the most current form published by the AIR;

    (b)    Copies of all leases, subleases, rental agreements, option rights, rights of first refusal, rights of first offer, or other documents containing any other limitations on Owner's right, ability and capacity to consummate a Transaction, and

    (c)    If available to Owner, copies of building plans, and if the Transaction is a sale, title reports, boundary surveys, and existing notes and trust deeds which will continue to affect the Property after consummation of a sale.

    (d)    Owner agrees that this is an on-going obligation to provide Agent, upon Owner learning of said information or receiving such documentation and without Agent having had to further request same, with (1) notification of any changes in the accuracy and completeness of the documents and information provided by Owner pursuant to this Paragraph 3.2 (and otherwise arising from this Agreement), (2) copies of such other and further documents bearing on the accuracy and completeness of the documents and information previously provided by or on behalf of Owner; and (3) notification of any anticipated, potential or other circumstances which may bear on the potential sale, condition or value of the Property or otherwise concerning any tenancy or subtenancy or related to the ownership of the Property.

3.3    Agent shall have no responsibility for maintenance, repair, replacement, operation, or security of the Property, all of which shall be Owner's sole responsibility. Unless caused by Agent's gross negligence, Agent shall not be liable for any loss, damage, or injury to the Property, to the person or property of Owner, any lessees of the Property, any buyer, prospective buyer, lessee, or prospective lessee, including, but not limited to, those which may occur as a result of or arising from Agent's use of a lock box or showing of the Property to prospective persons or entities.

3.4    HAZARD OR TOXINS DETECTION: Various construction materials may contain items that have been or may in the future be determined to be hazardous (toxic) or undesirable and may need to be specifically treated handled, or removed. For example, some transformers or other electrical components contain PCBs, and asbestos has been used in the components such as fire-proofing, heating and cooling systems, air duct insulation, spray-on and tile acoustical materials, linoleum, floor tiles, roofing, dry wall, and plaster. Due to prior or current uses of the Property or in the area, the Property may have hazardous or undesirable metals, minerals, chemicals, hydrocarbons, or biological hazards (including mold) or radioactive items (including electric and magnetic fields) in soils, water, building components, above or below-ground containers or elsewhere in areas that may or may not be accessible or noticeable. Such items may leak or

otherwise be released.  Agent has no expertise in the detection or correction of hazardous or undesirable items.  Expert inspections are necessary.  Current or future laws may require clean up by past, present, and/or future owners and/or operators.  It is the responsibility of the Owner to retain qualified experts to detect and correct such matters and to consult with legal counsel of their choice and at their sole expense to determine what provisions, if any, they may wish to include in transaction documents regarding the Property.

3.5    AMERICANS WITH DISABILITIES ACT:  The Americans With Disabilities Act is intended, among other things, to make many business establishments equally accessible to persons with a variety of disabilities; modifications to real property may be required.  State and local laws also may mandate changes.  Agent is not qualified to advise you as to what, if any, changes may be required now, or in the future.  Owners, buyers, and tenants should consult the attorneys and other qualified design professionals of their choice, and at their sole expense, for information regarding these matters.

4.    EXTENSION OF TERM. If the Transaction is a sale, and a sale is not consummated for any reason after Owner accepts an offer to purchase the Property ("Sale Agreement"), then the expiration date of the Term of this Agreement shall be extended by the number of days that elapsed between the date Owner entered into the Sale Agreement and the later of the date on which the Sale Agreement is terminated or the date Owner is able to convey title to a new buyer free and clear of any claims by the prior buyer of the Property; provided, however, in no event shall the Term be so extended beyond one year from the date the Term would have otherwise expired.

5.    COMMISSION.

5.1    In the event that the Property, or any portion thereof or interest therein (or any interest in Owner) is sold, transferred, conveyed, or such other "Alternative Transaction" (defined below) to a prospect (or any successor or assignee, affiliate, officer, director, shareholder, managing member, manager, member, general or limited partner, and/or employee of prospect) (collectively, the "Prospect," or "Buyer") during the term of this Agreement (and any extension thereof), then, Owner shall pay Agent a commission _X_ in accordance with the commission schedule attached hereto as Exhibit A and incorporated herein ("Agreed Commission"), based on that Transaction, whether such Transaction is consummated as a result of the efforts of Agent, Owner, or some other person or entity. Agent shall also be entitled to the Agreed Commission if any of the Owner's representations and warranties described in paragraph 8 are shown to be false. Such Agreed Commission is payable:

(a)    If the Transaction is a sale, the commission is due and accrued when (i) the Property is sold; (ii) Owner breaches or repudiates any Sale Agreement, escrow instructions or other documents executed by Owner regarding the sale of the Property; (iii) the Property or any interest therein is voluntarily or involuntarily sold, conveyed, contributed or transferred; (iv) the Property or any interest therein is taken under the power of Eminent Domain or sold under threat of condemnation, or (v) if Owner is a partnership, joint venture, limited liability company, corporation, trust or other entity, and any interest in Owner is voluntarily or involuntarily sold, contributed, conveyed or transferred to another person or entity that, as of the date hereof, does not have any ownership interest in Owner;

(b)    For the avoidance of doubt (and in addition to the terms set forth in the Exhibit A hereto) and without limiting the terms of this Agreement, the commission, based on the amounts set forth in Exhibit A, shall be paid in full at the time of closing of the Transaction, transfer of title to the Property, upon sale of any interest of owners in the Property to a Prospect, upon the sale of any interest in Owner's entity(ies) that hold title to a Prospect, Owner's contribution of the Property (or any portion thereof) as consideration for Owner entering into a partnership or joint venture, obtaining an interest in another entity (or such other business transaction), and/or the closing of any Alternative Transaction.  The entirety of the commission shall be due upon such trigger event, regardless whether the consideration being paid is paid on an installment or incremental basis.

5.2    If the Transaction is a sale, the purchase agreement and/or escrow instructions to be entered into by and between Owner and a Prospective of the Property shall expressly provide that:
(a)    Owner irrevocably instructs the escrow holder to pay from Owner's proceeds accruing to the account of Owner at the close of escrow the Agreed Commission to Agent;
(b)    A contingency to the consummation of the sale shall be the payment of the Agreed Commission to Agent at or prior to close of the escrow; and

(c)    No change shall be made by Owner or buyer with respect to the time of, amount of, or the conditions to payment of the Agreed Commission, without Agent's prior written consent so stated in a document that expressly states that it is amending this Agreement and the Agreed Commission schedule.

**6.    ALTERNATIVE TRANSACTION.** If the Transaction changes to any other transaction, including, but not limited to, a sale, exchange, option to buy, right of first refusal, ground lease, or other business transaction (including, without limitation, a merger, acquisition or other transaction wherein Owner [or any successor or assignee of Owner or any entity or affiliated entity owned or controlled by Owner (or by any agent, officer, directors, member, managing member, general or limited partner, employee or shareholder of Owner or of any affiliate of Owner)] (collectively, "Owner") is the Prospect (collectively **"Alternative Transaction"**), then Agent shall automatically be Owner's sole and exclusive Agent for such Alternative Transaction and represent Owner in such Alternative Transaction, under the terms and conditions of this Agreement. If, during the Term hereof, an Alternative Transaction is entered into, then Owner shall pay Agent the Agreed Commission.

**7.    EXCLUDED AND REGISTERED PERSONS.**

7.1    Attached hereto as Exhibit C is the Schedule of Excluded Persons identifying the names of those persons or entities registered with Owner (singularly, as an **"Excluded Person"** or, collectively, as the **"Excluded Persons"**)) and agents (**"Excluded Persons Agents"**)) who introduced one or more Excluded Persons to Owner regarding a possible Transaction. If Owner enters into a binding Transaction with any of the Excluded Persons, then the Agreed Commission paid to Agent with respect to consummation of such Transaction with an Excluded Person shall be limited to ~~the reasonable out of pocket expenses incurred by Agent in the marketing of the Property~~25 basis points (i.e., 0.25%) of the fair market value of the subject property as its Agreed Commission.

**8.    OWNER'S REPRESENTATIONS.**

As a further inducement for Agent to provide the services called for under this Agreement, Owner represents and warrants that:

(a)    Each person executing this Agreement on behalf of Owner has the full right, power and authority to execute this Agreement as or on behalf of Owner;

(b)    Owner owns the Property and/or has the full right, power and authority to execute this Agreement and to consummate a

Transaction as provided herein, and to perform Owner's obligations hereunder;

(c)    That as of the date of this Agreement the asking sales price is not less than the total of all monetary encumbrances on the Property; and

Owner further agrees that it has an on-going obligation to notify Agent in writing in the event that any of the representations above become untrue in any respect, which notice shall be given to Agent within three (3) business days of Owner becoming aware of any such representation becoming untrue in any respect.

**9.    OWNER'S ACKNOWLEDGMENTS.** Owner acknowledges that it has been advised by Agent to consult and retain experts to advise and represent it concerning the legal and tax effects of this Agreement and consummation of a Transaction or Alternative Transaction, as well as the condition and/or legality of the Property, including, but not limited to, the Property's improvements, equipment, soil, tenancies, title and environmental aspects. Agent shall have no obligation to investigate any such matters unless expressly otherwise agreed to in writing by Owner and Agent. Owner further acknowledges that in determining the financial soundness of any prospective buyer, lessee or security offered, Owner will rely solely upon Owner's own investigation and that of Owner's legal and financial advisors (and not Agent), notwithstanding Agent's assistance in gathering such information [Owner acknowledges that Agent's gathering of such information and delivery of same to Owner [and Owner's legal and financial advisors] shall not and does not constitute a verification or affirmation by Agent that the information obtained by Agent is true and correct or reliable and Owner shall rely on its own investigation thereof].

10.    **MISCELLANEOUS.**

Owner    Agent

10.1    This Agreement shall not be construed either for or against Owner or Agent, but shall be interpreted, construed and enforced in accordance with the mutual intent of the parties ascertainable from the language of this Agreement. Signatures to this Agreement accomplished by means of electronic signature or similar technology shall be legal and binding.

10.2    All payments by Owner (or on Owner's behalf) to Agent shall be made in lawful United States currency. If Owner fails to pay to Agent any amount when due under this Agreement, then such amount shall bear interest at the rate of 15% per annum or the maximum rate allowed by law, whichever is less.

10.3    In the event of litigation or arbitration between Owner and Agent arising under or relating to this Agreement or the Property, the prevailing party shall be paid its attorney's fees and costs (and reimbursed its fees paid to any arbitrator/arbitration firm) by the losing party. The term, "Prevailing Party" shall include, without limitation, one who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other party of its claim or defense. The attorney's fees award shall not be computed in accordance with any court fee schedule, but shall be in an amount to fully reimburse all attorney's fees reasonably incurred in good faith.

10.6    In the event that the Transaction is not an outright sale, Owner agrees that if Agent is not paid the Agreed Commission provided for herein within thirty days of the date due, that Agent shall have a lien in the amount of such commission, and may record a notice of such lien, against the Property.

10.8    IRS § 1445: Internal Revenue Code Section 1445 requires that buyers of any interest in any real property located in the United States withhold and pay over the Internal Revenue Service ("IRS") a portion of the purchase price unless the buyer can adequately establish that the seller is not a foreign individual or entity. Depending on the structure of the transaction, the tax withholding liability could exceed the net cash proceeds to be paid to a foreign seller at closing. Foreign sellers should be aware that there are mechanisms by which the withholding requirement can be mitigated, e.g., by obtaining a "qualified statement from the IRS before the transaction is consummated or by early refund after the transaction closes. NAI recommends that Owner consult its tax advisors in order to comply with the code. Owner agrees to provide Agent with evidence of compliance with Section 1445 at the time of closing.

10.9.    REPRESENTATION AND WARRANTY REGARDING TERRORISM:  Owner and Agent represent and warrant to the other that each party, and all persons and entities owning (directly or indirectly) an ownership interest in each party: (a) is not, and will not become, a person or entity with whom Agent is restricted from doing business under the regulations of the Office of Foreign Asset Control ("OFAC") of the Department of Treasury (including but not limited to, those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including, but not limited to, the September 24, 2001, Executive Order 13224 Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism), or other governmental action; and (b) is not knowingly engaged in, and shall not knowingly engage in, and any dealings or transaction or be otherwise associated with such persons or entities described in subparagraph (a) above.

11.    ARBITRATION OF DISPUTES.

11.1    ANY CONTROVERSY ARISING UNDER OR RELATING TO THIS AGREEMENT SHALL BE DETERMINED BY ~~BINDING ARBITRATION TO BE CONDUCTED BY~~:  X   The United States Bankruptcy Court

    Owner's Initials        Agent's Initials

11.4    THE PROVISIONS OF THE ABOVE ARBITRATION CLAUSE SHALL NOT BE BINDING ON EITHER PARTY UNLESS BOTH PARTIES HAVE PLACED THEIR INITIALS UNDER PARAGRAPH 11.1.

    Owner                Agent

12.    **OWNER'S TERMINATION RIGHTS.** Owner may terminate this Agreement at Owner's sole and absolute discretion, upon 30-day written notice to Agent, at any time. If so terminated, Agent shall not be entitled to any Agreed Commission, but Owner shall reimburse Agent for the reasonable out-of-pocket expenses incurred by Agent in the marketing of the Property.

13.    **Additional Provisions:** In addition to Exhibits A, B and C to this Agreement, Additional provisions of this Agreement are set forth in the following blank lines or in an addendum attached hereto and made a part hereof consisting of paragraphs <u>None</u> through <u>None</u> (if there are no additional provisions write "NONE"):

14.    **Disclosures Regarding The Nature of a Real Estate Agency Relationship.** When entering into an agreement with a real estate agent an Owner should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction.
    (i)    *Owner's Agent.* An Owner's agent may act as an agent for the Owner only. An Owner's agent or subagent has the following affirmative obligations: *To the Owner:* A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings. *To a potential buyer/lessee and the Owner:* a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

The above duties of the Agent do not relieve Owner from the responsibility to protect its own interests. By executing this Agreement below, Owner represents and warrants to Agent that Owner has carefully read this Agreement and all instruments made a part hereof and has relied on solely upon its own investigation and the advice of Owner's legal and financial advisors in electing to proceed to bind itself to this Agreement and all of the terms thereof (which Owner acknowledges are understood and agreed).

*[SIGNATURES APPEAR ON THE FOLLOWING PAGE]*

Owner          Agent

**OWNER:**

PLAMEX INVESTMENT, LLC,
a Delaware limited liability company

By: _____
Name:   Donald Chae
Title:    Manager

M + D PROPERTIES,
a California corporation

By: _____
Name:   Donald Chae
Title:    CEO

**AGENT:**

NAI CAPITAL, INC.,
a California corporation

By: _____
Name:   Chris Jackson
Title:    Co-CEO
Broker DRE License No. 02130474
Agent DRE License No. 01255538
15821 Ventura Blvd., Suite 320
Encino, CA 91436
(818) 905-2400
(818) 905-2425
cjackson@naicapital.com

By: _____
Name:   Philip "Ted" Atalla
Title:    Executive Managing Director    5/26/2021
Broker DRE License No. 02130474
Agent DRE License No. 01049278
970 W. 190th Street, Suite 100
Torrance, CA 90502
(323) 201-3608
(323) 878-6901
patalla@naicapital.com

Owner          Agent

<u>EXHIBIT A</u>

<u>SCHEDULE OF COMMISSIONS</u>

**For Property at: (Please see below parcel numbers)**

SWC of Long Beach Blvd. and Imperial Highway, Lynwood, CA, identified as "Plaza Mexico". The corresponding APN numbers are: 6171-001-040, 046, 052, 054, 055; 6171-003-039; 6171-004-017, 032; 6171-006-035, 037, 038; 6171-007-052, 056, 057; 6171-010-002

This Exhibit A – Schedule of Commissions is incorporated into and a part of the concurrently executed Exclusive Right to Represent Owner agreement (the "Agreement") between Owner and Agent.

**A.    SALES, EXCHANGES, AND OTHER TRANSFERS:**

1.    **Sales:** Notwithstanding Owner entering into a binding Transaction with any of the Excluded Persons identified in the Schedule of Excluded Persons under Exhibit C, Owner agrees to and will pay Agent one percent (1%) of the gross sales price of improved properties; one percent (1%) of financing which Agent secures for Owner, based on the total amount of such financing; and one percent (1%) of equity investment, based on the amount of investment made by an equity partner. In the event Owner enters into a binding Transaction with any of the Excluded Persons, the Agreed Commission paid to Agent shall be limited 25 basis points (i.e., 0.25%) of the fair market value of the subject property as its Agreed Commission.

**B.    PAYMENT OF COMMISSIONS & MISCELLANEOUS PROVISIONS:**

1.    **Payment of Sale and Exchange Commissions:** Commissions shall be paid through escrow upon the closing of a sales or exchange transactions. Absent an escrow, commissions shall be paid upon recordation of a deed or upon delivery of such deed or other instrument of conveyance. In the event of a contract or agreement of sale, merger, joint venture agreement, business opportunity or other transaction not involving the delivery of a deed, commissions shall be calculated on the fair market value of the property, rather than the gross sales price, multiplied by the percentage of interest so transferred and shall be paid upon execution and delivery of the agreement evidencing the transaction.

2.    **Owner's Right to Terminate:** Pursuant to Section 12 of the Agreement, Owner may terminate this Agreement at Owner's sole and absolute discretion, upon 30-day written notice to Agent, at any time. If so terminated, Agent shall not be entitled to any Agreed Commission, but Owner shall reimburse Agent for the reasonable out-of-pocket expenses incurred by Agent in the marketing of the Property, which amount shall not exceed twenty thousand dollars ($20,000).

3.    **Term Extended:** If, during the term of the attached agreement, an option or right of first refusal to purchase or lease the Property or any interest therein is granted, or an escrow is opened or negotiations involving the sale, transfer, conveyance or lease of the Property have commenced and are continuing, then the term of the attached agreement shall be extended with respect to such transaction(s) and negotiation for a period through the exercise of such option or right of first refusal, the closing of such escrow, the termination of such negotiations or the consummation of such transaction.

4.    **Attorney's Fees:** If either party brings any action, suit, counter-claim, appeal, arbitration or mediation for any relief against the other, declaratory or otherwise, to enforce the terms of the Agreement (including this Schedule of Commissions) or to declare rights hereunder, the losing party shall pay to the prevailing party a reasonable sum for the attorney's fees and costs incurred in bringing such an action and enforcing a judgment or award. The court or arbitrator shall determine the prevailing party, which can be a party who agreed to dismiss an action on the other party's payment of the sums allegedly due or who substantially obtains the relief sought.

5.    Owner acknowledges and understands that Broker and its agents have listings on properties that may compete for the same tenants and/or buyers of the Owner's property. Owner has concluded that retaining Broker and its agents with other competing area listings is a benefit, in that Broker and its agents will market other properties to suitable, prospective buyers and tenants of the Property. Thereby, Owner consents

Owner            Agent

to Broker and its agents representing competing properties. Owner acknowledges and understands that Broker and its agents have a fiduciary duty to uphold confidentiality in such transactions. Therefore, Broker and its agents shall not disclose the price and terms that one party will pay, or accept in the same transaction, or competing properties, or the existence of and the actual status of competing negotiations for transactions between the represented competing owners and prospective tenants or buyers.

Owner      Agent

# EXHIBIT "2"

[PROFESSIONAL RESUMES]

# Todd Lorber



**NAI Capital, Inc.**
15821 Ventura Boulevard
Suite 320
Encino, CA 91436

**Phone:** +1 (818) 933-2376
**Email:** tlorber@naicapital.com

**Title:** Executive Vice President

## Career Summary

After graduating from the University of California at Berkeley with a degree in Biological Science, Todd Lorber joined Grubb & Ellis as a Research Associate for the San Fernando Valley.  In this capacity, he maintained the industrial inventory system and authored the 1988 L.A. North Real Estate Forecast for Grubb & Ellis and the Ventura County Market Profile for the Urban Land Institute.

In June of 1989, Todd began his career in the Industrial Division of the San Fernando Valley Office, where he quickly found acceptance from industrial users and investors because of his understanding of the technical and financial aspects of industrial real estate.  Since this time, Todd has concentrated his efforts in the San Fernando and Santa Clarita Valley Industrial marketplaces where his time is spent on the leasing and sales of Industrial/R&D product in both the user and investor arenas. He also has acquired significant development and product repositioning experience via his own portfolio and those of his clients.

In January of 2007 Todd relocated to NAI CAPITAL, the Southern California franchise of NAI GLOBAL as a Senior Vice President, where he has been a member of its Capital Club each year since.  He continues to be one of the most productive brokers in his marketplace, adding value to transactions with his expertise in adapting product to the evolving logistics models and maximizing asset value for his clients.

## Experience

Below is a partial list of clients:

| | |
|---|---|
| Easton Sports | AEW Capital Management |
| Rexford Industrial | Nestle |
| St. Judes Medical | First Industrial Realty Trust |
| Northrup/Grumman | Pinkerton |
| Anheuser Busch | LA Unified School District |
| ARKA Properties | Prudential Realty Company |
| TA Associates | |

## Education

University of California at Berkeley with a degree in Biological Science.  Todd has been an active member of the AIR Industrial Multiple since he began his career.  He is held in high regard by his clients and partners, and by his peers within the brokerage community.



# BUSINESS REFERENCES

Ms. Kathy Schreiber

**Ambassador Foods**

16625 Saticoy Street

Van Nuys, CA  91406

(818) 571-8090

Mr. Danny Finkelstein

**Pacific Suppliers**

8541 Lankershim Boulevard

Sun Valley, CA  91352

(818) 219-0788

Mr. Gary Blackwell

**EPI General Contractors**

7655 Haskell Avenue

Van Nuys, CA  91406

(818) 908-0348

Mr. Vincent Bohanec

**ARKA Properties**

9350 Wilshire Blvd. Suite 302

Beverly Hills, CA  90212

(310) 274-2259

Mr. Dean Daily

**Van Nuys Airport Industrial Center**

7647 Mulholland Drive

Los Angeles, CA  90046

(818) 994-6231

Mr. Dick Decker

**Woodmart Window Coverings**

15800 Strathern Street

Van Nuys CA  91406

(818) 785-1528

**Ms. Carol Woodard Kozimor**

Graywood Properties

440 NW Columbia Street

Bend OR  97701

(541) 389-8666

Mr. Jonathan Bass

**Pro Tour Memorabilia**

20362 Plummer Street

Chatsworth, CA  91311

(818) 909-5937



Committed to Southern California Connected to the World.
**800.468.2618 ▪ naicapital.com**

# Projects

**Project Leasing:**

| | |
|---|---|
| Creative Technologies | 110,000s.f. |
| First Industrial/Port to Port Dist. | 121,000s.f. |
| Greywood Properties | 82,000 s.f. |
| Lamsco West | 75,000 s.f. |
| Paiho Mfg | 62,000 s.f. |
| Pro Tour Memorabilia | 25,000s.f. |
| Sara Lee Baking Corp. | 16,000 s.f. |
| AEK | 18,000 s.f. |
| Norman Wright/Airelink | 15,900 s.f. |
| TRE Motorsports | 20,000 s.f. |
| ATK Technologies | 52,000s.f. |
| Alberto Culver Labs | 213,000s.f. |

**Recent Project Sales:**

| | |
|---|---|
| First Industrial | 173,000 s.f. Investment Santa Clarita |
| Titan Pacific | 110,000 s.f. Leased Investment, Van Nuys |
| Titan Atlantic | 100,000 s.f. Leased Investment,Van Nuys |
| Sherman Family | 411,000 s.f. Leased Investment De Kalb Il |
| Sherman Family | 140,000 s.f. Leased Investment Stafford TX |
| Kavli Portfolio | 398,000 s.f. User Sale, Oxnard |
| Canyon Plastics | 110,000 s.f. User Sale, Santa Clarita |
| Bocci Laboratories | 2 acre land purchase, Santa Clarita |
| Bocci Laboratories | 96,000 s.f. Santa Clarita |
| King Bros | 75,055 s.f. Sant Clarita |
| Arka Properties | 126,000 s.f. Chatsworth |
| Dean Metropolis | 47,000 s.f. Van Nuys |



# Philip "Ted" Attalla
## Executive Managing Director



Philip T. Attalla has thirty-two years of professional experience representing corporations in the acquisition/disposition of industrial/commercial real estate. His client services focus on facilitation of negotiations in order to achieve below-market rates; and on providing in-depth knowledge on government permitting and licensing processes. Mr. Attalla has completed real estate transactions representing over ten million square feet of warehouse/distribution and commercial facilities in over twenty-nine (29) states throughout the Continental U.S.

# David Shaby III
## Senior Associate



David Shaby III has six years of professional experience representing both institutional and noninstutional clients. He specializes in industrial and retail real estate brokerage, with extensive experience leasing shopping centers. Between 2017 and 2020, David completed real estate transations representing over five million square feet of mixed-used property. David completed his B.S. in Real Estate Finance from New York University and is set to attend USC's Masters in Real Estate Development program in Summer 2021.

# DAVID M. SHABY, III

426 Altair Pl, Venice, CA 90291 ▪ davidshaby14@gmail.com ▪ (310)683-8767 ▪ CA DRE License #02081248

## EDUCATION

**NEW YORK UNIVERSITY**                                                                     **NEW YORK, NY**
*B.S. in Real Estate, Schack Institute of Real Estate, School of Professional Studies*                *September 2013 – May 2017*

- ▪ **Relevant Coursework:** Real Estate Capital Markets, Risk and Portfolio Management, Real Estate Development Process, Accounting, Financial Modeling in Excel and Argus, Commercial Lease Analysis, Real Estate Appraisal and Valuation, Real Estate Market Analysis

**Every-day Work Experience in:** Microsoft Excel, VTS, Argus-Developer, Argus-Enterprise, Adobe Photoshop, Adobe InDesign

## WORK EXPERIENCE

**NAI CAPITAL**                                                                             **TORRANCE, CA**
*Senior Associate, Industrial Brokerage*                                                     *October 2020 – Present*

- ▪ Specialize in the acquisition, disposition, and leasing of industrial real estate assets in the Greater Los Angeles area.

- ▪ Represented and consulted both Landlords and Tenants on industrial real estate-based decisions; was responsible for preparing marketing material, scheduling property tours, overseeing LOI and Lease negotiations, Sale and Purchase Agreements, Broker Opinion of Value presentations, and conducting financial analyses.

- ▪ Actively canvassed industrial real estate located in the cities of Gardena, Carson, and along with the Alameda Corridor.

**SEISMIC RETROFIT SPECIALISTS, LLC**                                                         **CULVER CITY, CA**
*Co-Founder, Vice President*                                                                 *June 2020 – Present*

- ▪ Co-Founder of Seismic Retrofit Specialists (SRS), a full-service general contracting start-up, licensed by Contractor State License Board #549884. SRS specializes in bringing multi-family and commercial buildings into compliance with current earthquake and seismic building codes, such as Ordinance 183893, Ordinance 184081, and SB-721. Services include soft-story retrofitting, basement expansion, balcony repairs, earthquake bolting, sister foundation, and spalling concrete repair.

- ▪ Current responsibilities include managing and overseeing finances, marketing (website in progress), client procurement, and business development.

**JONES LANG LASALLE (JLL)**                                                                 **LOS ANGELES, CA**
*Leasing Associate, National Retail Group*                                                   *September 2017 – October 2020*

- ▪ Assisted in the leasing of 9 shopping centers in excess of 5.53M SF, representing the following Clients: DWS–Deutsche Bank, Brixton Capital, Nuveen Capital, Rialto Capital, and Gerrity Group. Properties included: Manhattan Village Shopping Center, Forum Carlsbad Shopping Center, Marina Marketplace Shopping Center, SouthBay Pavilion, Rogue Valley Mall, Sherwood Mall, Everett Mall, Salem Center, and Provo Towne Center.

- ▪ Main duties included: Generating new leads, negotiating LOI's into Lease (new deals and renewals), maintaining Client and Tenant relations, financial modeling in Microsoft Excel, preparing property-wide leasing budgets and quarterly investment reports, creating marketing material such as flyers, merchandising plans, and custom renderings all using Adobe Photoshop.

- ▪ During entire employment, supported the leasing of the Manhattan Village Shopping Center, a $200M redevelopment in Manhattan Beach, CA. Working alongside Kristin Grove and Devin Klein, our team closed 75+ deals, earning over $2.64M in leasing revenue.

**MARCUS & MILLICHAP**                                                                       **NEW YORK, NY**
*Brokerage Assistant*                                                                         *February 2017 – May 2017*

- ▪ Gained experience in real estate evaluation and appraisal, market analysis, data basing, and client research under elite New York City based commercial real estate broker, Nat Rockett.

- ▪ Projects included researching and creating sale comps for recent retail and office sales to consolidate neighborhood-specific price per square foot and cap rates, as well as client research and database management; using Apto, Salesforce, LexisNexis, CoStar, Property Shark, and Reonomy.

## EXTRACURRICULAR

**NYU ICE HOCKEY**                                                                           **NEW YORK, NY**
*2x National Champion, Academic All-American, 4-Year Athlete*                                 *September 2013 – March 2017*

- ▪ 2017 ACHA National Champions, 2015 ACHA National Champions, 2017 & 2015 SECHL Division Champions
- ▪ Received President's Service Award in 2015, 2016, and 2017 for community service work in Greater New York City area.

**AVIATION**                                                                                 **LOS ANGELES, CA**
*Complex, High Performance Endorsed*                                                         *Summer 2012-Present*

- ▪ Received FAA Private Pilots license in the Summer of 2015.
- ▪ Received FAA High Performance and Complex license in the Summer of 2016.

**COMMUNITY SERVICE:** NYU Hockey: President's Service Award (2015-2017), State of California Assembly Award for Environmental Awareness work with Grades of Green as the Youth Co-Chair (2012-2013), Patient Discharge Volunteer at Providence Little Company of Mary Hospital in Torrance, CA (2012)



## BROKER PROFILE

### Professional Profile

Grant Bullen serves as an Associate with NAI Capital. He specializes in investment transactions throughout Southern California. He utilizes his in-depth financial knowledge and analytical skills to develop effective investment and disposition strategies for his clients.

### Background & Experience

Grant Bullen possesses a wide range of financial as well as commercial real estate experience. He began his career working in corporate finance and management consulting where he provided financial and strategic advisory for clients in a variety of industries. He leveraged his distinct blend of financial analysis and data management skills to help clients stabilize accounting operations, streamline data flows, and provide management reporting & analysis.

Throughout his career he has demonstrated a proven ability to boost company performance by identifying inefficiencies, developing solutions, and translating those solutions into clear results.

### Education

Grant Bullen earned a Bachelor of Science degree in Marketing from the W.P. Carey School of Business at Arizona State University. Additionally, he completed independent coursework in Finance Theory at MIT, Financial Markets at Yale, and Principles of Microeconomic at MIT, and Financial Analysis and Decision Making at Tsinghua University.



Grant Bullen
Associate
NAI Capital
O: (818) 815-2414
M: (435) 760-6094
gbullen@naicapital.com
Cal DRE Lic. #02060015

15821 Ventura Boulevard   Suite 320 | Encino, California USA  91436 | +1 818 905 2400 | naicapital.com

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **APPLICATION OF DEBTORS AND DEBTORS IN POSSESSION TO JOINTLY EMPLOY NAI CAPITAL COMMERCIAL, INC. AS REAL ESTATE BROKER PURSUANT TO 11 U.S.C. §§ 327 AND 328; DECLARATION OF CHRIS JACKSON IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **June 11, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Ron Bender    rb@lnbyb.com
- Amir Gamliel    amir-gamliel-9554@ecf.pacerpro.com, cmallahi@perkinscoie.com;DocketLA@perkinscoie.com
- Nancy S Goldenberg    nancy.goldenberg@usdoj.gov
- Monica Y Kim    myk@lnbrb.com, myk@ecf.inforuptcy.com
- Daniel A Lev    dlev@sulmeyerlaw.com, ccaldwell@sulmeyerlaw.com;dlev@ecf.inforuptcy.com
- Juliet Y Oh    jyo@lnbrb.com, jyo@lnbrb.com
- Robert E Opera    ropera@wghlawyers.com, jmartinez@wghlawyers.com;mweinberg@wghlawyers.com
- Ronald N Richards    ron@ronaldrichards.com, morani@ronaldrichards.com
- Jeffrey S Shinbrot    jeffrey@shinbrotfirm.com, sandra@shinbrotfirm.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

**2.  SERVED BY UNITED STATES MAIL**: On **June 11, 2021**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Plamex Investment, LLC
6988 Beach Blvd
Suite B-215
Buena Park, CA 90621

Hon. Erithe A. Smith
United States Bankruptcy Court
411 West Fourth Street, Suite 5040
Santa Ana, CA 92701-4593

☐ Service List continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **June 11, 2021**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

*None.*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| June 11, 2021 | Lisa Masse | /s/ Lisa Masse |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                        **F 9013-3.1.PROOF.SERVICE**