RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email:  RB@LNBYG.COM; MYK@LNBYG.COM; JYO@LNBYG.COM

Attorneys for Chapter 11 Debtors and Debtors-in-Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>PLAMEX INVESTMENT, LLC, a Delaware limited liability company,<br><br>        Debtor and Debtor in  Possession.<br>―――――――――――――――――<br>In re:<br><br>3100 E. IMPERIAL INVESTMENT, LLC, a Delaware limited liability company,<br><br>        Debtor and Debtor in Possession.<br>―――――――――――――――――<br>☒  Affects both Debtors<br><br>☐ Affects Plamex Investment, LLC only<br><br>☐  Affects 3100 E. Imperial Investment, LLC only | Lead Case No.: 8:21-bk-10958-ES<br><br>Jointly administered with 3100 E. Imperial Investment, LLC (8:21-bk-10957-ES)<br><br>Chapter 11 Cases<br><br>**NOTICE OF MOTION AND MOTION FOR ORDER: (I) ESTABLISHING BIDDING PROCEDURES FOR SALE OF REAL PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (II) APPROVING STALKING HORSE BIDDER, INCLUDING EXPENSE REIMBURSEMENT RIGHTS; (III) ESTABLISHING PROCEDURES RELATING TO ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (IV) APPROVING FORM AND MANNER OF SALE AND CURE NOTICES; (V) SCHEDULING AN AUCTION SHOULD THERE BE MORE THAN ONE QUALIFYING BID; (VI) SCHEDULING A HEARING TO CONSIDER APPROVAL OF SALE; (VII) APPROVING AND AUTHORIZING DEBTORS TO ENTER INTO A PLAN SUPPORT AGREEMENT; AND (VIII) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |

Date:       November 18, 2021
Time:       10:30 a.m.
Place:      ZoomGov

[Declaration of Donald Chae filed herewith]

**TO THE HONORABLE ERITHE A. SMITH, UNITED STATES BANKRUPTCY JUDGE, THE UNITED STATES TRUSTEE, ALL SECURED CREDITORS, TWENTY LARGEST UNSECURED CREDITORS, AND ALL PARTIES WHO HAVE REQUESTED SPECIAL NOTICE IN THESE CASES:**

**PLEASE TAKE NOTICE** that a hearing will be held on November 18, 2021, at 10:30 a.m., before the Honorable Erithe A. Smith, United States Bankruptcy Judge, in Courtroom "5A" located at 411 West Fourth Street, Santa Ana, California 92701 (via ZoomGov), for the Court to consider the motion ("Motion") filed by Plamex Investment, LLC, a Delaware limited liability company ("Plamex"), and 3100 E. Imperial Investment, LLC, a Delaware limited liability company ("3100," and together with Plamex, the "Debtors"), the debtors and debtors-in-possession in the above-captioned, jointly administered chapter 11 bankruptcy cases, for an order in substantially the form appended as **Exhibit "D"** to the Declaration of Donald Chae ("Chae Declaration") filed herewith (the "Bidding Procedures Order"):

(i)    Establishing and approving bidding procedures ("Bidding Procedures") substantially in the form described in **Exhibit "A"** attached to the Chae Declaration for the sale of real property, namely, Plamex's principal asset consisting of the real estate and improvements commonly known as the Plaza Mexico Shopping Center (the "Property"), free and clear of all liens, claims, encumbrances and other interests;

(ii)    Approving the stalking horse bidder, namely, Quarry Head 2017-1 Grantor Trust or its nominee ("SH Bidder"), including expense reimbursement rights, as reflected in the "*Summary Term Sheet for Joint Plan of Liquidation*" (the "Plan Term Sheet"), substantially in the form attached as **Exhibit "B"**, to the Chae Declaration;

(iii)    Approving the Debtors' entry into and performance under the "*Plan Support Agreement*" ("Plan Support Agreement") substantially in the form attached as **Exhibit "C"** to the Chae Declaration;

(iv)    Establishing and approving procedures relating to the assumption and assignment of executory contracts and unexpired leases;

(v)    Approving the Bidding Procedures Order granting the Motion, substantially in the form attached as **Exhibit "D"** to the Chae Declaration, which also attaches the form and manner of sale and cure notices, including the notice to (a) prospective buyers and other parties-in-interest ("Proposed Sale Notice"), and (b) non-Debtors counterparties under executory contracts and unexpired leases regarding the possible assumption and assignment thereof ("Proposed Cure Notice");

(vi)    Scheduling an auction ("Auction") should there be more than one qualifying bid;

(vii)    Scheduling a hearing to consider approval of the sale ("Sale Hearing"); and

(viii)    Granting related relief.

The documents that are attached as **Exhibits "A"** to **"D"** to the Chae Declaration are substantially complete, but subject to continuing discussions, revisions and amendments, and, thus, are not yet final. The Debtors anticipate filing updated, if not final, versions of these documents before the hearing date on this Motion. The complete bases of the Motion are set forth in the Memorandum of Points and Authorities annexed hereto.

Shortly after their bankruptcy filings, the Debtors determined that an expeditious sale of the Property is in the best interests of their bankruptcy estates. The Debtors, with the assistance of their real estate broker, NAI Capital Commercial, Inc. ("NAI"), actively marketed the Property for sale for more than 3 months, resulting in the Debtors receiving in August 5 potential offers from prospective purchasers to acquire the Property.  After sharing those offers with the Debtors' Consultation Parties (as defined below), the Debtors obtained an offer to acquire the Property from the SH Bidder, which will be an affiliate of the secured creditor of 3100.

More specifically, Plamex is wholly-owned by its sole member, 3100. In turn, 3100 is wholly owned by an entity called Placo Investment, LLC ("Placo"). The organizational structure of the Debtors and their parent companies are multi-layered and governed by limited liability agreements which are the direct result of pre-petition structured finance and securitization

transactions. These transactions include (i) loans obtained by Plamex secured by a first-priority deed of trust upon the Property in favor of Wells Fargo Bank, National Association, as Trustee for Morgan Stanley Capital I Trust 2016-UBS11, Commercial Mortgage Pass-through Certificates, Series 2016-UBS11 ("Wells Fargo"), (ii) loans obtained by 3100 secured by 3100's membership interests in Plamex in favor of Quarry Head 2017-1 Grantor Trust ("Quarry Head"), and (iii) preferred equity interests held by WF 1105, LLC (with Quarry Head, and Waterfall Asset Management, LLC, collectively, the "Waterfall Parties"). The SH Bidder will be an affiliate of Quarry Head.

Of all the offers received to date, the SH Bidder has submitted by far the highest offer for the Property at a price of $162,500,000, and has agreed that its offer will serve as a stalking horse bid on the terms set forth in the Plan Term Sheet, Plan Support Agreement and a purchase and sale agreement[1] between the parties yet to be finalized and which will be made available to the Court and to potential overbidders as the Bidding Procedures contemplate, and subject to higher and better bids pursuant to the Bidding Procedures. Furthermore, in connection with the continued marketing of the Property to potential overbidders, the Debtors have made the decision to replace NAI with Jones Lang LaSalle Americas, Inc. ("JLL") as their real estate brokers. The Waterfall Parties have consented to the replacement of NAI by JLL, and, contemporaneously herewith, the Debtors have filed their joint application to employ JLL as their new real estate brokers. The Debtors currently anticipate that it will take approximately 3-4 months to work with JLL to solicit overbids and conduct an auction (if any qualifying overbids are received) with a sale closing by March 31, 2022.

The Bidding Procedures, which are the result of extensive negotiations between the Debtors and the SH Bidder, are designed to ensure that the highest price possible is paid for the Property by a purchaser who has the financial ability to close on a purchase of the Property.

---

[1] The Debtors only received the initial draft of the "Agreement of Purchase and Sale and Joint Escrow Instructions" ("SH PSA") on October 28, 2021 (the filing date of this Motion), and, thus, have not had any opportunity to review or comment on such agreement prior to the filing of this Motion. The SH PSA is attached hereto as **Exhibit "1."**

Notably, the SH Bidder has agreed to forego two material stalking horse protections that are usually included in a bankruptcy free and clear sale process. Specifically, the SH Bidder has agreed to proceed without any break-up fee of any break-up fee of any type or amount. In the event SH Bidder is outbid, this concession will save the estates millions of dollars. An Auction will be held in the event there is at least one qualified overbid, and the Bidding Procedures expressly recognize the SH Bidder and Wells Fargo as qualified bidders in the event of an Auction. The Bidding Procedures also include key dates for potential overbidders (including bid deadline), due diligence requirements and limitations, overbid requirements, credit bidding provisions, and conduct at the Auction (if any).

For all of the reasons set forth in the accompanying Memorandum of Points and Authorities, the Debtors believes that the proposed Bidding Procedures and all of the relief sought herein, including authorization to enter into the Plan Support Agreement, which are all supported by and have been developed in conjunction with the Waterfall Parties, are in the best interests of the Debtors' estates as they have been designed to: (a) create as much bidding interest as possible with little to no bidding advantage (such as a break-up fee) to the SH Bidder, will provide certainty in connection with the bidding process and a "level playing field" for prospective bidders, operate to maximize the value of the Property, and facilitate a successful closing of the sale of the Property; and (b) provide for an orderly distribution of the proceeds from such sale under a plan of liquidation that will be pursued by the Debtors in conjunction with the sale process so that consistent with the Plan Support Agreement these chapter 11 cases can be effectively and promptly resolved.

**PLEASE TAKE FURTHER NOTICE** that the Motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Chae Declaration and all Exhibits attached thereto, Local Bankruptcy Rules 6004-1(b) and 9013-1, the entire record of the Debtors' bankruptcy cases, the statements, arguments, and representations of counsel to be made at the hearing on the Motion, and any other evidence properly presented to the Court.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-1(f), each interested party opposing or responding to the Motion must file and serve the response on the moving party and the United States Trustee not later than 14 days before the date designated for hearing. A response must be a complete written statement of all reasons in opposition thereto or in support, declarations and copies of all evidence on which the responding party intends to rely, and any responding memorandum of points and authorities. The response must advise the adverse party that any reply must be filed with the Court and served on the responding party not later than 7 days prior to the hearing on the Motion. The Court may deem the failure of any creditor or party in interest to file and serve a timely objection to the Motion to constitute consent to the granting of the Motion.

**WHEREFORE**, the Debtors respectfully requests that this Court enter the Bidding Procedures Order substantially in the form attached as **Exhibit "D"** to the Chae Declaration:

(1)     granting the Motion in its entirety;

(2)     Establishing and approving the Bidding Procedures substantially in the form described in **Exhibit "A"** attached Chae Declaration for the sale of the Property, free and clear of all liens, claims, encumbrances and other interests;

(3)     Approving the SH Bidder, including expenses reimbursement rights, as reflected in the Plan Term Sheet substantially in the form attached as **Exhibit "B"** to the Chae Declaration;

(4)     Approving the Debtors' entry into and performance under the Plan Support Agreement substantially in the form attached as **Exhibit "C"** to the Chae Declaration;

(5)     Establishing and approving the proposed procedures relating to the assumption and assignment of executory contracts and unexpired leases;

(6)     Approving the form and manner of sale and cure notices, including the Proposed Sale Notice and the Proposed Cure Notice attached to the Bidding Procedures Order attached as **Exhibit "D"** to the Chae Declaration;

(7)    Scheduling an Auction should there be more than one qualifying bid;

(8)    Scheduling a Sale Hearing; and

(9)    granting such other and further relief as the Court deems just and proper under the circumstances.

Dated:  October 28, 2021                    PLAMEX INVESTMENT, LLC
                                            3100 E. IMPERIAL INVESTMENT, LLC

                                            By:_____/s/ Monica Y. Kim_____
                                                    RON BENDER
                                                    MONICA Y. KIM
                                                    JULIET Y. OH
                                                    LEVENE, NEALE, BENDER,
                                                        YOO & GOLUBCHIK L.L.P.
                                                    Attorneys for Chapter 11 Debtors and
                                                    Debtors-in-Possession

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### STATEMENT OF FACTS

**A.** **Background.**

The Debtors each filed a voluntary petition for relief under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>") on April 14, 2021 (the "<u>Petition Date</u>"). The Debtors are continuing to manage their financial affairs and operate their bankruptcy estates as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. The Court has approved the joint administration of the Debtors' cases [Doc. No. 15].

Plamex is the fee simple owner of "Plaza Mexico," a 403,242 square-foot community shopping center offering specialty retail and dining located in Lynwood, California just north of the 105 freeway (approximately 20 minutes from LAX). For over 20 years, Plaza Mexico has been a community landmark in Southern California. The premise behind Plaza Mexico is to represent the rich Latino heritage of the community and create an authentic Mexican cultural landscape through the incorporation of Mexican architecture, authentic building materials, notable monuments, and a forum to celebrate all Mexican fiestas. Currently, Plaza Mexico is occupied by tenants that include Food 4 Less, Rite Aid, Curacao, Chuck E. Cheese, and a wide variety of restaurants and retailers of clothing, electronics, shoes, toys, jewelry, and furniture. The property also boasts a revenue-creating LED tower overlooking the I-105 Freeway.

Plamex is wholly owned by its sole member, 3100, one of the Debtors herein. Other than its membership interests in Plamex, 3100 does not have any other material assets. 3100 is wholly owned by an entity called Placo Investment, LLC ("<u>Placo</u>") and Placo is wholly owned by ISLT Investment, LLC ("<u>ISLT</u>").  Neither Placo nor ISLT has filed its own bankruptcy case.

**B.** **Secured Debts.**

### *1. Plamex - Senior Loans.*

On June 16, 2016, Plamex, as borrower, obtained $106,000,000 in loans from Natixis, New York Branch ("<u>Senior Loans</u>"), secured by a "*Deed of Trust, Assignment of Leases and Rents,*

*Security Agreement and Fixture Filing*" ("<u>Deed of Trust</u>") upon the Plaza Mexico real property, and liens upon substantially all other assets of Plamex purportedly perfected by, among other things, the recording of UCC-1 financing statements in the States of Delaware and California. The promissory note evidencing the Senior Loans was contemporaneously severed and split into six replacement promissory notes: Replacement Promissory Note A-1 for $28,000,000, Replacement Promissory Note A-2 for $20,000,000, Replacement Promissory Note A-3 for $20,000,000, Replacement Promissory Note A-4 for $20,000,000, Replacement Promissory Note A-5 for $10,000,000, and Replacement Promissory Note A-6 for $8,000,000 (collectively, the "<u>Notes</u>"). CWCapital Asset Management, LLC is the servicer ("<u>Servicer</u>") of all of the Notes, including the A-2 and A-3 Notes which are held by Wells Fargo Bank, National Association, as Trustee for Morgan Stanley Capital I Trust 2016-UBS11, Commercial Mortgage-Pass Through Certificates, Series 2016-UBS11 ("<u>Wells Fargo</u>").

The Senior Loans matured on or about July 5, 2021. Since the commencement of Plamex's chapter 11 case, the Senior Loans have accrued non-default interest at a fixed rate of 4.598% and default interest at a rate that is the lesser of (i) maximum rate permitted by applicable law, or (ii) 5% above the regular rate. Plamex went into default on the Senior Loans in May 2020. Given the pandemic and the financial effects of the pandemic including Plamex's efforts to re-finance the Senior Loans which was in process during the Spring of 2020 when the pandemic suddenly hit, Plamex requested, but the holders of the Notes refused, to extend the maturity date of the Senior Loans. As of the Petition Date, the holders of the Senior Loans contend that at least $107,779,709.71 in principal, interest, default interest, late charges, advances, administrative, liquidation and servicing fees and expenses, attorneys' fees, and other costs and expenses.

In June 2016, at the time of the Senior Loans, the Plaza Mexico property was appraised at approximately $184-187 million. Plamex is informed that, in October 2020, the Servicer of the Notes secured an appraisal of the Plaza Mexico property for $170 million.

2. ***3100 - Mezzanine Loans.***

Concurrently with the Senior Loans, on June 16, 2016, 3100 obtained $14,000,000 in mezzanine loans also from Natixis, New York Branch ("Mezzanine Loans"). These Mezzanine Loans were also contemporaneously or subsequently sold, conveyed and assigned to Waterfall Olympic Fund Grantor Trust, Series III and Quarry Head 2017-1 Grantor Trust ("Quarry Head"). The Mezzanine Loans were primarily secured by a pledge of all of 3100's membership interest in and to Plamex pursuant to a "*Pledge and Security Agreement*." The holders of the Mezzanine Loans also purportedly perfected their liens on substantially all assets of 3100 by the recording of UCC-1 financing statements in the States of Delaware and California.

Because 3100's ability to service its debt payments on the Mezzanine Loans also hinges on the performance of Plaza Mexico, which it was unable to do as a result of the pandemic and its financial effects, 3100 also went into default as to the Mezzanine Loans. Quarry Head sought to foreclose upon the pledge and lien upon 3100's membership interests in Plamex, with a UCC foreclosure sale scheduled for April 15, 2021 at 10:00 a.m. (EST). Plamex and 3100 commenced their bankruptcy cases to avoid foreclosure upon such membership interests and to preserve these interests and the Plaza Mexico property for all constituents.

Pursuant to an "*Intercreditor Agreement*" between Natixis, New York Branch with itself on behalf of the Senior Loans and the Mezzanine Loans, the Mezzanine Loans are, among other things, subordinated to the Senior Loans, including as to payment.

Plamex has minimal unsecured creditors which Plamex estimates are collectively owed less than $200,000.  3100 does not appear to have any unsecured creditors.

C.    **Events Leading To Debtors' Bankruptcy Filings.**

The Debtors' bankruptcies are the results of two primary factors: (i) substantial loss of rent revenue from Plamex's tenants due to the COVID-19 pandemic which caused the Debtors to default on their obligations to their secured lenders, and (ii) efforts by the secured lenders to foreclose on their collateral, including a foreclosure sale scheduled by the holders of the Mezzanine Loan for April 15, 2021 at 10:00 a.m. (EST) on the membership interests held by 3100

in Plamex.

More specifically, Plaza Mexico has not been immune to the financial effects of the COVID-19 pandemic. Due to government-imposed stay-at-home orders and related restrictions which started in March of 2020, Plaza Mexico's tenants were required to close and/or experienced a drastic loss of business, sales and income. Many of the tenants could and did not pay full or any rents to Plamex, which, in turn, resulted in a default by the Debtors to their secured lenders. The Debtors were in the process of re-financing at the time the pandemic hit, which halted the process. Recently, as California has started to ease restrictions, rent collections at Plaza Mexico have been brought almost back to pre-pandemic levels. There is an increase in foot traffic, and tenants are starting to pay rents timely. However, despite these positive movements, the holder of the Mezzanine Loan was unwilling to stop its April 15, 2021 foreclosure sale. As a result, 3100 and Plamex had no choice but to file their petitions to preserve their assets for the benefit of all constituencies.

**D.    Current Posture Of The Debtors' Bankruptcy Cases.**

Shortly after the Petition Date, the Debtors made the decision that the best interests of their estates are served by their employment of a real estate broker to assist the Debtors either to sell Plaza Mexico for the most money possible or to find an investment partner to team up with the Debtors either in connection with a sale process or a reorganization process.  After interviewing and consulting with as many qualified real estate brokers as possible within the short time period that it had, the Debtors decided to employ NAI Capital Commercial, Inc. ("NAI") as their real estate broker.

On June 11, 2021, the Debtors filed their joint application [Doc. No. 84] to employ NAI as their real estate broker on the terms and conditions set forth in such application and the listing agreement between the Debtors and NAI. Wells Fargo and the Waterfall Parties objected to the proposed employment of NAI, contending that NAI was not qualified to market the Property. After a hearing held on July 15, 2021, the Court entered its order [Doc. No. 119] approving NAI's employment on an interim basis, and scheduled a final hearing for September 30, 2021.  After the

final hearing held on September 30, 2021, the Court entered its order [Doc. No. 167] approving NAI's employment on a final basis.

The Debtors, with the assistance of NAI, have actively and diligently marketed the Property for sale for more than 3 months, with over 200 parties having signed non-disclosure agreements to access due diligence materials. The Debtors also received no less than 5 offers from prospective purchasers to acquire the Property, including an offer from an affiliate of 3100's secured creditor, Quarry Head or its nominee (the "SH Bidder").

Of all the offers received to date, the SH Bidder has submitted the highest offer for the Property at a price of $162,500,000, and has agreed that its offer will serve as a stalking horse bid on the terms set forth in a "*Summary Term Sheet for Joint Plan of Liquidation*" ("Plan Term Sheet"), the "*Plan Support Agreement*" ("Plan Support Agreement"), and purchase and sale agreements yet to be finalized between the parties and which will be made available to the Court and to potential overbidders as the Bidding Procedures contemplate, and subject to higher and better bids pursuant to bidding procedures agreed upon between the SH Bidder and the Debtors ("Bidding Procedures"). In connection therewith, the Debtors seek approval of the proposed Bidding Procedures substantially in the form described in **Exhibit "A"** to the Declaration of Donald Chae ("Chae Declaration") filed herewith.[2]

More specifically, by this Motion, the Debtors seek an order (1) establishing and approving the Bidding Procedures for the sale of the Property free and clear of all liens, claims, encumbrances and other interests, (2) approving the SH Bidder, including expense reimbursement rights, (3) establishing and approving procedures relating to the assumption and assignment of executory contracts and unexpired leases; (4) approving form and manner of the sale and cure notices; (5) scheduling an auction should there be more than one qualifying bid, (6) scheduling a hearing to consider the approval of the sale, (7) approving the Debtors' entry into and performance under the

---

[2] The Bidding Procedures described in **Exhibit "A"** attached to the Chae Declaration are substantially complete, but not yet final. The Debtors anticipate filing an updated description of the Bidding Procedures, if not final, version of this document prior to the hearing on the Motion.

Plan Support Agreement; and (8) granting certain related relief. Pursuant to the Bidding Procedures, the Debtors currently anticipate that it will take approximately 3-4 months to work with JLL to solicit overbids and conduct an auction (if any qualifying overbids are received) with a sale closing by March 31, 2022.

In connection with the acceptance of the stalking horse bid from the SH Bidder and the need for continued marketing of the Property to potential overbidders, the Debtors have also made the decision to terminate and replace NAI with Jones Lang LaSalle Americas, Inc. ("JLL") as their real estate broker. The Waterfall Parties have consented to the replacement and engagement of JLL on the terms set forth herein and in the "*Exclusive Listing Agreement*" between JLL and Plamex (the "JLL Listing Agreement"). Contemporaneously herewith, the Debtors have filed their joint application to employ JLL as their new real estate broker.

**E.    Bid From SH Bidder.**

The terms and conditions of the sale of the Property to the SH Bidder are described and set forth in the Plan Term Sheet substantially in the form attached as **Exhibit "B"** to the Chae Declaration, and the Plan Support Agreement substantially in the form attached as **Exhibit "C"** to the Chae Declaration.[3] The parties will also need to negotiate and execute a purchase and sale agreement which is expected to be in form and substance consistent with a typical purchase and sale agreement for a property like Plaza Mexico in this market (the "SH PSA"). The Debtors only received the initial draft of the "Agreement of Purchase and Sale and Joint Escrow Instructions" (*i.e.,* SH PSA) on October 28, 2021 (the filing date of this Motion), and, thus, have not had any opportunity to review or comment on such agreement prior to the filing of this Motion. The SH PSA is attached to this Motion as **Exhibit "1."**

As set forth in the Plan Term Sheet and the Plan Support Agreement, to the extent there are no qualified overbids and the SH Bidder purchases the Property for $162.5M, the sale is

---

[3] The documents attached as **Exhibits "B"** and **"C"** to the Chae Declaration are substantially complete, but not yet final. The Debtors anticipate filing updated, if not final, versions of these documents before the hearing date on this Motion.

contemplated to be approved as part of confirmation of a joint plan of liquidation ("Plan") proposed by the Debtors which will also provide for the payment in full, from the net proceeds of the sale and other cash of the Debtors of all allowed, nonaffiliated claims against the Debtors in accordance with the priorities set forth in the Bankruptcy Code or other applicable laws, based on the separate legal recognition of the Debtors.[4] In the event a qualified overbid is received and SH Bidder is not the successful bidder of the Property, the sale to the successful bidder will also be approved as part of confirmation of the Plan unless the successful bidder elects to proceed with an asset sale order and purchase outside the context of a confirmed Plan.

The sale of the Property to the SH Bidder will be free and clear of all liens, encumbrances and interests pursuant to Sections 363(b) and (f) of the Bankruptcy Code, and include all related assets such as tenant leases (pursuant to an assumption and assignment process), but exclude the Management Agreement (as amended) between Plamex and its affiliate Greenland Property Management, LLC, accounts receivable owing by the Debtors' affiliates, and any other asset expressly excluded in the Plan. The purchase by the SH Bidder is subject to satisfactory due diligence which must be completed before the Court's approval of the Bidding Procedures.

The bid from the SH Bidder is subject to higher and better offers pursuant to the Bidding Procedures. The Bidding Procedures expressly recognizes the SH Bidder and Wells Fargo (defined as the "Senior Lender" in the Bidding Procedures) as qualified bidders in connection with the sale of the Property (including in any Auction) without the requirement on the part of the SH Bidder and the Senior Lender to post any cash deposit.

Notably, the SH Bidder has agreed to forego two material stalking horse protections that are usually included in a Section 363 sale process.  Specifically, the SH Bidder is willing to proceed without any break-up fee of any type or amount, a savings to the Debtors' estates, based on break-up fees usually being in the range of 1% - 5% of the stalking bid, in the range of $1,625,000 - $8,125,000. Although the SH Bidder has waived any break-up fee, the SH Bidder

---

[4] Contemporaneously herewith, the Debtors are also filing its third motion for extension of their exclusive periods to file their Plan and obtain acceptances thereof.

has requested that it obtain expense reimbursement rights, as defined in the SH PSA (the "Expense Reimbursement"), in the event it is not the successful bidder for the Property and the other circumstances as more particularly addressed in the SH PSA and as provided in the proposed Bidding Procedures Order. The Debtors believe the expense reimbursement requested by the SH Bidder is reasonable, customary and appropriate under the circumstances. Further, the Debtors understand that without the right to expense reimbursement, the SH Bidder would not proceed with making the SH Bid. Accordingly, the Debtors believe such expense reimbursement should be approved by the Court as an allowed, super-priority administrative expense in Plamex's chapter 11 case.

## II.

## PROPOSED BIDDING AND SALE PROCEDURES

The bidding and sale procedures proposed by the Debtors and negotiated with the SH Bidder are described substantially in the form attached as **Exhibit "A"** to the Chae Declaration and summarized below. As aforementioned, unlike a traditional stalking horse bidder, the SH Bidder will not receive any bidding advantage such as a break-up fee or bid protections because the Bidding Procedures have been developed with the end goal of creating  as much bidding interest as possible, and to ensure that the highest price possible is paid for the Property by a purchaser who has the financial ability to close on the sale of the Property (the "Sale"). A summary of the Bidding Procedures is as follows:

*A.*    ***Bidding Process***

Plamex and its advisors shall, subject to the other provisions of these Bidding Procedures, including the consultation obligations set forth herein, (a) determine whether any person other than the SH Bidder is a Qualified Bidder (as defined below), (b) coordinate the efforts of Potential Bidders (as defined below) in conducting their due diligence investigations, (c) receive offers from Potential Bidders, and (d) negotiate any offers to purchase the Property so long as such offers otherwise constitute a Qualifying Bid (as defined below).

**B.**     ***Key Dates for Competing Bidders***

These Bidding Procedures provide interested parties with the opportunity to participate in the sale process for the Property, including to submit competing bids for the Property. The key dates for the sale process are as follows:

| | |
|---|---|
| _____ __, 202_ at _ _.m. (prevailing Pacific time) **[NOTE: SH BIDDER BELIEVES THIS DEADLINE SHOULD BE NO LATER THAN 75 DAYS AFTER THE ENTRY OF THE BIDDING PROCEDURES ORDER.]** | Bid Deadline – Due Date for initial Bids and Deposits, with all initial Bids (other than the SH Bid) having to be in an amount of at least $162,600,000. |
| _____ __, 202_ at _.m. (prevailing Pacific time) **[NOTE: THIS DEADLINE TO BE THE NEXT BUSINESS DAY AFTER BID DEADLINE.]** | Deadline by which Plamex will inform Bidders and Consultation Parties whether any Qualifying Bids have been received and thus, whether the Auction will proceed or instead be cancelled. |
| _____ __, 202_ at _ p.m. (prevailing Pacific time) **[NOTE: AUCTION, IF ONE IS TO BE HELD, WILL BE SCHEDULED TWO BUSINESS DAYS AFTER BID DEADLINE.]** | Auction, if any Qualifying Bids have been Received, which will be held at the offices of _____, which are located at _____, Los Angeles, CA, or via zoom with Qualified Bidders to be provided with particulars in advance of the Auction. |
| _____ __, 202_ at _ p.m. (prevailing Pacific time) **[NOTE: SUBECT TO COURT'S CALENDAR, SALE HEARING IS TO BE SCHEDULED TWO-FOUR BUSINESS DAYS FOLLOWING DATE SCHEDULED FOR THE AUCTION.]** | Sale Hearing, which will be held in conjunction with the confirmation hearing on the Plan of Liquidation. |

**C.**     ***Due Diligence Access / Participation Requirements.***

To participate in the bidding process or otherwise be considered for any purpose under the Bidding Procedures, a person or entity interested in purchasing the Property (a "Potential Bidder") must deliver or have previously delivered to Plamex the following documents (the "Participation Requirements"): (1) an executed non-disclosure agreement; (2) a statement demonstrating a bona fide interest in purchasing the Property; and (3) one of the following: (i) written evidence of available funds, (ii) a firm commitment for financing sufficient for the Potential Bidder to timely consummate the purchase of the Property, or (iii) other sufficient information, which may include current audited financial statements and the latest unaudited financial statements of the potential bidder and/or its equity holders, or such other form of financial disclosure and credit-quality support or enhancement that will allow Plamex to make a

reasonable determination as to the Potential Bidder's financial and other capabilities to timely consummate the purchase of the Property. Any Potential Bidder who has satisfied the foregoing Participation Requirements will be afforded, subject to the other provisions of these Bidding Procedures, due diligence access and additional information through access to an online data room, as well as, upon reasonable advance notice, on-site visits.

**D.    _Due Diligence Limitations_**

Plamex shall not be obligated to furnish any due diligence information to any Potential Bidder after the Bid Deadline. In its discretion, and after consultation with Wells Fargo and the Waterfall Parties (collectively, the "Consultation Parties"), Plamex may, but shall not be obligated to, furnish additional information after the Bid Deadline to Qualified Bidders (as defined below). Plamex reserves the right to withhold any due diligence materials from any Potential Bidder (other than the SH Bidder or Senior Lender) that Plamex, in consultation with the Consultation Parties, determines are business-sensitive or otherwise not appropriate for disclosure to any Potential Bidder who is a competitor of Plamex or is affiliated with any competitor of Plamex.

Neither Plamex nor any of its representatives or advisors shall be obligated to furnish information of any kind whatsoever to any person who is not determined to have satisfied the Participation Requirements (as defined below).

**E.    _Due Diligence from Potential Bidders_**

Each Potential Bidder (other than the SH Bidder or Senior Lender) shall comply with all reasonable requests for additional information by Plamex or its advisors regarding such Potential Bidder, including without limitation, its ability to close the Sale.  Failure by a Potential Bidder (other than the SH Bidder or the Senior Lender) to comply with any such requests may be a basis for the Debtor to determine that such Potential Bidder is not or cannot be a Qualified Bidder (as defined below).

**F.    _Bid Deadline._**

The deadline for submitting initial written bids for the Property (a "Bid" or "Bids") is _____, 202\_ at 4:00 p.m. (prevailing Pacific time) (the "Bid Deadline"). Such Bids may be

transmitted electronically and must be received on or before that date and time by Plamex and its counsel and the other parties listed in ¶12 of the following Bid Requirements section of these Bidding Procedures. A Bid received after the Bid Deadline shall not constitute a Qualified Bid (as defined below) unless Plamex, for good cause and after consultation with the Consultation Parties, consents.

## G.    *Bid Requirements.*

To be eligible to participate in the Auction (as defined below), each Bid (other than the SH Bid) and each Potential Bidder submitting such a Bid (other than the SH Bidder) (each, a "Bidder") must be determined by the Debtor, in consultation with the Consultation Parties, to satisfy the conditions listed below (collectively, the "Bid Requirements"):

1.    ***Terms***.  A Bid must be based on the SH PSA and must include binding, executed transaction documents, signed by an authorized representative of the Bidder.  A Bid must also include a copy of the Modified Agreement (including exhibits thereto) marked against the SH PSA to show all changes requested by the Bidder (including removal or modification of any provisions that apply only to the SH Bidder (such as the SH Bidder's expense reimbursement right and the no bid deposit provision), which shall not be permitted in any Modified Agreement).  For ease of submission, a copy of the SH PSA in Word format will be available in the online data room.

2.    ***Contingencies***.  A Bid must include a statement that there are no conditions precedent to the Bidder's authority to enter into or consummate a definitive agreement, other than entry by the Bankruptcy Court of an order approving the sale of the Property to the Bidder.

3.    ***Same or Better Terms than SH Bid***.  A Bid must (a) set forth a cash purchase price for the Property of at least $162.6 million, (b) be reasonably expected to result in net cash proceeds to Plamex at closing in excess of the aggregate amount of net proceeds expected to be realized should the Sale to the SH Bidder on the terms of the SH Bid be consummated (the "SH Bid Net Cash Baseline Amount"), and (c) otherwise be on

terms that Plamex, in its business judgment and after consulting with the Consultation Parties, determines are the same as or better for Plamex than the terms of the SH Bid. Without limiting the generality of the foregoing, a Bid (i) may not contain representation or warranties, covenants, or termination rights materially more onerous in the aggregate to Plamex than those set forth in the SH Bid, as determined by the Debtor in good faith after consultation with the Consultation Parties, (ii) may not be conditioned on obtaining financing, any internal, regulatory, or other third party approvals, or on the outcome or review of due diligence, including with respect to environmental laws, (iii) may not provide for a closing date that will be later than that contemplated in the SH Bid; provided, however, if Plamex reasonably determines that a Bid will produce significantly more than the SH Bid Net Cash Baseline Amount, Plamex, after consultation with the Consultation Parties, will have the discretion to qualify such a Bid that provides for a closing date up to thirty (30) days later than that contemplated in the SH Bid.

4. **Irrevocable**. A Bid must state that such offer is binding and irrevocable until five (5) business days after the Sale Hearing; provided that if the Bid is accepted as the Successful Bid or the Back-Up Bid (each, as defined below), such Bid shall continue to remain irrevocable as provided below under "Selection of the Successful Bid and Back-Up Bid".

5. **Identity of Bidder**. A Bid must fully disclose the identity of each entity or person that will be bidding for or purchasing the Property, including all equity holders in the case of a Bidder that is an entity specially formed for the purpose of effectuating the contemplated transaction, or otherwise participating in connection with such Bid, and the complete terms of any such participation, including any agreements, arrangements or understanding concerning collaborative or joint bid or any other combination concerning the proposed Bid.

6. **Contact Information**. A Bid must include the names and contact information of authorized representatives of the Bidder who will be available to answer

questions regarding the Bid, including advisors and related parties.

7.  ***Deposit***.  A Bid must include a good-faith deposit in immediately available funds equal to one percent (1%) of the proposed purchase price for the ***Property*** (the "Deposit").  If a Bid is identified as the Successful Bid (as defined below), and the Bidder who submitted such Bid fails to timely close the Sale for any reason other than a material breach by Plamex, the Deposit shall become non-refundable.  The Deposit for each Qualified Bidder shall be held in a segregated trust account maintained by Plamex's bankruptcy counsel on terms acceptable to Plamex and shall be returned (other than with respect to the Successful Bidder and any backup bidder) promptly after the approval of the Successful Bid at the Sale Hearing (as defined below).

8.  ***Financing Sources***.  A Bid must contain written evidence of available funds or a firm irrevocable commitment for financing sufficient to consummate the proposed Sale with appropriate contact information for such financing sources.

9.  ***Designation of Assigned Contracts and Leases.***  Subject to the right, if any, set forth in the Bidding Procedures Order or the SH PSA to add or exclude executory contracts or unexpired leases prior to the closing, a Bid must identify the executory contracts and unexpired leases with respect to which the Bidder seeks assignment from Plamex.

10.  ***Designation of Assumed Liabilities***.  A Bid must identify all liabilities that the Bidder proposes to assume.

11.  ***Termination Fees.***  A Bid must not entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement, and by submitting the Bid, the Bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. §503 related in any way to the submission of its Bid or its participation in any Auction.

12.  ***Bid Deadline***:  The following parties must receive a Bid in writing (in both PDF and Word formats) on or before the Bid Deadline: _____ [**NOTE:**

**SHOULD BE THE SAME PERSONS/ENTITIES THAT ARE SET FORTH IN THE BIDDING PROCEDURES ORDER.**].

**H.** ***Qualified Bidders and Bids.***

Potential Bidders who have satisfied the Participation Requirements and Bid Requirements will be deemed "<u>Qualified Bidders</u>," and Bids that meet all of the Bid Requirements described above will be deemed "<u>Qualified Bids</u>," in each case, only if Plamex concludes in its business judgment, in consultation with its advisors and the Consultation Parties, that such Bid would be consummated if selected as the Successful Bid; <u>provided</u>, <u>however</u>, that, for avoidance of doubt, if any Qualified Bidder (other than the SH Bidder or the Senior Lender) fails to comply with reasonable requests for additional information and due diligence access from the Debtor to the satisfaction of Plamex, in consultation with the Consultations Parties, Plamex may, after consulting with the Consultation Parties, disqualify any Qualified Bidder and Qualified Bid in the Debtor's discretion, and such Bidder shall not be entitled to attend or otherwise participate in the Auction, should one be conducted.

**I.** ***SH Bidder Is a Qualified Bidder***

SH Bidder shall constitute a Qualified Bidder for all purposes, including, without limitation, in connection with any Auction. Without limiting the generality of the foregoing, there shall be no requirement for the SH Bidder to post any deposit, including, without limitation, in connection with any Auction.

**J.** ***Senior Lender as a Qualified Bidder***

Should the Senior Lender wish to bid for the Property, the Senior Lender (a) will be deemed to have satisfied the Participation Requirements, (b) will be deemed to have satisfied any financial wherewithal requirements, (c) will be permitted to "credit bid" a portion of its Bid equal to the net amount of its undisputed secured claim as of the date of the Auction after taking into account the amount of existing cash collateral (as established either in the Bidding Procedures Order or by agreement among Plamex, the SH Bidder, and the Senior Lender) (the "<u>Credit Bid Currency</u>"), (d) will not be required to post any cash deposit at any time, and (e) will not be

required to provide any further due diligence information. Except as set forth in the preceding sentence, the Senior Lender shall have to satisfy all Bid Requirements timely in order to be deemed a Qualified Bidder. Without limiting the generality of the foregoing, should the Senior Lender be the Successful Bidder, the Senior Lender shall be required to pay cash in an amount equal to the difference between the amount of its winning bid and the amount of its Credit Bid Currency.

**K.**    ***No Other Use of Credit Bids***

   Other than real estate taxes, there are no other known secured claims against the Property. Accordingly, no other type of credit bidding shall be permitted in connection with the Sale.

**L.**    ***Notice of Debtor's Determination of Qualified Bids***

   As soon as practicable following the Bid Deadline, but in any event, on or before _____ _.m. (prevailing Pacific time) on _____ __, 2021 **[NOTE: THE NEXT BUSINESS DAY AFTER THE BID DEADLINE]**, Plamex shall identify to counsel to the Consultation Parties and any Qualified Bidders: (a) each and every Bid (other than the SH Bid) that it considers to be a Qualified Bid and (b) if Qualified Bids (in addition to the SH Bid) have been timely received, the Qualified Bid that will constitute the Initial Overbid (as defined below) at the Auction. Any timely amendments, supplements, or modifications to any Bids also shall have delivered to such parties.

**M.**    ***If No Other Qualified Bids Are Timely Received, the Auction Will Be Cancelled, and the SH Bid Shall Be the Successful Bid for the Property***

   If no timely, conforming Qualified Bids (other than the SH Bid) for the Property are received by the Bid Deadline, the Auction for the Property shall be cancelled, the SH Bid shall be the Successful Bid for the Property, and such Successful Bid promptly shall be submitted by the Debtor for approval to and by the Bankruptcy Court at the Sale Hearing.

**N.**    ***Auction***

   If one or more Qualified Bids for the Property (in addition to the SH Bid) have been received, the Debtor will conduct an auction for the sale of the Property (the "Auction"), which

Auction shall take place at _:00 _.m. (prevailing Pacific time) on _____ __, 202_ at

_____ **[Note: place of Auction to be determined. Will not be in courtroom. Will be via**

**Zoom if COVID-19 mandated/advisable.]**

### O.    *Initial Participation in and Attendance at Auction*

Only the Debtors, the Consultation Parties (including the SH Bidder), and any other

Qualified Bidder, in each case, along with their representatives, counsel, and advisors, may attend

the Auction (such Auction to be in person or via Zoom, Webex or similar virtual means, as

applicable), and only the SH Bidder and such other Qualified Bidders shall be permitted to make

any Bids at the Auction; provided, however, that any other creditor of either Debtor may attend

(but may not participate in) the Auction if such creditor provides Plamex with written notice, with

copies to each of the Consultation Parties, of its intention to attend any Auction on or before the

Bid Deadline. Such notice must be sent via email to counsel for Plamex at RB@lnbyg.com.

### P.    *No Collusion; Good Faith Bona Fide Offer.*

Each Qualified Bidder participating in the Auction will be required to confirm on the

record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding; (ii)

its Bid is a good-faith *bona fide* offer; (iii) it intends to consummate the proposed transaction if

selected as the Successful Bidder; and (iv) it acknowledges that, if chosen, it will serve as the

Back-Up Bidder.

### Q.    *Initial Overbid at Auction*

The "Initial Overbid" at the Auction will be the Qualified Bid that Plamex, in consultation

with the Consultation Parties, has determined is the highest and best bid received for the Property.

Without limiting the generality of the definition of "Qualified Bid" or any of the other provisions

of these Bidding Procedures, to qualify as the "Initial Overbid", such Bid must be reasonably

expected to result in the greatest amount of net cash payable to Plamex at closing in excess of the

SH Bid Net Cash Baseline Amount.

### R.    *Conducting the Auction*

Plamex and its professionals shall direct and preside over the Auction. At the start of the

Auction, and after each Qualified Bidder acknowledges on the record that it has not engaged in any collusion with respect to the bidding, that its Bid is a good faith bona fide offer, and that it intends to consummate the proposed transaction if selected as the Successful Bidder. Plamex shall then confirm and describe the Initial Overbid. All bidding after the Initial Overbid shall continue thereafter in subsequent bid increments of at least $100,000. All bids will be made and received in one room (or otherwise in the presence via Zoom, Webex or similar virtual means of all parties), on an open basis, and other Qualified Bidders will be entitled to be present for all bidding with the understanding that the true identity of each bidder will be fully disclosed to all other Qualified Bidders and that the material terms of each Qualified Bid submitted in response to the Initial Bid, or to any successive bids made at the Auction, including any amended or other concession regarding the provisions of the SH PSA or the pertinent Modified Agreement, as the case may be, will be fully disclosed to all other Qualified Bidders, and each Qualified Bidder will be permitted to respond to the previous bid at the Auction based on what the Debtor, after consultation with the Consultation Parties, determines to be an appropriate amount of time to respond to such bid. Once a Qualified Bidder (including the SH Bidder) elects not to submit a bid in any round of bidding, such Qualified Bidder's right to participate further in the Auction shall be terminated, and such Qualified Bidder shall be deemed to have withdrawn from the Auction and shall not be entitled to participate (but instead shall be prohibited from participating) in any subsequent rounds of bidding. Any Auction rules adopted by the Plamex will not modify the terms of the SH PSA or the rights of the SH Bidder under these Bidding Procedures or the Bidding Procedures Order without the express consent of the SH Bidder. Plamex generally shall consult with the Consultation Parties throughout the Auction Process to the extent reasonably practicable.

Except as expressly provided in the Bidding Procedures Order or the provisions of these Bidding Procedures (including, without limitation, those of the preceding paragraph), Plamex, following consultation with its advisors and the Consultation Parties, may otherwise conduct the Auction in the manner it reasonably determines, in its business judgment, will promote the goals of the bid process, will achieve the maximum value for all parties in interest and is not inconsistent with any

of the provisions of these Bidding Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith. The Debtor, in consultation with the Consultation Parties, may (1) determine which Qualified Bid, if any, is the highest, best and otherwise financially superior offer and (2) reject at any time any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or these Bidding Procedures, or (iii) contrary to the best interests of the Debtor, its estate, and its creditors; provided that, the highest, best, and otherwise financially superior offer shall be the Qualified Bid at the Auction reasonably be expected to result in the greatest amount of net cash payable to Plamex at closing in excess of the SH Bid Net Cash Baseline Amount; provided further, that the Debtor may not reject the SH Bid or any subsequent Bid by the SH Bidder.

**S.**    ***Selection of the Successful Bid and Back-Up Bid.***

The Auction shall continue until there is only one offer that Plamex (following consultation with its advisors and the Consultation Parties) determines, subject to Bankruptcy Court approval, is the highest, best and otherwise financially superior offer from among the Qualified Bidders submitted at Auction (the "Successful Bid"). Again, and for avoidance of doubt, the highest, best, and otherwise financially superior offer shall be the Qualified Bid at the Auction reasonably expected to result in the greatest amount of net cash payable to Plamex at closing in excess of the SH Bid Net Cash Baseline Amount. Plamex shall not be entitled or otherwise authorized to consider any Bids submitted after the conclusion of the Auction. The Qualified Bidder submitting the Successful Bid shall become the "Successful Bidder" and shall have such rights and responsibilities of a purchaser, as set forth in the SH PSA, or the pertinent Modified Agreement, as applicable. Plamex (after consultation with its advisors and the Consultation Parties) shall also select the second highest and best offer as the back-up bid (the "Back-Up Bid"), which shall remain open and irrevocable until one (1) business day after the closing of the Sale with the Successful Bidder or such later time as agreed to by the Qualified Bidder submitting such Back-Up Bid. In the event that, for any reason, the Successful Bidder fails to close the transaction contemplated by the Successful Bidder, Plamex shall elect to regard

the Back-Up Bid as the highest or best bid for the Property and thus, as the Successful Bidder, and Plamex will be authorized and directed to consummate the Sale contemplated by the Back-Up Bid without further order of the Court. For the avoidance of doubt, if there was only one Qualified Bid (in addition to the SH Bid) that was timely submitted, and if the SH Bidder does not elect to bid further bid at the Auction, such Qualified Bid shall be deemed the Successful Bid and such Qualified Bidder, the Successful Bidder, and the SH Bid shall be deemed to be the Back-Up Bid and the SH Bidder, the Back-Up Bidder.

**T.    _Sale Hearing_**

The hearing to approve and authorize the Sale to the Successful Bidder (the "Sale Hearing") shall be conducted in conjunction with the confirmation hearing on the Plan of Liquidation at __ _. m. (prevailing Pacific time) on _____ __, 2021, or at such other date and time set by the Court.

**U.    _Modification of Bidding Procedures._**

Subject to the SH Bidder's rights under the SH PSA, Plamex may not modify amend or otherwise these Bidding Procedures (including by extending any of the deadlines set forth herein) in any manner without the approval of the Bankruptcy Court pursuant to an Order by the Bankruptcy Court entered upon appropriate notice and after opportunity for a hearing.

**V.    _Consultation Parties_**

To the extent that these Bidding Procedures require Plamex (or its advisors) to consult with any Consultation Party in connection with making a determination or taking an action, or in connection with any other matter relating to these Bidding Procedures or the sale of the Property, including the Auction in connection with making a determination or taking an action, or in connection with any other matter relating to these Bidding Procedures or the Sale, including the Auction (as defined below) should one occur, Plamex and its advisors shall do so in a regular and timely matter before making such determinations or taking any such action. However, none of the Consulting Parties shall have any veto right in connection with any Bid (as defined below).

***W.***     ***Conduct of Sale Hearing***

Because of the COVID-19 pandemic, the Bankruptcy Court will conduct the Sale Hearing using ZoomGov audio and video technology. Hearing participants and members of the public may participate in and/or observe the hearing using ZoomGov, free of charge. Individuals may connect by ZoomGov audio and video using a personal computer (equipped with camera, microphone and speaker), or a handheld mobile device with an integrated camera, microphone and speaker (such as an iPhone, iPad, Android phone or Android tablet). The connection can be initiated by entering the "Meeting URL" into a web browser on any of these devices, provided the device is connected to the Internet. Individuals connecting in this manner will be prompted for the Meeting ID and Password shown below. Individuals may also connect to the hearing by telephone only, using the telephone number provided below. Individuals connecting to the hearing by telephone will also be prompted for the Meeting ID and Password. Neither a Zoom nor a ZoomGov account is necessary to participate in or observe the hearing, and no pre-registration is required.

***X.***     ***Audio Recording***

The audio portion of the Sale Hearing will be recorded electronically by the Bankruptcy Court and constitute its official record. All persons are strictly prohibited from making any other recording of court proceedings, whether by video, audio, "screenshot," or otherwise. Violation of this prohibition may result in the imposition of monetary and non-monetary sanctions.

**III.**

**PROPOSED SALE NOTICE AND CURE NOTICE**

Attached as **Exhibit "D"** to the Chae Declaration is the proposed order granting the Motion which also attaches in substantial form, the notices that the Debtors propose to provide (a) to prospective buyers and other parties in interest ("Proposed Sale Notice"), and (b) to non-Debtor counterparties under executory contracts and unexpired leases regarding the possible assumption and assignment thereof ("Proposed Cure Notice").

*A.*   ***Proposed Sale Notice.***

The Proposed Sale Notice will be served upon all known prospective buyers and others parties in interest within 5 business days of the entry of the order granting the Motion, and all other prospective buyers and other parties in interest as soon as their identities are known to the Debtors. In addition, the Debtors will cause the Proposed Sale Notice, or an appropriately formatted and revised version of it as the Debtors, in consultation with the Consultation Parties, determine to be reasonable, to be published at least once, reasonably in advance of any Bid Deadline.

The Debtors submit that the notice, and service thereof, will satisfy the requirements of Rule 2002 of the Federal Rules of Bankruptcy Procedure, and that such notice will constitute proper, timely, adequate and sufficient notice of the Sale, the Bidding Procedures including any Bid Deadline, the Auction, the Sale Hearing, and the objection to object to any Sale. Accordingly, the Debtors request that the Proposed Sale Notice, substantially in the form attached to the proposed order granting the Motion be approved.

*B.*   ***Proposed Cure Notice.***

Similarly, within 5 business days after the entry of the order granting this Motion, or as soon thereafter as is practicable, the Debtors will file with this Court and serve the Proposed Cure Notice (substantially in the form attached to the proposed order granting the Motion) on each counterparty to an executory contract or unexpired lease related to the Property, which notice shall: (i) state the cure amounts, if any, that the Debtors believe are necessary to assume such contracts or leases pursuant to Bankruptcy Code section 365 (the "Cure Amount"); (ii) notify the non-Debtor counterparty that such party's contract or lease may be assumed and assigned to a Successful Bidder of the Property; (iii) state the date of the Sale Hearing and that objections to any Cure Amount or to assumption and assignment will be heard at the Sale Hearing, or at a later hearing, as determined by the Debtors; and (iv) state the deadline by which the non-Debtor counterparty shall file an objection to the Cure Amount(s) or to the assumption and assignment of the applicable contract(s) and/or lease(s).

In connection with the scheduling of the Sale Hearing, the Debtors request that the Court also establish a deadline by which any objection to the Cure Amount or the assumption and assignment of the applicable contract(s) and/or lease(s) (the "Cure Objection Deadline") must be filed with the Clerk and served on the Notice Parties (as defined in **Exhibit "D"**). As provided for in the Proposed Cure Notice, the Debtors request that any such objection must also state (i) the basis for such objection and (ii) with specificity what Cure Amount(s) the non-Debtor counterparty to the relevant executory contract(s) or unexpired lease(s) believes is required (in all cases with appropriate documentation in support thereof).

The proposed assumption and assignment procedure, which includes the Proposed Cure Notice, also provides for the following terms which the Debtors believe are appropriate and reasonable under the circumstances of these cases:

(1)     Any objection solely to the Cure Amount(s) may not prevent or delay the Debtors' assumption and assignment of assumed and assigned contract(s) or lease(s).  If a party objects solely to Cure Amount(s), the Debtors may, with the consent of the Successful Bidder, hold the claimed Cure Amount(s) in reserve pending further order of the Court or mutual agreement of the parties.  So long as the Cure Amount is held in reserve, and there are no other unresolved objections to assumption and assignment of the applicable assumed and assigned contract(s) or lease(s), the Debtors can, without further delay, assume and assign such contract(s) or lease(s) to the Successful Bidder.   Under such circumstances, the objecting non-Debtor counterparty's recourse is limited to the funds held in reserve.

(2)     If no objection to the Cure Amount(s) is timely received, the Cure Amount(s) set forth in the Proposed Cure Notice shall be controlling notwithstanding anything to the contrary in any assigned contract(s) or lease(s) or other document(s) as of the date of the Proposed Cure Notice.

(3)     By the deadline mutually agreed to by the Debtors and the SH Bidder, the SH Bidder will provide to the Debtors a list of those executory contracts and unexpired leases that the SH Bidder elects to have assumed and assigned (the "SH Bidder Designated Contracts") to the

SH Bidder at Closing pursuant to Bankruptcy Code Section 365, subject to the SH Bidder's right to add or delete executory contracts or unexpired leases.

(4)     By a deadline mutually agreed to by the Debtor and the SH Bidder, the Debtors shall establish and maintain a website (the "Designated Contract Website") that contains (i) the list of the SH Bidder Designated Contracts, which the Debtors will update and provide notice of to the Notice Parties and non-Debtor counterparties to the SH Bidder Designated Contracts as promptly as possible as and when executory contracts or unexpired leases are added or deleted by the SH Bidder and (ii) a description of the SH Bidder and information as to the SH Bidder's ability to perform Plamex's obligations under the SH Bidder Designated Contracts. If a new website cannot be provided then this information will need to be served by the Debtors upon the non-Debtor counterparties and the Notice Parties in the cases.

(5)     As soon as reasonably practicable after the Debtors receives the schedule from each Qualified Bidder of those executory contracts or unexpired leases such bidder wishes to have assumed and assigned to it (each such schedule constituting a "Qualified Bidder's Designated Contracts"), which shall be provided by the bid deadline as part of such Qualified Bidder's bid, and then no later than the date of the Auction, the Debtors shall post (or cause to be posted) to the Designated Contract Website, the schedule of each Qualified Bidder's Designated Contracts that contains (i) the list of the each such Qualified Bidder's Designated Contracts and (ii) a description of such Qualified Bidder and information as to such Qualified Bidder's ability to perform the Debtors' obligations under each of the Qualified Bidder's Designated Contracts.

(6)     To the extent that any non-Debtor counterparty wishes to object to the adequate assurance of future performance by the SH Bidder or another Qualified Bidder under the applicable executory contract(s) or unexpired lease(s), then such non-Debtor counterparty shall file a written objection with the Court and serve on the Notice Parties and the applicable Qualified Bidder(s) so that such objection is received on or before twenty-four hours prior to the commencement of the Sale Hearing.

(7)    To the extent that any non-Debtor counterparty does not timely file and serve an objection as set forth above, such counterparty will be: (i) deemed to have consented to the Cure Amount(s), if any, set forth in the Cure Notice; (ii) barred, estopped and enjoined from asserting any additional Cure Amount(s) under the assumed and assigned executory contract(s) or unexpired lease(s); (iii) barred from objecting to the assumption and assignment of the applicable assumed and assigned executory contract(s) or unexpired lease(s) to the Successful Bidder, and (iv) barred from objecting to adequate assurance of future performance by the Successful Bidder.

(8)    The inclusion of a contract on a Cure Notice shall not constitute or be deemed a determination or admission by the Debtors, the SH Bidder, any Successful Bidder or any other party in interest that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code or that such contract or lease will be assumed in connection with the Sale of the Property.  The Debtors reserve all of its rights, claims and causes of action with respect to the contracts or leases listed on the Cure Notice.

The Debtors submit that the Proposed Cure Notice is reasonably calculated to provide sufficient effective notice to all non-Debtor counterparties to assumed and assigned contracts or leases and any other affected parties of the Debtors' intent to assume and assign some or all of such contracts or leases and to afford the non-Debtor counterparty to each such contract or lease the opportunity to exercise any rights affected by the Motion pursuant to Bankruptcy Rules 2002, 6004 and 6006, and should be approved.

**IV.**

**DISCUSSION**

Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…."  11 U.S.C. § 363(b)(1).  Section 105(a) of the Bankruptcy Code provides in pertinent part that "[t]he Court may issue any order, process or judgment that is necessary and appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

**A.     The Proposed Bidding Procedures Should Be Approved By The Court.**

Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") govern the scope of the notice to be provided in the event a debtor elects to sell property of the estate under Section 363; however, with respect to the procedures to be adopted in conducting a sale outside the ordinary course of a debtor's business, Bankruptcy Rule 6004 provides only that such sale may be by private sale or public auction, and requires only that the debtor provide an itemized list of the property sold together with the prices received upon consummation of the sale.  Fed. R. Bankr. Proc. 6004(f).  With that said, Local Bankruptcy Rule 6004-1 provides, in pertinent part, as follows:

> **(b) Motion for Order Establishing Procedures for the Sale of Estate Property.**
> . . .
>
> (2) Contents of Notice [of a Sale Procedure Motion]. The notice must describe the proposed bidding procedures and include a copy of the proposed purchase agreement. If the purchase agreement is not available, the moving party must describe the terms of the sale proposed, when a copy of the actual agreement will be filed with the court, and from whom it may be obtained. The notice must describe the marketing efforts undertaken and the anticipated marketing plan, or explain why no marketing is required. …
>
> (3) Service of the Notice and Motion. The moving party must serve the motion and notice of the motion and hearing by personal delivery, messenger, telephone, fax, or email to the parties to whom notice of the motion is required to be given by the FRBP or by these rules, any other party that is likely to be adversely affected by the granting of the motion, and the United States trustee. The notice of hearing must state that any response in opposition to the motion must be filed and served at least 1 day prior to the hearing, unless otherwise ordered by the court.
> . . .

Local Bank. R. 6004-1(b).

The Debtors respectfully submit that all of the information required under Local Bankruptcy Rule 6004-1(b)(2) to be provided in a notice of a bidding procedures motion has been included in the Notice of Motion filed and served concurrently herewith.

1  Further, Local Bankruptcy Rule 6004-1(b)(1) provides for the consideration and approval

2  of a bidding procedures motion on not less than seven (7) days' notice.  The Motion herein has

3  been brought on 21 days' notice, with service in accordance with Local Bankruptcy Rule 9013-1.

4  Neither the Bankruptcy Code nor the Bankruptcy Rules contain specific provisions with

5  respect to the procedures to be employed by a debtor in conducting a public or private sale.

6  Nonetheless, as one Court has stated, "It is a well-established principle of bankruptcy law that the

7  objective of bankruptcy rules and the [debtors'] duty with respect to such sales is to obtain the

8  highest price or greatest overall benefit possible for the estate."  *In re Atlanta Packaging*

9  *Products, Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988).  Additionally, courts have long

10  recognized the need for competitive bidding at hearings on private sales; "[c]ompetitive bidding

11  yields higher offers and thus benefits the estate.  Therefore, the objective is 'to maximize bidding,

12  not restrict it.'"  *Id.*

13  A corollary to these principles is that the court should not "cherry-pick" among

14  contractual provisions, objecting to select individual portions, if the agreement as a whole is

15  supported by an articulated business judgment.  At least one bankruptcy court has expressly

16  applied this corollary to a transaction including breakup and overbid provisions in the sale of the

17  debtor's business.  In *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877 (Bankr. S.D.N.Y.

18  1990), the court approved a transaction including provisions relating to a breakup fee and a

19  requirement that overbids be at least $500,000.  In responding to objections to other provisions of

20  the agreement, the court held that:

21  
22  > The Court is not to second guess the inclusion of some
> provisions as long as the Agreement as a whole is within
> reasonable business judgment, and the subject provisions do not

23  > distort the balance Congress struck in Chapter 11.  *Cf. In re
> Ames Dep't Stores, Inc., Eastern Retailers Service Corp., et al.,*

24  > 115 B.R. 34, 37-38 (Bankr. S.D.N.Y. 1990) (some contractual
> provisions may be justified by the need to attract a prospective

25  > investor.).

26  
27  114 B.R. at 886.

28

The Debtors respectfully submits that the proposed Bidding Procedures provide a structure for the sale of the Property and ensure a level of certainty with respect to any Qualified Bids which the Debtors may receive.

As a whole, the Debtors believe that the Bidding Procedures will (i) foster competitive bidding among any serious potential purchasers; (ii) eliminate from consideration potential purchasers who do not have the financial ability to consummate a Sale of the Property in a timely manner; and (iii) ensure that the highest possible aggregate purchase price is obtained for the Property.  The Debtors believe that the approval of the proposed Bidding Procedures is in the best interests of the Debtors' estates as they provide no break-up fee or other bidding advantage to the SH Bidder, will provide certainty in connection with the bidding process and a "level playing field" for prospective bidders, will operate to maximize the value of the Property, and will facilitate a successful closing of the Sale of the Property.

The Debtors therefore submit that the proposed Bidding Procedures described above are in the best interest of their bankruptcy estates, are necessary and appropriate to maximize the recovery for their bankruptcy estates, and should be approved by the Court as a sound exercise of the Debtors' business judgments.  Importantly, the Debtors are <u>not</u> seeking at this time to have the Court approve the actual sale of the Property.  That request will be set forth in a separate sale motion to be filed by the Debtors and considered by the Court at the Sale Hearing.

**B.**     **<u>The Court Should Also Approve The Assumption And Assignment Procedures Of Designated Contracts</u>.**

Barring exceptions not herein relevant, sections 365(a) and 1107(a) authorizes a debtor in possession, "subject to the Court's approval, ... [to] assume or reject any executory contract or unexpired lease of the debtor."  A debtor in possession may assume or reject executory contracts for the benefit of the estate.  <u>In re Klein Sleep Products, Inc.</u>, 78 F.3d 18, 25 (2d. Cir. 1996); <u>In re Central Fla. Metal Fabrication, Inc.</u>, 190 B.R. 119, 124 (Bankr. N.D. Fla. 1995); <u>In re Gucci</u>, 193 B.R. 411, 415 (S.D.N.Y. 1996).  In reviewing a debtor in possession's decision to assume or reject an executory contract, a bankruptcy court should apply the "business judgment test" to

determine whether it would be beneficial to the estate to assume it.  In re Continental Country Club, Inc., 114 B.R. 763, 767 (Bankr. M.D. Fla. 1990); see also In re Gucci, 193 B.R. at 415.  The business judgment standard requires that the court follow the business judgment of the debtor unless that judgment is the product of bad faith, whim, or caprice.  In re Prime Motors Inns, 124 B.R. 378, 381 (Bankr. S.D. Fla. 1991), citing Lubrizol Enterprises v. Richmond Metal Finishers, 756 F.2d 1043, 1047 (4th Cir. 1985), cert. denied, 475 U.S. 1057 (1986).

Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign its executory contracts and unexpired leases, provided the debtor first assumes such executory contracts and unexpired leases in accordance with section 365(b)(1), and provides adequate assurance of future performance by the assignee.  Pursuant to section 365(b)(1), assumption of executory contracts and unexpired leases requires a debtor to: (a) cure any existing defaults under such agreements; (b) compensate all non-debtor parties to such agreements for any actual pecuniary loss resulting from the defaults; and (c) provide adequate assurance of future performance under the contract or lease.  11 U.S.C. § 365(b)(1); see also In re Bowman, 194 B.R. 227, 230 (Bankr. D. Ariz. 1995); In re AEG Acquisition Corp., 127 B.R. 34, 44 (Bankr. C.D. Cal. 1991), aff'd 161 B.R. 50 (9th Cir. B.A.P. 1993).  Pursuant to section 365(f)(1) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease pursuant to section 365(f)(2) of the Bankruptcy Code notwithstanding any provision in such executory contract or unexpired lease that prohibits, restricts or conditions the assignment of such executory contract or unexpired lease.

The assumption and assignment of executory contracts furthers the goals of Chapter 11 of promoting reorganization by balancing the debtor's interest in maximizing the value of its estate against the contracting party's interest in receiving the benefit of its bargain and being protected against default by the debtor after assumption has occurred.  In re Embers 86th Street. Inc., 184 B.R. 892, 896 (Bankr. S.D.N.Y. 1995).

As part of this Motion, the Debtors are seeking approval of the procedures by which the Debtors will assume and assign to the Successful Bidder all of the Debtors' executory contracts and unexpired leases that the Successful Bidder desires. Within 5 business days after the entry of

the order granting this Motion, or as soon thereafter as is practicable, the Debtors will file with this Court and serve the Proposed Cure Notice (substantially in the form attached to the proposed order granting the Motion) on each counterparty to an executory contract or unexpired lease related to the Property, which notice shall: (i) state the Cure Amount; (ii) notify the non-Debtor counterparty that such party's contract or lease may be assumed and assigned to a Successful Bidder of the Property; (iii) state the date of the Sale Hearing and that objections to any Cure Amount or to assumption and assignment will be heard at the Sale Hearing, or at a later hearing, as determined by the Debtors; and (iv) state the deadline by which the non-Debtor counterparty shall file an objection to the Cure Amount(s) or to the assumption and assignment of the applicable contract(s) and/or lease(s).

The identity of the Successful Bidder is not known at this time, and it is also unknown to the Debtors the schedules or lists of the SH Bidder Designated Contracts and the Qualified Bidder's Designated Contracts. As such, the Proposed Cure Notice will be served on <u>every</u> counterparty to all executory contracts or unexpired leases that are related to the Property; thus, every counterparty to a contract or lease that could be subject to an assumption and assignment will have a meaningful opportunity to object, including to the Cure Amount. Thus, these parties will not be prejudiced by the proposed procedures for assumption and assignment of their executory contract or unexpired lease.

Moreover, as soon as the schedules or lists of the SH Bidder Designated Contracts and the Qualified Bidder's Designated Contracts are given to the Debtors, the Debtors will either post these schedules or lists on the Designated Contract Website (or serve such schedules, lists and related information upon all affected counterparties). To the extent these counterparties wish to object to the assumption and assignment of their executory contracts or unexpired leases on adequate assurance of future performance grounds, they may do so up until 24 hours before the Sale Hearing.

The Debtors submit that this procedure and the proposed notices are fair and reasonable under the circumstances of these cases.

**V.**

**CONCLUSION**

**WHEREFORE**, the Debtor respectfully requests that this Court enter an order:

(1)    granting the Motion in its entirety;

(2)    Establishing and approving the Bidding Procedures substantially in the form described in **Exhibit "A"** attached Chae Declaration for the sale of the Property, free and clear of all liens, claims, encumbrances and other interests;

(3)    Approving the SH Bidder, including expenses reimbursement rights, as reflected in the Plan Term Sheet, substantially in the form attached as **Exhibit "B"** to the Chae Declaration;

(4)    Approving the Debtors' entry into and performance under the Plan Support Agreement substantially in the form attached as **Exhibit "C"** to the Chae Declaration;

(5)    Establishing and approving the proposed procedures relating to the assumption and assignment of executory contracts and unexpired leases;

(6)    Approving the Bidding Procedures Order, substantially in the form attached as **Exhibit "D"** to the Chae Declaration, which attaches the form and manner of sale and cure notices, including the Proposed Sale Notice, and the Proposed Cure Notice;

(7)    Scheduling an Auction should there be more than one qualifying bid;

(8)    Scheduling a Sale Hearing; and

///

///

///

///

///

///

(9)     granting such other and further relief as the Court deems just and proper under the circumstances.

Dated:  October 28, 2021

PLAMEX INVESTMENT, LLC
3100 E. IMPERIAL INVESTMENT, LLC


By:  _/s/ Monica Y. Kim_
        RON BENDER
        MONICA Y. KIM
        JULIET Y. OH
        LEVENE, NEALE, BENDER, YOO
            & BRILL L.L.P.
        Attorneys for Chapter 11 Debtors and
        Debtors-in-Possession

**EXHIBIT "1"**

FOR DISCUSSION PURPOSES

MB Draft 10/28/21

**AGREEMENT OF PURCHASE AND SALE
AND JOINT ESCROW INSTRUCTIONS**

by and between

**QUARRY HEAD 2017-1 GRANTOR TRUST**,
Buyer

and

**PLAMEX INVESTMENT, LLC**,
Seller

Dated as of _____, 2021

Premises:                3100, 3140, and 3170 E. Imperial Hwy and
11201, 11255, 11301, 11338, and 11369 Long
Beach Blvd, Lynwood, California

# TABLE OF CONTENTS

**Page**

1.    Purchase and Sale; Excluded Liabilities ................................................................ 2

2.    Purchase Price. ...................................................................................................... 3

3.    Escrow and Title. .................................................................................................. 3

4.    Contingencies; Conditions Precedent to the Close of Escrow ........................... 4

5.    Deliveries to Escrow Holder ............................................................................... 8

6.    Deliveries upon Close of Escrow ........................................................................ 9

7.    Costs and Expenses .............................................................................................. 10

8.    Prorations .............................................................................................................. 10

9.    Covenants of Seller .............................................................................................. 12

10.    AS-IS Sale and Purchase .................................................................................... 12

11.    Seller's Representations and Warranties.............................................................. 14

12.    Buyer's Representations and Warranties .............................................................. 17

13.    Casualty and Condemnation ................................................................................ 17

14.    Notices .................................................................................................................. 18

15.    Bankruptcy Matters.............................................................................................. 19

16.    Termination; Waiver. ........................................................................................... 20

17.    Specific Enforcement; Limited Liability. ........................................................... 23

18.    Assignment ........................................................................................................... 23

19.    Exchange............................................................................................................... 24

20.    Confidentiality ..................................................................................................... 24

21.    Brokers .................................................................................................................. 24

22.    Commercially Reasonable Efforts ....................................................................... 25

23.    Adequate Assurances Regarding the Lease ......................................................... 25

24.    GOVERNING LAW; JURISDICTION................................................................ 25

25.    Miscellaneous ...................................................................................................... 26

## AGREEMENT OF PURCHASE AND SALE
## AND JOINT ESCROW INSTRUCTIONS

This Agreement of Purchase and Sale and Joint Escrow Instructions (the "**Agreement**"), dated as of _____ ___, 2021 (the "**Execution Date**"), is made by and between **QUARRY HEAD 2017-1 GRANTOR TRUST**, a Delaware statutory trust ("**Buyer**"), and **PLAMEX INVESTMENT, LLC**, a Delaware limited liability company ("**Seller**"), with reference to the following facts:

## RECITALS

A.      Seller commenced a Chapter 11 Case (the "**Chapter 11 Case**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**") on April 14, 2022 (the "**Petition Date**") in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "**Bankruptcy Court**").

B.      Seller owns that certain parcel of land more particularly described on <u>Exhibit "A"</u> attached hereto (the "**Land**") and the improvements thereon, commonly known as the Plaza Mexico shopping center containing a 403,242 square foot community shopping center located in the City of Lynwood (the "**City**"), County of Los Angeles (the "**County**"), California, and addressed at 3100, 3140, and 3170 E. Imperial Hwy and 11201, 11255, 11301, 11338, and 11369 Long Beach Blvd, Lynwood, California.

C.      Subject to the terms of this Agreement, Seller desires to sell and convey to Buyer and Buyer desires to purchase and acquire from Seller the following: (i) the Land and all rights, privileges, easements, strips and gores, mineral, oil, gas and other hydrocarbon substances thereon, and appurtenances benefiting the Land and/or the Improvements (collectively, the "**Real Property**"); (ii) all of Seller's interest in all improvements, structures, and apparatus located on the Land (the "**Improvements**"); (iii) excluding only those Leases (if any) which are Excluded Assets, all of Seller's interest as lessor in and to all leases, licenses and occupancy agreements covering the Real Property and/or the Improvements, and any new leases, modifications and supplements which may be entered into with Buyer's approval in accordance with this Agreement subsequent to the Execution Date (said leases and agreements, together with any and all amendments, modifications or supplements thereto, are hereinafter referred to collectively as the "**Leases**") with any tenant, licensee or occupant of thereof (together, the "**Tenants**" and, individually, a "**Tenant**"); (iv) all personal property, appliances, equipment, supplies and fixtures (collectively, the "**Personal Property**") owned by Seller and used or useful in the operation of the Real Property and/or the Improvements, including without limitation the Personal Property described on <u>Exhibit "J"</u> attached hereto; (v) all of Seller's right in the Assumed Contracts (as hereinafter defined); and (vi) to the extent assignable, all of Seller's rights, but not obligations, in any intangible property used or useful in connection with the foregoing, including without limitation building-specific trademarks and trade names, reports, test results, environmental assessments, as-built plans, specifications, surveys, deposits, contract rights, warranties, guaranties, licenses, permits, entitlements, governmental approvals and certificates of occupancy which benefit or relate to the Real Property, the Improvements, and/or the Personal Property (collectively, the "**Intangible Property**").    The Real Property, the Improvements, the Personal Property, Seller's interest under the Assumed Contracts (as such

term is defined herein), the Assumed Leases (as such term is defined herein) and the Intangible Property are collectively referred to herein as the "**Property**." For the avoidance of doubt the Property expressly excludes the Excluded Assets and Excluded Liabilities.

D.    Should Buyer be the Successful Bidder (as such term is defined herein), the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated pursuant to the Bid Procedures Order (as such term is defined herein) and the Sale Order (as such term is defined herein) to be entered in the Chapter 11 Case.

E.    Accordingly, and subject to the terms and conditions contained herein, and subject to higher and better offers as contemplated by the Bid Procedures Order (as defined herein), should Buyer be the Successful Bidder, and following the entry of the Sale Order (as defined herein), Seller shall sell, transfer and assign to Buyer, and Buyer shall purchase, acquire and accept from Seller, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Property, all as more specifically set forth herein and in the Sale Order.

F.    Certain initially-capitalized terms in this Agreement shall have their meaning as set forth in Exhibit "L" attached hereto.

NOW, THEREFORE, in consideration of the foregoing recitals, the representations, warranties and covenants set forth herein, and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENT

NOW, THEREFORE, in consideration of the covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Seller hereby agree as follows, and hereby instruct Escrow Holder as follows:

1.    Purchase and Sale; Excluded Liabilities.  Seller agrees to sell to Buyer, and Buyer agrees to purchase from Seller, the Property upon the terms and conditions set forth in this Agreement. In connection with the sale of the Property, under no circumstance shall Buyer assume or be obligated to pay, and none of the Property shall be or become liable for or subject to, any of the following liabilities and obligations (collectively, "**Excluded Liabilities**" or "**Retained Liabilities**"), which shall be and remain liabilities of Seller and shall expressly be excluded from the Property notwithstanding any provision to the contrary:

1.1    Liabilities accrued or arising from facts or circumstances prior to the Closing Date;

1.2    Liabilities or obligations associated with any and all indebtedness of Seller, including for borrowed money;

1.3    Liabilities or obligations arising under any Contracts that are not Assumed Contracts and any Leases that are not Assumed Leases (including all termination fees), including the Existing Property Management Agreement and any and all Affiliate Leases;

1.4 Liabilities or obligations arising out of or in connection with claims, litigation and/or proceedings (whether instituted prior to or after Closing) for acts or omissions by Seller or during its ownership that occurred, or arise from events that occurred, prior to the Closing Date;

1.5 Liabilities of Seller to the Internal Revenue Service or any other Governmental Authority, including those relating to Seller;

1.6 penalties, fines, settlements, interest, costs and expenses arising out of or incurred as a result of any presence or release of any Hazardous Substances at any location or any actual or alleged violation by Seller of any Legal Requirement and/or Environmental Law prior to the Closing Date;

1.7 Liabilities of Seller to any Person arising out of any act or omission under any Legal Requirement, including any Environmental Law;

1.8 Any Cure Amounts with respect to any Assumed Lease or Assumed Contract (unless expressly assumed by Buyer); and

1.9 any Excluded Taxes; and

1.10 any other liabilities of Seller that constitute "claims" as such term is defined in Section 101(5) of the Bankruptcy Code.

2. Purchase Price.Purchase Price. Buyer shall pay the sum of One Hundred Sixty-Two Million Five Hundred Thousand Dollars ($162,500,000.00) (the "**Purchase Price**") for the Property as hereinafter provided in this Section 2; provided, however, that should an Auction occur pursuant to the provisions of the Bid Procedures Order and should Buyer participate in and be the Successful Bidder at the Auction, the Purchase Price shall be the amount of Buyer's Successful Bid.

2.1.1 No Deposit. There shall be no bid deposit required of Buyer, even if in the event that there is an Auction under the Bid Procedures and Buyer elects to participate therein.[1]

2.1.2 Cash Balance. On the Closing Date (defined below), Buyer shall deposit with Escrow Holder cash by means of a confirmed wire transfer the amount of the balance of the Purchase Price, adjusted for Buyer's and Seller's respective shares of expenses and prorations as described herein.

3. Escrow and Title.

3.1 Opening of Escrow. Should Buyer be declared the Successful Bidder, Buyer and Seller shall promptly deliver a fully executed copy of this Agreement to Escrow Holder, and Escrow Holder shall promptly notify Buyer and Seller of the date of opening of

---

[1] **Note to Draft**: Template APA instead shall have deposit requirement of Qualified Bidders equal to 1% of their Bid.

Escrow.   Seller and Buyer shall execute and deliver to Escrow Holder any additional or supplementary instructions as may be reasonably necessary to implement the terms of this Agreement and close the transactions contemplated hereby, provided such instructions are consistent with and merely supplement this Agreement and shall not in any way modify, amend or supersede this Agreement.   Such supplementary instructions, together with the escrow instructions set forth in this Agreement, as they may be amended from time to time by the parties, shall collectively be referred to as the "**Escrow Instructions**."  In the event of a conflict between any standard escrow terms and provisions supplied by the Escrow Holder and this Agreement, this Agreement shall prevail.

   3.2 Close of Escrow/Closing.  For purposes hereof, the "**Close of Escrow**" or the "**Closing**" shall mean the date on which the Deed (defined below) is recorded in the Official Records of the County where the Land is located (the "**Official Records**").  The Close of Escrow shall occur at 1:00 p.m. California time not later than five (5) Business Days following the date (if any) on which all of the conditions set forth in Sections 4.3 and 4.4 are satisfied (other than conditions the fulfillment of which is to occur at the Closing) and Buyer has received written notice of the same, with the parties agreeing to reasonably cooperate to confirm in writing a specific date consistent with the same (the "**Closing Date**").

   3.3 Title Insurance.   At the Close of Escrow, Stewart Title Guaranty Company, 100 Pine Street, Suite 450, San Francisco, CA 94111-5106, Attention:  Marion Aaron or another title insurance company acceptable to Buyer in its sole and absolute discretion ("**Title Company**") shall be irrevocably prepared to issue to Buyer with an "effective date" as of the Close of Escrow an ALTA extended coverage Owner's Policy of Title Insurance (the "**Title Policy**") with liability in the amount of the Purchase Price, showing title to the Property vested in Buyer, subject only to, and without limiting Seller's express representations, warranties and covenants in this Agreement and the Closing documents (collectively, "**Seller's Warranties**"), the Permitted Encumbrances and otherwise in the form of the Approved Proforma.

   4. Contingencies; Conditions Precedent to the Close of Escrow.

   4.1 Buyer's Review.

   4.1.1 Delivery of Due Diligence Materials by Seller.   To the extent within the possession or control of Seller prior to the date that is five (5) Business Days before the Execution Date, Seller has made or will make available to Buyer for inspection, at Seller's expense on a data site available to Buyer, the categories of documents and materials identified on Exhibit "Q" attached hereto (collectively, the "**Due Diligence Items**").  Notwithstanding the foregoing, the Due Diligence Items shall not include any attorney-client privileged materials prepared by or on behalf of Seller.   Continuing until the entry of the Bid Procedures Order,[2] Buyer shall have the right to review and investigate the Due Diligence Items, the physical and environmental condition of the Property, the character, quality, value and general utility of the Property, the zoning, land use, environmental and building requirements and restrictions applicable to the Property, the state of title to the Property, and any other factors or matters

---

[2] **NTD**: This deadline for other bidders will be the Bid Deadline and will be addressed in the Bid Procedures. Accordingly, in the Template APA, this will be replaced by a provision expressly providing that the bid is not subject to any further due diligence.

relevant to Buyer's decision to purchase the Property.  In addition, Buyer shall have the right to enter and inspect the Property during reasonable business hours through closing as required in its reasonable discretion to confirm Buyer's closing conditions are satisfied.  Buyer shall provide Seller with at least two (2) Business Days' prior written notice of its desire to enter upon the Land and the Improvements for Tenant and/or Seller's personnel and property manager interviews, inspection and/or testing, and any such interviews, inspections or testing shall be conducted at a time and manner reasonably approved by Seller and to minimize disruption or interference with any Tenants.  Seller shall have the right to be present at any such interviews, inspections or testings, and Buyer will reasonably cooperate and coordinate with Seller to allow Seller's representative(s) to be present at any such interviews, inspection or test.  Prior to conducting any inspections or testing, Buyer and its consultants, shall deliver to Seller a certificate of insurance naming Seller as additional insured (on a primary, non-contributing basis), together with a copy of the additional insured endorsement, evidencing commercial general liability and property damage insurance with limits of not less than $2,000,000.00 in the aggregate for liability coverage and not less than $2,000,000.00 in the aggregate for property damage.  Notwithstanding the foregoing, Buyer shall not be permitted to undertake any air sampling or any physically intrusive or destructive testing of the Property, including, without limitation, a "Phase II" environmental assessment, without in each instance first obtaining Seller's prior written consent thereto, which consent Seller may give or withhold in Seller's sole and absolute discretion.  Buyer shall restore the Property to its original condition promptly after any and all testing and inspections conducted by or on behalf of Buyer.   Buyer hereby indemnifies, defends and holds Seller, Seller Parties and the Property harmless from any and all Claims (defined below) of any kind or nature to the extent arising out of or resulting from any entry and/or activities upon the Property by Buyer and/or Buyer's agents, employees, contractors or consultants (together, "**Buyer Parties**"); provided, however, such indemnification and defense obligation shall not be applicable to Buyer's mere discovery of any pre-existing adverse physical condition at the Property or any Claims arising out of the acts or omissions of Seller or its representatives.  Buyer's indemnification and defense obligations under this Section shall survive the Close of Escrow or any termination of this Agreement.   For the purposes of this Agreement, "**Seller Parties**" shall mean Seller's affiliates, subsidiaries, property manager, and their respective officers, directors, members, beneficiaries, and employees.  Buyer's obligations under this Section 4.1.1 shall survive the termination of this Agreement.

        4.1.2    <u>Leases and Contracts Generally</u>.  Attached hereto as <u>Exhibit __</u> is a schedule of all Leases of Seller as of the [date hereof] and all contracts of Seller related to the Property (the "**Contracts**") that contains, with respect to each Lease or Contract, as applicable, Seller's good-faith estimate of the Cure Amount with respect to each Lease or Contract, as applicable.  As required pursuant to the Bid Procedures Order, within five (5) Business Days after the entry of the Bid Procedures Order, or as soon as practicable thereafter, Seller shall file with the Bankruptcy Court in the Chapter 11 Case and serve the Cure Notice on each counterparty to a Lease or Contract related to the Property.  On or before _____ __, 2021 at __:00 _.m. (prevailing Pacific time), Buyer will provide Seller with a list of those Leases and Contracts that Buyer elects to have assumed and assigned (collectively, the "**Designated Leases/Contracts**") to Buyer at Closing pursuant to Section 365 of the Bankruptcy Court, subject to Buyer's right to add or delete Leases or Contracts in accordance with <u>Section 4.1.3</u> hereof.  Such schedule, once so delivered, shall be deemed to be <u>Schedule __</u> hereto (the "**Assumed/Assigned Lease and Contract Schedule**") and shall be subject to automatic

amendment as set forth in Section 4.13 hereof.  At the Sale Hearing, and with respect to all Designated Leases and Contracts on such Schedule as of such date, should Buyer be the Successful Bidder, Seller shall pursue the determination of the Cure Amount with respect each Designated Contract or Designated Lease and the assumption and assignment thereof to Buyer under Section 365 of the Bankruptcy Code, and Buyer shall be prepared to demonstrate its ability to provide adequate assurances as to its future performance thereunder as required pursuant to Section 365(f)(2) of the Bankruptcy Code, at the Sale Hearing.  At the Closing, but subject to Section 4.1.3 hereof, Seller shall assume and assign to Buyer all Designated Leases and Contracts, in each case pursuant to Section 365 of the Bankruptcy Code and the Sale Order, subject to provision by Buyer of adequate assurances as may be required under Section 365(f)(2) of the Bankruptcy Code and payment or assumption of all Cure Amounts in respect of such Designated Leases and Contracts as contemplated hereby.

        4.1.3    Additional and Eliminated Leases and Contracts. Notwithstanding anything in this Agreement to the contrary, Buyer, from time to time and in its sole and absolute discretion, may amend or revise the Assumed/Assigned Lease and Contract Schedule in order to add or eliminate any Lease or Contract from such Schedule up to one (1) Business Day prior to the Closing Date ("**Designation Deadline**").  Automatically upon the addition of any Lease or Contract to such Schedule by Buyer in accordance with the previous sentence, it shall be an assumed and assigned Lease or Contract, as applicable, for all purposes of this Agreement, and Seller shall take such steps as are reasonably necessary, assuming payment or assumption of the related Cure Amount and subject to the provision by Buyer of adequate assurances of future performance, to cause such Lease or Contract to be assumed and assigned to Buyer as promptly as possible on or after the Closing Date; provided, however, Seller shall not be required to assume and assign any such added Lease or Contract unless and until the Bankruptcy Court, whether as part of the Sale Order or in any separate Order, enters an Order approving such assumption and assignment (a "**Stand-Alone Assumption/Assignment Order**").  Automatically upon the deletion of any Lease or Contract from the Assumed/Assigned Lease and Contract Schedule by Buyer in accordance with the first sentence of this Section 4.1.3, such Lease or Contract, as well as any other Lease or Contract not set forth or deemed set forth on such Schedule, shall be an Excluded Asset (and all liabilities thereunder shall be Excluded Liabilities) for all purposes of this Agreement.  All such Excluded Leases or Contracts shall be deemed rejected by Seller under Section 365 of the Bankruptcy Code as of the Closing Date. Each Lease assumed and assigned pursuant to the provisions of Section 4.1.2 or Section 4.1.3 hereof shall be an "Assumed Lease," and each Contract assumed and assigned pursuant to the provisions of Section 4.1.2 or Section 4.1.3 hereof shall be an "Assumed Contract."

        4.1.4    Cure Amounts.  All Cure Amounts shall be paid from the Purchase Price or, at the discretion of Buyer, shall be expressly assumed by Buyer (such as a non-segregated Tenant security deposit) and credited against the Purchase Price.

        4.2    Mandatory Cure Exceptions.  Without in any manner whatsoever limiting the effect of the Sale Order and its provisions, Seller shall be required as an affirmative covenant of Seller under this Agreement to use its commercially reasonable efforts to remove (or endorse over to Buyer's sole satisfaction) (i) any liens secured by deeds of trust entered into or assumed by Seller, mechanics' liens or exceptions for the same (including inchoate liens) relating to work contracted for or assumed by Seller, judgment liens against Seller, and delinquent real property

taxes and assessments, (ii) any exceptions relating to Seller's authority to consummate the Transaction, (iii) any liens, exceptions or encumbrances arising out of a breach of any covenant by Seller under this Agreement herein or which Seller has notified Buyer that it will remove or so endorse over (collectively, the "**Mandatory Cure Exceptions**").

4.3     <u>Buyer's Conditions Precedent to Closing</u>:   The Close of Escrow and Buyer's obligations with respect to the transactions contemplated by this Agreement are subject to the satisfaction or waiver of the following conditions:

4.3.1     <u>Title Policy</u>.  On or before the Closing Date, Title Company shall have irrevocably committed to issue to Buyer as of the Close of Escrow the Title Policy described in Section 3.3.

4.3.2     <u>Seller's Performance</u>.  On or before the Closing Date, Seller shall have duly performed in all material respects each and every covenant of Seller hereunder.

4.3.3     <u>Accuracy of and No Breach of Representations and Warranties</u>. All representations and warranties made by Seller in Section 11.1 shall be true and correct in all material respects as of the Execution Date and the Closing Date, subject to Section 11.2.

4.3.4     <u>Satisfactory Evidence of Lease and Contract Assumption</u>.  On or before a date that is two (2) Business Days prior to the Closing Date, Buyer shall have received reasonably satisfactory evidence, whether as a result of the provisions and entry of the Sale Order, the provisions and entry of the Stand-Alone Assumption/Assignment Orders, if any, Buyer's receipt of executed estoppel certificates substantially in the form of <u>Exhibit "H"</u>  hereto (or otherwise in form and substance reasonably satisfactory to Buyer), or otherwise, that there are no material issues as to Cure Amounts or the other aspects of the assumption and assignment of (a) the Leases collectively demising no less than eighty percent (80%) of the leased space of the Property or (b) the material Contracts set forth of <u>Schedule 4.3.4</u> hereof.

4.3.5     <u>No Adverse Change</u>.  There has been no material adverse change to the Property since the date of this Agreement, including any casualty.

4.3.6     <u>Bankruptcy Court Approval</u>. The Bankruptcy Court shall have found Buyer to be the Successful Bidder and, in connection therewith, shall have entered the Sale Order, and such Sale Order shall be a Final Order (unless such Final Order requirement is waived by Buyer in its sole discretion).

4.3.7     <u>Outside Closing Date</u>.  Except to the extent a material default by Buyer under this Agreement is the cause of the delay, the Closing occurs on or before March 31, 2022 (or such later date up to 30 days after March 31, 2022 as agreed to in writing by Seller and Buyer).

For avoidance of doubt, and without limiting the termination provisions of <u>Section 15</u> hereof, Buyer's obligations with respect to the transactions contemplated by this Agreement are subject to the satisfaction of the conditions precedent to such obligations for Buyer's benefit set forth in this Section 4.3.

        4.4    <u>Conditions Precedent to Seller's Obligations</u>.  The Close of Escrow and Seller's obligations with respect to the transactions contemplated by this Agreement are subject to the timely satisfaction or waiver of the following conditions:

        4.4.1    <u>Buyer's Performance</u>.  Buyer shall have duly performed in all material respects each and every covenant of Buyer hereunder, including without limitation, Buyer's timely delivery of the Purchase Price pursuant to the provisions of Section 2 above; and

        4.4.2    <u>Accuracy; No Breach of Representations and Warranties</u>. Buyer's representations and warranties set forth in this Agreement shall be true and correct in all material respects as of the Execution Date and the Closing Date.

        4.4.3    <u>Bankruptcy Court Approval</u>. The Bankruptcy Court shall have found Buyer to be the Successful Bidder and, in connection therewith, shall have entered the Sale Order, and no order staying, reversing, modifying, or amending the Sale Order shall be in effect as of the Closing Date, unless consented to by Seller.

For avoidance of doubt, and without limiting the termination provisions of <u>Section 15</u> hereof, Seller's obligations with respect to the transactions contemplated by this Agreement are subject to the satisfaction of the conditions precedent to such obligations for Seller's benefit set forth in this Section 4.4.

        5.    <u>Deliveries to Escrow Holder</u>.

        5.1    <u>Seller's Deliveries</u>.  Seller hereby covenants and agrees to deliver or cause to be delivered to Escrow Holder by no later than the Closing Date the following instruments and documents, the delivery of each of which shall be a condition to the Close of Escrow: (i) a Grant Deed (the "**<u>Deed</u>**") in the form of <u>Exhibit "B"</u> attached hereto, duly executed and acknowledged in recordable form by Seller; (ii) a certificate duly executed by Seller in the forms of <u>Exhibit "C"</u> attached hereto and a California Form 593 (the "**<u>Tax Certificates</u>**"); (iii) two (2) counterparts of the Assignment of Leases as to the Assumed Leases in the form of <u>Exhibit "D"</u> attached hereto (the "**<u>Lease Assignment</u>**"); (iv) a Bill of Sale ("**<u>Bill of Sale</u>**") duly executed by Seller in the form attached hereto as <u>Exhibit "E"</u>; (v) a General Assignment duly executed by Seller in the form of <u>Exhibit "F"</u> attached hereto (the "**<u>General Assignment</u>**"); (vi) two (2) counterparts of the Assignment of Contracts as to the Assumed Contracts in the form of <u>Exhibit "I"</u> attached hereto (the "**<u>Contract Assignment</u>**"); (vii) two (2) counterparts of an escrow holdback agreement in the form attached as <u>Exhibit "M"</u> (the "**<u>Escrow Holdback Agreement</u>**") which will provide for 2% of the Purchase Price to be held in escrow for the Survival Period as security for Seller's post-Closing obligations under this Agreement and the Closing documents, (viii) a letter ("**<u>Tenant Notice Letter</u>**") in form reasonably approved by Buyer, signed by Seller addressed to Tenants under the Leases assigned to Buyer advising Tenants of the sale of the Property to Buyer, the transfer or assumption of the security deposits to or by Buyer, and directing that all future rent payments and other charges under the Leases be forwarded to Buyer; (ix) a letter ("**<u>Vendor Notice Letter</u>**") in form reasonably approved by Buyer, signed by Seller addressed to all vendors under the Assumed Contracts advising the vendors of the sale of the Property to Buyer; (x) an owner's affidavit and gap indemnity as required by Title Company to issue the Title Policy; (xi) a settlement statement ("**<u>Settlement Statement</u>**") in form approved by the parties consistent with

this Agreement; (xii) a certified copy of the Sale Order; (xiii) without in any manner whatsoever limiting the effect of the Sale Order and its provisions, (a) a termination, waiver of lien and subordination agreement executed by Greenland Property Management with respect to the Existing Property Management Agreement in form reasonably acceptable to Buyer and (b) a termination, together with a release of any Tenant damage claims and a Tenant commitment to vacate the Property, of the Affiliate Leases, each in form and substance reasonably satisfactory to Buyer; and (xiv) such other documents reasonably required by Title Company to consummate the Closing, including any transfer tax affidavits, and such proof of Seller's authority and authorization to enter into this Agreement and the transactions contemplated hereby, and such proof of the power and authority of the individual(s) executing any instruments on behalf of Seller to act for and bind Seller, as may be reasonably required by Title Company.

       5.2    <u>Buyer's Deliveries</u>.  Buyer agrees to deliver or cause to be delivered to Escrow Holder by no later than the Closing Date the following funds, instruments and documents, the delivery of each of which shall be a condition to the Close of Escrow: (i) on the Closing Date, the Purchase Price, plus such additional funds, if any, necessary to comply with Buyer's obligations hereunder regarding prorations, credits, costs and expenses,[3]; (ii) two (2) counterparts of the Lease Assignment duly executed by Buyer; (iii) the Settlement Statement; (iv) two (2) counterparts of the Contract Assignment duly executed by Buyer; (v) two (2) counterparts of the Escrow Holdback Agreement duly executed by Buyer; and (v) such other documents reasonably required by Title Company to consummate the Closing, including any transfer tax affidavits, and such proof of Buyer's authority and authorization to enter into this Agreement and the transactions contemplated hereby, and such proof of the power and authority of the individual(s) executing any instruments on behalf of Buyer to act for and bind Buyer, as may be reasonably required by Title Company.

       6.    <u>Deliveries upon Close of Escrow</u>.  Upon the Close of Escrow, and provided Escrow Holder is unconditionally committed to issue the Title Policy as of the Close of Escrow, Escrow Holder shall promptly undertake all of the following:  (i) file the information return for the sale of the Property required by the Internal Revenue Code of 1986, as amended, and the regulations thereunder; (ii) prorate all matters referenced in Section 8 based upon the statement delivered into Escrow signed by the parties; (iii) cause the Deed and any other documents which the parties hereto may direct, to be recorded in the Official Records in the order directed by the parties; (iv) disburse from funds deposited by Buyer with Escrow Holder towards payment of all items and costs (including, without limitation, the Purchase Price subject to retention by Escrow Holder of 2% of the Purchase Price in accordance with the Escrow Holdback Agreement) chargeable to the account of Buyer pursuant hereto in payment of such items and costs and disburse the balance of such funds, if any, to Buyer; (v) deliver to Seller counterpart originals of the Escrow Holdback Agreement, Lease Assignment and the Contract Assignment executed by Buyer, the final Settlement Statement and a conformed copy of the recorded Deed; (vi) deliver to Buyer an original of the Bill of Sale, General Assignment, Tax Certificates, Vendor Notice and Tenant Notice, and counterpart originals of the Escrow Holdback Agreement, Lease Assignment and the Contract Assignment executed by Seller, the final Settlement Statement, a conformed copy of the recorded Deed, and, when issued, the Title Policy; (vii) direct the Title Company to issue the Title Policy to Buyer; and (viii) deduct all items chargeable to the account of Seller

---

[3] **NTD**: APA Template will provide for the deduction of the <mark>Deposit</mark> here.

pursuant to <u>Section 7</u>. If, as the result of the net prorations and credits pursuant to <u>Section 8</u>, amounts are to be charged to the account of Seller, deduct the total amount of such charges; and if amounts are to be credited to the account of Seller, disburse such amounts to Seller, or in accordance with Seller's instructions, at Close of Escrow.

7.    <u>Costs and Expenses</u>. Seller shall pay through Escrow (i) the Title Policy premium inclusive of that for ALTA owner's extended coverage and all endorsements reasonably requested by Buyer, (ii) all documentary transfer taxes, if any are owing,[4] (iii) one-half (½) of the Escrow Holder's fee, (iv) the costs for Seller to cure any title matters it is obligated to or agrees to remove or insure over pursuant to this Agreement ("**Seller's Title Cure Charges**"), (iv) all excise, transfer and use taxes imposed with respect to the conveyance of the Personal Property, if any are owing, and (v) the fee for recording the Deed. Buyer shall pay through Escrow (a) all document recording charges other than recording the Deed, if any are owing, and (b) one-half (½) of the Escrow Holder's fee. Buyer shall pay outside of Escrow all costs and expenses related to its inspection of the Property, including any Survey expenses, and, subject to Buyer's Expense Reimbursement, each party shall pay its own legal and professional fees and costs of attorneys and other consultants and agents retained by such party in connection with the execution of this Agreement. For the avoidance of do doubt, all Cure Amounts ordered by the Bankruptcy Court after hearing as required under Section 365 of the Bankruptcy Code with respect to the assumption and assignment of the Leases and the Contracts (to the extent that such Cure Amounts have not been expressly assumed by Buyer) shall be paid from the Purchase Price, and any Expense Reimbursement owing to Buyer shall be paid separately.

8.    <u>Prorations</u>. The following prorations between Seller and Buyer shall be made by Escrow Holder computed as of the Close of Escrow:

8.1    <u>Taxes and Assessments</u>. All real estate and personal property taxes and assessments attributable to the Property will be prorated at Closing. Seller shall be charged with all such taxes and assessments up to, but not including, the Closing Date, and Seller shall be responsible for any supplemental taxes assessed before or after the Closing to the extent relating to Seller's period of ownership. If the applicable tax rate and assessments for the Property have not been established for the year in which Closing occurs, the proration of real estate and/or personal property taxes and assessments, as the case may be, will be based upon the rate and assessments for the preceding year.

8.2    <u>Lease Rentals</u>. All non-delinquent collected rents (including all accrued tax and operating expense pass-throughs), charges and revenue of any kind receivable from the Leases will be prorated at Closing. Seller will receive all collected rents (including all accrued tax and operating expense pass-throughs), charges and other revenue of any kind receivable from the Leases up to, but not including, the Closing Date. No proration will be made with respect to any uncollected rents or delinquent rents of any kind receivable from the Leases for any period before Closing. All amounts collected by Buyer subsequent to Closing relating to delinquent rents will be promptly remitted to Seller; provided, however, all rents received by Buyer after

---

[4] **NTD**: Section 1126(a) of the Bankruptcy Code provides that, if a Sale is closed in connection with the confirmation of plan of liquidation for the Debtors, the making or delivery of an instrument of transfer under such a confirmed plan may not be boxed under any <mark>law</mark> imposing a stamp tax or similar tax.

Closing will be applied first to the rental period in which the Closing occurred, second to any current rental period following the Closing and third to satisfy delinquent rental obligations for any period before Closing not prorated at Closing.  Seller will retain all ownership rights relating to any such delinquent rents but in no event may Seller try to collect directly from any Tenant or commence any action against the Tenants, and specifically excluding any action for unlawful detainer or other action seeking to terminate such Tenant's occupancy of its premises.  Buyer agrees that for a period of six (6) months after Closing it will bill Tenants for, and collect, delinquent rents in accordance with Buyer's normal billing and collections procedures, which obligation shall survive the Closing.  In no event shall Buyer be required to terminate any Lease or litigate with any Tenant in collecting delinquent rent.  Notwithstanding the foregoing, if any of such operating expenses and other charges and expenses or other additional rents are payable by Tenants (collectively, the "**Tenant Charges**") on an estimated basis, then the Tenant Charges shall be reconciled against actual charges as of and at the Closing, to the extent then possible, as provided below in Section 8.4.

        8.3    <u>Security Deposit</u>.  Buyer shall be credited and Seller shall be charged with the balance of the security deposit then held by Seller under the Leases.  In the event that Seller holds any letters of credit as a tenant security deposit, then prior to the Closing Seller shall (i) execute and deliver to Escrow Holder such assignment and/or transfer documents as may be called for and required under such letters of credit for the transfer of such letters of credit to Buyer, and (ii) at Buyer's option, either deliver into Escrow or deliver to Buyer, upon confirmation of the Closing, the originals of such letters of credit.  Seller shall be responsible for the amount of the transfer fee required under such letters of credit.

        8.4    <u>Operating Expenses</u>.  Any common area maintenance expenses, elevator maintenance expenses, utility expenses, expenses related to any recorded encumbrances, taxes and other than real estate taxes such as rental taxes, other expenses incurred in operating the Property that Seller pays and that are not paid by the Tenants on an estimated or other basis, and any other costs incurred in the ordinary course of business or the management and operation of the Property not so paid by the Tenants, shall be prorated on an accrual basis.  Seller shall pay all such expenses that accrue prior to the Close of Escrow and Buyer shall pay all such expenses accruing on the Close of Escrow and thereafter.  Seller and Buyer shall cooperate to complete the reconciliation of the aforementioned expenses and Tenant Charges with the Tenants in accordance with their Leases and Seller shall provide Buyer with access to all applicable records.  Notwithstanding anything herein to the contrary, (a) if any amounts are owed by Tenants for the aforementioned items for periods prior to Closing, Buyer shall have no obligation to pay such amounts to Seller until actually collected by Buyer and (b) Seller shall be responsible for reconciliation of Tenant Charges and any refunds due tenants under the Leases with respect to all periods prior to Closing.  Buyer agrees that for a period of six (6) months after Closing it will bill Tenants for, and collect, delinquent Tenant Charges owed in accordance with Buyer's normal billing and collections procedures, which obligation shall survive the Closing.  In no event shall Buyer be required to terminate any Lease or litigate with any Tenant in collecting delinquent Tenant Charges.

        8.5    <u>Leasing Costs</u>.  If the Closing occurs, (a) Seller shall be responsible and shall pay for and/or credit Buyer, as applicable (and with Buyer entitled to seek reimbursement from Seller after Closing if such costs are billed to Buyer after Closing), for the costs of all rent

abatements and/or free rent coming due after Closing, tenant improvement work or allowances, third-party leasing commissions and other leasing costs (collectively, the "**Leasing Costs**") relating to the existing term of those Leases executed as of the Execution Date, and (b) Buyer shall be responsible and shall pay for the Leasing Costs relating to or arising from (i) the exercise by any Tenant, after the Execution Date, of a renewal, expansion or extension option contained in any of the Leases executed as of the Execution Date and (ii) any Property Contract Modification entered into with Buyer's consent after the Execution Date in accordance with the terms of Section 9 below.  If, on the Closing, there are any outstanding or unpaid Leasing Costs which are the responsibility of Seller as set forth herein, then on the Closing Buyer shall be entitled to a credit toward the payment of the Purchase Price at Closing in the amount of such unpaid Leasing Costs, and following the Closing Buyer shall assume and be responsible for the payment of such Leasing Costs to the extent of such credit.

At least four (4) Business Days prior to the Close of Escrow, the parties shall endeavor to agree upon all of the prorations to be made and submit a Settlement Statement to Escrow Holder setting forth the same.  In the event that any prorations, apportionments or computations made under this Section 8 shall require final adjustment, then the parties shall make the appropriate adjustments promptly when accurate information becomes available and either party hereto shall be entitled to an adjustment to correct the same, but in no event, other than for adjustment of property taxes and reconciliation of Tenant Charges under the Leases, shall such final adjustment occur later than one year following the Close of Escrow.  Any corrected adjustment or proration shall be paid in cash to the party entitled thereto within ten (10) days after completion of the reconciliation.  The provisions of this Section 8 shall survive the Close of Escrow.

9.    Covenants of Seller.  From the Execution Date until the Close of Escrow, Seller shall insure, comply with the Leases and Contracts and operate and manage the Property in the ordinary course and consistent with Seller's past practices and not enter into any new Leases. Seller shall provide to Buyer prior written notice of any new Lease amendment or contract pertaining to the Property (each, a "**Property Contract Modification**") desired to be entered into by Seller together with a true and correct, complete copy of such proposed Property Contract Modification together with a summary of any applicable Leasing Costs.  (a) Buyer shall have the right to approve or disapprove of the proposed Property Contract Modification in its sole discretion, and (b) Buyer shall endeavor within three (3) Business Days after receipt from Seller of the proposed Property Contract Modification to deliver to Seller written notice (the "**Property Contract Modification Notice**") that Buyer either approves or disapproves of the proposed Property Contract Modification delivered to Buyer, with failure to respond within such period constituting deemed disapproval.

10.    AS-IS Sale and Purchase.  As a material inducement to Seller to enter into this Agreement and to convey the Property to Buyer, Buyer hereby acknowledges and agrees that:

10.1    AS-IS.  Except as otherwise expressly set forth in this Agreement, and subject to Seller's Warranties, Buyer is purchasing the Property in its existing condition, "AS-IS, WHERE-IS, WITH ALL FAULTS," and upon the Closing Date has made or has waived all inspections and investigations of the Property and its vicinity which Buyer believes are necessary to protect its own interest in, and its contemplated use of, the Property.

10.2    <u>No Representations</u>.    Other than Seller's Warranties, neither Seller, nor any Seller Parties have made any representation, warranty, inducement, promise, agreement, assurance or statement, oral or written, of any kind to Buyer upon which Buyer is relying, or in connection with which Buyer has made or will make any decisions concerning the Property or its vicinity including, without limitation, its use, condition, value, compliance with Governmental Regulations, the existence or absence of Hazardous Substances, or the permissibility, feasibility, or convertibility of all or any portion of the Property for any particular use or purpose, including, without limitation, its present or future prospects for sale, lease, development, occupancy or suitability as security for financing.    Subject to Seller's Warranties, Buyer further acknowledges and agrees that Seller, unless otherwise required by law, is under no duty to make any affirmative disclosures regarding any matter which may be known to Seller.    As used herein, the term "**<u>Governmental Regulations</u>**" means any laws (including Environmental Laws), rules and regulations of any governmental or quasi-governmental body or agency claiming jurisdiction over the Property.    "**<u>Environmental Laws</u>**" shall mean all federal, state and local laws, rules and regulations now or hereafter in force, as amended from time to time, in any way relating to human health or safety, or industrial hygiene or environmental conditions, or protection of the environment, or pollution or contamination of the air, soil, surface water or groundwater. "**<u>Hazardous Substances</u>**" shall mean any substance or material that is described as a toxic or hazardous substance, waste or material or a pollutant, or words of similar import, in any of the Environmental Laws.

10.3    <u>No Implied Warranties</u>.    Excluding Seller's Warranties, Seller hereby specifically disclaims:    (a) all warranties implied by law arising out of or with respect to the execution of this Agreement, any aspect or element of the Property, or the performance of Seller's obligations hereunder including, without limitation, all implied warranties of merchantability, habitability and/or fitness for a particular purpose; and (b) any warranty, guaranty or representation, oral or written, past, present or future, of, as to, or concerning (i) the nature and condition of the Property or other items conveyed hereunder, including, without limitation, the water, soil, and geology, the suitability thereof and of the Property or other items conveyed hereunder for any and all activities and uses which Buyer may elect to conduct thereon, the existence of any environmental hazards or conditions thereon (including but not limited to the presence of asbestos or other Hazardous Substances) or compliance with applicable Governmental Regulations; and (ii) the nature and extent of any right-of-way, Lease, possession, lien, encumbrance, license, reservation,  condition or otherwise.

10.4    <u>Information Supplied by Seller</u>.    Buyer specifically acknowledges and agrees that, except for Seller's Warranties, the Seller has made no representation or warranty of any nature concerning the accuracy or completeness of any documents delivered or made available for inspection by Seller to Buyer, including, without limitation, the Due Diligence Items, and that Buyer has undertaken such inspections of the Property as Buyer deems necessary and appropriate and that Buyer, except for the Seller's Warranties, is relying solely upon such investigations and not on any of the Due Diligence Items or any other information provided to Buyer by or on behalf of Seller.

10.5    <u>Natural Hazard Disclosure</u>.  Buyer and Seller acknowledge that Seller may be required to disclose if any of the Property lies within certain natural hazard areas or zones. Buyer acknowledges that Seller will employ the services of Disclosure Source (**the "<u>Natural</u>**

**Hazard Expert**") to examine the maps and other information specifically made available to the public by government agencies and to report the results of its examination to Buyer in writing. Subject to Seller's Warranties, the written report prepared by the Natural Hazard Expert regarding the results of its examination fully and completely discharges Seller from its disclosure obligations referred to herein, and, for the purposes of this Agreement, the provisions of Civil Code Section 1103.4 regarding the non-liability of Seller for errors and/or omissions not within its personal knowledge shall be deemed to apply, and the Natural Hazard Expert shall be deemed to be an expert dealing with matters within the scope of its expertise with respect to the examination and written report regarding the natural hazards referred to above.

        10.6    <u>Survival</u>.    Section 10 shall survive the Closing or termination of this Agreement.

       11.    <u>Seller's Representations and Warranties</u>.

        11.1    <u>Representations and Warranties</u>.  Seller represents and warrants to Buyer, as of the Execution Date and as of Closing, as follows:

        11.1.1    <u>Formation; Authority</u>.  Seller is (i) duly organized, validly existing and in good standing under the Governmental Regulations of the State of Delaware and (ii) duly qualified to do business and in good standing in the state of California.  Subject to entry of the Bid Procedures Order (as to the matters set forth therein such as the Expense Reimbursement) and the entry of the Sale Order (as to all other matters), the execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby are within the power and authority of Seller and, if applicable, have been duly authorized by all necessary action on the part of Seller.  This Agreement has been duly executed and delivered by Seller and, subject to entry of the Bid Procedures Order (as to the matters set forth therein) and the entry of the Sale Order (as to all other matters), is a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except to the extent that enforcement of the rights and remedies created thereby is subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws of general application affecting the rights and remedies of creditors and to general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law). Seller has the full power and authority necessary to own, lease, operate and use the Property.

        11.1.2    <u>No Conflicts</u>.  Subject to the entry of the Bid Procedures Order (as to the matters set forth therein) and/or the entry of the Sale Order (as to all other matters), neither the execution of this Agreement nor the consummation of the transactions contemplated in this Agreement will constitute a violation of, be in conflict with, or constitute a default under any term or provision of any agreement or other instrument to which Seller is bound.

        11.1.3    <u>Leases</u>.  Other than the Leases listed on <u>Exhibit "G"</u> there are no leases (recorded or unrecorded), licenses or other similar occupancy agreements with respect to the leasing or occupancy of the Property. A true, correct and complete copies of the Leases has been made available to Buyer.  There is no uncured default by any Tenant or, to Seller's knowledge, by Seller, as landlord, under the Leases except as set forth in any Cure Notice to be provided as set forth herein and in the Bid Procedures Order.

11.1.4    <u>Legal Requirements</u>.  Except solely as qualified by all matters set forth in the Due Diligence Items as of the Execution Date, Seller has not received any written notice from any governmental agency that (i) the Property or any condition existing thereon or any present use thereof violates any Governmental Regulations or (ii) in the case of an environmental condition requires any investigation or remediation under any Governmental Regulations.  Whether or not Seller has received any such notice, there are no existing conditions or uses of the Property that, with the passage of time or notice or both, would constitute a material violation of any Legal Requirement.

11.1.5    <u>Litigation</u>.    Seller has not received written notice of any litigation, arbitration or other legal or administrative suit, action, proceeding or investigation of any kind pending or threatened against or involving Seller or any Tenant relating to the Property or any part thereof, including, but not limited to, any condemnation action relating to the Property or any part thereof, which has not been adjudicated or dismissed prior to the Execution Date.

11.1.6    <u>Foreign Person</u>.  Seller is not a "foreign person" as defined in Section 1445 of the Internal Revenue Code of 1986, as amended, and the regulations thereunder.

11.1.7    <u>Bankruptcy</u>.    No attachments, execution proceedings, assignments for the benefit of creditors, insolvency, bankruptcy, reorganization or other proceedings are pending, or, to Seller's knowledge, threatened, against any Tenant under the Leases.

11.1.8    <u>Contracts</u>.   There are no Contracts that will be binding on Buyer or the Property after Closing except as set forth on the schedule attached hereto as Exhibit 1 to <u>Exhibit "I"</u> attached hereto.

11.1.9    <u>Preferential Rights</u>.  Seller has not granted any options or rights of first refusal or rights of first offer to third parties to purchase or otherwise acquire an interest in the Property which remain in effect that cannot be extinguished pursuant to the Sale Order.

11.1.10    <u>OFAC</u>.  Seller is not a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including those named on OFAC's Specially Designated Nationals and Blocked Persons List) or under any statute or executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism).

11.1.11    <u>Unpaid Leasing Costs</u>.  As of the Closing Date, there will be no unpaid or unsatisfied Leasing Costs.

11.1.12    <u>Title</u>.  Seller has good and marketable title to all of the Property, whether real or personal property and whether tangible or intangible.  Subject to entry of the Sale Order, Buyer will be vested with title to the Property, free and clear of all Encumbrances, other than Permitted Encumbrances, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

11.1.13    <u>Material Physical Changes</u>.  Except solely as qualified by all matters set forth in the Due Diligence Items as of the Execution Date, there have been no material physical changes to the Property from the description thereof shown on the Existing Survey that would have a material adverse effect on the value, operation, or other use of the Property.

11.2    <u>Subsequent Changes</u>.  If Seller first becomes aware after the Execution Date, but prior to the Closing, of any fact or circumstance which would result in a breach of one of its representations or warranties contained herein, then Seller will promptly give Buyer notice of such changed fact or circumstance.  Without in any manner limiting the provisions of <u>Section 16.1(d)</u> hereof (whether as to the breach of other representations and warranties or otherwise), upon Buyer having actual knowledge of any fact or circumstance which results in a breach of one of Seller's representations or warranties contained herein, Buyer, as its sole remedy, shall have the option, by written notice to Seller within a reasonable period thereafter of (i) waiving the breach of the representation or warranty and proceeding with the Close of Escrow, or (ii) terminating this Agreement.[5]  Any such election shall be made by Buyer not later than ten (10) Business Days after Buyer's receipt of a written notice from Seller to Buyer (x) disclosing such fact or circumstance and (y) stating that such notice is being delivered under <u>Section 11.2</u> of the Agreement.  If Buyer does not so timely elect to terminate this Agreement, then Buyer shall be deemed, to have elected to waive its rights to terminate this Agreement by reason of the existence of such fact or circumstance, elected to acquire the Property on the terms set forth in this Agreement, and waived all remedies at law or in equity with respect to any representations or warranties resulting from the facts or circumstances disclosed by Seller in its notice to Buyer.

11.3    <u>Seller's Knowledge</u>.  Whenever phrases such as "**to Seller's knowledge**" or "**Seller has no knowledge**" or similar phrases are used herein, they will be deemed to refer exclusively to matters within the current actual (as opposed to constructive) knowledge of Donald Chae, Estelle Chae, Justin Chae, Thomas Lee, Mary Marcial, Clayton Tanaka, or Luis Valenzula (each, a "**<u>Seller's Representative</u>**").  No duty of inquiry or investigation on the part of Seller or Seller's Representative will be required or implied by the making of any representation or warranty which is so limited to matters within Seller's actual knowledge, and Buyer agrees and acknowledges that in no event shall Seller's Representative have any personal liability therefor. Seller represents and warrants that the Seller's Representative is the person affiliated with Seller most knowledgeable regarding the matters described in the representations of Seller set forth in this Agreement.

11.4    <u>Survival</u>.  All of the representations and warranties of Seller contained herein, and any representations and warranties of Seller contained in any document delivered to Buyer at Closing, shall not be deemed to have merged with the Grant Deed and will survive Closing for a period of six (6) months after the Closing Date ("**<u>Survival Period</u>**").  No claim for a breach of any representation or warranty of Seller will be actionable or payable if (i) Buyer does not notify Seller in writing of such breach and commence a "legal action" thereon within the Survival Period, or (ii) the breach in question results from or is based on a condition, state of facts or other matter which was actually known to Buyer prior to Closing and Buyer elects to consummate the Closing.

---

[5] **NTD**: Template APA will require return of the <mark>Deposit</mark> here.

12.    Buyer's Representations and Warranties.  In addition to any express agreements of Buyer herein, Buyer represents and warrants to Seller as of the Execution Date, and as of the Closing Date, as follows:

12.1    Formation; Authority.   Buyer is duly organized, validly existing and in good standing under the laws of the State of Delaware. The execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby are within the power and authority of Buyer and have been duly authorized by all necessary action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer and is a legal, valid and binding obligation of Buyer, enforceable against Buyer  in accordance with its terms.

12.2    No Conflicts.    Neither the execution of this Agreement nor the consummation of the transactions contemplated in this Agreement will constitute a violation of, be in conflict with, or constitute a default under any term or provision of any agreement or other instrument to which Buyer is bound.

12.3    OFAC.  Buyer is not a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of OFAC of the Department of the Treasury (including those named on OFAC's Specially Designated Nationals and Blocked Persons List) or under any statute or executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism).

12.4    Survival.  All of the representations and warranties of Buyer contained herein, and any representations and warranties of Buyer contained in any document delivered to Seller at Closing, shall not be deemed to have merged with the Deed and will survive Closing for the Survival Period.  No claim for a breach of any representation or warranty of Buyer will be actionable or payable if (i) Seller does not notify Buyer in writing of such breach and commence a "legal action" thereon within the Survival Period, or (ii) the breach in question results from or is based on a condition, state of facts or other matter which was actually known to Seller prior to Closing.

13.    Casualty and Condemnation.

13.1    Casualty.  In the event that after the Execution Date and prior to the Closing there is any damage to the Property or any part thereof due to a casualty, Seller shall promptly notify Buyer of the same and Seller in its sole discretion may elect as an affirmative covenant of Seller under this Agreement to repair or replace such damage lien free to its condition existing prior to the damage.  However, in the event that (a) Seller elects not to repair or replace such damage (or fails to repair or replace such damage) prior to Closing to its condition prior to the damage, (b) any Tenant would have the right to terminate its Lease under a right given to such Tenant under its Lease or (c) the reasonably estimated cost to repair the damage exceeds five percent (5%) of the Purchase Price, then Seller shall notify Buyer in writing of such fact and then Buyer shall have the right, exercisable by giving written notice to Seller within ten (10) Business Days after receiving written notice of such damage from Seller, (i) to

terminate this Agreement in which event,[6] any documents in Escrow shall be returned to the party depositing the same, and thereafter neither party shall have any further rights or obligations hereunder except for the parties' obligations under this Agreement that by their terms expressly survive the termination of this Agreement, or (ii) to accept the Property in its then condition and to proceed with the consummation of the transaction contemplated by this Agreement with an abatement or reduction in the Purchase Price in the amount of the deductible for the applicable insurance coverage and any other uninsured loss not credited to Buyer, and Buyer shall be entitled to an assignment of all of Seller's rights to any insurance proceeds payable by reason of such damage or destruction.  If Buyer elects to proceed under clause (ii) above, Seller shall not compromise, settle or adjust any claims to such proceeds without Buyer's prior written consent. The Closing Date shall be extended as necessary to accommodate the time period within which Buyer has to make the election in clause (i) or (ii) above.

13.2    Condemnation.  In the event that after the Execution Date and prior to the Close of Escrow, all or any portion of the Real Property is subject to a taking or a written threat of taking by a public or governmental authority Seller shall promptly notify Buyer, and Buyer shall have the right, exercisable by giving written notice to Seller within ten (10) Business Days after receiving written notice of such taking, either (i) to terminate this Agreement, in which event[7] any other money or documents in Escrow shall be returned to the party depositing the same, or (ii) to accept the Real Property in its then condition, without a reduction in the Purchase Price, and to receive an assignment of all of Seller's rights to any condemnation award or proceeds payable by reason of such taking.  If Buyer elects to proceed under clause (ii) above, Seller shall not compromise, settle or adjust any claims to such award without Buyer's prior written consent. The Closing Date shall be extended as necessary to accommodate the time period within which Buyer has to make the election in clause (i) or (ii) above.

14.    Notices.  All notices or other communications required or permitted hereunder shall be in writing, and shall be (i) personally delivered (including by means of professional messenger service or reputable air express service utilizing receipts) or (ii) sent via electronic mail (provided a copy of such notice is sent pursuant to (i) above within one (1) Business Day thereafter), and shall be deemed received upon the date of receipt thereof if received prior to 5:00 p.m. Pacific time, and if not so received, shall be deemed received upon the following Business Day.  Refusal of notice shall be deemed delivery.

To Seller:                                    To Buyer:

    Plamex Investment, LLC              c/o _____
                                                  _____

    Attn: _____            E-mail:
    E-mail: _____

With copies to:                               With copies to:

    Levene, Neale, Bender, Yoo & Brill

---

[6] **NTD**: Template APA will require the return of the Deposit here.
[7] **NTD**: Template APA will require the return of the Deposit here.

L.L.P.
10250 Constellation Boulevard
Suite 1700
Los Angeles, California  90067
Attn: Ron Bender, Monica Y. Kim and
Juliet Y. Oh
E-mail:  rb@lnbyb.com,
myk@lnbyb.com and jyo@lnbyb.com

To Escrow Holder and Title Company:

Stewart Title Guaranty Company, 100
Pine Street, Suite 450, San Francisco,
CA 94111-5106
Attention:  Marion Aaron
E-mail:  marion.aaron@stewart.com

Notice of change of address shall be given by written notice in the manner detailed in this Section 14.

15.    Bankruptcy Matters.

15.1    Seller and Buyer acknowledge that this Agreement and the sale of the Property are subject to Bankruptcy Court approval.  Seller and Buyer acknowledge that to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest or otherwise best offer possible for the Property, including, but not limited to, giving notice of the transactions contemplated by this Agreement to creditors and certain other interested parties as ordered by the Bankruptcy Court.

15.2    Seller and Buyer acknowledge that, towards that end, they have negotiated the forms of the Sale Motion, Bid Procedures Order, the Bidding Procedures, and the other exhibits to the Bid Procedures Order that, among other things, are intended to create and establish a process that will allow other parties an opportunity to provide higher and better offers for the Property pursuant to reasonable bidding procedures.[8]  The transaction contemplated herein is subject to the approval of the Bankruptcy Court pursuant to entry of (i) the Bid Procedures Order and (ii) should Buyer be the Successful Bidder, a final Sale Order in form and substance satisfactory to Buyer in its sole discretion.  [Seller and Buyer are also parties to the Plan Support Agreement, which, among other things, obligates Seller to file the Sale Motion and Bid Procedures Motion, obtain the entry of both the Plan Support Order and the Bid Procedures Order, and otherwise pursue the sale process that is premised on Buyer as the stalking horse bidder and this Agreement as the stalking horse purchase and sale agreement pursuant to the timetable set forth herein.  Accordingly, Seller and Buyer acknowledge that Buyer is the SH Bidder (as such term is defined in both the Plan Support Agreement and the Bid Procedures Order) and this Agreement is the SH PSA (as such term is defined in the Plan Support Agreement.][9]  Seller hereby agrees to use all commercially efforts promptly [to file the Sale

---

[8] **NTD:** This sentence pertains to SH Bidder exclusively and accordingly, shall be omitted from Template APA.

[9] **NTD:**  These sentences pertain to the SH Bidder exclusively and accordingly, shall be omitted from the Template

Motion and the Bid Procedures Motion and to obtain the entry of the Bid Procedures Order and,][10] should Buyer be the Successful Bidder, to obtain the entry of the Sale Order.  Nothing contained herein shall limit Seller's obligations or Buyer's rights under the Bid Procedures Order, the Bid Procedures, [the Plan Support Order,][11] or, if entered, the Sale Order.

15.3    Seller shall use its reasonable best efforts to provide Buyer with copies of all motions, applications and supporting papers prepared by or on behalf of the Seller (including forms of orders) directly relating to the Property or this Agreement prior to the filing thereof in the Chapter 11 Case so as to allow Buyer to provide reasonable comments for incorporation into same.

15.4    Expense Reimbursement.  Buyer shall be entitled to the payment of the Expense Reimbursement automatically upon the termination of this Agreement pursuant to any subparagraph of Section 16.1(d) hereof.  The Expense Reimbursement shall have the priority set forth in the Bid Procedures Order, and Seller shall, without the requirement of any notice or demand from Buyer or any further application to or Order of the Bankruptcy Court, pay the Expense Reimbursement in cash to Buyer on the earlier to occur of (i) one Business Day after the closing of any Alternative Transaction and (ii) on the date claims of similar priority receive a distribution in the Chapter 11 Case.  For avoidance of doubt, the amount of the Expense Reimbursement authorized in the Bid Procedures to be used as currency in any Auction has been establish for administrative convenience only and shall not constitute a "cap" or otherwise limit Buyer's rights to the Expense Reimbursement in the event that Buyer's actual out-of-pocket expense should prove to exceed that amount set forth in the Bid Procedures Order[12].

16.    Termination; Waiver.

16.1    Termination.  This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written consent of Seller and Buyer;

(b)    by Seller or Buyer, at any time in their respective sole discretion, if:

(i)    there shall be any Legal Requirement that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited; or

(ii)    consummation of the transactions contemplated hereby would violate any non-appealable final order, decree or judgment of the Bankruptcy Court or any other Governmental Authority having competent jurisdiction;

---

APA.

[10] **NTD:**  The bracketed language pertains to the SH Bidder exclusively and accordingly, shall be omitted from the Template APA

[11] **NTD:**  The bracketed language pertains to the SH Bidder exclusively and accordingly, shall be omitted from the Template APA

[12] **NTD:**  This Section 15.4 and related provisions pertain to the SH Bidder exclusively and accordingly, shall be omitted from the Template APA.

*provided* that the actions of the party seeking to terminate this Agreement pursuant to this Section 16.1(b) shall not have been a principal cause of the entry of such Legal Requirement, order, decree or judgment;

(c)    by Seller, at any time in its sole discretion, if:

(i)    any of the representations and warranties of the Buyer contained in Section 12 hereof shall be inaccurate as of the date of this Agreement, or shall have become inaccurate as of a date subsequent to the date of this Agreement (as if made on and as of such subsequent date) such that the condition set forth in Section 4.4.2 would not then be satisfied; or

(ii)    Buyer shall have failed to perform or comply with any of the covenants or agreements contained in this Agreement to be performed and complied with by the Buyer such that the condition set forth in Section 4.4.1 would not then be satisfied;

*provided, however*, that if an inaccuracy in any of the representations and warranties of Buyer or a failure to perform or comply with a covenant or agreement by the Buyer is curable by Buyer within ten (10) days after the date of written notice from Seller to Buyer of the occurrence of such inaccuracy or failure, then Seller may not terminate this Agreement under this Section 16.1(c) on account of such inaccuracy or failure (x) prior to delivery of such written notice to Buyer or during the ten (10) day period commencing on the date of delivery of such notice or (y) following such ten (10) day period, if such inaccuracy or failure shall have been fully cured during such ten (10) day period;

(d)    by Buyer, at any time in its sole discretion, if:

(i)    any of the representations and warranties of Seller contained in Section 11 hereof shall be inaccurate as of the date of this Agreement, or shall have become inaccurate as of a date subsequent to the date of this Agreement (as if made on and as of such subsequent date) such that the condition set forth in Section 4.3.3 would not then be satisfied; or

(ii)    Seller shall have failed to perform or comply with any of its respective covenants or agreements contained in this Agreement to be performed and complied with by it such that the condition set forth in Section 4.3.2 would not then be satisfied;

*provided, however*, that if an inaccuracy in any of the representations and warranties of Seller or a failure to perform or comply with a covenant or agreement by Seller is curable by it within ten (10) days after the date of written notice from Buyer to Seller of the occurrence of such inaccuracy or failure, then Buyer may not terminate this Agreement under this Section 16.1(d) on account of such inaccuracy or failure (x) prior to delivery of such written notice to the Seller or during the ten (10) day period commencing on the date of delivery of such notice or (y) following such ten (10) day period, if such inaccuracy or failure shall have been fully cured during such ten (10) day period;

(iii)    the Bankruptcy Court shall approve an Alternative Transaction;

(iv)    Seller shall (A) withdraw the Bidding Procedures Motion or the Sale Motion, or publicly announce its intention to withdraw the Bidding Procedures Motion or the Sale Motion, (B) move to voluntarily dismiss the Chapter 11 Case, (C) move for conversion of the Chapter 11 Case to Chapter 7 of the Bankruptcy Code or (D) move for appointment of an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code or a trustee in the Chapter 11 Case;

(v)    the Bidding Procedures Order should not have been entered by the Bankruptcy Court on or before December 31, 2021;

(vi)    (A) a trustee or an examiner with expanded powers is appointed in the Chapter 11 Case or (B) the Chapter 11 Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(vii)    an order of the Bankruptcy Court is entered denying approval of the Sale Order;

(viii)    any court of competent jurisdiction shall enter a final, non-appealable judgment or order declaring this Agreement to be unenforceable;

(ix)    Seller shall have breached the provisions of the Bid Procedures Order or otherwise failed to comply with the Bid Procedures;

(x)    the Bidding Procedures Order shall have been stayed, vacated, reversed, modified, or amended at any time in any respect without the prior written consent of Buyer given in its sole discretion;

(xi)    the Bankruptcy Court shall not have entered the Sale Order, in form and substance acceptable to Buyer in its sole discretion, on or prior to February 28, 2022 (or such later date up to 30 days after February 28, 2022 as agreed to in writing by Seller and Buyer), or such order shall have been stayed, vacated, reversed, modified or amended at any time in any respect without the prior written consent of Buyer given in its sole discretion.

(xii)    the Closing Date shall not have occurred on or prior to March 31, 2022 (or such later date up to 30 days after March 31, 2022 as agreed to in writing by Seller or Buyer); or

16.2    Procedure and Effect of Termination.  In the event of termination of this Agreement by either Seller or Buyer pursuant to Section 15.1, written notice thereof shall forthwith be given by the terminating party to the other party (and may be given by Buyer without application to or order of the Bankruptcy Court), specifying the provision hereof pursuant to which such termination is made, and this Agreement shall thereupon terminate and become void and of no further force and effect, and the transactions contemplated hereby shall be abandoned without further action by any of the Parties; *provided, however,* that (a) no party

shall be relieved of or released from any liability arising from any willful, knowing or intentional breach by such party of any provision of this Agreement, (b) this Section 16.2, Section 15.4, Section 24 and Section 25, shall remain in full force and effect and survive any termination of this Agreement, and (c) the Seller shall remain liable for payment of the Expense Reimbursement to the extent set forth herein and in the Bidding Procedures Order.

17.    Specific Enforcement; Limited Liability.  Without in any manner limiting its other rights under this Agreement and/or under applicable law, including the Bankruptcy Code, Buyer may seek specific performance of the provisions of this Agreement or the Bidding Procedures Order.  Notwithstanding anything to the contrary contained herein, and to the fullest extent permitted by applicable law, Seller shall not assert and hereby waives any claim against Buyer and all Buyer Parties, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any matter relating thereto, and the maximum aggregate liability of Buyer or Buyer Parties for any direct or actual damage arising out of, in connection with, or as a result of, this Agreement or any matter relating thereto shall, under no circumstances whatsoever, exceed one percent (1%) of the Purchase Price.  After the Closing Date, and notwithstanding anything to the contrary contained herein:  (a) the maximum aggregate liability of Seller or Seller Parties, and the maximum aggregate amount which may be awarded to and collected by Buyer or Buyer Parties (including, without limitation, for any breach of any representation, warranty and/or covenant of Seller) under this Agreement or any documents executed pursuant hereto or in connection herewith, including, without limitation, the Exhibits attached hereto (collectively, the "**Other Documents**") shall, under no circumstances whatsoever, exceed two percent (2%) of the Purchase Price (the "**CAP Amount**"); (b) Buyer shall notify Seller in writing of any claim of any breach of any representation, warranty and/or covenant of Seller under the Agreement or the Other Documents and commence a "legal action" thereon within the Survival Period; and (c) no claim by Buyer alleging a breach by Seller of any representation, warranty and/or covenant of Seller contained herein or any of the Other Documents may be made, and Seller shall not be liable for any judgment in any action based upon any such claim, unless and until such claim, either alone or together with any other claims by Buyer alleging a breach by Seller of any such representation, warranty and/or covenant, is for an aggregate amount in excess of $25,000.00 (the "**Floor Amount**"), in which event Seller's liability respecting any final judgment concerning such claim or claims shall be for the entire amount thereof, subject to the CAP Amount set forth in clause (a) above; provided, however, that if any such final judgment is for an amount that is less than or equal to the Floor Amount, then Seller shall have no liability with respect thereto.  Furthermore, notwithstanding any provision to the contrary in this Agreement, the CAP Amount and Floor Amount shall not apply to any claim under Articles 8 and/or 13 of this Agreement and/or for fees and/or costs under Section 25 of this Agreement. The provisions of this Section 16.4 shall survive the Closing.

18.    Assignment.  Except in connection with an exchange or reverse exchange contemplated under Section 19 of this Agreement, neither Buyer nor Seller may assign, transfer or convey its rights and obligations under this Agreement without the prior written consent of the other party, which consent shall be granted or withheld in such other party's sole and absolute discretion; provided that Buyer shall have the right, without Seller's consent, to assign its rights and obligations under this Agreement to any entity controlling, controlled by, or under common control with Buyer.  No such assignment shall relieve Buyer from its liability under this

Agreement, and any assignee shall assume all of Buyer's obligations hereunder and succeed to all of Buyer's rights and remedies hereunder.  Any assignment and assumption must be in writing and a copy of such writing shall be delivered to Seller at least five (5) Business Days prior to the Closing Date.

19.    Exchange.  The parties acknowledge and agree that Seller may transfer, and/or Buyer may acquire, the Property as part of a tax-deferred exchange pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended (the "**Code**"), and/or a reverse exchange in accordance with Revenue Procedure 2000-37, and that each has the right to restructure all or part of the transaction contemplated by this Agreement as a concurrent, delayed (non-simultaneous), or reverse tax-deferred exchange for the benefit of such party.  Each party shall cooperate with the other and acknowledge any assignment to a qualified intermediary or exchange accommodation titleholder if a party elects to convey or acquire the Property in connection with such a tax-deferred exchange within the meaning of Section 1031 of the Code (an "**Exchange**") and, if requested, shall accommodate the other party with respect to any such Exchange, provided that a party's election to effect such an Exchange shall not delay the Closing (except as otherwise provided in this Agreement), create any additional conditions to the Closing, create any additional costs or liabilities for the other party, or require the other party to take title to any other property.  A party, in electing to structure the transaction as an Exchange, shall have the right to substitute, assign, or delegate its rights and duties to one or more entities or persons who will be such party's qualified intermediary or exchange accommodation titleholder in the escrow, but in no event shall the party electing to effect such an Exchange be released from any liabilities or obligations under this Agreement.

20.    Confidentiality.  The parties agree that (a) except as otherwise provided or required by valid law, (b) except as made by Buyer or its affiliates in connection with an earnings call or other communications to actual or potential investors, shareholders or analysts, or any public company communications or filings, (c) except to the extent a disclosing party reasonably considers such documents or information reasonably necessary to prosecute and/or defend any claim made with respect to the Property or this Agreement, and (d) except to the extent reasonably necessary to deliver such documents or information to such party's employees, paralegals, attorneys, partners, investors, lenders and/or consultants in connection with this transaction, (i) until the Closing, Buyer and Buyer's Parties shall keep the contents of any non-publically available materials, reports, documents, data, test results, and other information related to the transaction contemplated hereby, including, without limitation, the Due Diligence Items and (ii) each party shall refrain from generating or participating in any publicity or press release regarding this transaction without the prior written consent of the other party. The provisions of this Section 19 shall survive any termination of this Agreement but shall not survive the Closing except for clause (ii) hereof which covenants shall survive the Closing.

21.    Brokers.  Each of Seller and Buyer represents to the other that it has had no dealings, negotiations, or consultations on its own behalf, or for its benefit, with any broker, representative, employee, agent or other intermediary except NAI and JLL in connection with the transaction contemplated by this Agreement.  Seller shall be responsible for all fees and commissions due NAI and JLL in connection with the transaction contemplated by this Agreement.  Seller and Buyer agree that each will indemnify, defend and hold the other free and harmless from the claims of any other broker(s), representative(s), employee(s), agent(s) or other

intermediary(ies) claiming to have represented Seller or Buyer, respectively, or otherwise to be entitled to compensation in connection with this Agreement or the sale of the Property.  This provision shall survive Closing.

22.    <u>Commercially Reasonable Efforts</u>.  Upon the terms and subject to the conditions of this Agreement, and without limiting the provisions of <u>Section 15.2</u> hereof, each of the Parties hereto shall use commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable consistent with applicable Legal Requirements to consummate and make effective in the most expeditious manner practicable the transactions contemplated hereby.  Without limiting the foregoing, and should Buyer be the Successful Bidder, Seller shall use its reasonable best efforts to obtain the entry of the Sale Order on or prior to February 28, 2022 (or such later date up to 30 days after February 28, 2022 as agreed to in writing by Seller and Buyer) and upon entry, cause it not to be vacated, stayed or reversed, except with the express written consent of the Buyer, or as would not be adverse to Buyer in any material respect.

23.    <u>Adequate Assurances Regarding the Lease</u>.  With respect to the Leases, Seller and Buyer will use commercially reasonable efforts to provide adequate assurance to the extent required by the Bankruptcy Court for assignment of the Leases (which are not Excluded Assets) and Assumed Contracts to Buyer.  Buyer and Seller agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that all defaults have been cured and there has been an adequate demonstration of adequate assurance of future performance under such Leases, such as furnishing affidavits, non-confidential financial information or other documents or information for filing with the Bankruptcy Court.

24.    **<u>GOVERNING LAW; JURISDICTION</u>**.

24.1    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF CALIFORNIA, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION (EXCEPT TO THE EXTENT IT MAY BE PREEMPTED BY THE BANKRUPTCY CODE).  BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, DISPUTE OR PROCEEDING ARISING UNDER, OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL BE BROUGHT EXCLUSIVELY IN THE FEDERAL OR STATE COURTS LOCATED IN THE STATE OF CALIFORNIA, COUNTY OF LOS ANGELES, AND THEY IRREVOCABLY CONSENT TO THE JURISDICTION OF SUCH COURTS AND WAIVE ANY OBJECTIONS AS TO VENUE OR INCONVENIENT FORUM; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT, NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, AND SO LONG AS THE BANKRUPTCY COURT HAS JURISDICTION OVER SELLER (AND ELECTS TO EXERCISE THAT JURISDICTION), EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT AND HEREBY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT; <u>PROVIDED</u>, <u>FURTHER</u>, <u>HOWEVER</u>, THAT SUCH SUBMISSION TO JURISDICTION SHALL NOT CONSTITUTE

AND SHALL NOT BE DEEMED TO CONSTITUTE THE CONSENT BY BUYER TO THE ENTRY OF A FINAL ORDER OF FINAL JUDGMENT AGAINST IT IN ANY ADVERSARY PROCEEDING OR OTHER PROCEEDING THAT THE BANKRUPTCY COURT WOULD NOT HAVE THE CONSTITUTIONAL AUTHORITY TO ENTER ANY SUCH FINAL ORDER OR FINAL JUDGMENT AGAINST BUYER WITHOUT BUYER'S CONSENT UNDER THE AUTHORITY OF *STERN V. MARSHALL*, 564 U.S. 462 (2011).  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, BUYER EXPRESSLY DOES NOT CONSENT TO THE ENTRY BY THE BANKRUPTCY COURT OF ANY FINAL ORDER OR FINAL JUDGEMENT, WHETHER IN ANY ADVERSARY PROCEEDING OR OTHERWISE, AWARDING ANY TYPE OF MONETARY RECOVERY AGAINST BUYER.

      25.   Miscellaneous.  If any term or provision or portion thereof of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision or portion thereof to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each such term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.  No waiver of any breach of any covenant or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof, or of any other covenant or provision herein contained.  No extension of time for performance of any obligation or act shall be deemed an extension of the time for performance of any other obligation or act.  Subject to the provisions of Section 18, this Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of the parties hereto.  In the event of the bringing of any action or suit by a party hereto against another party hereunder by reason of any breach of this Agreement, then the prevailing party shall be entitled to recover from the other party all costs and expenses of the action or suit and any appeals therefrom, and enforcement of any judgment in connection therewith, including actual reasonable attorneys' fees, accounting and any other professional fees resulting therefrom. This Agreement (including all Exhibits attached hereto) is the final expression of, and contains the entire agreement between, the parties with respect to the subject matter hereof and supersedes all prior understandings with respect thereto.  This Agreement may not be modified, changed, supplemented or terminated, nor may any obligations hereunder be waived, except by written instrument signed by the party to be charged or by its agent duly authorized in writing or as otherwise expressly permitted herein.  This Agreement may be executed in one or more counterparts, each of which shall be an original, and all of which together shall constitute a single instrument.  This Agreement may be executed by a party's signature transmitted by fax or email, and copies of this Agreement executed and delivered by means of faxed or emailed copies of signatures shall have the same force and effect as copies hereof executed and delivered with original wet signatures.  All parties hereto may rely upon faxed or emailed signatures as if such signatures were original wet signatures.  All parties hereto agree that a faxed or emailed signature page may be introduced into evidence in any proceeding arising out of or related to this Agreement as if it were an original wet signature page. The parties do not intend to confer any benefit hereunder on any person, firm or corporation other than the parties hereto.  Seller and Buyer hereby acknowledge and agree that time is strictly of the essence with respect to each and every term, condition, obligation and provision hereof and that failure to timely perform any of the terms, conditions, obligations or provisions hereof by either party shall constitute a material breach of and a non-curable (but waivable) default under this Agreement by the party so failing to perform.  Unless the context otherwise requires, all periods terminating on a given day, period

of days, or date shall terminate at 5:00 p.m. (Pacific time) on such date or dates, and references to "days" shall refer to calendar days except if such references are expressly to "**Business Days**." Notwithstanding the foregoing, if any period terminates on a day that is not a Business Day, the termination of such period shall be on the next succeeding Business Day.   Headings at the beginning of each paragraph and subparagraph are solely for the convenience of the parties and are not a part of the Agreement.   Whenever required by the context of this Agreement, the singular shall include the plural and the masculine shall include the feminine and vice versa. This Agreement shall not be construed as if it had been prepared by one of the parties, but rather as if both parties had prepared the same.   Unless otherwise indicated, all references to sections are to this Agreement.   All Exhibits referred to in this Agreement are attached and incorporated by this reference.   In the event the date on which Buyer or Seller is required to take any action under the terms of this Agreement is not a Business Day, the action shall be taken on the next succeeding Business Day.   The words "herein," "hereof" and "hereunder" and other words of similar import in this Agreement refer to this Agreement as a whole, and not to any particular section, subsection, clause, subclause or paragraph contained in this Agreement. Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter genders.   The words "including," "includes" and "include" shall be deemed to be followed by the words "without limitation" or "including, but not limited to."

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year hereinabove written.

"SELLER"                **PLAMEX INVESTMENT, LLC**,
                        a Delaware limited liability company


                        By:_____
                        Name:_____
                        Title:_____



"BUYER"                 **QUARRY HEAD 2017-1GRANTOR TRUST**,
                        a Delaware statutory trust


                        By:_____
                        Name:_____
                        Title:_____


### JOINDER BY ESCROW HOLDER

Escrow Holder hereby acknowledges that it has received this Agreement executed by the Seller and Buyer and accepts the obligations of and instructions for the Escrow Holder set forth herein. Escrow Holder agrees to disburse and/or handle, the Purchase Price and all closing documents in accordance with this Agreement.

Dated: _____, 2021          STEWART    TITLE    GUARANTY
COMPANY


                        By:_____
                        Name:_____
                        Title:_____

## EXHIBIT "A"

## LEGAL DESCRIPTION

That certain real property located in the City of Lynwood, County of Los Angeles, State of California, described as follows:

[LEGAL DESCRIPTION TO BE ADDED]

## EXHIBIT "B"

## GRANT DEED

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

_____

_____
MAIL TAX STATEMENTS TO:


APN: [_____]
═══════════════════════════════════════════════════════════
(Above Space For Recorder's Use Only)

## GRANT DEED

The undersigned grantor(s) declare(s):

Documentary Transfer Tax:  $_____.
**XX** Computed on full value of property conveyed.
City of Lynwood, County of Los Angeles

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, _____, a _____ ("**Grantor**"), hereby GRANTS to _____, a _____ ("**Grantee**"), that certain real property which is more particularly described on Exhibit "A" which is attached hereto, together with all buildings and improvements located thereon and any and all improvements, easements, privileges and rights appurtenant thereto.

Subject to:

1.      Nondelinquent taxes and assessments; and

2.      All matters of record or visible from an inspection of the property or which an accurate survey of the property would disclose.

Dated: _____, 2021      _____,
                              a _____


                              By:____**EXHIBIT ONLY – DO NOT
SIGN**_____
                              Name: _____

Title:_____

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that

State of California                           )
County of _____ )


On _____, before me, _____,
                                        (insert name of notary)
Notary Public, personally appeared _____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

        I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

        WITNESS my hand and official seal.


Signature_____               (Seal)

## EXHIBIT "A" TO GRANT DEED

## LEGAL DESCRIPTION

That certain real property located in the City of Lynwood, County of Los Angeles, State of California, described as follows:

[LEGAL DESCRIPTION TO BE ADDED]

## EXHIBIT "C"

## TRANSFEROR'S CERTIFICATION OF NON-FOREIGN STATUS

To inform _____, a _____ ("**Transferee**"), that withholding of tax under Section 1445 of the Internal Revenue Code of 1986, as amended ("**Code**") will not be required upon the transfer of certain real property to the Transferee by _____, a _____ ("**Transferor**"), the undersigned hereby certifies the following on behalf of the Transferor:

1.      The Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Code and the Income Tax Regulations promulgated thereunder);

2.      The Transferor's U.S. employer identification number is _____;

3.      The Transferor's office address is c/o _____;

4.      Transferor is not a disregarded entity as defined in § 1.1445-2(b)(2)(iii).

The Transferor understands that this Certification may be disclosed to the Internal Revenue Service by the Transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalty of perjury I declare that I have examined this Certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of the Transferor.

Date: _____, 2022

"TRANSFEROR"          _____,

                      a _____

                      By: _____  **EXHIBIT ONLY – DO NOT SIGN** _____

                      Name: _____

                      Title: _____

## EXHIBIT "D"

## ASSIGNMENT OF LEASES

THIS ASSIGNMENT OF LEASES ("**Assignment**") is made this _____ day of
_____, 2022 ("**Assignment Date**") by and between
_____, a _____
("**Assignor**"), and _____, a _____ ("**Assignee**").

W I T N E S S E T H:

A.     Assignor and Assignee entered into that certain Agreement of Purchase and Sale
and Joint Escrow Instructions, dated as of _____, 2021 ("**Agreement**"),
respecting the sale of the Property.  Capitalized terms used herein and not separately defined
have the meanings ascribed to them in the Agreement.

B.     Under the Agreement, Assignor is obligated to assign to Assignee all of
Assignor's right, title and interest in and to the Leases which are not Excluded Assets and
security deposits paid by tenants ("**Tenants**") under such Leases to Assignor ("**Deposits**").  Such
Leases and Deposits are identified on Exhibit "1" attached hereto.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of
which are hereby acknowledged, the parties hereto hereby agree as follows:

1.     Effective as of the Assignment Date, Assignor hereby assigns, sells, transfers, sets
over and delivers unto Assignee all of Assignor's estate, right, title and interest in and to such
Leases and the Deposits and Assignee hereby accepts such assignment.  Notwithstanding the
foregoing or anything to the contrary contained herein, subject to the terms of the Agreement and
without limiting any rights of Assignee, Assignor shall retain all rights, title and interest in and to
all rentals and other amounts payable by Tenants, and other rights and claims against any parties,
under such Leases for the period of time prior to the Assignment Date.

2.     Assignor hereby covenants that Assignor will, at any time and from time to time
upon written request therefor, execute and deliver to Assignee, Assignee's successors, nominees
or assigns, at no cost or expense to Assignor, such documents as Assignee or they may
reasonably request in order to fully assign and transfer to and vest in Assignee or Assignee's
successors, nominees and assigns such Leases and the Deposits.

3.     Assignee hereby assumes the performance of all of the terms, covenants and
conditions imposed upon Assignor as landlord under such Leases to the extent first accruing or
arising on or after the Assignment Date.

4.     In the event of any dispute between Assignor and Assignee arising out of the
obligations of the parties under this Assignment or concerning the meaning or interpretation of
any provision contained herein, the losing party shall pay the prevailing party's costs and
expenses of such dispute, including, without limitation, reasonable attorneys' fees and costs.
Any such attorneys' fees and other expenses incurred by either party in enforcing a judgment in

its favor under this Assignment shall be recoverable separately from and in addition to any other amount included in such judgment, and such attorneys' fees obligation is intended to be severable from the other provisions of this Assignment and to survive and not be merged into any such judgment.

     5.     This Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument.

     6.     This Assignment shall be binding upon and inure to the benefit of the successors, assignees, personal representatives, heirs and legatees of all the respective parties hereto.

     7.     This Assignment shall be governed by, interpreted under, and construed and enforceable in accordance with, the laws of the State of California.

     IN WITNESS WHEREOF, Assignor and Assignee have executed and delivered this Assignment as of the day and year first written above.

"ASSIGNOR"              _____,
                                         a _____

                                         By: _____**EXHIBIT ONLY – DO NOT SIGN**_____
                                       Name: _____
                                       Title: _____

"ASSIGNEE"              _____,
                                           a _____

                                       By: _____**EXHIBIT ONLY – DO NOT SIGN**_____
                                        Name: _____
                                        Title: _____

## EXHIBIT 1 TO EXHIBIT "D"

## SCHEDULE OF LEASES AND DEPOSITS

[TO BE PROVIDED]

| Suite | Tenant | Security Deposit |
|-------|--------|------------------|
|       |        | $                |

## EXHIBIT "E"

## BILL OF SALE

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, _____, a _____, ("**Seller**"), does hereby GRANT, SELL, CONVEY, TRANSFER AND DELIVER to _____, a _____ ("**Buyer**"), without any warranty of any kind, any and all of Seller's right, title and interest in and to the Personal Property (as defined in the Agreement), including without limitation as described on Exhibit "B" attached hereto relating to the real property described in Exhibit "A" attached hereto and made a part hereof (the "**Property**").As used herein "**Agreement**" shall mean that certain Agreement of Purchase and Sale and Joint Escrow Instructions, dated as of _____, 2021 between Seller and Buyer.

IN WITNESS WHEREOF, this Bill of Sale has been executed as of this ___ day of _____, 2022.

SELLER:      _____,

         a _____

         By: _____ **EXHIBIT ONLY – DO NOT SIGN** _____

         Name: _____

         Title: _____

BUYER:      _____,

         a _____

         By: _____ **EXHIBIT ONLY – DO NOT SIGN** _____

         Name: _____

         Title: _____

## EXHIBIT A TO EXHIBIT "E"

## REAL PROPERTY

That certain real property located in the City of Lynwood, County of Los Angeles, State of California, described as follows:

[LEGAL DESCRIPTION TO BE ADDED]

## EXHIBIT B TO EXHIBIT "E"

## NON-EXCLUSIVE LIST OF PERSONAL PROPERTY

[TO BE PROVIDED]

| Location | Item |
|----------|------|
|          |      |
|          |      |

## EXHIBIT "F"

## GENERAL ASSIGNMENT

This General Assignment is made as of the _____ day of _____, 2022 ("**Assignment Date**"), by _____, a _____, (the "**Assignor**"), for the benefit of _____, a _____ (the "**Assignee**").

W I T N E S S E T H:

Pursuant to that certain Agreement of Purchase and Sale and Joint Escrow Instructions dated as of _____, 2021 (the "**Purchase Agreement**"), Assignee has this day acquired from Assignor the Property.  Capitalized terms used herein shall have the meanings ascribed to them in the Purchase Agreement.

In consideration of the acquisition of the Property by Assignee and other good and valuable consideration, the mutual receipt and legal sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      <u>Assignment</u>.  Assignor hereby assigns, transfers and sets over unto Assignee, without representation or warranty of any kind except for Seller's Warranties under the Purchase Agreement, any and all of Assignor's right, title and interest in and to the Intangible Property.

2.      <u>Counterparts</u>.  This Assignment may be executed in counterparts, each of which shall be deemed an original, and all of which shall taken together be deemed one document.

3.      <u>Survival</u>.  This Assignment and the provisions hereof shall inure to the benefit of and be binding upon the parties to this Assignment and their respective successors, heirs and permitted assigns.

4.      <u>No Third Party Beneficiaries</u>.  Except as otherwise expressly set forth herein, Assignor and Assignee do not intend, and this Assignment shall not be construed, to create a third-party beneficiary status or interest in, nor give any third-party beneficiary rights or remedies to, any other person or entity not a party to this Assignment.

5.      <u>Governing Law</u>.  This Assignment shall be governed by, interpreted under, and construed and enforceable in accordance with, the laws of the State of California.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, Assignor has caused this instrument to be executed as of the date above-written.

"ASSIGNOR"

_____,

a _____

By: _____**EXHIBIT ONLY – DO NOT SIGN**_____

Name: _____

Title: _____

## EXHIBIT "G"

## LIST OF LEASES

| Tenant | |
|---|---|
| Lease Date | _____ |
| Amendments | |
| Address/Suite | |

**[EXHIBIT "H"]**

**FORM OF TENANT ESTOPPEL CERTIFICATE**

**Tenant Estoppel Certificate**

THIS **TENANT ESTOPPEL CERTIFICATE** ("**Certificate**"), dated as of _____ __, 2021, is executed by _____, a _____ ("**Tenant**") in favor of _____, a Delaware limited liability company, together with its nominees, designees and assigns (collectively, "**Buyer**").

**RECITALS**

**A.** Buyer and [_____], a [_____] ("**Landlord**"), have entered into that certain Purchase and Sale Agreement and Joint Escrow Instructions, dated as of _____ ___, 2021 (the "**Purchase Agreement**"), whereby Buyer has agreed to purchase, among other things, the improved real property located at 3100, 3140, and 3170 E. Imperial Hwy and 11201, 11255, 11301, 11338, and 11369 Long Beach Blvd, Lynwood, California (the "**Property**").

**B.** Tenant and Landlord have entered into that certain Lease Agreement dated as of _____ ___, 20__, as amended and supplemented by _____ (as so amended and supplemented, the "**Lease**"), for a portion of the Property.

**C.** Pursuant to the Lease, Tenant has agreed that upon the request of Landlord, Tenant would execute and deliver an estoppel certificate certifying the status of the Lease.

**D.** In connection with the Purchase Agreement, Landlord has requested that Tenant execute this Certificate with an understanding that Buyer will rely on the representations and agreements below in acquiring the Property and Landlord's interest under the Lease.

**NOW, THEREFORE,** Tenant certifies, warrants, and represents to Buyer as follows:

1. **Leased Premises.** Pursuant to the Lease, Tenant leases those certain premises (the "**Leased Premises**") consisting of approximately _____ rentable square feet within the Property, as more particularly described in the Lease.

2. **Full Force of Lease.** The Lease has been duly authorized, executed and delivered by Tenant, is in full force and effect has not been terminated and constitutes a legally valid instrument, binding and enforceable against Tenant in accordance with its terms, subject only to applicable limitations imposed by laws relating to bankruptcy and creditor's rights.

3. **Complete Agreement.** The Lease constitutes the complete agreement between Landlord and Tenant for the Leased Premises and the Property, except as modified by the Lease amendments noted above (if any), has not been modified, altered or amended.

4. **Acceptance of Leased Premises.** Tenant has accepted possession and is currently occupying the Leased Premises.

5.    **Lease Term.**  The term of the Lease commenced on _____ ___, 20___ and ends on _____ ___, 20___, subject to the following options to extend: _____ _____.(If none, please state "None.")

6.    **Purchase Rights.**  Tenant has no option, right of first refusal, right of first offer, or other right to acquire or purchase all or any portion of the Leased Premises or all or any portion of, or  interest in, the Property.

7.    **Options**.  Tenant has no right of first refusal or right of first offer or similar right to expand the Leased Premises under the Lease except as follows:_____  (If none, please state "None.")

8.    **Rent**.

The obligation to pay rent under the Lease commenced on _____ ___, 20___.  The rent under the Lease is current, and Tenant is not in default in the performance of any of its obligations under the Lease.

Tenant is currently paying base rent under the Lease in the amount of $_____ per month.  Tenant is currently paying percentage rent (if any) under the Lease as follows: _____.  Tenant has not received and is not, presently, entitled to any abatement, refunds, rebates, concessions or forgiveness of rent or other charges, free rent, partial rent, or credits, offsets or reductions in rent, except as follows: _____. (If none, please state "None.")

Tenant's estimated share of operating expenses, common area charges, insurance, real estate taxes and administrative and overhead expenses is ___% and is currently being paid at the rate of $_____ per month, payable to: _____.

There are no existing defenses or offsets against rent due or to become due under the terms of the Lease, and there presently is no default or other wrongful act or omission by Landlord under the Lease or otherwise in connection with Tenant's occupancy of the Leased Premises, nor is there a state of facts which with the passage of time or the giving of notice or both could ripen into a default on the part of Tenant, or to the best knowledge of Tenant, could ripen into a default on the part of Landlord under the Lease, except as follows: _____ _____. (If none, please state "None.")

9.    **Security Deposit.**  The amount of Tenant's security deposit held by Landlord under the Lease is $_____.

10.    **Prepaid Rent.**  The amount of prepaid rent, separate from the security deposit, is $_____, covering the period from _____ ___, 20___ to _____ ___, 20___.

11.    **Pending Actions.**  There is not pending or, to the knowledge of Tenant, threatened against or contemplated by the Tenant, any petition in bankruptcy, whether voluntary or otherwise, any assignment for the benefit of creditors, or any petition seeking reorganization or arrangement under the federal bankruptcy laws or those of any state.

12.    **Tenant Improvements.**    Landlord has completed all tenant improvement and other construction required of Landlord under the Lease and there are no outstanding tenant improvement allowances or similar obligations owed by Landlord to Tenant.

13.    **No Claims.**    No offsets, counterclaims, or defenses of Tenant under the Lease exist against Landlord; and no events have occurred that, with the passage of time or the giving of notice, would constitute a basis for offsets, counterclaims, or defenses against Landlord, except as follows: _____. (If none, please state "None.")

14.    **Assignments by Landlord.**    Tenant has received no notice of any assignment, hypothecation or pledge of the Lease or rentals under the Lease by Landlord.  Tenant hereby consents to an assignment of leases and rents to be executed by Landlord to Buyer in connection with the acquisition of the Property by Buyer and acknowledges that said assignment does not violate the provisions of the Lease.

15.    **Assignments by Tenant.**    Tenant has not sublet or assigned the Leased Premises or the Lease or any portion thereof to any sublessee or assignee.  No one except Tenant and its employees will occupy the Leased Premises.  The address for notices to be sent to Tenant is as set forth in the Lease.

16.    **Environmental Matters.**    The operation and use of the Leased Premises does not involve the generation, treatment, storage, disposal or release into the environment of any hazardous materials, regulated materials and/or solid waste, except those used in the ordinary course of Tenant's business and accordance with all applicable laws.

Tenant makes this Certificate with the knowledge that it will be relied upon by Buyer in agreeing to purchase the Property.

Tenant has executed this Certificate as of the date first written above by the person named below, who is duly authorized to do so.

"TENANT"

**<u>EXHIBIT ONLY – DO NOT SIGN</u>**
(Signature)

_____
(Title)

# EXHIBIT "I"

## ASSIGNMENT OF CONTRACTS

THIS ASSIGNMENT OF CONTRACTS ("**Assignment**") is made this _____ day of _____, 2022 ("**Assignment Date**") by and between _____, a _____ ("**Assignor**"), and _____, a _____ ("**Assignee**").

W I T N E S S E T H :

A.    Assignor and Assignee entered into that certain Agreement of Purchase and Sale and Joint Escrow Instructions, dated as of _____, 2021 ("**Agreement**"), respecting the sale of the Property.  Capitalized terms used herein and not separately defined have the meanings ascribed to them in the Agreement.

B.    Under the Agreement, Assignor is obligated to assign to Assignee all of Assignor's right, title and interest in and to the contracts identified on **Exhibit 1** attached hereto (the "**Contracts**").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    Effective as of the Assignment Date, Assignor hereby assigns, sells, transfers, sets over and delivers unto Assignee all of Assignor's estate, right, title and interest in and to the Contracts and Assignee hereby accepts such assignment.

2.    Assignor hereby covenants that Assignor will, at any time and from time to time upon written request therefor, execute and deliver to Assignee, Assignee's successors, nominees or assigns, at no cost or expense to Assignor, such documents as Assignee or they may reasonably request in order to fully assign and transfer to and vest in Assignee or Assignee's successors, nominees and assigns the Contracts.

3.    Assignee hereby assumes the performance of all of the terms, covenants and conditions imposed upon Assignor under the Contracts to the extent first accruing or arising on or after the Assignment Date.

4.    In the event of the bringing of any action or suit between Assignor and Assignee arising out of the obligations of the parties under this Assignment or concerning the meaning or interpretation of any provision contained herein, the prevailing party in such action or suit shall be entitled to have and recover of and from the other party all costs and expenses of the action or suit and any appeals therefrom, and enforcement of any judgment in connection therewith,

including reasonable attorneys' fees, accounting and engineering fees, and any other professional fees resulting therefrom.  Any such attorneys' fees and other expenses incurred by either party in enforcing a judgment in its favor under this Assignment shall be recoverable separately from and in addition to any other amount included in such judgment, and such attorneys' fees obligation is intended to be severable from the other provisions of this Assignment and to survive and not be merged into any such judgment.

5.    This Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument.

6.    This Assignment shall be binding upon and inure to the benefit of the successors, assignees, personal representatives, heirs and legatees of all the respective parties hereto.

7.    This Assignment shall be governed by, interpreted under, and construed and enforced in accordance with the internal laws of the State of California, without reference to any otherwise applicable principles of conflicts of laws or choice of laws.

IN WITNESS WHEREOF, Assignor and Assignee have executed and delivered this Assignment as of the day and year first written above.

"ASSIGNOR"                    _____,
                              a _____

                              By: _____**EXHIBIT ONLY – DO NOT SIGN**_____
                              Name: _____
                              Title: _____

"ASSIGNEE"                    _____,
                              a _____

                              By: _____**EXHIBIT ONLY – DO NOT SIGN**_____
                              Name: _____
                              Title: _____

# EXHIBIT 1 TO EXHIBIT "I"

## CONTRACTS

[TO BE PROVIDED]

[TO BE UPDATED IN CLOSING VERSION OF EXHIBIT
BASED ON CONTRACTS TO BE ASSUMED BY BUYER]

| Vendor | Service |
|--------|---------|
|        |         |

# EXHIBIT "J"

## NON EXCLUSIVE LIST OF PERSONAL PROPERTY

[TO BE PROVIDED]

| Location | Item |
|----------|------|
|          |      |

# EXHIBIT "K"

## CONTRACTS

[TO BE PROVIDED]

| Vendor | Service |
|--------|---------|
|        |         |

## EXHIBIT "L"

## GLOSSARY OF CERTAIN DEFINED TERMS

"Affiliate Leases" means any Lease between Seller and any of its affiliates, including Arcade, M+D Properties, Imperial Market, Lavanderia Burbuja, The Kickin' Crab, La Huasteca, and/or COMEX Korean BBQ, LLC.

"Alternative Transaction" means any dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, consolidation, tender offer, exchange offer, business combination, joint venture, partnership, sale of assets or securities, financing, debt (including any debtor-in-possession financing) or equity), recapitalization or restructuring of Seller (including, for the avoidance of doubt, a transaction premised on a sale of the Property under section 363 of the Bankruptcy Code, whether to a Successful Bidder under the Bid Procedures or otherwise), other than the sale of the Property to Buyer under this Agreement.

"Approved Proforma" means the proforma owner's title policy attached hereto as Exhibit "N".

"Assumed/Assigned Lease and Contract Schedule" shall have the meaning given to such term in Section 4.1.2 hereof.

"Assumed Contracts" shall have the meaning given to such term in Section 4.1.3 hereof.

"Assumed Leases" shall have the meaning given to such term in Section 4.1.3 hereof.

"Auction" shall have the meaning given such term in the Bidding Procedures.

"Bankruptcy Code" has the meaning given to such term in the recitals hereto.  It may be included as part of the Sale Motion.

"Bankruptcy Court" has the meaning given to such term in the recitals hereto.

"Bid Procedures Motion" means the motion in form and substance reasonably acceptable to Buyer seeking entry of the Bid Procedures Order.

"Bid Procedures Order" means the entry of the Bankruptcy Court substantially in the form of Exhibit O, establishing bidding procedures for the solicitation of higher or otherwise better bids for the Property.  References herein to the Bid Procedures Order shall include references to the pertinent exhibits thereto, including the Bidding Procedures (which are expressly incorporated by reference into the Bid Procedures Order).

"Bidding Procedures" shall mean those bidding procedures attached as Exhibit A to, and to be approved by the Bankruptcy Court pursuant to the Bid Procedures Order.

"Bill of Sale" shall have the meaning given to such term in Section 5.1 hereof.

"Business Days" means any day that is not Saturday, Sunday,  a legal holiday under the laws of the United States, or a legal holiday on which banks are not open under the laws of the State of New York or the State of California.

"Buyer" has the meaning given to such term in the preamble hereto.

"Buyer Parties" shall have the meaning given to such term in Section 4.1.1 hereof.

"CAP Amount" has the meaning given to such term in Section 17 hereof.

"Chapter 11 Case" has the meaning given to such term in the recitals hereto.

"City" has the meaning given to such term in the recitals hereto.

"Close of Escrow" has the meaning given to such term in Section 3.2 hereof.

"Code" shall have the meaning given to such term in Section 19 hereof.

"Confirmation Order" shall mean the Final Order of the Bankruptcy Court (unless such finality requirement is waived by Buyer in its sole and absolute discretion) confirming the Plan under Section 1129 of the Bankruptcy Code and approving the other Plan transactions, including the transfer of the Property under Sections 105, 363, 365 and 1146(a) of the Bankruptcy Code to the Successful Bidder, in form and substance satisfactory to Buyer in its sole and absolute discretion as to the provisions thereof relating to the sale of the Property.[13]

"Contract Assignment" shall have the meaning given to such term in Section 5.1 hereof.

"Contracts" has the meaning given such term in Section 4.1.2 hereof, excluding Leases.

"County" has the meaning given to such term in the recitals hereto.

"Cure Amount" has the meaning given to such term in the Bid Procedures Order.

"Cure Notice" has the meaning given to such term in the Bid Procedures Order.

"Deed" shall have the meaning given to such term in Section 5.1 hereof.

"Designated Leases/Contracts" shall have the meaning given to such term in Section 4.1.2 hereof.

"Designation Deadline" shall have the meaning given to such term in Section 4.1.3 hereof.

---

[13] **NTD:** Template APA will include a footnote here stating that this definition should be deleted if Bidder is proceeding independently of Plan confirmation.

"Due Diligence Items" shall have the meaning given to such term in Section 4.1.1 hereof.

"Encumbrances" means, with respect to any property or asset, any Lease, Contract, mortgage, lien, pledge, charge, claim, encumbrance, security interest, community or other marital property interest, equitable interest, license, option, right of way, easement, encroachment, servitude, right of first offer or first refusal, buy/sell agreement or other encumbrance with respect to the use, construction, voting, transfer, receipt of income or exercise of any other attribute of ownership in respect of such property or asset.

"Environmental Laws" shall have the meaning given to such term in Section 10.2 hereof.

"Escrow Holdback Agreement" shall have the meaning given to such term in Section 5.1 hereof.

"Escrow Holder" means Stewart Title Guaranty Company, 100 Pine Street, Suite 450, San Francisco, CA 94111-5106, Attention:  Leticia Colon or any other escrow holder acceptable to the parties.

"Escrow Instructions" has the meaning given to such term in Section 3.1 hereof.

"Exchange" shall have the meaning given to such term in Section 19 hereof.

"Excluded Assets" means collectively (i) Seller's interest in all property management and leasing agreements relating to the Property (including without limitation the Existing Property Management Agreement), (ii) Seller's interest in all Affiliate Leases, (iii) Seller's interest in the other Contracts and Leases that are not Assumed Contracts or Assumed Leases, (iv) Seller's interest in accounts receivable (other than any rent owing by Tenants under any Assumed Leases), including the accounts receivable owing by affiliates of Seller, (v) Seller's cash and cash equivalents, including funds now held or subsequently held by Seller in bank accounts, (vi) Seller's interest in escrows, deposits, and refunds, except as expressly provided for in this Agreement to the contrary, (vii) subject to Buyer's obligation to pay the Purchase Price pursuant to Section 2 hereof, the Purchase Price, (viii) Seller's books and records; provided, however, that Buyer shall be entitled to receive copies of all Seller's books and records, including particularly those relating to the Assets, including as to the operation of the Property, and as required to complete prorations in accordance with Section 8 of this Agreement, and (ix) any claims or causes of action that, subject to the Plan and the Confirmation Order and the restrictions of Section 8.2 may be asserted by or on behalf of Seller against any party, including all causes of action under Chapter 5 of the Bankruptcy Code, and (x) the proceeds of any of the foregoing.

"Excluded Liabilities" has the meaning given to such term in Section 1 hereof.

"Excluded Tax" means any Liability of Seller for the following Taxes (whether such Liability is direct or as a result of transferee or successor liability or pursuant to a Contract

or other agreement): (i) income Taxes of Seller; and (ii) Taxes that relate to the Property prior to the Closing.

"Execution Date" has the meaning given to such term in the preamble hereto.

"Existing Property Management Agreement" means that certain Management Agreement (as amended, including by a First Amendment dated as of September 22, 2011 and a Second Amendment dated as of January 1, 2013) dated as of September 22, 2011, by and between Plamex Investment, LLC and Greenland Property Management, LLC, a California limited liability company ("**Greenland Property Management**").

"Existing Survey" means [to be defined].

"Expense Reimbursement" means the sum of the aggregate amount of Buyer's reasonable and documented out-of-pocket costs and expenses (including expenses of outside counsel, accountants and financial advisors, which shall be based on summary invoices, redacted to preserve privileged or confidential information, and which shall not be required to comply with applicable United States Trustee guidelines) incurred by Buyer in connection with or related to the Buyer's evaluation, due diligence, consideration, analysis, negotiation, execution and documentation of a possible transaction with Seller or in connection with or related to the transactions contemplated by this Agreement.

"Final Order" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, reargument or rehearing shall then be pending or (ii) if an appeal, writ of certiorari new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; *provided*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause an order not to be a Final Order.

"Floor Amount" shall have the meaning given to such term in Section 17 hereof.

"General Assignment" shall have the meaning given to such term in Section 5.1 hereof.

"Governmental Authority" means the government of the United States or any foreign country or any state or political subdivision thereof and any entity, body, commission or authority exercising executive, legislative, judicial, regulatory or administrative functions of or

pertaining to government, including quasi-governmental entities established to perform such functions.

"Governmental Regulations" shall have the meaning given to such term in Section 10.2 hereof.

"Hazardous Substances" shall have the meaning given to such term in Section 10.2 hereof.

"Improvements" has the meaning given to such term in the recitals hereto.

"Intangible Property" has the meaning given to such term in the recitals hereto.

"JLL" means Jones Lang LaSalle Americas, Inc.

"Land" has the meaning given to such term in the recitals hereto.

"Lease Assignment" shall have the meaning given to such term in Section 5.1 hereof.

"Leasing Costs" shall have the meaning given to such term in Section 8.5 hereof.

"Leases" has the meaning given to such term in the recitals hereto.

"Legal Requirements" means with respect to any Person, all statutes, ordinances, bylaws, codes, rules, regulations, restrictions, judgments, orders, writs, injunctions, decrees, determinations or awards of any Governmental Authority having jurisdiction over such Person or any of such Person's assets or businesses.

"Liabilities" means any obligation or liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due).

"Mandatory Cure Exceptions" shall have the meaning given to such term in Section 4.2 hereof.

"Natural Hazard Expert" shall have the meaning given to such term in Section 10.5 hereof.

"Official Records" has the meaning given to such term in Section 3.2 hereof.

"Order" means any decree, order, judgment, writ, ruling, award, injunction, stipulation, decisions, verdict, determination or consent of or by, or settlement agreement as approved by the Bankruptcy Court.

"Other Documents" shall have the meaning given to such term in Section 17 hereof.

"Permitted Encumbrances" means (a) Encumbrances for real property Taxes not yet due and payable; (b) Assumed Leases; (c) Encumbrances expressly assumed by Buyer pursuant to the Sale Order; and (d) the Encumbrances listed as exceptions to the Approved Proforma.

"Person" means any natural person, corporation, partnership, limited liability company, joint venture, trust, association or unincorporated entity of any kind.

"Personal Property" has the meaning given to such term in the recitals hereto.

"Petition Date" has the meaning given to such term in the recitals hereto.

"Plan" means _____.

"Plan Support Agreement" means _____.

"Plan Support Order" means _____.

"Property" has the meaning given to such term in the recitals hereto.

"Property Contract Modification" shall have the meaning given to such term in Section 9 hereof.

"Property Contract Modification Notice" shall have the meaning given to such term in Section 9 hereof.

"Purchase Price" has the meaning given to such term in Section 2 hereof.

"Real Property" has the meaning given to such term in the recitals hereto.

"Retained Liabilities" has the meaning given to such term in Section 1 hereof.

"Sale Hearing" shall have the meaning given to such term in the Bid Procedures Order.

"Sale Motion" means the motion filed by Seller with the Bankruptcy Court seeking the Bankruptcy Court's approval of this Agreement and entry of the Sale Order.

"Sale Order" means the order of the Bankruptcy Court, substantially in the form of Exhibit "P" or otherwise acceptable to Buyer in its sole discretion, which, among other things, (i) approves, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) to the extent not previously approved in the Bid Procedures Order, the execution, delivery and performance by the Seller of this Agreement, (B) the sale of the Property to the Buyer free and clear of all Encumbrances (other than solely Permitted Encumbrances), and (C) the performance by the Seller of its obligations under this Agreement; (ii) authorizes the Seller to assume and assign to the Buyer the Assumed Contracts and the Assumed Leases; (iii) finds that Buyer is not a successor to Seller; and (iv) finds that Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code and grants Buyer the full protection provided thereby.

The Sale Order may be entered contemporaneously with the entry of the Confirmation Order or may be included as part of and within the provisions of the Confirmation Order at option of Buyer; provided, however, that, where the Sale Order is entered contemporaneously with the entry of the Confirmation Order, the Confirmation Order shall reference the sale of the Property to Buyer pursuant to the Sale Order and the applicability of Section 1146(a) of the Bankruptcy Code to such sale.[14]

"Seller" has the meaning given to such term in the preamble hereto.

"Seller Parties" shall have the meaning given to such term in Section 4.1.2 hereof.

"Seller Warranties" shall have the meaning given to such term in Section 3.3 hereof.

"Seller's Representative" shall have the meaning given to such term in Section 11.3 hereof.

"Seller's Title Cure Charges" shall have the meaning given to such term in Section 7 hereof.

"Settlement Statement" shall have the meaning given to such term in Section 5.1 hereof.

"Stand-Alone Assumption/Assignment Order" shall have the meaning given to such term in Section 4.1.3 hereof.

"Successful Bidder" shall have the meaning given to such term in the Bid Procedures.

"Survival Period" shall have the meaning given to such term in Section 11.4 hereof.

"Tax Certificates" shall have the meaning given to such term in Section 5.1 hereof.

"Taxes" means all taxes, charges, fees, duties (including custom duties), levies or other assessments, including gross or net income, gross or net receipts, gross or net proceeds, capital gains, profits, gaming, capital, estimated, employment, alternative or add-on minimum, registration, natural resources, premium, ad valorem, turnover, real or personal property (tangible and intangible), sales, goods or services, use, franchise, excise, value added, stamp, unclaimed or abandoned property, leasing, lease, user, transfer, fuel, excess profits, occupational, interest equalization, windfall profits, license, payroll, environmental, capital stock, disability, severance, employee's income withholding, other withholding, unemployment and Social Security taxes, which are imposed by any Governmental Authority, and such term shall include any interest, penalties or additions to tax attributable thereto.

---

[14] **NTD:** Template APA will include a footnote here stating that this last sentence should be deleted if Bidder is proceeding independently of Plan confirmation.

"Tenant Charges" shall have the meaning given to such term in Section 8.2 hereof.

"Tenant Notice Letter" shall have the meaning given to such term in Section 5.1 hereof.

"Tenants" shall have the meaning given to such term in the recitals hereto.

"Title Company" shall have the meaning given to such term in Section 3.3 hereof.

"Title Policy" shall have the meaning given to such term in Section 3.3 hereof.

"to Seller's knowledge" or "Seller has no knowledge" shall have the meaning given to such phrase in Section 11.3 hereof.

"Transaction" means the sale and purchase of the Property contemplated in this Agreement.

"Vendor Notice Letter" shall have the meaning given to such term in Section 5.1 hereof.

# EXHIBIT "M"

## ESCROW HOLDBACK AGREEMENT

[form to follow]

**EXHIBIT "N"**

**APPROVED PROFORMA**

[form to follow]

# EXHIBIT "O"

# FORM OF BID PROCEDURES ORDER

**EXHIBIT "P"**

**FORM OF SALE ORDER**

[form to follow]

## EXHIBIT "Q"

## DUE DILIGENCE ITEMS

Property Information:

- List of personal property to be sold to Buyer
- list of all Contracts
- complete copies of all Contracts
- complete copies of all Leases including amendments
- Copies of all warranties, certifications, approvals, consents, authorizations, licenses, permits, easements and rights of way
- all environmental reports
- all physical inspection and property condition reports
- list of all Lease documents including amendments
- most current rent roll
- most current title report
- most current zoning report/municipal search report (NTD: update expected end of November, 2021)
- list of all unpaid or uncompleted work in progress which Seller is a party to—include contract amount and amount unpaid
- list of all outstanding leasing costs (free rent, leasing commissions, TI allowances)
- disclosure statement of any outstanding litigation, violations of law, defaults by tenants.

Drawings and Specifications, Maps, Plans and Photographs:

- physical information including as-built plans and specifications, site plans, aerial photographs, floor plans, CAD drawing and other similar maps, plans and drawings
- existing ALTA Survey
- updated ALTA Survey (NTD: update expected end of November, 2021)

Financial Information:

- Tax bills for 2019/2020, 2020/2021 and 2021/2022

Insurance Information:

- Evidence of insurance including statement of insurance coverage and premiums

## SCHEDULE 4.3.4

### Schedule of Material Contracts

[TBD]

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **NOTICE OF MOTION AND MOTION FOR ORDER: (I) ESTABLISHING BIDDING PROCEDURES FOR SALE OF REAL PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (II) APPROVING STALKING HORSE BIDDER, INCLUDING EXPENSE REIMBURSEMENT RIGHTS; (III) ESTABLISHING PROCEDURES RELATING TO ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (IV) APPROVING FORM AND MANNER OF SALE AND CURE NOTICES; (V) SCHEDULING AN AUCTION  SHOULD THERE BE MORE THAN ONE QUALIFYING BID; (VI) SCHEDULING A HEARING TO CONSIDER APPROVAL OF SALE; AND (VII) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **October 28, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Ron Bender    rb@lnbyb.com**
- **Alexander S Berk    aberk@mayerbrown.com, courtnotification@mayerbrown.com**
- **Amir Gamliel    amir-gamliel-9554@ecf.pacerpro.com, cmallahi@perkinscoie.com;DocketLA@perkinscoie.com**
- **Nancy S Goldenberg    nancy.goldenberg@usdoj.gov**
- **Monica Y Kim    myk@lnbyb.com, myk@ecf.inforuptcy.com**
- **Daniel A Lev    dlev@sulmeyerlaw.com, ccaldwell@sulmeyerlaw.com;dlev@ecf.inforuptcy.com**
- **Kyle J Mathews    kmathews@sheppardmullin.com**
- **Juliet Y Oh    jyo@lnbyb.com, jyo@lnbrb.com**
- **Robert E Opera    ropera@wghlawyers.com, jmartinez@wghlawyers.com;mweinberg@wghlawyers.com**
- **Ronald N Richards    ron@ronaldrichards.com, morani@ronaldrichards.com**
- **Jeffrey S Shinbrot    jeffrey@shinbrotfirm.com, sandra@shinbrotfirm.com**
- **United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov**

**2.  SERVED BY UNITED STATES MAIL**: On **October 28, 2021**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒  Service List continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                **F 9013-3.1.PROOF.SERVICE**

3.   **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **October 28, 2021**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

*None.*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| October 28, 2021 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                          **F 9013-3.1.PROOF.SERVICE**

Plamex and 3100
Secured, UST, Top 20, RSN

Office of the U.S. Trustee
Region 16
411 W 4th St #7160
Santa Ana, CA 92701

The Lynwood Redevelopment Agency
11330 Bullis Road
Lynwood, CA 90262

WF 1105, LLC
c/o Waterfall Asset Management, LLC
Attention: General Counsel
1140 Ave of the Americas, 7th Fl
New York, New York 10036

Perkins Coie LLP
2901 N. Central Ave., Suite 2000
Attn: Liana W. Spendlove
Phoenix, AZ 85012

CWCapital Asset Management
900 19th Street NW, 8th Floor
Attn: Ariel Levin/Jake Hamel
Washington, DC 20006

Natixis, New York Branch
1251 Avenue of the Americas
New York, NY 10020

Perkins Coie LLP
1888 Century Park East, Suite 1700
Attn: Mark Birnbaum
Los Angeles, CA 90067

Quarry Head 2017-1 Grantor Trust
c/o Waterfall Asset Management, LLC
1251 Ave. of the Americas, 50th Fl.
New York, NY 10020

c/o CWCapital Investments LLC
7501 Wisconsin Ave., Suite 500 West
Attn: Chris McCormack
Bethesda, MD 20814

c/o Keybank Real Estate Capital
11501 Outlook Street, Suite 300
Attn: Stephen J. Friedman
Overland Park, KS 66211

c/o Keybank Real Estate Capital
11501 Outlook Street, Suite 300
Attn: Timothy R. Gruenenfelder
Overland Park, KS 66211

Greenberg Traurig, PA
Attn: Laura Gangemi Vignola, Esq.
333 S.E. 2nd Avenue
Miami, FL 33131

Quarry Head 2017-1 Grantor Trust
c/o Waterfall Asset Management, LLC
1140 Ave. of the Americas, 7th Fl.
New York, NY 10036

*Top 20*
Wells Fargo Bank, N.A., as Trustee
Morgan Stanley Cap I Trust 2016-UBS
9062 Old Annapolis Road
Columbia, MD 21045

*Top 20*
Better & Best Building Service Inc.
1833 Avenida San Lorenzo
Fullerton, CA 92833

*Top 20*
Star Buffet Lynwood
11383 Long Beach Blvd
Lynwood, CA 90262

*Top 20*
Autofin USA
3180 E. Imperial Hwy. #G
Lynwood, CA 90262

*Top 20*
Bubbles Apparel
2839 Sycamore Avenue
La Crescenta, CA 91214

*Top 20*
GTO Security
2202 S Figueroa Street, Suite 134
Los Angeles, CA 90017

*Top 20*
Planet Fitness
125 E. Elm Street, Suite 300
Conshohocken, PA 19428

*Top 20*
Greenland Property Management, LLC
6988 Beach Blvd B-215
Buena Park, CA 90621

*Top 20*
Imperial Shopping Center, LLC
3100 E. Imperial Highway
Lynwood, CA 90262

*Top 20*
Community Enforcement Patrol
11600 Paramount Blvd #D
Downey, CA 90241

*Top 20*
3100 E. Imperial Investment, LLC
6988 Beach Blvd, Suite B-215
Buena Park, CA 90621

*Top 20*
Kone Inc.
1821 Tyburn Street
Glendale, CA 91204

*Top 20*
3100 E. Imperial Highway Corp.
3100 E. Imperial Highway
Lynwood, CA 90262

*Top 20*
Placo Investment, LLC
6988 Beach Blvd B-215
Buena Park, CA 90621

*Top 20*
Sonamu Holdings, LLC
P.O. Box 489
Buena Park, CA 90621

*Top 20*
M+D Properties
3100 E. Imperial Highway
Lynwood, CA 90262

*Top 20*
The Source at Beach, LLC
3100 E. Imperial Highway
Lynwood, CA 90262

*Top 20*
Waste Resources, Inc.
23 Corporate Plaza Drive, Suite 247
Newport Beach, CA 92660

*Top 20*
Southern California Edison
2244 Walnut Grove Avenue
Rosemead, CA 91770

Family Acupuncture & Herb Clinic
3150 E. Imperial Hwy B8-206
Lynwood, CA 90262

Fashion Qrew
1324 E. Washington Blvd
Los Angeles, CA 90021

Bioncos La Huerta
8557 Orange Street
Downey, CA 90242

Grupo Concordia LA
5919 San Miguel Road
Bonita, CA 91902

Grupo Pakar LLC
9595 Six Pines Drive Suite 8210
The Woodlands, TX 77382

Happy Land
6732 Los Verdes Dr. #3
Rancho Palos Verdes, CA 90275

Hip Hop Zone
3100 E. Imperial Hwy #1009
Lynwood, CA 90262

JPL Event Enterprise LLC
1238 South Beach Blvd
Anaheim, CA 92804

Jose Alan Sandoval-Iniquez
15137 San Jose Ave
Paramount, CA 90723

Pho VNK
3180 E. Imperial Hwy, Suite C
Lynwood, CA 90262

The Kickin' Crab
3170 Imperial Hwy B4B102
Lynwood, CA 90262

Real De Oaxaca
11215 Long Beach Blvd #1010
Lynwood, CA 90262

*Request for Special Notice*
Stephen T. Owens & Tania Ochoa
Alvarez-Glasman & Colvin
13181 Crossroads Parkway North
Suite 400, West Tower
City of Industry, CA 91746

*Request for Special Notice*
David M. Neff, III
Amir Gamliel, Cal. Bar No. 268121
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, CA 90067