RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email:  RB@LNBYG.COM; MYK@LNBYG.COM; JYO@LNBYG.COM

Attorneys for Chapter 11 Debtors and
Debtors-in-Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>PLAMEX INVESTMENT, LLC, Delaware limited liability company,<br><br>        Debtor and Debtor in  Possession. | Lead Case No.: 8:21-bk-10958-ES<br><br>Jointly administered with 3100 E. Imperial Investment, LLC (8:21-bk-10957-ES)<br><br>Chapter 11 Cases |
| In re:<br><br>3100 E. IMPERIAL INVESTMENT, LLC, a  Delaware  limited  liability company,<br><br>        Debtor and Debtor in Possession. | **DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN OF LIQUIDATION (DATED JANUARY 27, 2022)** |
| ☒  Affects both Debtors<br><br>☐ Affects Plamex Investment, LLC only<br><br>☐  Affects 3100 E. Imperial Investment, LLC only | Disclosure Statement Hearing:<br>Date:     February 10, 2022<br>Time:     10:30 a.m.<br>Place:    ZoomGov<br><br>Plan Confirmation Hearing:<br>Date:     May 5, 2022<br>Time:     2:00 p.m.<br>Place:    ZoomGov |

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................... 2

    A.    Purpose of this Disclosure Statement. ....................................................... 3

    B.    Deadlines for Voting and Objecting; Date of the Plan Confirmation
           Hearing. ....................................................................................................... 4

           1.    Time and Place of the Plan Confirmation Hearing. .................... 4

           2.    Deadline For Voting For or Against the Plan. ............................ 4

           3.    Deadline for Objecting to the Confirmation of the Plan. ............ 4

    C.    Identity of Persons to Contact for More Information Regarding the Plan. ............. 4

    D.    Disclaimer. ................................................................................................. 5

II. BACKGROUND ................................................................................................... 5

    Description and History of the Debtors and Events Leading To The Filing Of
           The Debtors' Chapter 11 Cases ................................................................. 5

    A.    Background. ................................................................................................. 5

    B.    Secured Debts. ............................................................................................ 6

           1.    Plamex - Senior Loans. ............................................................... 6

           2.    3100 - Mezzanine Loans. ........................................................... 8

    C.    Events Leading To The Debtors' Bankruptcy Filings. ............................... 9

    D.    Current Posture Of The Debtors' Bankruptcy Cases. ............................. 10

    E.    Significant Events Which Have Occurred During The Debtors'
           Bankruptcy Cases. ................................................................................... 13

           1.    First Day Motions Including Emergency Motion For Use of Cash
                 Collateral. ................................................................................... 13

           2.    Employment Of Professionals. ................................................. 14

           3.    Administration Of The Debtors' Chapter 11 Bankruptcy Estates. ............. 16

           4.    Extensions of the Debtors' Plan Exclusivity Periods. ............... 16

           5.    Claims Bar Date and Analysis. ................................................. 16

6.      Marketing and Sale Process of Plaza Mexico. ........................................... 17

III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE
    PLAN............................................................................................................................ 18

    A.      What Creditors and Interest Holders Will Receive Under the Plan. .................... 18

    B.      Unclassified Claims................................................................................................ 19

            1.      Administrative Expenses. ........................................................................... 19

            2.      Priority Tax Claims. ................................................................................... 21

            3.      Cash Collateral/Adequate Protection Claims. ........................................... 22

    C.      Classified Claims and Interests. ............................................................................ 22

IV. MEANS FOR EFFECTUATING AND IMPLEMENTATION OF THE PLAN .................. 34

V. TAX CONSEQUENCES OF THE PLAN ........................................................................... 50

VI. CONFIRMATION REQUIREMENTS AND PROCEDURES............................................ 52

    A.      Who May Vote or Object. ...................................................................................... 52

    B.      Who May Vote to Accept/Reject the Plan. ............................................................ 52

    C.      What Is an Allowed Claim/Interest. ...................................................................... 52

    D.      What Is an Impaired Claim/Interest. ...................................................................... 53

    E.      Who Is Not Entitled to Vote................................................................................... 53

    F.      Who Can Vote in More Than One Class................................................................. 54

    G.      Votes Necessary to Confirm the Plan..................................................................... 54

    H.      Votes Necessary for a Class to Accept the Plan..................................................... 54

    I.      Treatment of Non-Accepting Classes..................................................................... 54

    J.      Request for Confirmation Despite Nonacceptance By Impaired Class(es)...........55

    K.      Liquidation Analysis. ............................................................................................. 55

    L.      Feasibility. .............................................................................................................. 56

VII. RISK FACTORS REGARDING THE PLAN................................................................... 58

VIII. EFFECT OF CONFIRMATION OF THE PLAN............................................................ 58

A.    Discharge. ..........................................................................................................58

B.    Modification of the Plan. ...................................................................................59

C.    Post-Confirmation Status Reports. ....................................................................59

D.    Post-Confirmation Conversion/Dismissal. ........................................................59

E.    Final Decree. ......................................................................................................60

## I.      INTRODUCTION

On April 14, 2021 (the "Petition Date"), Plamex Investment, LLC, a Delaware limited liability company ("Plamex"), and 3100 E. Imperial Investment, LLC, a Delaware limited liability company ("3100," and together with Plamex, the "Debtors"), the debtors and debtors-in-possession in the above-captioned, jointly administered chapter 11 bankruptcy cases, commenced their chapter 11 bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. ("Bankruptcy Code"). No official committee of unsecured creditors has been appointed in these chapter 11 cases.

The Debtors are parties in interest that are authorized to propose a plan of liquidation. This document is the Disclosure Statement ("Disclosure Statement") that describes the Debtors' Joint Plan of Liquidation (Dated January 27, 2022) ("Plan") that is being proposed by the Debtors. The Debtors have concurrently filed the Plan. All terms that are defined in the Plan and that are not defined in this Disclosure Statement shall be deemed to have the same definitions in this Disclosure Statement.

The Plan is premised upon the sale of Plamex's primary asset, the Plaza Mexico Shopping Center (as further described below), pursuant to a $162.5 million stalking horse bid, bidding procedures, and a sale process that already have been approved by the Bankruptcy Court pursuant to an amended Bidding Procedures Order entered on January 18, 2022 as Docket No. 263, all as more fully described below. Based on current claim estimates, and even if no higher and better offers are received, the consummation of the sale of the Plaza Mexico Shopping Center for the stalking horse bid is expected to provide for the payment in full of all Allowed non-insider Claims against both Debtors.

The effective date of the Plan (the "Effective Date") means the date on which all conditions to the effectiveness of the Plan set forth in Article X of the Plan have been satisfied or waived in accordance with the terms of the Plan. Among other things, for the Effective Date to occur, the Court order confirming the Plan (the "Plan Confirmation Order") shall have been entered as to the Debtors and shall have become a Final Order (as defined in the Plan) and shall be in full force and effect, the sale of the Plaza Mexico Shopping Center shall have been

consummated, and the Plan and all documents, instruments and agreements to be executed in connection with the Plan have been executed and delivered by all parties to such documents, instruments and agreements.

**A.**      **Purpose of this Disclosure Statement.**

This Disclosure Statement summarizes what is in the Plan, and tells you certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to confirm the Plan.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

**(1)**      **WHO CAN VOTE OR OBJECT**,

**(2)**      **WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what you will receive on account of your claim if the Plan is confirmed) AND HOW THIS TREATMENT COMPARES TO WHAT YOU WOULD RECEIVE ON ACCOUNT OF YOUR CLAIM IN LIQUIDATION**,

**(3)**      **THE HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS DURING THEIR BANKRUPTCY CASES,**

**(4)**      **WHAT THINGS THE BANKRUPTCY COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN,**

**(5)**      **WHAT IS THE EFFECT OF CONFIRMATION, AND**

**(6)**      **WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as this Disclosure Statement. If there are any inconsistencies between the Plan and this Disclosure Statement, the Plan provisions will govern.

The Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. The Bankruptcy Court has approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to

make an informed judgment about the Plan. Any party can now solicit votes for or against the Plan.

**B.    Deadlines for Voting and Objecting; Date of the Plan Confirmation Hearing.**

THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON ALL CREDITORS AND INTEREST HOLDERS IN THESE CASES.

**1.    *Time and Place of the Plan Confirmation Hearing.***

The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan (the "Plan Confirmation Hearing") will take place on March 24, 2022, at 10:30 a.m. before the Honorable Erithe Smith, United States Bankruptcy Judge for the Central District of California, Santa Ana Division. All appearances at the Plan confirmation hearing must be in compliance with the Court's Zoom instructions.

**2.    *Deadline For Voting For or Against the Plan.***

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot in the enclosed envelope to Ron Bender, Esq., Levene, Neale, Bender, Yoo & Golubchik L.L.P., 2818 La Cienega Avenue, Los Angeles, California 90034. Your ballot must be properly completed and executed and submitted to counsel for the Debtors by 5:00 p.m. Pacific Time on April 12, 2022.

**IF YOU DO NOT TIMELY VOTE FOR OR AGAINST THE PLAN, THE DEBTORS WILL REQUEST THE BANKRUPTCY COURT TO TREAT YOU AS HAVING VOTED TO ACCEPT THE PLAN.**

**3.    *Deadline for Objecting to the Confirmation of the Plan.***

Objection to the Court's confirmation of the Plan must be filed with the Court and served on the Debtors' counsel by no later than April 12, 2022.

**C.    Identity of Persons to Contact for More Information Regarding the Plan.**

Any interested party desiring further information about the Plan should contact the

1    Debtors' bankruptcy counsel, Levene, Neale, Bender, Yoo & Golubchik L.L.P., 2818 La Cienega

2    Avenue, Los Angeles, California 90034, Attention: Ron Bender (RB@LNBYG.com), Monica Y.

3    Kim (MYK@LNBYG.com) and Juliet Y. Oh (JYO@LNBYG.com).

4    **D.    Disclaimer.**

5          The financial data relied upon in formulating the Plan is based on the Debtors' books and

6    records which, unless otherwise indicated, are unaudited. The information contained in this

7    Disclosure Statement is provided by the Debtors based upon the information available to the

8    Debtors. The Bankruptcy Court has not yet determined whether or not the Plan is confirmable and

9    makes no recommendation as to whether or not you should support or oppose the Plan.

10   **II.    BACKGROUND**

11   **Description and History of the Debtors and Events Leading To The Filing Of The Debtors'**

12   **Chapter 11 Cases**

13   **A.    Background.**

14         The Debtors each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy

15   Code on the Petition Date of April 14, 2021. The Debtors are continuing to manage their financial

16   affairs and operate their bankruptcy estates as debtors-in-possession pursuant to Sections 1107 and

17   1108 of the Bankruptcy Code. The Court approved the joint administration of the Debtors' cases.

18         Plamex is the fee simple owner of "Plaza Mexico" ("Plaza Mexico" or the "Property"), a

19   403,242 square-foot community shopping center offering specialty retail and dining located in

20   (Lynwood, California just north of the 105 freeway (approximately 20 minutes from LAX). For

21   over 20 years, Plaza Mexico has been a community landmark in Southern California. The premise

22   behind Plaza Mexico is to represent the rich Latino heritage of the community and create an

23   authentic Mexican cultural landscape through the incorporation of Mexican architecture, authentic

24   building materials, notable monuments, and a forum to celebrate all Mexican fiestas. Currently,

25   Plaza Mexico is occupied by tenants that include Food 4 Less, Rite Aid, Curacao, Chuck E. Cheese,

26   and a wide variety of restaurants and retailers of clothing, electronics, shoes, toys, jewelry, and

27   furniture. The property also boasts a revenue-creating LED tower overlooking the I-105 Freeway.

28         Plamex is wholly owned by its sole member, 3100, one of the Debtors herein. Other than

its membership interests in Plamex, 3100 does not have any other material assets. 3100 is wholly owned by an entity called Placo Investment, LLC ("Placo"), and Placo is wholly owned by ISLT Investment, LLC ("ISLT"). Neither Placo nor ISLT has filed its own bankruptcy case.

**B.    Secured Debts.**

   **1.    _Plamex - Senior Loans._**

On June 16, 2016, Plamex, as borrower, obtained $106,000,000 in loans from Natixis, New York Branch ("Senior Loans"), secured by a "_Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing_" ("Deed of Trust") upon the Plaza Mexico real property, and liens upon substantially all other assets of Plamex purportedly perfected by, among other things, the recording of UCC-1 financing statements in the States of Delaware and California. The promissory note evidencing the Senior Loans was contemporaneously severed and split into six replacement promissory notes: Replacement Promissory Note A-1 for $28,000,000, Replacement Promissory Note A-2 for $20,000,000, Replacement Promissory Note A-3 for $20,000,000, Replacement Promissory Note A-4 for $20,000,000, Replacement Promissory Note A-5 for $10,000,000, and Replacement Promissory Note A-6 for $8,000,000 (collectively, the "Notes"). CWCapital Asset Management, LLC is the servicer ("Servicer") of all of the Notes, including the A-2 and A-3 Notes which are held by Wells Fargo Bank, National Association, as Trustee for Morgan Stanley Capital I Trust 2016-UBS11, Commercial Mortgage-Pass Through Certificates, Series 2016-UBS11 (the "Senior Lender").[1]

Plamex went into payment default on the Senior Loans in May 2020.  The Senior Lender contends that the Senior Loans remained in default until the Petition Date, which the Senior Lender contends entitles the Senior Lender to pre-petition default interest.  However, pursuant to the

---

[1] Allonges for Replacement Promissory Notes A-1 and A-6 were endorsed in favor of Wilmington Trust, National Association, as Trustee for the Benefit of the Registered Holders of SG Commercial Mortgage Securities Trust 2016-C5, Commercial Mortgage Pass-through Certificates, Series 2016-C5. Allonges to Replacement Promissory Notes A-2 and A-3 were endorsed in favor of the Senior Lender. Allonges for Replacement Promissory Notes A-4 and A-5 were endorsed in favor of Wilmington Trust, National Association, as Trustee for the Benefit of the Registered Holders of Wells Fargo Commercial Mortgage Trust 2016-NXS6, Commercial Mortgage Pass-through Certificates, Series 2016-NXS6. Pursuant to that certain Co- Lender Agreement, Senior Lender is vested with the authority to pursue any and all enforcement actions, including in this bankruptcy, in connection with or related to the Notes.

express provisions of the loan agreement governing the Senior Loans, default interest may be charged only during the continuance of an event of default. As set forth in the Proof of Claim (the "Mezz Lender Proof of Claim") filed by Quarry Head 2017-1 Grantor Trust ("Quarry Head") in the 3100 E. Imperial Chapter 11 case on August 17, 2021, Quarry Head made advances in the aggregate amount of $1,169,336.91 to cure these payment defaults under the Senior Loans (the "Cure Payments").

Given the pandemic and the financial effects of the pandemic including Plamex's efforts to re-finance the Senior Loans which was in process during the Spring of 2020 when the pandemic suddenly hit, Plamex requested, but the holders of the Notes refused, to extend the maturity date of the Senior Loans.

As of the Petition Date, the holders of the Senior Loans contended that at least $107,779,709.71 in principal, interest, default interest, late charges, advances, administrative, liquidation and servicing fees and expenses, attorneys' fees, and other costs and expenses was due and owing with respect to the Senior Loans, less escrow, reserve, and suspense amounts held by the Senior Lender. Without limiting the generality of the other provisions of the Plan, to the extent that such amount includes default interest for the period after the Cure Payments were made and prior to the Petition Date, such interest is not included in the Senior Lender Undisputed Amount as defined in the Plan, but instead is included, with various other amounts, in the definition of "Senior Lender Disputed Amount" in the Plan, and, as such, may be subject to objection, including by the Debtors, Quarry Head, and/or D. Chae on the grounds, as described above, that it could not be properly charged as a matter of contract during that period as there was no continuing payment default by virtue of the Cure Payments.

The commencement of Plamex's chapter 11 case constituted a new event of default under the loan agreement governing the Senior Loans. Accordingly, since the Petition Date, the Senior Loans have accrued non-default interest at a fixed rate of 4.598% and default interest at a rate that is the lesser of (i) maximum rate permitted by applicable law, or (ii) 5% above the regular rate. Please see the definition of "Senior Lender Undisputed Amount" in the Plan.

The Senior Loans matured on or about  July 5, 2021.

In June 2016, at the time of the Senior Loans, the Plaza Mexico property was appraised at approximately $184-$187 million. Plamex is informed that, in October 2020, the Servicer of the Notes secured an appraisal of the Plaza Mexico property for $170 million.

## 2.    *3100 - Mezzanine Loans*.

Concurrently with the Senior Loans, on June 16, 2016, 3100 obtained $14,000,000 in mezzanine loans also from Natixis, New York Branch ("Mezzanine Loans"). These Mezzanine Loans were also contemporaneously or subsequently sold, conveyed and assigned to Waterfall Olympic Fund Grantor Trust, Series III and Quarry Head. The Mezzanine Loans were primarily secured by a pledge of all of 3100's membership interest in and to Plamex pursuant to a "*Pledge and Security Agreement*." The holders of the Mezzanine Loans also purportedly perfected their liens on substantially all assets of 3100 by the recording of UCC-1 financing statements in the States of Delaware and California.

Because 3100's ability to service its debt payments on the Mezzanine Loans also hinges on the performance of Plaza Mexico, which it was unable to do as a result of the pandemic and its financial effects, 3100 also went into default as to the Mezzanine Loans. Quarry Head, as the holder of the Mezzanine Loans, retained Jones Lang LaSalle Americas, Inc. ("JLL") as its advisor and sought to foreclose upon the pledge and lien upon 3100's membership interests in Plamex, with a UCC foreclosure sale scheduled for April 15, 2021 at 10:00 a.m. (EST). Plamex and 3100 commenced their bankruptcy cases to avoid foreclosure upon such membership interests and to preserve these interests and the Plaza Mexico property for all constituents.

Pursuant to an "*Intercreditor Agreement*" originally between Natixis, New York Branch on behalf of the Senior Loans and Natixis, New York Branch on behalf of the Mezzanine Loans, the Mezzanine Loans are, among other things, subordinated to the Senior Loans, including as to payment.

As of November 30, 2021, Quarry Head's Claim, defined as the Mezz Lender Secured Claim in the Plan, was not less than $22,412,646.97, consisting of (a) $15,418,691.87 in outstanding principal, (b) $5,032,518.45 in accrued interest at the contract rate of 12.352% from March 5, 2020 to November 30, 2021, (c) $1,279,694.70 in accrued default interest, (d)

$525,941.81 in incurred professional fees and costs as of the Petition Date, (e) $154,727.46 in late fees, (f) $1,000.00 in lien release and assignment fees, and (g) $72.68 in miscellaneous fees, plus (x) interest accruing after November 30, 2021 on the principal amount of $15,418,691.87 at the contract and default rates set forth in the operative loan documents, (y) professional fees and expenses incurred after the Petition Date, and (z) any other fees, expenses, and other amounts incurred after November 30, 2021 that are reimbursable under the applicable agreements, all of which amounts also constitute a portion of the Mezz Lender Secured Claim.

Aside from any Plamex obligation to return tenant security deposits and any Plamex liability with respect to the Litigation Claims (as such term is defined below), Plamex has relatively minimal non-Affiliate unsecured and liquidated debt.  Plamex estimates its liability to return Tenant security deposits to be approximately $1,274,717 in the aggregate.  To the extent that the underlying Tenant Leases are assumed and assigned as part of the sale of the Property, the Purchaser is expected to assume this liability in return for a corresponding credit against the Purchase Price.  As to the Litigation Claims, and in addition to any available insurance coverage, those are Disputed and subject to the claim resolution process, including disallowance should a proof of claim with respect to which not have been timely filed. 3100 does not appear to have any unsecured creditors.

**C.**     **Events Leading To The Debtors' Bankruptcy Filings.**

The Debtors assert that the Debtors' bankruptcies are the results of two primary factors: (i) substantial loss of rent revenue from Plamex's tenants due to the COVID-19 pandemic which caused the Debtors to default on their obligations to their secured lenders, and (ii) efforts by the secured lenders to foreclose on their collateral, including a foreclosure sale scheduled by Quarry Head as the holder of the Mezzanine Loan for April 15, 2021 at 10:00 a.m. (EST) on the membership interests held by 3100 in Plamex.

More specifically, Plaza Mexico has not been immune to the financial effects of the COVID-19 pandemic. Due to government-imposed stay-at-home orders and related restrictions which started in March of 2020, Plaza Mexico's tenants were required to close and/or experienced a drastic loss of business, sales and income. Many of the tenants could and did not pay full or any rents to Plamex, which, in turn, resulted in a default by the Debtors to their secured lenders. The

1    Debtors were in the process of re-financing at the time the pandemic hit, which halted the process.

2    As California has started to ease restrictions, rent collections at Plaza Mexico have been brought

3    almost back to pre-pandemic levels. There is an increase in foot traffic, and tenants are starting to

4    pay rents timely. However, despite these positive movements, the holder of the Mezzanine Loan,

5    based on its assessment of the existing circumstances and its contractual and legal rights, was

6    unwilling to stop its April 15, 2021 foreclosure sale. As a result, 3100 and Plamex had no choice

7    but to file their petitions to preserve their assets for the benefit of all constituencies. The Waterfall

8    Parties dispute this.

9    **D.    Current Posture Of The Debtors' Bankruptcy Cases.**

10    Shortly after the Petition Date, the Debtors made the decision that the best interests of their

11    estates are served by their employment of a real estate broker to assist the Debtors either to sell

12    Plaza Mexico for the most money possible or to find an investment partner to team up with the

13    Debtors either in connection with a sale process or a reorganization process. The Debtors decided to

14    employ NAI Capital Commercial, Inc. ("NAI") as their real estate broker.

15    On June 11, 2021, the Debtors filed their joint application to employ NAI as their real estate

16    broker on the terms and conditions set forth in such application and the listing agreement between

17    the Debtors and NAI. The Senior Lender and the Waterfall Parties objected to the proposed

18    employment of NAI, contending that NAI was not qualified to market the Property. After a hearing

19    held on July 15, 2021, the Court entered its order approving NAI's employment on an interim basis,

20    and scheduled a final hearing for September 30, 2021. After the final hearing held on September 30,

21    2021, the Court entered its order approving NAI's employment on a final basis.

22    The Debtors, with the assistance of NAI, actively and diligently marketed the Property for

23    sale for more than 3 months, with over 200 parties having signed non-disclosure agreements to

24    access due diligence materials. While no formal bidding procedures had been in place at that time,

25    NAI set a deadline for the submission of initial bids for the Property. A total of four initial bids were

26    submitted ranging from $140-$150 million. Following that initial bid deadline, and in connection

27    with global settlement discussions that eventually culminated in a Plan Support Agreement among

28

the parties[2], Quarry Head on behalf of itself and any nominee (the "SH Bidder") submitted a stalking horse bid to Plamex of $162.5 million (the "SH Bid") as part of an overall comprehensive sale/plan process.

At a hearing held on November 18, 2021, the Court granted the Debtors' motion for approval of initial bidding procedures and related matters involving the Debtors, various Debtor Affiliates, the SH Bidder and the other Waterfall Parties, including approval of the Plan Support Agreement. A copy of the Plan Support Agreement is on file with the Bankruptcy Court as Docket No. 282 and can be viewed by any interested party.  A copy of the Plan Support Agreement may also be obtained by any interested party by sending an email request to counsel for the Debtors whose contact information is set forth above.

On December 2, 2021, the Court entered the initial bidding procedures order (the "Bidding Procedures Order"). The initial Bidding Procedures Order governed the process for the proposed sale of the Property and contained detailed bidding procedures. In summary, the initial Bidding Procedures Order established an initial bid deadline of February 17, 2022 and n auction to be held on February 21, 2022.

The Debtors decided to replace NAI as the real estate broker for the Property with JLL. The Court approved the Debtors' employment of JLL at a hearing held on November 18, 2021.  After

---

[2] The Plan Support Agreement dated November 23, 2021 (as amended from time to time, the "Plan Support Agreement" or "PSA") is among the Debtors, Donald Chae, individually, as a debtor and debtor-in-possession in his Chapter 11 case, Case No. 8:21-12493-ES, also pending in the Bankruptcy Court and as trustee of the Donald and Eun Hee Family Trust u/d/t March 16, 2006, M+D Properties, a California Corporation, and the Waterfall Parties, including Quarry Head or its nominee as the SH Bidder. The PSA generally sets forth the basis and parameters of the sale process and the Plan and the obligations of the parties to cooperate towards the successful culmination of both. Among the interrelated transactions that constitute such global resolution, Section 4(f) of the PSA provides that, in the event that the Plan Transactions are fully consummated, then, as soon as practicable after the later of the Effective Date and the substantial consummation of the Plan Transactions, Quarry Head and WF I105 shall be obligated to enter into that certain Termination of Guaranties and Release in Favor of Guaranteed Parties (3100 E. Imperial Mezz Guaranties and Placo Investment Pref Guaranties), substantially in the form of Exhibit B to the PSA, with D. Chae, Min Chae Successor (as such term is defined in the PSA), the Donald and Eun Hee Family Trust, the Min and Young Mee Chae Family Trust, and M+D. The PSA is subject to Bankruptcy Court approval in the Chapter 11 Cases, which, as noted below, was granted via the Bidding Procedures Order, as well as to Bankruptcy Court approval in the D. Chae bankruptcy case. In Section 9 thereof, the PSA expressly provides that in the event of any conflict between the terms and provisions of the Plan or the Confirmation Order, on the one hand, and the PSA, on the other hand, the terms and provisions of the Plan or the Confirmation Order, as the case may be, shall control except as to the SH Bidder's termination and expense reimbursement rights.  The foregoing summary is qualified in its entirety by reference to the PSA.

consultation with, among other parties, the Debtor, JLL and the Waterfall Parties, the parties all agreed that extending the deadlines established by the initial Bidding Procedures Order was in the best interests of the Debtors' estates.  The Court entered an amended Bidding Procedures Order on January 18, 2022 as Docket No. 263.  Pursuant to the amended Bidding Procedures Order, the bid deadline has been extended to April 7, 2022, and the auction in the event one or more qualified overbids is submitted has been extended to take place on April 11, 2022.  The sale hearing has been extended to April 14, 2022 at 10:30 a.m. (prevailing Pacific time).

The Debtors and the SH Bidder have negotiated a form of purchase and sale agreement (the "SH PSA"), and all prospective overbidders will be required to submit their proposed changes to the SH PSA pursuant to a purchase agreement template that can be obtained from JLL or the Debtors. Notably, the SH Bidder has agreed to forego two material stalking horse protections that are usually included in a free and clear asset sale process. Specifically, the SH Bidder is proceeding without any break-up fee or bid protections, except, in connection with bid protections, the Bidding Procedures Order expressly provides the SH Bidder with an expense reimbursement right, which, among other things, may be used as currency at any auction in the amount of $500,000.  A copy of the SH PSA is on file with the Bankruptcy Court as Docket No. 281 and can be viewed by any interested party. A copy of the SH PSA may also be obtained by any interested party by sending an email request to counsel for the Debtors whose contact information is set forth above.

The minimum overbid will be $162.6 million. The winning bidder will have the option of consummating its purchase of the Property through a traditional free and clear asset sale outside the context of a confirmed plan or through and in conjunction with a confirmed plan.

The Bidding Procedures Order expressly provides that, in the event that a qualified bid for the Property (other than the SH Bid) is not submitted by a qualified bidder on or before such April 7, 2022 bid deadline, the SH bid shall be deemed the highest and best bid and accordingly, the successful bid for the Property, the auction shall be deemed cancelled and shall not proceed, and Plamex shall promptly submit the SH Bid for approval at the sale hearing, which presently is scheduled to be held on April 14, 2022 at 10:30 a.m. (prevailing Pacific time), as the successful bid for the Property.

**E.    Significant Events Which Have Occurred During The Debtors' Bankruptcy Cases.**

      **1.    *First Day Motions Including Emergency Motion For Use of Cash Collateral.***

Immediately upon commencing their cases, the Debtors sought joint administration of their cases which was approved, and also filed two emergency "first-day" motions: (i) for authority to provide adequate assurance of future payments to utilities pursuant to Section 366 of the Bankruptcy Code ("Utilities Motion"), and (ii) for authority to use the cash collateral of the Senior Lender to pay its ongoing expenses to operate and maintain the Property ("Cash Collateral Motion"). The Court scheduled emergency hearings on these "first day" motions for April 16, 2021 at 10:00 a.m. The Court approved the Utilities Motion having received no objection to such motion.

Prior to the emergency hearing, Plamex also reached an agreement with the Senior Lender for use of cash collateral through the final hearing on the Cash Collateral Motion pursuant to a budget approved by the Senior Lender. On April 16, 2021, the Court entered an Interim Order Granting Debtor's Emergency Motion for Entry of an Interim Order, Pending a Final Hearing, Authorizing the Debtor to Use Cash Collateral (the "Interim CC Order"). Pursuant to the Interim CC Order, the Court scheduled a final hearing on Plamex's use of cash collateral for May 11, 2021 at 10:30 a.m. Prior to this hearing, Plamex and the Senior Lender entered into a stipulation for use of cash collateral through August 31, 2021, and on May 12, 2021, the Court entered a Final Order Authorizing the Debtor to Use Cash Collateral (the "Final CC Order") authorizing the Debtor to continue to use cash collateral pursuant to the terms of the Stipulation Regarding Use of Cash Collateral (the "Cash Collateral Stipulation") between the Senior Lender and Plamex. Pursuant to the Final CC Order, the Court also continued the hearing on the Debtor's use of cash collateral to August 19, 2021 at 10:30 a.m.

The Cash Collateral Stipulation, approved by the Court, includes a provision that such stipulation can be further extended by the parties in writing without further order of the Bankruptcy Court. On or about July 29, 2021, the parties entered into their first "Agreement To Extend Stipulation Regarding Use of Cash Collateral" pursuant to which the Senior Lender consented to the use of cash collateral through October 31, 2021 pursuant to the terms and conditions thereof.

Contemporaneously, the parties entered into their "Stipulation To Continue Hearing On Debtor's Motion Authorizing The Debtor To Use Cash Collateral" to continue the August 19, 2021 hearing on Plamex's use of cash collateral. The Court entered its order approving this stipulation and continued the hearing on Plamex's use of cash collateral to October 21, 2021 at 10:30 a.m. and set deadlines for the parties to file their respective pleadings.

On or about October 14, 2021, the parties entered into their "Second Agreement To Extend Stipulation Regarding Use of Cash Collateral" pursuant to which the Senior Lender consented to the use of cash collateral through January 31, 2022 pursuant to the terms and conditions thereof. Contemporaneously, the parties entered into their "Stipulation To Continue Hearing On Debtor's Motion Authorizing The Debtor To Use Cash Collateral" to continue the October 21, 2021 hearing on Plamex's use of cash collateral. The Court entered its order approving this stipulation and continued the hearing on Plamex's use of cash collateral to January 20, 2022 at 10:30 a.m. and set deadlines for the parties to file their respective pleadings. Plamex has requested that the Senior Lender extend the parties' Cash Collateral Stipulation through April 30, 2022 to parallel the Debtors' exclusive period to confirm their Plan and hope to file a further stipulation to extend the hearing on the Cash Collateral Motion.

**2.**    ***Employment Of Professionals.***

The Debtors filed their applications to employ Levene, Neale, Bender, Yoo & Golubchik L.L.P. ("LNBYG") as their bankruptcy counsel, which was approved by the Court.

As mentioned above, at the outset of their cases, the Debtors employed NAI as their real estate broker to assist the Debtors either to sell Plaza Mexico for the most money possible or to find an investment partner to team up with the Debtors either in connection with a sale process or a reorganization process. The Senior Lender and the Waterfall Parties objected to the proposed employment of NAI, contending that NAI was not qualified to market the Property. In addition to filing an objection to the employment application, the Senior Lender requested and filed applications under Rule 2004 of the Federal Rules of Bankruptcy Procedure ("2004 Applications") for the production of documents and examinations of the persons most knowledgeable as to the NAI

engagement and other financial and operational matters concerning the Debtors. The Debtors opposed the 2004 Applications, however, the Court granted the 2004 Applications.

The Debtors invited the Senior Lender to interview Chris Jackson, the Co-Chief Executive Officer of NAI, and also agreed that Donald Chae and Luis Valenzeula, the President and Executive Vice President, respectively, of M&D Properties, which, together with its affiliated companies including Greenland Property Management, LLC (collectively, "Manager"), manages the day-to-day operations and affairs of the Plaza Mexico shopping center, represented the persons most knowledgeable as to the areas sought to be examined by the Senior Lender. These examinations were held on July 7, 2021 (Luis Valenzuela) and July 9, 2021 (Donald Chae).

Following these examinations and after the continued hearing held on July 15, 2021, the Court entered its order approving NAI's employment on an interim basis, and scheduled a final hearing for September 30, 2021. Prior to the final hearing held on September 30, 2021, the Senior Lender consented to the employment of NAI and the Court entered its order approving NAI's employment on a final basis.

As also mentioned above, in connection with the Debtors' decision to enter onto the Plan Support Agreement and, consistent therewith, to accept the stalking horse bid from the SH Bidder to sell Plaza Mexico for $162.5 million, subject to an overbid process, the Debtors decided to replace NAI as the real estate broker for the Property with JLL. The Waterfall Parties supported the Debtors' decision to hire JLL. On November 22, 2021 as Docket No. 214, the Court entered an order approving the Debtors' employment of JLL as the replacement real estate broker, and on November 22, 2021 as Docket No. 215, the Court entered an order approving a stipulation entered into between the Debtor and NAI which terminated the Debtor's employment of NAI as its real estate broker.

On September 16, 2021, the Court also held hearings to consider the first interim fee application filed by LNBYG seeking approval of fees and costs incurred during the Petition Date through August 25, 2021. The Court approved LNBYG's first interim fee application and approved the payment of fees and costs of $194,791.34 in the Plamex case and $52,775 in the 3100 case.

### 3.    *Administration Of The Debtors' Chapter 11 Bankruptcy Estates.*

The Debtors have complied with all of the reporting requirements of the United States Trustee ("UST"), including the preparation and filing of their 7-Day Packages to the UST, their Schedules of Assets and Liabilities and Statements of Affairs, and Monthly Operating Reports and have paid their quarterly fees owing to the UST. The Debtors have timely filed their status reports in accordance with the orders of the Court and attended the status conference hearings. The Debtors also attended their Initial Debtors' Interviews with the UST and their Meetings of Creditors. The Debtors have also continued to operate their businesses, namely, the operation of the Plaza Mexico shopping center in the ordinary course of business.

### 4.    *Extensions of the Debtors' Plan Exclusivity Periods.*

The Debtors have obtained various extensions of their plan exclusivity periods. Most recently, on November 29, 2021, as Docket No. 228, the Court extended the Debtors' exclusive period to file a plan of reorganization to January 21, 2022, and the Court extended the Debtors' exclusive period to obtain acceptances of a plan of reorganization to February 22, 2022. On December 17, 2021, as Docket No. 237, the Court further extended the Debtors' exclusive period to obtain acceptances of a plan to April 29, 2022. These dates are all intended to coincide with the Debtors' sale and plan process as more discussed below.

### 5.    *Claims Bar Date and Analysis.*

The Court set a deadline of August 20, 2021 as the deadline for creditors who assert pre-petition claims against either or both of the Debtors to file proofs of claims in these cases. On October 15, 2021, Plamex filed its motion for the entry of an order establishing a supplemental bar date for filing proofs of claim in Plamex's case for those creditors and parties in interest who were not included in Plamex's master mailing list and therefore did not receive notice of the original bar date for filing proofs of claim established in Plamex's bankruptcy case. The Court approved this request and set a deadline of January 7, 2022 as the supplemental bar date by which such excluded parties who wish to assert pre-petition claims against Plamex must file and serve proofs of claim, or be forever barred from asserting such pre-petition claims against Plamex.

The Debtors are in the process of reviewing all filed claims, and will review any

additional claims filed on or before the January 7, 2022 supplemental bar date, to determine if any

of them warrant objections. The Debtors understand that the Waterfall Parties are, and will be,

doing the same, particularly with respect to any additional claims filed on or before the January 7,

2022 supplemental bar date (especially any relating to any of the Litigation Claims (as such term

is defined below)), as they are likely beneficiaries, together with the holders of the direct and

indirect equity interests in the Debtors (including D. Chae), of any reduction in the allowed

amount of Claims. As set forth above, the Senior Loans may be subject to objection as to the

allowability of any default interest sought that purportedly relates to the period from May 2020 to

the Petition Date, as well as to the allowability of possibly other charges. Please see the definition

of Senior Lender Disputed Amount in the Plan. If the Debtors obtain more information in that

regard they will supplement this Disclosure Statement as appropriate.

### 6.     *Marketing and Sale Process of Plaza Mexico*.

Without the benefit of any bidding procedures from the Court or any formal decision

having been made by the Debtors, NAI went to market with a potential sale of Plaza Mexico and

set an informal initial bid deadline. A number of initial offers were received but none of them

were acceptable to the Debtors or to the Waterfall Parties. Thereafter, Quarry Head, on behalf of

itself and any nominee, submitted a stalking horse bid the SH Bidder to purchase Plaza Mexico

for $162.5 million, subject to an overbid process, and the Debtors accepted that stalking horse bid.

As explained above, at a hearing held on November 18, 2021, the Court granted the Debtors'

motion for approval of the initial proposed bidding procedures and related matters involving the

SH Bidder. On December 2, 2021, the Court entered the initial Bidding Procedures Order, which,

as noted, approved the proposed bidding procedures, as well as the forms of the "Purchase and

Sale Agreement" and various notices, as well as the Plan Support Agreement. All of the relevant

dates set forth in the initial Bidding Procedures Order were superseded by the amended Bidding

Procedures Order entered by the Bankruptcy Court on January 18, 2022 as Docket No. 263.  The

amended Bidding Procedures Order governs the sale process for the Property and contains

detailed bidding procedures. In summary, a bid deadline of April 7, 2022 has been set, and if at

least one qualified bid is submitted, there will be an auction conducted on April 11, 2022. The

minimum overbid will be $162.6 million. The winning bidder will have the option of consummating its purchase of the Property through a traditional free and clear asset sale outside the context of a confirmed plan or through and in conjunction with a confirmed plan.[3] The timing of the entire Plan confirmation process and approval of this Disclosure Statement is intended to permit the winning bidder to consummate its purchase of the Property through a confirmed plan without delay. Even if the winning bidder decides to consummate its purchase of the Property outside the context of a confirmed plan, the Debtors and the Waterfall Parties still believe that the best interests of these bankruptcy estates is for the Debtors to confirm the Plan as soon as possible. JLL as the Debtors' new real estate broker will be spearheading the overbid process. The Debtors are expecting that this Disclosure Statement will be approved by the Court before the overbid deadline.  Accordingly, this Disclosure Statement will not set forth the results of the Property sale process.  However, as indicated more below, even if there is no overbid and the SH Bidder ends up being the winning bidder with its stalking horse bid of $162.5 million, all holders of Allowed non-Debtor Affiliate Claims against the Debtors are expected to be paid in full and accordingly, the Waterfall Parties and the direct and indirect equity holders in the Debtors (and the Persons claiming by and through such direct and indirect equity holders) are likely to be the parties-in-interest most directly affected by any increase in the purchase price.

**III.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN**

**This Disclosure Statement contains only general and brief descriptions and provisions of the Plan. All creditors and other parties in interest are urged to review the Plan that accompanies this Disclosure Statement in its entirety to determine the treatment of their claims and equity interests and any other consequences or effects.**

**A.    What Creditors and Interest Holders Will Receive Under the Plan.**

---

[3]    As noted above, the Bidding Procedures Order expressly provides that, in the event that a qualified bid for the Property (other than the SH Bid) is not submitted by a qualified bidder on or before such April 7, 2022 bid deadline, the SH bid shall be deemed the highest and best bid and accordingly, the successful bid for the Property, the auction shall be deemed cancelled and shall not proceed, and Plamex shall promptly submit the SH Bid for approval at the sale hearing, which presently scheduled to be held on April 14, 2022 at 10:30 a.m. (prevailing Pacific time), as the successful bid for the Property.

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority. The Plan states whether each class of claims or interests is impaired or unimpaired. The Plan provides the treatment each class will receive.

**B.**   **Unclassified Claims.**

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Debtors have <u>not</u> placed the following claims in a class:

**1.**   ***Administrative Expenses.***

Administrative expenses are claims for costs or expenses of administering the Debtors' bankruptcy cases that are allowed under Bankruptcy Code Section 507(a)(2). The Bankruptcy Code requires that all administrative claims be paid on the Effective Date unless a particular claimant agrees to a different treatment.

The following chart lists <u>all</u> of the § 507(a)(2) administrative claims (other than operating expenses relating to the Property, which have been paid in the ordinary course pursuant to the Cash Collateral Order and which are required to be paid in full pursuant to the Plan) and their treatment under the Plan:

| Name | Amount Owed | Treatment |
|------|-------------|-----------|
| Clerk's Office Fees | $0 | Paid the later of (a) the Effective Date, and (b) the first Business Day after the date that is thirty (30) calendar days after the date this Administrative Expense Claim becomes an Allowed Administrative Expense Claim |
| UST Quarterly Fees | $0 | Paid the later of (a) the Effective Date, and (b) the first Business Day after the date that is thirty (30) calendar days after the date this |

| | | Administrative Expense Claim becomes an Allowed Administrative Expense Claim |
|---|---|---|
| Levene, Neale, Bender, Yoo & Golubchik L.L.P. ("LNBYG"), bankruptcy counsel to the Debtors | $300,000 (est.), which would be in addition to any payments made to LNBYG to date, including LNBYG's second interim fee application which is scheduled for hearing on March 3, 2022. | Paid in such amounts as are Allowed by the Bankruptcy Court on the date upon which an order relating to any such Allowed Fee Claim is entered or as soon as reasonably practicable thereafter. |
| JLL, real estate broker for the Debtors | Fee amount will be tied to the ultimate purchase price paid for the Property | JLL will paid its brokerage commission in accordance with the terms of its employment agreement with the Debtors and related Bankruptcy Court order |
| **TOTAL** | $300,000 (est.) | Paid in the manner described above |

<u>Bankruptcy Court Approval of Fees Required:</u>

The Bankruptcy Court must approve all professional fees and expenses listed in this chart before they may be paid. For all professional fees and expenses except fees owing to the Clerk of the Bankruptcy Court and fees owing to the UST, the professional in question must file and serve a properly noticed fee application and the Bankruptcy Court must rule on the application. Only the amount of fees and expenses allowed by the Bankruptcy Court will be required to be paid under the Plan. The administrative claim amounts set forth above simply represent the Debtors' best estimate as to the amount of allowed administrative claims in the Debtors' cases. The actual administrative claims may be higher or lower. Much of whether the actual administrative claims described above for professionals will be higher will be dependent upon whether the Debtors are required to engage in any substantial litigation regarding the confirmation of the Plan or otherwise and/or objecting to claims. To the extent the Debtors are required to engage in any such substantial litigation, the Debtors' professionals are likely to incur professional fees and expenses

in excess (and possibly substantially in excess) of the figures set forth above. By voting to accept the Plan, creditors are not acknowledging the validity of, or consenting to the amount of, any of these administrative claims, and creditors are not waiving any of their rights to object to the allowance of any of these administrative claims. Similarly, professionals who have been employed in these cases are not being deemed to have agreed that the figures contained herein represent any ceiling on the amount of fees and expenses that they have incurred or are entitled to seek to be paid pursuant to Bankruptcy Court order as such fees and expenses are just estimates provided at the time of the preparation of the Plan.

**2.** ***Priority Tax Claims.***

Priority tax claims include certain unsecured income, employment and other taxes described by Section 507(a)(8) of the Bankruptcy Code. Section 1129(a)(9)(C) of the Bankruptcy Code requires that each holder of such a Section 507(a)(8) priority tax claim receive regular installment payments of a total value, as of the Effective Date, equal to the allowed amount of such allowed tax claims over a period ending not later than five years after the Petition Date.

Under the Plan, each holder of an Allowed Priority Tax Claim against a Debtor will receive, in full and final satisfaction, settlement, and release of such Allowed Priority Tax Claim, at the sole option of the applicable Debtor, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (iii) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due. Notwithstanding anything to the contrary in the foregoing or elsewhere in the Plan, to the extent that any Priority Tax Claim consists of real estate taxes with respect to the Property that, as of the Effective Date, are not yet due and payable, such Priority Tax Claim will be deemed Allowed, prorated as part of the Sale Transaction, and in light of the credit against the Purchase Price accorded to the Purchaser therefor pursuant to the Purchase Agreement, payable by the Purchaser and will continue as a Lien against the Property following the Effective Date until so paid by the Purchaser.

### 3. *Cash Collateral/Adequate Protection Claims.*

On the Effective Date, to the extent any Cash Collateral Obligations remain unpaid, the commitments under the Cash Collateral Orders of the Senior Lender will terminate and all Allowed Cash Collateral Claims will be paid in full in Cash. As of the date hereof, there are no unpaid Cash Collateral Claims known to be due and owing, and in light of the required payment in full of the Senior Lender Mortgage Claim that ultimately is Allowed under the Plan, there will be no unpaid Cash Collateral Claims to be satisfied as Administrative Claims or otherwise under the Plan.

### C. **Classified Claims and Interests.**

The Plan constitutes a separate chapter 11 plan for each Debtor. Votes to accept or reject the Plan will be solicited by each Debtor.  If the Plan is approved for both of the Debtors, all classes of Claims against the Debtors will be treated as provided for in the Plan. The Plan will not be confirmed for any Debtor unless it is confirmed for both of the Debtors. All Claims and Interests are to be treated on a Debtor by Debtor basis with the assets of each Debtor's estate only being distributed on account of Allowed Claims and Allowed Interests of such Debtor. Claims against each Debtor, other than Administrative Expense Claims, Fee Claims, and Priority Tax Claims (which are not classified but are treated under the Plan on a Debtor by Debtor basis) are classified for all purposes (unless otherwise specified), including voting and Distribution pursuant to the Plan.

The following tables designate the Classes of Claims against and Interests in the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan; (b) entitled to vote to accept or reject the Plan in accordance with Section 1126 of the Bankruptcy Code; and (c) presumed to accept or deemed to reject the Plan. In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.

**Claims Against and Interests in Plamex**

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |

| | | | |
|---|---|---|---|
| 2 | Senior Lender Mortgage Claim | Unimpaired | No (Presumed to accept) |
| 3 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| 4 | General Unsecured Claims | Unimpaired | No (Presumed to accept) |
| 5 | Sole Member Interest | Unimpaired | No (Presumed to accept) |

**Claims Against and Interests in 3100**

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |
| 2 | Mezz Lender Secured Claim | Unimpaired | No (Presumed to accept) |
| 3 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| 4 | General Unsecured Claims | Unimpaired | No (Presumed to accept) |
| 5 | Interests | Impaired | Yes |
| 6 | Debtor Affiliate Claims | Impaired | Yes |

## 1.  TREATMENT OF CLAIMS AND INTERESTS FOR PLAMEX.

### 1.1    Priority Non-Tax Claims (Class 1).

(a)    *Classification*: Class 1 consists of Priority Non-Tax Claims against Plamex.

(b)    *Treatment*: Except to the extent that a holder of an Allowed Priority Non-Tax Claim against Plamex agrees to a less favorable treatment, in full and final satisfaction, settlement and release of such Allowed Priority Non-Tax Claim, each such holder will receive payment in full in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable.

(c)    *Voting*: Class 1 is Unimpaired, and holders of Priority Non-Tax Claims against Plamex are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Holders of Priority Non-Tax Claims against Plamex, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Priority Non-Tax Claims.

1.2    **Senior Lender Mortgage Claim – (Class 2).**

(a)    *Classification*:   Class 2 consists of the Senior Lender Mortgage Claim against Plamex.

(b)    *Allowance.*   The holder of the Senior Lender Mortgage Claim will be entitled to receive payment in full in Cash of the Allowed amount of such Claim.   The Senior Lender Mortgage Claim initially will be Allowed in the amount of Senior Lender Undisputed Amount, which will be calculated as of the Effective Date in accordance with the definition of Senior Lender Undisputed Amount and will be set forth in the Confirmation Order, and such amount will not be subject to any avoidance, reductions, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or other challenges under any applicable law or regulation by any Person with respect to such amount. The procedures for the allowance or disallowance of the Senior Lender Disputed Amount, including the establishment of the Senior Lender Cash Collateral Account on the Effective Date, pending the final resolution of any remaining objection to the Senior Lender Disputed Amount, will be governed by Section 4.2(c) of the Plan.

(c)    *Treatment*:   On or as soon as practicable after the Effective Date, the holder of the Senior Lender Mortgage Claim will apply all amounts held by Senior Lender or any of its Related Parties in escrow and reserve accounts relating to the Senior Lender Mortgage Claim (the "Existing Senior Lender Reserve Accounts") towards payment of the Senior Lender Undisputed Amount, and, following the application of all such amounts, Senior Lender will receive Cash under the Plan in an amount equal to the remaining balance of the Senior Lender Undisputed Amount. For avoidance of doubt, and absent a consensual resolution of the Senior Lender Disputed Amount, the Senior Lender Disputed Amount will be subject to an objection to claim to be filed by the Debtors, D. Chae, the Waterfall Parties, and/or any other creditor or party-in-interest. On the Effective Date, an amount of Sale Proceeds equal to the Senior Lender Disputed Amount will be deposited in a cash collateral account (the "Senior Lender Cash Collateral Account"), which will be pledged to Senior Lender pending the final resolution of the

Senior Lender Disputed Claim. If the Debtors, the Waterfall Parties, and Senior Lender counsel cannot reach agreement on or before the Confirmation Hearing as to the amount of the Senior Lender Disputed Amount for the purpose of such deposit in the Senior Lender Cash Collateral Account, such amount will be sought to be determined at the Confirmation Hearing, with such determination to be set forth in the Confirmation Order. To the extent that the Senior Lender Disputed Amount thereafter becomes Allowed by a Final Order, the holder of the Senior Lender Mortgage Claim will be entitled to receive immediate payment in full in Cash of such Allowed amount from the Senior Lender Cash Collateral Account, with interest to have accrued thereon to the extent that any such accrued interest is expressly required pursuant to the provisions of the Senior Lender's loan documents or as otherwise ordered by the Court, which payment or payments, together with the payments described in the first sentence of Section 4.2(c) of the Plan, will be in full and final satisfaction, settlement, and release of the Senior Lender Mortgage Claim. Immediately following such distribution, any remaining amount in the Senior Lender Cash Collateral Account will be distributed pursuant to the Section 4.5 of the Plan for further distribution pursuant to Article V hereof. On the Effective Date, and subject to the payment in full of the Senior Lender Undisputed Amount and the full funding of the Senior Lender Cash Collateral Account as set forth in Section 4.2(c) of the Plan, the Senior Lender will deliver customary mortgage and other Lien terminations (except as to the Senior Lender Cash Collateral Account) to be recorded of record. The payment of the final Allowed Amount of the Senior Lender Mortgage Claim as provided in the Plan is in full and complete satisfaction of any guaranties thereof (subject only to the express reinstatement provisions, if any, in such guaranties), including any such guaranties of D. Chae or M. Chae, to the maximum extent provided under applicable bankruptcy law and applicable non-bankruptcy law.

(d)    *Voting*: Class 2 is Unimpaired, and the holder of the Senior Lender Mortgage Claim against Plamex is conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. The holder of the Senior Lender Mortgage Claim, therefore, is not entitled to vote to accept or reject the Plan, and the vote of such holder will not be solicited with respect to such Senior Lender Mortgage Claim; provided, however, that, should

Class 2 nonetheless be determined to be Impaired and the holder of the Senior Lender Mortgage Claim votes or is deemed to have voted to reject the Plan, the Debtors will seek confirmation of the Plan over such dissent pursuant to Section 1129(b) of the Bankruptcy Code.

        1.3      **Other Secured Claims (Class 3).**

        (a)     *Classification*:  Class 3 consists of the Other Secured Claims against Plamex. To the extent that Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims will be treated as separate subclasses of Class 3 for purposes of voting to accept or reject the Plan and receiving distributions under the Plan.

        (b)     *Treatment*:

        (i)     *Generally*:  Except to the extent that a holder of an Allowed Other Secured Claim against Plamex agrees to different treatment, and except as set forth in Section 4.3(b)(ii) of the Plan, on the later of the Effective Date and the date on which such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim against Plamex will receive, on account and in full satisfaction of such Allowed Claim, at the sole option of Plamex: (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) return of the applicable collateral or the proceeds thereof in satisfaction of the Allowed amount of such Other Secured Claim; or (iii) such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired. However, except for the Other Secured Claims held by Debtor Affiliates (addressed in Section 4.3(b)(ii) of the Plan) and the real estate tax claims (addressed in Section 4.2(b)(iii) of the Plan), there are no known Other Secured Claims against Plamex.

        (ii)     *Affiliate Other Secured Claims*:  The Other Secured Claims of the Debtor Affiliates are the deemed secured claims under Section 506(a) of the Bankruptcy Code because such Claims arise from the right to set off Affiliate accounts receivable owing to Plamex by various affiliates against unsecured claim amounts owing by Plamex to such affiliates, which are described on Exhibit A to the Plan. The treatment of each such Other Secured Claim will be deemed to constitute a separate Class under the Plan. On the Effective Date, the setoff will

be deemed exercised, with any such remaining positive accounts receivable balances, if any (other than the net accounts receivables balances owing by 3100 to Plamex and by Placo to Plamex as reflected on Exhibit A to the Plan) being retained as an asset of Plamex and with any net unsecured claim in favor of such affiliate, if any, being deemed suspended and subordinated for purposes of distributions under the Plan until after WF I105's Preferred Equity Redemption Amount (as such term is defined below) is realized in full pursuant to the priority of distribution scheme described herein and in the Plan or WF I105's Placo Preferred Interest is otherwise redeemed in accordance with Section 5.5(b) of the Plan. Any remaining unsecured balances owed by Plamex to any such Affiliate will be treated as Debtor Affiliate Claims and will be addressed pursuant to Section 5.6 of the Plan. The net accounts receivable balances owing by 3100 to Plamex and by Placo to Plamex will be treated as provided in Section 4.5(c) of the Plan. The Debtors are not able to provide any estimated recovery, if any, from the Debtor Affiliate Claims as that would require an extensive financial and accounting analysis, and the Debtors do not have resources to provide any such analysis. The Debtors also believe that any such analysis is not relevant to any holders of any non-insider Allowed Claim as all non-insider Allowed Claims will be paid in full under the Plan regardless of the ultimate sale price for the Property.

(iii)    *Real Estate Tax Claims*:  Notwithstanding anything to the contrary in the Plan, to the extent an Allowed Other Secured Claim consists of real estate taxes with respect to the Property that are currently due and payable or will become due and payable in the future, the Purchaser may elect to either (1) acquire the Property at the consummation of the Sale Transaction subject to such Claims (with a corresponding credit to the Purchase Price) or (2) have such Claims paid from the Sale Proceeds and any other Cash on hand pursuant to Section 4.3(b)(i) of the Plan.

(c)    *Voting*:    Class 3 is Unimpaired, and holders of Other Secured Claims against Plamex are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Holders of Other Secured Claims against Plamex, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Other Secured Claims.

1.4     **General Unsecured Claims (Class 4).**

(a)     *Classification*:    Class 4 consists of General Unsecured Claims against Plamex other than any unsecured claim owed by Plamex to any Affiliate.

(b)     *Treatment*:

(i)     *Generally*:  Except to the extent that a holder of an Allowed General Unsecured Claim against Plamex agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, and release of such Allowed General Unsecured Claim, each such holder will receive payment in full in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim. For avoidance of doubt, the litigation Claims listed on Exhibit B to the Plan (the "Litigation Claims") are presently Disputed and, accordingly, will not be deemed Allowed pursuant to the Plan. General Unsecured Claims that are Disputed will be treated as set forth in the Plan, including pursuant to Sections 8.5 and 8.6.

(ii)     *Affiliate General Unsecured Claims:*     Notwithstanding anything to the contrary in the Plan, to the extent a General Unsecured Claim is held by an Affiliate of Plamex, including, without limitation, any such claims reflected on Exhibit C to the Plan, such Claim will not constitute a General Unsecured Claim, but instead will constitute and be treated as Debtor Affiliate Claims, and will be addressed pursuant to Section 5.6.

(c)     *Voting*:  Class 4 is Unimpaired, and holders of General Unsecured Claims against Plamex are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Holders of General Unsecured Claims against Plamex, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such General Unsecured Claim.

1.5     **Affiliate Claims and Interests (Class 5).**

(a)     *Classification*:  Class 5 consists of 3100's 100% equity interest in Plamex.

(b)     *Allowance*:  3100's 100% equity interest in Plamex will be deemed Allowed as of the Effective Date.

(c)    *Treatment*:  Subject to the provisions of Section 6.2(b), and on and after the Effective Date, all net Plan Cash proceeds of Plamex's Assets remaining after payment in full of all Allowed Claims against Plamex will be deemed distributed on account of 3100's 100% equity interest in Plamex subject to Mezz Lender's security interest in and to such equity interest as and when such Plan Cash proceeds are realized. On the Effective Date, all Effective Date Cash that remains after (i) the payment in full of all Allowed Claims against Plamex as of the Effective Date, (ii) the establishment and funding of the Senior Lender Cash Collateral Account, and (iii) the establishment of all Claim Reserves, will be deemed distributed to 3100 (subject to Mezz Lender's security interest) to be distributed in accordance with the provisions of Article V of the Plan. Thereafter, all Post-Effective Date Plan Cash, as and when realized, will be deemed distributed to Post-Effective Date 3100 to be distributed in accordance with the provisions of Article V of the Plan. Because all Claims against Plamex, other than Debtor Affiliate Claims, are to be paid in full (or sufficient funds are to be set aside to provide for payment in full) prior to the foregoing distributions, the claims of Plamex against 3100 and Placo will not be collected or enforced, but will instead be deemed to be subsumed and satisfied in connection with the distribution to 3100 pursuant to Section 4.5(c) of the Plan.

(d)    *Voting*:  Class 5 is Unimpaired, and the holders of the Class 5 Interests are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Accordingly, the holders of the Class 5 Interests are not entitled to vote to accept or reject the plan; provided, however, should Class 5 nonetheless be determined to be Impaired, and in connection with Quarry Head's contractual rights with respect to the pledge of 3100's 100% equity interest in Plamex, Quarry Head, rather than 3100, would be entitled to vote to accept or reject the Plan, and its vote, rather than 3100's, would be solicited.

## 2.    TREATMENT OF CLAIMS AND INTERESTS FOR 3100

### 2.1    Priority Non-Tax Claims (Class 1).

(e)    *Classification*:  Class 1 consists of Priority Non-Tax Claims against 3100.

(f)    *Treatment*:  Except to the extent that a holder of an Allowed Priority Non-Tax Claim against 3100 agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of such Allowed Priority Non-Tax Claim, each such holder will receive payment in full in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable.

(g)    *Voting*:  Class 1 is Unimpaired, and holders of Priority Non-Tax Claims against 3100 are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Holders of Priority Non-Tax Claims against 3100 are, therefore, not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Priority Non-Tax Claims.

    2.2    **Mezz Lender Secured Claim (Class 2).**

(h)    *Classification*:  Class 2 consists of the Mezz Lender Secured Claim.

(i)    *Allowance*.  The Mezz Lender Secured Claim will be Allowed in full, the actual amount of which to be calculated in accordance with the definition of the term Mezz Lender Secured Claim and to be set forth in the Confirmation Order, and such Allowed amount will not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or other challenges under any applicable law or regulation by any Person (except to the extent provided in the PSA with respect to releases to be delivered by the Mezz Lender after the Effective Date in favor of D. Chae and M. Chae).

(j)    *Treatment*:  In final settlement of such Mezz Lender Secured Claim against 3100, on or as soon as practicable after the Effective Date, the holder of the Allowed Mezz Lender Secured Claim will receive Plan Cash under the Plan in an amount equal to the full Allowed amount of such Claim. Furthermore, upon the payment of the Allowed amount of the Mezz Lender Secured Claim in full as provided in the Plan, any and all Liens asserted by the Mezz Lender will be deemed fully and completely released and terminated, and the Mezz Lender

thereafter will deliver any customary documents to effectuate such release and termination of record.

(k)     *Voting*:  Class 2 is Unimpaired, and the holder of the Mezz Lender Secured Claim against 3100 is conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. The holder of the Mezz Lender Secured Claim is therefore not entitled to vote to accept or reject the Plan, and the vote of such holder will not be solicited with respect to such Claim.

2.3     **Other Secured Claims (Class 3).**

(l)     *Classification*:  Class 3 consists of the Other Secured Claims against 3100. To the extent that Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims will be treated as separate subclasses of Class 3 for purposes of voting to accept or reject the Plan and receiving distributions under the Plan.

(m)     *Treatment*:  Except to the extent that a holder of an Allowed Other Secured Claim against 3100 agrees to different treatment, on the later of the Effective Date and the date on which such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim against 3100 will receive, on account and in full satisfaction of such Allowed Claim, at the sole option of 3100: (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) return of the applicable collateral or the proceeds thereof in satisfaction of the Allowed amount of such Other Secured Claim; or (iii) such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired. As of the date hereof, there are no known Other Secured Claims against 3100.

(n)     *Voting*:  Class 3 is Unimpaired, and holders of Other Secured Claims against 3100 are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Holders of Other Secured Claims against 3100, therefore, are not entitled to vote to accept or reject the Plan.

2.4    **General Unsecured Claims (Class 4).**

(o)    *Classification*:    Class 4 consists of General Unsecured Claims against 3100.

(p)    *Treatment*:    Except to the extent that a holder of an Allowed General Unsecured Claim against 3100 agrees to a less favorable treatment of such Claim, and except to the extent that such Claim has not been satisfied pursuant to Section 4.4 of the Plan, in full and final satisfaction, settlement, and release of such Allowed General Unsecured Claim, at the sole option of 3100: (i) each such holder will receive payment in full in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, or as soon thereafter as is reasonably practicable; or (ii) such holder will receive such other treatment so as to render such holder's Allowed General Unsecured Claim Unimpaired. Other than a $63,582.12 proof of claim filed by Blank Rome LLP in both Chapter 11 Cases, there are no known Claims in this Class. As such Claim appears to be a duplicate of the Claim filed in Plamex's Chapter 11 case, and assuming that it is Allowed, it should be satisfied in full pursuant to Section 4.4(b) of the Plan, and, accordingly, no distribution is expected for this Class.

(q)    *Voting*:    Class 4 is Unimpaired, and holders of General Unsecured Claims against 3100 are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Holders of General Unsecured Claims against 3100, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such General Unsecured Claim.

2.5    **Interests (Class 5).**

(r)    *Classification*:    Class 5 consists of the sole member interest of Placo in 3100.

(s)    *Treatment*:    Subject to the provisions of Section 6.2(b) of the Plan, and on and after the Effective Date, all net Plan Cash proceeds of Plamex's Assets that 3100 is entitled to receive pursuant to the provisions of the Plan that are remaining after the satisfaction of all Allowed Claims in 3100 Classes 1-4, as well as any net receivables owing by Placo to Plamex

previously distributed to 3100 pursuant to Section 4.5 of the Plan, will be deemed distributed to Placo on account of Placo's equity interest in 3100. In order to facilitate the satisfaction of the direct and indirect interests in Placo pursuant to contractual and legal priorities, the Plan recognizes and allows WF I105's Preferred Equity Redemption Amount in its full amount,[4] the actual amount of which to be updated in accordance with the definition of Preferred Equity Redemption Amount and to be set forth in the Confirmation Order, and, accordingly, all such Plan Cash amounts deemed distributed on account of Placo's equity interest in 3100 will be first paid directly to WF I105 on account of its Placo Preferred Interest until WF I105's Preferred Equity Redemption Amount, after taking into account the application of all Placo Preferred Interest Reserves as of the Effective Date[5], is fully satisfied or all Plan Cash fully, ultimately, and finally has been distributed. Specifically, on the Effective Date, (i) all Placo Preferred Interest Reserves will be distributed to WF I105 for immediate application toward and in reduction of its Preferred Equity Redemption Amount, and (ii) all Effective Date Cash that remains after the payment in full of all Claims against Plamex then Allowed, the establishment and funding of the Senior Lender Cash Collateral Account, the establishment of the Claim Reserves, and the payment in full of all Allowed Claims in 3100 Classes 1-4 will be first paid directly to WF I105 on account of its Placo Preferred Interest until the balance of its Preferred Equity Redemption Amount is fully satisfied. Thereafter, where any portion of WF I105's Preferred Equity Redemption Amount remains unsatisfied, all Post-Effective Date Plan Cash, as and when realized, will be first paid directly to WF I105 until its Preferred Equity Redemption Amount has been fully satisfied or all Plan Cash fully, ultimately, and finally has been distributed. Upon the earlier of the payment in full of the Preferred Equity Redemption Amount and the full, ultimate,

---

[4] As of November 30, 2021, the total amount due and owing to WF I105 on account of its Preferred Equity Redemption Amount was no less than $40,601,856.89, consisting of $18,000,000.00 in outstanding principal, $6,643,238.25 in accrued interest at the contract rate, $1,997,489.64 in accrued default interest, $13,959,000.00 in yield maintenance premiums, $1,000.00 in lien release and assignment fees, and $1,129.00 in miscellaneous fees, plus legal fees and expenses and other out-of-pocket expenses and such additional amounts, including interest at the contract and default rates, accruing or arising under the applicable agreements during the period after November 30, 2021.

[5] As of December 24, 2021, the Placo Preferred Interest Reserves totaled $6,587,113.43.

and final distribution to WF I105 of all residual Post-Effective Date Cash, the Preferred Equity Redemption Amount will be deemed satisfied, the Placo Preferred Equity Interest will be deemed redeemed, and WF I105 thereafter will execute and deliver any customary documents to acknowledge such deemed satisfaction and redemption. Thereafter, any remaining funds held by the Post-Effective Date 3100 will be distributed pursuant to Section 5.6 of the Plan.

(t)     *Voting:* Class 5 is Impaired, and the holders of the Class 5 Interests are entitled to vote to accept or reject the Plan. In connection with WF I105's contractual rights with respect to its Placo Preferred Interest, WF I105, rather than Placo, will be entitled to vote to accept or reject the Plan, and its vote, rather than Placo's, will be solicited.

**2.6     Debtor Affiliate Claims (Class 6).**

(u)     *Classification*:  Class 6 consists of the Debtor Affiliate Claims.

(v)     *Treatment*:  Holders of Debtor Affiliate Claims will not be entitled to any payment, and such claims will be suspended and subordinated, until WF I105's Preferred Equity Redemption Amount has been paid in full or WF I105's Placo Preferred Interest otherwise has been redeemed, all in full accordance with the provisions of Section 5.5(b) of the Plan. Thereafter, subject to the payment or provision for payment of any actual or anticipated Wind Down expenses set forth in Section 6.3 of the Plan, any Cash or other property (including the Retained Accounts Receivable) held by the Post Effective Debtors will be distributed to the Debtor Affiliate Representative and applied to the Debtor Affiliate Claims and the remaining equity interests in Placo as the Debtor Affiliates may agree to among themselves.

(w)     *Voting:* Class 6 is impaired, and the holders of the Debtor Affiliate Claims are entitled to vote to accept or reject the Plan.

## IV.    MEANS FOR EFFECTUATING AND IMPLEMENTATION OF THE PLAN

Article VI of the Plan contains the terms of the means for implementation for the Plan. The salient terms include the following.

1.     **The Sale Transaction; Allocation and Distribution of Sale Proceeds and Other Cash of the Estates.**

(a)     Unless the Purchaser has elected to close the Sale Transaction independently of the confirmation of the Plan as expressly permitted pursuant to the Bidding Procedures Order and the Bidding Procedures and the Sale Transaction has been so fully consummated prior to such date, on the Effective Date, and in accordance with the Plan and the Purchase Agreement, and subject to the satisfaction or waiver of all applicable conditions thereof, including that the Sale Order and the Confirmation Order will have been entered and will have become Final Orders (unless such finality requirement will have been waived by the Purchaser), Plamex will sell the Property to the Purchaser pursuant to the provisions of the Purchase Agreement.

(b)     The term "Plan Cash" means the sum of (i) the aggregate amount of Cash on hand in the Estates on the Effective Date (the "Existing Cash"), including the aggregate amount then on deposit in the Existing Senior Lender Reserve Accounts, but excluding any Sale Proceeds, (ii) the aggregate amount of Cash ultimately received by Plamex from the Sale Transaction (the "Sale Proceeds"), and (iii) the aggregate amount of Cash received by Post-Effective Date Plamex or Post-Effective Date 3100 E. Imperial after the Effective Date relating to pre-Effective Date operations or from any other sources (other than from any Retained Accounts Receivable). So long as Plan Cash will be (x) strictly distributed in accordance with the provisions of the Plan and (y) sufficient to satisfy all Allowed Claims against Plamex in full, to satisfy all Allowed Claims in 3100 Classes 1-4 in full, and to provide for a Cash distribution in 3100 Class 5 to WF I105 on account of its Preferred Equity Redemption Account, the Plan Cash will be the sole source of distributions under the Plan (other than solely as provided in Section 5.6(b) of the Plan with respect to the Debtor Affiliate Claims). Without limiting the generality of the foregoing, in such an instance, the Retained Accounts Receivable, which aggregate in excess of $90 million, will not be a source for distributions under the Plan (other than solely as provided in Section 5.6(b) with respect to the Debtor Affiliate Claims).

(c)     On the Effective Date, the Debtors or the Disbursing Agent will use the Existing Cash and the Sale Proceeds actually received by Plamex on or before such date in accordance with the Purchase Agreement (collectively, the "Effective Date Cash") to make the payments provided in Articles II and IV of the Plan and to establish and fund the Senior Loan Cash Collateral Account. On the Effective Date, the Debtors or the Disbursing Agent, as applicable, also will set aside, and not distribute on the Effective Date, Effective Date Cash in an amount equal to the aggregate amount set forth in the Claim Reserves.  Following the making of all of such payments and funding and the establishment of all such reserves, the remaining Effective Date Cash will be distributed or deemed distributed to 3100 as set forth in Section 4.5 of the Plan, for the payment of Claims and Interests set forth in Article V of the Plan.

(d)     Plan Cash that becomes available for distribution after the Effective Date ("Post-Effective Date Plan Cash") will consist of (i) Sale Proceeds received by the Post-Effective Date Plamex after the Effective Date from any escrow or reserve established under the Purchase Agreement, (ii) amounts previously set aside or reserved on the Effective Date that subsequently have been determined as no longer being needed to satisfy any of the Claims for which such amounts were set aside or reserved, and (iii) amounts received by Post-Effective Date Plamex or Post-Effective Date 3100 E. Imperial after the Effective Date relating to pre-Effective Date operations or from any other sources (other than from any Retained Accounts Receivable).  Any Post-Effective Date Plan Cash, as and when received, will be distributed by the Post-Effective Date Debtors or the Disbursing Agent, as applicable, in accordance with provisions of Section 5.5(b) of the Plan until WF I105's Preferred Equity Redemption Amount is fully satisfied and thereafter, in accordance with the provisions of Section 5.6(b) of the Plan. At the request of the Waterfall Parties, the Post-Effective Date Debtors will file periodic reports in the Chapter 11 Cases setting forth the dates any Post-Effective Date Cash was received (or released from a Claim Reserve), the amounts thereof, and the distributions then made therewith.

**2.      Wind Down and Dissolution of the Debtors; Further Transactions.**

(a)     Upon the occurrence of either (1) the payment in full to WF I105 of the Preferred Equity Redemption Amount or (2) the deemed redemption of WF I105's Placo

Preferred Interest, all in accordance with the provisions of Section 5.5(b), the Post-Effective Debtors may take (but will not be required to take) any and all actions that are necessary or appropriate to effectuate the Wind Down of the Post-Effective Debtors. The applicable Post-Effective Date Debtor may act through any manager, managing member, board of managers, board of directors, or equivalent governing body, as applicable, and through officers, subject to the provisions of the Plan (and all certificates of formation and limited liability company agreements and certificates of incorporation or by-laws, or equivalent governing documents and all other related documents (including membership agreements, stockholders agreements, or similar instruments), as applicable, are deemed amended pursuant to the Plan to permit and authorize the same). The applicable Post-Effective Date Debtor may not be compensated and may be reimbursed for reasonable costs and expenses only to the extent of available funds following payment of the Preferred Equity Redemption Amount.

(b)      The Post-Effective Debtors, without the need for Bankruptcy Court approval, are authorized to carry out and implement all provisions of the Plan, including, without limitation, to: (i) implement the Wind Down as expeditiously as reasonably possible and administer the liquidation, dissolution, sale, and/or abandonment or similar action of the Debtors and their Estates and any Assets held by the Post-Effective Debtors after the Effective Date; (ii) except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process in conjunction and consultation with the Waterfall Parties, including to object to, seek to subordinate, compromise, or settle any and all Disputed Claims against the Debtors, each subject to the consent rights provided for in the Plan; (iii) make distributions to holders of Allowed Claims in accordance with the Plan; (iv) prosecute the Avoidance Actions and all other Causes of Action on behalf of Post-Effective Debtors (but only against Persons without Allowed Claims against either Estate), elect not to pursue any Avoidance Actions and Causes of Action, consent to derivative standing to the Waterfall Parties in connection with, any and all Avoidance Actions and all other Causes of Action and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Avoidance Actions and Causes of Action, as determined to be in the best interests of each of the Post-Effective Debtors;

(v) create and fund, as necessary, any reserves required under the Plan, including for Disputed Claims and other such reserves as the Post-Effective Date Debtors (subject to the consent of the Waterfall Parties) deem necessary and appropriate to carry out the provisions of the Plan; (vi) retain and compensate professionals to assist in performing its duties under the Plan; (vii) maintain the books, records, and accounts of the Debtors; (viii) complete and file, as necessary, all final or otherwise required federal, state, and local tax returns and other tax reports for the Debtors or the Post-Effective Debtors; (ix) represent the interests of the applicable Debtors, their Estates, or the Post-Effective Debtors before any taxing authority in all matters including, without limitations, any action, suit, proceeding, appeal, or audit; and (x) appoint and compensate an agent to effectuate distributions under the Plan; and (xi) perform other duties and functions that are consistent with the implementation of the Plan or required by the Bankruptcy Code.

(c)    The Post-Effective Date Debtors will pay any and all reasonable and documented costs and expenses incurred in connection with the Wind Down of the Post-Effective Debtors, including the reasonable fees and expenses of their professionals, without further order of the Bankruptcy Court, provided that either the Preferred Equity Redemption Amount will have been paid in full or the distribution or depletion of all assets and potential assets available for distribution pursuant to the Plan (other than funds remaining Post-Effective Date Expense Reserve) will have been completed prior to the incurrence of any such expenses.

(d)    Subject to Section 7.3 of the Plan, the Debtors or the Disbursing Agent will make an initial distribution on the Effective Date and thereafter, the Post-Effective Date Debtors or the Disbursing Agent will, in an expeditious but orderly manner, make timely distributions pursuant to the Plan and the Confirmation Order.

(e)    All matters provided for in the Plan involving the corporate structure of the Debtors, or the Post-Effective Debtors, to the extent applicable, or any corporate or related action required by the Debtors or the Post-Effective Debtors in connection herewith will be deemed to have occurred and will be in effect, without any requirement of further action by the stockholders, members, or directors or managers of the Debtors or the Post-Effective Debtors, and with like effect as though such action had been taken unanimously by the stockholders, members, directors,

managers, or officers, as applicable, of the Debtors or Post-Effective Debtors. Subject to Section 6.3(a) of the Plan, the Post-Effective Date Debtors will be authorized to file on behalf of the Debtors, certificates of dissolution and any and all other corporate and company documents necessary to effectuate the Wind Down of the Post-Effective Debtors without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, the board of directors, or board of directors or similar governing body of the Post-Effective Debtors.

(f)      All directors and officers of the Debtors will be deemed to remain in such capacities unless they have resigned or otherwise have ceased being officers and directors.

(g)      Upon the Effective Date, all actions contemplated by the Plan (whether to occur before, on, or after the Effective Date) will be deemed authorized and approved in all respects, in each case, in accordance with and subject to the terms hereof. All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors and the Post-Effective Debtors, and any corporate or limited liability company action required by the Debtors or the Post-Effective Debtors, in connection with the Plan will be deemed to have occurred and will be in effect, without any requirement of further action by the directors, managers, or officers of the Debtors or the Post-Effective Debtors. On or (as applicable) before the Effective Date, the authorized officers of the Debtors or the Post-Effective Debtors, as applicable, will be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Post-Effective Debtors, including, but not limited to, any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by Section 6.3 of the Plan will be effective notwithstanding any requirements under non-bankruptcy law.

(h)      On or as soon as practicable after the Effective Date, the Post-Effective Date Debtors may take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, subject in all respects to the provisions of the Plan, and the rights vested in the Waterfall Parties

and the Purchaser, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, transition services, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law or to reincorporate in another jurisdiction.

      **3.**      **<u>Distributions; Disbursing Agent.</u>**    Article VII of the Plan contains extensive terms governing distributions under the Plan. The Disbursing Agent, the Debtors, or the Post-Effective Date Debtors will make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan. At the election of the Debtors or the Post-Effective Date Debtors, all distributions under the Plan will be made by the Disbursing Agent on and after the Effective Date as provided in the Plan. The Disbursing Agent will not be required to give any bond or surety or other security for the performance of its duties. The Debtors or the Post-Effective Date Debtors, as applicable, will use all commercially reasonable efforts to provide the Disbursing Agent with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the applicable Debtor's books and records. The Debtors or the Post-Effective Date Debtors, as applicable, will cooperate in good faith with the applicable Disbursing Agent to comply with the reporting and withholding requirements outlined in Section 7.18 of the Plan. The rights and powers of the Disbursing Agent are further described in Section 7.5 of the Plan.  It is expected that the Debtors' bankruptcy counsel, LNBYG, will serve as the Disbursing Agent which LNBYG will do without charging any separate commission which LNBYG frequently does as an accommodation to its clients when

LNBYG serves as bankruptcy counsel to the chapter 11 debtor.

**4.** **Delivery of Distributions.** Subject to Bankruptcy Rule 9010, all distributions to any holder or permitted designee, as applicable, of an Allowed Claim or Interest will be made to the Disbursing Agent, if any, who will transmit such distribution to the applicable holders or permitted designees of Allowed Claims or Interests on behalf of the Debtors. In the event that any distribution to any holder or permitted designee is returned as undeliverable, no further distributions will be made to such holder or such permitted designee unless and until the Disbursing Agent is notified in writing of such holder's or permitted designee's, as applicable, then-current address, at which time all currently due, missed distributions will be made to such holder as soon as reasonably practicable thereafter without interest. Nothing in the Plan will require the Disbursing Agent to attempt to locate holders or permitted designees, as applicable, of undeliverable distributions and, if located, assist such holders or permitted designees, as applicable, in complying with Section 7.14 of the Plan.

**5.** **Procedures for Disputed Claims, Estimate of Claims, Claims Reserves, Etc.** Article VIII of the Plan contains extensive terms governing the procedures for any Disputed Claim, including the resolution and distribution on any Disputed Claim. Generally, the Debtors are required to consult with the Waterfall Parties with respect to any Disputed Claim in connection with the estimation, settlement of, and/or prosecution of objections to any such Disputed Claims, and will obtain the prior written consent from the Waterfall Parties prior to estimating or settling any such Disputed Claims (with such consent not to be unreasonably withheld). Notwithstanding anything to the contrary in the Plan or in the Bankruptcy Code, the Debtors will consent to, and agree not to oppose or dispute, the rights of the Waterfall Parties to be heard in connection with, intervene in, or be granted standing to prosecute, any estimation or objection to such Disputed Claims.

Without limiting the generality of the foregoing, Section 8.6(c) of the Plan sets forth detailed procedures regarding the identification and estimation of Claims that have not been Allowed as of the Effective Date and the intended establishment of sufficient Reserves therefor in connection with the determination of distributions to be made and the other transactions to be

consummated in connection with the substantial consummation of the Plan and the occurrence of the Effective Date. ***All creditors and parties in interest are encouraged to review carefully such Section 8.6(c), as well as all of Article X of the Plan, in order to fully understand their rights and the manner in which the Plan is intended to be implemented.***

**6.**    **Objections to Claims**.    Only the Post-Effective Date Debtors or any Waterfall Party will be entitled to object to Claims as of the Effective Date. Except with respect to any Claim that is Allowed pursuant to the Plan, as of the Effective Date, the applicable Post-Effective Date Debtor will have and retain any and all rights and defenses that the applicable Debtor had with regard to any Claim to which they may object, and any Waterfall Party may assert any such rights and defenses in connection with any Claim to which they may object. Any objections to proofs of Claim will be served and filed on or before the later of (a) one hundred and twenty (120) days after the Effective Date, and (b) on such other date as ordered by the Bankruptcy Court for cause.

**7.**    **Exemption from Transfer Taxes**.    Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of the Bankruptcy Code, may not be taxed under any law imposing a stamp tax or similar tax. Transfers under the Plan that are exempt from taxes under section 1146(a) of the Bankruptcy Code include all transfers by the Debtors after the commencement of their cases and prior to the Effective Date, and all transfers to and by the Debtors as contemplated by the Plan, including all payments made to claim holders in accordance with the terms of the Plan. The taxes from which such transfers are exempt include stamp taxes, recording taxes, sales and use taxes, transfer taxes, and other similar taxes.

**8.**    **Injunction**.

(a)    Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, will be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim resolved, extinguished, discharged, or released pursuant to the Plan; provided, however, the foregoing will

not enjoin or prevent any party from taking any action to enforce any rights or obligations granted pursuant to the Plan.

(b)     Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Post-Effective Date Debtors (after consultation with the Waterfall Parties) and a holder of a Claim against or Interest in the Debtors, all Persons who have held, hold, or may hold Claims against or Interests in the Debtors (whether or not proof of such Claims or Interests has been filed and whether or not such Persons vote in favor of or against, or abstain from voting on, the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties-in-interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action against the Debtors that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting the Debtors or the Post-Effective Debtors, or the property of any of the Debtors or the Post-Effective Debtors; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors or the Post-Effective Debtors, or the property of any of the Debtors or the Post-Effective Debtors; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors or the Post-Effective Debtors, or the property of any of the Debtors or the Post-Effective Debtors; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtors or the Post-Effective Debtors, or against property or interests in property of either of the Debtors or the Post-Effective Debtors, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

(c)     By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in Section 11.4 of the Plan.

(d)     The injunctions in Section 11.4 of the Plan will extend to any successors of the Debtors (including the Post-Effective Debtors) and their respective property and interests in property.

Notwithstanding the foregoing injunctions, the Senior Lender, on the one hand, and the Waterfall Parties, on the other hand, retain all of their respective rights under (a) the intercreditor agreement between the Senior Lender and the Mezzanine Lender and/or (b) applicable law.

**9.     Effective Date Releases**.

(a)     Estate Releases.  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce (i) the Plan, (ii) the Definitive Documents, (iii) the PSA, and (iv) the Retained Causes of Action, for good and valuable consideration, including, without limitation, the services rendered by the Released Parties to facilitate the implementation of the Plan, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties will be deemed released and discharged, to the maximum extent permitted by law, by the Debtors and their Estates, and the Post-Effective Debtors, in each case, on behalf of themselves and their respective successors, assigns, and representatives, solely in their capacities as such, and any and all other persons to the extent that they may purport to assert any Cause of Action derivatively, by, through or on behalf of the foregoing Persons or Entities, from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown (including whether disclosed, sealed, or hidden or foreseen or unforeseen), existing or hereinafter arising, in law, equity, or otherwise, that

the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the pre- and postpetition marketing and sale process, the purchase, sale, or rescission of the purchase or sale of any security or Asset of the Debtors, the Sale Transaction, the Purchase Agreement, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, this Disclosure Statement, the PSA, the Plan (including any Plan Supplement), the Sale Documents, the documents and instruments evidencing the Senior Lender Mortgage Claim, the documents and instruments evidencing the Mezz Lender Secured Claim, the documents and instruments evidencing the Placo Preferred Interest, the Cash Collateral Orders, and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, in all of the foregoing cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, however, that, in the case of the release of the Senior Lender and its Related Parties, such release does not include a release of, and will remain subject to, the rights of the Debtors, D. Chae, the Waterfall Parties, and/or any other parties-in-interest to contest the Senior Lender Disputed Amount pursuant to the procedures set forth in the Plan or in the D. Chae bankruptcy case. The Debtors, their Estates, and the Post-Effective Debtors will be permanently enjoined from prosecuting any of the foregoing Claims or Causes of Action released under Section 11.5(a) of the Plan against any and each of the Released Parties.

(b)    Releases in Favor of the Waterfall and Senior Lender Parties.  Upon and as of the Effective Date of the Plan, the Debtors and their Affiliates (excluding D. Chae and M. Chae) will execute and deliver full releases in favor of Senior Lender and its Related Parties and of the Waterfall Parties, in form and substance satisfactory to Senior Lender and the Waterfall Parties, as applicable, for any claim of any nature whatsoever, whether, known or unknown, relating in any manner whatsoever to any of the releasors and their property arising during or relating to the period on and before such Effective Date, subject, in the case of the release of

Senior Lender and its Related Parties, only to the ability of the Debtors, D. Chae, the Waterfall Parties, and for any other party-in-interest to contest the allowed amount of the Senior Lender Mortgage Claim pursuant to the procedures set forth in the Plan or in the D. Chae bankruptcy case.

**10.**    **Exculpation**.

To the maximum extent permitted by applicable law, as set forth in the Plan, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any conduct occurring on or after the Petition Date in connection with or arising out of the filing and administration of the Chapter 11 Cases, the postpetition marketing and sale process, the purchase, sale, or rescission of the purchase or sale of any security or Asset of the Debtors; the negotiation and pursuit of the Cash Collateral Orders, this Disclosure Statement, the PSA, the Purchase Agreement, the Sale Transaction, including the formulation, negotiation, preparation, dissemination, implementation, administration, confirmation, and consummation thereof, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the Cash Collateral Orders; the administration of the Plan or the property to be distributed under the Plan; or the transactions in furtherance of any of the foregoing; except for acts or omissions of an Exculpated Party that constitute gross negligence, fraud, or willful misconduct, as determined by a Final Order. This exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

**11.**    **Executory Contracts and Unexpired Leases.**    Article IX of the Plan contains extensive terms governing executory contracts and unexpired leases, aspects of which are outlined below.  Additionally, the Bidding Procedures Order sets forth detailed procedures concerning the assumption and assignment of executory contracts.  The executory contracts are expected to consist primarily of vendor and service-provider agreements relating to the operations of the Plaza Mexico Shopping Center.  The unexpired leases are expected to consist primarily of Tenant

Leases, *i.e.*, leases for retail and other units in the Plaza Mexico Shopping Center.  It is anticipated that all or nearly all executory contracts and unexpired leases will be assumed by the Debtor and assigned to the Purchaser in accordance with the Bidding Procedures Order.  Any cure obligations with respect to such assumption and assignment will be paid by the Debtors upon the effectiveness of the Plan as administrative expense claims.  Any damages arising from the rejection of the executory contracts and unexpired leases will be dealt with pursuant to Section 9.3 of the Plan.  Additionally, the Plan provides as follows:

(a)     Unless otherwise assumed and assigned pursuant to a Sale Order separate from the Confirmation Order, on the Effective Date, all Tenant Leases timely designated by the Purchaser will be assumed by Plamex and assigned to the Purchaser in accordance with the Purchase Agreement.  Any and all security deposits held on account of the tenants of the Property will be treated as set forth in the Purchase Agreement. Unless otherwise assumed and assigned pursuant to a Sale Order separate from the Confirmation Order, on the Effective Date, all Assumed Contracts will be assumed by Plamex and assigned to the Purchaser in accordance with the Purchase Agreement. On the Effective Date, the Property Management Agreement will be deemed terminated pursuant to the express terms thereof, and Greenland Property Management will have no claim against the Debtors arising from such termination except as a subordinated Debtor Affiliate Claim treated in Class 6 of the Plan. As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any Debtor is a party will be deemed rejected, unless such contract or lease (i) was previously assumed or rejected by such Debtor pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by such Debtor on or before the Confirmation Date; (iv) is identified in Section 9.4 of the Plan; (v) is a Tenant Lease; or (vi) is an Assumed Contract.

(b)     Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of the assumption, assumption and assignment, or rejection provided for in the Plan pursuant to Sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Post-Effective Debtors

have provided adequate assurance of future performance under such assumed executory contracts and unexpired leases. Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan will vest in and be fully enforceable by the Post-Effective Debtors or the Purchaser, as applicable, in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

12.    **Retention of Jurisdiction.**    On and after the Effective Date, the Bankruptcy Court will retain non-exclusive jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases, including Assumption Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)    to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan, including cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely paid;

(d)    to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(e)    to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the

consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)    to hear and determine any application to modify the Plan in accordance with Section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)    to hear and determine all Fee Claims;

(i)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Purchase Agreement, the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)    to hear and determine disputes arising in connection with the Sale Transaction or any agreement, instrument, or other document governing or relating thereto;

(k)    to hear and determine disputes arising in connection with the PSA, or any agreement, instrument, or other document governing or relating to the PSA;

(l)    to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(m)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)    to hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code (including any Disputed Claims for taxes or requests for expedited determinations under Section 505(b) of the Bankruptcy Code);

(o)     to hear, adjudicate, decide, or resolve any and all matters related to Article XI of the Plan, including, without limitation, the releases, exculpations, and injunctions issued thereunder;

(p)     to resolve disputes concerning Disputed Claims or the administration thereof;

(q)     to hear and determine any other matters related to the Plan and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(r)     to enter one or more final decrees closing the Chapter 11 Cases;

(s)     to recover all Assets of the Debtors and property of the Debtors' Estates, wherever located;

(t)     to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, this Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, or any bar date established in the Chapter 11 Cases, or any deadline for responding or objection to a Cure Amount, in each case, for any purpose;

(u)     to hear and determine all disputes relating to the Wind Down;

(v)     to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory, including, without limitation, Avoidance Actions; and

(w)     to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in Sections 502 or 503 of the Bankruptcy Code, other than defenses or limits that are asserted under non-bankruptcy law pursuant to Section 502(b)(1) of the Bankruptcy Code.

## V.    TAX CONSEQUENCES OF THE PLAN

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN

1   MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN

2   ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS. The following disclosure of possible

3   federal income tax consequences is intended solely for the purpose of alerting creditors and interest

4   holders about possible federal income tax issues the Plan may present to these estates. The Debtors

5   CANNOT and DO NOT represent that the tax consequences contained below are the only tax

6   consequences of the Plan because the Tax Code embodies many complicated rules which make it

7   difficult to state completely and accurately all of the tax implications of any action. The Debtors are

8   unaware of whether the confirmation of the Plan will have any positive or negative tax impact upon

9   any creditors or equity holders of the Debtors.

10        The federal income tax consequences to the Debtors' estates resulting from the confirmation

11  of the Plan will depend on whether the sale and transfer of the Property results in any tax

12  ramifications to the estates. If it does then that would constitute an administrative tax claim that will

13  have to be paid. The Debtors are disregarded entities, and, thus, not taxed; however, the Debtors

14  have not done any analysis as to whether it will have no tax consequences.

15        The confirmation of the Plan and the sale of the Property may also result in the cancellation

16  of debt income for federal income tax purposes. If the estates incur cancellation of debt income,

17  such income may qualify for the bankruptcy cancellation of debt exclusion under the cancellation of

18  debt rules under IRC Section 108(a)(1)(A). There also may be prior tax losses that could be reduced

19  or lost as a result of the confirmation of the Plan. The Debtors have not performed any analysis of

20  the extent to which, if any, the confirmation of the Plan may have on the retention or loss of net

21  operating losses and current losses or ability of the Debtors or any other party to use such losses in

22  the future.

23        The Debtors make no representations regarding the potential tax consequences to creditors

24  or interest holders from the confirmation of or implementation of the Plan. All creditors and all

25  interest holders are encouraged to do their own tax analysis and their own tax planning and to

26  consult with their own tax professionals and advisors. In particular, the Debtors have not done any

27  tax analysis on whether the sale of the Property and/or confirmation of the Plan will have any

28  negative tax consequences on any equity holders of the Debtors or on any equity holders of any

equity holders of the Debtors. All such people and entities are responsible for performing their own tax analysis. This is particularly important given that the Debtors are expecting that all holders of Allowed Claims will likely be paid in full.

## VI.    CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF LIQUIDATION IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims. The Debtors CANNOT and DO NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm a plan. Some of the requirements include whether the plan has been proposed in good faith, whether the plan has been accepted, whether the plan pays creditors at least as much as creditors would receive in a chapter 7 liquidation, and whether the plan is feasible. These requirements are <u>not</u> the only requirements for confirmation.

### A.    <u>Who May Vote or Object</u>.

Any party in interest may object to the confirmation of the Plan, but, as explained below, not everyone is entitled to vote to accept or reject the Plan.

### B.    <u>Who May Vote to Accept/Reject the Plan</u>.

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim or interest which is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

### C.    <u>What Is an Allowed Claim/Interest</u>.

As noted above, a creditor or interest holder must first have an <u>allowed claim or interest</u> to have the right to vote. Generally, any proof of claim or interest will be allowed, unless a party in interest files an objection to the claim or interest. When an objection to a claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the Court, after

notice and hearing, either overrules the objection or allows the claim or interest for voting purposes.

THE GENERAL BAR DATE FOR FILING A PROOF OF CLAIM IN THESE CASES WAS AUGUST 20, 2021, WITH JANUARY 7, 2022 AS THE BAR DATE FOR THOSE CREDITORS AND PARTIES IN INTEREST WHO WERE NOT INCLUDED IN PLAMEX'S MASTER MAILING LIST.

A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest was not timely filed. A claim is deemed allowed if (1) it is scheduled on the bankruptcy schedules that the Debtors filed and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim. An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest. However, as indicated above, the Debtors are in the process of reviewing the filed claims and may be filing objections to any disputed claims. Other parties in interest also have standing to file objections to any disputed claims.

**D.    What Is an Impaired Claim/Interest.**

As noted above, an allowed claim or interest has the right to vote only if it is in a class that is _impaired_ under the Plan. A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class. For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that class 100% of what they are owed.

Parties who dispute the Debtors' characterization of their claim or interest as being impaired or unimpaired may file an objection to the Plan contending that the Debtors has incorrectly characterized the class.

**E.    Who Is Not Entitled to Vote.**

The following four types of claims are _not_ entitled to vote:  (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(2), (a)(3), and (a)(8); and (4) claims in classes that do not receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to

Bankruptcy Code Sections 507(a)(2), (a)(3), and (a)(8) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Bankruptcy Code. Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan. EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

As indicated above and in the Plan, the Debtors have characterized all classes in the Plamex case as being unimpaired under the Plan, and the Debtors have characterized all classes in the 3100 case as being unimpaired other than class 5 (Interests) and class 6 (Affiliate Claims).

**F.**    **Who Can Vote in More Than One Class.**

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject the Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

**G.**    **Votes Necessary to Confirm the Plan.**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting classes, as discussed below.

**H.**    **Votes Necessary for a Class to Accept the Plan.**

A class of claims is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the claims which actually voted on the plan, voted in favor of the plan. A class of interests is considered to have "accepted" a plan when at least two-thirds (2/3) in amount of the interest-holders of such class which actually voted on the plan, voted to accept the plan.

**I.**    **Treatment of Non-Accepting Classes.**

As noted above, even if _all_ impaired classes do not accept the Plan, the Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner required by the Bankruptcy Code. The process by which non-accepting classes are forced to be bound by the

terms of a plan is commonly referred to as "cramdown." The Bankruptcy Code allows the Plan to be "crammed down" on non-accepting classes of claims or interests if it meets all consensual requirements except the voting requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

**J.     Request for Confirmation Despite Nonacceptance By Impaired Class(es).**

The Debtors will ask the Court to confirm the Plan by cramdown on any and all impaired classes that do not vote to accept the Plan. **The Debtors will also request the Court to treat any creditor who does not timely vote on the Plan to be deemed to have accepted the Plan**.

**K.     Liquidation Analysis.**

Another confirmation requirement is the "Best Interest Test", which requires a liquidation analysis. Under the Best Interest Test, if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the assets of the Debtors' estates were liquidated under chapter 7 of the Bankruptcy Code.

In a chapter 7 case, the assets of the bankruptcy estate are usually liquidated by a chapter 7 Trustee. Secured creditors are paid first from the sales proceeds of properties subject to their lien. Administrative claims are paid next. Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims. Finally, interest holders receive the balance that remains after all creditors are paid, if any.

For the Court to be able to confirm the Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a chapter 7 liquidation of the Debtors' estates. Other than the Retained Accounts Receivable, the only meaningful asset of the Plamex estate is the Property. 3100 has no assets other than its membership interests in Plamex.

The Best Interest Test does not apply to the Plamex case (except to the extent that Class 6 of the 3100 plan contains Affiliate Claims owed by Plamex) because there are no impaired classes in the Plamex case. There are no impaired classes with respect to 3100 other than Classes 5 and 6. Accordingly, the Best Interest Test therefore applies only to class 5 (Interests) and class 6 (Affiliate Claims) in the 3100 case. The Waterfall Parties control the voting rights of the requisite percentage of the class 5 Interests to cause class 5 to vote to accept the Plan; so, the Best Interest Test will not apply to the 3100 case. It is the Debtors' understanding that the parties who control the Affiliate Claims have agreed to their treatment under the Plan. Even had that not been the case, it is the position of the Debtors that the holders of the Affiliate Claims will not receive less under the Plan than they would receive in a chapter 7 liquidation of either Debtor because, among other things, in a Chapter 7 liquidation, the Chapter 7 trustee would be entitled to pursue the collection of the Retained Accounts Receivable and, pending such collection, the pertinent Affiliates would not be entitled pursuant to Section 502(d) of the Bankruptcy Code to the allowance (or any distributions on account) of their Claims against the Debtors pending the payment in full by them to the Debtors of the Retained Accounts Receivable. In addition, and with respect to the Debtor Affiliate(s) who or that hold the direct and indirect equity interests in the Debtors, including D. Chae, the Plan actually will provide more than a Chapter 7 liquidation of 3100 as, per the terms of the operative documents, WF I105, in a Chapter 7 liquidation of the Debtors, would be entitled to receive all net proceeds of any Retained Accounts Receivable distributable on account of Placo's equity interest in 3100 until it will have received payment of its Preferred Equity Redemption Account in full. In contrast, under the PSA, and so long as the provisions of Section 6.2(b) of the Plan are satisfied, WF I105 has agreed not to have any recourse to the proceeds of the Retained Accounts Receivable for satisfaction of its Preferred Equity Redemption Amount, thus leaving the proceeds of the Retained Accounts Receivable ultimately available to the direct and indirect interest holders in Placo other than WF I105.

**L.** **Feasibility.**

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further

financial liquidation unless liquidation is the contemplation of the Plan in the first place.

There are at least two important aspects of a feasibility analysis. The first aspect considers whether the Debtors will have enough cash on hand on the Effective Date to pay all the claims and expenses that are entitled to be paid on such date. Under the Plan, one of two things will happen. One is that the buyer of the Property elects to consummate its purchase of the Property outside the context of the Plan in which case the Plan will effectively be the vehicle by which the sale proceeds will be distributed. The other is that buyer of the Property elects to consummate its purchase of the Property pursuant to and in accordance with Plan confirmation which is what the Waterfall Parties have advised would be the case if the Waterfall Parties are the ultimate buyer of the Property. In either instance, between the proceeds from the sale of the Property and the Debtors' substantial cash on hand, the Debtors will clearly have a sufficient amount of cash on the Effective Date to pay all the claims and expenses that are entitled to be paid on or near the Effective Date.

Following the Debtors' execution of an NDA, the Waterfall Parties provided the Debtors in confidence with, among other documents, all of the following: (1) an audited financial statement dated as of December 31, 2020 prepared by the accounting firm of Grant Thornton for an entity known as LMAP 904 Limited that the Waterfall Parties have advised the Debtors is an investment management client whose funds are available to use to fund any purchase of the Property by the SH Bidder; (2) a financial statement dated as of December 31, 2020 prepared as an Independent Auditor's Report by the accounting firm of Deloitte for an entity known as Waterfall Eden Master Fund, Ltd. that the Waterfall Parties have advised the Debtors is an investment management client whose funds are available to use to fund any purchase of the Property by the SH Bidder; (3) a financial statement dated as of December 31, 2020 prepared as an Independent Auditor's Report by the accounting firm of Deloitte for an entity known as Waterfall Rock Island, LLC that the Waterfall Parties have advised the Debtors is an investment management client whose funds are available to use to fund any purchase of the Property by the SH Bidder; (4) a financial statement dated as of December 31, 2020 prepared as an Independent Auditor's Report by the accounting firm of Deloitte for an entity known as Waterfall Sandstone

Fund, L.P. that the Waterfall Parties have advised the Debtors is an investment management client whose funds are available to use to fund any purchase of the Property by the SH Bidder; and (5) an annual financial report for the fiscal year ending June 30, 2020 for an entity known as Kentucky Retirement Systems that the Waterfall Parties have advised the Debtors is an investment management client whose funds are available to use to fund any purchase of the Property by the SH Bidder. These documents appear to demonstrate that these entities have sufficient funds to enable the SH Bidder to consummate its purchase of the Property in the event that no qualified overbid is submitted or if the SH Bidder is otherwise deemed to be the winning bidder at the auction if the SH Bidder is in fact authorized to use these funds to fund its purchase of the Property and if no material negative changes have occurred to the financial position of these entities since December 31, 2020, which the Waterfall Entities have advised the Debtors is the case.

The second aspect considers whether there will be enough cash over the life of the Plan to make the required Plan payments. Since this is a plan of liquidation designed to result in the distribution of all funds in the Debtors' estates, and, pending such distribution, to establish Claim Reserves reasonably intended to ensure that such funds will be available as and when any Claims not Allowed as of the Effective Date are finally resolved, this second aspect should, by definition, be satisfied.

**VII. RISK FACTORS REGARDING THE PLAN**

As indicated, there does not appear to be any risk in the funding of the Plan because the Property will be sold to the SH Bidder or a successful overbidder.

**VIII. EFFECT OF CONFIRMATION OF THE PLAN**

**A.** <u>**Discharge**</u>.

Plamex will not receive a discharge under the Plan pursuant to and in accordance with the provisions of Section 1141 of the Bankruptcy Code because the Plan contemplates and will result in a sale or liquidation of all or substantially all of the property of Plamex's estate. 3100 also will not receive a discharge under the Plan for the same reason.

**B.**    **Modification of the Plan.**

Subject to the consent rights of the Waterfall Parties in the PSA, (i) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend, modify, or supplement the Plan (i) prior to the entry of the Confirmation Order, including amendments or modifications to satisfy Section 1129(b) of the Bankruptcy Code, and (ii) after entry of the Confirmation Order, in the manner provided for by Section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to Section 1125 of the Bankruptcy Code. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims or Allowed Interests pursuant to the Plan and subject to the reasonable consent of the Waterfall Parties and the Purchaser, the Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of the PSA and the Plan, and any holder of a Claim or Interest that has accepted the Plan will be deemed to have accepted the Plan as amended, modified, or supplemented.

**C.**    **Post-Confirmation Status Reports.**

Until the Final Decree closing the Debtors' cases is entered, and in addition to any supplemental reporting that the Waterfall Parties may request under the provisions of the Plan, the Post-Effective Date Debtors will file quarterly status reports with the Bankruptcy Court explaining what progress has been made toward consummation of the confirmed Plan.

**D.**    **Post-Confirmation Conversion/Dismissal.**

A creditor or any other party in interest may bring a motion to convert or dismiss the Debtors' cases under Section 1112(b) of the Bankruptcy Code after the Plan is confirmed if there is a default in performing the Plan. If the Bankruptcy Court orders the Debtors' cases converted to chapter 7 after the Plan is confirmed, then all property that had been property of the Debtors' estates, and that has not been disbursed or otherwise transferred pursuant to the Plan, will revest in the chapter 7 estates, and the automatic stay will be reimposed upon the revested property, but only to the extent that relief from stay was not previously authorized by the Bankruptcy Court

during the Debtors' cases. The Plan Confirmation Order may also be revoked under very limited circumstances. The Bankruptcy Court may revoke the Plan Confirmation Order if it was procured by fraud and if a party in interest brings an adversary proceeding to revoke confirmation within 180 days after the entry of the Plan Confirmation Order.

**E.     Final Decree.**

Once the Debtors' estates have been fully administered as referred to in Bankruptcy Rule 3022, the Post-Effective Date Debtors will file a motion with the Bankruptcy Court to obtain entry of the Final Decree to close the Debtors' cases. The Post-Effective Date Debtors will be responsible for the timely payment of all fees incurred pursuant to 28 U.S.C. Section 1930(a)(6).

Presented By:

LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.

By:___*/s/ Ron Bender*_____
         RON BENDER
         MONICA Y. KIM
         JULIET Y. OH
         Attorneys for Chapter 11 Debtors

**PLAMEX INVESTMENT, LLC, as Debtor**

By: /s/_____
Name:
Title:

**3100 E. IMPERIAL INVESTMENT, LLC, as Debtor**

By: /s/_____
Name:
Title:

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **DISCLOSURE STATEMENT DESCRIBING DEBTORS' JOINT CHAPTER 11 PLAN OF LIQUIDATION (DATED JANUARY 27, 2022)** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:   Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **March 14, 2022**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Ron Bender    kjm@lnbyb.com**
- **Ron Bender    rb@lnbyb.com**
- **Alexander S Berk    aberk@mayerbrown.com, courtnotification@mayerbrown.com**
- **Steven Casselberry    s.casselberry@mpglaw.com, j.jacobs@mpglaw.com**
- **Timothy W Evanston    tevanston@swelawfirm.com,**
  **gcruz@swelawfirm.com;lgarrett@swelawfirm.com;jchung@swelawfirm.com**
- **Amir Gamliel    amir-gamliel-9554@ecf.pacerpro.com,**
  **cmallahi@perkinscoie.com;DocketLA@perkinscoie.com**
- **Nancy S Goldenberg    nancy.goldenberg@usdoj.gov**
- **Monica Y Kim    myk@lnbyg.com, myk@ecf.inforuptcy.com**
- **Daniel A Lev    dlev@sulmeyerlaw.com,**
  **ccaldwell@sulmeyerlaw.com;dlev@ecf.inforuptcy.com**
- **Robert S Marticello    Rmarticello@swelawfirm.com,**
  **gcruz@swelawfirm.com;lgarrett@swelawfirm.com;jchung@swelawfirm.com**
- **Kyle J Mathews    kmathews@sheppardmullin.com**
- **Juliet Y. Oh    jyo@lnbyg.com, jyo@lnbyb.com**
- **Robert E Opera    ropera@wghlawyers.com,**
  **jmartinez@wghlawyers.com;mweinberg@wghlawyers.com**
- **Ronald N Richards    ron@ronaldrichards.com, morani@ronaldrichards.com**
- **Jeffrey S Shinbrot    jeffrey@shinbrotfirm.com, sandra@shinbrotfirm.com**
- **United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov**

**2.  SERVED BY UNITED STATES MAIL**: On **March 14, 2022**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service List* continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                        **F 9013-3.1.PROOF.SERVICE**

1    **3.    SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR,

2    on **March 14, 2022**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or

3    email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

4
     *None.*
5

6    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

7
     March 14, 2022        Lourdes Cruz                        /s/ Lourdes Cruz
8    *Date*                        *Type Name*                    *Signature*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                    **F 9013-3.1.PROOF.SERVICE**